**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEAMSHIP TRADE ASSOCIATION OF BALTIMORE – INTERNATIONAL LONGSHOREMEN'S ASSOCIATION PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-cv-08228-JSR CLASS ACTION JURY TRIAL DEMAND |
| Plaintiff, | |
| v. | |
| OLO INC., NOAH GLASS, and PETER BENEVIDES, | |
| Defendants. | |

**PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR**
**<u>VIOLATIONS OF FEDERAL SECURITIES LAWS</u>**

Lead Plaintiff Steamship Trade Association of Baltimore – International Longshoremen's Association Pension Fund ("STA-ILA" or "Plaintiff"), by and through its attorneys, and on behalf of all others similarly situated, alleges the following as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which includes, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings made by Olo Inc. ("Olo" or the "Company"), the Company's Chief Executive Officer ("CEO") Noah H. Glass ("Glass"), and the Company's Chief Financial Officer ("CFO") Peter J. Benevides ("Benevides"), analyst and media reports, conference call transcripts, Company press releases, interviews with former Company employees, and other publicly available information. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein.

## I.    SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities that purchased shares of Olo's Class A common stock ("Olo's common stock") between August 10, 2021 and August 11, 2022, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. §78a, *et seq*. (the "Exchange Act"). This action brings claims against Defendants Olo, CEO Glass, and CFO Benevides, and seeks to recover damages caused by Defendants' violations of the Exchange Act.

2.      Olo, short for "online ordering," is a New York software company that connects individual restaurant locations to consumers directly through mobile and online ordering and/or indirectly through third-party applications, including DoorDash and Uber Eats.

3.      Founded in 2005 by Defendant Glass, on March 17, 2021, Olo rode a wave of popularity for mobile and online restaurant orders driven by the Covid-19 pandemic to commence its initial public offering ("IPO"), raising almost $520 million in gross proceeds. In the Company's

IPO registration statement and prospectus (collectively, the "Offering Documents"), pursuant to which Olo issued its shares to the public, Olo stated that it had "approximately 400 brand customers representing over 64,000 ***active locations*** using our platform," defining "an ***active location*** as a specific restaurant location that has deployed one or more of our modules." [Emphasis added.]

4.     Indeed, after the IPO and continuing into and throughout the Class Period, Defendants continued to stress the number of ***active locations*** the Company had as a marker of growth and success.  For example, in May 2021, on the Company's first earnings call with analysts (but prior to the start of the Class Period), Defendants provided this same definition and stated that ***active locations*** were one of "3 key metrics" that had experienced "positive performance for the first quarter [of 2021]."  Since then, Defendants have repeatedly referred analysts and investors to Olo's "key metrics," spending significant amounts of time on earnings calls discussing the number of Olo's active locations, as well as emphasizing active locations in press releases, presentations, SEC Forms 10-K, 10-Q, and 8-K, and at business conferences.  According to Defendants, the "active location count is an important metric that demonstrates the growth and scale of our overall business and reflects our ability to attract, engage, and monetize our customers and thereby drive revenue, as well as provides a base to expand usage of our modules."

5.     Throughout the Class Period, Defendants claimed that the number of active locations utilizing at least one of Olo's products grew, especially as the Company added new restaurant brand clients to Olo's portfolio of clients.  Significantly, Defendants claimed that when Olo signed a new restaurant brand, all of that brand's locations – whether corporate-owned or franchised – were obligated to adopt Olo's technology and "***always*** go[] live really ***all at the same time*** to create that consistent experience everywhere."  [Emphasis added.]

6.      Indeed, with each passing quarter, the number of active locations noted in Defendants' SEC filings and public statements grew.  For example, in the Company's SEC Form 10-Q for 2Q 2021, issued at the start of the Class Period on August 10, 2021, Defendants stated that Olo retained "over 400 existing brands across approximately 74,000 active locations as of June 30, 2021," a claim Defendants repeated on that day's earnings call.  The following quarter, in another SEC Form 10-Q, issued on November 9, 2021, Defendants stated that Olo retained "over 500 existing brands across approximately 76,000 active locations as of September 30, 2021," a claim Defendants would again repeat on that day's earnings call.  This number grew to 82,000 by the end of the Class Period.  Moreover, often accompanying Defendants' statements on earnings calls were presentations to analysts and investors about Olo's active locations.  The following chart is representative of what Defendants presented:

**Figure 1. Olo's Active Locations Chart from the Company's Fourth Quarter 2021 Presentation on February 23, 2022.**



7.      Beyond bolstering Olo's claims about historical and present performance, the Company's active locations metric also served as "***performance indicator***" of future growth signifying "Olo's ability to attract, engage, and monetize our customers and thereby drive revenue, as well as provides a base to expand usage of our modules."  [Emphasis added.]

8.      Furthermore, despite the fact that Olo boasted of retaining hundreds of restaurant brand clients, the Company remained heavily reliant on a handful of brands, with just eight brands representing over 50% of Olo's active locations at the start of the Class Period.  One of those brands was Subway IP LLC ("Subway").[1]

9.      On February 12, 2020, Olo announced a partnership with Subway to enable Subway's more than 20,000 U.S.-based restaurants to handle digital orders from third-party marketplaces, utilizing Olo's "Rails" module.  One of Olo's products that allows customer orders from applications like Uber Eats and DoorDash, "Rails" enables digital orders from third-party marketplaces to be transmitted to the individual restaurant that a customer seeks to order from.

10.      Upon inclusion in Olo's count of active locations, Subway immediately became the Company's largest client both by revenue and active location count, accounting for approximately 27% of the Company's active locations at the start of the Class Period.

11.      Unfortunately for analysts and investors, throughout the Class Period Defendants' SEC filings and public statements materially inflated the number of individual restaurants they were providing services to in Olo's active locations category in multiple respects and likewise failed to disclose its dead-end relationship with Subway.

12.      *First*, despite defining "active locations" as "a unique restaurant location ***live*** on the platform with at least one product module," Olo prematurely included individual restaurant

---

[1]      The other seven brands were DairyQueen, Jimmy John's, Jack in the Box, Panda Express, Five Guys, Denny's, and IHOP.

locations in its active locations count before those locations had actually begun utilizing **any** of Olo's products.  [Emphasis added.]  As discussed below, Olo had a policy of including **all** individual restaurant locations in its active locations count after the new brand client signed with Olo, but before many of the individual brand locations were ever truly "active."

13.     *Second*, Olo failed to remove inactive locations from the Company's active locations count.  As discussed below, Olo internally tracked whether its brand clients' individual locations had their Olo product modules activated, as well as the quantity of customer orders from those specific locations utilizing Olo's platforms.  On multiple occasions, individual locations, which continued to be counted in Olo's active locations category, turned **off** their Olo products and therefore were not truly "active," but were included in the count nonetheless.

14.     *Third*, not all brand locations joined Olo's platform, despite Defendant Glass' misstatement that "we [Olo] sell into one brand decision maker and then we[']re adopted by **all** of the restaurant locations within that brand . . ."  [Emphasis added.]  In truth, individual locations often opted not to use Olo's technology.  In one example, a major restaurant brand with thousands of locations – all of which were included in Olo's count of active locations – had just half of its locations actually "active"; the remainder opted not to utilize Olo's services and products.

15.     *Fourth*, Defendants also misled the public by failing to disclose that Subway would be ending its relationship with Olo while still  continuing to include in Olo's active locations count Subway locations that would imminently cease using Olo's services.  Without Subway, the Company's largest client, it became highly unlikely if not impossible for Olo to meet the lofty goals and guidance it announced.

16.     Indeed, upon information and belief, in a meeting with Subway in late January or early February 2022, Subway informed Olo that it would be ending its partnership with the

Company, a termination that played out over the course of the year.  Shortly thereafter, as multiple

Confidential Witnesses ("CWs") reported, in one of Olo's "regular" company-wide "town hall"

meetings[2] (which all Olo employees were entitled to attend), ***Defendant Glass announced that***

***Subway would be ending its relationship with Olo by the end of the year or the beginning of***

***2023***.

17.    Despite knowing the truth about Olo's inaccurate active locations count, as well as

Subway's pending departure, throughout the Class Period Defendants repeatedly assured investors

about Olo's growth prospects.  For example, when asked by an analyst on a February 23, 2022

earnings call, which occurred shortly after Subway informed Olo about its pending departure:

> I'm wondering on the location adds, I think you added about 15,000 this year
> [2021].  . . . Do you think you'll add sort of the same or maybe more locations in
> 2022?

