# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEAMSHIP TRADE ASSOCIATION OF BALTIMORE – INTERNATIONAL LONGSHOREMEN'S ASSOCIATION PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> OLO INC., NOAH GLASS, and PETER BENEVIDES, <br><br> Defendants. | Case No. 1:22-cv-08228-JSR |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Deborah S. Birnbach
Jennifer B. Luz
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
DBirnbach@goodwinlaw.com
JLuz@goodwinlaw.com

*Counsel for Defendants Olo Inc., Noah Glass, and Peter Benevides*

# TABLE OF CONTENTS

**Page**

BACKGROUND ...................................................................................................... 3

    A.    Olo Is Revolutionizing The Restaurant Industry. ................................... 3

    B.    Olo Reports Revenue And Other Performance Metrics. ........................ 4

    C.    Subway Decides To Directly Integrate With Third-Party Applications. ............... 6

ARGUMENT ........................................................................................................... 7

I.     THE AC DOES NOT ALLEGE A STRONG INFERENCE OF SCIENTER. ................. 7

    A.    The AC Does Not Plead A Motive To Commit Fraud. ......................... 7

         1.    The Individual Defendants' Trading Is Not Suggestive Of Fraud............ 8

         2.    The Acquisitions Are Not Plausible Motives To Commit Fraud. ........... 10

    B.    Plaintiff Fails To Allege Knowledge Or Extreme Recklessness. ....................... 11

    C.    The Non-Fraudulent Inferences Outweigh Any Inference Of Scienter. .............. 16

II.    THE AC DOES NOT PLEAD ANY ACTIONABLE FALSE STATEMENTS OR OMISSIONS. ................................................................................................. 17

    A.    The AC Does Not Identify Any Material Omission. ........................... 17

    B.    The AC Does Not Allege Any False Or Misleading Statements........................ 19

    C.    The Alleged Misstatements And Omissions Are Inactionable. ........................... 22

III.   THE AC FAILS TO PLEAD LOSS CAUSATION. ..................................................... 23

IV.   PLAINTIFF'S SECTION 20(A) CLAIM MUST BE DISMISSED. ............................. 25

CONCLUSION....................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47, 52-54 (2d Cir. 1995) ............................................................8, 11, 18

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4d 353, 355-56 (2d Cir. 2022) ..............................................................8, 10

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228, 242 (S.D.N.Y. 2012)..........................................................10

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336, 347 (2005)...................................................................................23

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187, 196-99 (2d Cir. 2009) ...................................................7, 10, 11, 14

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
  778 F.3d 228, 242 (1st Cir. 2015).......................................................................12

*Francisco v. Abengoa, S.A.*,
  481 F. Supp. 3d 179, 197, 209 (S.D.N.Y. 2020)..............................................1, 20

*Fries v. N. Oil & Gas, Inc.*,
  285 F. Supp. 3d 706, 720 (S.D.N.Y. 2018).......................................................7, 16

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573, 587, 594-95 (S.D.N.Y. 2011) .........................................9, 14

*Hensley v. IEC Elecs. Corp.*,
  2014 WL 4473373, at *5-7 (S.D.N.Y. Sept. 11, 2014) ...................................16, 25

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. RBS Grp., PLC*,
  783 F.3d 383, 390 (2d Cir. 2015).....................................................................18, 21

*In re Adient PLC Sec. Litig.*,
  2020 WL 1644018, at *22 (S.D.N.Y. Apr. 2, 2020).............................................22

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
  2013 WL 144041, at *16 (S.D.N.Y. Jan. 14, 2013)..............................................10

*In re AOL Time Warner, Inc. Sec. Litig.*,
  503 F. Supp. 2d 666, 678-79 (S.D.N.Y. 2007) ....................................................25

*In re Aratana Therapeutics Inc. Sec. Litig.*,
    315 F. Supp. 3d 737, 755 (S.D.N.Y. 2018)................................................22

*In re AstraZeneca PLC Sec. Litig.*,
    2022 WL 4133258, at *7, *9 (S.D.N.Y. Sept. 12, 2022)..................................7, 8, 19

*In re CRM Holdings, Ltd. Sec. Litig.*,
    2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012)..............................................10

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
    2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021) ............................................12

*In re DRDGOLD Ltd. Sec. Litig.*,
    472 F. Supp. 2d 562, 571 (S.D.N.Y. 2007)..............................................................10

*In re Express Scripts Holding Co. Sec. Litig.*,
    2017 WL 3278930, at *16, *18 (S.D.N.Y. Aug. 1 2017) .....................................13, 15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249, 270 (S.D.N.Y. 2004)..............................................................14

*In re Francesca's Holdings Corp. Sec. Litig.*,
    2015 WL 1600464, at *20, *22 (S.D.N.Y. Mar. 31, 2015) .................................24, 25

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352, 389 (E.D.N.Y. 2013) .............................................................24

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009)................................................................8

*In re Iconix Brand Grp., Inc.*,
    2017 WL 4898228, at *15-16 (S.D.N.Y. Oct. 25, 2017)............................................9

*In re Initial Pub. Offering Sec. Litig.*,
    399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) ........................................................25

*In re Kandi Techs. Grp., Inc. Sec. Litig.*,
    2019 WL 4918649, at *7 (S.D.N.Y. Oct. 4, 2019) ...........................................15, 16

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553, 577-79, 580-81, 584-85 (S.D.N.Y. 2014)....................8, 19, 21

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501, 513 (2d Cir. 2010)............................................................................24

*In re Plug Power, Inc. Sec. Litig.*,
    2022 WL 4631892, at *11, *16 (S.D.N.Y. Sept. 29, 2022)..................................7, 11

*In re Sina Corp. Sec. Litig.*,
2006 WL 2742048, at \*12 (S.D.N.Y. Sept. 26, 2006)............................................................9

*In re Sportsline.com Sec. Litig.*,
366 F. Supp. 2d 1159, 1173 (S.D. Fla. 2004) ..........................................................8

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
2014 WL 7176187, at \*6 (S.D.N.Y. Dec. 16, 2014) ............................................13

*Johnson v. Sequans Commc'ns S.A.*,
2013 WL 214297, at \*2, \*17 (S.D.N.Y. Jan. 17, 2013)..........................................15

*Kalnit v. Eichler*,
264 F.3d 131, 141, 144 (2d Cir. 2001) ............................................................10, 12

*Kasilingam v. Tilary, Inc.*,
2021 WL 4429788, at \*7 (S.D.N.Y. Sept. 27, 2021)..............................................10

*Kocourek v. Shrader*,
391 F. Supp. 3d 308, 327 (S.D.N.Y. 2019).........................................................23

*Koplyay v. Cirrus Logic, Inc.*,
2013 WL 6233908, at \*5 (S.D.N.Y. Dec. 2, 2013) ...................................................9

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147, 157-58 (2d Cir. 2007) ...........................................................24, 25

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161, 173 (2d Cir. 2005).......................................................................23

*Lipow v. Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144, 162-63, 173 (S.D.N.Y. 2015) ...................................11, 15, 25

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010)..........................................................20

