**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEAMSHIP TRADE ASSOCIATION OF BALTIMORE – INTERNATIONAL LONGSHOREMEN'S ASSOCIATION PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-cv-08228-JSR CLASS ACTION JURY TRIAL DEMAND |
| Plaintiff, | |
| v. | |
| OLO INC., NOAH GLASS, and PETER BENEVIDES, | |
| Defendants. | |

**PLAINTIFF'S OPPOSITION TO DFENDANTS' MOTION TO DISMISS**
**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF FEDERAL SECURITIES LAWS**

## **TABLE OF CONTENTS**

I.  STATEMENT OF FACTS ................................................................................................ 1

    A.  Olo's Background & Business Model ................................................................ 1

    B.  Active Locations Was a Key Metric Directly Tied to Revenue ........................... 2

    C.  At All Relevant Times, Subway Was Olo's Most Important Brand Client ........... 2

    D.  The CWs Detail How Defendants Issued Inaccurate Active Locations Counts ..... 3

    E.  The CWs Confirm Subway's Departure Decision in Early 2022 ......................... 4

    F.  Defendants Used Olo's Inflated Share Price to Sell Shares and Make
        Acquisitions ...................................................................................................... 5

    G.  The Truth Begins to Emerge ............................................................................. 5

II.  ARGUMENT ............................................................................................................... 6

    A.  Legal Standard ................................................................................................. 6

    B.  Defendants Omitted Material Facts ................................................................... 6

    C.  Defendants Made Material Misstatements.......................................................... 9

    D.  The Alleged Misstatements Were Not Puffery, Forward-Looking, or
        Opinions .......................................................................................................... 11

    E.  The AC Adequately Alleges Scienter ................................................................ 13

        1.  Defendants Acted Knowingly or Recklessly ........................................... 14

        2.  Subway and Active Locations Were "core" to Olo's Operations............ 18

        3.  Defendants' Stock Sales Contribute to the Inference of Scienter............ 19

        4.  Defendants Were Motivated by the Wisely and Omnivore
            Acquisitions ........................................................................................... 21

    F.  The AC Adequately Alleges Loss Causation....................................................... 22

III.  CONCLUSION............................................................................................................. 24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020).....................................................................24

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)...........................................................................8

*Arkansas Tchr. Ret. Sys. v. Bankrate, Inc.*,
  18 F. Supp. 3d 482 (S.D.N.Y. 2014).........................................................12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................................5

*Carpenters Pen. Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014).......................................................................23

*CFTC v. LaMarco*,
  2019 WL 4247632 (E.D.N.Y. Sept. 5, 2019) .............................................9

*Cheng v. Canada Goose Holdings Inc.*,
  2021 WL 3077469 (S.D.N.Y. July 19, 2021) ...........................................12

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
  2010 WL 3910265 (S.D.N.Y. Sept. 29, 2010)...........................................16

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ...........................................11

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020).........................................10, 11, 24

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)..............................13, 14, 18, 22

*Cornwell v. Credit Suisse Grp.*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010).......................................................17

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)...................................................................................23

*Flynn v. Sientra, Inc.*,
  2016 WL 3360676 (C.D. Cal. June 9, 2016) ............................................

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)........................................................................8, 16, 21

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................................20

*Gauquie v. Albany Molecular Rsch., Inc.*,
   2016 WL 4007591 (E.D.N.Y. July 26, 2016) ........................................................................18

*Guevoura Fund v. Sillerman*,
   2016 WL 4939372 (S.D.N.Y. Sept. 12, 2016)..........................................................................6

*Hall v. The Children's Place Retail Stores, Inc.*,
   580 F.Supp. 2d 212 (S.D.N.Y. 2008)......................................................................................22

*Hutchins v. NBTY, Inc.*,
   2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) ........................................................................20

*Illinois State Bd. of Inv. v. Authentidate Holding Corp.*,
   369 F. App'x 260 (2d. Cir. 2010) .............................................................................................8

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
   2013 WL 144041 (S.D.N.Y. Jan. 14, 2013) ...........................................................................21

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010).....................................................................................11

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)...............................................................................16, 19

*In re Check point Software Techs. Ltd. Sec. Litig.*,
   2006 WL 1116699 (S.D.N.Y. Apr. 26, 2006) .........................................................................17

*In re Citigroup Inc. Bond Litig.*,
   723 F. Supp. 2d 568 (S.D.N.Y. 2010).......................................................................................7

*In re Complete Mgmt. Inc. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001).....................................................................................21

*In re DRDGold Ltd. Sec. Litig.*,
   472 F. Supp. 2d 562 (S.D.N.Y. 2007).....................................................................................21

*In re Express Scripts Holding Co. Sec. Litig.*,
   2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ..........................................................................15

*In re Francesca's Holdings Corp. Sec. Litig.*,
   2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ........................................................................24

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012) ...................................................................16

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..................................................................23

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009) ..........................................................2, 8, 15

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) ...................................................................20

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ......................................................7, 18

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
    236 F. Supp. 3d 824 (S.D.N.Y. 2017) ...................................................................14

*In re Initial Pub. Offering Sec. Litig.*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008) ...................................................................21

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017) ...................................................................18

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ...................................................................14

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ...................................................................14

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) ...................................................................16

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620, 646 (E.D. Va. 2000) ...........................................................20

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ..........................................................6

*In re NIO, Inc. Sec. Litig.*,
    2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021) .......................................................18

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003) ...................................................................11

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ..................................................................................23

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ........................................................13

*In re Platinum-Beechwood Litig.*,
  2019 WL 2569653 (S.D.N.Y. June 21, 2019) ........................................................22

*In re PTC Therapeutics, Inc. Sec. Litig.*,
  2017 WL 3705801 (D.N.J. Aug. 28, 2017) ........................................................17

*In re Regeneron Pharms., Inc. Sec. Litig.*,
  2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ........................................................8

*In re Sadia, S.A. Secs. Litig.*,
  269 F.R.D. 298 (S.D.N.Y. 2010) ........................................................8

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ........................................................6

*In re Signet Jewelers Ltd. Sec. Litig.*,
  389 F. Supp. 3d 221 (S.D.N.Y. 2019) ........................................................12

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ........................................................15

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................12

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) ........................................................12

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  2022 WL 2114628 (S.D.N.Y. June 13, 2022) ........................................................17

*Kasilingam v. Tilray, Inc.*,
  2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021) ........................................................21

*Lattanzio v. Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007) ........................................................24

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ........................................................24

*Lewy v. SkyPeople Fruit Juice, Inc.*,
  2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ........................................................24

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ........................................................7

*Matrixx Initiaives, Inc v. Siracusano*,
    563 U.S. 27 (2011)................................................................................................13, 17

*Metz v. U.S. Life Ins. Co. in the City of N.Y.*,
    662 F.3d 600 (2d Cir. 2011)..............................................................................................5

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)..............................................................................................6

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
    2022 WL 17815767 (2d Cir. Dec. 20, 2022) ....................................................................6

