N3SCsteO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

POMPANO BEACH POLICE AND
FIREFIGHTERS' RETIREMENT
SYSTEM, Individually and on
Behalf of All Others Similarly
Situated,

                Plaintiffs,

        v.                              22 Civ. 8228 (JSR)

OLO INC., NOAH GLASS, and
PETER J. BENEVIDES,

                Defendants.

------------------------------x

                                        New York, N.Y.
                                        March 28, 2023
                                        2:30 p.m.

Before:

                    HON. JED S. RAKOFF,

                                        District Judge

                        APPEARANCES

SCOTT & SCOTT LLP
     Attorneys for Plaintiffs
BY:  AMANDA F. LAWRENCE
     JEFFREY JACOBSON

GOODWIN PROCTER LLP
     Attorneys for Defendants
BY:  JENNIFER BURNS-LUZ
     DEBORAH S. BIRNBACH
     BRENDAN BLAKE

(Case called)

MS. LAWRENCE:  Good afternoon, your Honor.  Amanda Lawrence on behalf of Scott & Scott on behalf of plaintiff STA-ILA.  With me today is Jeffrey Jacobson, also from Scott & Scott.  And also with me today is a representative from the plaintiff.

THE COURT:  Good afternoon.

MS. BURNS-LUZ:  Good afternoon, your Honor.  Jennifer Luz from Goodwin Procter on behalf of Olo and the individual defendants.  With me today is Deborah Birnbach and Brendan Blake, also from Goodwin Procter.  And representatives from the company are here, as well.

THE COURT:  Good afternoon.  We're here on the motion to dismiss.  I thank both sides for their very helpful papers.  And I think even though the motion is made by the defendant, I think we ought to start with plaintiffs' counsel.  So if you want to go to the rostrum, I'll put some questions to you.

So I guess my basic question is this:  A lot of the statements that you say were false or misleading look like forward projections, which are protected.  Show me the specific statement in your complaint that you say is an actionable false or misleading statement.

MS. LAWRENCE:  Your Honor, I would point you not to just one, but to multiple.

First, I would start with, for example, paragraph 64.

I would point this out as an example.  This is where defendant Benevides lists the number of active locations, and he gives a precise number at that time of 75,000, 74,000.  So that can't be forward looking if it's giving the number at that moment in time.  There is a number of misstatements like this in the complaint where they give an actual number --

THE COURT:  Hold on.  All right.  So you say that -- I think the statement you're really referring to is initially stated at paragraph 62.  "On the earnings call that day, Defendant Benevides reiterated that "[i]n terms of key metrics, we ended the quarter with approximately 74,000 active locations on the platform, a 30% increase year-over-year and a 7% increase sequentially.""  And there are similar allegations at paragraph 61, 63, and as you say, 64.

Now, you say that is false because?

MS. LAWRENCE:  It's false, your Honor, for three reasons, and those three reasons are listed in the complaint. It's false because the calculation for active locations, in brief, included entities within the restaurant brand that either had chosen not to use all those platforms that hadn't yet on-boarded it or had chosen to turn it off.  So what they were doing, they were counting all of the restaurant locations, regardless of whether they were using the Olo platform or not in that 74,000, 76,000, it grows into the eighty-thousands. Those are set forth in the paragraphs in the complaint and

N3SCsteO

corroborated by confidential witnesses who give specific examples for each of the categories.

THE COURT:  So sit down for a moment and let me have your adversary respond to that.

MS. BURNS-LUZ:  Thank you, your Honor.  Your Honor, we don't dispute that paragraphs 62 through 65 are not forward-looking statements.  Our argument as to those alleged misstatements is that the plaintiff has simply not alleged that they are materially false or misleading.  The plaintiffs' arguments about statements that are active-location based are based -- they rest solely on the shoulder of the two confidential witnesses, confidential witness No. 1 and confidential witness No. 2.  Neither of those witnesses -- there are not enough allegations about either of those witnesses to suggest that either of them have the level of seniority, the scope of view of the entire organization, any relationship to financial reporting or how Olo rolled up active locations for external recording.  To suggest they have the information that they're purporting to provide --

THE COURT:  So the statement is that in terms of key metrics — I'm not quite sure what the heck that means — we ended the quarter with approximately 74,000 active locations on the platform.

