N3TDSTEO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STEAMSHIP TRADE
ASSOCIATION-INTERNATIONAL
LONGSHOREMENS ASSOCIATION
PENSION FUND, ET AL.,

                 Plaintiffs,

          v.                          22 CV 08228

OLO, INC., ET AL.,

                 Defendants.
                                      Oral Argument
------------------------------x
                                      New York, N.Y.
                                      March 29, 2023
                                      11:00 a.m.

Before:

                    HON. JED S. RAKOFF,

                                      District Judge

                    APPEARANCES

SCOTT & SCOTT, LLP
     Attorneys for Plaintiffs
BY:  AMANDA F. LAWRENCE
     JEFFREY JACOBSON

GOODWIN PROCTER, LLP
     Attorneys for Defendants
BY:  JENNIFER B. LUZ
     BRENDAN BLAKE

N3TDSTEO

(Case called; appearances noted)

THE COURT:  Good morning.

So I missed you at midnight last night, but I think you made a wise choice.  So just going back before, because I know plaintiffs' counsel said there were other false statements that she wanted to address in her answer to my question of what were the nonforward-looking statements alleged in the complaint, but going to the ones that we were looking at yesterday, which were, first, the ones that begin around paragraph 61 or so, where, according to the press release, on August 10th, 2021, Olo's, quote, pending active locations increased 30 percent year over year to approximately 74,000 locations.  And variations on that theme were then repeated, and specified in the subsequent paragraphs.

And the claim is that was false, because at least according to CW1 many of those locations were never truly active, and he was -- he being CW1 -- was instructed to prematurely report the total contracted number of individual locations as active locations when, in fact, according to him, they were not active and not active ever in some cases.

So, for example, on paragraph 85, it says towards the end of that paragraph, "however, according to CW1, in truth, by the end of the second quarter of 2021, Jack in the Box really had at most 200 live locations utilizing Olo's dispatch platform.  And while the initiation of Olo's module proceeded

N3TDSTEO

to ramp up, by the time CW1 left Olo, approximately 30 percent, 30 percent of the Jack in the Box locations, were still not utilizing Olo's modules."

So we spent some time yesterday talking about whether those were actually false statements, whether they were material, and so forth. I guess my question that I wanted to put to plaintiffs' counsel first today was how do you -- assuming for the sake of argument that the statements that I referred to back in the paragraphs in the 60s were false, or at least misleading, and that they were materially so in the sense that it would have been important to investor to notice, although that's still -- I'm not making any rulings on this. I'm assuming this hypothetically.

How do you show that that caused a loss? Where is your loss causation?

MS. LAWRENCE: So, your Honor, loss causation is alleged, as is typical, towards the end of the complaint, and I believe, for the active locations, it's going to be a little bit difficult to talk about in isolation, because we haven't gotten to the second set of the misrepresentations that are announced on that date in August of 2022.

THE COURT: Yes. Let's take a look at that. Remind me, those are --

MS. LAWRENCE: You want the misstatements or loss causation paragraphs?

N3TDSTEO

THE COURT:  No.  Let's go first to the other statements that --

MS. LAWRENCE:  Okay.  So let me make life a little easier.  The first category of misstatements pertaining to the active locations, it involved when they gave a number at that date, and those are paragraphs 69, 71, 75, 78, and 80.

The second category we talked about yesterday was when they discuss how they take on all restaurant locations at one time, and those are paragraphs 70, 76, 77, and 81.

And then there's an entirely separate category of misstatements that pertain to the sandwich chain Subway.

THE COURT:  Okay.  And then let's, for the moment, glom those together.  Then where's your loss causation paragraph that you want me to take a look at?

MS. LAWRENCE:  So the loss causation allegations are -- we'll get you the exact paragraph -- begin at paragraph 107.

THE COURT:  Okay.

MS. LAWRENCE:  So for the -- Subway, that we haven't discussed yet, they expressly announce on that date that earlier in the year they had lost Subway as a client.  Subway had terminated its relationship.

They also announce that their active locations count, which had previously been growing, was going to stagnate or stay the same, just by prior statements; and they announced

N3TDSTEO

very poor guidance, restated guidance on that date.

