# EXHIBIT J

## Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

STEAMSHIP TRADE ASSOCIATION OF )
BALTIMORE - INTERNATIONAL      )Case No. 1:22-cv-08228-JSR
LONGSHOREMEN'S ASSOCIATION     )
PENSION FUND, Individually and )
on Behalf of All Others        )
Similarly Situated,            )
                               )
                Plaintiffs,)
        v.                     )
                               )
OLO INC., NOAH GLASS, and      )
PETER BENEVIDES,               )
                               )
                Defendants.)
_____)


VIDEOTAPED DEPOSITION OF DR. MICAH S. OFFICER
APPEARING REMOTELY
June 14, 2023
1:42 p.m. (GMT Time Zone)


Reported by: Eileen Mulvenna, CSR/RMR/CRR

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

## Page 2

REMOTE VIDEOTAPED DEPOSITION of MICAH S. OFFICER, Expert Witness plaintiff in the above-titled action, held on Wednesday, June 14, 2023, commencing at approximately 1:42 p.m. (GMT Time Zone), before Eileen Mulvenna, CSR/RMR/CRR/RDR, Certified Shorthand Reporter, Registered Merit Reporter, Certified Realtime Reporter, Registered Diplomate Reporter, and Notary Public of the State of New York.

## Page 3

APPEARANCES:
AMANDA LAWRENCE, ESQUIRE
JEFFREY JACOBSON, ESQUIRE
MANDEEP MINHAS, Esquire
Attorneys for Plaintiffs
Scott + Scott Attorneys at Law LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York  10169
212.223.6444
alawrence@scott-scott.com

DEBORAH BIRNBACH, ESQUIRE
JUSTIN WARD, ESQUIRE
KOURTNEY KINSEL, ESQUIRE
LAURA NOERDLINGER, ESQUIRE
Attorneys for Defendants
GOODWIN & PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
617.570.1000
dbirnbach@goodwinlaw.com

## Page 4

ALSO PRESENT:

Corey Bott Esq., STA-ILA
Jeeyoon Ahn, Summer Associate
Henry Marte, Videographer

1 (Pages 1 to 4)

6/14/2023          Steamship Trade Association of Baltimore v. Olo, Inc.   Dr. Micah S. Officer

Page 13

Q.   Is that still accurate in your view?

A.   It is, yes.

Q.   When were you retained to draft this report?

A.   I don't remember exactly, but I think it was late April or early May. I don't recall exactly the date.

Q.   And who contacted you?

A.   I was contacted by an expert at Forensic Economics, who was, I believe -- if I can recall the story correctly, I believe she was supposed to be the expert in this case but had some other conflict.

Q.   And what's her name?

A.   Her first name is Sunita. I honestly can't remember her last name.

Q.   And --

A.   But I can get that for you.

Q.   Sorry.

     Had you worked with Forensic Economics before?

A.   Yes.

Page 14

Q.   And on how many occasions?

A.   Maybe three.

Q.   Do you remember which cases? Were they all in litigations?

A.   They were all litigations. There's the Celgene case. There's the Pattern Energy case. And there's one that I -- there's potentially one that I can't remember. So there was at least those two and then maybe one other.

Q.   And when you -- was the name Pattern Energy?

A.   That's right.

Q.   The one listed in, I believe, Exhibit 1 to your report; correct?

A.   Yes, that's correct. So if I look at Exhibit 1, Pattern Energy was with Forensic. So was the Celgene case, which is the next one down. And, actually, that's it. So I take it back. It's two, not three.

Q.   Okay. Thank you.

     And did you work with the same person at Forensic Economics each time, or did you work

Page 15

with someone different other than Subita [sic]?

A.   I worked with someone different every time. They have different analysts they assign to different projects.

Q.   Is one of the people you worked with a Mr. Torchio?

A.   He's the CEO of the firm. I haven't necessarily specifically worked with him. He has other analysts that do the work.

Q.   After that initial contact, do you recall -- I think you said late April or early May is when you believe you were engaged?

A.   Yes.

Q.   Do you recall anything -- anyone else involved? When did you get introduced to counsel for plaintiff in this case?

A.   It was an initial Zoom or conference call. I can't recall which. But there was an initial get-to-know-you meeting. It would have been probably maybe five days later than that. And I'm pretty sure that Amanda was on that. I'm sure that Jeffrey was. Both of those people are in this Zoom

Page 16

room. I don't recall who else was on that call.

