# EXHIBIT K

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer[1]**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| **Opening Report Para. 15:** Damages under Section 10(b) of the Exchange Act and SEC Rule 10b-5 are generally based on an out-of-pocket measure – the difference between the artificial inflation on the date of purchase and the artificial inflation on the date of sale.[12] Artificial inflation is defined as the difference between the actual stock price and the "true value" of the stock on each day in a class period, where the true value of the stock is its value after accounting for the effect of the disclosure failures. Damages experts routinely provide economic evidence to assist the court or jury in determining whether or not certain misrepresented information is material and the amount of losses caused when such information is revealed to the market.<br><br>[12] Damages are also limited by the 90-day look-back provision of the PSLRA. *See* footnote 4. | **Para. 128:** . . . [D]amages under Section 10(b) of the Exchange Act and SEC Rule 10b-5 are generally based on an out-of-pocket measure – the difference between the artificial inflation on the date of purchase and the artificial inflation on the date of sale.[108] Artificial inflation is defined as the difference between the actual share price and the "true" value of the share on each day in a class period, where the "true" value of the security is the value that reflects the information that the defendant(s) failed to disclose or misrepresented according to the complaint and the assumptions provided to the expert. In this Report, I am not providing an opinion as to the amount of damages in this matter.<br><br>[108] Damages are also limited by the 90-day look-back provision of the PSLRA. *See* paragraph 137 in this Report. |
| **Opening Report Para. 16:** It is my understanding that, for Section 10(b) claims, plaintiffs are ultimately required to show a sufficient connection between the alleged misconduct and financial losses suffered by investors when the truth is revealed. I refer to this as economic evidence of loss causation. In general, losses that result from disclosure failures are manifested as this conduct is actually revealed through "curative" or "corrective" disclosures that eventually bring an alleged disclosure failure and/or its economic effects to light. | **Para. 130:** It is my understanding that, for Section 10(b) claims, plaintiffs are ultimately required to show a sufficient connection between the alleged misconduct and financial losses suffered by investors when the truth is revealed in a (at least partially) corrective disclosure. I refer to this as economic evidence of loss causation.[109]<br><br>**Para. 129:** . . . In general, losses that result from disclosure failures are revealed through "curative" or "corrective" disclosures that eventually bring an alleged disclosure failure and/or its economic effects to light. |

[1] This Exhibit contains examples from many of the 81 paragraphs of Dr. Officer's report that are copied, in whole or in part, from Mr. Torchio's reports. For the Court's convenience, certain omissions, denoted with ". . .", have been made from the paragraphs. Certain footnotes in the excerpted paragraphs have also been omitted.

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| **Opening Report Para. 17:** . . . The focus of event studies in securities litigation is predominantly on disclosures that correct prior disclosure failures. Negative price reactions from corrective disclosures can provide economic evidence of materiality and loss causation.[13] The stock price change caused by a corrective disclosure is generally the best estimate of the change in the amount of artificial inflation present in the security on the date of the disclosure because the corrective disclosure removes artificial inflation from the market price of the stock.<br><br>[13] Mark Mitchell and Jeffrey Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49, February 1994, 545-590; and David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, 3rd ed., ed. by Roman L. Weil, Michael Wagner, and Peter Frank, Wiley, 2001. | **Para. 131:** . . . The focus of event studies in securities litigation is predominantly on dates when information that corrects prior disclosure failures makes it into the market through (at least partially) corrective disclosures.<br><br>**Para. 132:** Negative price reactions from (at least partially) corrective disclosures can provide economic evidence of materiality and loss causation.[110] The stock price change caused by a corrective disclosure is generally the best estimate of the change in the amount of artificial inflation present in the security on the date of the disclosure because the corrective disclosure removes artificial inflation from the market price of the stock in an efficient market.[111]<br><br>[110] Mark Mitchell and Jeffrey Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49, February 1994, 545-590; and David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, Third Edition, ed. by Roman L. Weil, Michael Wagner, and Peter Frank, Wiley, 2001. |
| **Opening Report Para. 19:** . . . [F]or a statement that omits material information, as opposed to an affirmative misstatement, it is widely recognized and understood that a researcher would not expect to observe a price reaction. By definition, an omitted fact is not disclosed to the market. An event study is designed to quantify the effect of disclosed information, not undisclosed information.[14] . . . | **Para. 133:** . . . [F]or a statement that ***omits*** material information (as opposed to an affirmative misstatement, a statement containing misleading information for which such information was unanticipated or unexpected by the market), it is recognized and understood by scholars that a researcher would ***not*** expect to observe a price reaction on the day of the announcement that omitted the information in question. By definition, an omission of material information means that critical, value relevant |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| [14] David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, 3rd ed., ed. by Roman L. Weil, Michael Wagner, and Peter Frank, Wiley, 2001(emphasis added). | information **is not** disclosed to the market. An event study is designed to quantify the effect of **disclosed** information (and **not** undisclosed information).[112]<br><br>[112] David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, Third Edition, ed. by Roman L. Weil, Michael Wagner, and Peter Frank, Wiley, 2001(emphasis added). |
| **Opening Report Para. 22:** . . . Since the publication in 1969 of a classic paper by Fama, Fisher, Jensen, and Roll, financial economists have used the event study methodology as a tool to measure the effect on market prices of new information relevant to a company's equity valuation.[19] New information may include, for example, earnings reports, dividend changes, stock splits, regulatory rulings, acquisition bids, asset sales, company press releases, ratings agency actions, and analyst reports.<br><br>**Opening Report Para. 23:** . . . The metric used to measure the effect on a company's stock price from an event is called a "return," which is the percentage change in the market price of a company's shares over a specific time period such as one trading day. . . . | **Para 19:** Since the publication of Fama, Fisher, Jensen, and Roll (1969),[18] financial economists have used the event study methodology as an empirical tool to measure the effect on market prices of new information relevant to a company's equity valuation. New information may include, for example, earnings reports, dividend changes, stock splits, regulatory rulings, acquisition bids, asset sales, company press releases, ratings agency actions, and media and analyst reports, amongst other things. The metric used to measure the effect on a company's share price from an event is called a "return," which is the percentage change in the market price of a company's shares over a specific time period, such as one trading day ("daily returns"). |
| **Opening Report Para. 24:** Market models are empirical models that follow the theoretical Capital Asset Pricing Model ("CAPM") explained in finance literature.[21] The inference from the CAPM is that the returns for a given stock are correlated with the returns of the general market. The sensitivity of the returns for a given stock to the general market is referred to as | **Para. 26:** Market models are empirical models that follow the theoretical Capital Asset Pricing Model ("CAPM") from the finance literature.[23] The essential insight from the CAPM is that the "normal" returns on a given stock are related to the returns to the overall stock market. The sensitivity of the returns for a given stock to overall stock market returns is referred to as the |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| the stock's "beta," which I discuss more fully below.<br><br>[21] *See*, for example, G. William Schwert, "Using Financial Data to Measure Effects of Regulation," *The Journal of Law and Economics* 24(1), 1981, 121-158. | stock's "beta," which I discuss more fully below.<br><br>[23] The capital asset pricing model ("CAPM") is a model that describes the relationship between the risks of an asset and its expected return. *See, for example*, G. William Schwert, "Using Financial Data to Measure Effects of Regulation," *The Journal of Law and Economics* 24(1), 1981, pp.121-158. |
| **Opening Report Para. 25:** Thus, a market model describes the normal relation between the return on the company's security and the return on a broad-based market index, such as the S&P 500 Index or the Nasdaq Composite Index, and possibly an industry index of stocks of companies that are similar to the company of interest or an index of stocks of companies from which the company of interest derives its revenues. . . .<br><br>**Opening Report Para. 26:** A market model is derived from linear regression analysis.[24] The company's return is regressed against the returns of the market index and industry index(es) (if applicable) to estimate the historical relation (the "betas") between the index variables and the company returns.[25] In essence, the indexes in the market model can "explain" or account for some measurable portion of the company's total return. This is done to isolate the share price movements that result from company-specific factors.<br><br>[24] *See* John Y. Campbell, Andrew W. Lo and A. Craig MacKinlay, <u>The Econometrics of Financial Markets</u>, Princeton University Press, 1997, p. 155. "A **regression line** is a straight line that describes how a response variable *y* changes as an explanatory variable *x* changes. We often use a regression line to | **Para. 27:** A market model describes the normal relation between the return on the company's security and the return on a broad-based market index, such as the S&P 500 Index or the NASDAQ composite index, and also often an industry index.[24] A market model uses linear regression analysis.[25] The company's return is regressed against the returns of the market index and industry index(es) (if applicable) to estimate the normal relation (the "betas") between the returns to the index variables and the company's returns.[26] In essence, the indexes in the market model can "explain," or account for some measurable portion of, the company's stock return. This is done to isolate company-specific factors affecting the stock's return from share price movements that are attributable to market and industry-wide factors.<br><br>[25] *See* John Y. Campbell, Andrew W. Lo and A. Craig MacKinlay, <u>The Econometrics of Financial Markets</u>, Princeton University Press, 1997, p.155. "A **regression line** is a straight line that describes how a response variable *y* changes as an explanatory variable *x* changes. We often use a regression line to **predict** the value of *y* for a given value of *x*." *See* David S. Moore and George P. McCabe, <u>Introduction to the Practice of Statistics</u>, Fourth Edition, W. H. Freeman and Company, 2003, |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| **predict** the value of *y* for a given value of *x*." *See* David S. Moore and George P. McCabe, Introduction to the Practice of Statistics, 4th ed., W. H. Freeman and Company, 2003, p. 135 (emphasis in original).<br><br>[25] The return on an industry index is generally measured "net-of-market" to minimize the effects of a statistical phenomenon called multicollinearity, in which two or more independent variables in a multiple regression model are highly correlated. Net-of-market means that the return on the market index is subtracted from the return on the industry index before running the regression. | p.135 (emphasis in original).<br><br>[26] The return on the industry index is generally measured "net-of-market" to minimize the effects of a statistical phenomenon called multicollinearity, in which two or more independent variables in a multiple regression model are highly correlated. Net-of-market means that the return on the market index is subtracted from the return on the industry index before running the regression. |
| **Opening Report Para. 27: Figure 1** below shows graphically an example of a market model regression using the S&P 500 Index as the independent variable. The red line is a result of a regression analysis. The red line in **Figure 1** represents the predicted returns of the company. It shows the relationship, or beta, between the daily movement in the share price and that for the general market. | **Para. 28:** Figure 1 below shows, graphically, a hypothetical example of a market model regression based on the S&P 500 Index. The red line is a result of a regression analysis and represents the predicted (or expected) returns to the company's stock (on the vertical axis) given returns to the overall stock market (on the horizontal axis). This shows the expected relationship, or beta, between the daily movement in the company's share price and that of the general market. |