Defendant Benevides replied:

> ***Yes.  So our expectation for 2022 is to add a similar amount of net new locations***
> ***to the platform***, coupled with full year growth of ARPU of around 10%.[3]  In terms
> of how we think about the active locations quarter-to-quarter, I would estimate a
> pretty even distribution quarter-to-quarter, although noting that there can be
> changes quarter-to-quarter depending on a number of factors.  So we tend to think
> about things on a full year perspective.  ***And for 2022, again, we're targeting a***
> ***similar number of net adds as we achieved in 2021.***

[Emphasis added.]

18.    Hiding the truth from the public about Olo's inaccurate active locations count and

Subway's departure was extremely profitable for Defendants, as the Company, Glass, and

Benevides were able to take advantage of Olo's artificially inflated common stock prices.  During

the Class Period, Olo made two significant bolt-on acquisitions, acquiring Wisely, Inc. ("Wisely")

---

[2]    One CW stated that these "town hall" meetings were "always led" by Defendants Glass and Benevides.

[3]    "Average revenue per unit, or ARPU, which represents the average quarterly platform revenue we earn on
a per-location basis." Olo Inc., 1Q 2021 Earnings Call (May 11, 2021).

and Omnivore Technologies, Inc. ("Omnivore"), the former paid for in large part with artificially inflated Olo common stock and the latter with leftover cash that the Company did not need to spend on Wisely.  Additionally, immediately upon the expiration of the IPO's lock-up period,[4] Defendants Glass and Benevides began selling their Olo shares, selling approximately $8.8 million and $1.5 million, respectively during the Class Period.

19.    The truth began to be revealed after the markets closed on August 11, 2022.  That day, in a stunning admission, Defendants disclosed that they had known about Subway's then-pending departure prior to the issuance of their full year ("FY") 2022 guidance on February 23, 2022 and announced that 2,500 Subway locations, which heretofore had been utilizing Olo's Rails product, had integrated directly with third-party marketplaces and that the remaining Subway locations would be removed in 4Q 2022 and 1Q 2023.  As a result, Defendants announced that the Company would experience *virtually no active locations growth in 2022*, correcting earlier misstatements about "targeting a similar number of net adds [15,000] as we achieved in 2021." [Emphasis added.]

20.    More broadly, even though Defendants did not explicitly reveal the true extent of their inaccurate reporting of Olo's active locations count, the undisclosed risk of those inaccuracies materialized on the same day – August 11, 2022 – when Defendants were forced to significantly reduce FY 2022 revenue guidance.  Though Defendants attempted to blame "macroeconomic challenges," such excuses fall flat in the face of (1) Olo's previous claims that a recession would inure to Olo's benefit as consumers "trade down from the high-end restaurants to the lower-cost restaurants," *i.e.*, fast-food restaurants, Olo's bread-and-butter brand clients and (2) the fact that

---

[4]    A "lock-up" period is the period – often lasting 180 days – after an offering during which corporate insiders, certain significant investors, and corporate employees are prohibited from selling their shares.

Olo's chief competitor – Toast, Inc. ("Toast") – announced earnings the ***same day*** and, despite citing the "macroeconomic backdrop," ***raised*** guidance.

21.     In response to these revelations, Olo's common stock price plummeted 36% the following day, from a closing price of $12.99 per share on August 11, 2022, to a closing price of $8.26 per share on August 12, 2022, erasing more than $480 million in shareholder value.  Olo's shares have never recovered, trading below $7.00 per share as of the date of the filing of this Complaint.

## II.     JURISDICTION AND VENUE

22.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

24.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(a)).  At all relevant times, Olo was headquartered and conducted business in this District at 285 Fulton Street One World Trade Center, 82nd Floor New York, NY 10007.  In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  In addition, at all relevant times, Olo's common stock was offered, sold, and traded on the New York Stock Exchange (the "NYSE"), which is located in this District.

25.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of a national securities exchange.

### III.    PARTIES

#### A.    Plaintiff

26.    Lead Plaintiff STA-ILA, as set forth in its certification (ECF No. 16-3), purchased Olo's common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements alleged herein.

#### B.    Defendants

27.    Defendant Olo is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.  Olo provides software to restaurants to assist with online ordering and food-delivery coordination.  Olo's stock trades on the NYSE under the ticker "OLO."  During the Class Period, Olo, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, violated the securities laws and contained materially false and misleading statements.

28.    Defendant Glass founded Olo in 2005 and was, at all relevant times, Olo's CEO and a member of Olo's Board of Directors.  Throughout the Class Period, Glass signed all of the Company's SEC filings and made statements in the Company's press releases, earnings conference calls, and at other public events, which, as alleged herein, violated the securities laws and contained materially false and misleading statements.  At all relevant times, Glass made the false and misleading statements with scienter.

29.    Defendant Benevides was, at all relevant times, Olo's CFO.  Previously, Defendant Benevides held positions with Olo as Senior Vice President and Vice President of Finance.  Throughout the Class Period, Benevides signed multiple of the Company's SEC filings and made statements in the Company's press releases, earnings conference calls, and at other public events, which, as alleged herein, violated the securities laws and contained materially false and misleading

statements.   At all relevant times, Benevides made the false and misleading statements with scienter.

30.     Defendants Glass and Benevides are referred to herein together as the "Individual Defendants."   Due to the Individual Defendants' positions at the Company, they possessed the power and authority to control the contents of Olo's filings with the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional and individual investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be materially false, misleading, and incomplete prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individuals Defendants knew that the adverse facts specified herein had not been disclosed to, but were being concealed from, the public, and that the statements at issue were materially false, misleading, and incomplete when made.

31.     Olo, Glass, and Benevides are collectively referred to herein as "Defendants."

IV.     **SUBSTANTIVE ALLEGATIONS**

A.      **Overview of Olo and Its Business Model**

32.     Olo was founded in 2005 by Defendant Glass as "Mobo Systems, Inc." and shortly thereafter began operating under the name "GoMobo."   At the time, its core business operation focused on creating a directory listing of restaurants where consumers could order ahead and get food on the go.   In 2010,  the Company began doing business under the name "Olo," short for "Online Ordering."   At this point, Olo's strategy consisted of a self-signup tool for restaurants, allowing restaurants to create their own branded online and mobile ordering services.

33.     In January 2020, the Company's Board of Directors and shareholders formally approved the name change on the Company's Certificate of Incorporation to "Olo."  On March 17, 2021, Defendants commenced Olo's IPO, issuing 20,700,000 shares of Olo Class A common stock to the investing public at $25.00 per share, all pursuant to the Offering Documents, and raising gross proceeds of $517.5 million ($485.5 million net of underwriting discounts and commissions). By then, Olo's business encompassed two information technology ("IT") solutions[5] for generating online and mobile ordering: "Order Management" and "Delivery Enablement."

34.     Olo's "Order Management" IT solution connects restaurants directly to consumers through multiple modules.  Most prominently is Olo's "Ordering" module, which allows consumers to interact directly with a restaurant location through a suite of digital commerce channels, including restaurant-branded mobile applications and websites, as well as telephonic orders.  This module allows for the storage and hosting of restaurant menus, creation and management of promotional offers and loyalty/reward programs, as well as the synchronization of menu item availability, the modification of ingredients, and per-location pricing.  Connected to each restaurant's point-of-sale system,[6] the Ordering Module within Olo's Order Management IT system serves as the centerpiece of Olo's business model connecting restaurants directly to consumers.  Additionally, Olo has four other modules within Order Management: "Network" module, which allows brands to connect directly with consumers through Google and Maps pages and applications; "Switchboard" module, which centralizes inbound phone orders; "Kiosk" module, a digital interface for a physical ordering device located inside the participating restaurant; and "Virtual Brands" module, a digital and delivery-only service for restaurants that do not have

---

[5]     "IT Solutions" are sets of services, software, and/or hardware that help businesses manage complex technical operations.
[6]     A "point-of-sale" system is typically a combination of hardware and software that allows businesses to accept payments from customers and keep track of sales.

their own physical locations and instead use host kitchens to produce their food for digital- and delivery-only ordering.