*Magnum Hunter Res. Corp. Sec. Litig.*,
26 F. Supp 3d 278, 285, 298-99 (S.D.N.Y. 2014) ................................................14

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245, 250 (2d Cir. 2014).......................................................................17

*Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
517 F. Supp. 3d 196, 207 (S.D.N.Y. 2021)..........................................................17

*Reilly v. U.S. Physical Therapy, Inc.*,
2018 WL 3559089, at \*15, \*18 (S.D.N.Y. July 23, 2018) ................................10, 16

*Shemian v. Rsch. in Motion Ltd.*,
  2013 WL 1285779, at *18, *23 (S.D.N.Y. Mar. 29, 2013) ..............................................15, 23

*Silsby v. Icahn*,
  17 F. Supp. 3d 348, 362 (S.D.N.Y. 2014) .................................................................................19

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
  412 F. Supp. 3d 353, 364 (S.D.N.Y. 2019) ..............................................................................23

*Steinberg v. Ericsson LM Tel. Co.*,
  2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) ......................................................15, 17

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190, 196 (2d Cir. 2008)............................................................................13, 15, 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308, 314 (2007) .....................................................................................................7, 16

*Tyler v. Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323, 327, 344 (S.D.N.Y. 2011)......................................................................16

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749, at *13-14, *21-22 (S.D.N.Y. Sept. 21, 2021) .............................8, 13, 23

*Vladimir v. Bioenvision Inc.*,
  606 F. Supp. 2d 473, 485-86 (S.D.N.Y. 2009) ..................................................................18, 19

*Woolgar v. Kingstone Cos.*,
  477 F. Supp. 3d 193, 221, 239 (S.D.N.Y. 2020)................................................................16, 19

**Statutes**

15 U.S.C. § 78t(a) ..............................................................................................................................25

15 U.S.C. § 78u-5(c) ........................................................................................................................22

Olo Inc. ("Olo" or the "Company") is a leading software provider to the restaurant industry, powering on-demand digital commerce operations, enabling digital ordering, delivery, front-of-house management, and payments. AC ¶¶ 34-36; Ex. N at 48.[1] Olo sells software "modules" to restaurant brands. AC ¶¶ 70, 81. Once established, Olo attempts to grow these brand relationships by selling additional modules to each customer. *Id.* ¶ 81. Olo has more than 600 customers, many of whom are large, household-name enterprise brands with many locations including Dairy Queen, Jimmy John's, Jack in the Box, and Panda Express. AC ¶ 39; Ex. U at 27. All customer brands and all customer locations are not equal when it comes to revenue generation: a location's revenue depends on how many and which modules are used at that location, and whether those modules generate subscription or transaction-based revenue. AC ¶ 37; Ex. N at 2, 50, 53. As a result of this diversification, no single customer is material to Olo's business. *See* Ex. N at 21 (10 largest customers collectively 19% of revenue).

Despite Olo's repeated warnings to investors that customers may stop or decrease usage of their modules, Plaintiff now claims fraud because a single well-known restaurant brand—Subway—did exactly as Olo warned. Subway, a customer since 2020, utilized just one of Olo's lower revenue modules (Rails), paying Olo on a per transaction basis. AC ¶ 43. For example, every time an order was placed at a Subway location using Olo's software, Olo received a small fee. *See* AC ¶ 37. Despite other Olo customers averaging nearly 3 modules per location, Subway remained a Rails-only client with an average revenue per location ("ARPU") that was a fraction of other Olo

---

[1] The Court may consider the AC's allegations, as well as the exhibits attached to the accompanying Declaration of Jennifer B. Luz ("Ex."), all of which are referenced in or relied upon by the Plaintiff's Amended Class Action Complaint for Violations of Federal Securities Laws (the "AC"). *See Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 197 (S.D.N.Y. 2020) (court may take judicial notice of SEC filings). All (i) internal alterations, citations, and quotation marks are omitted unless otherwise noted; and (ii) emphasis is added.

customers, and generated only a few million dollars of the Company's annual revenues of $150 million for 2021. Ex. N at 50, 58; Ex. T at 11. In 2022, Subway indicated that it was considering transitioning away from Rails and instead directly integrating with third-party applications (AC ¶¶ 50, 105-06; Ex. T at 11, 13)—another risk Olo had specifically warned investors might occur with Rails customers. Ex. N at 20, 28-29; *see also* Ex. A. The timing, certainty, and impact were unknown however, and while Olo worked to determine if the relationship could be modified or otherwise saved, it took a conservative approach when incorporating Subway into its full year revenue guidance. AC ¶105; Ex. T at 9. Ultimately, by the summer of 2022, it became clear that Olo would be unlikely to convince Subway to continue using Rails, and Subway locations began to slowly transition off the Olo platform and would continue to do so over the next three quarters (the "Subway Transition"). AC ¶ 104. Olo announced the Subway Transition to investors as part of its second quarter earnings release in August 2022. *Id.* Also in August 2022, Olo reduced its full-year revenue guidance due to inflation, restaurant industry labor shortages, and the "recessionary environment," which had further elongated Olo's sales and deployment cycles during the first half of the year. *Id.* ¶ 107; Ex. T at 5.

Plaintiff now asserts Olo should have disclosed the Subway Transition sooner, and that Olo misstated its active locations count between August 10, 2021 and August 11, 2022 (the "Class Period"). But invoking a well-known restaurant chain does not equate to securities fraud. The securities laws do not require disclosure of ongoing customer discussions that could potentially sabotage an evolving business relationship before the outcome of those discussions was certain, especially here, where Subway was a one-module customer contributing an immaterial amount of annual revenue. Nor are there sufficient allegations of personal benefit to the Individual Defendants: their sales of Olo stock pursuant to trading plans preceded the developments with

Subway by several months, and there is no allegation they personally benefitted from two Olo acquisitions, which were primarily financed by cash, not stock. The AC's claim that Defendants misstated active locations throughout the Class Period is even less plausible: Olo has never restated active locations, and the AC relies solely on low-level confidential witnesses ("CWs") unable to provide any facts tying module deployment data to Olo's publicly reported active locations. The AC does not allege any internal document or conversation to suggest that the Individual Defendants knew active locations was allegedly misreported.

The claims fail for the independent reasons that the AC fails to allege scienter, fails to allege a material misstatement or omission, and fails to allege loss causation. In addition, most of the alleged misstatements and omissions are inactionable forward-looking statements, puffery, or statements of opinion. Absent a primary violation of § 10(b)(5), Plaintiff's § 20(a) claim should also be dismissed, and the AC should be dismissed with prejudice.

## BACKGROUND

### A.   Olo Is Revolutionizing The Restaurant Industry.

Olo is a leading SaaS (software as a service) platform for restaurants. *See* AC ¶ 2, 32. Olo created an on-demand platform to enable digital ordering and delivery. *See id.* ¶¶ 32, 34. Olo has experienced tremendous growth since 2020 as restaurants added take-out and delivery services, curbside pickup offerings, online ordering, and pre-pay functionalities. *See id.* ¶ 3, 32, 34. Olo went public on March 17, 2021. *Id.* ¶ 3. By the end of Q2 2022, Olo had over 600 restaurant brands on its platform—including hundreds of large enterprise restaurant brands like Subway—and approximately 82,000 restaurant locations using its products. *See id.* ¶¶ 74-75, 80, 103. No single customer is a material source of revenue for Olo; at the end of 2021, Olo's 10 largest customers collectively generated approximately 19% of its revenue. Ex. N at 21; *see also* Ex. A.