*N.J. Carpenters Health Fund v. The Royal Bank of Scotland, PLC*,
    709 F.3d 109 (2d Cir. 2013)............................................................................................10

*Nathel v. Siegal*,
    592 F. Supp. 2d 452 (S.D.N.Y. 2008) ............................................................................15

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...........................................................................7, 10, 16, 17

*Nguyen v. New Link Genetics Corp.*,
    297 F.Supp. 3d 472 (S.D.N.Y. 2018)..............................................................................20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)....................................................................................*passim*

*Nursing Home Pens. Fund Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ........................................................................................20

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)...............................................................................18

*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
    2020 WL 3268531 (S.D.N.Y. June 17, 2020) ............................................................23, 24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund.*,
    575 U.S. 175 (2015)........................................................................................................13

*Plumbers and Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
    2019 WL 236942 (S.D.N.Y. Mar. 4, 2019) ....................................................................20

*Reilly v. U.S. Physical Therapy, Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) ..................................................................20

*SEC v. Rio Tinto*
    *plc*, 2019 WL 1244933 (S.D.N.Y. March 18, 2019) ........................................................7

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..................................................................................21

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020)...............................................................................22

*Speakes v. Taro Pharm. Indus., Ltd.*,
    2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018).................................................17

*Steinberg v. Ericsson LM Tel. Co.*,
    2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ..................................................17

*Struogo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015)..................................................................7

*Teamsters Loc. 445 Freight Div. Pen. Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008).........................................................................14, 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)...................................................................................13, 22

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013)...............................................................15

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)..................................................15

*Vladimir v. Bioenvision Inc.*,
    606 F. Supp. 2d 473 (S.D.N.Y. 2009)..................................................................8

*Washington State Inv. Bd. v. Odebrecht S.A.*,
    461 F. Supp. 3d 46 (S.D.N.Y. 2020)..................................................................23

*Wilson v. LSB Indus., Inc.*,
    2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) .....................................................11

*Woolgar v. Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)................................................................10

*Yannes v. SCWorx Corp.*,
    2021 WL 2555437 (S.D.N.Y. June 21, 2021) ...................................................18

Lead Plaintiff Steamship Trade Association of Baltimore – International Longshoremen's Association Pension Fund ("STA-ILA" or "Plaintiff") – respectfully submits this opposition to Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint (the "AC") (ECF No. 39) and their accompanying Memorandum of Law (ECF No. 40 ("Mot.")).[1]

The AC pleads clear violations of the anti-fraud provisions of the Securities Exchange Act of 1934 against Olo, Inc. ("Olo"), CEO Noah H. Glass ("Glass") and CFO Peter J. Benevides ("Benevides"). From August 10, 2021 through August 11, 2022 (the "Class Period"), Defendants reported false numbers of Olo's "active locations" and expressly misled investors about Olo's relationship with Subway, its largest customer, until Defendants were forced to reveal that Subway had terminated its contract with Olo at the start of 2022. Both falsity and scienter are set forth in great detail in the AC, including comprehensive allegations from no less than seven Confidential Witnesses ("CWs") as well as allegations of actual meetings, hands-on-roles, insider sales, and lucrative acquisitions. Faced with such thorough allegations, Defendants' Motion sets forth an entirely different version of the "facts" actually alleged in the AC in an attempt to spin the story towards an "innocent" explanation. In doing so, it asks this Court to make countless highly factual determinations entirely inappropriate at the motion dismiss stage. It likewise seeks to impose on Plaintiff a far higher burden than the law actually requires. Such attempts should be rejected.

## I.    STATEMENT OF FACTS

### A.    Olo's Background & Business Model

Olo is a software company that connects individual restaurants to consumers directly through mobile and online ordering and/or indirectly through third-party applications. ¶2. The vast majority of Olo's revenue comes from fixed monthly fees paid by each location using an Olo

---

[1] All "¶_" cites are to the AC.

product and from revenue earned on a per order basis paid by each restaurant location utilizing one of Olo's modules.  ¶37.  Most of Olo's restaurant clientele are quick service restaurants ("QSRs"), *i.e.*, fast-food, including Subway, Jack in the Box, and Carl's Jr.  ¶¶38-39, 91.  Olo's brand contracts are generally three-year deals with continuous one-year automatic renewals, a set-up it claims provides "visibility into [the Company's] future financial performance."  ¶40.

### B.  Active Locations Was a Key Metric Directly Tied to Revenue

As a "key metric[]," alongside average revenue per unit ("ARPU") and net revenue retention, Defendants consistently defined an "active location[]" as "a unique restaurant location ***live*** on the platform with at least one product module," meaning each restaurant utilizing any module counted as a separate active location.  ¶¶41-42 (emphasis added).  On every Class Period earnings/analyst call, at every investor/industry conference, and in every press release and Form 10-Q/10-K, Defendants touted an ever-growing number of active locations.  *See* ¶¶61-64 (74,000); ¶¶6, 69 (76,000); ¶¶71-72 (79,000); ¶¶74-75, 78, 80 (82,000); *see also* ¶82 ("Since 2018, we have increased total active restaurant locations from 35,000 to 82,000 representing a compound annual growth rate north of 30 percent.").  According to Defendants, active locations shows past and current performance by "demonstrat[ing] the growth and scale of our overall business," ***and*** future performance by reflecting "our ability to attract, engage, and monetize our customers and thereby drive revenue, as well as provide[] a base to expand usage of our modules" (¶59), especially upselling.  *See* ¶¶79, 81, 94.  Defendants repeatedly made two significant claims about Olo's active locations count: (1) Olo sells to "***the <u>entire</u> location base***", ¶76 (emphasis added), (¶¶70, 77, 81); and (2) Olo's client "brands are always going live really ***all at the same time***…," (¶77) (emphasis added).

### C.  At All Relevant Times, Subway Was Olo's Most Important Brand Client

On February 12, 2020, Olo announced a partnership with Subway's 20,000 plus restaurants

to connect via Olo's Rails module.  ¶¶43-44.  Immediately, the mega-sandwich chain became Olo's most important brand client.  During the Class Period, Subway comprised about 27% of Olo's active locations and over 8% of Olo's quarterly revenue.  ¶¶10, 44.[2]

Olo employees recognized Subway's importance.  CW5, Olo's former Head of Data Science and Business Intelligence, tracked Olo's top ten clients, including Subway, spoke with Benevides monthly, and periodically warned him that Olo kept "too many eggs in one basket." ¶48.  CW3, a former Technical Specialist, stated Olo was "all hands on deck" for any Subway request, even pausing other clients' projects.  ¶46.  CW4, a former Senior Software Engineer, stated Subway was "very important" and Subway always needed to be "taken care of."  ¶47.