Is that true or false?

MS. BURNS-LUZ:  Your Honor, that's true.  There is

then no corrective disclosure to suggest that the active location number that was reported by the company was incorrect, and the plaintiffs' allegations that that number is incorrect should not be credited by the Court for the reasons I just explained.

THE COURT:  Point me to where they say those statements are incorrect.  If I can have plaintiff do that, but if you know where it is.

MS. BURNS-LUZ:  Yes, your Honor.  I would point you to paragraphs -- if you start on -- a couple pages later in the amended complaint, if you look at paragraph 85, 86, 87, 88, these are the only facts alleged with any particularity about the active location --

THE COURT:  Let me just take a look at this.  85 says: "CW1 was a Delivery Solutions Manager within Olo's Dispatch module segment from December 2020 to August 2021 and reported to Olo's Vice President of Delivery."

So he overlapped, although only barely, with the initial statements we've just been looking at.

"CW1's primary role was to help onboard new clients to Olo's Dispatch service.  According to CW1, after signing a new customer, CW1 was instructed to prematurely report the total contracted number of individual locations as active locations, before all of those locations were ever truly "active."  For example, defendants announced on an August 10, 2021 earnings

call that QSR brand Jack in the Box had joined Olo on or before June 30, 2021.  Jack in the Box had over 2,200 locations at the time, all of which were included in Olo's active locations count in Olo's 2Q 2021 Form 10-Q press release, and earnings call.  However, according to CW1, in truth, by the end of 2Q 2021, Jack in the Box really only had, at most, 200 live locations utilizing Olo's Dispatch platform.  And while the initiation of Olo's module proceeded to ramp up, by the time CW1 left Olo approximately 30 percent of Jack in the Box locations were still not utilizing Olo's module."

So, if those facts are true, why doesn't it show that your clients' statements at the time were false?

MS. BURNS-LUZ:  Your Honor, two points.  First, I would say that this individual, if you refer to paragraphs 34 and 35 and explains how Olo's divisions work.  There are different groups of software services, and dispatch is one module within one of the two major areas of software services performed.  Confidential witness No. 1 has information only about dispatch and there's no facts here alleged to suggest that he has the knowledge necessary, and the Second Circuit has said confidential witness must have a basis for the information -- to believe he has access to the information he's purporting to provide.  There's no basis to believe that this confidential witness had any information whatsoever about how the numbers for that were actually recorded externally, built

up, and whether or not all of the Jack in the Box locations were included in that recorded number.

Your Honor, taking the premise of your question, if this is true, this still is not the basis for securities fraud. There is no allegation anywhere in the complaint that information about a miscount or a potential miscount of Jack in the Box locations was ever communicated to either of the individual defendants. There is not one allegation that either Mr. Glass, the CEO, or Mr. Benevides had any reason to know that the Jack in the Box number was incorrect or that active locations --

THE COURT: Well, that might be helpful to them, but it wouldn't be helpful to Olo.

MS. BURNS-LUZ: Well, your Honor, without any allegation that either of the individuals had any knowledge or any specific information that was contrary to the disclosures, there's no *scienter*.

THE COURT: I'm not sure I understand. So let's assume, in fact, that they were counting all of the new customers' locations long before there had been any involvement of the platform, and let's assume that person who was a delivery solutions manager and reported to Olo's vice president of delivery was, quote, instructed to prematurely report the total contracted number of individual locations as active locations before those locations were ever active. Why isn't

N3SCsteO

that an allegation that someone with authority within the company gave an instruction to falsify the numbers and why wouldn't that be imputed to the company?

MS. BURNS-LUZ:  Well, your Honor, there is no allegation that confidential witness No. 1 ever had a conversation with anyone with any authority in the company.