THE COURT:  So they had Subway as a client, and then they lost them.

MS. LAWRENCE:  That's correct, your Honor.

THE COURT:  That caused a decline in the price of the stock, but that's not what you're basing your claim on, because you're not denying they had some sort of contract with Subway previously, yes?

MS. LAWRENCE:  We're not denying they had a contract with Subway.  The allegation is they lost that contract early in the year and waited eight months to tell the market, which according to cases, your Honor's *WWE* case, for example --

THE COURT:  I do want to get to that, but what I was trying to pick up from was the statements that you had pointed me to yesterday.  You made very clear there were other statements that you wanted to get to, and that may include what you're talking about now, but just focusing on the statements where the alleged false or misleading aspect was they gave a number of units that were -- that, according to your view, they suggested were utilizing all those platforms, when, in fact, they were not, that's a separate question from whether they delayed too long in saying they had lost Subway.

So we'll put aside, for the moment only, the loss of Subway.  My question to you was, just focusing on the allegedly false statements about, we've got tens of thousands of

N3TDSTEO

restaurants now on board, when, in fact, that was really just a statement of all the restaurants that were Jack in the Box or whatever, but not the real number of those that were actually utilizing it, how do you show loss causation as to that? That's my question.

MS. LAWRENCE:  I will answer that, but first I just want to point out I am going to separate Subway from active locations, but I'd like to remind the Court of the holistic analysis.  And it's difficult, because they do intertwine in places, but for the purpose of this analysis, I am separating them even though I think they play hand in hand with each other in the grand scheme the complaint.

So as to the active locations, it's important to note that all throughout the class period and before the class period, the individual defendants repeatedly tied together active locations and revenue.  Increased active locations drives revenue, right?  They reflect our ability to attract, engage, and monetize our customers, and drive revenue.  That's how defendants talk about active locations.

When they issue a poor guidance, decreased revenue, especially when their competitors are increasing their guidance, it's a direct reflection of a loss of active locations.  That's point one.

Point two is it was in the middle of the class period, and this is the February, I believe, 2022 statements.  They

say, well, we're going to increase our active locations.  We plan on increasing them even more.  We're going to add 50,000 locations.  On that date in August 2022, they said, no, we're not -- we're not adding any more.  We're going to stay stable.  So the stock price declines 36 percent.

So I think those two combined show that somehow the active locations miscount was playing into the 36 percent stock drop.  Whether it was materialization of the risk or a direct result is for discovery.  And as your Honor knows, loss causation falls under the Rule 8 analysis.  So I think we've alleged enough for that conclusion.

THE COURT:  All right.  So let me turn to defense counsel again, just focusing on the loss causation aspect of those false statements, those allegedly false statements.

MS. LUZ:  Yes.  Thank you, your Honor.

I think you've put your finger on exactly the issue we've identified in our motion to dismiss, is that there is no active disclosure about active locations at any point in time.  It is not alleged that the company restated or corrected the number of active locations for any of the periods at issue in this period or the proposed class period.  And the company, in fact, has never restated or corrected those locations.

So what the plaintiff alleges is that, you know, as of August 2022, the company announced that there was -- there would be a revision to their full year of guidance, and that

N3TDSTEO

their forecast would be lowered because of greater economic issues. Now, it's not true that, as the plaintiff just argued, that the company came out and said, no, we're not going to add any active locations.

And I point your Honor to paragraph 104, where the company -- where they allege the company would add an additional 4,000 locations, or 2,000 locations in the second half of the year. And it's outside the complaint, your Honor, but if you were to look at the company's disclosure, the company actually did add 8,000 new active locations in 2022.

But the point here, your Honor, is that what the plaintiffs have tried to allege in their complaint is that there was a misstatement of approximately a couple of thousand active locations in August of 2021 and November of 2021. And what they're asking us, your Honor, to infer is that, as of August of 2022, all of a sudden a reduction in guidance is somehow related to a slight misstatement, which is no more than 2 or 3 percent I believe, your Honor, of the active locations back a year before. And there are a number of courts in the Second Circuit that have held a reduction in guidance or change in forecast or an inability to meet your prior forecast numbers is not enough to allege loss causation.