Q.   Do you have an economic relationship with the organization Forensic Economics?

     MS. LAWRENCE: Object to form -- object to form, vague.

     THE WITNESS: An informal one, but not a formal one, no.

BY MS. BIRNBACH:

Q.   Well, do they pay you any fees?

A.   No.

Q.   Do you pay them any fees?

A.   I pay them a fee if they bring a case to me and I get retained.

Q.   So they will be receiving a fee for your engagement on this case?

A.   Correct.

Q.   And what's the amount of that fee?

A.   I don't recall. It's some percent of what I bill -- well, actually, that's not true. It's some percent of what I collect.

Q.   And are they additionally being paid by plaintiffs in this case for assisting you?

4 (Pages 13 to 16)

Page 49

THE WITNESS: Okay. I see all those things, yes.

BY MS. BIRNBACH:

Q. So just to confirm, your understanding is that plaintiff alleges that defendants misrepresented the number of active restaurant locations they serve; correct?

A. I may have been paraphrasing, but I think that's exactly what's in the complaint.

Q. And your understanding is that the allegation in the complaint is with respect to Olo's historic number of active restaurant locations; correct?

A. That is one of the things that is brought up in the complaint, yes.

Q. Well, the active locations were reported on quarterly for that past quarter; correct?

A. Correct.

Q. In paragraph 167, there's a sentence that reads -- let me try to read it correctly -- "Plaintiff alleges that these previous false or

Page 50

misleading public statements by Defendants were corrected coincident with their earnings release after the close of trading on Monday, August 11, 2022."

Do you see that?

A. I do.

Q. So your understanding from the complaint is that Olo made a corrective disclosure about the number of its active restaurant locations on August 11, 2022?

MS. LAWRENCE: Objection, calls for a legal conclusion.

THE WITNESS: Well, you skipped over paragraph 166, in which I outline some of the other complaint -- other issues raised in the complaint.

BY MS. BIRNBACH:

Q. So paragraph 167 does not refer to a corrective disclosure about active locations?

MS. LAWRENCE: Objection, calls for a legal conclusion.

THE WITNESS: Paragraph -- in

Page 51

paragraph 167, I -- maybe I could have been more accurate to say that some of these previous false or misleading statements were corrected coincident with their earnings release.

BY MS. BIRNBACH:

Q. Okay. But I'm asking you the question: Does paragraph 167 refer to a corrective disclosure about the number of active locations made on August 11, 2022?

MS. LAWRENCE: Objection, calls for a legal conclusion. Objection, asked and answered.

THE WITNESS: I'm just not sure. I haven't gotten far enough into this to actually assess the corrective disclosure in terms of things like economic correspondence, loss causation, and so on. That wasn't part of my assignment to date in this case.

BY MS. BIRNBACH:

Q. Well, what was the corrected active locations number disclosed on any date?

Page 52

A. Again, I just haven't done anything with the economic correspondence or loss causation in this particular matter.

Q. So you can't point me to any corrective disclosure on the number of active locations today?

A. I cannot today. But that's also not what paragraph 167 says. The first two words are "Plaintiff alleges." It's not my opinion. It's what the plaintiff alleges.

Q. Correct. And your report said you accept plaintiff's factual allegations as true; correct?

A. Any damages calculation in a case like this is done with the understanding that the plaintiff is successful at trial with their allegations, that's correct.

Q. So for purposes of your report, though, I believe you said in your report that you accept plaintiffs' factual allegations as true; don't you?

A. I don't know. Can you point me to the

6/14/2023          Steamship Trade Association of Baltimore v. Olo, Inc.   Dr. Micah S. Officer

Page 57

number?

A.   Right.  And there's no -- there's no insinuation that doesn't exist.  I can't because I haven't done the work to figure it out.  That's correct.

Q.   Where will you be looking for that information if you do the work?

MS. LAWRENCE:  Objection, calls for speculation.

THE WITNESS:  There is a section of this report.  I've just got to find it, hang on.

So if you look at paragraph 138, and it goes through to paragraph 161, that describes what I would need to do in the next phase of this in order to ascertain if there is a corrective disclosure of the number of active locations consistent with what the plaintiffs have alleged.