5

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
|  FIGURE 1: ILLUSTRATION OF A MARKET MODEL REGRESSION | FIGURE 1 MARKET MODEL REGRESSION BASED ON THE S&P 500 INDEX |
| **Opening Report Para. 28:** The regression analysis is represented by the generalized equation:<br><br>Company Return = α + β · Market Return. | **Para. 29:** The regression analysis yields a generalized equation:<br><br>Company Return = α + (β * Market Return) |
| **Opening Report Para. 29:** The slope of the regression line is the beta (β). The market beta or slope of the regression line indicates the expected return caused by a 1% change in the market return. The α is the constant term or intercept of the equation. It represents the value of the regression line where the market return is zero. . . . | **Para. 30:** The slope of the regression line (the red line in Figure 1) is the beta (β). This "market" beta (as it is known, to distinguish it from an industry beta, for example) indicates the expected return in a company's stock caused by a given (*e.g.*, 1%) overall stock market return. The α is the constant term of the equation, representing the value of the regression line where the market return is zero. |

6

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| **Opening Report Para. 31:** For a market model with an industry index, predicted returns are equal to the intercept term from the regression plus: (i) the market beta multiplied by the return on the market; and (ii) the net-of-market industry beta multiplied by the net-of-market return on the industry.[26] | **Para. 32:** For a market model including an industry index, predicted returns are equal to the intercept term from the regression plus: (i) the market beta multiplied by the return on the market; and (ii) the industry beta multiplied by the return on an industry index net-of-market. . . . |
| **Opening Report Para. 32:** After calculating predicted returns, excess returns are calculated on each day by subtracting the predicted return from the company's return on each day. This represents the company-specific portion of the return on a given day. | **Para. 33:** After calculating predicted (or normal) returns, excess (or abnormal) returns are calculated on each day by subtracting the predicted return from the company's actual stock return on each day. This represents the company-specific portion of the return on a given day. . . . |
| **Opening Report Para. 33:** Event studies also assess the probability that an excess return was the result of new information disclosed in an event, and not due to random price movements (*i.e.*, due to chance).<br><br>**Opening Report Para. 34:** A statistically significant excess return at significance level ($\alpha$) of 5% means that the excess return could be due to chance only 5% of the time. A statistically significant excess return at a significance level of 1% means that the excess return could be due to chance only 1% of the time. Significance levels in statistics are closely related to confidence intervals. For instance, a 5% significance level is equivalent to a 95% confidence interval and a 1% significance level is equivalent to 99% confidence interval (a confidence interval "C" equals $1 - \alpha$).[27]<br><br>[27] *See* David S. Moore and George P. McCabe, <u>Introduction to the Practice of Statistics</u>, 4th ed., W. H. Freeman and Company, | **Para. 34:** Event studies are also used to assess the probability that an excess return was the result of new information disclosed in an event and not simply due to random price movements (*i.e.*, due to chance). As described above, a statistically significant excess return at significance level of 1% or 5% means that the excess return would be due to chance only 1% or 5% of the time. Significance levels in statistics are closely related to confidence intervals. For instance, a 1% significance level is equivalent to a 99% confidence interval and a 5% significance level is equivalent to a 95% confidence interval.[27]<br><br>[27] *See* David S. Moore and George P. McCabe, <u>Introduction to the Practice of Statistics</u>, Fourth Edition, W. H. Freeman and Company, 2003, pp.442-452. |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| 2003, pp. 442-452. | |
| **Opening Report Para. 35:** The statistical significance for each daily excess return is measured by the t-statistic, which is calculated as a day's excess return divided by the standard error of the regression:<br><br>t-statistic = Excess Return ÷ Standard Error of Regression. | **Para. 35:** The statistical significance for each daily excess return is measured by the t-statistic, which is calculated as a day's excess return divided by the standard error of the regression:<br><br>t-statistic = Excess Return ÷ Standard Error of Regression. |
| **Opening Report Para. 37:** A t-statistic greater than 1.96 in absolute value (either positive or negative) means that the excess return is significant at the 5% significance level; a t-statistic greater than 2.58 in absolute value means that the excess return is significant at the 1% significance level. As is common in financial economics research, I use the 5% level of significance for my analyses and consider excess returns with a t-statistic greater than 1.96 in absolute value as statistically significant. | **Para. 37:** . . . [A] t-statistic greater in magnitude than 1.96 in absolute value (either positive or negative) is associated with a p-value of less than 5% and interpreted as implying that the excess return is significant at the 5% significance level; a t-statistic greater than 2.58 in absolute value is associated with a p-value of less than 1% and interpreted as implying that the excess return is significant at the 1% significance level.[28] In this Report, I use the 5% level of significance for my analyses and consider excess returns with a t-statistic greater than 1.96 in absolute value as statistically significant. |
| **Opening Report Para. 38:** Statistical significance can also be depicted graphically. In **Figure 1** above, the dashed green lines represent 1.96 times the standard error of the regression away from the regression line. The red diamonds indicate excess returns that are statistically significant because they are outside of the dashed lines. This means that those excess returns have t-statistics greater than 1.96 (in absolute value). | **Para. 38:** Statistical significance can also be depicted graphically. In Figure 1 above, the dashed green lines represent a band of plus and minus 1.96 times the standard error of the regression away from the regression line (*i.e.*, the confidence interval). The red diamonds indicate excess returns that are statistically significant because they are outside of (or on) the dashed lines. This means that those excess returns have t-statistics greater than or equal to 1.96 (in absolute value). |
| **Opening Report Para. 42:** The first step in performing this part of the event study analysis is to identify disclosures that | **Para. 138:** The first step in performing this part of the event study analysis is to identify disclosures that informed investors |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| informed market investors of the alleged misconduct and its direct and foreseeable economic effects. Then the results of the statistical analysis discussed above are used to determine whether the identified disclosures resulted in statistically significant stock price declines and to quantify the per-share losses caused by the revelation of alleged disclosure failures. | of the alleged misconduct and the ***direct and foreseeable economic effects of these corrective disclosures***. Then the results of the event study analysis are used to (a) determine whether the identified disclosures resulted in statistically significant stock price declines and (b) quantify the per-share losses caused by the revelation of alleged disclosure failures. |
| **Opening Report Para. 43:** There are several important factors, which I discuss below, that should be considered when identifying which disclosures are relevant in securities litigation. | **Para. 139:** There are several important factors that should be considered when identifying which disclosures are relevant in securities litigation: |
| **Opening Report Para 44:** As discussed above, in general, losses that result from disclosure failures are manifested as this conduct is revealed through the release of "curative" or "corrective" information that eventually brings the alleged disclosure failure and/or its economic effects to light. If the new information disclosed has sufficient economic correspondence or equivalence to the information alleged to have been previously misrepresented and/or omitted, then the information is said to "correct," to some degree, the previous misrepresentation and/or omission.[30]<br><br>[30] Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, June 1990, 883-924, at 894. | **Para. 147:** As discussed above, losses that result from disclosure failures are revealed through the release of "corrective" information that eventually brings the alleged disclosure failure and/or its economic effects to light. If the new information disclosed is sufficiently economically equivalent to the information alleged to have been previously misrepresented and/or omitted, then the information is said to (at least partially) correct the previous misrepresentation and/or omission.[119]<br><br>[119] Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, June 1990, 883-924, at 894. |
| **Opening Report Para. 45:** Corrective information can emanate from issuers or from various other sources, including securities analysts, rating agencies, news media, regulators, whistleblowers, and activist shareholders.[31] The market will generally react quickly to the release of new important | **Para. 148:** Corrective disclosures can be initiated by the issuers of the securities in dispute in the case, or from various other sources (securities analysts, rating agencies, news media, regulators, whistleblowers, activist shareholders, etc.). Under the efficient market hypothesis discussed earlier in this Report, the |