35.     At all relevant times, Olo's other major IT solution was its "Delivery Enablement" solution, which connects restaurants indirectly to consumers through third-party applications. There are two significant modules within this solution: "Dispatch" module (hereinafter "Dispatch") and "Rails" module (hereinafter "Rails") (used by Subway and relevant to the claims alleged herein).

36.     Dispatch enables orders directly from a restaurant's digital ordering channel – such as a restaurant's website or application – but then delivers the order through a third-party delivery service provider ("DSP").  Rails enables the integration of a restaurant's menu and pricing into a third-party application or website for pick-up or delivery by that third-party.  According to Defendants, by the start of the Class Period, Olo's third-party Rails partners included "all major national digital ordering aggregators," including Caviar, DoorDash, Grubhub, Postmates, Seamless, and Uber Eats, each of which were also members of Olo's DSP network,[7] as well as "regional and local aggregators that are meaningful to operators in specific geographies."

37.     During the Class Period, almost of all of Olo's revenue was derived from what Olo calls "platform revenue," which includes both subscription and transaction-based revenue streams placed using all of the various models within both its Order Management and Delivery Enablement Solutions.  Subscription revenue is earned from fixed monthly subscription fees from each restaurant location that subscribes to Olo's Ordering module.  Additionally, some restaurant locations purchase an allotment of monthly orders for a fixed monthly fee and then pay an

---

[7]     While Uber Eats became a Rails partner in 2019, it joined Olo's DSP network shortly after the start of the Class Period, in November 2021.  All of the other third-party partners listed were DSPs at the start of the Class period.

additional fee for each excess order utilizing the Company's Ordering module, which Olo also classifies as subscription revenue. Transaction revenue is earned from individual orders on a per order, per location basis from each restaurant location that subscribes to Olo's Dispatch and Rails modules. In other words, when a customer orders from an Olo-brand partner – either directly, when in excess of an agreed-upon monthly allotment, or indirectly through a third-party – Olo receives a cut. Therefore, as "transaction volume" (*i.e.*, the quantity of orders placed utilizing one of Olo's modules) increases, so too does Olo's revenue.[8]

38.     During the Class Period, Olo's restaurant clients were comprised of brands across a spectrum of restaurant types, including: quick service restaurants ("QSRs") (another term for fast-food restaurants); fast casual restaurants; casual dining restaurants; family dining restaurants; and coffee and snack food restaurants.

39.     However, the majority of Olo's restaurant clientele consisted of QSRs, including Subway, DairyQueen, Krystal, Jimmy John's, Jack in the Box, Checkers, Del Taco, and Panda Express, a statistic Defendants did not expect would change. As Defendant Glass explained on the August 10, 2021 earnings call:

> As the largest component of the restaurant industry by both locations and transactions, QSR brands represent the greenfield industry segment[9] that we love for its high average location count, industry transaction share and cornerstone commitments to convenience.

---

[8]     Olo has a second, far smaller source of revenue: "professional services and other," which primarily consists of fees for platform implementation services. At the start of the Class Period, Olo reported that out of $35,896,000 in total 2Q 2021 revenue, just $1,370,000 – or 3.8% – was "professional services and other" revenue, while the other 96.2% was "platform" revenue. Similarly, in its FY 2021 annual report released in February 2022, Olo reported that out of $149,368,000 in 2021 annual revenue, just $4,922,000 – or 3.3% – was "professional services and other" revenue, while the other 96.7% was "platform" revenue.

[9]     In this context, a "greenfield" investment refers to an investment opportunity in a market that has never been commercially explored.

40.     The Company generally held three-year contracts with continuous one-year automatic renewal periods, which it claimed provided "visibility into [the Company's] future financial performance."  *See* all 10-K and 10-Qs filed during the Class Period.

### B.     Active Locations, a Key Metric

41.     Defendants steadfastly emphasized three "key metrics" for the Company: ***active locations***, ARPU, and net revenue retention.  It long defined "active locations" as:  "a unique restaurant location ***live*** on the platform with at least one product module.  So, for example, if an individual restaurant location subscribes to 3 modules, such as Ordering, Dispatch and Rails, we would count that location once as a unique active location."  [Emphasis added.]  Olo Inc., 1Q 2021 Earnings Call (May 11, 2021).

42.     Importantly, the Company counted each individual restaurant location within a brand as a separate active location.  For example, CEO Glass explained :

> ***So we sell into one brand decision maker and then we[']re adopted by all of the restaurant locations within that brand, the corporate-owned locations, the franchise locations, the mix of the 2, however, they're set up in their organizational structure.  And then brands are always going live really all at the same time to create that consistent experience everywhere. So yes, we are deployed in all locations.***

[Emphasis added.] Olo Inc., JPMorgan Global Technology, Media & Communications

Conference Transcript (May 23, 2022).[10]

### C.     Subway's Importance as Olo's Largest Restaurant Client Brand by Revenue and Location Count

43.     On February 12, 2020, Olo issued a press release announcing a partnership with Subway to connect the mega-sandwich chain to third-party marketplaces via Olo's Rails module.

---

[10]     This statement reiterated Olo's claim in the IPO Offering Documents that "In every one of our customer relationships, we are the exclusive provider of direct digital ordering services with 100% franchisee participation."

According to the press release, "The partnership allows Subway's network of more than **_20,000_** U.S. restaurants to more seamlessly handle digital orders from third-party marketplaces." [Emphasis added.]

44.     Immediately, Subway became Olo's largest brand partner and single largest source of revenue, ultimately representing about 8% of Olo's quarterly revenue during the Class Period.[11]

45.     Throughout Subway's time with the Company, Olo and its employees recognized the sub-maker's unparalleled importance to the Company.

46.     From July 2018 through August 2021, CW3 worked for Olo in multiple roles, including as a Technical Specialist, which CW3 explained, is a "fancy term for implementation manager[] and brand deployment," meaning that CW3 was essentially a project manager responsible for guiding customers through the onboarding process.  CW3 reported to Olo's Vice President of Implementation – Customer Success.  According to CW3, given Subway's position as Olo's most important client, Olo was always "all hands on deck" for any Subway request, even if it required putting other pending projects and/or requests from other clients on hold.

47.     Similarly, CW4, who was employed by Olo from May 2017 through April 2022 as a Senior Software Engineer and reported to Olo's Director of Engineering, confirmed that Subway was "very important" to Olo's business, and explained the lengths to which Olo would go to satisfy Subway, including noting that inside Olo there was a sentiment that Subway always needed to be "taken care of."  Moreover, CW4 stated that "Subway pushed them [Olo] around," including,

---

[11]     While Olo never disclosed the exact revenue it earned from Subway, that figure can be determined from later comments Defendants made on the August 11, 2022 earnings call.  On the call, Defendants explained that as a Rails-only partner, Subway's ARPU was "about 1/3 of kind of the platform average on a quarterly basis." Therefore, in 4Q 2021, for example, given that Subway had approximately 20,000 locations utilizing Olo and they each generated "about 1/3" of the overall company-wide ARPU ($504), each location generated approximately $168 for Olo.  When multiplied by the total number of Subway locations (20,000), that means Subway generated about $3.36 million in revenue, about 8.4% of Olo's 4Q 2021 revenue of $39.95 million.  The same calculation for 1Q 2022 yields a result of $3.44 million in revenue, about 8% of Olo's $42.76 million in revenue that quarter.

uniquely among Olo restaurant partners, by preventing Olo from innovating and adding new features, only allowing Olo to add additional features – including features to support third-parties, such as Postmates and DoorDash – when Subway requested them.

48.     Moreover, CW5, who served as Olo's Head of Data Science and Business Intelligence from November 2020 through April 2021 and reported to Olo's former President and Chief Operating Officer Matthew Tucker, spoke with Defendant Benevides about once each month, periodically pointing out that given the danger to Olo of losing any of the "top five or ten" brand clients (including Subway), the Company risked keeping "too many eggs in one basket." When asked what actions Olo would take to address this risk, Defendant Benevides never gave CW5 an informative response, generally providing only a variation of "I don't know."

49.     Every single Olo SEC Form 10-Q and 10-K filed to date states that "[Olo's] contracts typically have initial terms of ***three years*** or longer, with continuous one-year automatic renewal periods, ***providing visibility into our future performance***." [Emphasis added.]  Therefore, at the start of 2022, the third year of Subway's contract with Olo, securing a renewal of the Company's largest brand client would have been a high priority for Defendants.  This was far from occurring.