The Olo platform has a number of modules across five separate product suites. AC ¶¶ 34-

36. "[A]lmost all" of Olo's platform revenue comes from its suite of "Ordering" modules. *Id.* at ¶37; Ex. U at 30. Lower revenue generating platform suites include Dispatch and Rails. Ex. U at 30. Rails allows Olo's customers to directly integrate their menus and pricing with third-party ordering applications, such as UberEats and DoorDash, and customers pay Olo a small fee for every order processed. AC ¶¶ 36-37. Olo continues to offer new modules; for example, it recently launched Olo Pay, which allows Olo to generate revenue from processing payment transactions. Ex. N at 2, 8. It also has expanded its product suite through acquisitions, including the November 2021 acquisition of Wisely, Inc. ("Wisely") and the February 2022 acquisition of Omnivore Technologies, Inc. ("Omnivore"). AC ¶¶ 117, 119. Customers can use different configurations of Olo's modules; at the end of 2021, Olo's brand customers used on average 2.7 modules *per location*. Ex. N at 15, 50. A large part of Olo's growth strategy is to sell additional modules to existing customers. AC ¶ 94; Ex. N at 50.

Olo sells to restaurants at the brand level—rather than to individual locations—with the goal of "secur[ing] exclusivity across all company-owned and franchise locations." Ex. N at 2; *see also* AC ¶ 81. This strategy allows Olo to realize certain sales and marketing cost efficiencies. Ex. N at 2. As Olo has warned investors, however, historically it has "experienced long sales cycles when selling to customers" and, "while restaurant brand customers may more quickly deploy our modules on a limited basis, before they will commit to deploying our modules at scale, they often require extensive education about our modules and significant customer support time or pilot programs, engage in protracted pricing negotiations, and seek to secure development resources." Ex. N at 20; *see also* Ex. A. This sales process recently became even longer due to macroeconomic conditions, such as rising inflation, a recessionary environment, and labor shortages. AC ¶ 107.

### B.    Olo Reports Revenue And Other Performance Metrics.

Olo provides investors with guidance on core financial metrics of revenue and net non-

GAAP operating income. *See, e.g.*, Ex. L. Olo also reports quarterly on several performance indicators, including active locations and ARPU. AC ¶ 41; *see also* Ex. N at 50.[2] These metrics measure different aspects of Olo's performance (*see* AC ¶ 59; Ex. C), and positive performance on one metric does not necessarily correlate to positive performance on the other (*see* Ex. T at 8, 12). In other words, Olo could have active locations that generate minimal revenues per location. Olo "define[s] an active location as "a unique restaurant location that is *utilizing* one or more modules in a given quarterly period." AC ¶ 66. Olo's active location data is based on actual usage of Olo's products in a given fiscal quarter. Ex. C; Ex. T at 15. By contrast, Olo "calculate[s] ARPU by dividing the total platform revenue in a given period by the average active locations in that same period." Ex. C. Between active locations and ARPU, the Company views ARPU to be the critical driver of its future growth and the most important input for its "100X growth opportunity." AC ¶¶ 93-94; *see also* Ex. R.

In addition to financial metrics, Olo warned investors about significant risks that could impact its financial performance including, for example:

- If "any of our largest restaurant customers do not continue to use our platform, use fewer of our modules, use our modules in a more limited capacity, or not at all, . . . our . . . financial condition could be adversely affected." Ex. N at 21;

- If "any of the largest digital ordering aggregators . . . create software that . . . competes with our platform by directly integrating with one of our customers, our ability to generate transactional revenue using our Rails module will decline, which could harm our business and results of operations." *Id.* at 28-29;

- "[I]f our customers do not increase their use of our platform or adopt and deploy additional modules, or if they reduce the number of locations using our platform, then our revenue may decline and our results of operations may be harmed." *Id.* at 20; and

- Olo "cannot accurately predict our customers' usage levels and the loss of customers or reductions in the number of locations that use our platform or their usage levels of our

---

[2] Unlike revenue, the Company does not provide formal guidance for performance metrics like active locations. *See* Ex. L; Ex. C at 10.

modules may each have a negative impact on our business . . . ." *Id.*; *see also* Ex. A.

**C.      Subway Decides To Directly Integrate With Third-Party Applications.**

In February 2020, Olo announced its Rails partnership with Subway. AC ¶ 43. Although a household name, Subway was just one of Olo's 600-plus brand customers, and it used only a single module, the lower revenue Rails. AC ¶ 43. As a Rails-only customer, Olo earned revenue from Subway via a small fee paid per transaction (AC ¶37), and a Subway location would be counted as an "active location" for a period even if the only transaction in a quarter was a single sandwich order at that location (AC ¶¶ 41, 66). Unsurprisingly, Subway's ARPU was a fraction of Olo's other customers' ARPU. AC ¶44; Ex. T at 8, 12. Subway contributed "just a few million dollars of revenue on a full year basis" (Ex. T at 11) as compared to Olo's annual revenues for 2021 of approximately $150 million (Ex. N at 58).

In 2022, Olo learned there was a possibility that Subway may directly integrate with third-party delivery applications rather than continuing to use Olo's Rails module. AC ¶ 50. Initially, neither the timeline nor the full ramifications for the Olo-Subway business relationship were clear to Defendants. AC ¶ 105; Ex. T at 10. To account for the risk that Subway locations might stop using the Rails module—and while discussions between the companies were ongoing—Defendants took a conservative approach in setting Olo's full-year revenue guidance and assumed that Subway-related revenue might "taper" over the course of the year. AC ¶ 105; Ex. T at 9, 12. By the summer 2022, it was clear that Subway in fact would be leaving the Olo platform, and the first Subway locations—approximately 2,500 total—ceased being active locations as of the end of Q2 2022. AC ¶ 104. Given these developments, during Olo's Q2 2022 earnings call on August 11, 2022, Defendants announced the Subway Transition and their expectation that the Subway locations still using Rails would cease to do so by the end of 2022 or in Q1 2023. *Id.*

**ARGUMENT**

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiff must plead (1) a strong inference of scienter; (2) a material misrepresentation or omission; and (3) loss causation. *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). The AC must also meet the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by "stating with particularity the circumstances constituting fraud," including "facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 196.

## I.   THE AC DOES NOT ALLEGE A STRONG INFERENCE OF SCIENTER.

To plead scienter, Plaintiff must allege that a defendant acted with "a state of mind demonstrating an intent to deceive, manipulate or defraud." *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 720 (S.D.N.Y. 2018). Plaintiff can do this by alleging facts that show either (1) that the Defendants had the "motive and opportunity" to commit the alleged fraud, or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *11 (S.D.N.Y. Sept. 29, 2022). Further, Plaintiff's allegations must give rise to a "strong inference" of scienter that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). This mandatory balancing inquiry "requires courts to consider not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Fries*, 285. F. Supp. 3d at 720.