**D.    The CWs Detail How Defendants Issued Inaccurate Active Locations Counts**

Defendants' active locations data was inaccurate for three reasons.  First, Olo prematurely included individual restaurant locations in its active locations count before numerous of those locations actually used any Olo products, *i.e.*, before they were truly "active."  ¶¶77, 84.  According to CW1, a former Delivery Solutions Manager within Olo's Dispatch segment, QSR brand Jack in the Box – with its 2,200 locations – is an example.  ¶¶84-85.  On August 10, 2021, Olo announced Jack in the Box as a new client, with all of its individual locations going live on or before the end of 2Q 2021.  *Id.*  However, according to CW1, by the end of 2Q 2021, Jack in the Box had *at most* 200 live locations and at the start of the Class Period about 30% of Jack in the Box locations were still *not* utilizing Olo products.  *Id.*

---

[2] Olo never reported exactly how much revenue Subway accounted for, only stating Subway's ARPU was "about 1/3 of kind of the platform average on a quarterly basis," meaning in 4Q 2021 each Subway location generated about $168 (1/3 of Olo's $504 in ARPU) – at least $3.36 million when multiplied by the 20,000 locations Olo claimed were utilizing Rails. ¶44 n.11. The same calculation for 1Q 2022 yields $3.44 million. *Id.* If just 15,000 Subway locations utilized Rails – as Defendants now concede (Mot. at 18 n.13) – Subway would still account for over 6% of revenue in both 4Q 2021 and 1Q 2022 and about 19% and 18% of active locations, respectively.

Second, Olo did not remove inactive locations from its active locations count. ¶88. According to CW1, Olo had the ability to track whether a client had its Olo module turned on and the quantity of orders it received. *Id.* CW1 reported attending meetings where discrepancies between the number of reported active locations and the restaurant locations actually using Olo's modules were apparent. *Id.* CW1 listed Berg Hospitality Group as an example. *Id.*

Third, numerous locations elected to forgo utilizing Olo's technology, but were still included in Olo's active locations count. ¶89. According to CW2, a former Olo Deployment Manager, QSR chain CKE – parent company to Carl's Jr. and Hardee's – and its 4,000 locations is an example. ¶¶89-91. Despite only *half* of CKE locations electing to install Olo modules, CW2 reported that Olo included *all* CKE locations in its public active location count. ¶91.

###    E.    The CWs Confirm Subway's Departure Decision in Early 2022

In *late January or early February 2022*, Olo's Senior V.P. of Enterprise Sales, a Sales Director, and a Customer Success Representative met with their counterparts at Subway and received stunning news: *Subway had elected to terminate its relationship with Olo*. ¶50. Shortly thereafter, as CWs 6 and 7 both reported, at one of Olo's regular "town hall" meetings, Glass announced Subway's departure by the end of 2022 or the start of 2023. ¶¶51-53.[3]

Despite knowing of Subway's pending departure, Defendants issued FY 2022 guidance on a February 23, 2022 earnings call that included a projection that "for 2022, again, we're targeting a similar number of net adds as we achieved in 2021," which totaled 15,000. ¶¶17, 96. Through the end of the Class Period, Defendants continued to issue rosy projections – including Olo's supposed "100x growth opportunity in U.S. enterprise restaurants" (¶¶93, 97-100) – and warnings

---

[3] CW6, a former Technical Engineer, stated Glass and Benevides "always led" town hall meetings and they occurred regularly. ¶52. CW7, a former Deployment Manager, stated the town hall meetings occurred monthly, that Glass always led them, and Benevides generally attended. ¶53.

that *if* "any of our largest restaurant customers do not continue to use our platform," "then our revenue *may* decline and our results of operations *may* be harmed" (Mot. at 5) (emphasis added), risks that had *already* occurred.

**F.    Defendants Used Olo's Inflated Share Price to Sell Shares and Make Acquisitions**

At the same time Defendants issued false statements, Glass and Benevides took advantage of Olo's inflated share price to sell their own Olo shares, ultimately generating $10.3 million for themselves.  ¶¶111-15.  Similarly, Defendants used Olo's elevated share price as currency to acquire Wisely in October 2021, financing the deal with $110 million in Olo shares, leaving ample cash left over for the acquisition of Omnivore just three months later.  ¶120.

**G.    The Truth Begins to Emerge**

After the market closed on August 11, 2022, Defendants disclosed: (1) Subway had opted to end its contract with Olo; (2) 2,500 Subway locations deactivated their Olo modules in 2Q 2022 and the rest would be removed by 4Q 2022 or 1Q 2023 at the latest; and (3) as a result, Olo would have virtually *no* active locations growth in 2022.  ¶104.

That same day, Defendants also reduced FY 2022 revenue guidance, falsely blaming "macroeconomic challenges."  ¶107.  In truth, the lowered guidance was a materialization of the undisclosed risk of Defendants' repeated misreporting of Olo's active locations count (¶108), as *more* active locations equates with *more* revenue.  ¶37 (platform revenue increases when new locations utilize or existing locations increase usage of Olo modules).  On August 12, 2022, Olo's share price fell from its August 11, 2022 closing price of $12.99 to a close of $8.26, a one-day drop of approximately 36% and a loss of $480 million in market capitalization.  ¶110.

## II.      ARGUMENT

### A.      Legal Standard

At this stage, the Court must "accept [] all factual allegations as true and draw [] all reasonable inferences in favor of the plaintiff." *Metz v. U.S. Life Ins. Co. in the City of N.Y.,* 662 F.3d 600, 602 (2d Cir. 2011).  A complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 545 (2007).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Id.* at 556.  Although securities fraud plaintiffs "must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the role of the defendants," they may do so "in broad strokes." *Guevoura Fund v. Sillerman,* 2016 WL 4939372, at *8 (S.D.N.Y. Sept. 12, 2016).  Plaintiff need not plead "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir. 2001), but only sufficient facts "to support a reasonable belief" defendants' statements were materially false or misleading. *Novak v. Kasaks,* 216 F.3d 300, 314 n.1 (2d Cir. 2000).  Plaintiff meets this standard.

### B.      Defendants Omitted Material Facts

It is indisputable that Defendants failed to disclose that Subway elected to ***terminate its relationship*** with Olo in ***late January or early February 2022*** (¶50) and Defendants had a duty to disclose Subway's pending departure thereafter.  "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *1 (2d Cir. Dec. 20, 2022).  By touting "Subway's network of ***more than 20,000 U.S. restaurants***" utilizing Rails (¶43) and the continued active locations growth (¶¶58-82), Defendants triggered a duty to disclose the "whole truth" concerning Subway and its departure. *Meyer*, 761 F.3d at 250; *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018).

6

Defendants' assertion that the omitted Subway facts were somehow not material and, therefore, there was no duty to disclose them (Mot. at 17-19), is unavailing and entirely at odds with the AC's allegations, which must be accepted as true at this stage. Plaintiff alleges that Subway "represent[ed] about 8% of Olo's quarterly revenue during the Class Period" and that Subway was its "largest client by active location count," accounting for about 27% of active locations at the start of the Class Period. ¶¶10, 44. It was clearly a "material" customer despite Defendants' repeated protestations to the contrary. Indeed, multiple CWs detail just how important Subway was to Olo, and thereby prove Defendants' point that "all customer brands" are not created equal. Mot. at 1; ¶¶46-48. *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013) (defendant's omission of contract dispute with its largest customer – responsible for more than 5% of revenue – was material).