THE COURT:  Well, he's not a janitor and he is a delivery solutions manager, he reports to the vice president of delivery, and it says that he was instructed.

Let me ask plaintiffs' counsel, who instructed him?

MS. LAWRENCE:  My understanding is that the person to whom CW1 reported, instructed, I'm going to say him.

THE COURT:  That being the vice president of delivery?

MS. LAWRENCE:  Correct, your Honor.

THE COURT:  So assuming that that's a reasonable way to read the complaint, otherwise they could be given leave to amend and say that's who made the instruction, why isn't that attributable to the company?

MS. BURNS-LUZ:  Because, your Honor, corporate *scienter* is rare in the Second Circuit.  What the court in Silvercreek held --

THE COURT:  I'm sorry.  What's rare in the Second Circuit?

MS. BURNS-LUZ:  Corporate *scienter*.  Where you have a situation where the knowledge that something is false, if you

N3SCsteO

divorce that from the person who's speaking --

THE COURT:  I'm not quite sure what you're saying when you say "corporate *scienter* is rare."  Last I checked, the Supreme Court of the United States in, I think it was about 1890 in the Central Bank case, said that all the statements and actions of any corporate employee are imputed to the corporation.  So if here you have someone who is apparently in a high position, the vice president of delivery instructing a subordinate to falsify the numbers, why isn't that -- I mean, he clearly has the *scienter*.  Now that's not the same as the individuals who are named, but so what.  Why isn't that imputed to the company?

MS. BURNS-LUZ:  Well, your Honor, in the *Silvercreek Mgmt., Inc. v. Citigroup, Inc.* decision, what the court held is that it's not enough to separately allege that misstatements by one individual and knowledge by others, that's not enough without some strong inference of a connection between the two, and that's precisely --

THE COURT:  I'm sorry.  Say that again.

MS. BURNS-LUZ:  Your Honor, what the court said in *Citigroup* was if you allege that there was one person who had the knowledge, let's say confidential 1, witness No. 1's manager, and the statements were made by other individuals, the individual defendants here, unless there is some allegation of a strong connection between the two of them, that's not

N3SCsteO

sufficient --

THE COURT:  But the allegation is he reported to him and was instructed by him to do something to falsify the books, so to speak, to falsify the numbers.

MS. BURNS-LUZ:  Your Honor, again, we challenge the premise that what was being falsified was what rolled up to the public disclosures.  There is no connection.  They're factually what's pled, that this individual or their manager was accessing information that rolled into what was publicly disclosed.

And I would also point you to --

THE COURT:  I guess maybe I'm not totally following what you're saying.  Let me give a hypothetical, you tell me why this would not be actionable.

So let's say the chief financial officer of a company says to his subordinate, please go falsify our income for the current quarter and make it twice what it really was, and the subordinate goes and does that, and the financial statements are then publicly filed, we'll assume that the difference was material, but in my hypothetical, the CEO and the president didn't know about this.  It was being done by the chief financial officer maybe because he was under pressure to do a better job or whatever, would not, nevertheless, his clear intent to bind the company and produce a statement that was false also bind the company when the statement was *scienter*?

N3SCsteO

MS. BURNS-LUZ:  Your Honor, I think that's a markedly different hypothetical than what we have here.

THE COURT:  Of course.  But if it were my hypothetical, you agree that would be sufficient, yes?

MS. BURNS-LUZ:  Yes, when you have a CFO who's involved in this conduct, that's a much different question. What you have here, your Honor, however, the only allegation that the CEO or the CFO had any information that may be contrary is plainly insufficient under the *Teamsters v. Dynex* case.

THE COURT:  At what level?  I agree this is not set forth in the complaint, at least not in this paragraph, but what level was the vice president of delivery?

MS. BURNS-LUZ:  It's not alleged, your Honor.

THE COURT:  I know it's not alleged, and maybe that's a fatal flaw, but one that could probably be easily cured through amendment.  Do you happen to know whether it's high, low, middle?