THE COURT: All right. So let me shift gears first with you and then come back to plaintiff.

So the sort of common sense indication of why the

N3TDSTEO

stock declined in August of 2022 is, among other things, that they lost Subway.  So paragraph 104 says, quote, in a stunning revelation on that day's earnings call, that day being August 11, 2022, defendants reveal that Subway, the company's largest client by revenue and active locations count, had opted not to renew its contract with Olo, removing roughly 2,500 locations in the second quarter of 2022, with a balance of their locations being removed from the total active location count in the fourth quarter of that year or the first quarter of 2023.  Quote, as a result, as defendant Benevides conceded, the loss of all Subway locations, quote, will likely impact our pending active location counts in the fourth quarter of this year or the first quarter of 2023, and the company will likely add 2000 locations per quarter between now and the balance of the year, i.e., just 4,000 more locations in total.

And then they go on in paragraph 105 to say, equally as troubling, however, was the fact that defendants had known about Subway's pending departure since the beginning of the year.

So maybe I should start with plaintiffs' counsel, and then we'll come back to defense counsel.

So when you say "they had known about Subway's pending departure," what do you mean?

MS. LAWRENCE:  So, your Honor, first, if I might address just two more things?

N3TDSTEO

THE COURT:  All right.  Go ahead.

MS. LAWRENCE:  I couldn't let them go.

On the active locations count, I think it's important to clear up what we're actually alleging.  We are not alleging that these examples given by the CWs are the only miscount.  What they've done is added up those Jack in the Boxes and Carl's Jr., and said, oh, it's only 2,000.  That's not what we're alleging.

We're alleging, as your Honor said yesterday, taking the complaint as it's written, that this is larger than just these examples.  So I want to make -- I want to make that very clear.

THE COURT:  Well, I take it, picking up from yesterday as well, I take it what you say is a fair reading of the complaint -- is you're alleging that they had this practice of which these are just examples?

MS. LAWRENCE:  That's correct, your Honor.

THE COURT:  But that the implication was that it was a widespread, if not uniform practice, and, therefore, it would have a more material impact on the number of actual ongoing platforms?

MS. LAWRENCE:  Correct.  And only discovery and probably expert discovery, you know, looking at databases and numbers would reveal the true number.

Now, shifting to Subway -- oh, in the complaint, we

N3TDSTEO

set forth several allegations about the Subway relationship. So the first thing, if I take them temporally, is that in January or February, end of January, early February, there was a meeting between individuals at Subway and individuals at Olo. Included in that meeting was Juan George, who was the vice president of sales for the company. And there were two others from Olo who met with Subway, and they were told that Subway had chosen to terminate their relationship with Olo.

The --

THE COURT: So where is that last part? Which paragraph?

MS. LAWRENCE: Absolutely. Paragraph 50.

THE COURT: Okay. Hang on.

MS. LAWRENCE: And I think an important thing about paragraph 50, I'm sure your Honor will see, is it gives details about that meeting. It doesn't just say, hey, they decided to terminate it. It gives the exact reasons that Subway gave for terminating its contract. It talks about the international aspect, and it talks about the inhouse aspect that Subway had.

This isn't a vague allegation.

THE COURT: Okay. I see in paragraph 50 the allegation, quote, at the meeting, the Subway representatives informed the Olo group that Subway decided to terminate its relations with Olo. And I can't miss that, because you have it in bold face.

N3TDSTEO

MS. LAWRENCE:  And italics.

THE COURT:  And italics.  Right.  Right.

Well, you forgot underscoring.

MS. LAWRENCE:  Underscoring.  Bad job.

THE COURT:  What's the source of that information?

MS. LAWRENCE:  Your Honor, the source of that information was an individual who was at the meeting but asked not to be named in the complaint.

THE COURT:  All right.  You say, therefore, since that would have an obvious impact on the business, that they had to disclose it, what, in their next filing or --

MS. LAWRENCE:  They should have --

THE COURT:  -- right away, or what do you say the law requires them to do?