BY MS. BIRNBACH:

Q.   And in that section, which I see the bold italicized language in paragraph 138, seems to

Page 58

be describing the direct and foreseeable economic effects of these corrective disclosures, in that section that you pointed to, is there a particular paragraph or sentence that would explain how you would find the corrected active locations number?

MS. LAWRENCE:  Objection, calls for speculation.

THE WITNESS:  No, there's not.  It's just -- the whole summary in those paragraphs is what I would do in the next phase of this if I were asked to do so.

MS. BIRNBACH:  Can we pull up the amended complaint?

Which tab is that, Justin?

MS. LAWRENCE:  As you pull it up --

MS. BIRNBACH:  Do you want to take a break?

MS. LAWRENCE:  We've been going an hour and a half, I think.  Probably a good time if you're going to go to another document, but I defer to Dr. Officer.

MS. BIRNBACH:  Yeah, we've been going

Page 59

less than an hour, actually.  It just feels like forever, Amanda, when I ask.  But, yeah, no, why don't we take a break for a few minutes.  That would be fine.

MS. LAWRENCE:  No, we've been going over an hour, almost an hour and a half.

THE VIDEOGRAPHER:  Do you want to go off the record first, and then we can discuss it?

MS. BIRNBACH:  Well, and the video will tell us what time we're going off the record.  We started at 42 after the hour.

MS. LAWRENCE:  Oh, you're right.  I thought we started at the top of the hour.  I'm completely wrong.

MS. BIRNBACH:  We can argue about many things, Amanda.  I don't think time is one of them.

MS. LAWRENCE:  I could be wrong.  I'm okay being wrong.

THE VIDEOGRAPHER:  Counsel, do you still want to go off the record?

Page 60

MS. BIRNBACH:  Yes.

THE VIDEOGRAPHER:  The time is 2:38 p.m.  We're going off the record.

(Recess from the record.)

THE VIDEOGRAPHER:  The time is 2:51 p.m., and we're back on the record.

MS. BIRNBACH:  And can we look at Tab 3, which I think is the amendment complaint.

And can you go to paragraph 108.

(Exhibit 3, No Bates numbers, Amended Complaint, received and marked.)

BY MS. BIRNBACH:

Q.   So in paragraph 108, it says, "In truth, Defendants' downward projections represented a materialization of the undisclosed risk of their repeated misreporting of Olo's active locations count."

Do you see that?

A.   I do.

Q.   What is your understanding of what the undisclosed risk was that's being referred to there?

15  (Pages 57 to 60)

Page 61

MS. LAWRENCE: Objection, calls for a legal conclusion.

THE WITNESS: I just don't know. I have not done the work to figure out in this particular context in this particular time what that statement might mean.

BY MS. BIRNBACH:

Q. Well, you do make reference to the materialization of an undisclosed risk in your report; don't you?

A. I don't believe so.

Q. Is there in your mind any difference between alleging a misrepresentation of fact and alleging nondisclosure of the risk?

MS. LAWRENCE: Objection, calls for a legal conclusion.

THE WITNESS: I just don't have any opinion about that at this particular point in this case.

BY MS. BIRNBACH:

Q. Do you know -- so you don't know what the undisclosed risk that's being referred to in

Page 62

paragraph 108 of the complaint refers to; correct?

A. That's correct. I was not asked to opine on that, and, therefore, I haven't done the work to understand it. I'm sure I probably could, but I just haven't done it.

Q. So in your report, you did not consider an undisclosed risk; is that fair?

A. I think that's fair. Yeah, I considered market efficiency, and I considered the outline of a damages model. I didn't do any of those things. Like I haven't actually investigated those issues, but...

Q. Well, did you look at whether there was a price impact on Olo's stock from an undisclosed risk?

MS. LAWRENCE: Objection, calls for a legal conclusion.

THE WITNESS: I think there is probably an excess return on the key date after the end of the class period here, but -- that's probably in my report, but I don't spend any time in the report discussing

Page 63

that or what caused it or whether there was any information that was driving that stock price reaction. It's just not part of my assignment at this stage in this case.

BY MS. BIRNBACH:

Q. Right. So you're not offering an opinion on the price impact of the active locations undisclosed risk; correct?

A. I'm not -- at this stage of this litigation, I'm not offering an opinion about any price impact of any sort.

Q. So my question was: Is that correct? The answer is yes?

MS. LAWRENCE: Objection, misstates testimony.