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| information. To measure the full effect of a disclosure of complex information will often require the inclusion of subsequent, related or follow-on disclosures, such as reports or statements by expert analysts and additional media reports.[32] | market will generally react quickly to the release of **new, value relevant** information.<br><br>**Para. 149:** However, measuring the effect of a disclosure of **complex** information will sometimes require the consideration of subsequent, related, or follow-on disclosures, such as reports or statements by expert analysts and additional media reports. |
| **Opening Report Para. 46:** I refer to economic correspondence as the extent to which disclosures of economic information connect or correspond to the alleged misrepresentations (misstated or omitted information) or the reasonably foreseeable economic consequences of those misrepresentations and other activities that together constitute the alleged disclosure failure. Thus, economic correspondence means that the economic content and substance of the information disclosed accords with economic content and substance and the foreseeable economic effects of the alleged misrepresentations and related misconduct. | **Para. 150:** I refer to the concept of "economic correspondence" as the extent to which disclosures of information later in time connect to (or correspond with) the alleged earlier misrepresentations (or omitted information) or the reasonably foreseeable economic consequences thereof (*i.e.*, the alleged disclosure failure). Economic correspondence means that the economic content and substance of the information disclosed accords with the economic content and substance (and the foreseeable economic effects) of the misrepresentations and misconduct alleged by the plaintiffs in securities litigation. |
| **Opening Report Para. 47:** In securities litigation, it is rare to encounter language in a corrective disclosure that is identical to the language describing the alleged misrepresentations.[33] A cursory comparison of the language in a corrective disclosure to that in a statement of claim may suggest that the corrective disclosure "over-corrects" (or sometimes "under-corrects") the disclosure failures. | **Para. 151:** In securities litigation, it is rare to find language in a corrective disclosure that is **identical** to the language in the alleged misrepresentations. A cursory comparison of the language in a corrective disclosure to that in a complaint may suggest that the corrective disclosure "overcorrects" or "under-corrects" the disclosure failure at issue. |
| **Opening Report Para. 48:** Whether the information in a disclosure over-corrects or under-corrects, however, cannot be determined by merely comparing a literal reading of the language from a corrective disclosure with the language | **Para. 152:** Whether the information in a disclosure over-corrects or under-corrects, however, cannot be determined by merely comparing a literal reading of the language from a corrective disclosure with the language describing the disclosure failures or |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| describing the misrepresentations in a complaint. Rather, the answer requires an analysis of how investors, analysts, the media, and others translate the language of a disclosure into financial consequences for the company. That is, it requires consideration as to how the market processes information from a disclosure and forms a consensus of the consequences from that disclosure. | alleged misrepresentations in a complaint. Rather, the answer requires an analysis of how investors, analysts, the media, and others translate the language of a disclosure into financial consequences for the company. That is, it requires consideration as to how the market processes information from a disclosure and forms a consensus of the consequences from that disclosure. |
| **Opening Report Para. 51:** Direct and foreseeable consequences, as I apply the term in an economic context, refer to whether the ultimate effects or consequences of the alleged misrepresentations from a corrective disclosure would have been reasonably anticipated or predictable from the given counterfactuals. The literature discusses the concept of foreseeability within the fundamentals of loss causation for financial expert witnesses.[34] There are some judges' opinions that allude to acceptance of foreseeability regarding consequential damages as a basis for losses from disclosure failures.[35]<br><br>[34] *See* Joshi, Madrid, Mulholland, "Causation Issues and Expert Testimony, The Fundamentals of Causation," <u>Litigation Services Handbook: The Role of the Financial Expert</u>, 5th Ed., ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, p. 3.4.<br><br>[35] *Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357, 1361 (8th Cir. 1977); *DCD Programs v. Michael W. Leighton, et al.*, 90 F.3d 1442, 1449 (9th Cir. 1996); and *The Ambassador Hotel Company, Ltd. v. Wei-Chuan Investment, et al.*, 189 F. 3d 1017, 1030 (9th Cir. 1999). | **Para. 153:** Direct and foreseeable economic consequences refer to whether the ultimate effects or consequences of a corrective disclosure correcting an alleged misrepresentation could have been reasonably anticipated or predictable. The literature discusses the concept of foreseeability within the fundamentals of loss causation for financial expert witnesses.[120] There are some judges' opinions that allude to acceptance of foreseeability regarding consequential damages as a basis for losses from disclosure failures.[121]<br><br>[120] *See* Joshi, Madrid, Mulholland, "Causation Issues and Expert Testimony, The Fundamentals of Causation," <u>Litigation Services Handbook: The Role of the Financial Expert</u>, 5th Ed., ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, p.3.4.<br><br>[121] *Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357, 1361 (8th Cir. 1977); *DCD Programs v. Leighton*, 90 F.3d 1442, 1449 (9th Cir. 1996); and *The Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F. 3d 1017, 1030 (9th Cir. 1999). |

11

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| **Opening Report Para. 52:** One common example of foreseeable consequences in securities litigation concerns the loss of management credibility or integrity because of disclosure failures.[36] Generally, top managers in publicly traded corporations are sophisticated and knowledgeable. Therefore, top managers could and would anticipate that if they fail to disclose important and relevant information to investors (for example, by overstating their firm's performance in its financial statements) and the disclosure failure is later discovered, the market could well reduce the firm's stock price because of perceived lack of credibility associated with the disclosure failure in addition to the direct effect from the true financial information hidden by the disclosure failure. . . .<br><br>[36] Some argue that damages should not include any stock losses attributable to a diminution in management credibility that results from the disclosure failures. This view is based principally on a legal theory that a stock loss from diminished management credibility, even if directly caused by the disclosure failures, is a form of "collateral damage" and that collateral damages should not be included in a damage award to harmed shareholders. *See* Frederick Dunbar and Arun Sen, "Counterfactual Keys to Causation and Damages in Shareholder Class Actions," *Wisconsin Law Review*, 2009, 199-242; Bradford Cornell and James Rutten, "Collateral Damage and Securities Litigation," *Utah Law Review* 3, 2009, 717-747. | **Para. 154:** One common example of foreseeable consequences in securities litigation concerns the loss of management credibility due to the disclosure failure.[122] Generally, top executives at publicly traded corporations are sophisticated and knowledgeable. Therefore, top executives could anticipate that if they fail to disclose important and relevant information to investors and the disclosure failure is later discovered, the market could well reduce the firm's stock price because of perceived lack of credibility stemming from the disclosure failure (in addition to the direct effect of the true financial information hidden by the disclosure failure).<br><br>[122] Some argue that damages should not include any stock losses attributable to a diminution in management credibility that results from the disclosure failures. This view is based principally on a legal theory that a stock loss from diminished management credibility, even if directly caused by the disclosure failures, is a form of "collateral damage" and that collateral damages should not be included in a damage award to harmed shareholders. *See* Frederick Dunbar and Arun Sen, "Counterfactual Keys to Causation and Damages in Shareholder Class Actions," *Wisconsin Law Review*, 2009, 199-242; Bradford Cornell and James Rutten, "Collateral Damage and Securities Litigation," *Utah Law Review* 3, 2009, 717-747. |
| **Opening Report Para. 54:** "Truth-on-the-market" means that the information identified in a specific disclosure that corrects the alleged misrepresentations has already been previously disclosed and, therefore, is already in the total mix of publicly | **Para. 158:** "Truth-on-the-market" means that information identified in a disclosure (that potentially corrects the alleged misrepresentation(s)) has already been fully disclosed and, therefore, is already in the total mix of publicly available |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| available information and incorporated in the company's market price.[37] If the information that corrects the misrepresentations and/or omissions has already been disclosed so that the market price has already adjusted to this news, then the same news cannot later cause any stock-price changes, all else held equal.<br><br>[37] Daniel Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38, November 1982, 1-20. | information and likely already incorporated into the market price of the company's stock.[123] If the information that corrects the misrepresentations and/or omissions has already been fully disclosed so that the market price has already adjusted to this news, then the same news cannot be argued to later be the cause of any stock-price changes, all else held equal.<br><br>[123] *See* Daniel Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38, November 1982, p.6. . . . |
| **Opening Report Para. 55:** An economic analysis of truth-on-the-market requires that "new" information must be analyzed, not only with regard to the specific language and economic content of a disclosure, but the analyst must also be cognizant of the relevant context of the disclosure.[38] The economic context is comprised of the relevant facts and circumstances that surround the disclosure, which allows the researcher to determine the likely interpretation of the disclosure by the market.<br><br>[38] Lucy Chang, "The Truth-on-the-Market Defense and its Relevance in SEC Enforcement Actions," *Law and Contemporary Problems* 76(3/4), 2013, 341-365, at 348-349. | **Para. 159:** An economic analysis of truth-on-the-market requires that "new" information must be analyzed, not only the specific language and economic content, but in the economic context of the disclosure.[124] The economic context is comprised of the relevant facts and circumstances that surround the disclosure, which allows the researcher to assess the likely interpretation of that disclosure by the market.<br><br>[124] Lucy Chang, "The Truth-on-the-Market Defense and its Relevance in SEC Enforcement Actions," *Law and Contemporary Problems* 76(3/4), 2013, 341-365, at 348-349. |
| **Opening Report Para. 58:** Therefore, economic analysis of truth-on-the-market requires an analysis of the content, context, and source of disclosures so the researcher may correctly determine the interpretation of the disclosure made by the market. | **Para. 161:** . . . Economic analysis of truth-on-the-market requires an analysis of the content, context, and source of disclosures so the researcher may correctly determine the interpretation by the market of the disclosure. |
| **Opening Report Para. 59:** Confounding information refers to | **Para. 140:** Confounding information refers to other information |