50.     ***In late January or early February 2022***, Juan George, Olo's Senior Vice President of Enterprise Sales, George's deputy, Olo's Sales Director (Enterprise Team), and an Olo Customer Success Representative met with their business and IT counterparts at Subway.  ***At the meeting, the Subway representatives informed the Olo group that Subway decided to terminate its relationship with Olo***.  Subway provided two explanations for its departure.  First, Subway wanted a single product to connect all Subway locations globally to third-party applications.  At the time, Olo operated mainly in the United States and Canada and therefore could not fill that

role.  Second, given that Subway had its own in-house technical staff and infrastructure, the Subway delegation explained that moving forward, Subway would utilize its own technology to connect to third-party applications, instead of Olo's Rails module.[12]

51.     Shortly thereafter, Defendants announced Subway's pending departure to Company employees in one of Olo's regular internal "town hall" meetings.  Multiple CWs confirm this internal announcement and its timing.

52.     CW6 served as a Technical Engineer at Olo from March through October 2022. CW6 joined Olo upon Olo's acquisition of Omnivore, where CW6 had been employed.  CW6 reported to Omnivore's (and later Olo's) Director of Customer Support.  As an Olo employee, CW6 was entitled to attend Company-wide town hall meetings that CW6 recalled occurred regularly.  CW6 explained that Defendants Glass and Benevides "always led" the town hall meetings and generally spoke about Olo's brand partnerships, both new and existing.  At "one of the first" town hall meetings CW6 attended in "early 2022," Defendant Glass announced that Subway had decided to ditch Olo's Rails platform in favor of Subway's own in-house platform for integrating with third-party applications.  Upon speaking with legacy Olo colleagues, CW6 discovered that many of them were "agitated" by Defendant Glass' announcement.

53.     CW7 served as a Deployment Manager from November 2021 through October 2022.  CW7 joined Olo upon Olo's acquisition of Wisely, where CW7 had been employed.  CW7 also attended town hall meetings, stating that they occurred monthly and were always led by Defendant Glass and generally Defendant Benevides.  CW7 confirmed attendance at the town hall

---

[12]     According to CW4, that Subway's own in-house technical staff and infrastructure posed a threat to the Subway-Olo relationship was known within Olo.  "If they [Subway] had their own tech team, why would they stay with us indefinitely," CW4 had previously wondered.

meeting in early 2022 during which Defendant Glass announced Subway's departure from the Company.

54.     Therefore, CWs amply describe how important a client Subway was and that at least as of February 2022, Defendants were well aware that it was ending its relationship with Olo.

### D.     Defendants Made Numerous Material Misstatements and Omissions

55.     Throughout the Class Period, in numerous SEC filings and public statements, Defendants issued materially false and misleading statements about the number of individual restaurant locations that actually met Olo's definition of an "active location."  Specifically, Defendants: (a) prematurely included thousands of individual restaurant locations in the Company's ***active locations*** count before those locations had actually begun utilizing any of Olo's products, (b) failed to remove inactive locations from the Company's active locations count, and (c) included individual restaurant locations in the Company's active locations count that rejected or refused to utilize any of Olo's products.

56.     Additionally, starting on February 23, 2022 and continuing through the end of the Class Period, Defendants issued materially false and/or misleading statements and/or material omissions about Olo's business relationship with Subway – its largest client.  Specifically, Defendants failed to disclose that at the beginning of 2022, Subway had informed Olo that it was terminating its relationship with Olo and that all individual Subway locations would cease utilizing Olo's Rails product by the end of 2022 or the start of 2023.

57.     Defendants' actionably false or misleading Class Period statements are separately enumerated below.

1.    **Throughout the Class Period, Defendants Hyped Olo's Growing Number of Active Locations**

58.    Starting on August 10, 2021 (the very first day of the Class Period) and continuing throughout the duration of the Class Period, on every earnings call, in every SEC Form 10-K and 10-Q, and in numerous press releases (including those attached to SEC Form 8-K), presentations, and investor conferences, Defendants emphasized and touted the Company's active locations count, painting a rosy picture of ever-upward active locations growth (in addition to reiterating the Company's definition of "active locations" in no fewer than ten of the aforementioned SEC filings and public statements).

59.    Indeed, Defendants pitched their active locations metric as more than a tracking tool of historical and present performance, but one that additionally "demonstrates the growth and scale of our overall business and reflects our ability to attract, engage, and monetize our customers and thereby drive revenue, as well as provides a base to expand usage of our modules."[13]

60.    The misstatements concerning active locations during the Class Period include:

a.    **August 10, 2021 Press Release, Earnings Call, Form 10-Q**

61.    After the market closed on August 10, 2021, Defendants issued a press release as part of the Company's SEC Form 10-Q disclosing its 2Q 2021 earnings, signed by Glass and Benevides.  According to the press release, Olo's "ending active locations increased 30% year-over-year to approximately 74,000" locations, which was also stated in the Company's Form 10-Q.

---

[13]    *See*, *e.g.*, Olo Inc., 4Q & FY 2021 Press Release, attached to SEC Form 8-K (Feb. 23, 2022) (characterizing "Active Locations" as one of three "Key Business Metrics"); Olo Inc., 1Q 2022 Press Release, attached to SEC Form 8-K (May 10, 2022) (characterizing "Active Locations" as one of three "Key Performance Indicators").

62.     On the earnings call that day, Defendant Benevides reiterated that "[i]n terms of key metrics, we ended the quarter with approximately 74,000 active locations on the platform, a 30% increase year-over-year and a 7% increase sequentially."

**b.      October 21, 2021 Wisely Acquisition Press Release and Call**

63.     After the market closed on October 21, 2021, Defendants issued a press release that again reiterated the 74,000 active restaurant locations.

64.     On the conference call with analysts later that day, Defendants repeated the misstatement and 74,000 number.  Similarly, on the same call, Defendant Benevides stated:  "I think the big takeaway here is a lot of upside when you think about the 75,000 – 74,000 restaurant locations on the platform today."

**c.      November 9, 2021 Press Release, Earnings Call, Form 10-Q**

65.     After the market closed on November 9, 2021, Defendants issued a press release and SEC Form 10-Q disclosing its 3Q 2021 earnings, signed by Glass and Benevides.  That same day, the Company also conducted an earnings call with analysts.

66.     The press release provided that Olo "define[s] active locations as a unique restaurant location that is utilizing one or more modules in a given quarterly period."  This definition was, in fact, included in all SEC filings during the Class Period, including the Form 10-Q filed the same day.

67.     On the earnings call, Benevides stated that platform revenue increased "primarily due to an increase in active locations coming on to the platform . . ."

68.     On the same call, in response to Stifel, Nicolaus & Company analyst Brad Reback's question – "As we look forward, what should we think of as the durable growth rate of the business? – Benevides stressed that "As we look ahead, we see a lot of opportunity for growth and

20

a lot of different levers to pull to get there. ***I think in the most simplest form, continuing to add more active locations to the platform***." [Emphasis added.]

### d.  January 10, 2022 Presentation at ICR Conference

69.  After the market closed on January 10, 2022, Defendants presented at the ICR Conference.  At that conference, Defendant Glass stated, "[t]oday we are a proud partner to over 500 restaurant brands representing 76,000 individual restaurant locations to enable consumers to order ahead, pay ahead and get their food faster for takeout, delivery and more."

70.  At the same conference, Defendant Benevides stated, "[w]e also contract directly, or always contract directly, with brand headquarters to long-term exclusive contracts ***and secure all locations within the brand***, ensuring end consumer experience is consistent, regardless of which location within a brand the end consumer interacts with." [Emphasis added.]

### e.  February 23, 2022 Press Release, Earnings Call, Form 10-K

71.  After the market closed on February 23, 2022, Defendants issued a press release and disclosing its 4Q 2021 earnings, signed by Glass and Benevides.  That same day, the Company also conducted an earnings call with analysts.  According to the press release, Olo's "[e]nding active locations increased 23% year-over-year to approximately 79,000" locations, which was also stated in the Company's SEC Form 10-K, filed on February 25, 2022.

72.  On the conference call with analysts later that day, Defendants repeated the misstatement, with Defendant Glass stating that "[w]e ended the year with our platform connecting approximately 79,000 active restaurant locations . . ."