### A.   The AC Does Not Plead A Motive To Commit Fraud.

"To plead a motive to commit fraud, a plaintiff must allege that the individual defendants received a concrete and personal benefit from making their alleged misrepresentations or actionable omissions." *In re AstraZeneca PLC Sec. Litig.*, 2022 WL 4133258, at *9 (S.D.N.Y.

Sept. 12, 2022). Neither of the AC's "motives"—sale of stock pursuant to trading plans and corporate acquisitions primarily paid in cash—satisfy the compelling inference required by the PSLRA.

### 1.   The Individual Defendants' Trading Is Not Suggestive Of Fraud.

Insider "stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent," unless Plaintiff "establish[es] that [the] stock sales were unusual." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 584-85 (S.D.N.Y. 2014); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); (same). All trades by CEO Noah Glass and CFO Peter Benevides during the Class Period were pursuant to Rule 10b5-1 trading plans (*see* AC ¶ 112; Ex. X; Ex. Y), therefore, those sales "could not be timed suspiciously." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4d 353, 355-56 (2d Cir. 2022); *see also In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) ($96 million in gross profits not suspicious because pursuant to trading plan). Nor is either plan alleged to have been "entered into or strategically amended to take advantage of an inflated stock price or insider information." *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021).

Moreover, the timing of the Individual Defendants' stock sales are not suspicious. Glass and Benevides had no ability to sell stock before the post-IPO lock-up expired (AC ¶ 18 & n.4), and it is not suspicious that their first sales occurred almost immediately upon the lock-up's expiration (Ex. X; Ex. Y). In addition, the dates of their stock sales bear no relationship to the dates of the allegedly misleading statements. The AC alleges false statements during the Class Period on August 10, October 21, November 9, January 10, February 23, and later. Glass's Class Period sales were on September 15, October 1 and 4, and November 5 and 8[3]; Benevides's sales were on

---

[3] The allegation that Glass "conspicuously" stopped selling "in early 2022 when he was informed of the Subway departure" (AC ¶ 114) is demonstrably false from the SEC filings relied upon in

September 14 and 15, October 28 and 29, and November 22 and 23.[4] Where, as here, stock sales were made "neither at the beginning of the Class Period, soon after the allegedly misleading statements, nor clustered at its end," the timing of the sales is not suspicious. *Koplyay v. Cirrus Logic, Inc.*, 2013 WL 6233908, at *5 (S.D.N.Y. Dec. 2, 2013). Indeed, all of the Individual Defendants' sales occurred at least three months *before* the earliest allegedly misleading statement relating to Subway on February 23 (AC ¶¶ 93-96), and at least two months *before* the earliest the AC alleges Defendants could have known of the Subway Transition (AC ¶¶ 16, 50). *See In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *15-16 (S.D.N.Y. Oct. 25, 2017) (stock sales when "the alleged fraud was only just beginning to ramp up" not "unusual"). And all sales occurred at least eight months *before* the alleged August 2022 corrective disclosures (AC ¶¶ 103-10), longer than periods that courts have concluded are not suspicious at the pleading stage. *See, e.g.*, *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at *12 (S.D.N.Y. Sept. 26, 2006) (sales more than a month before disclosure not suspicious).

The simple fact that Glass and Benevides obtained approximately $8.8 million and $1.5 million, respectively, from their Class Period sales (AC ¶¶ 18, 112-13, 115) does not render those sales suspicious. Glass's Class Period sales were no more than 1% of his vested holdings at the time of each sale; Benevides's Class Period sales were less than 2.5% of his vested holdings at the time of each sale; and both Individual Defendants' overall vested holdings in the Company

---

the AC. Glass's only sales after November 8 were non-discretionary sales to cover tax obligations triggered by the vesting of restricted stock units. *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1173 (S.D. Fla. 2004) (sales for "tax withholding purposes" do not support inference of scienter); *see also* Ex. X.

[4] The AC does not allege the specific dates of Benevides's Class Period stock sales, which were disclosed in Olo's Forms 4 used as the source of the AC's allegations. Ex. Y. "When a complaint alleges only 'incomplete information' concerning insider sales, the court is 'free to consider' defendants' SEC filings to fill gaps on motion to dismiss." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).

*increased* from the start of the Class Period to the end of the Class Period. Ex. V; Ex. W.[5] An increase is not indicative of scienter. *See Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (sales of 44% of shares not suspicious); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012) ($37 million of sales of 100%, 36%, and 26% of shares not suspicious). Taken together, the alleged sales were not suspicious.

### 2.      The Acquisitions Are Not Plausible Motives To Commit Fraud.

Plaintiff's theory that Defendants engaged in fraud to "facilitate" the Wisely and Omnivore transactions also fails. AC ¶ 116. The AC does not allege that either transaction was done for personal gain. *See Kasilingam v. Tilary, Inc.*, 2021 WL 4429788, at *7 (S.D.N.Y. Sept. 27, 2021) (no scienter because no allegation of direct financial benefit to individual defendants). If anything, Defendants' purported motive to enter into the transactions reflects "a laudable desire . . . to protect shareholder investments," and not an intent to defraud Olo's stockholders. *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *16 (S.D.N.Y. Jan. 14, 2013); *see also In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 571 (S.D.N.Y. 2007). Further, "[m]otives that are common to most corporate officers . . . do not constitute 'motive' for purposes of [the scienter] inquiry." *ECA*, 553 F.3d at 198; *see also Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001). And the AC does not allege any "unique connection between the fraud and the acquisition[s]," which is a minimum requirement for such a transaction to support a strong inference of scienter. *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 242 (S.D.N.Y. 2012).

The allegations related to the acquisitions are also implausible. The combined acquisition price was $237M, more than half of which was paid in cash. AC ¶¶ 117, 119 (Wisely acquired for stock and $77M cash; Omnivore for $50M cash). Recognizing that the Company's stock price had

---

[5] *See Bristol-Myers*, 28 F.4th at 355 (defendants bought more than sold during the class period).

zero bearing on the Omnivore all-cash acquisition, Plaintiff claims that "had the market known the truth prior to the Wisely acquisition, Olo shares would have traded at a lower price, and *perhaps would have forced Olo to dip further into its cash reserves*, leaving little, if anything, available for the Omnivore acquisition." AC¶ 120. This is pure speculation. The AC contains no allegation that Olo's cash reserves were depleted, or that Company could not have funded either transaction absent Defendants' alleged fraud. Nor could it, as the Company had over $500 million of cash and cash reserves *after* acquiring Wisely, still more than twice the cost of both acquisitions combined. Ex. N at 62.[6] Plaintiff's allegations concerning the Wisely and Omnivore transactions are insufficient as a matter of law for the Court to infer scienter.