Moreover, materiality is a mixed question of law and fact that will rarely be dispositive on a motion to dismiss. *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 588 (S.D.N.Y. 2010). Indeed, "a complaint may not be properly dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* Defendants come nowhere close to meeting this exacting standard, as far less quantitatively significant misstatements have been held to be material. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 713, 718-19 (2d Cir. 2011) (decline in value of assets totaling "a mere" 0.4% and 3.6% of "[total] assets under management at the time of the IPO" were material).[4] Moreover, alongside Olo's other active locations, Subway was also material to Olo's vision of ***upselling new products***

---

[4] *See also SEC v. Rio Tinto plc*, 2019 WL 1244933, at *12 (S.D.N.Y. March 18, 2019) (statement relating to transaction amounting to less than 5% of assets were material); *Struogo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 (S.D.N.Y. 2015) (misstatement of revenue opportunity accounting for less than 0.1% of Barclay's total revenue was material).

*to existing customers* – *see* ¶¶79, 81, 94, and Mot. at 4 ("A large part of Olo's growth strategy is to sell additional modules to existing customers.") – which Olo "identified as playing a significant role in [its] operations or profitability." SAB No. 99 (Aug. 12, 1999) at *3).

Furthermore, the market reaction following the disclosure that Subway had opted to end its contract with Olo demonstrates that the market viewed the omitted facts about Subway's departure – and its impact on Olo's operations – as material. ¶¶129-30; *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (citing "precipitous decrease" in share price that occurred after disclosure of truth as evidence of materiality).[5]

Next, Defendants argue that they had no duty to disclose Subway's pending departure because it was not yet "definite." Mot. at 18. This argument ignores the AC's allegations that Defendant Glass **affirmatively announced** Subway's departure in one of Olo's regular "town hall" meetings in early 2022. ¶¶51-53.[6] The facts here are inapposite to Defendants' cases. *See Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009), *aff'd sub nom. Thesling v. Bioenvision, Inc.*, 374 F. App'x 141 (2d Cir. 2010) (no duty to disclose **ongoing** merger discussions); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (no duty to disclose where no "foregone conclusion" that risk would materialize). Therefore, despite knowing of Subway's

---

[5] *See also Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) ("significant stock drop further supports an inference of materiality"); *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 302 (S.D.N.Y. 2010) (when "a stock price decline[s] followed a corrective disclosure, a court can infer that the information contained in that disclosure was material").

[6] Defendants (Mot. at 13 n.9) assert that because CW6 joined Olo after Olo acquired Omnivore in late February 2022, Glass could not have announced the Subway departure at a town hall *prior* to issuance of guidance on February 23, 2022. But when Glass and Benevides learned of Subway's departure is "a factual dispute inappropriate for resolution on this motion [to dismiss]." *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 570 (S.D.N.Y. 2009). Nonetheless, even if Glass learned of Subway's departure immediately *after* issuing guidance, Defendants still issued multiple misstatements/omissions in May and June 2022 (¶¶73-82, 97-101), and had a duty to update when they learned of Subway's departure. *Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 263 (2d. Cir. 2010) ("duty to update prior statements arises when those statements have become misleading as the result of intervening events").

pending departure and its critical importance, rather than disclose it, Defendants proceeded to issue guidance and rosy projections about 2022 growth.

### C.    Defendants Made Material Misstatements

Defendants made numerous materially false and misleading statements, including:

- a growing numbers of active locations (¶¶61, 63, 69, 71, 74, 78, 80);

- that active locations include "*all* locations" within the brand (¶¶70, 76, 77, 81); and

- that "brands are always going live really ***all at the same time***" (¶77).

The AC also sets forth the precise reasons why all these were false. As outlined by CW1 (including examples), Olo prematurely included individual restaurant locations in its active locations count before numerous of those locations had actually begun using any of Olo's products (¶¶77, 84-85) and failed to remove inactive locations from its active locations count. ¶88.[7]    Additionally, as detailed by CW2, including the clear example of CKE, multiple brands chose not to use Olo's technology, and yet were included in Olo's active locations count.    ¶89.[8]    As to the misrepresentations concerning continued active locations and future prospects, those were false because, by then, Defendants knew that Subway had terminated its relationship with Olo. Indeed, it was impossible to add the "same" 15,000 active locations considering Olo would simultaneously lose 20,000 individual Subway locations. ¶¶93, 96.

---

[7] Defendants claim the AC "ignores the context of the statement" about when Olo's client locations go "live," while ***conceding*** that "not all brand locations necessarily go live at the same time." Mot. at 20-21, n. 7.

[8] Defendants attempt to excuse such statements as mere reflections of "Olo's sales strategy," because Olo could not "promise that every single restaurant location" was using its products. Mot. at 21. Again, beyond conceding the inaccuracy of their statements, Defendants cannot present their own counter-narrative at this stage. *CFTC v. LaMarco*, 2019 WL 4247632, at *3 (E.D.N.Y. Sept. 5, 2019) ("Motions to dismiss are not vehicles for resolving the parties' factual disputes."). *See also* Mot. at 18 n.13 (conceding that "only 15,000 of Subway's 20,000 locations ultimately utilized Olo's products and services").

In the face of these clear and detailed allegations, Defendants attempt to discredit Plaintiff's numerous CW allegations as mere "low-level" employee statements.  Mot. at 19.  However, it is black-letter law that information obtained from CWs should be considered as long as the CWs "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314; *N.J. Carpenters Health Fund v. The Royal Bank of Scotland, PLC*, 709 F.3d 109, 124 (2d Cir. 2013).  Nor is there a prohibition on courts crediting allegations based even on indirect knowledge.  *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.,* 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) (Rakoff, J.) ("[T]he heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources, even where those sources offer indirect knowledge, that is, information and belief that is hearsay but plausible.").

The AC identifies each of the ***seven*** CWs as former employees of Olo, and specifies job titles, direct reports, periods of employment, and job responsibilities.  ¶¶46-48, 52-53, 85, 90.  This is more than enough to conclude that the CWs possess the information alleged.  *Celestica*, 455 F. App'x at 14.  Defendants contend that CW1 does not provide a basis to infer that the alleged statements were false because CW1 "left the Company before the Class Period started."  Mot. at 19.  This is false.  CW1's allegations make it clear that "the purported issues [CW1] discuss[es] actually existed during the Class Period."[9]  Here, as alleged, Olo claimed all Jack in the Box locations went live on or before June 30, 2021, and ***by the time CW1 left Olo***, approximately 30% of Jack in the Box locations were still not utilizing Olo's module.  ¶85.  Similarly, Defendants ignore CW2's detailed information that numerous locations decided "***not to use Olo's technology***"

---

[9] Defendants' citation to *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 221 (S.D.N.Y. 2020), is inapposite because there the court held "the critical deficiency is that the CWs' ***allegations*** are largely undated, not their dates of employment."  Mot. at 19 (emphasis in original).

and yet were still included in active location counts reported to the public – not that Defendants simply reported active locations in tranches. ¶91; Mot. at 20-21 (emphasis added).