MS. BURNS-LUZ:  I don't happen to know, your Honor.

MS. LAWRENCE:  I don't, your Honor.  I don't want to misrepresent it.

THE COURT:  So if you don't know, that certainly casts doubt on whether *scienter* can be imputed.  I could give you a different hypothetical.

So supposing a low level accountant well down in the

N3SCsteO

hierarchy of the company falsifies an entry, and we'll assume materially that it has a material impact, but he does it totally on his own in my hypothetical because he was fearful that he wasn't showing as good results as would be expected. That wouldn't create *scienter* for the company, would it, under the PSLRA?

MS. LAWRENCE:  It would depend on the circumstances of the case, I would have to say.

But I would note one crucial difference here, and that's that both CW1 and CW2 -- we haven't yet talked about CW2, but it's important to know they corroborate each other. This was something they wanted to do.  They both were being told to do this and they didn't think it was right, didn't think that it was accurately reflecting the number of true active locations.  So I see those as somewhat different. They're being ordered by the company to do it.

THE COURT:  Well, when you say they're being ordered by the company to do it, that's why I asked you something that turns out you don't know the answer to, which what was the level of the person that gave the instruction to CW1.  But point me to where you want me to look for CW2.

MS. LAWRENCE:  Sure.  I will answer this, is that I do know the supervisor of CW1 is two down from the defendants, I just don't know who the person between him and the defendants is, so that's why I didn't want to misspeak.  Obviously, we

N3SCsteO

could amend the complaint to add that quite easily.

THE COURT:  Where do you allege about CW2?

MS. LAWRENCE:  So CW2 follows right after.  If you start looking at paragraph 89, please.  So CW1 gives two of the three ways in which the active locations count was false and CW2 gives the third way, and this was when some of the clients, the locations within a client had definitively chosen not to use Olo's products, but they were still being counted.

THE COURT:  So 89 says --

MS. LAWRENCE:  89, 90, and 91, your Honor.

THE COURT:  89, "Third, Defendants' representations about active locations were false and misleading because not all brand locations within a single chain joined Olo's platform, despite Defendants' repeated statements that Olo sells to and is deployed in "all locations," whether corporate-owned, franchised, or a mix of the two.  CW2 corroborates this allegation."

90.  "CW2 was a Deployment Manager at Olo from March 2021 through February 2022 and reported to an Olo Director of Deployment.  CW2's role involved onboarding new restaurant locations and project management to ensure each product the customer selected was implemented.  CW2 served as a "point person" between the customer and Olo product specialists.  CW2 worked across all Olo-modules, from Ordering (within Olo's Order Management Solutions) to Dispatch and Rails (within Olo's

Delivery Enablement Solutions)."

91.    "QSR chain CKE Restaurants fell under CW2's purview.  On November 9, 2021, Olo announced CKE as a new brand client in both a press release announcing 3Q 2021 earnings as well as on that day's earnings call.  CKE, the parent company for Carl's Jr. Restaurants LLC, Hardee's Restaurants LLC, as well as multiple other fast-food chains, had approximately 4,000 individual locations at the time, over 90 percent of which were franchises.  According to CW2, numerous of these franchises decided not to use Olo's technology.  As a result, Olo was installed in only about 50 percent of overall CKE locations.  Yet Defendants included 100 percent of the locations in the active locations count reported to the investing public."

So let me go back to defense counsel.  What plaintiff is arguing is that that behavior is sufficiently similar to the behavior that we looked at with CW1, that the two corroborate the notion that this is a company-wide practice, ergo imputed to the company.  What about that?

MS. BURNS-LUZ:  A few responses, your Honor.

First, nothing in those paragraphs suggests that anyone ordered CW2 or that there was an instruction that the numbers be falsified for the active locations.