MS. LAWRENCE:  So I would say at the absolute latest, February 23, 2022, when they issued guidance, they should have mentioned the loss of their largest client.  And they also said on February 23, 2022, that they would be adding 15,000 active locations, which was a mathematical impossibility if all of the Subway -- now there's a factual dispute whether it's 15,000 or 20,000 locations.  It doesn't matter either way if all of them were being removed.  It was almost mathematically impossible, barring some huge score, to get 15,000 more locations that quarter, or that year.

THE COURT:  All right.  Now I'll go back to defense

N3TDSTEO

counsel.

So why wasn't this something they had to disclose much sooner than they did?  Because, otherwise, their -- both their figures and their projections were misleading.

MS. LUZ:  That's a great question, your Honor.  While investors might like to know certain information, that's not the base sign for determining what is required to be disclosed. And here what the plaintiff alleges is that the last time before August 2022 that Olo spoke about Subway in particular was in February of 2020.  That's two and a half years before.

And so what the plaintiff is suggesting is a regime by which, if a company announces we have some new customers, that there is then a continuing obligation to update investors on every twist and turn of discussions with those discussions about what's going to happen, if there's going to be a change to the contract, if there's going to be a renewal, if the customer will roll off.

So simply speaking, there is no obligation that we are aware of or we have been able to find or the plaintiffs have cited that when you announce a customer a year before you go public, you then have a continuing disclosure obligation to update the market on any development with that customer.

So, your Honor, the only other statements that the plaintiffs point to that they allege are misleading, because of the omission of information about Subway potentially rolling

N3TDSTEO

off the platform, are forward-looking statements that are clearly protected by the safe harbor provision.  And that's where your Honor started the day yesterday, and we didn't get to address that.

But all of the statements that are alleged to have been misleading are all forward-looking statements about we anticipate our growth will look like this or that, and what they're expected runway is.  And there's nothing alleged in the complaint that suggests that either of the individual defendants believes that they could not still grow if they lost one of their 600 customers, even if a large customer.  There's not an allegation that the market was saturated, and there were no other restaurants or fast food chains out there to go sell to.

And the notion that there was a mathematical impossibility for the company to continue to grow, even though it was experiencing the ordinary churn that it warned investors that may happen with its customers, there's just no basis for that.  There's not a fact pled here that says the loss of Subway is the tip of an iceberg.  Right?

This isn't an item 303 case; this is not a -- this is a trend, this is the beginning of something, this indicates something more where the growth story is over -- these are forward-looking statements without any allegation that they were -- that the defendants believed they were wrong at the

time they made the statements.  And there are significant cautionary statements in all of the plaintiffs' disclosures that weren't exactly the risk that came to be.

Olo told investors, our largest customers may choose to stop using us, they may choose to reduce the services they use from us, they may leave the platform entirely.  Olo told customers who only use our Rails module, which is the only module that Subway used -- and that module, your Honor, just for background, allows Subway and other Olo customers to integrate directly with DoorDash and UberEats and these other third parties.  And what Olo said is -- in its risk factors, is Rails customers are at risk of leaving and directly integrating with those third parties.

And another risk factor, your Honor, that the plaintiff makes a lot of actually in the amended complaint is that Olo told customers our contracts are generally three years.  They announced that Subway was a customer in February of 2020, so it's hardly a surprise that the contract may come up and Olo may not renew the contract at the end of three years.

And that timing aligns with exactly what the timing was for the Subway transition.  Olo -- Subway locations started to rollover in the second quarter of 2022, and depending on the numbers -- as plaintiffs said, there's debate about whether Subway had 20,000 or 15,000 locations that were active, but

either way you slice it, they only have about 12 to 15 percent of their locations stop being active in that second quarter of 2022.  So 85 percent of their locations remained active.

This was still an active customer, who had a contract. There's no allegation that the contract was terminated, that there was a written termination.  It was an active customer whose 85 percent of the locations were expected to roll off through the end of 2022 into the first quarter of 2023, which, as I noted, your Honor, aligns exactly with the timeline that the -- that Olo had laid out in its risk factors and in its disclosures about what contracts with customers generally look like.

THE COURT:  What's your view of why the price substantially declined after the loss of Subway was announced?