THE WITNESS: I think it might be yes with an asterisk. Yes, but I'm not offering -- not specifically offering an opinion -- I'm not specifically not offering an opinion about what you just said.

BY MS. BIRNBACH:

Q. In your materials relied upon in your

Page 64

report, you listed EDGAR, the SEC's EDGAR database, generally.

Did you review Olo's SEC filings during the class period?

A. Mostly for things like share counts and the like. I didn't probably go past about page 2, when I got all the information I needed for understanding what the share counts were at various points in the class period.

Q. So did you --

A. I --

Q. Sorry, please continue.

A. I apologize.

Q. So did you review Olo's second quarter 2022 10-Q?

A. The answer is probably the same as what I just gave. I'm sure that I looked at it and took what information I needed from it that's cited in my report, but I don't recall as I sit here now exactly what I got from it. It's probably cited in the report somewhere.

Q. And can you describe to me the two

16 (Pages 61 to 64)

6/14/2023        Steamship Trade Association of Baltimore v. Olo, Inc.   Dr. Micah S. Officer

Page 69

MS. LAWRENCE: Objection, calls for speculation.

THE WITNESS: I mean, the literal answer to your question is no, it doesn't say that. The word "Subway" is not in there anywhere. You know, I just don't know what I have to do if I'm asked to do it by the plaintiffs. It's not clear to me yet.

BY MS. BIRNBACH:

Q. So you have no understanding today of the methodology where you would need to disaggregate the disclosures about Subway from other confounding information.

Is that your testimony?

MS. LAWRENCE: Objection, misstates testimony.

THE WITNESS: It is my testimony that I understand the methodology, which is the way of doing something. I don't understand the actual steps that need to be taken because I haven't done the work yet. But I did -- in the Celgene case, I've passed out

Page 70

confounding information before. So I understand the methodology. I understand the reason for doing it.

As it applies to Subway versus other active location counts, no, I haven't done it, and I have opinion on that particular breakdown. That may come at a different time or it may not. So...

BY MS. BIRNBACH:

Q. So I know you haven't done it, but what I'm asking is: Wouldn't you need to do it if you performed that analysis? Can you answer that question?

MS. LAWRENCE: Objection, calls for speculation, asked and answered.

THE WITNESS: I'm not going to deal with hypotheticals here. Your hypothetical was: What if the Subway allegations were the only ones left in the case, and I just don't know. It's work I haven't done yet.

A, I don't know that the Subway allegations are the only ones left in the

Page 71

case. If that's true, then that's something that would come up at some other point in time in my involvement here.

BY MS. BIRNBACH:

Q. Dr. Officer, you do understand that experts can be asked to assume things and asked hypothetical questions; don't you?

A. Sure. And you've just done that. And I'm not going to answer it, but I understand you can ask me.

Q. Well, why won't you answer it? Are you not capable? Do you not have sufficient expertise to answer it?

MS. LAWRENCE: Objection, argumentative. Objection, assumes facts not in evidence.

THE WITNESS: I just haven't done the work yet to read through these statements like the one that ended this class period to know that there's a method by which it would be easy to pass out confounding information in this case. I simply haven't been asked to

Page 72

do it.

BY MS. BIRNBACH:

Q. Whether it's easy or hard, based on your expertise, it would be necessary to disaggregate the disclosures from other confounding information; correct?

MS. LAWRENCE: Objection, calls for speculation. Objection, asked and answered.

THE WITNESS: As a generic statement that you just made, the answer is yes. You didn't mention anything about this particular case, and I totally agree with you that in general it is necessary to disaggregate out confounding information. That's what the highlighted sentence on my screen says. I agree with that. I wrote it. I agree with it.

BY MS. BIRNBACH:

Q. Okay. So my hypothetical was: In this case, if the Subway allegations were the only allegations, eliminate the active locations bucket, you would need to disaggregate the effect of

18 (Pages 69 to 72)

Page 73

confounding information from the alleged corrective disclosure; correct?

MS. LAWRENCE: Objection, asked and answered.

THE WITNESS: I would need to disaggregate confounding information if that is the case. I don't know that to be the case here because I haven't done the work to figure out what is confounding information that was released on that date. I simply have not investigated it.

BY MS. BIRNBACH:

Q. Is it your understanding -- because, again, you're assuming the allegations of the complaint are true; correct? I just wanted to reconfirm that.