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| other information that affects the valuation of a stock that enters the market in the event window and is unrelated to the alleged disclosure failure or its foreseeable economic consequences. Such news can have a simultaneous, "confounding" effect on the stock's price. | that affects the valuation of a stock and that enters the market around the same time as a corrective disclosure but is unrelated to the alleged disclosure failure or its foreseeable economic consequences. Such news can also have an effect on the firm's stock price, but that effect needs to be disaggregated from the effect of the news in the disclosure (or another disclosure at the same time) that does correct an earlier misstatement or omission. |
| **Opening Report Para. 60:** . . . [T]he multi-factor market model is designed to account for and "net out" from the subject company's stock returns the effects of simultaneous movements in the market and the industry indices, so that the excess return should be largely free of any confounding macro-economic and industry-specific news on that day. This presumes, however, that the company's disclosure did not substantially affect the prices of firms in the industry. If the company's disclosure was of such import that it affected the prices for firms in its industry, then the industry return should not be used to compute a predicted return for that event. To do so would artificially mask the true effect of the information on the company's price. This is sometimes referred to as a "contagion" effect.<br><br>**Opening Report Para. 61:** If the analyst believes that confounding information outside of market-wide and industry-specific influences may still be present, there are several analyses that may shed light on the potential magnitude of any confounding firm-specific information. | **Para. 141:** The multi-factor market model is designed to "net out" from the subject company's stock returns the effects of simultaneous movements in market and industry indices so that the excess return should be largely free of any "confounding" macroeconomic and industry-specific news on that day.[118]<br><br>[118] This presumes that the subject company's disclosure did not substantially affect the stock prices of other firms in the industry. If the company's disclosure was of such importance that it affected the prices for substantially all firms in its industry, then the industry return should not be used in the multi-factor market model: To do so would artificially mask the true effect of the information on the company's stock price. This is sometimes referred to as a "contagion effect."<br><br>If the analyst believes that confounding information outside of market-wide and industry-specific sources may still be present, there are several analyses that may help assess the potential magnitude of any confounding information. |
| **Opening Report Para. 62:** First, one should attempt to determine whether or not the confounding information is sufficiently material, *i.e.*, whether it would be expected to | **Para. 142:** First, one should attempt to determine whether or not the confounding information is sufficiently material, *i.e.*, whether it would be expected to significantly change the subject |

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| significantly change the security's price when it is disclosed. If it is found to be immaterial, then such confounding information should not affect the conclusion. Often, the analyst can analyze contemporaneous commentary by analysts and the media to help gauge the importance to investors of the information related to the disclosure failure relative to the potentially confounding information. Sometimes the confounding information has economic implications that can be potentially measured or quantified independently of the subject company's stock returns. | firm's stock price when it is disclosed. If it is found to be immaterial, then such confounding information should not affect the conclusion of an event study analysis. Often, a researcher can analyze contemporaneous commentary by analysts and the media to help gauge the importance to investors of the information related to the disclosure failure relative to potentially confounding information. Sometimes the confounding information has economic implications that can be potentially measured or quantified independently from its effect on the subject company's stock returns. |
| **Opening Report Para. 63:** Second, one should determine if the confounding information was previously disclosed in full or in part to the investing public. If it has already been disclosed and fully incorporated into the stock price, then such confounding information is unlikely to have caused any stock-price changes measured on the day of the corrective disclosure. | **Para. 143:** Second, one should determine if the confounding information was previously disclosed in full (or in part) to the market. If this information has already been disclosed and fully incorporated into stock prices, then such potentially confounding information is unlikely to have been the cause of any stock-price changes measured on the day of the corrective disclosure. |
| **Opening Report Para. 64:** Third, if confounding information is disclosed at a different time of day than the corrective disclosure, intraday price movements can sometimes be used to differentiate the price responses to each piece of information. | **Para. 144:** Third, if confounding information is disclosed at a different time of day than the corrective disclosure, intraday price movements can sometimes be used to differentiate the price responses to each piece of information. |
| **Opening Report Para. 65:** Fourth, financial analysis such as discounted cash flow or price-earnings ratio analyses can be used to differentiate the price responses to each piece of information. | **Para. 145:** Fourth, fundamental financial analysis (such as discounted cash flow or comparable companies analysis) can be used to differentiate the price responses to each piece of information. |
| **Opening Report Para. 66:** Although this is not meant to be an exhaustive list, the aforementioned techniques include some of the ways researchers can attempt to deal with confounding news. | **Para. 146:** Although this is not meant to be an exhaustive list, the aforementioned techniques are some of the ways that researchers can attempt to deal with value-relevant and |

15

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| If confounding news is present and material, then the researcher must attempt to exclude the effect of the confounding news so that it is not included in the quantification of investor losses and artificial inflation. | potentially timely confounding information. If confounding information is present and material, then the researcher must attempt to exclude the effect of the confounding news so that it is not included in the quantification of investor losses and artificial inflation. |
| **Opening Report Para. 67:** The length of the event window used to measure the full effect on the stock price of new information is often an important consideration. It is common to use windows of one or two days depending on the information that is being disclosed. But a window of more than two days can also be appropriate in certain circumstances. The determination of the appropriate length of an event window is dependent on case-specific circumstances such as the complexity of the disclosure, the extent of its distribution and dissemination among the investing public, whether or not the defendants are denying or otherwise influencing the market's interpretations of the event, as well as the degree to which additional information from securities analysts and other commentators is forthcoming in subsequent hours or days. | **Para. 156:** The length of the event window used to measure the full effect of new information on a company's stock price is often an important consideration. It is common to use windows of one or two trading days depending on the information that is being disclosed and ***when*** it is disclosed (*i.e.*, before the market open or after the market close). But a window of more than two days can also be appropriate in certain circumstances. The determination of the appropriate length of an event window used to measure the full effect of new information on a company's stock price is dependent on case-specific circumstances such as the complexity of the disclosure, the extent of its distribution and dissemination among the investing public, whether or not the Defendants are denying or otherwise influencing the market's interpretations of the information, as well as the degree to which additional information from securities analysts and other commentators is forthcoming in subsequent hours or days. |
| **Opening Report Para. 68:** If a particular material disclosure continues to generate analyst commentary and additional news stories beyond the first event day and the excess returns are statistically significant in active trading, then the analyst should consider lengthening the event window to include the effects of this continued market response. Otherwise, improperly excluding a day with a significant negative excess return can understate damages, and improperly excluding a day with a | **Para. 157:** If a particular material disclosure continues to generate analyst commentary and additional news stories beyond the first event day and excess returns (or cumulative excess returns) are statistically significant in active trading, then the researcher should consider lengthening the event window to include the effects of this continued market response. Otherwise, improperly excluding a day with a significant negative excess return can understate damages and improperly excluding a day |