### f.  May 10, 2022 Press Release, Earnings Call, Form 10-Q

73.  After the market closed on May 10, 2022, Defendants issued a press release and SEC Form 10-Q disclosing its 1Q 2022 earnings, signed by Glass and Benevides.  That same day, the Company also conducted an earnings call with analysts.

21

74.     According to the press release, Olo's "[e]nding active locations increased 19% year-over-year to approximately 82,000" locations, which was also stated in the Company's SEC Form 10-Q.

75.     On the conference call with analysts later that day, Defendants repeated the misstatement, with Defendant Glass stating "[o]ur ending active location counts increased 19% year-to-year to approximately 82,000, and we surpassed more than 600 restaurant brands utilizing our platform."

76.     On the same call, Defendant Glass also reiterated that "we always sell to the brand, and then we're adopted across the entire location base, whether those are corporate owned or franchise owned."

> **g.     May 23, 2022 Presentation at the JPMorgan Global Technology, Media & Communications Conference**

77.     After the market closed on May 23, 2022, Defendants presented at the JPMorgan Technology, Media & Communications Conference.  When an analyst inquired "when Olo signs on a large enterprise, are all of the franchises obligated to come onto the platform? And what does that process look like?"  Defendant Glass responded:

> So we sell into one brand decision maker and ***then we[']re adopted by all of the restaurant locations within that brand***, the corporate-owned locations, the franchise locations, the mix of the 2, however, they're set up in their organizational structure.  And then brands are always going live really all at the same time to create that consistent experience everywhere.  ***So yes, we are deployed in all locations.***

[Emphasis added.]

78.     Glass also reiterated the 82,000 active locations number.

79.     Additionally, Glass stated that:

> I really believe that we've demonstrated that we can start a relationship with even the largest restaurant brands out there ***with a single module*** and maybe that's a

22

convenient way for them to fortify their internal efforts, prove ourselves out and then expand into a larger deployment.

[Emphasis added.]

### h.   June 6, 2022 Presentation at the William Blair Growth Stock Conference

80.   On June 6, 2022, Defendants presented at the William Blair Growth Stock Conference.  At the conference, Glass stated that "[a]s of March 21, we are a proud partner to over 600 restaurant brands representing approximately 82,000 individual restaurant locations . . ."

81.   Glass stated that:

Unlike other enterprise software businesses where the sales teams works to add a single location or division and expand to others, Olo enters into relationships at the brand's corporate level and secures exclusivity across all company owned and franchisee locations.  And this enables us to deploy our modules across all existing and new brand locations without any additional sales and marketing costs and upsell new offerings to the brand itself rather than each individual location.

82.   When discussing active locations, Glass stated that:

Since 2018, we have increased total active restaurant locations from 35,000 to 82,000 representing a compound annual growth rate north of 30 percent demonstrating our ability to empower enterprise restaurant brands in a total addressable market of roughly 300,000 locations.

### 2.   Throughout the Class Period, Defendants' Active Locations Hype was Built on Inaccurate Data, Materially Misleading Investors

83.   Unfortunately for investors, each of the above statements regarding active locations was false and misleading for numerous reasons.

84.   *First*, despite repeatedly defining "active locations" as "a unique restaurant location *live* on the platform with at least one product module," [emphasis added] Olo prematurely included individual restaurant locations in its active locations count before those locations had actually begun utilizing any of Olo's products, as corroborated by CW1.

23

85.     CW1 was a Delivery Solutions Manager within Olo's Dispatch module segment from December 2020 to August 2021 and reported to Olo's Vice President of Delivery.  CW1's primary role was to help onboard new clients to Olo's Dispatch service.  According to CW1, after signing a new customer, CW1 was instructed to prematurely report the ***total*** contracted number of individual locations as active locations, before all of those locations were ever truly "active."  For example, Defendants announced on an August 10, 2021 earnings call that QSR brand Jack in the Box had joined Olo on or before June 30, 2021.  Jack in the Box had over 2,200 locations at the time, all of which were included in Olo's active locations count in Olo's 2Q 2021 Form 10-Q, press release, and earnings call.[14]  However, according to CW1, in truth, by the end of 2Q 2021, Jack in the Box really only ***had at most 200 live locations*** utilizing Olo's Dispatch platform.[15] And while the initiation of Olo's module proceeded to ramp up, by the time CW1 left Olo, approximately 30% of Jack in the Box locations were still not utilizing Olo's module.

86.     CW1 also reported that upon joining Olo, CW1 took over the Dispatch accounts for two small regional chains of casual dining restaurants, Berg Hospitality Group, located in Texas, and Newport Restaurant Group, located in New England.[16]  According to CW1, multiple Berg locations were counted as "active," despite the fact that those restaurant locations had yet to begin utilizing Olo's module.  Moreover, by the time of CW1's departure in August 2021, CW1 stated

---

[14]     According to Jack in the Box's 2021 annual report filed on SEC Form 10-K, as of October 3, 2021, it had "2,218 Jack in the Box quick-service restaurants, primarily in the western and southern United States, including one in Guam."

[15]     Indeed, according to Defendant Glass, Jack in the Box only utilized Olo's Dispatch module.  Olo Inc., Q2 2021 Earnings Call, at 3 (Aug. 10, 2021) (CEO Glass: "A great example of customers realizing Dispatch's value was the Q2 [2021] launch of Jack in the Box as a Dispatch-only deployment, which will enhance their existing digital ordering for takeout program.")

[16]     According to archived versions of their websites, as of August 2021, Berg Hospitality Group had seven locations and as of July 2021, Newport Restaurant Group had 13 locations.  *Reservations*, BERG HOSP. GRP., http://web.archive.org/web/20210803070350/https://www.berghospitality.com/ (last visited Jan. 11, 2023); *Our Restaurants*, NEWPORT REST. GRP., http://web.archive.org/web/20210725160848/https://www.newportrestaurant group.com/dining-options (last visited Jan. 11, 2023).

that an accurate location count for Berg had still not been completed.  With respect to Newport, CW1 stated that upon taking over that account, CW1 discovered that multiple locations were not open for business, including several that were still under construction, and yet were marked as "active."

87.     Thus, as confirmed by CW1, Defendants made glaring misstatements about the number and prospects of active locations the Company actually had because they included locations that had not yet begun to use Olo products, and may take some time to even begin using them (if at all).

88.     *Second*, Olo's statements about active locations were false and misleading because Olo failed to remove inactive locations from the  active locations count.  According to CW1, Olo had "various ways" of tracking whether a client had its Dispatch or Rails modules turned on and the quantity of orders coming through each.  In fact, in monthly Delivery Enablement Solutions meetings – which included participants from both Rails and Dispatch module teams – CW1 noticed discrepancies between the number of reported active locations and the restaurant locations actually utilizing Olo's modules.  As CW1 explained, these discrepancies were due, in part, to individual locations turning off their Olo modules, either because of Olo's module issues in keeping up with customer demand – which CW1 found to be the case with certain Berg Hospitality Group locations – or when restaurants shut down during the Covid-19 pandemic.  In fact, when CW1 asked CW1's supervisor at one of the meetings whether they should correct the inaccurate active locations count, CW1 was instructed to continue reporting all locations as active because "they'll turn it [Olo's modules] on next week for all we know."

89.     *Third*, Defendants' representations about active locations were false and misleading because not all brand locations within a single chain joined Olo's platform, despite Defendants'

repeated statements that Olo sells to and is deployed in "***all locations***," whether corporate-owned, franchised, or a mix of the two.  [Emphasis added.]  CW2 corroborates this allegation.

90.     CW2 was a Deployment Manager at Olo from March 2021 through February 2022 and reported to an Olo Director of Deployment.  CW2's role involved onboarding new restaurant locations and project management to ensure each product the customer selected was implemented.  CW2 served as a "point person" between the customer and Olo product specialists.  CW2 worked across all Olo-modules, from Ordering (within Olo's Order Management Solutions) to Dispatch and Rails (within Olo's Delivery Enablement Solutions).