### B.   Plaintiff Fails To Allege Knowledge Or Extreme Recklessness.

Absent motive, Plaintiff must allege strong circumstantial evidence of conscious misbehavior or recklessness. *See ECA*, 553 F.3d at 198-99; *Acito*, 47 F.3d at 52. To do so, Plaintiff must plead specific facts demonstrating conduct "that is at least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Plug Power*, 2022 WL 4631892, at *16. Recklessness is "a state of mind approximating actual intent." *Id.*; *see also Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 162 (S.D.N.Y. 2015) ("Where the plaintiff pleads scienter by conscious misbehavior or recklessness rather than motive, the strength of the circumstantial allegations must be correspondingly greater."). The AC does not allege particularized facts that suggest Defendants knew or were reckless in not knowing that their statements were false and misleading. Further, the "core operations" doctrine (to the extent still

---

[6] Olo announced the Wisely transaction in October 2021, *nearly three months before* Defendants allegedly learned of the Subway Transition (*see* AC ¶ 50), making it impossible that the transaction could have motivated Defendants to mislead stockholders about Subway.

viable) cannot compensate for these pleading deficiencies.

 ***Subway Transition.*** The AC's allegations do not support that Glass or Benevides knew that any public statements between February and August 2022 were false and misleading due to "Subway's pending departure." AC ¶ 105. The AC first points to Olo's decision to reduce its revenue guidance in February 2022 to account for the possibility of the Subway Transition as support for the inference that Defendants were reckless in not disclosing earlier. AC ¶¶ 105-106. But the fact that Defendants took a conservative approach in setting revenue guidance does not mean that the Subway Transition was certain to occur as of February 2022. As Benevides stated, as of February 2022 when Olo issued its guidance, Defendants only knew of "*the possibility* that Subway may integrate directly," but did not know whether the risk would come to fruition, and "the timeline was unclear." AC ¶ 105. Moreover, in the same call, Benevides explained (and the AC alleges no facts to refute) that Defendants "believe[d] the relationship could evolve sometime this year with a wide range of outcomes and took a conservative approach to our relationship with Subway in our prior guidance." Ex. T at 8. Where the Subway Transition was not certain to occur and Defendants had no duty to disclose, Plaintiff's allegations regarding the revenue guidance reduction do not give rise to an inference of scienter. *See Kalnit*, 264 F.3d at 144 (no scienter absent "clear duty to disclose"); *see also Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 242 (1st Cir. 2015) ("questionable" or "marginal" materiality undercuts inference of scienter).[7]

 The AC also alleges that Subway informed certain Olo "sales" employees in a meeting

---

[7] *See infra* at 17-19. Nor can Plaintiff's rely on the fact that the Subway Transition did eventually come to pass to establish that Defendants knew it would happen as of February 2022. *See In re Diebold Nixdorf, Inc. Sec. Litig.*, 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021) ("Hindsight, although 20/20, cannot be used to prove securities fraud.").

sometime "[i]n late January or early February 2022" that Subway intended to directly integrate with third-party applications and cease using Rails. AC ¶ 50. This allegation falls far short of suggesting an inference that Subway terminated its relationship with Olo as of February 2022 (the AC acknowledges it did not, AC ¶ 104), or that this meeting was anything other than a sales meeting during and after which Olo worked to determine how the relationship would, in fact, evolve (as Benevides explained). Ex. T at 9. Nor does the AC allege that the Individual Defendants participated in or even knew about this meeting. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008). General, unsourced allegations that Glass "has regular interactions with Olo's clients" (AC ¶¶ 124-25),[8] do not link either Glass or Benevides to this alleged meeting. *See Villare*, 2021 WL 4311749, at *22 ("senior executives were very hands on" insufficient). Nor is it a reasonable inference that Defendants must have been aware of the meeting by virtue of their senior positions at Olo. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) (allegations based only on "defendants' corporate positions . . . are entitled to no weight").

Lastly, the AC claims that Glass announced at an Olo town hall meeting sometime in "early 2022" that Subway would stop using Olo's Rails module "by the end of the year or the beginning of 2023." AC ¶¶ 16, 51-53, 122.[9] Yet this allegation of an undated internal meeting is not specific enough to establish *when* Defendants learned the Subway Transition was definite, *see In re Express*

---

[8] The AC examples of Glass's involvement in operations at Olo from interviews purportedly conducted by an unidentified "Public Company Research Organization." AC ¶ 124. Defendants have not been able to identify the source of these allegations from the AC's vague descriptions. Defendants cannot adequately assess their context or import, and the Court should not credit them.

[9] This allegation is based primarily on the claims of CW6 who joined Olo in March 2022 and states the Subway Transition was announced at "one of the first" monthly town hall meetings CW6 attended, putting the town hall meeting—*at the earliest*—in late Q1 or Q2 2022. AC ¶ 52. CW7 does not add any additional detail regarding the timing of the alleged announcement. AC ¶ 53.

*Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1 2017), or whether they made any allegedly misleading statements after that point. Taken together, these allegations do not support that the Defendants engaged in "conscious misbehavior or recklessness" by not disclosing the Subway Transition earlier despite knowing it inevitably would be disclosed if it happened. *See ECA*, 553 F.3d at 198-99.

     ***Active Locations.*** The AC contains *zero* allegations that Defendants knew or were reckless in not knowing about the Company's purportedly misreported active locations. Plaintiff's entire theory rests on CW1 and CW2, two low-level employees involved in deploying software to Olo customers (but notably not involved in public reporting) who do not claim to have had any interactions with either Glass or Benevides such that they had insight into their state of mind. *See Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp 3d 278, 285, 298-99 (S.D.N.Y. 2014); *Glaser*, 772 F. Supp. 2d at 594-95. Even if their statements related to Olo's publicly reported active locations as opposed to deployed and/or contracted locations (they do not, *see infra* at 19-21)— there is no allegation that the alleged inaccuracies in reported active locations were known to anyone other than themselves or their immediate supervisors. *See* AC ¶¶ 84-91; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 270 (S.D.N.Y. 2004) (CW's anticipation "does not establish that . . . the individual defendants had similar foresight"). Plaintiff attempts to bridge this gap by pleading that Benevides (but not Glass) had access to business intelligence software ("Looker") that tracked Olo's "metrics, including the active locations count." AC ¶ 123. But there is no allegation that Benevides ever accessed Looker, never mind when or what data he accessed, that the Looker data was inaccurate, or that Benevides would have been able to tell there was anything wrong with the data.[10] Having "fail[ed] to identify any reports Defendants . . . saw,

---

[10] Nor do these allegations support an inference of knowledge during the Class Period. The AC's

or any conversations in which they were provided information, that was inconsistent in any way with their public statements," Plaintiffs have failed to plead a strong inference of scienter. *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008); *see also Dynex*, 531 F.3d at 196.

***Core Operations.*** The AC's reliance on the "core operations" doctrine to bolster its scienter allegations is also insufficient. It is unclear whether the "core operations" doctrine survived the passage of the PSLRA. *See Shemian v. Rsch. in Motion Ltd.*, 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014). The doctrine is not an independent basis for establishing scienter. *See Lipow*, 131 F. Supp. 3d at 163. Core operations are matters "critical to the long term viability of the company and events affecting a significant source of income." *Express Scripts*, 2017 WL 3278930 at *18. The operation must "either make up nearly all of a company's business or be essential to its survival." *In re Kandi Techs. Grp., Inc. Sec. Litig.*, 2019 WL 4918649, at *7 (S.D.N.Y. Oct. 4, 2019). Neither Olo's contract with Subway nor its reporting of active locations is, or is alleged to be, a "core operation" of the Company.