### D. The Alleged Misstatements Were Not Puffery, Forward-Looking, or Opinions

Defendants next argue that certain statements are "inactionable" because they involve (i) forward-looking statements, (ii) puffery, or (iii) statements of opinion. Mot. at 22. Defendants are again wrong on all counts.

*Forward-Looking*. Defendants' contention that their statements about growth prospects were forward-looking statements is meritless. *Id.* The alleged statements (¶¶68, 93-101) are not protected by the statutory safe harbor because Defendants "misrepresented present facts" about the true number of Olo's active locations. *World Wrestling Ent. Inc.*, 477 F. Supp. 3d at 135. *See also In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (safe harbor does not apply "[b]ecause the [] Complaint alleges that the Defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality."). Defendants' statements about the Company's growth prospects tied its growth potential to Olo's active locations. ¶101. Thus, Defendants' supposed "belief" in Olo's growth implied that Olo's publicly-reported active locations count ***accurately reflected*** Olo's ***correct*** active locations count. This is not true because Defendants were misquantifying active locations in numerous ways and knew of Subway's imminent departure.[10]

Defendants also seek cover in the Company's "disclosures" regarding the risk of its "largest restaurant customers" leaving the platform. Mot. at 5. But these risk disclosures were "not 'meaningful' or 'sufficiently specific' because [Defendants] did not disclose that the risk factors

---

[10] In any event, "[courts] in this circuit have consistently held that neither the PSLRA safe harbor, nor the bespeaks-cautions doctrine protects material omissions." *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017).

were not merely hypothetical (*i.e.*, they 'could' happen), but were in fact happening." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*12 (S.D.N.Y. Mar. 25, 2013); *see also In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010).

     ***Puffery***. Defendants argue that certain challenged statements constitute "non-actionable 'puffery.'" Mot. at 22. Whether a statement is puffery "'depends on all relevant circumstances of the particular case,' and is generally not an appropriate basis [for] dismiss[al]." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003); *Arkansas Tchr. Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) (Rakoff, J.). Importantly, statements like those at issue here, that are "'clearly designed to distinguish the company' to the investing public in some meaningful way" are not puffery. *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) (quoting *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016)).

     The two alleged "puffing" statements that Defendants quote in their brief illustrate why their arguments fail. Glass's statements that "we've never been more confident in our position and more excited about our opportunity ahead" (¶93) and "we continue to deliver revenue growth and profitability . . . [o]ur position is strong as we have a long runway for growth through adding more locations" (¶101) are examples of statements that invited investors to believe that Olo's largest customers were staying with the Company and it was continuing to add to its active location count. Such statements are routinely held ***not*** to be puffery, especially where, as here, Defendants were aware of contradictory facts (such as Olo's inaccurate active locations count and Subway's pending departure). *See*, *e.g.*, *Novak*, 216 F.3d at 315 (statements that inventory situation was "'in good shape" or "under control'" were not puffery because they were made when defendants "allegedly knew that the contrary was true"); *Cheng v. Canada Goose Holdings Inc.*, 2021 WL 3077469, at

*6 (S.D.N.Y. July 19, 2021).

*Opinions*.  Defendants assert that statements about active locations and ARPU serving as "the main drivers" of Olo's revenue and Olo's "future growth opportunities" constitute non-actionable opinion statements.  Mot. at 40.  As explained above, these statements must be viewed in the context of Olo's inaccurate active locations count and Subway's pending departure – both of which Defendants had knowledge of or recklessly disregarded.  ¶17; *infra* at §II.E.  None of these facts were disclosed to investors, even though the "omit[ted] information" made Olo's purported "opinion" about "increasing the number of active locations" and "future growth opportunities" patently misleading to a reasonable investor, and thus actionable.  *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *13 (S.D.N.Y. Aug. 11, 2021); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund.*, 575 U.S. 175, 188-89 (2015) (investors "expect[] not just that [the speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time").

### E.    The AC Adequately Alleges Scienter

"The [scienter] inquiry . . . is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310, 322-23 (2007) (emphasis in original).  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.* of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324.  "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."  *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).  In assessing the inference of scienter, the Supreme Court mandates a holistic analysis.  *Matrixx Initiaives, Inc v. Siracusano,* 563 U.S. 27, 48 (2011).

Here, the AC's allegations, taken as a whole, give rise to a strong inference of scienter.  In support of that inference, the AC offers: (i) multiple CWs, (ii) suspicious trading activity and

opportunistic acquisitions, (iii) that active locations and Subway were core to Olo's operations, and (iv) that Defendants, given their positions, would have known of the issues. Furthermore, the AC contains later admissions that add to the inference of scienter. Defendants offer no stronger "innocent" inference. Their motion to dismiss for failure to plead scienter should be denied.

1.    Defendants Acted Knowingly or Recklessly

A plaintiff can plead scienter "either '[] by alleging facts to show that defendants had both motive and opportunity to commit fraud, or . . . that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Novak*, 216 F.3d at 307. "Recklessness may be shown by allegations that defendants 'knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor.'" *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 833 (S.D.N.Y. 2017). Here, the AC adequately alleges Defendants' scienter as to their Subway and active locations misstatements.

First, as to Subway, the chronology is damning:

- In late January/early February 2022, Olo Senior V.P. of Enterprise Sales Juan George, an Olo sales director, and an Olo representative met with a team from Subway and received the news that Subway had decided to terminate its partnership with Olo. ¶50.[11]

- Shortly thereafter, according to CWs 6 and 7, Glass reported the dissolution of the Subway relationship to the Company at large in an Olo "town hall." ¶¶51-53.

---

[11] Even if Glass and Benevides somehow did not know of Subway's termination by, at the latest, "early February" (¶50) – and were not reckless – scienter still attaches to Olo by virtue of "corporate scienter," *Teamsters Loc. 445 Freight Div. Pen. Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008), where "the intent of an executive who acted with scienter can be imputed to the company." *Lockheed Martin*, 875 F. Supp. 2d at 369. Here, the scienter of Juan George – who attended the Subway termination meeting – may be attributed to Olo. *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("[T]here is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter."); *id.* (in pleading corporate scienter, "courts in this District have recently emphasized that there is no requirement 'that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter.'"); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (same).

- Defendants issued rosy guidance to the market on February 23, 2022 including that Olo's active locations would have "a similar number of net adds as we achieved in 2021," and that Olo had "a 100x growth opportunity in U.S. enterprise restaurants." ¶¶93, 96.

- Two days later, Olo issued a Form 10-K, misleadingly warning that "any of our largest customers" may "not continue to use our platform" and instead may "directly integrat[e] with one of our customers" (Mot. at 5), risks that had *already* come to pass.

- Through August 2022, Defendants continued to make similar misstatements and omissions. *See* ¶¶97-101; *supra* at §§II.B, II.C.