THE COURT:  Although, an important part of the growth of this company to be able to say we now have on board X number

N3SCsteO

of participants who are using our platform and we're growing rapidly, as shown by the fact that we have greater numbers of such restaurants.  That was part of your --

MS. BURNS-LUZ:  Your Honor, yes, the company did talk about active locations.  They also talked about the average revenue per location, the net revenue routine from quarter to quarter.  What's critical --

THE COURT:  Sorry to interrupt.  Now talking about the people, the individual defendants, before they can sign off on statements like that or make those statements themselves, don't they have to know how those figures are being computed?

MS. BURNS-LUZ:  Yes, your Honor.  And there's no allegation that they had any access to any specific information that was contrary to the numbers that they reported.  The only allegation that either of the individual defendants had any access to information that could potentially be contrary to the numbers that were reported is in paragraph 123.

THE COURT:  I'm sorry.  Let me look at that.

MS. BURNS-LUZ:  Paragraph 123.

THE COURT:  Yes.  123 says, "In fact, according to CW1 and CW5, Olo used business intelligence software provided by Looker Data Sciences, Inc. ("looker") to keep track of Olo's key metrics, including the active locations count.  According to CW5, who regularly spoke with upper management, including Defendant Benevides, Benevides had access to Looker and would

N3SCsteO

have obtained his active locations data from it."

So, so what?

MS. BURNS-LUZ:  Your Honor, in the *Teamsters v. Dynex* case, the Second Circuit considered allegations very much like this.  What the Second Circuit held was that it's not sufficient to plead *scienter* just by saying that an individual defendant had access to broad data.

THE COURT:  Well, I agree with that.  So that's why I'm not sure what this paragraph adds.  Your point is it doesn't add enough itself to show *scienter*, but I come back to the paragraphs we were looking at earlier.

If, in fact, a person of let's say middle management repeatedly says, at least twice, to subordinates that I want you to count as active users of our platform hundreds, if not thousands of restaurants that are not using our platform or we have no idea whether they're using our platform or not or they may refuse to use our platform, why isn't that imputable to the company?

MS. BURNS-LUZ:  Two things, your Honor.  Those three paragraphs that you looked at earlier in the 80s to 90s, those are the only allegations that there was any -- those are the only particular allegations that there was any difference between the reported number and potentially the actual number.  This is not a repeated thing.  The plaintiffs have pled with particularity facts around active locations only in August 2021

and November 2021.  And even that, based on the paragraphs you read, your Honor, it's a little squishy as to what timeline is what.  There are no particular facts that the active locations were incorrect in any of the other quarters that are at issue in the class period.

THE COURT:  So why isn't it a reasonable inference, notwithstanding the PSLRA, still on a motion to dismiss, I have to draw every reasonable inference in favor of the plaintiffs?  Why isn't it a reasonable inference if one guy is giving this instruction in 2021 and another guy is giving the same instruction to a different subordinate in 2022, that they wouldn't be doing that if it wasn't a company-wide practice?

MS. BURNS-LUZ:  Your Honor, they simply haven't pled it.  And the PSLRA does apply.  The plaintiff is required to plead with particularity what statements are incorrect and why, and they haven't done that.  There is no allegation here that this is a repeated --

THE COURT:  The statements here that are incorrect is that X-thousand restaurants use our platform when, in fact, according to the complaint, that was untrue.  There was no basis for assuming its truth because that was just the total number and everyone knew that not everyone in that entity would necessarily sign on, and even if they did, they just added those entities so they hadn't signed on yet.  That's all, in effect, in the complaint by inference, yes?

MS. BURNS-LUZ:  Yes, your Honor.  They certainly lay out that theory, but there's no allegation that this was a continuing practice.  There's no allegation that there was repeated instructions that were provided, there's no allegation by how much any additional quarter may have been off, and the numbers that they're providing here, even as to these particular examples, are relatively small.

Your Honor, I would also, if I could, I would say part of the active location allegations also tie to allegations about reported misstatements around how the company sold its software to customers.  And what the company did was -- and they disclosed this and we've attached those disclosures for your Honor.  But what the company did was it would sell to the brand and then the locations for a brand would come on board.  And what the company disclosed repeatedly to its customers was we sell to our brand, and then it can take a significant amount of time, sometimes spanning multiple quarters, for all of the locations to come on board.