MS. LUZ:  Well, I think, your Honor, there was more information that was disclosed on that day.  I think maybe the loss of Subway was disappointing to investors, but it certainly didn't cover up any fraud.

And it's important to remember, as the plaintiff alleges in the amended complaint, that what Olo also told the market in August of 2022 was, look, it's a recession, and it's getting harder, it's taking longer for our customers to deploy our software.  It is a recessionary environment.  It's impacting our customers.  It is impacting us.  And this is -- we're going to reduce our guidance.

N3TDSTEO

So there was a lot of unfortunate information.  There was disappointing news.  It's not some uncovering or revelation of truth after a fraud.  Olo wasn't speaking about Subway.  Olo was providing guidance that there's no allegation that they didn't believe it.  Sorry.

THE COURT:  Okay.  Let me hear plaintiffs' response.

MS. LAWRENCE:  So the first thing I'll start with is the suggestion that there was no allegation that Subway officially terminated its relationship with Olo, and I would say that's just patently wrong, because paragraph 50 that we talked about earlier, again, bolded and italicized, says at that meeting that Subway representatives informed the Olo group that Subway decided to terminate its relationship with Olo.

THE COURT:  When was -- do you allege when it was to take effect?

MS. LAWRENCE:  When it was to take effect?

THE COURT:  When that termination was to take effect?

MS. LAWRENCE:  Because -- well, we know it took effect by the second quarter, because they started removing them already by the second quarter.

THE COURT:  All right.  Go ahead.

MS. LAWRENCE:  Oh, I thought you wanted defense counsel to respond.

THE COURT:  No.

MS. LAWRENCE:  I apologize.

N3TDSTEO

And then defense counsel also said that there's no obligation to talk about every customer out there. That's not what our complaint is saying at all. What we're saying is that this was the number one client by revenue and by active locations of Olo, and those allegations are in the complaint. They're at paragraph 44 and paragraph 10.

You also have two separate CWs talking about how critically important Subway was, even citing such things that if Subway spoke, it was all hands on deck. Those are at paragraphs 46 and 47.

We know that the loss of Subway was so material as a company that its employees -- this is also according to a CW -- were incredibly agitated when they found out that Subway was leaving. And that's at paragraph 52.

So this isn't saying, oh, every single customer you have to talk about every status and every moment of their contract. We're talking about your number one customer terminating its contract with you, and I think that's a far cry from what defense counsel is suggesting.

So, no, there's no obligation to update the market continually on every client, but there is an obligation to tell the truth. So in February, to say, "we delivered another strong quarter of operational and financial performance," that's paragraph 95, when you just lost your largest client, is misleading. Then to say that for 2022, "we're targeting a

N3TDSTEO

similar number of net adds we achieved in 2021," when you know you can't get those because you just lost 15,000 to 20,000 locations, is false and misleading.

I'd point your Honor to -- there are some incredible analyses, which is -- cases on this topic.  The first is your Honor's decision in the *City of Warren v. WWE*.  There had also been a termination of an agreement, and it was not disclosed. Your Honor found that to be a material misstatement.  The complaint said that the termination not only affected the financial outlook, but left the company scrambling to find a replacement.  We have alleged the same thing here.

I'd also point your Honor to the *Hi-Crush Partners* case -- it's in the briefing -- from Judge McMahon.  Same thing.

THE COURT:  Well, I'm glad you weren't relying on such weak authority as me exclusively.

MS. LAWRENCE:  Well, I added Judge McMahon.

THE COURT:  We have at least one smart judge, Judge McMahon, allegedly on your side.

MS. LAWRENCE:  I particularly liked -- not that I didn't like *WWE*, but I particularly liked, being from Connecticut -- the *WWE* case -- I particularly liked Judge McMahon's decision, because he says, even though defendants talk about, well, we didn't know if it was officially terminated, we knew it was disputed, and it might be

terminated, Judge McMahon said that didn't matter. A new fact had come to light about their largest customer, and they had a duty to disclose that. So I think those two cases, the facts I said earlier, clearly show that these were misstatements.