A. I'm assuming that they'll be proven correct at trial, yes.

Q. Is it your understanding that plaintiffs' allegations are that Olo's disclosure on August 11, 2022, that Subway would be ending its relationship with Olo was the piece of information

Page 74

that corrected the prior Subway alleged omissions or misrepresentations, the Subway bucket?

A. It is my understanding that, exactly as you said, the corrective disclosure that follows the class period here, as it specifically relates to Subway -- well, sorry, the corrective disclosure -- now I've got myself all confused.

Can you just ask the question again?

Q. Was the corrective disclosure on August 11, 2022, that Subway would be ending its relationship with Olo the piece of information that corrected the Subway allegations in the case?

A. Yes, I agree with that.

Q. And was -- it was the disclosure of the Subway decision on August 11, 2022, that allegedly caused investors to incur recoverable losses; right?

MS. LAWRENCE: Objection, assumes facts not in evidence.

THE WITNESS: I do not know that to be the case. I haven't literally been asked to work on loss causation yet in terms of what

Page 75

caused the investors their losses. I agree that the Subway information corrected the Subway omission that was alleged by the plaintiffs, but I don't know that they -- economic consequences on August 11/12th of 2022 were solely related to Subway.

BY MS. BIRNBACH:

Q. And I believe you specifically say in your report that you're not opining on loss causation; correct?

A. Yes, and I think I just said that in this deposition, also.

Q. And do you know what the class period is in this case?

A. I know it's in my report. It's roughly August 11th to August 11th, '21 to '22 --

Q. It's not meant to be a memory test. It's August 10, 2021, through August 11, 2022.

Is that your understanding?

A. Yes, that's in paragraph 1 of my report, yes.

Q. And do you know when the company has

Page 76

alleged in the complaint to have learned that Subway would be ending its relationship with Olo?

If you flip to paragraph 16 -- I'm sorry, 16 of the complaint. So that's --

A. Oh.

MS. BIRNBACH: Is that Exhibit 3, Dan? I apologize if I've lost track of some exhibits.

MS. LAWRENCE: Oh, 16 of the complaint. Sorry.

THE VIDEOGRAPHER: Yeah, that is Exhibit 3.

BY MS. BIRNBACH:

Q. So paragraph 16, do you see where it says, "late January or early February 2022"? Is that when the complaint alleges the company learned that Subway would be ending its relationship?

A. Yes, that's what the complaint says.

Q. And so that's about, I don't know, halfway, approximately, through the class period?

A. Yeah, give or take six months.

Q. A company can't disclose information

19 (Pages 73 to 76)

6/14/2023        Steamship Trade Association of Baltimore v. Olo, Inc.   Dr. Micah S. Officer

Page 77

before they know about it; correct?

A.    That's correct.

Q.    So if based on the complaint's allegation, the earliest Olo could have disclosed that Subway was ending its partnership with Olo would be that time frame listed in paragraph 16 of the complaint; correct?

MS. LAWRENCE:  Objection, assumes facts not in evidence.

THE WITNESS:  I think what you're saying logically makes sense.  I haven't done the work to figure out yet the timeline here. I just haven't been asked to it, but what you're saying makes logical sense.

BY MS. BIRNBACH:

Q.    So let's go back to your report --

A.    Got it.

Q.    -- page 3.

And if you look at Footnote 7, describing artificial inflation.

Do you see that?

A.    I do.

Page 78

Q.    The end of that sentence is talking about where the true value of the security is the value that reflects the information that is alleged to have been omitted and/or represented [sic].

Do you see that?

A.    I do.

Q.    So any artificial inflation prior to that January 2022 early February 2022, when Olo learned of Subway leaving the platform, could not be traced to the Subway disclosure; correct?

MS. LAWRENCE:  Objection, assumes facts not in evidence.

THE WITNESS:  Again, I haven't done the work to ascertain that, but what you're saying makes logical sense.

BY MS. BIRNBACH:

Q.    I understand you haven't done the work, but your report does say you're assuming the allegations in the complaint are true.

And so assuming the allegations in the complaint are true, artificial inflation prior to late January 2022 could not be traced to the Subway

Page 79

disclosure; correct?

MS. LAWRENCE:  Objection, assumes facts not in evidence.

THE WITNESS:  Again, that would be something that I would have to look at in terms of loss causation and economic correspondence, but I think, broadly speaking, what you're saying is sensible.