16

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| significant positive excess return can overstate damages. | with a significant positive excess return can overstate damages. |
| **Opening Report Para. 69:** . . . In general, losses per share caused by disclosures of alleged misrepresentations and omissions are translated into artificial inflation per share for each day of a class period. Thus, artificial inflation is generally computed by first starting with the losses measured from the declines in the stock price over the event window used for each identified corrective disclosure, which generally occur toward the end of a class period. As discussed previously, corrective disclosures are relevant disclosures that reveal or partially reveal the disclosure failures to the market. Artificial inflation for each day is then determined by working backward from the dates of the measured losses from identified corrective disclosures to the beginning of the class period.[39]<br><br>[39] Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, June 1990, 883-924; David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA White Paper, July 2002; David Tabak, "Loss Causation And Damages in Shareholder Class Actions: When It Takes Two Steps To Tango," NERA White Paper, May 2004; David Tabak, "Inflation and Damages in a Post-*Dura* World," NERA White Paper, September 2007. | **Para. 162:** In general, losses per share caused by disclosures correcting alleged misrepresentations and/or omissions are translated into ***artificial inflation*** on a per share basis for each day of a class period. Thus, artificial inflation is computed by starting with the losses measured from the declines in the stock price in reaction to each identified corrective disclosure.[125] As discussed earlier, corrective disclosures are relevant disclosures that (at least partially) reveal the disclosure failures to the market. Artificial inflation for each day is then determined by working backward from the dates of the measured losses from identified corrective disclosures to the beginning of the class period.[126]<br><br>[126] Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, June 1990, 883-924; David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA White Paper, July 2002; David Tabak, "Loss Causation And Damages in Shareholder Class Actions: When It Takes Two Steps To Tango," NERA White Paper, May 2004; David Tabak, "Inflation and Damages in a Post-Dura World," NERA White Paper, September 2007. |
| **Opening Report Para. 90:** If a class is certified by the court, I could, if requested, calculate damages on a class-wide basis by applying the principles and methodologies discussed in Section | **Para. 163:** If a class is certified by the court in this matter, I could, if requested, calculate damages on a class-wide basis by applying the principles and methodologies discussed above. |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| V above. | |
| **Opening Report Para. 91:** A primary aspect of that analysis would be analyzing Defendants' alleged misstatements and omissions as well as any public disclosures that ultimately apprised the market of facts that were previously misstated or concealed. | **Para. 164:** A primary aspect of that analysis would be analyzing Defendants' alleged misstatements and/or omissions, as well as any public disclosures that ultimately apprised the market of facts that were previously misstated or concealed. |
| **Reply Report Appendix A Para. 2:** The Efficient Market Hypothesis ("EMH") is conventionally divided into three categories by economists, each dealing with a different type of information:<br><br>a) Weak-form – information contained in historic prices is fully reflected in current prices;<br><br>b) Semi-strong form – publicly available information is fully reflected in current prices; and<br><br>c) Strong-form – all information, public and non-public, is fully reflected in current prices.[1]<br><br>[1] *See* Edwin J. Elton, Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, <u>Modern Portfolio Theory and Investment Analysis</u>, 6th ed., John Wiley & Sons, Inc., 2003, p. 402. | **Para. 53:** . . . The Efficient Market Hypothesis ("EMH") is an important theory in the development of financial economics, and economists generally refer to three forms (or levels) of market efficiency:<br><br>a) Weak-form – information about past prices is fully reflected in current stock prices;<br><br>b) Semi-strong form – *all publicly available information* is fully reflected in current stock prices; and<br><br>c) Strong-form – *all information, public and non-public*, is fully reflected in current stock prices.[42]<br><br>[42] *See* Edwin J. Elton, Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, <u>Modern Portfolio Theory and Investment Analysis</u>, 6th ed., John Wiley & Sons, Inc., 2003, p.402. |
| **Reply Report Appendix A Para. 3:** A finding of market efficiency for a security generally means that the price of the security reflects all relevant, publicly available information or, in other words, that it satisfies the semi-strong form of the EMH. | **Para. 54:** If a security trades in a semi-strong efficient market, that generally means that the price of the security reflects all relevant, *publicly available* information. In litigation, courts in the United States have accepted the semi-strong form of the |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| Similarly, for litigation purposes, courts in the United States have accepted the semi-strong form of the EMH.[2] <br><br> [2] *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") at 246. | EMH.[43] <br><br> [43] *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) ("*Basic*"). |
| **Reply Report Appendix A Para. 5:** Courts have approved many of the indicators or factors that economists consider in assessing market efficiency in ruling on the issue of market efficiency for a stock that is the subject of securities litigation. For example, the court in *Cammer v. Bloom* listed five factors to assess whether the market for a security is efficient.[3] Those five factors are: i) "average weekly trading volume during the class period"; ii) number of analysts following the stock during the class period; iii) number of market makers for the stock; iv) whether the company was entitled to "file an S-3 Registration Statement in connection with public offerings"; and v) "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[4] <br><br> [3] *See Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*") at 1286-87. <br><br> [4] *Id.* | **Para. 56:** . . . [C]ourts have approved many of the indicators that economists use to assess market efficiency. The court in *Cammer* listed five indicators that the court considered important in assessing whether the market for a security satisfies the semi-strong form of the EMH.[44] Those five indicators are: i) "average weekly trading volume during the class period"; ii) number of analysts producing information and opinions about the firm during the class period; iii) number of intermediaries making a market in the firm's stock during the class period; iv) whether the company qualified to "file an S-3 Registration Statement in connection with public offerings"; and v) "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[45] <br><br> [44] *See Cammer*, 711 F. Supp. At 1286-87. <br><br> [45] *Id.* |
| **Reply Report Appendix A Para. 6:** Other courts have looked at additional factors bearing on the efficiency of a particular stock, including the Fifth Circuit, which adopted the use of three additional factors: i) the company's market capitalization; ii) the bid-ask spread; and iii) the stock's float,[5] as well as the First | **Para. 57:** Other courts have given credence to additional indicators of the efficiency of a firm's common stock. For example, in the Fifth Circuit, the court suggested the consideration of three additional indicators: i) the market capitalization of the firm's common stock; ii) the bid-ask spread; |

19

Exhibit K

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| Circuit, which approved of the consideration of: i) the presence of autocorrelation in stock-price returns; ii) constraints on short selling; and iii) violations of put-call parity.[6]<br><br>[5] *See Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*") at 477-78; *Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005) ("*Unger*") at 323.<br><br>[6] *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir. 2005) ("*PolyMedica*") at 18. | and iii) the float of the common stock.[46] In the Second Circuit, the court suggested the consideration of holdings of institutional investors.[47] In the First Circuit, the court suggested the consideration of: i) autocorrelation in returns to the firm's common stock; ii) constraints on short selling the firm's shares (i.e., selling shares prior to purchasing them); and iii) put-call parity.[48]<br><br>[46] *See Krogman*, 202 F.R.D. at 477-78.<br><br>[47] *See Winstar*, at 449 n.16.<br><br>[48] *See PolyMedica*, 432 F.3d at 18. |
| **Reply Report Appendix A Para. 7:** "Economists broadly agree that stock prices in developed markets generally do respond to information."[7] This tenet was also affirmed in the U.S. Supreme Court decision in *Halliburton II*.[8] Thus, because stocks in developed markets are generally informationally efficient,[9] economists can compare the factors of efficiency for a given stock with the same factors for the universe of stocks traded in a developed market, such as the NYSE or Nasdaq, as an objective measure of efficiency. . . . This ranking of efficiency that measures a specific stock against the universe of stocks in a well-developed market provides the basis for an assessment of the "relative" degree of efficiency for that stock.[10] As discussed in a well-regarded treatise on econometrics, the notion of relative efficiency may be a useful concept.[11] Therefore, my analysis discussed below includes an applicable comparison of BofI to the norm from the universe of stocks listed on the NYSE | **Para. 58:** The U.S. Supreme Court in *Halliburton II* gave weight to the notion that "(e)conomists broadly agree that stock prices in developed markets generally do respond to information."[49] . . . Because stocks in a developed market (such as the market for the trading of common stocks in the U.S.) are generally considered to be informationally efficient, economists can compare the indicators of efficiency for a given stock with the same measures calculated for (virtually) all stocks traded in a liquid market, such as the NYSE or Nasdaq.<br><br>[49] *See* Brief of Financial Economists as *Amici Curiae* in Support of Respondents for the Supreme Court of the United States, *Halliburton Co. v. Erica P. John Fund, Inc.*, February 5, 2014, p.12.<br><br>**Para. 59:** Such a ranking of efficiency (comparing a specific stock to the universe of stocks in a well-developed market, such |