91.     QSR chain CKE Restaurants fell under CW2's purview.  On November 9, 2021, Olo announced CKE as a new brand client in both a press release announcing 3Q 2021 earnings, as well as on that day's earnings call.  CKE, the parent company for Carl's Jr. Restaurants LLC, Hardee's Restaurants LLC, as well as multiple other fast-food chains, had approximately 4,000 individual locations at the time, over 90% of which were franchises.[17]  According to CW2, numerous of these franchises decided not to use Olo's technology.  As a result, Olo was installed in only about 50% of overall CKE locations.  Yet Defendants included 100% of the locations in the active locations count reported to the investing public.

### 3.     Defendants Materially Misled the Market About Subway's Pending Departure

92.     Between February 23, 2022 – the date Olo released 4Q and FY 2021 earnings and 2022 guidance – and August 11, 2022 – the date Olo released 2Q 2022 earnings and revised guidance – Defendants made numerous public statements extolling continued earnings and active

---

[17]     According to an archived version of CKE's website, as of November 2021, CKE had "over 3,800 franchised or company-operated restaurants in 44 states and 43 foreign countries and U.S. territories.  *Our Brands*, CKE RESTS., http://web.archive.org/web/20211109222135/https://www.ckr.com/ (last visited Jan. 11, 2023).  According to one source, over 90% of CKE locations are franchises.  *See CKE Restaurants Franchise Overview*, FRANCHISING.COM, https://www.franchising.com/ckerestaurants/ (last visited Jan. 11, 2023) ("The Carl's Jr./Hardee's system is now 93 percent franchised.").

locations growth, fully aware that they were soon to lose Subway (*i.e.*, 8% of their revenue and 25% of their active locations) as a customer.  Those misstatements include:

           **a.**       **February 23, 2022 Press Release, Earnings Call, Form 10-K**

93.     On the earnings call, Glass stated that "[a]s we enter 2022, we've never been more confident in our position and more excited about our opportunity ahead.  We believe that we have a 100x growth opportunity in U.S. enterprise restaurants, representing a TAM of more than $15 billion within the U.S. enterprise segment."

94.     On the same call, Benevides stated:

> ***Throughout 2022***, we believe the main drivers of revenue growth will be ARPU expansion as well as ***increasing the number of active locations on the platform***. Related to ARPU, we expect year-over-year growth to be around 10% as order volumes continue to grow and brands adopt additional product modules.

[Emphasis added.]

95.     Benevides continued that "[w]'re confident that these investments will unlock future growth opportunities for Olo in 2023 and beyond.  ***To summarize, we delivered another strong quarter of operational and financial performance***."

96.     When an analyst inquired about whether Olo will "add sort of the same or maybe more locations in 2022" as last year, Benevides replied:

> Yes. So our expectation for 2022 is to add a similar amount of net new locations to the platform, coupled with full year growth of ARPU of around 10%. . . . ***And for 2022, again, we're targeting a similar number of net adds as we achieved in 2021.***

[Emphasis added.]

           **b.**       **May 10, 2022 Press Release, Earnings Call, Form 10-K**

97.     On the earnings call, Defendant Glass projected continued growth throughout 2022, including "Olo's next chapter of execution and growth as we realize our 100x scale opportunity."

        **c.**      **May 23, 2022 Presentation at the JPMorgan Global Technology, Media & Communications Conference**

98.    At this presentation, when Benevides was asked what he sees as the durable growth rate for the business, he replied:

> So I think what we've communicated is we feel pretty confident in being able to deliver high growth we define as 30% year-on-year growth. Noah articulated earlier, the 100x opportunity in front of us. ***And when we look at all those different avenues, more locations, more transactions per location and more revenue per transaction, there's just a lot of levers that we can pull in order to maintain that growth rate.***

[Emphasis added.]

        **d.**      **June 6, 2022 Presentation at the William Blair Growth Stock Conference**

99.    During this presentation, Glass commented that:

> Our solutions set that meets the needs of a digital restaurant, robust network, and highly efficient go-to-market give us confidence that we have long runway for growth ahead of us. We believe that we have a 100x growth opportunity in U.S. enterprise restaurants representing a total addressable market of more than $15 billion. First, through continuing to focus on the enterprise restaurant segment, we have a 4x opportunity to capture all 300,000 enterprise restaurant locations.

100.    Glass concluded that "Altogether, these three levers result in Olo's near-term 100x revenue growth opportunity in U.S. enterprise restaurants, more locations, more orders per location, and more revenue per order."

101.    When providing guidance, Glass stated that:

> To summarize, ***we continue to deliver revenue growth and profitability as we take meaningful strides towards driving digital hospitality. Our position is strong as we have a long runway for growth through adding more locations,*** cross selling our robust and comprehensive product suite, and through expanded use cases of the Olo platform.

[Emphasis added.]

102.    At no point, throughout this entire period, do Defendants mention the pending loss of their largest client by revenue and active locations – Subway – and that, without them, it was likely impossible to meet the numbers reported.

**E.    On August 11, 2022, the Truth Emerges**

103.    After the market closed on Monday, August 11, 2022, Olo reported its 2Q 2022 earnings results, falling short of expectations across multiple metrics, including revenue, cash flow, and active locations, which ***experienced zero growth***, remaining unchanged from the prior quarter at 82,000 active locations.  Moreover, Defendants lowered FY 2022 revenue guidance by $12 million to $13 million (from a prior range of $195 million to $197 million to a new range of $183 million to $184 million).

**1.    Defendants Disclosed that They Had Known About Subway's Pending Departure Since Early 2022**

104.    In a stunning revelation on that day's earnings call, Defendants revealed that Subway, the Company's largest client by revenue and active locations count, had opted not to renew its contract with Olo, removing "roughly 2,500 locations in the second quarter [of 2022] . . . with the balance of their locations being removed from our total active location count in the fourth quarter of this year or the first quarter of 2023."[18]  As a result, as Defendant Benevides conceded, the loss of all Subway locations "will likely impact our ending active location counts in the fourth quarter of this year or the first quarter of 2023" and the Company would likely add just "2,000

---

[18]    On the same August 11, 2022 earnings call, Defendant Glass also stated that "In February of 2020, we announced a relationship with Subway in which approximately ***15,000*** locations would utilize the Rails module to integrate and manage third-party marketplace orders."  [Emphasis added.]  This is incorrect, as Olo's press release declared that the Subway "partnership allows Subway's network of more than ***20,000*** U.S. restaurants to more seamlessly handle digital orders from third-party marketplaces."  [Emphasis added.]  *Supra*, ¶43.  Defendants' statement about the loss of 2,500 Subway locations in 2Q 2022 and factually incorrect statement about the initial coverage of 15,000 locations led multiple analysts – including Truist Securities, Piper Sandler, and RBC Capital Markets – to report that 12,500 Subway locations remained to be removed from Subway's active locations count, instead of ***17,500***.

locations per quarter between now and the balance of the year," *i.e.*, just 4,000 more locations in total.

105.    Equally as troubling, however, was the fact that Defendants had known about Subway's pending departure since the beginning of the year, as Defendant Benevides explained in response to an analyst's question about whether FY 2022 guidance, issued on February 23, 2022, had included an expected drop in revenue from the loss of Subway as an Olo brand client:

> ***So when we entered the year, there was indication that Subway may plan to directly integrate with marketplaces.***  But at that point in time, the time line was unclear.  So like all data points and assumptions that feed the model, we took that information, we factored in the possibility that Subway may integrate directly by doing 2 things: one, reducing their transaction volumes throughout the year and in turn, reducing a portion of their revenue contribution throughout the year. So as that has begun to happen, the guidance for both the third quarter and the full year are aligned.

[Emphasis added.]

106.    When pressed on the point by RBC Capital analyst Matthew Hedberg – "just to be clear, when you started the year, you've assumed less Subway contributions and it seems like that is playing out" – Benevides admitted that "what we had done ***entering the year*** is really start to tail that off in the second quarter through the balance of the year, really as a hedge to some of the indications that we had heard as we entered the year."  [Emphasis added.]

### 2.    The Undisclosed Risk of Defendants' Inaccurate Active Locations Count Materializes

107.    In explaining why they had lowered FY 2022 guidance, in light of the fact that they had supposedly incorporated the pending loss of Subway into the original FY 2022 guidance (issued on February 23, 2022), Defendants cited "macroeconomic challenges at the brand and operator level [which] have resulted in elongated deployment in sales cycles, impacting revenue in the back half of the year."