Subway is not "core" because it does not account for all or nearly all of Olo's business nor is it necessary to the Company's survival. *Kandi*, 2019 WL 4918649, at *7. Subway used only one (lower revenue) module; was one of more than 600 brand customers; and accounted for only a small fraction of the Company's revenue. *Supra* at 6. The AC's unsupported allegations that Subway was Olo's "largest client both by revenue and active location count"[11] (AC ¶ 10) and its "most important client" (*Id.* ¶ 46-47), are not sufficient. *See Express Scripts*, 2017 WL 3278930,

---

claims regarding Looker come from CW5 and, to a lesser extent, CW1, both of whom left the Company before the beginning of the Class Period. AC¶¶ 48, 85, 123.

[11] Even if Subway was 8% of Olo's total revenue as Plaintiff claims (it was not, *see infra* at 17-18), that is still insufficient to render it a "core operation." *See Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *2, *17 (S.D.N.Y. Jan. 17, 2013).

at *16 (not "core" despite "[t]he critical importance" of "largest client"); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 327, 344 (S.D.N.Y. 2011) ("largest customer by volume" not "core").[12] "[A]ctive locations" is an operating metric rather than one measuring Olo's actual revenues. *See Reilly*, 2018 WL 3559089, at *18 (core operations doctrine inapplicable to "accounting issue"); *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (metric for tracking inventory not "a core operation"). That active locations was discussed during "every earnings call and analyst conference" (AC ¶¶ 121-22) does not alter this conclusion. *See Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 239 (S.D.N.Y. 2020).

### C.    The Non-Fraudulent Inferences Outweigh Any Inference Of Scienter.

The AC lacks any facts that support a cogent and compelling inference of scienter when balanced against non-fraudulent inferences. *See Tellabs*, 551 U.S. at 314; *Kandi*, 2019 WL 4918649, at *4; *Fries*, 285 F. Supp. 3d at 720. According to the Plaintiff, Defendants knew the Subway Transition was certain to occur as of February 2022 but then concealed it from investors for six months to inflate the stock price, despite no longer selling stock under their trading plans, despite financing acquisitions with cash not stock, despite the minimal revenue impact of Subway, and despite knowing that the Subway Transition imminently would be disclosed to investors due to the corresponding reduction of the active locations count. Further, Plaintiff contends that Defendants knowingly or recklessly misstated Olo's active locations count even though—apart from inapposite CW allegations—there has never been any restatement or indication that this was the case. By contrast, the non-culpable explanations are cogent and compelling. As to Subway, initial indications from Subway took place in the context of a *sales* conversation. Olo proceeded

---

[12] The claim that the Court should infer Defendants knew of the alleged over-reporting of Jack in the Box active locations because it was one of "Olo's top eight clients," which *collectively* made up 50% of Olo's active locations should be rejected for the same reason. AC ¶¶ 8,121.

cautiously as it evaluated its relationship with Subway, and did not jeopardize the potential evolution of that relationship by prematurely rushing to disclose that Subway was transitioning from the platform *before* the transition was certain, *before* Subway terminated its contract, and *before* any Subway locations were alleged to have stopped using Olo's Rails module. As to Olo's active locations, the far more cogent inference is that the Individual Defendants were unaware of any facts suggesting that the publicly reported active location number somehow reflected internal deployment or contracted location data. The non-fraudulent inference is especially strong where, as here, there are no allegations of a single internal document or witness statement that Defendants knew or should have known the Company's publicly reported active locations count was inaccurate. *See Steinberg*, 2008 WL 5170640, at *13; *Dynex*, 531 F.3d at 196.

## II.     THE AC DOES NOT PLEAD ANY ACTIONABLE FALSE STATEMENTS OR OMISSIONS.

### A.     The AC Does Not Identify Any Material Omission.

The AC alleges a material omission based on Olo's failure to disclose the Subway Transition before August 2022. To plead securities fraud based on an omission, Plaintiff must show that Defendants "had a duty to disclose the omitted information." *Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 207 (S.D.N.Y. 2021). The AC does not plausibly allege that the Subway Transition required disclosure. "In general, there is no duty to disclose a fact . . . 'merely because a reasonable investor would very much like to know that fact.'" *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). Olo does not have any customer that is material by revenue, and Subway's name recognition does not somehow make it so. *See supra* at 3. Plaintiff's allegation that Subway was 8% of Olo's revenue during the Class Period (AC ¶ 44 & n.11) is based on math directly refuted by the very disclosures the AC uses for this calculation, which also state that Subway "contributed about a few million dollars of revenue *on*

*a full year basis*" (Ex. T at 11), far less than the $3.36 to $3.44 million *per quarter* hypothesized by Plaintiff (AC ¶ 44 & n.11).[13] "[A] few million dollars of revenue" compared to Olo's total annual revenues of approximately $150 million in 2021 (Ex. N at 58), is presumptively not material. *See IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. RBS Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015) (revenue of 5% or less presumptively immaterial). Subway's use of only one module, and paying Olo based on transaction volume and not location count, underscores Subway's immateriality—while active locations decreased due to the Subway Transition, ARPU actually *increased*. AC ¶ 41; *see also* Ex. T at 8, 12.

The AC also fails to allege facts giving rise to any duty to disclose the Subway Transition earlier. Plaintiff has not alleged any fact that contradicts what Defendants explained in August 2022: although the first indications from Subway came earlier in the year, the timeline was "unclear" (AC ¶ 105), and Defendants believed there was potentially "a wide range of outcomes" (Ex. T at 9). Because the certainty and potential impact was not yet reasonably definite and discussions with the customer were still ongoing, Defendants had no obligation to disclose. *See Acito*, 47 F.3d at 53 (no duty to disclose negative consequences from a failed factory inspection where it was not a "foregone conclusion" that consequences would materialize); *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009) (no duty to disclose negotiations while discussions ongoing or before definite agreement). This is particularly so, given the statements Plaintiff claims were misleading because of the omission are "[g]eneral statements about a company's financial projections or activities" and not specifically related to Subway.

---

[13] The AC's calculation of Subway's revenue mistakenly assumes that all of Subway's 20,000 locations were using Rails and producing revenue, despite conceding that every analyst following Olo understood what Glass explained on the same call: only 15,000 Subway locations ultimately utilized Olo's products and services. Ex. T at 6. Other than these faulty calculations, the AC alleges no facts to suggest that Subway's revenue contribution was material.

*See Bioenvision*, 606 F. Supp. 2d at 485-86.[14] The securities laws did not require Defendants to sabotage negotiations with Subway by prematurely announcing the end of their relationship.[15]

      **B.**      **The AC Does Not Allege Any False Or Misleading Statements.**

      The AC alleges that Defendants overstated Olo's number of active locations because "Olo prematurely included individual restaurant locations in its active locations count"; "Olo failed to remove inactive locations from the active locations count"; and "not all brand locations within a single chain joined Olo's platform". AC ¶¶ 84-91. This claim is based solely on CW1 and CW2, who do not plausibly support an inference of falsity.