Such scienter allegations are sufficient. *Novak*, 216 F.3d at 311; *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 472 (S.D.N.Y. 2013).[12]

Defendants' attempt (Mot. at 12-14) to spin the Subway termination meeting as merely "a sales meeting," after which they knew only of "*the possibility*" of Subway's loss as a customer at best constitutes a factual dispute inappropriate at this stage. *Giant Interactive*, 643 F. Supp. 2d at 570. Yet even if Defendants were somehow unaware of Subway's decision to terminate its partnership with Olo prior to issuing FY 2022 guidance on February 23, they were at least reckless in "fail[ing] to check" whether Olo's largest customer, in the third year of its contract, was renewing or not. *Novak*, 216 F.3d at 311; *Nathel v. Siegal*, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008). That CFO Benevides admitted on the August 11, 2022 earnings call that "when we entered the year, there was *indication* that Subway may plan to directly integrate with marketplaces" (¶105) (emphasis added), adds further weight to any apparent failure to verify with Subway, or

---

[12] For the same reason, Defendants' reliance on *In re Turquoise Hill Res. Ltd. Sec. Litig.,* 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014), where plaintiff relied *entirely* on corporate positions, and *Villare v. Abiomed, Inc.,* 2021 WL 4311749, at *22 (S.D.N.Y. Sept. 21, 2021), where plaintiffs merely stated that "senior executives were very hands on," are not only inapposite, but *support* Plaintiff here because the AC alleges Glass/Benevides were "*specifically informed of contrary information*," a pleading deficiency the *Villare* court faulted that plaintiff for. *Id.* at *23 (emphasis added). The same logic applies to Defendants' citation to *In re Express Scripts Holding Co. Sec. Litig.,* 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017) (plaintiff failed to allege factual allegations demonstrating that "[d]efendants had specific knowledge of or access to contradictory facts").

Juan George, or heed the warnings of employees who repeatedly warned Benevides about the danger of Olo losing any of its "top" brands, including Subway (¶48).

**Second,** as to active locations, Defendants repeatedly emphasized – and reported an inaccurate count of – the number of Olo's active locations.  ¶¶41, 58-82.

Defendants now implausibly claim they lacked any knowledge of the alleged inaccuracies. Mot. at 14.  It is well settled that if an executive speaks about a topic of "critical importance," they cannot later pretend to have lacked any knowledge about it.  *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 2010 WL 3910265, at *6, *18-19 (S.D.N.Y. Sept. 29, 2010); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) ("Defendants cannot maintain that its officers repeatedly disclosed the RMBS-content of the CDOs-squared to the market, but that none of its officers were aware of the RMBS backing the CDOs-squared."); *cf. In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("highly improbable" that defendant who publicly described company's finances did not inquire into basis for statements).  That Defendants pitched active locations as a "'key to measuring [Olo's] financial performance" – *infra* at §II.A – and was "'a subject about which investors and analysts often inquired'" further reinforces the inference of scienter.  *comScore*, 268 F. Supp. 3d at 553 (quoting *Celestica*, 455 F. App'x at 14).

Moreover, Defendants' ready access to information about Olo's active locations, for example via Looker, a business intelligence platform (¶123), further supports a strong inference of scienter.  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (Where "facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them.").[13]  And Defendants' personal

---

[13] Defendants do not contest Looker's existence or that it contained active locations data, only

attendance at customer conferences, negotiations with, and onboarding of, Olo clients (¶124), also supports an inference of scienter. *Karimi v. Deutsche Bank Aktiengesellschaft*, 2022 WL 2114628, at \*11 (S.D.N.Y. June 13, 2022) (executives' personal involvement "in on-boarding and retention decisions" supports inference of scienter).[14]   *See also Celestica,* 455 F. App'x at 13 (CWs' allegations about monthly calls with senior management where inventory discussed established scienter); *In re Check point Software Techs. Ltd. Sec. Litig.,* 2006 WL 1116699, at \*3 (S.D.N.Y. Apr. 26, 2006) (regular teleconferences about an important product alleged scienter).

As with Subway, even if Defendants were somehow unaware of Olo's inaccurate active locations reporting, they were at least reckless in their failure to check the accuracy of a "Key Metric" they constantly reminded investors about. *Novak*, 216 F.3d at 3110; *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at \*9 (S.D.N.Y. Sept. 24, 2018) (strong inference of CEO and CFO scienter where they spoke specifically to the issues on earnings calls); *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at \*16 (D.N.J. Aug. 28, 2017) ("powerful

---

[14] claiming that "there is no allegation that Benevides ever accessed Looker." Mot. at 14. Defendants miss the point, as "**access to similar information they should have monitored**" is sufficient to allege a strong inference of scienter. *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (emphasis added). As such, Defendants' reliance on *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at \*13 (S.D.N.Y. Dec. 10, 2008), where plaintiffs "failed to allege defendants' knowledge **or access to** contradictory facts" and *Dynex*, 531 F.3d at 196, where plaintiff failed to alleged defendants "saw **or had access to** specific reports or statements that indicated malfeasance or reports," are inapposite. Mot. at 14-15. Furthermore, there is no requirement that a CW identify a specific report given to a defendant for the CW's statements to support a strong inference of scienter. Rather, it suffices that the CW's statements allege that the defendants had access to information contradicting their public statements. *See Matrixx Initiatives,* 563 U.S. at 45-49.

[14] As support for the AC's scienter allegations, Plaintiff cited to the transcripts of a series of interviews conducted with former Olo employees and current Olo customers, stating exact interview dates, quotes, and job titles (¶¶124-125), which Defendants try to dismiss as mere "[g]eneral, unsourced allegations." Mot. at 13. They cannot. *See Celestica*, 455 F. App'x at 14 ("Although the witnesses are not identified by name in the complaint, plaintiffs' descriptions of these persons are sufficiently particular to permit the strong inference of scienter necessary for plaintiffs to sustain their burden on a motion to dismiss.").

evidence of scienter" where defendants spoke "explicitly and repeatedly" about drug trials, implying that they had first-hand knowledge of the study); *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it.").[15]

2. *Subway and Active Locations Were "Core" to Olo's Operations*

Defendants argue that Plaintiff's core operations allegations are not "an independent basis for establishing scienter." Mot. at 15. However, Plaintiff pleads far more than core operations and the Second Circuit has "endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter." *Lockheed Martin*, 875 F. Supp. 2d at 371. The core operations doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 623-24 (S.D.N.Y. 2017); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019).