THE COURT:  So you're saying that even if taken in isolation, the statements about we have so many active participants that, in context with other statements, it would be clear to a reasonable investor that what was being said is we sign on to this group that has so many thousand, we don't know yet, it's going to take a while before we know, but we think you ought to know that at least potentially, they've got

tens of thousands of restaurants and they use our product.  So that's the argument you're making, yes?

MS. BURNS-LUZ:  Yes.  You just articulated it very well for me.  Thank you, your Honor.

THE COURT:  I'll send you my bill tomorrow.

So let me go to plaintiffs' counsel.

MS. LAWRENCE:  Your Honor, I agree, believe it or not, with defense counsel that you have to take it in context.  When your Honor asked me about the misstatements, I had just gotten to the tip of the iceberg when I mentioned the 64,000, 74,000, 82,000 active locations.

It's very important to point out another category of active locations misstatements.  It's in multiple paragraphs in the complaint, so I'll just pick one.  I will pick paragraph 77.

THE COURT:  77 says:  "After the market closed on May 23, 2022, defendants presented at the JPMorgan Technology, Media & Communications Conference.  When an analyst inquired "when Olo signs on a large enterprise, are all of the franchises obligated to come onto the platform?  And what does that process look like?"  Defendant Glass responded:

So we sell into one brand decision maker and then we're adopted by all of the restaurant locations within that brand, the corporate-owned locations, the franchise locations, the mix of the two, however, they're set up in their

organizational structure.  And then brands are always going live really all at the same time to create that consistent experience everywhere.  So yes, we are deployed in all locations."

So let me ask defense counsel, isn't that contrary to the statements you were just relying on?  Isn't this a flatout statement that once the location, once, in effect, the parent has signed on, then they are ultimately employed in all locations?

MS. BURNS-LUZ:  Your Honor, that statement was made in the context of responding to a question about the sales process.  No reasonable investor could be confused by that when you have the multiple repeated disclosures in the company's SEC filings, and we have attached these as exhibits, your Honor.

But I point you to Exhibit E.  For example, what the company said was further, even after our customers contract to use our platform, they may require extensive integration or deployment resources from us before they become active customers, which have, at times, extended to multiple quarterly periods following the execution of the agreement.

THE COURT:  Let me ask you this, the panelist was asking, "When Olo signs on a large enterprise, are all of the franchises obligated to come into the platform?"  Isn't the answer to that no?

MS. BURNS-LUZ:  Your Honor, I think -- I don't want to

N3SCsteO

over -- to represent one way or the other that there may be some outliers that I'm unaware of, but I think the answer to that is yes --

THE COURT:  They're obligated?

MS. BURNS-LUZ:  Way that Olo sells is if they sell to a brand and the brand restaurant has a number of franchisees or corporate locations, if those franchisees or corporate locations are going to use a service — that's the software — they have to use Olo.  Now, there may be some outlier franchise relationship where that may not apply, but for the most part, yes, this is how they sell.  They sell at the brand level and all of the restaurant locations within the brand then adopt the software.

THE COURT:  So let me go back to plaintiffs' counsel.

So I haven't looked at -- I'm not sure I even have the underlying contracts, but what your adversary is saying is that there is an obligation, it may take some time, but there is an obligation once the parent has signed on for all of its folks, if they use a platform for this purpose at all, to use all those platforms.  So what about that?

MS. LAWRENCE:  That's not what they're saying to the investing public.

I'll give you two examples.  One is the one we just looked at.  If you look at the -- I guess it's the third line, the last sentence, and then brands are always going live really

all at the same time.  We know from the CWs that that wasn't happening.  Even if they were eventually obligated, which I think is an issue for discovery, we know that they weren't going live all at the same time.