And then just quickly I'll touch upon the loss causation argument defense counsel mentioned when she talked about all this explaining away, that there was a recession. Again, I'd like to point out that Rule 8 applies to loss causation. So figuring out what element of the damages is caused by a recession versus the Subway disclosure versus the materialization of the risk will come. It doesn't come right now, but I'd also point out that this is a company that --

THE COURT: You're saying that's the way economics experts get rich is by figuring that out --

MS. LAWRENCE: Somehow they get rich. It baffles me, but --

THE COURT: All right.

MS. LAWRENCE: What I wanted to point out was that this is a company that has stressed that a recession is a tailwind for them. They blossomed during COVID. They said earlier, we welcome a tailwind. And that's in paragraph 108. At the same time, their competitor, main -- Toast, increased its guidance on the same day by five percent. So it's hard to credit the recession excuse.

THE COURT: All right. So those are the main areas I

N3TDSTEO

wanted to -- that I had questions about, but I'm happy to hear anything else that either counsel wants to say on any aspect of these motions.  As I indicated, I think these are quite interesting motions, and I am still considering how to resolve them.

Anything further?

Let's start with, since they're making a motion, with defense counsel.

MS. LUZ:  Thank you, your Honor.

I do have a few points, and, first, I would like to respond to counsel's argument just now.  Counsel pointed you to your Honor's decision in *WWE*, and I would say that the forward-looking statement in that case is markedly different than here.  It was a forward-looking statement about a renewal of a contract that had already been terminated, and that one-to-one correspondence of the issuer speaking directly about a customer relationship is not present here.  What was -- the forwarding-looking statements in this case are about work generally, and not at all related to Subway specifically.

And I'd also state plaintiffs' counsel has pointed you to *Hi-Crush*, and I think if the Court is considering that in terms of the duty to disclose, the other instructive case on that is *Express Scripts*.  And in that case -- in both of those cases, they're different because the issuer in those cases put in their SEC disclosures, this customer is material, this

customer is 16 percent of our revenue in its transcripts, this customer is 18 percent of our revenue.

And in those cases, in *Hi-Crush*, the new fact that was alleged that changed the script to a duty to disclose was a written letter of termination, and that's not something that's alleged here. What's alleged is a sales conversation. This is much more similar to *Express Scripts*, where the individual defendants were engaged in almost a year-long process of renegotiating pricing over contracts in the billions of dollars, but it was still found not to be a duty to disclose, even though in that case the judge described the negotiations with the customer as being very volatile, and contentious, and heading towards a bad place.

THE COURT: But here, in paragraph 50, they are alleging flat out that Subway said it was going to terminate, so it's not as if they -- if it turns out that's not true, and it was just part of an ongoing negotiation stance, of course that will be useful to you as the case goes forward, but right now I have to take that allegation as true.

MS. LUZ: And even if you do, your Honor -- and we disagree, but even if you do, there's still the *Tellabs* balancing. And the Court has to consider whether or not the plaintiff has alleged a strong interest of scienter. And here the scienter analysis in the Second Circuit, when you're considering an alleged material omission, is whether there is a

clear duty to disclose, and whether or not the defendants were reckless, an extreme departure from the ordinary standard of care in deciding not to disclose the information.

And here you've got two individuals who -- individual defendants who are not alleged to have been selling stock, who are not alleged to have benefited in any sort of way in 2022. The last discretionary sale of stock was in November of 2021, months before anyone is alleged to have heard that Subway was possibly going to leave the platform. All of the trades were pursuant to 10b5-1 trading plans, and it's not disputed that the individual defendants ended the class period owning more stock than they started the class period with.

There's also some accusations about two acquisitions, but there's no allegation that either of the defendants benefited from those acquisitions. And the acquisitions were primarily funded in cash, so there's no, motivation for these defendants to mislead or deceive investors.

And a cogent and a compelling inference from the facts that are alleged is that the defendants -- even if you believe that they knew early -- the defendants hadn't been talking about Subway for over two years, and they were providing guidance that they believed they could hit. They were forecasting where the company might grow. And the fact that that turned out not to be wrong is not evidence that it was false at the time. There's no allegation that they didn't

N3TDSTEO

believe it could grow.