BY MS. BIRNBACH:

Q.    You don't know, do you, what amount would cut out of damages -- would be cut out of damages for that beginning of the class period through late January or early February 2022 because it couldn't be traced to the Subway disclosure.  You don't know what that amount is; do you?

MS. LAWRENCE:  Objection, assumes facts not in evidence.

THE WITNESS:  I do not.

BY MS. BIRNBACH:

Q.    But you would agree that any reliable damages methodology must be capable of separately estimating inflation associated with the active

Page 80

location bucket and the Subway allegations bucket; correct?

A.    Yes, it would need to do that.  I have no opinion about which bucket is still in the case or which bucket is reasonable, but yes, you would need to disaggregate any artificial inflation to account for the different aspects of the complaint and the different timelines that they imply, yes.

Q.    So can you describe how you would separately do that here?

MS. LAWRENCE:  Objection, calls for speculation.

THE WITNESS:  There's a section in my report that I think I just referred to earlier which broadly defines what would need to be done.  I've done this in other cases, and it's very, very much situation specific as to what information you have and what you can use to disaggregate damages between various parts of the complaint and confounding information and so on and so forth.  I can't outline for you right now

20  (Pages 77 to 80)

6/14/2023          Steamship Trade Association of Baltimore v. Olo, Inc.   Dr. Micah S. Officer

Page 81

what I would do.  It would depend on what it looked like when I got to doing the work to do it.

BY MS. BIRNBACH:

Q.    Can you look at paragraph 17 of your report.

A.    Yes.

Q.    And is this an acknowledgment that not all investors act the same; correct?

MS. LAWRENCE:  Objection, calls for a legal conclusion.

THE WITNESS:  What do you mean by "act the same"?

BY MS. BIRNBACH:

Q.    Well, you state in the report, "Some investors may believe that a share (based on its underlying fundamentals, including expectations of future cash flows) is overvalued and some may believe it is undervalued."

Do you see that in paragraph 17?

A.    I do.

Q.    So is that saying that not all

Page 82

investors value the share the same way?

A.    Yes, but that's different than saying they act differently.  But heterogenous beliefs are an important part of finance, and they have been for a long time.

Q.    And you would also agree that not all investors have the same risk tolerance; correct?

A.    As a generic statement, sure.

Q.    Well, would you agree that one investor might consider a risk to be material and another investor might not?

MS. LAWRENCE:  Objection, calls for a legal conclusion.  Objection, calls for speculation.

THE WITNESS:  Could you repeat the question, please.

BY MS. BIRNBACH:

Q.    I'm asking if you would agree that what one investor might consider a risk to be material, another investor might not consider that same risk to be material?

MS. LAWRENCE:  Same objections.

Page 83

THE WITNESS:  As I just said, it's been common in the finance field to think of investors as having somewhat heterogenous expectations, heterogenous beliefs.  It's been that way in the finance literature for a long time.  It's not something I completely disagree with, no.

BY MS. BIRNBACH:

Q.    Well, do you partially disagree with it?

A.    No, I don't disagree with it.

Q.    Do you agree it's possible that some investors might have still purchased Olo's stock even if they knew about the risk that active locations was inaccurate?

MS. LAWRENCE:  Objection, calls for speculation.

THE WITNESS:  So now we've moved from generic statements about heterogenous beliefs to actual statements about Olo investors, and I don't know what Olo investors considered. I just haven't -- have no exposure to any of

Page 84

those things.

BY MS. BIRNBACH:

Q.    Well, my question was:  Do you agree based on your expertise that it's possible that some investors might still have purchased Olo's stock even if they knew of a risk that active locations were inaccurate?

MS. LAWRENCE:  Objection, calls for speculation.  Objection, asked and answered.

THE WITNESS:  And, again, I just don't know why or why not a specific investor would buy a specific stock like Olo, for example.

BY MS. BIRNBACH:

Q.    Well, and if you don't know, then it's possible; correct?

MS. LAWRENCE:  Objection, misstates testimony.  Objection, argumentative.

THE WITNESS:  "I don't know" means I don't know whether it's possible or impossible.

BY MS. BIRNBACH:

Q.    So it could be possible; correct?

21 (Pages 81 to 84)

6/14/2023          Steamship Trade Association of Baltimore v. Olo, Inc.   Dr. Micah S. Officer

Page 85

MS. LAWRENCE: Same objections.