20

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| or Nasdaq.<br><br>[7] *See Halliburton Co. v. Erica P. John Fund, Inc.*, Brief of Financial Economists as *Amici Curiae* in Support of Respondent (9th Cir. Court of Appeals), February 5, 2014, p. 12.<br><br>[10] The U.S. Supreme Court endorsed the concept that "market efficiency is a matter of degree," *see Halliburton II* at 2410.<br><br>[11] *See* John Y. Campbell, Andrew W. Lo, and A Craig MacKinlay, The Econometrics of Financial Markets, Princeton University Press, 1997, p. 24. | as the NYSE or Nasdaq) provides the basis for an assessment of the "relative" degree of efficiency of that stock.[50] As discussed in an often-cited book on the econometrics of financial markets, the authors note that "relative" efficiency is a useful concept.[51] Therefore, my analysis of the efficiency of the market for Olo's common stock involves a comparison of Olo to the population of stocks listed on the NYSE or Nasdaq.<br><br>[50] The U.S. Supreme Court has endorsed the concept of "relative" efficiency: "market efficiency is a matter of degree," *see Halliburton Co. v. Erica P. John Fund, Inc.* 134 S. Ct. 2398, 2410 (2014) ("*Halliburton II*").<br><br>[51] *See* John Y. Campbell, Andrew W. Lo, and A Craig MacKinlay, The Econometrics of Financial Markets, Princeton University Press, 1997, p.24. |
| **Reply Report Appendix A Para. 13:** The first indication of an efficient market in *Cammer* is that the average trading volume per week exceeds one percent of shares outstanding.[12] Trading volume is generally viewed as an indicator of market efficiency because high volume implies significant investor interest in the company and liquidity. . . . | **Para. 61:** The first indicator of an efficient market in *Cammer* references the average trading volume per week for the firm's common stock. Trading volume is viewed as an indicator of market efficiency because high trading volume implies that the market for the firm's stock is liquid.[53] . . . |
| **Reply Report Appendix A Para. 14:** The average weekly trading volume for BofI common stock was 1.1 million shares during the Class Period. The average weekly trading volume as a percent of shares outstanding over the Class Period was 7.32%.[13] *See* **Exhibit A-1**. | **Para. 62:** The average weekly trading volume for Olo common stock was 7.1 million shares during the Class Period. The average weekly trading volume as a percent of shares outstanding over the Class Period was 11.12%. *See* **Exhibit 4**. |
| **Reply Report Appendix A Para. 15:** In a recently published | **Para. 63:** In a recently published paper about indicators of |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| paper, for the commonly-accepted factors of market efficiency, my co-authors and I ranked the stocks listed on the NYSE and NASDAQ exchanges ("NYSE/Nasdaq Universe"), two of the most open and well-developed markets in the world, from best to worst.[14] This allows for the benchmarking of BofI statistics relative to the stocks in the NYSE/Nasdaq Universe. The weekly turnover of BofI shares during the Class Period is between the 75th and 90th percentiles of the universe of NYSE/NASDAQ stocks during 2013- 2015, meaning that the turnover of BofI stock is better than at least 75% of stocks that trade in well-developed markets.[15] | market efficiency, Bhole, Surana and Torchio (2020) ranked all the stocks listed on the NYSE and NASDAQ exchanges ("NYSE/Nasdaq Universe") from best to worst using court-supported indicators.[54] This allows for the benchmarking of Olo common stock relative to the stocks in the NYSE/Nasdaq Universe. The weekly turnover of Olo common shares during the Class Period is between the 90th and 95th percentiles of the universe of NYSE/NASDAQ stocks during 2016-2018, implying that the turnover of Olo stock is greater than volume as a percent of shares outstanding for at least 90% of stocks that trade in well-developed markets (such as the NYSE or Nasdaq).[55] |
| [14] The details of the analysis are discussed in: Bharat Bhole, Sunita Surana, and Frank Torchio, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Online Law Review* 96, 2020, 96-116 ("BST 2020"). | [54] *See* Bharat Bhole, Sunita Surana, and Frank Torchio, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Online Law Review* 96, 2020, 96-116 ("BST 2020"). . . . |
| [15] *See* BST 2020, Table 1 (p. 102). I calculate daily average turnover for BofI common stock as the weekly average divided by 5. | [55] *See* BST 2020, Table 1 (p.102). For comparison to BST 2020, Table 1, I calculate daily average turnover for Olo common stock of 2.22% as the average weekly trading volume as a percent of shares outstanding of 11.12% divided by 5. |
| **Reply Report Appendix A Para. 16:** In my opinion, the Company's weekly trading volume provides support for my opinion that BofI common stock traded in an efficient market during the Class Period. In addition, BofI's trading volume exceeds the benchmark of weekly volume of 2% of shares outstanding that has been considered to justify "a strong presumption" that the market for a security is efficient.[16] | **Para. 64:** In my opinion, the Company's weekly trading volume provides support for my opinion that Olo common stock traded in an efficient market during the Class Period. In addition, Olo's trading volume easily exceeds the benchmark of weekly volume greater than 2% of shares outstanding that has been considered to justify "a strong presumption" that the market for a security is efficient.[56] |
| [16] *See Cammer* at 1286 (citing Bromberg & Lowenfels, 4 | [56] *See Cammer*, 711 F. Supp. at 1286 (citing Bromberg & |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)). | Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)). |
| **Reply Report Appendix A Para. 17:** The second indication of an efficient market in *Cammer* is the number of securities analysts following and reporting on the stock. Reports issued by analysts serve the purpose of disseminating publicly available information along with analysis and recommendations by the analysts to investors. *Cammer* stated it would be "persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the Class Period."[17] The greater the number of analysts, the more likely information about the company is "relied upon by investors."[18]<br><br>[17] *See Cammer* at 1286 (footnote omitted).<br><br>[18] *See In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005) ("*Xcelera*") at 514. | **Para. 65:** The second indicator of an efficient market in *Cammer* references the number of securities analysts that provide reports, analysis, and opinion on the firm's stock. Such reports issued by external equity analysts both disseminate available information to the investing public *and* add additional detail with the analysis by, and recommendations of, the analyst. The court in *Cammer* stated that it would be "persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the Class Period."[57] The greater the number of analysts following a firm's stock, the more likely it is that value-relevant information about the firm is available to and "relied upon by investors."[58]<br><br>[57] *See Cammer* 711 F. Supp. at 1286 (footnote omitted).<br><br>[58] *See In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514 (1st Cir. 2005). |
| **Reply Report Appendix A Para. 18:** According to Bloomberg data, there were between 4 and 7 research analysts providing Buy/Sell/Hold recommendations for BofI during the Class Period, with an average of 6 analysts. Further, between 3 and 7 research analysts during the Class Period, with an average of 5 analysts, were part of the Refinitiv I/B/E/S consensus EPS estimate for the current fiscal year. *See* **Exhibit A-1**. Over 250 analyst reports were issued during the Class Period by firms including: D.A. Davidson; FBR Capital Markets; Keefe, Bruyette & Woods; Maxim Group; Oppenheimer; Raymond | **Para. 66:** According to Bloomberg data, there were six sell-side equity analysts providing Buy/Sell/Hold recommendations for Olo common stock during the Class Period.[59] Further, between five and six analysts (with an average of six) were part of the Refinitiv I/B/E/S consensus EPS estimate during the Class Period for the then current fiscal year. *See* **Exhibit 4**. Approximately 90 analyst reports were issued during the Class Period by firms including: J.P. Morgan, Piper Sandler, RBC Capital Markets, Truist Securities, and William Blair.[60, 61] I have reviewed many of these reports and they generally provide |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| James; Sandler O'Neil; Sidoti & Co.; and Sterne Agee.[19,20,21] I have reviewed many of these reports and they generally provide analyses and recommendations that would be of interest to investors. | analyses and recommendations that would be of interest to investors. |
| **Reply Report Appendix A Para. 19:** . . . I benchmark BofI statistics relative to the stocks in the NYSE/Nasdaq Universe. On average, analyst coverage for the Company (based on Refinifiv I/B/E/S data) was between the 25th and 50th percentiles of the stocks in the NYSE/Nasdaq Universe during 2013- 2015, meaning that BofI's analyst coverage is better than at least 25% of stocks that trade in well-developed markets.[22] Consequently, BofI's analyst coverage provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.<br><br>[22] *See* BST 2020 at Table 2, p. 104. What was earlier known as Thomson Reuters I/B/E/S is now known as Refinitiv I/B/E/S. | **Para. 67:** I benchmark analyst coverage for Olo to the stocks in the NYSE/Nasdaq Universe (as discussed earlier). On average, analyst coverage for the Company (based on Refinifiv I/B/E/S data) was between the 25th and 50th percentile of the stocks in the NYSE/Nasdaq Universe from 2016 to 2018, suggesting that analyst coverage for Olo common stock is greater than coverage for at least 25% of stocks that trade in the NYSE/Nasdaq Universe.[62]<br><br>[62] *See* BST 2020 at Table 2, p.104. What was earlier known as Thomson Reuters I/B/E/S is now known as Refinitiv I/B/E/S.<br><br>**Para. 68:** Consequently, analyst coverage of Olo common stock provides support for my opinion that Olo common stock traded in an efficient market during the Class Period. |
| **Reply Report Appendix A Para. 20:** During the approximately 25-month Class Period, over 2,700 news articles about BofI appeared in a leading financial and trade publications, including Bloomberg News, Dow Jones Institutional News, MarketWatch, Reuters News, *The New York Times*, and *The Wall Street Journal Online*.[24,25] According to the SEC Edgar database, additional information about BofI was distributed through over 140 Company SEC filings. These filings include, among others, Current Reports on Form 8-K, Quarterly (Form 10-Q) and Annual (Form 10-K) Reports, and Proxy Statements. **Appendix** | **Para. 69:** During the one-year-long Class Period, there were over 1,300 news articles about Olo, including news that appeared in leading financial and trade publications, such as Bloomberg News, Bloomberg First Word, Business Wire, Dow Jones Newswires, Investor's Business Daily, PR Newswire, Reuters News, and Theflyonthewall.com.[63] According to the SEC Edgar database, additional information about Olo common stock was distributed through over 40 SEC filings during the Class Period. These filings include, among others, Current Reports on Form 8-K, Quarterly (Form 10-Q) and Annual (Form |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| **B** is a chronology spanning the period September 4, 2013 through October 16, 2015 that lists analyst reports, news articles, press releases, and other filings disseminated during this period. <br><br> [24] Based on searches in Bloomberg and Factiva. For Factiva, I searched for the words "Bank of Internet" or "BofI," and included all sources in the search. For Bloomberg, I used the ticker symbol "BOFI" and searched for all sources with "medium" relevance excluding Internetlinked headlines, SEC EDGAR filings, Company Filings, Bloomberg Social Velocity Alerts, Makor Capital Ltd, and Banorte Ixe. Bloomberg articles were downloaded in August 2017. | 10-K) Reports, and Proxy Statements. <br><br> [63] Based on searches in Bloomberg and Factiva for the period August 10, 2021 to August 11, 2022. For Factiva, I searched (in May 2023) for the company "Olo Inc." and included all sources in English in the search. The number of Factiva articles was 307. For Bloomberg, I searched (in May 2023) using the ticker symbol "OLO" and searched for all sources with "medium" relevance. The number of Bloomberg articles was 1,001. |
| **Reply Report Appendix A Para. 21:** In my opinion, the Company's analyst and media coverage provides support for my opinion that BofI common stock traded in an efficient market during the Class Period. | **Para. 70:** Consequently, media coverage of Olo provides support for my opinion that Olo common stock traded in an efficient market during the Class Period. |
| **Reply Report Appendix A Para. 29:** In my opinion, the third *Cammer* factor provides support for my opinion that BofI common stock traded in an efficient market during the Class Period. | **Para. 72:** In my opinion, this third *Cammer* indicator provides support for my opinion that Olo common stock traded in an efficient market during the Class Period. |
| **Reply Report Appendix A Para. 30:** The fourth indication of an efficient market in *Cammer* is the eligibility of the company to file a Form S-3 with the SEC.[33] According to *Cammer*: "The 'public float' aspect of the Form S-3 requirements ensures that enough investors have in fact read the previously filed document… It is this aspect of the Form S-3 requirements that calls into play the efficient market hypothesis."[34] | **Para. 73:** The fourth indicator of an efficient market in *Cammer* references the eligibility of the company to file a Form S-3 with the SEC.[67] According to *Cammer*: "The 'public float' aspect of the Form S-3 requirements ensures that enough investors have in fact read the previously filed document. . . . It is this aspect of the Form S-3 requirements that calls into play the efficient market hypothesis."[68] |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| [33] *See Cammer* at 1287.<br><br>[34] *See Cammer* at 1285 and n.33. | [67] *See Cammer*, 711 F. Supp. at 1287.<br><br>[68] *See Cammer*, 711 F. Supp. at 1285 and n.33. |
| **Reply Report Appendix A Para. 31:** At the time of the *Cammer* decision, the filing of a Form S-3 registration statement required firms to file periodic reports with the SEC under the Exchange Act of 1934 for three years prior to the Form S-3 filing and to have $150 million of stock held by nonaffiliates (or $100 million of stock held by non-affiliates coupled with annual trading volume of 3 million shares per year).[35] The SEC has since modified the requirements for filing a Form S-3. Among the current requirements for filing a Form S-3 registration statement are that a company has filed reports under the Exchange Act for 12 calendar months and has an aggregate market value of common equity held by non-affiliates of $75 million or more.[36] . . . | **Para. 74:** At the time of the *Cammer* decision in 1989, a Form S-3 registration statement required firms to file periodic reports with the SEC for the three years prior and to have $150 million of stock held by non-affiliates (or $100 million of stock held by non-affiliates coupled with annual trading volume of 3 million shares per year).[69]<br><br>[69] *See Cammer*, 711 F. Supp. at 1271.<br><br>**Para. 75:** In the more than three decades since that decision, the SEC has changed the requirements for filing a Form S-3. Among the current requirements for filing a Form S-3 registration statement are that a company has filed reports under the Exchange Act for 12 calendar months[70] and has an aggregate market value of common equity held by non-affiliates of $75 million or more.[71] |
| **Reply Report Appendix A Para. 32:** In my opinion, the Company's substantial public float, in accordance with the float requirement for filing a Form S-3, provides support for my opinion that BofI common stock traded in an efficient market during the Class Period. | **Para. 77:** Olo's substantial public float, which met the requirement for filing Form S-3ASR, supports my opinion that Olo common stock traded in an efficient market during the Class Period. |
| **Reply Report Appendix A Para. 33:** The fifth factor for an efficient market adopted by *Cammer* is a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[39] | **Para. 78:** The fifth indicator of an efficient market in Cammer references a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[74] Financial economists use a variety of |