108.    In truth, Defendants' downward projections represented a materialization of the undisclosed risk of their repeated misreporting of Olo's active locations count.  Defendants' own words reveal this.  During the Class Period, when discussing how "macroeconomic challenges" would impact the Company, Defendants not only shrugged off an economic downturn, ***they welcomed it***.  For example, on May 23, 2022, at the JPMorgan Conference, Defendant Glass stated that a recession would lead to increased volume for Olo at QSRs, Olo's bread-and-better brand clients:

> [E]ven during a recession, if we had a recession, and we've seen this in 2008, '09, they [consumers] have to eat 3 times a day or more.  They don't magically start cooking, consumers go to restaurants, they get food at restaurants, ***and they trade down from the high-end restaurants to the lower-cost restaurants***.
>
> ***And that is something that has been a tailwind for our business in past recessions as it's been a benefit to our restaurant customers, picking up order volume.***

[Emphasis added.]

109.    Additionally, on the same day that Olo lowered its guidance, one of Olo's chief competitors, Toast, released its 2Q 2022 earnings report as well.[19]  While similarly acknowledging "the current macroeconomic backdrop," Toast ***raised*** FY 2022 revenue guidance by 5%.  Toast, Inc., 2Q 2022 Earnings Call (Aug. 11, 2022).

*    *    *

110.    As the market digested these astonishing revelations, the price of Olo Class A common stock plummeted approximately 36%, from a closing price of $12.99 per share on August 11, 2022, to a closing price of $8.26 per share on August 12, 2022, erasing more than $480 million

---

[19]    According to its corporate description, Toast "is a cloud-based all-in-one digital technology platform purpose-built for the entire restaurant community.  Our platform provides a comprehensive suite of software as a service, or SaaS, products, financial technology solutions, including integrated payment processing, restaurant-grade hardware, and a broad ecosystem of third-party partners.  We serve as the restaurant operating system, connecting front of house and back of house operations across dine-in, takeout, and delivery channels."  Toast, Inc., 2Q 2022 SEC Form 10-Q (Aug. 12, 2022).

of shareholder value.  On September 26, 2022, the date the initial complaint in this action was filed, Olo shares closed at \$7.72.  Since then, Olo shares have fallen further, trading below \$7.00 per share.

## V.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   Executives Glass and Benevides Profited from Their False and Misleading Statements

111.   While Defendants were issuing the false and misleading statements identified herein, Glass and Benevides sold their personally held stock generating \$10.3 million in insider sales.

112.   That these insider sales were made pursuant to Rule 10b5-1 plans does nothing to rebut the inference of scienter drawn from the suspicious timing and amount of the insider sales. For example, on September 15, 2021, when Olo's stock was at or near its highest price during the entire Class Period as a result of Defendants' false and misleading statements, Glass sold nearly 96,000 shares for over \$3 million.

113.   And then again, on October 2, 2021, Glass sold nearly another 96,000 shares for over \$2.8 million, and then, on November 8, 2021 (the day before the earnings release and call where Defendants touted increasing active locations), again sold nearly 96,000 shares for over \$2.8 million.

114.   Glass did not sell shares prior to the Class Period (arguably due to the lock-up period) and he sold just \$55,000-worth after the end of the Class Period.  Indeed, his sales in the middle of Class Period (conspicuously ending in early 2022 when he was informed of the Subway departure) are out of line with his trading pattern both in timing and amount:

**Figure 2.  Olo Closing Price Chart from March 17, 2021 through December 17, 2022.**



**Figure 3.  Noah H. Glass Trading Chart.**



115.    Benevides also profited handsomely from his share sales, drawing nearly $1.5 million in sales over the Class Period.

**B.    Defendants' Materially False and Misleading Statements Provided Olo an Opportunity to Acquire Wisely with An Inflated Stock Price**

116.    By reason of Defendants' repeated material misstatements, Olo's common stock was artificially inflated throughout the Class Period and Defendants took full advantage in order to facilitate acquisitions that would have otherwise been more expensive, difficult, and/or impossible without an artificially inflated share price.

117.    On October 21, 2021, the Company filed an SEC Form 8-K to inform investors that it had entered into an agreement to acquire Wisely, a customer intelligence and engagement platform, paying Wisely securityholders approximately $187 million, comprised of $77 million in cash and $110 million in Class A Common Stock, based on a price per share of $29.85.

118.    In acquiring Wisely, the Company benefited from its elevated share price because, had the market known the truth about the Company's misleading statements, Olo's common stock would have traded at a significantly lower value, which in turn would have adversely impacted the Company's ability to acquire Wisely on favorable terms – for example, by financing the agreement with almost 60% of the Company's stock – and would have made the acquisition more expensive, if not impossible.

**C.    Defendants' Materially False and Misleading Statements Also Provided Olo an Opportunity to Acquire Omnivore**

119.    On February 23, 2022, the Company announced on an earnings call that it had entered into an agreement to acquire Omnivore.  Two days later, in the Form 10-K for FY 2022, Olo disclosed that it paid approximately $50 million in cash for Omnivore.

120.    Again, Defendants benefited from the inflated share price by their material misstatements.  Had the market known the truth prior to the Wisely acquisition, Olo shares would

have traded at a lower price, and perhaps would have forced Olo to dip further into its cash reserves, leaving little, if anything, available for the Omnivore acquisition just four months later.

**D.      Individual Defendants' Positions and the Centrality of the Issues Further Support a Stronger Inference of Scienter**

121.    Throughout the Class Period, Defendants expounded upon the "core" of Olo's platform.  *See, e.g.*, Olo Inc. 3Q 2021 Earnings Call (Nov. 9, 2021) (Defendant Glass emphasizing "all 3 of Olo's core modules, Ordering, Dispatch and Rails"); Olo Inc., 3Q 2021 Press Release (Nov. 9, 2021) ("all three of Olo's core modules: Ordering, Dispatch, and Rails").[20]  In fact, tracking, increasing and touting the number of active locations was one of the primary (if not the primary) metric for the Company.  Additionally, as stated above, at least one of Olo's top eight clients (that comprised 50% of Olo's business), Jack in the Box, had incorrect reported active locations during the Class Period.  Given the centrality of such clients to Olo, it can be inferred that the Individual Defendants were informed of and were aware of their active locations.  Indeed, on the August 10, 2021 earnings call, Defendant Glass chose to speak expressly about Jack in the Box's business.

122.    That Defendants Glass and Benevides spoke at monthly town hall meetings about Olo's brand partnerships, both new and existing, including, Olo's loss of Subway, further supports a strong inference of scienter.  Moreover, because Defendants repeatedly defined "active locations" as a "key metric," and then discussed this metric at length in every earnings call and analyst conference, it can be readily and strongly inferred that Defendants Glass and Benevides had knowledge at all material times of the adverse facts and truth that were not disclosed to investors (or had reckless disregarded for the truth), as alleged herein.

---

[20]      These statements reiterate the IPO Offering Documents' explanation of Olo's "core modules:" Ordering, Dispatch, and Rails.

123.    In fact, according to CW1 and CW5, Olo used business intelligence software provided by Looker Data Sciences, Inc. ("Looker") to keep track of Olo's key metrics, including the active locations count.  According to CW5, who regularly spoke with upper management, including Defendant Benevides, Benevides had access to Looker and would have obtained his active locations data from it.

124.    Additionally, upon information and belief, Defendant Glass is intimately involved with Olo's day-to-day operations.  For example, in a November 15, 2021 interview with a Public Company Research Organization ("PCRO"), a former Senior Customer Success Manager at Olo described Glass as "engage[d] with [his] followership."  In another interview with the PCRO on March 16, 2021, a former Senior Director of Customer Success at Olo even described Glass as involved with key business partnerships, as he was leading Olo's "negotiations" between "the heads of DoorDash" and other companies.

125.    Further, upon information and belief, Defendant Glass also has regular interactions with Olo's clients.  In addition to attending Olo's annual "customer conference," Glass also answers client concerns.  For example, according to the transcript of an interview the Executive Chairman at Tender Greens, an Olo brand client, had with the PCRO on October 21, 2021, he [the executive] "could call Noah [Glass] and he would respond" in the "early bumpy onboarding days" and that "if some things aren't right, they [Olo] fix it."