      CW1 is the sole source for Plaintiff's claim that Olo misreported active locations by prematurely including locations and failing to remove inactive locations. CW1 worked at Olo for less than a year and *left the Company before the Class Period started*, and so does not provide any basis to infer that statements during the Class Period were false. *See Lululemon*, 14 F. Supp. 3d at 580-81 (CW allegations from prior to class period did not render class period statements false); *see also Woolgar*, 477 F. Supp. 3d at 221 (no false statements where undated CW allegations did not establish contemporaneous falsity). Moreover, CW1 was a low-level employee who worked to onboard new customers. *See* AC ¶ 85. There is no allegation that CW1 was involved in the Company's public reporting function or had any visibility into how the Company tracked module usage for the purpose of publicly reporting active locations.[16] Indeed, while CW1 claims that as of

---

[14] The AC alleges that the omission of the Subway Transition rendered misleading generic statements about Olo's growth prospects. *Infra* at 22-23; *see also* Ex. B.

[15] Nor were Defendants required to disparage Olo's growth prospects or the Company's continuing relationship with Subway before they determined with reasonable certainty that Subway would, indeed, slowly stop using Rails. *See Silsby v. Icahn*, 17 F. Supp. 3d 348, 362 (S.D.N.Y. 2014); *see also AstraZeneca*, 2022 WL 4133258, at *7 ("no generalized duty to disclose negative facts").

[16] CW1 corroborates CW5's general claim that Olo used Looker to track metrics (AC ¶ 123), but does not otherwise provide any particularized allegations regarding how active locations were tracked, or if they had access to how data rolled up to the publicly reported active locations count.

the end of Q2 2021 only 200 of the approximately 2,000 Jack in the Box locations were "live" on the Olo Platform, CW1 does not claim to know whether all 2,000 locations actually were included in the Company's quarterly count. AC ¶ 85; *see Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (declining to credit allegations of "rank-and-file" CWs not alleged to have access to relevant data), *aff'd* 430 F. App'x 63 (2d Cir. 2011). And CW1 does not identify a single example of a purportedly "inactive" location that was erroneously reported as an active location. *See Abengoa*, 481 F. Supp. 3d at 209 (CW allegations insufficient where no allegations concerning "frequency" or "magnitude" of discrepancies).

CW2 is the sole source for the AC's claim that Olo allegedly included all franchise locations in its active locations count, even if not all were active. CW2 also is not alleged to have insight into Olo's public reporting. *See* AC ¶ 90. In characterizing CW2's claims, Plaintiff conflates "contracted" locations with "active locations." But Olo disclosed that active locations are not simply *all* contracted locations, and no reasonable investor could be surprised or confused by this given Olo's repeated warning that the period between contracting and deployment and use of its modules historically "extended to multiple quarterly periods." *See, e.g.*, Ex. N at 20-21; *see also* Ex. A. CW2's only example demonstrates Plaintiff's error. According to the AC, CW2 claims that all 4,000 *contracted* CKE locations were added to and included in Olo's *active* locations count for Q3 2021 even though only 50% of the *contracted* locations had actually installed Olo software at the time. AC ¶ 91.[17] But Olo's Q3 2021 earnings announcement disclosed it had added just

---

[17] To the extent Plaintiff claims that Olo included all contracted locations in its active locations based on a single statement by Glass that restaurant brands' corporate and franchise locations "always go[] live really all at the same time" (AC ¶¶ 5, 42, 77), this argument should not be credited. Plaintiff ignores the context of the statement, which was given in response to a question about Olo's practice of selling to a brand and subsequent deployment to corporate locations versus franchise locations. *See also infra* at 21. And Plaintiff's interpretation of this statement is directly contradicted by Olo's robust disclosures that deployment timelines can be protracted and not all

2,000 locations since the prior quarter, *not* all 4,000 contracted locations that Plaintiff claims. *Compare* Ex. H (76,000 active locations), *with* Ex. L (74,000 active locations).[18]

The AC also alleges that statements concerning Olo's sales practice of selling to restaurant brands and then entering into exclusive contracts covering all of the brands' locations are somehow false or misleading. *See* AC ¶¶ 70, 76, 77, 81. For support, the AC points to CW2's statement that "not all brand locations within a single chain joined Olo's platform" to suggest falsity. AC ¶ 89. No CW is alleged to have had sales roles, and there are no facts alleged that suggest that Olo did not actually sell at the brand level rather than the franchisee level. Critically, the AC impermissibly ignores the context in which the statements were made. *See Lululemon*, 14 F. Supp. 3d at 577-79. In context, these statements concern Olo's sales strategy and do not amount to a promise that every single restaurant location across the Company's 600-plus brand customers in fact were utilizing its products. To the contrary, Olo told investors that that it "*strive[s]* to be the exclusive provider of direct digital ordering services with *nearly 100% franchisee participation*,"—*not* that 100% of franchises actually used its products (Ex. N at 9), and warned repeatedly that there was no guarantee that brand customers would deploy Olo's products to their full location base or that all of a brand's locations would continue to use Olo's products once deployed (*see, e.g.*, Ex. N at 20 ("restaurant brand customers may more quickly deploy our modules on a limited basis, before they will commit to deploying our modules at scale"); *id.* ("customers [may] . . . reduce the number of locations using our platform"); *see also* Ex. A).

---

brand locations necessarily go live at the same time. *See* Ex. A.

[18] Even if the Court credits the AC's claims that active locations were overstated, the AC only claims that the Q2 2021 count was overstated by 2,038 locations or 2.8% of the total (AC ¶¶ 85-88), and that Q3 2021 count was overstated by approximately 2,000 locations or 2.6% of the total (AC ¶¶89-91). The AC thus does not offer any reason why the alleged overstatements are material. *See RBS*, 783 F.3d at 390.

### C.    The Alleged Misstatements And Omissions Are Inactionable.

Many of the alleged misstatements are "classically" forward-looking statements that are immunized by the PSLRA's statutory safe harbor. *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 755 (S.D.N.Y. 2018) ("[a] forward-looking statement is not actionable if it is identified and accompanied by meaningful cautionary language or . . . the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading"); *see also* 15 U.S.C. § 78u-5(c).[19] The AC points to statements that Defendants intended to grow the number of active locations on Olo's platform over the course of 2022 and beyond (AC ¶¶ 68, 93-101) and argues those statements were misleading because the Defendants failed to disclose the Subway Transition. But Olo's statements about growth prospects are nonactionable because they were accompanied by robust and meaningful cautionary disclosures that specifically identified the risks that came to fruition with Subway. *See supra* at 5-6; *see also* Ex. A. Olo also disclosed that "there can be no assurance that we will be able to retain these customers or acquire new customers, deploy additional modules to these customers, or continue to increase the volume of transactions on our platform." Ex. N at 16. And the AC fails to allege that Defendants had actual knowledge of the certainty of the Subway Transition (*see supra* at 12-14) or did not believe Olo had high-growth potential at the time of these forward-looking statements.