Core operations include "matters 'critical to the long term viability' of the company and events affecting a 'significant source of income.'" *Hi-Crush*, 2013 WL 6233561, at *26. Here, Olo's active locations metric was not, as Defendants characterize, a simple "operating metric." Mot. at 16. Instead, Olo touted its active locations as a "Key Metric" because it "demonstrates the growth and scale of our ***overall business*** and reflects our ***ability to attract, engage, and monetize*** our customers and thereby drive revenue, as well as provides a base to ***expand usage*** of our modules." ¶4 (emphasis added). And, as stated above, Subway was a key customer in terms of

---

[15] *See also  Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *4 (S.D.N.Y. June 21, 2021) ("defendants could have and should have learned in the course of reasonable due diligence about a potential business partner"); *In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300, at *9-10 (E.D.N.Y. Aug. 12, 2021) ("If the Individual Defendants failed to verify the construction status before telling investors that construction was underway, then they were reckless.").

revenue, the number of active locations, and corporate attention.[16]  Further, as Glass and Benevides actively participated in the day-to-day operations of Olo (¶¶122-25), under the core operations doctrine, it can be inferred that as corporate executives they were aware of misrepresented or undisclosed matters involving the business's core operations.

>     3.    *Defendants' Stock Sales Contribute to the Inference of Scienter*

Defendants attempt to downplay the significance of Glass and Benevides' stock sales during the Class Period, but the facts alleged here are clear: while possessing material inside information, Glass and Benevides liquidated large amounts of their personally owned shares through trades timed to take advantage of Olo's artificially inflated stock.  Specifically, Glass sold almost $9 million in shares during the Class Period while Benevides sold $1.5 million.  ¶¶111-15. These sales support an inference of scienter because they were out of line with past trading, large, and suspiciously timed.  *Id.*  Each of Defendants' arguments fails.

First, the purported 10b5-1 plans are not public.  Therefore, Defendants cannot show that the plans are valid without discovery and converting their Rule 12(b)(6) motion to a Rule 54 motion. Mot. at 8.  Therefore, because the contents of the plans are unknown, and because inferences are drawn in favor of the Plaintiff, the Court cannot infer a lack of scienter from the available information.  Indeed, it could be that Defendants' 10b5-1 plans were adopted during the Class Period and thus absolutely no defense to scienter.  *Freudenberg v. E*Trade Fin. Corp.*, 712

---

[16] Defendants quibble (Mot. at 17-18) with Plaintiff's math regarding the revenue Olo derived from Subway, which is detailed herein at note 2.  That raises a highly factual dispute inappropriate at the motion to dismiss stage ***and*** it ignores both that Subway accounted for ***27% of active locations*** and that it received preferential treatment.  Furthermore, Defendants' claim that Subway contributed "a few million dollars" of revenue on a full year basis is based on a misreading of the transcript that Defendants quote from (Def. Ex. T at 11), where Benevides explained how Olo supposedly accounted for Subway's ***projected*** 2022 revenue in Olo's February 23, 2022 guidance, not a reflection on Subway's ***prior*** revenue, which Benevides then proceeded to explain as "about 1/3 of kind of the platform average on a quarterly basis," a figure that, as discussed in note 2, yields revenue per quarter of about 8%.

F. Supp. 2d 171, 201 (S.D.N.Y. 2010).

Furthermore, even if the 10b5-1 plans were relevant, they would not explain the suspiciousness of the timing of the Class Period trades. Here, particularly as to Glass, the AC goes into detail about how his sales align with the misstatements in this case (including, at times, the day before announcements). ¶113. Defendants seem to want each and every trade to perfectly align with the allegations in the AC. But that is not the law. "That the Complaint does not tether every single trade to a fraud-related event is not fatal to an inference of scienter." *Nguyen v. New Link Genetics Corp.,* 297 F.Supp. 3d 472, 495 (S.D.N.Y. 2018).

Defendants also take issue with the amount of shares they sold. Mot. at 9-10. However, courts routinely find that opportunistically timed sales of "small" amounts suffice to plead to scienter. *See, e.g. Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *2 (E.D.N.Y. Mar. 30, 2012) (sold 9.4% of holdings and scienter found); *Nursing Home Pens. Fund Loc. 144 v. Oracle Corp.,* 380 F.3d 1226, 1232 (9th Cir. 2004) (selling 2.1% and 7% of holdings supported scienter); *In re MicroStrategy, Inc. Sec. Litig.,* 115 F. Supp. 2d 620, 646 (E.D. Va. 2000) (sales of 2.2% of holdings indicative of scienter). And, the amount of sales is still suspicious due to the timing, particularly as Glass does not trade anywhere near the same amount after the Class Period. ¶114 (Figure 3). Defendants' own authority makes clear that "[i]nsider stock sales are unusual where the trading was in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed information." *In re Gildan Activewear, Inc. Sec. Litig.,* 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009).[17] And, their cited case of *Reilly v. U.S. Physical Therapy, Inc.,* 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018), proves this point as

---

[17] Furthermore, the fact that Defendants may have increased their holdings during the Class Period is irrelevant to the insider trading analysis. *See E*Trade,* 712 F. Supp. 2d at 201 (acquiring shares does not necessarily demonstrate a lack of scienter).

the 44% of stock holdings sold were not indicative of scienter because they occurred when Defendants *were not in possession of adverse information*.

    4.    *Defendants Were Motivated by the Wisely and Omnivore Acquisitions*

Defendants also had a motive to inflate (or maintain) Olo's share price in order to use it as "currency" to acquire other entities. ¶¶116-20; *Rothman v. Gregor*, 220 F.3d 81, 93-94 (2d Cir. 2000); *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 294-95 (S.D.N.Y. 2008).[18] That the acquisitions took place so soon after the issuance of false statements about Olo's active locations (¶¶61-64, 69-70) and contemporaneously with Glass and Benevides' stock sales (¶¶111-115; Def. Exs. X, Y), establishes the "direct line" courts look to in weighing the connection between the alleged fraud and the acquisition. *comScore*, 268 F. Supp. 3d at 554; *see also In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001).[19] Nor do courts in this Circuit accept arguments – as Defendants here proffer (Mot. at 10-11) – that acquisitions only partially paid for with inflated shares cannot support an inference of scienter. *See Rothman*, 220 F.3d at 93-94 (acquisition defendants characterized as "largely a cash deal" supports inference of scienter because the shares that were exchanged – $1.4 million-worth, compared to the $5.4 million in cash paid – were alleged to be fraudulently inflated nonetheless).[20] Furthermore, these

---

[18] Defendants' citation to *Kasilingam v. Tilray, Inc.*, 2021 WL 4429788, at *7 (S.D.N.Y. Sept. 27, 2021) is inapplicable because in *Tilray* (unlike here), plaintiffs failed to allege any facts showing motive, including stock sales, and actually demonstrated that "among those most harmed by the natural and intentional consequences of this purported scheme was the schemer himself."

[19] As such, Defendants' citations to *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *16 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013), where plaintiffs fail to "connect the alleged pattern of concealment and misrepresentation to the particular transactions," and *In re DRDGold Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 571 (S.D.N.Y. 2007), where "[p]laintiffs fail to identify how such a motive evidences fraud against DRD shareholders," are inapposite.

[20] Defendants' hair-splitting attempt (Mot. at 11) to distinguish between the October 2021 stock-fueled Wisely acquisition and the February 2022 all-cash Omnivore deal, ignores the thrust of the AC's allegation that the $110 million in fraudulently inflated shares Olo exchanged for Wisely

acquisitions need not have been for "personal gain" as Defendants suggest. Mot. at 10. As this Court stated in *In re Platinum-Beechwood Litig.*, 2019 WL 2569653, at *6 (S.D.N.Y. June 21, 2019) (Rakoff, J.), "[a] fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company."