THE COURT:  Why is that really material from an investor's standpoint if, in fact, it takes some time to get going and then they don't all get set up at the same time.  So what?  If they are obligated, sooner or later, they're going to get set up.

MS. LAWRENCE:  So the CWs directly dispute what defense counsel is saying.  The CW said -- one of them said that they might have been obligated, but then they turned it off.  In some situations, some franchisees or some locations, they might have started with the software, they didn't like it, so they turned it off, but they were still being counted as an active location.  And then CW2 said something, which directly refutes what defense counsel says here, which is, in my opinion, a perfect issue for discovery, says that a number of the locations, obligation or not, chose, affirmatively chose not to use Olo's software.

So in both --

THE COURT:  That's what we ran before in CW2's paragraph.

So let me go back to defense counsel.  So if that statement is true and material and binding on the company, so a

N3SCsteO

lot of things, then the statements "that we have so many people who are using our platform and will be using it" are false, yes?

MS. BURNS-LUZ:  I'm sorry, your Honor.

THE COURT:  It's one of those law school questions.

So I was watching The Paper Chase on TV last night and I don't know why Kingsfield has such a bad reputation.  He seems like a sweetheart to me.

Anyway, if, in fact, the practice is for large numbers to say no, we're not going to use this, and that Olo lives with that, so to speak, acquiescence, the last part goes beyond anything in the complaint, but assume it for a moment.  Then Olo has just added so many active platform users, not true.

MS. BURNS-LUZ:  So, your Honor, I want to make sure I'm answering your question, so let me make sure I understand it.  So I believe what you're asking is if certain of the franchisees can opt out, does that then make the active locations misstated, is that --

THE COURT:  Well, let's start with that.  I'll start with that.

MS. BURNS-LUZ:  Your Honor, I would say no because there's no allegation that links the two.  The only allegations that the numbers that were reported are incorrect are August and November of 2021.  What's missing is the link between, okay, the timing of the franchisees and how they come on.

N3SCsteO

There's no allegation that that is somehow mistranslated into the numbers that are reported.  What the company says in its disclosure is active locations are locations that are active in a quarter.  There is at least one transaction, they are generating revenue for us in some way in that quarter, and there is a precise definition, I don't know it by heart, but we put that in our exhibits.

Now, what the allegations about whether or not all of the franchisees, if there may be some that opt out, there's no allegation that when they're calculating that number of who was active, that they're somehow just routinely scooping in we signed this contract, there's five thousand locations, they all get counted.  There is no allegation that links that other than these three particular allegations, which are very small numbers, your Honor, at the very beginning of the class period.

THE COURT:  Let me raise a logistical problem, which I did not appreciate when we first scheduled this conference.  So I have to leave at 3:30 because I teach first year criminal law at Columbia Law School.  I thought we could cover all the issues that I wanted to cover in an hour, but I was wrong.  And this is, I think, an interesting case, maybe a close case.  So I think we need to continue this colloquy and the question is when.

Now, one option, but I don't recommend it, is I can get back from Colombia by 7:30 tonight and we can go from 7:30

N3SCsteO

to midnight and maybe that's not your first choice.

Let me ask my law clerk to see what we have on tomorrow.

THE DEPUTY CLERK:  Pretty open, we only have the 10 o'clock tomorrow.

THE COURT:  How about 11 o'clock tomorrow morning?

MS. LAWRENCE:  I can make that work, your Honor.  I want to point out one thing.  I don't know how long of a slot you have at 11:00, but I would like to point out that the active locations is only a small part of the case, we haven't even touched the other category of misstatements.  So it's probably going to take over an hour.

THE COURT:  I know.  I want to hear you on that.  Why don't we do this, if this is agreeable to both sides, why don't we start at 11:00 and I will free up -- I think it's already maybe free, but if not, I will free up 11:00 to 1:00, and if you can't finish by 1:00, then the hell with it.

Linda, that works?

THE DEPUTY CLERK:  Yes.

THE COURT:  So I'll see you tomorrow at 11 o'clock.

* * *