So when you get to the *Tellabs* balancing, your Honor, you have two individual defendants who are not alleged to have benefited in any particular way during the period at which the plaintiff says it should have been disclosed, from February to August. And there's no inference that it was an extreme departure of care for the defendants not to disclose that one of their customers may leave the platform when they've already warned investors of exactly this risk, and when the last time they talked about this particular -- this particular customer was two years earlier.

And so the scienter reason, your Honor, we submit, is another reason that the case should be -- the Subway allegation should be dismissed.

THE COURT: All right. Let me hear from plaintiffs' counsel.

MS. LAWRENCE: So, your Honor, I'll start with the *Express Scripts* case that defense counsel brought up. I'd like to point out that in *Express Scripts*, that was Judge Ramos' decision, there it looked at the very particulars of the situation, and said that Express Scripts was having a dispute with Anthem, also its largest customer, and that they were engaging in resolution and mediation. Indeed, Anthem publicly said that it was hopeful to resolve its issues with Express Scripts. There was no allegation that that relationship had

N3TDSTEO

been terminated. Absolutely none. So I find *Express Scripts* highly distinguishable in the line of cases of termination of relationship.

I would also add in the *Hutchins* case. It's in our briefing. It's from the Eastern District of New York. And there a nutritional supplier did not disclose the prospect of losing its largest customer, which was Wal-Mart, even though the new Wal-Mart was soliciting other bids. Just soliciting other bid, not having told them, we are terminating our -- we decided to terminate our relationship. The Court said those were misstatements.

I'd also point out that -- something that hasn't been mentioned here. We talked a lot about the January-February meeting, but I think it's important to note that that meeting, and Subway's decision to terminate its relationship with Olo, is corroborated by numerous things in the complaint. And I think one of the most important things to point out as a corroborating fact is that defendants later admitted that they knew going into the new year -- the new year was then 2022 -- that there was at least the possibility that Subway was going to terminate their contract.

So we've alleged far more than the other cases here have set forth.

THE COURT: What do you say about the individual defendant lack -- alleged lack of scienter in terms of the

N3TDSTEO

pleadings?

MS. LAWRENCE:  So I was heading there right now. Defense counsel's allegations that we have -- suggestions that we have no allegations of stock sales or personal profit are wrong.  And I'll point to the paragraphs on that, but I would like to point out, first, that even without motive, which we do allege, there is no doubt they were reckless.  There is absolutely no doubt here.

They knew.  We show in the complaint via multiple -- via their later admission, via the just one-on-one or three-on-three meeting with Subway, and then via town hall. They knew they had lost Subway, and they waited.  They waited to tell the market.  And they continued to say, oh, we're having a great quarter.  We're adding all these locations.  You can't do that.  So they were, at a minimum, reckless.

That being said, we have also added motive allegations.  As to the stock sales, the CEO sells $9 million. He sells them all in one giant lump the end of 2021, which is the most reasonable inference, when he found out Subway had decided to terminate its relationship.  Coincided timing with Benevides, who sold less but at the same time.

Now, defendants made the point that they were all made pursuant to 10b5-1 trading plans.  What's interesting is that defendants haven't produced -- they put in many, many SEC form 4s, form 3s.  We haven't seen the 10b5-1 trading plan.  It's

N3TDSTEO

not public.  I can't tell you whether it was entered into in the class period.  I can assume it was, because we haven't seen it yet.  And there's a long line of case law saying if it's entered into in the class period, it doesn't necessarily defeat the inference of scienter for stock sales.  So that argument is a wash.

The argument that they will increase their holdings, when you look at the actual forms, is also a wash.  For example, this alleged increase by defendant Glass.  He increased his holding during the class period by .92 percent.  That increase is comprised entirely of convergence and of a vesting schedule.

And then I would point to the acquisitions.  They are not compliant -- there were two acquisitions.  Defense counsel suggested that they were largely cash.  That's not true.  The first one, which overlaps perfectly with Glass' and Benevides' sales was done at least a large part with inflated stock prices.