THE WITNESS: I just don't know. I don't know whether it's possible or not.

BY MS. BIRNBACH:

Q. Do you know how many hours you spent drafting this report?

A. Off the top of my head, it's somewhere around 30 to 40.

Q. Thirty to 40 hours?

A. Somewhere around that, yeah.

Q. Not days?

A. Not days. I didn't -- I wasn't engaged in this case 30 or 40 days ago, I don't think.

Q. And I know you said you drafted it. Is every opinion your own?

A. Yeah, it is.

Q. Are there parts of your report that you copied from another report?

A. There are parts of the report that are the generic background pieces that I copied from the Celgene report that I submitted, yeah, and then

Page 86

edited them to this particular context. But, yes, there was no need for me to rewrite words I've already written.

Q. Understood.

Were you engaged as an expert on a case called B-O-F -- is it B-O-F-L -- B-O-F-L Holding, Inc., securities litigation?

A. No, I was not.

Q. So you didn't write any expert report for that case?

A. No, I did not. I think there's a correction. It's B-O-F-I.

Q. B-O-F-I, my apologies.

MS. BIRNBACH: Can we pull up Tab 5, Dan? Maybe you can show the first substantive page.

THE VIDEOGRAPHER: Sorry, I was just marking it as Exhibit 4.

MS. BIRNBACH: Sorry.

(Exhibit 4, No Bates numbers, Expert Report of Frank C. Torchio, received and marked.)

Page 87

BY MS. BIRNBACH:

Q. So this is Exhibit 4. Can we turn -- marked as Exhibit 4. Do you know what this is, Dr. Officer?

A. From what I can tell, it's an expert report by Frank Torchio.

Q. I just want to look side by side at your report, which is Exhibit 1, and Mr. Torchio's report, which is Exhibit 4, paragraph 153 of your report, if Dan can turn to that. So the one on the right would be paragraph 153, and paragraph 51 of Exhibit 4, Mr. Torchio's report.

MS. BIRNBACH: Maybe you can make them bigger, Dan. Thank you.

BY MS. BIRNBACH:

Q. So I think, Dr. Officer, you have your own report in front of you; right?

A. I do.

Q. Hopefully we've made paragraph 51 of Mr. Torchio's report in that case where you were not an expert.

Do you see that these are identical?

Page 88

A. No.

Q. Or nearly identical?

A. No.

Q. If you look at the sentence that starts "The literature" -- in paragraph 51 at the top, "The literature discusses the concept of foreseeability within the fundamentals of loss causation for financial expert witnesses," do you see that same sentence in your report, paragraph 153?

A. I do.

Q. And then the following sentence beginning, "There are some judges' opinions," do you see that in the two reports the following sentence is identical?

A. I do.

Q. And we can go on in other sections, but can you explain to me why your report is word for word in certain places with Mr. Torchio's report in this other case?

MS. LAWRENCE: Objection, misstates testimony, assumes facts not in evidence.

22  (Pages 85 to 88)

Page 89

THE WITNESS: Yes, Frank and I have worked together for a number of years on a number of things, and this particular sentence probably came from the Celgene report. And that may have been authored by me being -- having read some of Frank's reports, also. This is generic background to what the damages methodology would be. It's not specific to this case.

BY MS. BIRNBACH:

Q. So in those paragraphs, there are two sentences that are identical?

A. Correct.

Q. In paragraph 155 of your report, there's another sentence that is identical to paragraph 53 of Mr. Torchio's report. I'll just read the sentence while Dan is pulling it up. "In my view, this approach is appropriate and proper to answer the question of what losses were caused by the disclosure failures in securities cases."

Do you see that in your report and in

Page 90

Mr. Torchio's report on that other case?

A. I do.

Q. And, again, you're not opining in this case on loss causation, as you said; correct?

A. Correct. I think I would be if this case moves forward, but yes. I'm not opining in this particular matter -- this particular report, rather.

Q. And you see that that sentence is identical?

A. And the answer is probably exactly the same as the last answer I gave, which is that I wrote some of this generic background, having reviewed some of Frank's reports in other cases that probably ended up in the Celgene report and then I probably copied it here in this report. It's generic background material. I don't...

Q. Well, you said you wrote the whole report and you just testified that you wrote this, but you didn't write it; did you?