26

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| Economists in academia and private practice have published scholarly research of large sample studies that present various tests and statistical methodologies that can provide probative economic evidence concerning the existence of a cause-and-effect relationship consistent with market efficiency.[40]<br><br>[39] *See Cammer* at 1287.<br><br>[40] *See* Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46(5), December 1991, 1575-1617, p. 1602. | statistical tests to provide evidence of the existence of a cause-and-effect relationship consistent with market efficiency.[75]<br><br>[74] *See Cammer*, 711 F. Supp. At 1287.<br><br>[75] *See* Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46(5), December 1991, 1575-1617, p. 1602. |
| **Reply Report Appendix A Para. 69:** BofI's average market capitalization was between the 50th and 75th percentiles of the stocks in the NYSE/Nasdaq Universe during 2013-2105, meaning that BofI's market capitalization is better than at least 50% of stocks that trade in well-developed markets.[71,72]<br><br>[71] *See* BST 2020 at Table 5, p. 107. | **Para. 95:** Olo's average market capitalization was between the 50th and 75th percentile of the stocks in the NYSE/Nasdaq Universe between 2016 and 2018, meaning that Olo's market capitalization was larger than at least 50% of stocks that trade in well-developed markets (such as the NYSE or Nasdaq).[84]<br><br>[84] *See* BST 2020 at Table 5, p.107. |
| **Reply Report Appendix A Para. 70:** In my opinion, BofI's market capitalization provides support for my opinion that BofI common stock traded in an efficient market during the Class Period. | **Para. 96:** In my opinion, Olo's market capitalization provides support for my opinion that Olo common stock traded in an efficient market during the Class Period. |
| **Reply Report Appendix A. Para. 71:** . . . [A] study by Barber et al. (1994) concludes that, in isolation, institutional holdings are a proxy for market efficiency.[73] Thomas and Cotter (2000) argue that the level of institutional investors' ownership in a company's stock is a proxy for market efficiency.[74] | **Para. 107:** . . . A study by Barber et al. (1994) concludes that, in isolation, institutional holdings can be a valid indicator of market efficiency.[90] Thomas and Cotter (2000) also argue that the level of institutional investors' ownership in a company's stock is an indicator market efficiency.[91] |