## VI.    LOSS CAUSATION

126.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class (defined herein).  During the Class Period, Plaintiff and Class members purchased Olo's Class A common stock at artificially inflated prices caused by Defendants' misconduct, as alleged herein.  The price of the Company's Class A common stock declined significantly when the substantial problems and risks concealed

by Defendants were disclosed and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

127.     Before the end of the Class Period, on August 11, 2022, investors had been unaware of the following material facts about Olo that had been known to Defendants:

(a)     throughout the Class Period, Defendants reported an inaccurate active locations count; and

(b)     starting at the end of January or beginning of February 2022, and continuing through the end of the Class Period, Defendants were aware Subway would not be renewing its contract with Olo.

128.     Defendants' misrepresentations and omissions and fraudulent scheme, as alleged in §IV.D., *supra*, misrepresented and concealed the true adverse material facts from the market during the Class Period, leading investors to wrongly believe that Olo had exponentially increasing active locations and a positive guidance and financial prospects.

129.     As alleged in §IV.E., *supra*, these material facts were revealed to investors – and/or the undisclosed risks materialized – for the first time on August 11, 2022 when Defendants told the market that Subway had ended its contract with Olo, that the number of active locations did not increase, and lowered FY 2022 guidance.

130.     The market reacted swiftly and negatively to these disclosures, which were made after trading hours on August 11, 2022.  As a result of them, on the next trading day, August 12, 2022, the price of Olo's Class A common stock dropped 36%, from $12.99 per share to $8.26 per share, on a volume of 11,582,335 million shares.  More than $480 million of shareholder value was erased, and the price of Olo's Class A common stock remains depressed, closing at just $7.72

as of the date of the initial complaint (ECF No. 1) in this action and below $7.00 on the date of the filing of this Amended Complaint.

## VII.   CLASS ACTION ALLEGATIONS

131.   Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, the securities of Olo during the Class Period (August 10, 2021 to August 11, 2022, inclusive), seeking to pursue remedies under the Exchange Act (the "Class").  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

132.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Olo's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, millions of Olo common stock were actively traded on the NYSE (an open and efficient market) under the symbol "OLO."  Record owners and other members of the Class may be identified from records maintained by Olo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

133.   Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws, which is complained of herein.  Further, Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

134.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws by the acts and omissions as alleged herein;

(b)     whether statements made by Defendants to the investing public and the Company's shareholders during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of Olo;

(c)     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of Olo;

(d)     whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     whether the market price of Olo Class A common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)     to what extent Class members have sustained damages and the proper measure of damages.

135.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.   APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

136.    The market for Olo common stock was open, well developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to Olo.  Plaintiff and Class members have been damaged thereby.

137.    During the Class Period, the artificial inflation of the value of Olo common stock was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class members.  As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's common stock, causing Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

138.    At all relevant times, the market for Olo common stock was efficient for the following reasons, among others:

> (a)    Olo stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Olo filed periodic public reports with the SEC and/or the NYSE;

(c)     Olo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Olo was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

139.     Based on the foregoing, during the Class Period, the market for Olo common stock promptly digested information regarding the Company from all publicly available sources and reflected such information in the price of Olo stock.  Under these circumstances, the market for Olo common stock was efficient during the Class Period and, therefore, investors' purchases of Olo common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

140.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions, which concealed that:

(a)     throughout the Class Period, Defendants reported an inaccurate active locations count; and

(b)      starting at the end of January or beginning of February, and continuing through the end of the Class Period, Defendants were aware Subway would not be renewing its contract with Olo.

141.    Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects – information that Defendants were obligated to disclose during the Class Period but did not – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    NO SAFE HARBOR

142.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.  To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

143.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the

speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Olo who knew that the statement was false when made.

## X.    COUNTS

**COUNT I**
**Violation of §10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

144.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.  This claim is asserted against all Defendants.

145.    During the Class Period, Defendants: (i) knowingly, or with reckless disregard, deceived the investing public, including Plaintiff and Class members, as alleged herein; (ii) artificially inflated and/or maintained the market price of Olo common stock; and (iii) caused Plaintiff and Class members to purchase, or otherwise acquire, Olo common stock at artificially inflated prices.

146.    Each of the Defendants, in violation of §10(b) of the Exchange Act and Rule 10b-5(b), made false statements of material facts and omitted to state material facts necessary to make the statements made by Defendants not misleading, which operated as a fraud and deceit upon Plaintiff and the Class, in an effort to create or maintain an artificially inflated price of Olo common stock during the Class Period.  Defendants' material misrepresentations and omissions are alleged in §IV.D., *supra*.

147.    As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

148.    As officers, directors, and controlling persons of a publicly held Company, whose common stock is registered with the SEC, pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, Glass and Benevides had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

149.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, made, or substantially participated in, the creation and/or dissemination of false or misleading statements of material fact, as set forth herein, or with reckless disregard failed to ascertain and disclose truthful facts, even though such facts were available to them.

150.    The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter.  Each of the Defendants knew, or recklessly disregarded, that the Class Period statements set forth in §IV.D., *supra*, contained material misrepresentations and omissions for the reasons set forth herein.

151.    By virtue of Glass and Benevides' positions of management and control within Olo, they had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects.  Glass and Benevides would ascertain such information through the Company's internal corporate documents; conversations and connections with corporate officers and employees; attendance at conferences and management and Board of Directors meetings, including committees thereof; and reports and

other information provided to them in connection with their roles and duties as Olo officers and directors.

152.    Glass and Benevides were aware of, or recklessly disregarded, that material misrepresentations and omissions were being made regarding the Company, and approved or ratified such statements in violation of the federal securities laws.

153.    As a result of Defendants' dissemination of the materially false or misleading information, and their failure to disclose material facts, as alleged herein, the market price of Olo common stock was artificially inflated throughout the Class Period.  Unaware that the market price of Olo common stock was artificially inflated, relying directly or indirectly on the false or misleading statements made by Defendants, at the times such statements were made, or relying upon the integrity of the markets in which Olo common stock traded; and in the absence of material adverse information that was known, or recklessly disregarded, by Defendants, but not disclosed to the public, Plaintiff and Class members purchased or otherwise acquired Olo common stock at artificially inflated prices.

154.    Had Plaintiff and the other Class members known the truth regarding the problems that Olo was experiencing, which was not disclosed by Defendants, Plaintiff and other Class members would not have purchased, or otherwise acquired, Olo common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

155.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases and sales of Olo common stock during the Class Period, when the artificial inflation in the price of such securities dissipated, as the truth regarding Defendants' conduct was revealed and/or the

undisclosed risks materialized, causing the price of Olo common stock to decline, resulting in economic losses to Plaintiff and the Class.

156.    By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and they are liable to Plaintiff and the Class for damages suffered in connection with their transactions in Olo common stock during the Class Period.

**COUNT II**
**Violation of §20(a) of the Exchange Act**
**(Against Defendants Glass and Benevides)**

157.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.  This claim is asserted against Defendants Glass and Benevides.

158.    Olo is a primary violator of §10(b) and Rule 10b-5, promulgated thereunder.

159.    Glass and Benevides acted as controlling persons of Olo within the meaning of §20(a) of the Exchange Act.  Glass and Benevides had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence, and during the Class Period, did exercise their power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein.  Glass and Benevides prepared, or were responsible for preparing, the Company's press releases and SEC filings, and made statements to the market in SEC filings, annual reports, press releases, news articles, and conference calls.  Glass and Benevides controlled Olo and each of its employees.

160.    Glass and Benevides were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Glass and Benevides were provided with copies of the documents, as alleged herein, containing material misrepresentations and omissions prior to, or shortly after, their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be

corrected.  Accordingly, Glass and Benevides are responsible for the accuracy of the Company's public reports and releases.

161.    By virtue of their positions as controlling persons of Olo, and by reason of the conduct described in this Count, Glass and Benevides are liable pursuant to §20(a) of the Exchange Act for controlling a primary violator of the federal securities laws.  As a direct and proximate result of Glass and Benevides' wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

A.    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding compensatory damages in favor of Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## XII.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  January 13, 2023

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 *s/ Amanda F. Lawrence*
Amanda F. Lawrence
Donald A. Broggi
Jeffrey P. Jacobson
Mandeep S. Minhas
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
alawrence@scott-scott.com
dbroggi@scott-scott.com
jjacobson@scott-scott.com
mminhas@scott-scott.com

*Counsel for Lead Plaintiff Steamship Trade Association of Baltimore – International Longshoremen's Association Pension Fund*