These alleged misstatements[20] are also classic non-actionable "puffery" that are "too general for a reasonable investor to have relied on them." *In re Adient PLC Sec. Litig.*, 2020 WL 1644018, at *22 (S.D.N.Y. Apr. 2, 2020). No reasonable investor would rely on the generic optimistic statements that Plaintiffs identifies: "we've never been more confident in our position and more excited about our opportunity ahead" (AC ¶ 93); or "we continue to deliver revenue

---

[19] *See* AC ¶¶ 64, 68, 93, 94, 95, 96, 97, 98, 99, 100, 101; *see also* Ex. B.
[20] *See* AC ¶¶ 64, 68, 70, 76, 77, 79, 81, 93, 94, 95, 96, 97, 98, 99, 100, 101; *see also* Ex. B.

growth and profitability. . . [o]ur position is strong as we have a long runway for growth through adding more locations" (AC ¶ 101). *See Villare*, 2021 WL 4311749, at *13-14 ("sustainable growth" was puffery); *Shemian*, 2013 WL 1285779, at *23 ("really exciting growth" was puffery). Many of the alleged misstatements are also non-actionable statements of opinion, such as: "*we believe* the main drivers of revenue growth will be ARPU expansion as well as increasing the number of active locations on the platform" (AC ¶ 94) and "*[w]e're confident* that these investments will unlock future growth opportunities for Olo" (AC ¶ 95).[21] *See also* AC ¶¶ 64, 68, 79, 93, 96, 98, 99; Ex. B. The AC fails to allege either that Defendants did not believe these statements to be true or (*see supra* at 14-15), or that they omitted material facts. *See Kocourek v. Shrader*, 391 F. Supp. 3d 308, 327 (S.D.N.Y. 2019) (statements of belief of revenue growth non-actionable); *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 364 (S.D.N.Y. 2019) (statements of belief that company would "grow at a significant pace" non-actionable), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020).

## III.   THE AC FAILS TO PLEAD LOSS CAUSATION.

The AC also must be dismissed in its entirety for the additional reason that it fails to plead loss causation. Plaintiff must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security," *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005), and that the price "fell significantly after the truth [of the fraud] became known," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The

---

[21] The AC states no claim related to statements concerning ARPU and revenue growth. *See, e.g.*, AC ¶¶ 94, 100, 101. The AC does not allege that either ARPU or revenue was ever misstated or incorrect, or any facts that would support such an inference. Nor is there any allegation that the statement "we delivered another strong quarter of operational and financial performance" regarding Q4 2021 (*i.e.*, before Subway allegedly informed Olo) is false or misleading. AC ¶ 95.

AC alleges a corrective disclosure and materialization of a hidden risk based on the August 11, 2022 announcement of the Subway Transition and reduction in guidance due to macroeconomic conditions. *See* AC ¶¶ 19-20. Neither theory is plausible.

The AC alleges a single corrective disclosure related to the Subway Transition. AC ¶¶ 104-06, 129. But the disclosure of the Subway Transition—at most—merely revealed disappointing news, not any misconduct or fraud. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (no loss causation where article did not include "any new information . . . regarding Omnicom's alleged fraud"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 389 (E.D.N.Y. 2013) (no loss causation where earnings releases did not "contain any disclosure of the alleged fraud").[22]

The AC's materialization of risk theory fares no better. According to Plaintiff, Olo's reduction in guidance was a materialization of the risk of the alleged inflation of active locations. AC ¶¶ 20, 108. But Olo did not hide the risk of lowered guidance from investors. To the contrary, Olo repeatedly disclosed that it was "difficult to project future results," that Olo's "rapid growth may not be sustainable," and that results may be impacted by "general economic conditions." *See* Ex. A. Olo also warned investors that "they should not rely on forward looking statements" including "expectations regarding our revenue . . . and other operating results, including . . . active locations." Ex. E at pmbl.; *see also* Ex. A. There can be no loss causation when, as here, the allegedly concealed risk was repeatedly disclosed, because "no reasonable investor would have been misled." *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *20 (S.D.N.Y.

---

[22] The AC also fails to adequately plead that the announcement of the Subway Transition was the proximate cause of Plaintiff's loss, as opposed to other news from the same day, including the revenue guidance adjustment, which the AC concedes was not due to the Subway Transition. *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (affirming dismissal where plaintiffs did not allege facts to show that defendant's misstatements, as opposed to other misstatements, were the proximate cause of plaintiffs' loss).

Mar. 31, 2015) (dismissing for lack of loss causation). Even if the risk had been concealed (it was not), failure to meet guidance is not sufficient to plead loss causation. *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678-79 (S.D.N.Y. 2007) ("the mere failure to meet earnings forecasts is insufficient to establish loss causation"); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) (same).

Nor is Olo's guidance reduction within the "zone of risk" of allegedly misstated active locations. The AC fails to link alleged misstatements of *prior* quarter active locations to revenue guidance for *future* quarters. *Francesca's*, 2015 WL 1600464, at *22 (no loss causation where the "dots" the Court must connect "are too numerous and attenuated"). The AC speculates that the reduced guidance must be related to active locations—and not macroeconomic factors as stated— because Olo previously anticipated a challenging macroeconomic environment might boost orders for its lower-cost restaurant customers. AC ¶¶ 20, 108. But the macroeconomic challenges impacting Olo's guidance were longer sales and deployment cycles and labor shortages. Ex. T at 5. That Olo's competitor did not contemporaneously announce a reduction in its own guidance (AC ¶¶ 20, 109), is hardly sufficient to connect the missing dots between alleged incorrect active location count in prior quarters and lowered guidance for future quarters. *See Lattanzio*, 476 F.3d at 157 (no loss causation when plaintiff "failed to allege a sufficient connection between . . . misstatements and the losses suffered").

## IV.   PLAINTIFF'S SECTION 20(A) CLAIM MUST BE DISMISSED.

Because Plaintiff fails to plead a primary securities law violation, Plaintiff's claim under Section 20(a) must also be dismissed. 15 U.S.C. § 78t(a); *see also Lipow*, 131 F. Supp. 3d at 173.

## CONCLUSION

For the foregoing reasons, the AC should be dismissed with prejudice. *Hensley*, 2014 WL 4473373, at *6-7.

Dated:  February 3, 2023                     Respectfully submitted,


                                             OLO INC., NOAH GLASS, and PETER
                                             BENEVIDES


                                             By their attorneys,


                                             */s/ Deborah S. Birnbach*

                                             Deborah S. Birnbach
                                             Jennifer B. Luz
                                             GOODWIN PROCTER LLP
                                             100 Northern Avenue
                                             Boston, MA 02210
                                             Tel.: 617.570.1000
                                             Fax: 617.523.1231
                                             DBirnbach@goodwinlaw.com
                                             JLuz@goodwinlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Deborah S. Birnbach, hereby certify that a copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint for Violations of Federal Securities Laws, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 3, 2023.

Dated: February 3, 2023                              */s/ Deborah S. Birnbach*