Finally, Defendants assert that their version of the "facts" makes more sense. Mot. at 16-17. However, the Court is to look holistically at the facts actually alleged, and Defendants may not proffer their contradictory version of events.[21] *Tellabs,* 551 U.S. at 326. Indeed, if Defendants truly believed that active locations and the Subway relationship were immaterial, there is no reasonable non-culpable explanation for their refusal to tell the market the truth about them. *See Setzer v. Omega Healthcare Invs., Inc.,* 968 F.3d 204, 216 (2d Cir. 2020). The facts here show that Defendants were well aware of both the loss of Subway as a client and the inflated and flatly incorrect active locations counts. Rather than disclose these, they effectively held their breaths hoping to somehow fill those gaps, all while selling their shares and making acquisitions. This is far more plausible an inference given the allegations in the AC. And, again, at this stage, "a tie on scienter goes to the plaintiff." *Lockheed Martin,* 875 F. Supp. 2d at 372.

F.    **The AC Adequately Alleges Loss Causation**

Loss causation does not impose "a great burden upon a plaintiff," who need only satisfy Rule 8. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *19 (S.D.N.Y. June 17, 2020). Loss causation

---

had a spillover effect in reserving additional funds for the Omnivore deal just three months later. ¶¶116-119. Furthermore, Defendants' contention that Olo could have paid for both in cash calls for a factual determination inappropriate at this stage.

[21] Adding to the holistic totality of the scienter allegations is the fact Defendants made later admissions about the indications of Subway's loss in early 2022. *Hall v. The Children's Place Retail Stores, Inc.,* 580 F.Supp. 2d 212, 227 (S.D.N.Y. 2008) ("[A]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter.").

may be pled by alleging: "(a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Carpenters Pen. Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014). The AC does both.

      ***Corrective Disclosure.*** After the market closed on August 11, 2022, Defendants revealed that by the end of 4Q 2022 or 1Q 2023, all Subway locations would cease using Rails, that 2,500 Subway locations had already ceased using Rails, and that as a result, Olo's FY 2022 active locations count growth would be flat. ¶¶103-04.[22]

      ***Materialization of the Undisclosed Risk.*** That same day, Defendants also lowered FY 2022 revenue guidance, providing a misleading excuse: "macroeconomic challenges." ¶¶103, 107.[23] In truth, Defendants' downward revenue projections represented a materialization of the undisclosed risk of their inaccurate active locations reporting given that active locations and revenue are intimately connected. ¶37; *supra* at §II.B. *See World Wrestling Ent. Inc.*, 477 F. Supp. 3d at 138 (finding "that the lower-than-expected income projections WWE provided on April 25, 2019 reflected a partial materialization of the unknown risk that WWE would not receive revenues

---

[22] Neither Defendants' conclusory assertion that this disclosure was just "disappointing" nor their citations – to *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010), where plaintiff relied on an article that did not "reveal some then-undisclosed fact," and *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 389 (E.D.N.Y. 2013), where the court found only one of three alleged disclosures insufficient – can be credited. Mot. at 24. Indeed, Benevides' partial admission on that day's earnings call Q-&-A that Defendants knew "when we entered the year, there was ***indication*** Subway may plan to directly integrate with marketplaces" and Olo supposedly adjusted FY 2022 guidance accordingly (¶¶105-06 (emphasis added)) was itself "new information and caused a decline in the [Olo's share] value." *Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 64 (S.D.N.Y. 2020).

[23] This excuse falls flat. On May 23, 2022 – ***halfway through 2Q 2022*** – Defendants welcomed a recession ("a ***tailwind*** for our business"), stating consumers would "trade down" to QSRs, Olo's main clientele. ¶108 (emphasis added). Also on August 11, 2022, Toast, Olo's chief rival, acknowledged the "macroeconomic backdrop" and ***raised*** FY 2022 revenue guidance 5%. ¶109. Nor do Olo's misleading risk warnings (*supra* at §II.D) diminish the AC's materialization theory. *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *16 (C.D. Cal. June 9, 2016); Mot. at 24-25.

associated with the cancelled OSN Agreement.").[24]

In any event, Plaintiff sufficiently pleads loss causation by alleging the "share[] price fell significantly after the truth became known' through an express, corrective disclosure or 'through events constructively disclosing the fraud' like the 'materialization of [the] risk' concealed." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020). Here, Olo's share price fell over 36% in response to the Subway corrective disclosure and revenue materialization. ¶110; *Lewy v. SkyPeople Fruit Juice, Inc.,* 2012 WL 3957916, at *16–17 (S.D.N.Y. Sept. 10, 2012) (18% drop immediately following corrective disclosure is sufficient to plead loss causation); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177-78 (2d Cir. 2005) (loss causation pled where "[defendants] concealed the [risk at issue] (or some other risk) that materialized and played some part in diminishing the market value of [the stock]").

## III.    CONCLUSION

As the AC adequately pleads §§10(b) and 20(a)[25] claims, Defendants' motion must be denied in its entirety. Should the Court grant Defendants' Motion, Plaintiff respectfully requests leave to amend pursuant to Rule 15(a). *See Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend.").

---

[24] Defendants' (Mot. at 25 (emphasis added)) claim the AC "fails to link alleged misstatements of ***prior*** quarter active locations to revenue guidance for ***future*** quarters," ignores their inaccurate active locations counts' tie-in to revenue and that the ***FY*** 2022 revenue guidance issued in February 2022, impacts the ***full year***. ¶19. The Motion also cites two inapposite cases – *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *22 (S.D.N.Y. Mar. 31, 2015) (risk did not materialize "for nearly a full year" after the alleged fraud ceased) and *Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 157 (2d Cir. 2007) ("zone of risk" does not include "risk that an accountant would make a misstatement") – in alleging the "dots" here "are too numerous and attenuated." Mot. at 25. *See Teligent*, 2020 WL 3268531, at *19 ("The chain of alleged causation here is clear.").

[25] Because the AC adequately pleads a primary violation, and the Individual Defendants' culpability in the primary violation, it also sufficiently pleads a Section 20(a) claim. *See In re Delcath Sys., Inc. Sec. Litig.,* 36 F. Supp. 3d 320, 336 (S.D.N.Y. 2014).

Dated:  February 24, 2023

Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 *s/ Amanda F. Lawrence*
Amanda F. Lawrence
Donald A. Broggi
Jeffrey P. Jacobson
Mandeep S. Minhas
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
alawrence@scott-scott.com
dbroggi@scott-scott.com
jjacobson@scott-scott.com
mminhas@scott-scott.com

*Counsel for Lead Plaintiff Steamship Trade Association of Baltimore – International Longshoremen's Association Pension Fund*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

 _s/ Amanda F. Lawrence_
Amanda F. Lawrence