And then I would look at -- I don't like -- it's called the core operations doctrine.  But we can say that, that Subway was the number one client, and this is the CEO, the CFO. We have multiple allegations about how hands on they are, CWs talking about that.  That's -- paragraph 125 is a great example of that.  And these all add up to the most logical inference, especially when you consider holistically that defendants acted

N3TDSTEO

with scienter.

And then I would end, as I usually like to end, with noting that even if it is a tie, and I don't even think it's close, a tie goes to the plaintiff.

THE COURT:  Okay.

MS. LAWRENCE:  Thank you.

THE COURT:  Well, let me hear, anything -- this is your last shot from both sides, so one more time for moving counsel, one more time for responding counsel.

MS. LUZ:  Thank you, your Honor.

I just want to respond to a few more statements that were made.  Your Honor, in terms of the stock sales that were alleged, plaintiff just argued that Mr. Glass, Mr. Benevides sold their stock in one mass sale in the fall of 2021.  The sales took place in September, October, and November of 2021, shortly after the lockout period expired for the company.  It had gone public earlier in that year.  The timing of these sales is not suspicious, because it happened there, and the timing of the sale is no basis for the Court to infer that somehow plaintiffs -- or the individual defendants learned about Subway in September, October, November.  There's simply not a single fact pled here, other than the fact that the individual defendants sold shares pursuant to their trading plans, that anyone had any idea about Subway's plans before late January or early February of 2022.

N3TDSTEO

And, your Honor, I would also -- in terms of the trading allegations, there's much more I could say, but I simply point your Honor to the *Bristol-Myers* split decision from the Second Circuit last year.  And in that case, the Court said when trades are pursuant to trading plans, unless there is an allegation in the complaint that the plan was entered into not in good faith, then they're not indicative -- those trades are not indicative of scienter.

And then, your Honor, on the core operations doctrine, plaintiff just argued that Subway should be considered core to the company.  It was significant enough that it was a core operation.  We've cited a number of cases where courts have held that simply being the largest customer, even if we believe that's true, believe that allegation on its face, that's not enough to make something core.

In fact, for something to be core, for the purposes of incurring scienter, then it has to be virtually all of the company's business or something that's essential to its survival.  Subway was one customer, albeit a large one, but it had one module of the company's many modules.  It certainly was not core.

Thank you.

THE COURT:  Thank you.

And, finally, from plaintiffs' counsel.

MS. LAWRENCE:  I will be very, very brief.

N3TDSTEO

Just quickly, as to the stock sales, I want to point out that, yes, before the $9 million lump in stock sales, there was a lockout period. We don't dispute that. But after the $9 million lump, there are no stock sales -- very, very minimal. It's in the complaint, and it looks like this. Defense counsel said -- and that's figure 3, paragraph 114.

Defense counsel said that there was no indication that defendants -- beside that lump, that defendants knew at the end of 2021 that Subway was terminating its contract. That is completely belied by defendant's own statements.

If you look at paragraph 105 -- this is, again, in August, when he finally says, so when we entered the year, the year being 2022, there was an indication that Subway may plan to directly integrate with the marketplace. Directly integrating with the marketplace means they don't need all those technologies, something they knew all along. They knew all along that Subway had the capability to do this themselves. So defendant has admitted that he knew at least of the possibility at the end of 2021, early 2022, and his stock sales dropped around that time.

Unless your Honor has any more questions, I stand by our complaint and by our papers. And I thank you for your time.

THE COURT: So I want to thank both counsel for excellent argument. When I have a motion to dismiss, even one

N3TDSTEO

that raises difficult issues, as I think perhaps this one does, I don't like to hold off ruling for an extended period of time, because if the case is going to go forward, we need to have it go forward.

So I will get you at least a bottom line ruling.  It may not be a full opinion, but at least you'll know whether the case is going forward or not, by two weeks from today, which is April 12.  It will still leave you ample time to prepare your income tax returns.  I will stay the case in all respects for that two-week period.  So we'll know where we stand in two weeks.

This really was an excellent argument.  I am very grateful to counsel for both sides.  My only regret is you made my life more difficult.  Now I have to decide all these close questions.  So, anyway, we'll do our best.

Thanks very much.

(Adjourned)