A. I did. I may have used the same words that Frank used in prior reports because it was

Page 91

generic background. That was likely the case for me in the Celgene report, and that likely has been copied over here because it's not efficient to rewrite words I've already written.

Q. Well, or you copied them. Isn't that a more accurate description of what you did?

MS. LAWRENCE: Objection, misstates testimony. Objection, argumentative.

THE WITNESS: I don't think it's more accurate at all. I think the answer I just gave is exactly how these sentences ended up there.

BY MS. BIRNBACH:

Q. So is it your testimony that you wrote yourself an identical sentence, and indeed identical multiple sentences, rather than copy them? Is that your testimony?

MS. LAWRENCE: Objection, argumentative.

THE WITNESS: Yes, it's my testimony.

BY MS. BIRNBACH:

Q. As an academic, do you understand what

Page 92

plagiarism is, for example?

MS. LAWRENCE: Objection, argumentative.

THE WITNESS: I do, but the construct of plagiarism is very different in academic work than it would be here.

BY MS. BIRNBACH:

Q. Well, what's your definition of "copying"?

A. Highlighting a phrase, pushing control-C, moving over to a different Word document and pushing control-V to paste the same thing.

Q. So if you retype a sentence word for word from Mr. Torchio's prior work, you're saying that's not copying?

A. It's not --

MS. LAWRENCE: Objection --

THE WITNESS: -- my definition of "copying," no.

BY MS. BIRNBACH:

Q. Do you know if it's anyone else's definition of "copying"?

23 (Pages 89 to 92)

Page 93

MS. LAWRENCE: Objection, calls for speculation.

THE WITNESS: I don't. You can ask people, I guess, but I don't know, no.

BY MS. BIRNBACH:

Q. In the "Economic Correspondence" section of your report, which is paragraphs 147 through 155, I'll represent to you that the economic correspondence of Exhibit 4, Mr. Torchio's report, paragraphs 44 through 50 on pages 16 to 19, are nearly identical.

Do you know if you lifted those six paragraphs from Mr. Torchio's report?

MS. LAWRENCE: Object to form.

THE WITNESS: I know that I didn't lift those directly from Mr. Torchio's report.

BY MS. BIRNBACH:

Q. So you typed them yourself; correct?

A. Correct.

Q. And you may have used them in your Celgene report; correct?

Page 94

A. That's correct.

Q. Do you know if you used them in your Celgene report?

A. I don't know as I sit here today, but I could look it up for you at some point.

Q. And if you used them in your Celgene report, did you take those words from Mr. Torchio's report?

MS. LAWRENCE: Objection, calls for speculation.

THE WITNESS: It's possible that as background I referred to some of Frank's old reports to fill in this generic detail. I don't recall exactly, honestly, how it was done.

BY MS. BIRNBACH:

Q. Well, would it -- I'm sorry.

Would it surprise you if several paragraphs were word for word nearly identical from Mr. Torchio's work?

MS. LAWRENCE: Objection, misstates facts, assumes facts not in evidence.

Page 95

THE WITNESS: You can't say nearly identical and then word for word. Those two things aren't the same.

BY MS. BIRNBACH:

Q. Let's say, would it surprise you that the sentences we've already highlighted that were word-for-word identical, did that surprise you now?

A. No, it doesn't.

Q. Why not?

A. As I stated earlier, in my work in the Celgene case, I was effectively inspired by some of Frank's old reports in terms of the generic description of how the process works in securities litigation.

Q. And your definition of "inspired" is word for word the same?

MS. LAWRENCE: Objection, misstates testimony.

THE WITNESS: My definition of "inspired" is I read some of the generic background material that Frank had produced in prior reports and wrote it myself, and I

Page 96

may have typed the exact same words.

BY MS. BIRNBACH:

Q. And would it surprise you if we found that over a dozen paragraphs from your report were identical or nearly identical to Mr. Torchio's report?

MS. LAWRENCE: Objection, assumes facts not in evidence.

THE WITNESS: Identical or nearly identical, those are different things. So...

BY MS. BIRNBACH:

Q. Well, would it surprise you? See if you can answer the question.

MS. LAWRENCE: Same objection.

THE WITNESS: It wouldn't surprise me. Because as I said, in drafting the Celgene report, I was referring to some of Frank's old reports for the generic background to the methodology here that is used for producing damages estimates in a securities class action case.