27

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| [73] *See* Brad M. Barber, Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, Winter 1994, 285-312, p. 302.<br><br>[74] *See* Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63(3), Summer 2000, 105-122, p. 106. | [90] *See* Brad M. Barber, Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, Winter 1994, 285-312, p.302.<br><br>[91] *See* Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63(3), Summer 2000, 105-122, p.106. |
| **Reply Report Appendix A Para. 80:** In addition to the factors discussed above, the court in *PolyMedica* considered several other factors as evidence of market inefficiency. These factors include: i) the presence of serial correlation in PolyMedica's stock price returns; ii) constraints on short selling; and iii) violations of put-call parity.[80] I analyze these factors below.<br><br>[80] *See PolyMedica* at 18. | **Para. 110:** In addition to the factors discussed above, the court in *PolyMedica* considered several other factors as evidence of market inefficiency.[94] I analyze these factors below.<br><br>[94] *See* paragraph 57. |
| **Reply Report Appendix A Para. 81:** I conducted statistical tests to determine whether the returns for BofI common stock exhibited "autocorrelation," which is also referred to as "serial correlation." Autocorrelation has been studied in the financial economics literature and accepted by the courts.[81]<br><br>[81] The lack of autocorrelation generally corresponds to the theory of random walk. "The term 'random walk' is usually used loosely in the finance literature to characterize a price series where all subsequent price changes represent random departures from previous prices. Thus, changes in price will be unrelated to past price changes." *See* Burton G. Malkiel, "Efficient Market | **Para. 111:** I conducted statistical tests to determine whether the returns to Olo's common shares exhibited "autocorrelation." Autocorrelation has been studied in the financial economics literature and accepted by the courts as being associated with tests of market efficiency.<br><br>**Para. 112:** Autocorrelation in a stock's returns means that tomorrow's stock price movement (or return) can be systematically predicted with a degree of statistical confidence based solely on the price movement today.[95] This ability to predict stock price movements may be a consequence of one of two problems. First, the market may systematically overreact to |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| Hypothesis," in The New Palgrave: A Dictionary of Economics, Volume 2, E to J, ed. by John Eatwell, Murray Milgate and Peter Newman, The Macmillan Press Limited, 1998, pp. 120- 123. *See also Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-07 (S.D. Tex. 2004); *In Re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 ("*PolyMedica II*") at 276-77.<br><br>**Reply Report Appendix A Para. 82:** Autocorrelation in a stock's returns means that tomorrow's stock price movement can be systematically predicted with a degree of statistical confidence based solely on the price movement today. This ability to predict stock price movements is a consequence of either of two problems. First, the market systematically overreacts to new information. A systematic overreaction allows investors to earn arbitrage profits by buying on days containing bad news (or selling short on the days containing good news) because there will be a reversal the next day (negative autocorrelation). Second, the market takes excessive time to incorporate new information or systematically underreacts to new information. A systematic underreaction to news allows investors to earn arbitrage profits by buying on a day with good news and selling short on days containing bad news (positive autocorrelation). | new information, allowing investors to earn arbitrage profits by buying on days with bad news (or selling short on the days with good news) because there is a predictable reversal the next day (negative autocorrelation). Second, the market may underreact to new, value relevant information, taking excessive time to incorporate new information in the stock's price. Systematic underreaction to value relevant news would allow investors to earn arbitrage profits by buying on a day with good news and selling short on days with bad news (positive autocorrelation).<br><br>[95] The lack of autocorrelation corresponds to the theory of random walk. "The term 'random walk' is usually used loosely in the finance literature to characterize a price series where all subsequent price changes represent random departures from previous prices. Thus, changes in price will be unrelated to past price changes." *See* Burton G. Malkiel, "Efficient Market Hypothesis," in The New Palgrave: A Dictionary of Economics, Volume 2, E to J, ed. by John Eatwell, Murray Milgate and Peter Newman, The Macmillan Press Limited, 1998, pp.120-123. *See also Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-07 (S.D. Tex. 2004); *In re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 276-77 (D. Mass 2006). |
| **Reply Report Appendix A Para. 83:** The presence of statistically significant autocorrelation over short subperiods may mean that there were instances in which there were consecutive days for which important news was disseminated. Under these circumstances, statistically significant autocorrelation would not indicate that any arbitrage opportunity | **Para. 113:** The presence of statistically significant autocorrelation over short subperiods may also mean that there were instances in which there were consecutive days on which important news was disseminated. Under these circumstances, statistically significant autocorrelation would not indicate that an arbitrage opportunity existed, but rather is caused by consecutive |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| existed, but rather is a figment of consecutive news days. | news days. |
| **Reply Report Appendix A Para. 84:** To test for autocorrelation, I first performed a regression analysis of BofI's daily common stock returns on the returns from the previous day over the Class Period. I did not find the autocorrelation for BofI's returns to be statistically significant, which means there is no statistical evidence of autocorrelation of BofI's returns.[82] I also performed a regression analysis of BofI's daily common stock excess returns on the excess return from the previous day over the Class Period. Similar to the raw returns, I found no statistically significant autocorrelation for BofI's excess returns, which means there is no statistical evidence of autocorrelation of BofI's excess returns.[83] *See* **Exhibit A-7**. | **Para. 114:** To test for autocorrelation, I first performed a regression analysis over the Class Period of Olo common stock's daily returns on the returns from the previous day. I find a positive coefficient of 0.13 with a t-statistic of 2.16, which is statistically significant at the 5% level. *See* **Exhibit 7**. I also performed a regression analysis of Olo's daily common stock excess returns on the excess return from the previous day over the Class Period, and found a coefficient of 0.161 with a t-statistic of 2.61, which is also statistically significant at the 5% level. *See* **Exhibit 7**. |
| **Reply Report Appendix A Para. 86:** The presence of short sellers is another indication of investor activity. Investor activity is a key component of a well-functioning efficient market. The level of short interest for BofI common stock during the Class Period averaged 1.7 million shares, which is 11.4% of the Company's common shares outstanding.[85] *See* **Exhibit A-1**. | **Para. 116:** The presence of short sellers is another indication of investor activity. Investor activity is a key component of a well-functioning efficient market, and active short selling allows investors with negative views of the company's stock to trade on those opinions by selling the shares without buying them first (and thereby potentially profiting from a ***decline*** in the stock). The level of short interest for Olo common stock during the Class Period averaged 6.5 million shares, which is 8.47% of the Company's common shares outstanding. *See* **Exhibit 4**. |
| **Reply Report Appendix A Para. 93:** Put-call parity is a theoretical relation between call option prices, put option prices, and stock prices that should hold because a portfolio of put and call options plus risk-free bonds can be constructed to replicate the payoff from purchasing the underlying common stock. An American-style option (unlike European-style) can be exercised | **Para. 120:** . . . Put-call parity is a theoretical relation between call and put option prices and stock prices that should hold because a portfolio can be constructed consisting of puts and calls plus risk-free bonds such that the return to that portfolio replicates the payoff from purchasing the common stock. . . . |

**Exhibit K**

**Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)**

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
|---|---|
| at any time during its life. For American-style options (such as BofI's), the put-call parity relation implies an upper and lower bound on the value of the put and call option prices such that:<br><br>$$S - D - X \leq C - P \leq S - Xe^{-rt},$$<br><br>where $S$ denotes the current price of common stock, $D$ denotes the present value of future dividends, $X$ denotes the exercise price of the option, $C$ is the call option price, $P$ is the put option price, $r$ is the risk-free interest rate, and $t$ is the time to expiration of the options.[91]<br><br>[91] *See*, for example, John C. Hull, Options, Futures, and Other Derivatives, 6th ed., Pearson Prentice Hall, 2006, p. 219. BofI did not declare or distribute any dividends during the Class Period. *See* BofI SEC Form 10-K dated August 25, 2016, p. 30. Therefore, the term $D$ in the equation is set to zero. | **Para. 121:** An American-style option (unlike European-style) can be exercised at any time during its life. For American-style options (such as Olo's) on non-dividend paying stocks,[100] the put-call parity relation implies the following upper and lower bound on the prices of the put and call options such that:<br><br>$$S - X \leq C - P \leq S - Xe^{-rt},$$<br><br>where S denotes the current price of Olo's common stock, X denotes the exercise (or "strike") price of the option, C is the call option price, P is the put option price, r is the risk-free interest rate, and t is the time to expiration of the options.[101]<br><br>[100] Because Olo has never declared or paid cash dividends on its common stock, the present value of dividends, ordinarily a part of the put-call parity equation, is zero.<br><br>[101] *See*, for example, John C. Hull, Options, Futures, and Other Derivatives, Sixth Edition, Prentice Hall, 2006, p. 215. |
| **Reply Report Appendix A Para. 94:** I conducted an empirical test to determine whether BofI's common stock and exchange-traded options on BofI's common stock violated put-call parity on any day during the Class Period.<br><br>**Reply Report Appendix A Para. 95:** I obtained daily bid and ask data for options on BofI's common stock from IVolatility.[92] The IVolatility database includes daily open interest, volume, expiration date, exercise price, and bid and ask prices for each option.[93] | **Para. 122:** I ran an empirical test to determine whether Olo's common stock and exchange-traded options frequently violated the put-call parity relation during the Class Period. I obtained daily bid and ask prices for Olo's put and call options from IVolatility.[102] The IVolatility database includes daily open interest, volume, expiration date, exercise price, and bid and ask prices for exchange traded put and call options.[103]<br><br>[102] Available at http://www.ivolatility.com.<br><br>[103] Open interest is the number of outstanding option contracts at |

31

**Exhibit K**

### Comparison of Excerpts of Expert Reports of Frank Torchio and Dr. Micah S. Officer (cont'd)

| Torchio Opening Report (Defs.' Ex. AA) / Torchio Reply Report and Appendix A (Defs.' Ex. AB) | Officer Report (Pl.'s Ex. A) |
| --- | --- |
| [92] Available at http://www.ivolatility.com.<br><br>[93] Open interest is the number of outstanding option contracts at a given point in time. In general, equity option contracts represent 100 shares of the underlying equity and option prices are quoted on a per-underlying share basis. | a given point in time. In general, equity option contracts represent 100 shares of the underlying equity and option prices are quoted on a per-underlying share basis. |

32