# EXHIBIT Q

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2022**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number: 001-40213**

# Olo Inc.
**(Exact name of registrant as specified in its charter)**

| Delaware | 20-2971562 |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**285 Fulton Street**
**One World Trade Center, 82nd Floor**
**New York, NY 10007**
**(Address of principal executive offices) (Zip Code)**

**(212) 260-0895**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.001 per share | OLO | The New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
|---|---|---|---|---|
| Non-accelerated filer | ☒ | | Smaller reporting company | ☐ |
| | | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of August 8, 2022, 102,296,240 shares of the registrant's Class A common stock and 59,363,960 shares of registrant's Class B common stock were outstanding.

**OLO INC.**

**TABLE OF CONTENTS**

**PART I - FINANCIAL INFORMATION**                                                                                                                    Page

Item 1.     Financial Statements (Unaudited)                                                                                                              1

            Condensed Consolidated Balance Sheets                                                                                                        1

            Condensed Consolidated Statements of Operations                                                                                              2

            Condensed Consolidated Statements of Comprehensive Loss                                                                                      3

            Condensed Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit)                                4

            Condensed Consolidated Statements of Cash Flows                                                                                              5

            Notes to the Condensed Consolidated Financial Statements                                                                                     6

Item 2.     Management's Discussion and Analysis of Financial Condition and Results of Operations                                                         26

Item 3.     Quantitative and Qualitative Disclosures About Market Risk                                                                                   44

Item 4.     Controls and Procedures                                                                                                                      45

**PART II - OTHER INFORMATION**

Item 1.     Legal Proceedings                                                                                                                            47

Item 1A.    Risk Factors                                                                                                                                 48

Item 2.     Unregistered Sales of Equity Securities and Use of Proceeds                                                                                  59

Item 3.     Defaults Upon Senior Securities                                                                                                              59

Item 4.     Mine Safety Disclosures                                                                                                                      59

Item 5.     Other Information                                                                                                                            59

Item 6.     Exhibits                                                                                                                                     60

            Signatures                                                                                                                                   62

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains express or implied forward-looking statements that are based on our management's belief and assumptions and on information currently available to our management. All statements other than statements of historical facts contained in this Quarterly Report on Form 10-Q, including statements regarding our future results of operations or financial condition, business strategy, and plans and objectives of management for future operations, are forward-looking statements. In some cases, you can identify forward-looking statements because they contain words such as "anticipate," "believe," "contemplate," "continue," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "target," "will," or "would" or the negative of these words or other similar terms or expressions.

These forward-looking statements include, but are not limited to, statements concerning the following:

•our expectations regarding our revenue, expenses, and other operating results, including overall transaction volumes, average revenue per unit, or ARPU, ending active locations and dollar-based net revenue retention, or NRR;

•the durability of the growth we have experienced in the recent past due to the COVID-19 pandemic and the associated government-imposed restrictions on consumer preferences for digital ordering and customer adoption of multi-modules;

•our ability to acquire new customers and successfully retain existing customers;

•our ability to develop and release new products and services;

•our ability to develop and release successful enhancements, features, and modifications to our existing products and services;

•our ability to increase usage of our platform and upsell and cross sell additional modules;

•our ability to attain or sustain our profitability;

•the effects of the COVID-19 pandemic or other public health crises, macroeconomic conditions, such as inflation, interest rates, or overall market uncertainty;

•future investments in our business, our anticipated capital expenditures, and our estimates regarding our capital requirements;

•the loss or decline in revenue from any of our largest customers and our resulting financial condition;

•our ability to compete effectively with existing competitors and new market entrants;

•the costs and success of our sales and marketing efforts, and our ability to promote our brand;

•our reliance on key personnel and our ability to identify, recruit, and retain skilled personnel;

•our ability to effectively manage our growth, including any international expansion;

•our ability to realize the anticipated benefits of past or future investments, strategic transactions, or acquisitions, and risk that the integration of these acquisitions may disrupt our business and management;

•our ability to protect our intellectual property rights and any costs associated therewith;

•the growth rates of the markets in which we compete;

•our expectations regarding the period during which we qualify as an emerging growth company under the Jumpstart Our Business Startups Act of 2012, or the JOBS Act; and

•other risks and uncertainties, including those listed under the caption "Risk Factors."

You should not rely on forward-looking statements as predictions of future events. We have based the forward-looking statements contained in this Quarterly Report on Form 10-Q primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition, and operating results. The outcome of the events described in these forward-looking statements is subject to risks, assumptions, uncertainties, and other factors described elsewhere in this Quarterly Report on Form 10-Q and those listed in the section entitled "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2021. Moreover, we operate in a very competitive and rapidly changing environment. New risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and

uncertainties that could have an impact on the forward-looking statements contained in this Quarterly Report on Form 10-Q. The results, events, and circumstances reflected in the forward-looking statements may not be achieved or occur, and actual results, events, or circumstances could differ materially from those described in the forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based on information available to us as of the date of this Quarterly Report on Form 10-Q. While we believe that information provides a reasonable basis for these statements, that information may be limited or incomplete. Our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely on these statements.

The forward-looking statements made in this Quarterly Report on Form 10-Q relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this Quarterly Report on Form 10-Q to reflect events or circumstances after the date of this Quarterly Report on Form 10-Q or to reflect new information or the occurrence of unanticipated events, except as required by law. We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures, or investments.

Unless the context otherwise indicates, references in this report to the terms "Olo," "the Company," "we," "our," and "us" refer to Olo Inc.

"Olo" and other trade names and trademarks of ours appearing in this Quarterly Report on Form 10-Q are our property. This Quarterly Report on Form 10-Q contains trade names and trademarks of other companies, which are the property of their respective owners. We do not intend our use or display of other companies' trade names or trademarks to imply an endorsement or sponsorship of us by such companies, or any relationship with any of these companies.

Table Of Contents

**PART I - FINANCIAL INFORMATION**

**Item 1.** *Financial Statements.*

**OLO INC.**

**Condensed Consolidated Balance Sheets (Unaudited)**
*(in thousands, except share and per share amounts)*

| | | As of June 30, 2022 | | As of December 31, 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 386,670 | $ | 514,445 |
| Short-term investments | | 73,535 | | - |
| Accounts receivable, net of allowances of $656 and $657, respectively | | 41,649 | | 42,319 |
| Contract assets | | 435 | | 568 |
| Deferred contract costs | | 2,642 | | 2,567 |
| Prepaid expenses and other current assets | | 8,281 | | 5,718 |
| Total current assets | | 513,212 | | 565,617 |
| Property and equipment, net | | 8,992 | | 3,304 |
| Intangible assets, net | | 23,678 | | 19,635 |
| Goodwill | | 207,540 | | 162,956 |
| Contract assets, noncurrent | | 619 | | 387 |
| Deferred contract costs, noncurrent | | 4,003 | | 3,616 |
| Operating lease right-of-use assets | | 17,347 | | - |
| Long-term investments | | 4,476 | | - |
| Other assets, noncurrent | | 395 | | 361 |
| Total assets | $ | 780,262 | $ | 755,876 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 2,098 | $ | 2,184 |
| Accrued expenses and other current liabilities | | 44,689 | | 45,395 |
| Unearned revenue | | 3,231 | | 1,190 |
| Operating lease liabilities, current | | 2,630 | | - |
| Total current liabilities | | 52,648 | | 48,769 |
| Unearned revenue, noncurrent | | 1,618 | | 3,014 |
| Operating lease liabilities, noncurrent | | 17,009 | | - |
| Other liabilities, noncurrent | | 69 | | 2,343 |
| Total liabilities | | 71,344 | | 54,126 |
| Commitments and contingencies (Note 16) | | | | |
| **Stockholders' equity:** | | | | |
| Class A common stock, $0.001 par value; 1,700,000,000 shares authorized at June 30, 2022 and December 31, 2021; 97,645,289 and 78,550,530 shares issued and outstanding at June 30, 2022 and December 31, 2021, respectively. Class B common stock, $0.001 par value; 185,000,000 shares authorized at June 30, 2022 and December 31, 2021; 63,554,232 and 79,149,659 shares issued and outstanding at June 30, 2022 and December 31, 2021, respectively | | 161 | | 158 |
| Preferred stock, $0.001 par value; 20,000,000 shares authorized at June 30, 2022 and December 31, 2021 | | - | | - |
| Additional paid-in capital | | 843,764 | | 813,166 |
| Accumulated deficit | | (134,756) | | (111,574) |
| Accumulated other comprehensive loss | | (251) | | - |
| Total stockholders' equity | | 708,918 | | 701,750 |
| Total liabilities and stockholders' equity | $ | 780,262 | $ | 755,876 |

*The accompanying notes are an integral part of these financial statements.*

Table Of Contents

**OLO INC.**

**Condensed Consolidated Statements of Operations (Unaudited)**
*(in thousands, except share and per share amounts)*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| Revenue: | | | | |
| Platform | $ 44,538 | $ 34,526 | $ 86,004 | $ 69,449 |
| Professional services and other | 1,063 | 1,370 | 2,353 | 2,570 |
| Total revenue | 45,601 | 35,896 | 88,357 | 72,019 |
| Cost of revenue: | | | | |
| Platform | 12,749 | 6,180 | 23,773 | 11,787 |
| Professional services and other | 1,419 | 1,183 | 3,197 | 2,426 |
| Total cost of revenue | 14,168 | 7,363 | 26,970 | 14,213 |
| Gross Profit | 31,433 | 28,533 | 61,387 | 57,806 |
| Operating expenses: | | | | |
| Research and development | 17,233 | 13,931 | 34,058 | 28,387 |
| General and administrative | 17,235 | 13,310 | 35,196 | 31,764 |
| Sales and marketing | 8,897 | 3,701 | 16,967 | 7,537 |
| Total operating expenses | 43,365 | 30,942 | 86,221 | 67,688 |
| Loss from operations | (11,932) | (2,409) | (24,834) | (9,882) |
| Other income (expenses), net: | | | | |
| Interest income | 533 | - | 585 | - |
| Interest expense | (46) | - | (46) | - |
| Other income (expense) | 7 | 10 | 13 | (8) |
| Change in fair value of warrant liability | - | - | - | (18,930) |
| Total other income (expenses), net | 494 | 10 | 552 | (18,938) |
| Loss before income taxes | (11,438) | (2,399) | (24,282) | (28,820) |
| Provision (benefit) for income taxes | 235 | 38 | (1,100) | 74 |
| Net loss | $ (11,673) | $ (2,437) | $ (23,182) | $ (28,894) |
| Accretion of redeemable convertible preferred stock to redemption value | - | - | - | (14) |
| Net loss attributable to Class A and Class B common stockholders | $ (11,673) | $ (2,437) | $ (23,182) | $ (28,908) |
| Net loss per share attributable to Class A and Class B common stockholders: | | | | |
| Basic | $ (0.07) | $ (0.02) | $ (0.15) | $ (0.30) |
| Diluted | $ (0.07) | $ (0.02) | $ (0.15) | $ (0.30) |
| Weighted-average Class A and Class B common shares outstanding: | | | | |
| Basic | 160,429,125 | 147,510,963 | 159,813,053 | 95,690,520 |
| Diluted | 160,429,125 | 147,510,963 | 159,813,053 | 95,690,520 |

*The accompanying notes are an integral part of these financial statements.*

2

Table Of Contents

**OLO INC.**

**Condensed Consolidated Statements of Comprehensive Loss (Unaudited)**
*(in thousands)*

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| Net loss | $ (11,673) | $ (2,437) | $ (23,182) | $ (28,894) |
| Other comprehensive loss: |  |  |  |  |
| Unrealized loss on investments | (251) | - | (251) | - |
| Total other comprehensive loss | (251) | - | (251) | - |
| Comprehensive loss | $ (11,924) | $ (2,437) | $ (23,433) | $ (28,894) |

*The accompanying notes are an integral part of these financial statements.*

3

Table Of Contents

**OLO INC.**

**Condensed Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit) (Unaudited)**
*(in thousands, except share data)*

| | Class A and Class B Common Stock | | Additional Paid In Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance as of December 31, 2021** | 157,700,189 | $ 158 | $ 813,166 | $ (111,574) | $ - | $ 701,750 |
| Issuance of common stock on exercise of stock options | 1,851,334 | 2 | 2,305 | - | - | 2,307 |
| Vesting of restricted stock units | 136,662 | - | - | - | - | - |
| Stock-based compensation | - | - | 12,457 | - | - | 12,457 |
| Net loss | - | - | - | (11,509) | - | (11,509) |
| **Balance as of March 31, 2022** | 159,688,185 | $ 160 | $ 827,928 | $ (123,083) | $ - | $ 705,005 |
| Issuance of common stock under the Employee Stock Purchase Plan | 193,267 | - | 1,764 | - | - | 1,764 |
| Issuance of common stock on exercise of stock options | 1,118,331 | 1 | 2,322 | - | - | 2,323 |
| Vesting of restricted stock units | 199,738 | - | - | - | - | - |
| Stock-based compensation | - | - | 11,750 | - | - | 11,750 |
| Other comprehensive loss | - | - | - | - | (251) | (251) |
| Net loss | - | - | - | (11,673) | - | (11,673) |
| **Balance as of June 30, 2022** | 161,199,521 | $ 161 | $ 843,764 | $ (134,756) | $ (251) | $ 708,918 |

| | Redeemable Convertible Preferred Stock | | Class A and Class B Common Stock | | Additional Paid In Capital | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| **Balance as of December 31, 2020** | 58,962,749 | $ 111,737 | 22,320,286 | $ 22 | $ 16,798 | $ (69,301) | $ (52,481) |
| Initial public offering, net of underwriting discount and deferred offering costs | - | - | 20,700,000 | 21 | 477,805 | - | 477,826 |
| Accretion of redeemable convertible preferred stock to redemption value | - | 14 | - | - | (14) | - | (14) |
| Issuance of preferred stock on exercise of warrants | 1,681,848 | 2 | - | - | 39,056 | - | 39,056 |
| Conversion of redeemable convertible preferred stock to common stock upon initial public offering | (60,644,597) | (111,753) | 100,196,780 | 100 | 111,653 | - | 111,753 |
| Issuance of common stock upon settlement of Share Appreciation Rights | - | - | 1,642,570 | 2 | 2,845 | - | 2,847 |
| Issuance of common stock in connection with charitable donation | - | - | 172,918 | - | 5,125 | - | 5,125 |
| Issuance of common stock on exercise of stock options | - | - | 1,965,824 | 2 | 2,155 | - | 2,157 |
| Stock-based compensation | - | - | - | - | 5,426 | - | 5,426 |
| Net loss | - | - | - | - | - | (26,457) | (26,457) |
| **Balance as of March 31, 2021** | - | $ - | 146,998,378 | $ 147 | $ 660,849 | $ (95,758) | $ 565,238 |
| Reversal of deferred offering costs | - | - | - | - | 1,145 | - | 1,145 |
| Issuance of common stock on exercise of stock options | - | - | 698,453 | 1 | 949 | - | 950 |
| Stock-based compensation | - | - | - | - | 8,198 | - | 8,198 |
| Net loss | - | - | - | - | - | (2,437) | (2,437) |
| **Balance as of June 30, 2021** | - | $ - | 147,696,831 | $ 148 | $ 671,141 | $ (98,195) | $ 573,094 |

*The accompanying notes are an integral part of these financial statements.*

4

Table Of Contents

**OLO INC.**

**Condensed Consolidated Statements of Cash Flows (Unaudited)**
*(in thousands)*

| | Six Months Ended June 30, 2022 | Six Months Ended June 30, 2021 |
|---|---:|---:|
| **Operating activities** | | |
| Net loss | $ (23,182) | $ (28,894) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 2,624 | 527 |
| Stock-based compensation | 23,185 | 13,550 |
| Stock-based compensation in connection with vesting of Stock Appreciation Rights | - | 2,847 |
| Charitable donation of Class A common stock | - | 5,125 |
| Bad debt expense | 276 | 238 |
| Change in fair value of warrants | - | 18,930 |
| Non-cash lease expense | 1,125 | - |
| Deferred income tax benefit | (1,421) | - |
| Impairment of internal-use software | 475 | - |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 911 | 5,701 |
| Contract assets | (99) | (537) |
| Prepaid expenses and other current assets | (2,016) | (4,848) |
| Deferred contract costs | (462) | (330) |
| Accounts payable | (286) | (7,225) |
| Accrued expenses and other current liabilities | (1,103) | 9,726 |
| Operating lease liabilities | (1,248) | - |
| Unearned revenue | 561 | 663 |
| Other liabilities, noncurrent | (36) | (2) |
| Other non-cash loss, net | (174) | - |
| Net cash (used in) provided by operating activities | (870) | 15,471 |
| **Investing activities** | | |
| Purchases of property and equipment | (409) | (271) |
| Capitalized internal-use software | (5,125) | (389) |
| Acquisitions, net of cash acquired | (49,308) | - |
| Purchases of investments | (82,394) | - |
| Sales and maturities of investments | 4,306 | - |
| Net cash used in investing activities | (132,930) | (660) |
| **Financing activities** | | |
| Proceeds from issuance of common stock upon initial public offering, net of underwriting discounts | - | 485,541 |
| Cash received for employee payroll tax withholdings | 3,033 | 18,691 |
| Cash paid for employee payroll tax withholdings | (2,866) | (18,691) |
| Proceeds from exercise of warrants | - | 392 |
| Payment of deferred finance costs | - | (136) |
| Payment of deferred offering costs | (420) | (4,118) |
| Proceeds from exercise of stock options and purchases under employee stock purchase plan | 6,278 | 2,990 |
| Net cash provided by financing activities | 6,025 | 484,669 |
| Net (decrease) increase in cash and cash equivalents | (127,775) | 499,480 |
| Cash and cash equivalents, beginning of period | 514,445 | 75,756 |
| Cash and cash equivalents, end of period | $ 386,670 | $ 575,236 |
| **Supplemental disclosure of non-cash investing and financing activities** | | |
| Accrued offering costs | $ - | $ 339 |
| Vesting of early exercised stock options | $ 116 | $ 116 |
| Accretion of redeemable convertible preferred stock to redemption value | $ - | $ 14 |
| Purchase of property and equipment on account | $ 3 | $ 7 |
| Capitalization of stock-based compensation for internal-use software | $ 1,418 | $ 104 |

*The accompanying notes are an integral part of these financial statements.*

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

**1.**
**Business**

Olo Inc. was formed on June 1, 2005 in Delaware and is headquartered in New York City. On January 14, 2020, our Board of Directors and stockholders approved our name change from Mobo Systems, Inc. to Olo Inc. Unless the context otherwise indicates or requires, references to "we," "us," "our," and "the Company" shall refer to Olo Inc.

We are an open SaaS platform for restaurants powering the industry's digital transformation. Our platform powers restaurant brands' on-demand digital commerce operations, enabling digital ordering, delivery, front-of-house management, and payments, while further strengthening and enhancing restaurants' direct consumer relationships. We provide restaurants with a business-to-business-to-consumer, enterprise-grade, open SaaS platform to manage their complex digital businesses and enable fast and more personalized experiences for their guests. Our platform and application programming interfaces seamlessly integrate with a wide range of solutions, unifying disparate technologies across the restaurant ecosystem. Restaurant brands rely on us to increase their digital omni-channel sales, maximize profitability, establish and maintain direct guest relationships, and collect, protect, and leverage valuable customer data.

*Emerging Growth Company Status*

We currently qualify as an emerging growth company, as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). Under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards issued subsequent to the enactment of the JOBS Act, until such time as those standards apply to private companies.

We have elected to use this extended transition period for complying with new or revised accounting standards that have different effective dates for public and private companies. As a result, our financial statements may not be comparable to financial statements of issuers that are required to comply with the effective dates for new or revised accounting standards based on public company effective dates.

However, as of the last business day of our second fiscal quarter of 2022, the market value of our Class A common stock that was held by non-affiliates exceeded $700 million, and as a result, we will no longer qualify as an emerging growth company as of the end of the current fiscal year ending December 31, 2022, and we will be subject to certain requirements that apply to other public companies but did not previously apply to us due to our status as an emerging growth company, including the provisions of Section 404(b) of the Sarbanes-Oxley Act of 2002, which require that our independent registered public accounting firm provide an attestation report on the effectiveness of our internal control over financial reporting. In addition, we will no longer be able to take advantage of the extended transition period as of the end of the current fiscal year ending December 31, 2022, and we will be required to adopt new or revised accounting standards when they are applicable to public companies that are not emerging growth companies.

*Initial Public Offering*

On March 19, 2021, we completed our IPO in which we issued and sold 20,700,000 shares of our Class A common stock at the public offering price of $25.00 per share. We received net proceeds of approximately $485.5 million after deducting underwriting discounts and commissions. Upon completion of the IPO, $6.6 million of deferred offering costs, which consisted primarily of accounting, legal, and other fees related to our IPO, were reclassified into stockholders' deficit as a reduction of the IPO proceeds.

Prior to the IPO, warrants to purchase 1,682,847 shares of our outstanding redeemable convertible preferred stock warrants were exercised and converted into redeemable convertible preferred stock. Upon completion of the IPO, all shares of our outstanding redeemable convertible preferred stock, inclusive of the shares issued pursuant to these warrant exercises, converted into 100,196,780 shares of Class B common stock. Additionally, upon completion of the IPO, stock appreciation rights ("SARs") granted to employees vested and settled, resulting in the issuance of 1,642,570 shares of Class B common stock.

6

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

**2.**
**Significant Accounting Policies**

*Basis of Presentation*

The accompanying unaudited condensed consolidated financial statements and accompanying notes were prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") for interim financial information and in accordance with the rules and regulations of the United States Securities and Exchange Commission (the "SEC"). Accordingly, certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been omitted pursuant to such rules and regulations. The December 31, 2021 condensed consolidated balance sheet was derived from the audited financial statements as of that date, but may not include all disclosures including certain footnotes required by U.S. GAAP on an annual reporting basis.

These unaudited condensed consolidated financial statements have been prepared on a basis consistent with our annual financial statements and, in the opinion of management, reflect all adjustments, which include all normal recurring adjustments necessary to fairly state our financial position as of June 30, 2022, our results of operations and comprehensive loss for the three and six months ended June 30, 2022 and 2021 and our cash flows for the six months ended June 30, 2022 and 2021, respectively. The results of operations for the three and six months ended June 30, 2022 are not necessarily indicative of the results that may be expected for the fiscal year ending December 31, 2022 or for any other future annual or interim period.

The information included in this Quarterly Report on Form 10-Q should be read in conjunction with the consolidated financial statements and related notes included in our Annual Report on Form 10-K filed with the SEC on February 25, 2022. All intercompany balances and transactions have been eliminated in consolidation.

Certain prior period amounts have been reclassified to conform to the current period presentation.

*Use of Estimates*

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period.

We regularly assess these estimates, including but not limited to, stock-based compensation including the determination of the fair value of our stock-based awards, realization of deferred tax assets, estimated life of our long-lived assets, purchase price allocations for business combinations, valuation of the acquired intangibles purchased in a business combination, valuation of goodwill, estimated standalone selling price of our performance obligations, and estimated consideration for implementation services and transactional revenue in certain arrangements. We base these estimates on historical experience and on various other market-specific and relevant assumptions that we believe to be reasonable under the circumstances. Actual results could differ from these estimates and such differences could be material to our financial position and results of operations.

*Significant Accounting Policies*

Our significant accounting policies are outlined in Note 2, *"Significant Accounting Policies"* in the Notes to Consolidated Financial Statements included in Part II, Item 8 of our Annual Report on Form 10-K for the year ended December 31, 2021. During the six months ended June 30, 2022, there were no material changes to our critical accounting policies from those described in our Annual Report on Form 10-K for the year ended December 31, 2021, except as described below.

*Concentrations of Business and Credit Risk*

We are exposed to concentrations of credit risk primarily through our cash and short- and long-term investments held by financial institutions. We primarily deposit our cash with two financial institutions and the amount on deposit exceeds federally insured limits. We reduce our credit risk by placing our cash and investments with major financial institutions with high credit ratings. As of June 30, 2022 and December 31, 2021, no customer had a balance over 10% of our accounts receivable. For the three months ended June 30, 2022 and 2021, one customer accounted for 12% and 16% of our revenue,

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

respectively. For the six months ended June 30, 2022 and 2021, one customer accounted for 13% and 20% of our revenue, respectively.

*Investments*

Management determines the appropriate classification of investments at the time of purchase based upon management's intent with regard to such investments. Our investments are classified as available-for-sale at the time of purchase, and we reevaluate such classification as of each balance sheet date. We consider all highly liquid investments with an original maturity of 90 days or less when purchased to be cash equivalents. Investments with remaining contractual maturities of one year or less from the balance sheet date, which are not considered cash equivalents, are classified as short-term investments, and those with remaining contractual maturities greater than one year from the balance sheet date are classified as long-term investments. All investments are recorded at their estimated fair value, and any unrealized gains and losses are recorded in accumulated other comprehensive loss. Realized gains and losses on sales and maturities of investments are determined based on the specific identification method and are recognized in the condensed consolidated statements of operations in interest income.

We perform periodic evaluations to determine whether any declines in the fair value of investments below cost are other-than-temporary. The evaluation consists of qualitative and quantitative factors regarding the severity and duration of the unrealized loss, as well as our ability and intent to hold the investments until a forecasted recovery occurs. The impairments are considered to be other-than-temporary if they are related to deterioration in credit risk or if it is likely that the underlying securities will be sold prior to a full recovery of their cost basis. Other-than-temporary fair value impairments, if any, are determined based on the specific identification method and are reported in interest income in the condensed consolidated statements of operations.

*Accounts Receivable, Net*

Accounts receivable, net are stated at net realizable value and include unbilled receivables. Unbilled receivables arise primarily from transactional services provided in advance of billing. Accounts receivable are net of an allowance for credit losses, are not collateralized, and do not bear interest. Payment terms vary by contract type but are generally due within 30 days. The accounts receivable balance at June 30, 2022 and December 31, 2021 included unbilled receivables of $
0.4 million and $4.1 million, respectively.

We assess the collectability of outstanding accounts receivable on an ongoing basis and maintain an allowance for credit losses for accounts receivable deemed uncollectible. Upon adoption of Accounting Standards Update ("ASU") 2016-13, *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments,* we analyzed our accounts receivable portfolio for significant risks, historical activity, and an estimate of future collectability to determine the amount that will ultimately be collected. This estimate is analyzed annually and adjusted as necessary or upon certain triggering events. Identified risks pertaining to our accounts receivable include the delinquency level, customer type, and current economic environment. Due to the short-term nature of such receivables, the estimate of the amount of accounts receivable that may not be collected is based on aging of the accounts receivable balances and the financial condition of customers.

The following summarizes our allowance for doubtful accounts activity (in thousands):

|  | Six Months Ended June 30, | | | |
|  | 2022 | | 2021 | |
| --- | --- | --- | --- | --- |
| Beginning balance | $ | 657 | $ | 631 |
| Provision for expected credit losses | | 276 | | 238 |
| Writeoffs | | (277) | | (212) |
| Ending balance | $ | 656 | $ | 657 |

*Business Combinations*

We account for acquisitions using the acquisition method of accounting and determine whether a transaction constitutes a business and is treated as a business combination or if the transaction does not constitute a business and is treated as an asset acquisition. The acquisition method of accounting requires, among other things, allocation of the fair value of purchase consideration to the tangible and intangible assets acquired and liabilities assumed at their estimated fair values on the

8

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

acquisition date. The results of businesses acquired in a business combination are included in our condensed consolidated financial statements from the date of acquisition.

Determining the fair value of assets acquired and liabilities assumed requires management to use significant judgment and estimates, including estimates of future revenue and adjusted earnings before interest and taxes and discount rates. Our estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ materially from estimates. Our estimates associated with the accounting for business combinations may change as additional information becomes available regarding the assets acquired and liabilities assumed. Any change in facts and circumstances that existed as of the acquisition date and impacts our estimates is recorded to goodwill if identified within the measurement period. Subsequent to the measurement period or our final determination of fair value of assets and liabilities, whichever is earlier, the adjustments will affect our earnings.

Transaction related expenses incurred in a business combination are not included as a component of consideration transferred, but are accounted for as an expense in the period in which the costs are incurred.

***Goodwill and Intangible Assets***

Goodwill represents the excess of the aggregate of the consideration transferred and the amount recognized for non-controlling interest, if any, over the fair value of identifiable assets acquired and liabilities assumed in a business combination. We have no intangible assets, other than goodwill, with indefinite useful lives.

Intangible assets other than goodwill are comprised of acquired developed technology, customer relationships, and trademarks. At initial recognition, intangible assets acquired in a business combination or asset acquisition are recognized at their fair value as of the date of acquisition. Following initial recognition, intangible assets are carried at acquisition date fair value less accumulated amortization and impairment losses, if any, and are amortized on a straight-line basis over the estimated useful life of the asset.

We review goodwill for impairment annually on October 1st (beginning day of the fourth quarter) of each fiscal year or whenever events or changes in circumstances indicate that an impairment may exist. In the first six months of 2022, there were no events or changes in circumstances that would have required an interim impairment test. In conducting our annual impairment test, we review qualitative factors to determine whether it is more likely than not that the fair value of the reporting unit is less than its carrying amount. If factors indicate that the fair value of the reporting unit is less than its carrying amount, we perform a quantitative assessment and the fair value of the reporting unit is determined by analyzing the expected present value of future cash flows. If the carrying value of the reporting unit continues to exceed its fair value, the fair value of the reporting unit's goodwill is calculated and an impairment loss equal to the excess is recorded.

We assess the impairment of intangible assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.

***Leases***

*Prior to the adoption of Accounting Standards Codification ("ASC") 842,* Leases*, on January 1, 2022*

We categorized leases at their inception as either operating or capital. In the ordinary course of business, we enter into non-cancelable operating leases for office space. We recognized lease costs on a straight-line basis and treated lease incentives as a reduction of rent expense over the term of the agreement. The difference between cash rent payments and rent expense was recorded as a deferred rent liability, with the amount expected to be amortized within the next twelve months classified as a current liability. We subleased a portion of our office space and recognize rental income on a straight-line basis as an offset to rent expense within general and administrative costs. The difference between cash rent payments received and rental income was recorded within prepaid expenses and other current assets.

*Subsequent to the adoption of ASC 842 on January 1, 2022*

We determine if an arrangement is a lease or contains a lease at inception. Our lease agreements are generally for office facilities, and the determination of whether such agreements contain leases generally does not require significant estimates or judgments. Our leases may also contain non-lease components such as payments of maintenance, utilities, and

9

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

taxes, which we have elected to account for separately, as these amounts are readily determinable. At the commencement date of a lease, we recognize a liability to make lease payments and an asset representing the right to use the underlying asset during the lease term. The lease liability is measured at the present value of the minimum rental payments discounted using our incremental borrowing rate ("IBR") over the lease term (or, if readily determinable, the rate implicit in the lease). The right-of-use ("ROU") asset is measured at cost, which includes the initial measurement of the lease liability and initial direct costs incurred and excludes lease incentives. We subleased a portion of our office space and recognize rental income on a straight-line basis as an offset to other leases costs, net within general and administrative expenses.

The lease term used to measure ROU lease assets and lease liabilities may include renewal options which are deemed reasonably certain to be exercised. Operating lease costs are recognized on a straight-line basis over the lease term. Variable lease payments are expensed as incurred. Our leases do not contain any material residual value guarantees or material restrictive covenants.

*Recently Adopted Accounting Pronouncements*

In February 2016, the Financial Accounting Standards Board ("FASB") issued ASU 2016-02, *Leases (Topic 842)* ("ASC 842")*,* which requires lessees to recognize the following for all leases (with the exception of short-term leases) at the commencement date: (i) a lease liability, which is a lessee's obligation to make lease payments arising from a lease, measured on a discounted basis; and (ii) a right-of-use asset, which is an asset that represents the lessee's right to use, or control the use of, a specified asset for the lease term. Additional disclosures are required to allow financial statement users to assess the amount, timing, and uncertainty of cash flows arising from leasing activities. A modified retrospective transition approach is required for leases existing at the time of adoption.

We adopted and began applying the standard on January 1, 2022 using the modified retrospective approach and applied it to all existing leases as of the adoption date. We will continue to present prior period amounts under ASC 840, *Leases*. In addition, we elected the package of practical expedients permitted under the transition guidance within the new standard which does not require us to reassess whether contracts that existed or expired prior to the adoption date contained an embedded lease, reassess historical lease classification, or evaluate initial direct costs for leases that were in effect at the adoption date. We did not elect the hindsight practical expedient related to determining the lease term.

As a result of implementing this guidance, we recognized $20.6 million in operating lease right-of-use assets as of January 1, 2022, and derecognized $2.4 million of previously recognized deferred rent. We also recorded $2.5 million in current operating lease liabilities and $18.1 million in operating lease liabilities, net of current portion in our condensed consolidated balance sheet as of January 1, 2022. The adoption of ASC 842 did not result in a cumulative-effect adjustment on retained earnings. See "Note 11-Leases" for additional details.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which requires an entity to utilize the current expected credit loss ("CECL") model to estimate its lifetime "expected credit loss" and record an allowance that, when deducted from the amortized cost basis of the financial asset, presents the net amount expected to be collected on the financial asset. The CECL model results in more timely recognition of credit losses. This guidance also requires new disclosures for financial assets measured at amortized cost, loans, and available-for-sale debt securities. We adopted this standard as of January 1, 2022. The adoption did not have a material impact on our condensed consolidated financial statements.

In October 2021, the FASB issued ASU No. 2021-08, *Business Combinations (Topic 805)-Accounting for Contract Assets and Contract Liabilities from Contracts with Customers*, which requires an acquirer to recognize and measure contract assets and contract liabilities in accordance with ASC Topic 606. Under prior guidance, an acquirer generally recognized assets acquired and liabilities assumed in a business combination, including contract assets and contract liabilities arising from revenue contracts with customers, at fair value on the acquisition date. ASU No. 2021-08 results in the acquirer recording acquired contract assets and liabilities on the same basis that would have been recorded by the acquiree before the acquisition under ASC Topic 606, *Revenue from Contracts with Customers*. ASU No. 2021-08 is effective for fiscal years beginning after December 15, 2022, with early adoption permitted. We early adopted ASU No 2021-08 as of January 1, 2022 on a prospective basis and the adoption impact of the new standard was not material to our condensed consolidated financial statements. The standard did not impact our contract assets or liabilities prior to the adoption date.

10

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

**3.**
**Revenue Recognition**

The following table disaggregates revenue by type (in thousands):

| | | Three Months Ended June 30, 2022 | | |
| | | Platform | Professional Services and Other | Total |
|---|---|---|---|---|
| Timing of revenue recognition | | | | |
| Transferred over time | $ | 22,990 | $ 1,063 | $ 24,053 |
| Transferred at a point in time | | 21,548 | - | 21,548 |
| Total revenue | $ | 44,538 | $ 1,063 | $ 45,601 |

| | | Three Months Ended June 30, 2021 | | |
| | | Platform | Professional Services and Other | Total |
|---|---|---|---|---|
| Timing of revenue recognition | | | | |
| Transferred over time | $ | 16,313 | $ 1,370 | $ 17,683 |
| Transferred at a point in time | | 18,213 | - | 18,213 |
| Total revenue | $ | 34,526 | $ 1,370 | $ 35,896 |

| | | Six Months Ended June 30, 2022 | | |
| | | Platform | Professional Services and Other | Total |
|---|---|---|---|---|
| Timing of revenue recognition | | | | |
| Transferred over time | $ | 43,791 | $ 2,353 | $ 46,144 |
| Transferred at a point in time | | 42,213 | - | 42,213 |
| Total revenue | $ | 86,004 | $ 2,353 | $ 88,357 |

| | | Six Months Ended June 30, 2021 | | |
| | | Platform | Professional Services and Other | Total |
|---|---|---|---|---|
| Timing of revenue recognition | | | | |
| Transferred over time | $ | 30,856 | $ 2,570 | $ 33,426 |
| Transferred at a point in time | | 38,593 | - | 38,593 |
| Total revenue | $ | 69,449 | $ 2,570 | $ 72,019 |

***Contract Balances***

*Contract Assets*

Professional services revenue is generally recognized ratably over the implementation period, beginning on the commencement date of each contract. Platform revenue is recognized as the services are delivered. Under ASC Topic 606, *Revenue from Contracts with Customers*, we record a contract asset when revenue recognized on a contract exceeds the billings. Our standard billing terms are monthly; however, the billings may not be consistent with the pattern of recognition, based on when services are performed. Contract assets were $
1.1 million and $1.0 million as of June 30, 2022 and December 31, 2021, respectively.

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

*Unearned Revenue*

Unearned revenue primarily consists of billings or payments received in advance of revenue recognition from subscription services and is recognized as revenue when transfer of control to customers has occurred. During the six months ended June 30, 2022, we recognized $0.8 million of revenue related to contracts that were included in unearned revenue at December 31, 2021. During the six months ended June 30, 2021, we recognized $0.4 million of revenue related to contracts that were included in unearned revenue at December 31, 2020.

As of June 30, 2022, our remaining performance obligations were approximately $41.7 million, approximately 43% of which we expect to recognize as revenue over the next twelve months, and substantially all of the remaining revenue will be recognized thereafter over the next 24 to 48 months. These amounts only include contracts subject to a guaranteed fixed amount or the guaranteed minimum under variable contracts. Unrecognized revenues under contracts disclosed above do not include: (1) contracts with an original expected term of one year or less; (2) contracts for which variable consideration is determined based on the customer's subsequent sale or usage; and (3) agreements for which our right to invoice corresponds with the value provided to the customer.

*Deferred Contract Costs*

The following table summarizes the activity of current and non-current deferred contract costs (in thousands):

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Beginning balance | $ 6,183 | $ 5,176 |
| Capitalization of deferred contract costs | 2,099 | 1,644 |
| Amortization of deferred contract costs | (1,637) | (1,314) |
| Ending balance | $ 6,645 | $ 5,506 |

**4.**
**Fair Value Measurement**

Fair value is the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. We apply the following fair value hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the lowest level of input that is available and significant to the fair value measurement:

Level 1 inputs: Based on unadjusted quoted prices in active markets for identical assets or liabilities.

Level 2 inputs: Based on observable inputs other than Level 1 prices such as quoted prices for similar assets or liabilities; quoted prices in markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which all significant inputs are observable or can be derived principally from or corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3 inputs: Based on unobservable inputs to the valuation methodology that are significant to the measurement of fair value of assets or liabilities, and typically reflect management's estimates of assumptions that market participants would use in pricing the asset or liability.

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

The following tables present the costs, net unrealized losses, and fair value by major security type for our investments as of June 30, 2022 and December 31, 2021 (in thousands):

| | Cost | | Net Unrealized Losses | | Fair Value | | Cash and cash equivalents | | Short-term investments | | Long-term investments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **As of June 30, 2022** | | | | | | | | | | | |
| Cash | $ | 236,312 | $ | - | $ | 236,312 | $ | 236,312 | $ | - | $ | - |
| Level 1: | | | | | | | | | | | |
| Money market funds | $ | 140,301 | $ | - | $ | 140,301 | $ | 140,301 | $ | - | $ | - |
| Commercial paper | | 18,214 | | (51) | | 18,163 | | 2,296 | | 15,867 | | - |
| Subtotal | $ | 158,515 | $ | (51) | $ | 158,464 | $ | 142,597 | $ | 15,867 | $ | - |
| Level 2: | | | | | | | | | | | |
| Certificates of deposit | $ | 32,326 | $ | (69) | $ | 32,257 | $ | 7,761 | $ | 24,496 | $ | - |
| U.S. Government and agency securities | | 15,361 | | (48) | | 15,313 | | - | | 15,313 | | - |
| Corporate bonds | | 22,418 | | (83) | | 22,335 | | - | | 17,859 | | 4,476 |
| Subtotal | $ | 70,105 | $ | (200) | $ | 69,905 | $ | 7,761 | $ | 57,668 | $ | 4,476 |
| Level 3: | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Total | $ | 464,932 | $ | (251) | $ | 464,681 | $ | 386,670 | $ | 73,535 | $ | 4,476 |

| | Cost | | Net Unrealized Losses | | Fair Value | | Cash and cash equivalents | | Short-term investments | | Long-term investments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **As of December 31, 2021** | | | | | | | | | | | |
| Cash | $ | 219,344 | $ | - | $ | 219,344 | $ | 219,344 | $ | - | $ | - |
| Level 1: | | | | | | | | | | | |
| Money market funds | | 295,101 | | - | | 295,101 | | 295,101 | | - | | - |
| Total | $ | 514,445 | $ | - | $ | 514,445 | $ | 514,445 | $ | - | $ | - |

Our assets measured at fair value on a nonrecurring basis include long-lived assets and finite-lived intangibles, which are considered to be Level 3 inputs. During the six months ended June 30, 2022, we determined that the estimated fair value of a portion of our internal-use software was non-recoverable, and we recorded a non-cash impairment charge of $0.5 million, as more fully described in "Note 5-Property and Equipment."

Accounts receivable, accounts payable and accrued expenses are stated at their carrying value, which approximates fair value due to the short time to the expected receipt or payment date.

**5.**
**Property and Equipment**

Property and equipment consisted of the following (in thousands):

| | Estimated Useful Life (in Years) | | As of June 30, 2022 | | As of December 31, 2021 |
|---|---|---|---|---|---|
| Computer and office equipment | 3 - 5 | $ | 2,197 | $ | 1,800 |
| Capitalized internal-use software | 3 | | 9,460 | | 3,392 |
| Furniture and fixtures | 10 | | 413 | | 386 |
| Leasehold improvements | Shorter of estimated useful life or remaining term of lease | | 386 | | 374 |
| Total property and equipment | | | 12,456 | | 5,952 |
| Less: accumulated depreciation and amortization of internal-use software | | | (3,464) | | (2,648) |
| Total property and equipment, net | | $ | 8,992 | $ | 3,304 |

13

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

Depreciation and amortization expense from property and equipment was approximately $0.5 million and $0.3 million for the three months ended June 30, 2022 and 2021, respectively. Depreciation and amortization expense from property and equipment was approximately $0.8 million and $0.5 million for the six months ended June 30, 2022 and 2021, respectively.

For the six months ended June 30, 2022, we recorded a non-cash impairment charge of $0.5 million related to a portion of our internal-use software that was abandoned. This amount was recorded in research and development expenses within the condensed consolidated statement of operations and comprehensive loss.

**6.
Acquisitions**

***Omnivore Acquisition***

On February 20, 2022, we signed a definitive agreement to acquire Omnivore Technologies, Inc., ("Omnivore") a restaurant technology provider that connects restaurants' Point of Sale systems with technologies that improve efficiency and increase profitability. We closed the acquisition on March 4, 2022 for total consideration of approximately $49.4 million in cash, net of cash acquired. During the three months ended June 30, 2022, we determined that we are owed an amount of $0.1 million as a result of updating the working capital acquired, which related to additional accrued expenses identified as of the acquisition date.

The operating results of Omnivore have been included in our consolidated statement of operations and comprehensive loss since the acquisition date. Actual results of operations from the date of acquisition through June 30, 2022 and supplemental pro forma revenue and results of operations have not been presented because the effects were not material to the consolidated financial statements.

14

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

*Purchase Price Allocation*

The acquisition was accounted for under the acquisition method in accordance with ASC 805, *Business Combinations*. We recognized and measured the identifiable assets acquired and liabilities assumed at their estimated fair values on the date of acquisition. The following table summarizes the preliminary allocation of the purchase price to the fair value of the assets acquired and liabilities assumed of Omnivore as of March 4, 2022 (in thousands):

| | Initial Fair Value Estimate |
|---|---|
| Accounts receivable | $ 518 |
| Other current assets | 148 |
| Operating lease right-of-use asset | 236 |
| Property and equipment | 24 |
| Other assets, noncurrent | 9 |
| Customer relationships | 1,290 |
| Developed technology | 4,410 |
| Trademark | 150 |
| Goodwill | 44,678 |
| Accounts payable | (198) |
| Accrued expenses and other current liabilities | (101) |
| Unearned revenue | (83) |
| Operating lease liability, current | (81) |
| Operating lease liability, noncurrent | (177) |
| Deferred tax liability, net | (1,421) |
| Total purchase price, net of cash acquired | $ 49,402 |

Customer relationships were measured at fair value using the multiple-period excess earnings method under the income approach. Significant inputs used to measure the fair value include an estimate of projected revenue and costs associated with existing customers, and a discount rate of 11.0%.

Developed technology was measured at fair value using the relief-from-royalty method of the income approach. Significant inputs used to measure the fair value include an estimate of projected revenue from existing technology, a pre-tax royalty rate of 20.0% and a discount rate of 11.0%.

Trademark was measured at fair value using the relief-from-royalty method under the income approach. Significant inputs used to measure the fair value include an estimate of projected revenue from the trademark, a pre-tax royalty rate of 1.0% and a discount rate of 11.0%.

The preliminary purchase price allocation resulted in the recognition of $44.7 million of goodwill. Goodwill represents the future economic benefits expected to arise from other intangible assets acquired that do not qualify for separate recognition, including an experienced workforce that will help accelerate product development and go to market strategy, as well as expected future synergies generated by integrating Omnivore's products with those in our existing platform. Accordingly, Omnivore will be reported along with our historical solutions under the same operating segment. None of the goodwill is expected to be deductible for tax purposes.

We recorded $1.2 million in transaction related expenses, primarily related to transaction related compensation, advisory, legal, valuation, and other professional fees, for the six months ended June 30, 2022. The transaction related expenses are recorded within the consolidated statements of operations and comprehensive (loss) income as follows (in thousands):

| Operating expenses: | |
|---|---|
| Sales and marketing | $ 79 |
| General and administrative | 1,117 |
| Total transaction costs | $ 1,196 |

15

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

We expect to finalize the purchase price allocation after management has further analyzed and assessed a number of the factors used in establishing the fair values of assets acquired and liabilities assumed as of the acquisition date, including, but not limited to, the working capital acquired.

*Wisely Acquisition*

On October 21, 2021, we signed a definitive agreement to acquire all of the outstanding shares of Wisely Inc. ("Wisely"), a customer intelligence and engagement platform for restaurants. We believe Wisely's Guest Engagement and Front-of-House solutions complement our existing solution suite and enhance our value to our customers. We closed the acquisition on November 4, 2021 for total consideration of approximately $177.8 million, consisting of $75.2 million in cash (net of cash acquired), $96.6 million of Class A common stock, and $5.9 million of substituted stock options granted in connection with the acquisition. The fair values of the Class A common stock and substituted stock options were based on a price per Class A common share of $27.93, which is equal to the closing price of our Class A common stock on the date of the transaction. As a result of the equity consideration component, we issued approximately 3.5 million shares of our Class A common stock and granted approximately 0.2 million fully vested stock options at the acquisition date. The fair value of the substituted options granted was based upon the estimated value of vested stock options held by Wisely employees immediately prior to the acquisition.

We recorded $0.3 million in transaction related expenses, primarily related to legal and insurance fees, for the six months ended June 30, 2022 in general and administrative expenses within the condensed consolidated statement of operations and comprehensive loss.

During the six months ended June 30, 2022, we decreased goodwill by $0.1 million as a result of finalizing our working capital acquired. We expect to finalize the purchase price allocation after management has further analyzed and assessed a number of the factors used in establishing the fair values of assets acquired and liabilities assumed as of the acquisition date.

**7.**
**Goodwill and Intangible Assets**

The following table summarizes the changes in the carrying amount of goodwill (in thousands):

| | | |
|---|---|---|
| Balance at December 31, 2021 | $ | 162,956 |
| Adjustment to Wisely acquisition | | (94) |
| Acquisition of Omnivore | | 44,678 |
| Balance at June 30, 2022 | $ | 207,540 |

The gross book value and accumulated amortization of intangible assets, net, as of June 30, 2022 were as follows (in thousands):

| | Weighted-average Remaining Useful Life (in years) | Gross Carrying Value | | Accumulated Amortization | | Net Carrying Value |
|---|---|---|---|---|---|---|
| Developed technology | 5.4 | $ | 14,595 | $ | (1,377) | $ 13,218 |
| Customer relationships | 7.4 | | 10,921 | | (856) | 10,065 |
| Trademark | 2.4 | | 486 | | (91) | 395 |
| Balance at June 30, 2022 | | $ | 26,002 | $ | (2,324) | $ 23,678 |

16

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

Amortization expense associated with intangible assets was $
1.0 million and $1.8 million for the three and six months ended June 30, 2022, respectively. As of June 30, 2022, estimated amortization related to the identifiable acquisition-related intangible assets expected to be recognized in future periods was as follows (in thousands):

| | | |
|---|---|---:|
| 2022 (remaining) | $ | 1,940 |
| 2023 | | 3,967 |
| 2024 | | 3,949 |
| 2025 | | 3,813 |
| 2026 | | 3,804 |
| Thereafter | | 6,205 |
| Total | $ | 23,678 |

No goodwill or intangible asset impairment losses were recognized during the six months ended June 30, 2022. See "Note 6-Acquisitions" for additional information on the acquisitions of Omnivore and Wisely.

**8.**
**Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets consist of the following (in thousands):

| | As of June 30, 2022 | | As of December 31, 2021 |
|---|---:|---|---:|
| Prepaid software licensing fees | $ 2,720 | $ | 1,888 |
| Prepaid insurance | 1,931 | | 1,298 |
| Other | 3,630 | | 2,532 |
| Total prepaid expenses and other current assets | $ 8,281 | $ | 5,718 |

**9.**
**Accrued Expenses and Other Liabilities**

Accrued expenses and other current liabilities consisted of the following (in thousands):

| | As of June 30, 2022 | | As of December 31, 2021 |
|---|---:|---|---:|
| Accrued delivery service partner fees | $ 33,896 | $ | 35,441 |
| Accrued compensation and benefits | 6,085 | | 4,189 |
| Professional and consulting fees | 976 | | 1,806 |
| Accrued taxes | 1,176 | | 1,538 |
| Other | 2,556 | | 2,421 |
| Total accrued expenses and other current liabilities | $ 44,689 | $ | 45,395 |

**10.**
**Line of Credit**

On June 10, 2022, we entered into the Second Amended and Restated Loan and Security Agreement with Pacific Western Bank related to a revolving credit and term loan facility (the "Second Amended and Restated LSA").

The Second Amended and Restated LSA amended and restated the Amended and Restated Loan and Security Agreement, dated February 11, 2020, as amended (the "Prior LSA") to, among other things, increase our available aggregate borrowing limit to $70.0 million and to provide the ability to request Pacific Western Bank to enter into commitments to increase the credit extensions available to us under the Second Amended and Restated LSA to up to $125.0 million (the "Accordion Facility").

Borrowings under the Second Amended and Restated LSA accrue interest at a variable annual rate equal to (i) in the case of Formula Advances (as defined in the Second Amended and Restated LSA), the greater of the variable rate of interest,

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

per annum, most recently announced by Pacific Western Bank (the "Prime Rate") or 3.25% or (ii) in the case of Term Loans (as defined in the Second Amended and Restated LSA), the greater of the Prime Rate plus 0.25% or 3.50%. The Second Amended and Restated LSA provides for a success fee payable upon an acquisition of Olo or termination of the Second Amended and Restated LSA (a "Success Fee Trigger"), in an amount equal to: (i) $800,000, if the Success Fee Trigger occurs prior to June 10, 2023; (ii) $600,000, if the Success Fee Trigger occurs on or after June 10, 2023 and prior to June 10, 2024; (iii) $400,000, if the Success Fee Trigger occurs on or after June 10, 2024 and prior to June 10, 2025; (iv) $200,000, if the Success Fee Trigger occurs on or after June 10, 2025 and prior to June 10, 2026; and (v) $0, if the Success Fee Trigger occurs on or after June 10, 2026. We also required to pay a fee of 1.0% of the difference between (i) the highest outstanding principal balance during the term of the Second Amended and Restated LSA and (ii) $3.5 million if a Liquidity Event (as defined in the Second Amended and Restated LSA) occurs during the term and or within 24 months after the termination of the Second Amended and Restated LSA. Our obligations under the Second Amended and Restated LSA are secured by substantially all of our assets, including certain securities owned by us in any subsidiary.

The Second Amended and Restated LSA includes a financial covenant requiring compliance with certain minimum revenue amounts. In addition, the Second Amended and Restated LSA contains representations and warranties generally consistent with the Prior LSA, as well as certain non-financial covenants, including, but not limited to, limitations on our ability to incur additional indebtedness or liens, pay dividends, or make certain investments. We were in compliance with these covenants as of June 30, 2022.

The Second Amended and Restated LSA also contains events of default that include, among other things, non-payment defaults, covenant defaults, insolvency defaults, cross-defaults to other indebtedness and material obligations, judgment defaults, inaccuracy of representations and warranties, and a material adverse change. Any default that is not cured or waived could result in Pacific Western Bank exercising its rights and remedies under the Second Amended and Restated LSA, including, but not limited to, the acceleration of the obligations under the Second Amended and Restated LSA and related documentation, and would permit Pacific Western Bank to exercise remedies with respect to all of the collateral that secured such obligations.

Pacific Western Bank has the right to terminate its obligation to make further advances to us immediately and without notice upon the occurrence and during the continuance of an event of default. Upon our request, Pacific Western Bank will provide us a payoff letter providing for, among other things, repayment of our obligations then outstanding, including the success fee, and for termination of Pacific Western Bank's obligations to make additional credit extensions and termination of the liens under the Second Amended and Restated LSA.

As of June 30, 2022, we had $43.6 million of commitments available under the Second Amended and Restated LSA, after consideration of $25.0 million in our letter of credit to DoorDash and $
1.4 million in our letter of credit on the lease of our headquarters. As of June 30, 2022, we had no outstanding borrowings under the line of credit, and no amounts have been drawn against any of our letters of credit.

Interest expense related to the Second Amended and Restated LSA was immaterial for the six months ended June 30, 2022. No interest expense was recognized related to the Prior LSA for the six months ended June 30, 2021. Deferred financing costs related to the Second Amended and Restated LSA were capitalized and are included within other current and non-current assets as of June 30, 2022.

**11.**
**Leases**

We have non-cancelable operating leases for our headquarters in New York City ("Headquarters Lease") that expires in May 2030 and for our former office that expires in September 2023. We sublease a portion of our former office space, which we ceased using in connection with the signing of the Headquarters Lease. The sublease expires in March 2023. As a result of the acquisition of Omnivore, we have a non-cancelable operating lease in Clearwater, Florida that expires in January 2025. Our lease terms include periods under options to extend or terminate the leases. Currently, there are no operating leases where we believe it is reasonably certain that we will exercise any option to extend the initial term.

As disclosed in "Note 2-Significant Accounting Policies," we adopted ASC 842 on January 1, 2022. We have elected the "package of practical expedients," which permits us not to reassess under ASC 842 our prior conclusions on expired or existing leases about lease identification, lease classification, and initial direct costs. Payments of maintenance, utilities, and taxes are expensed as incurred and excluded from ROU assets and lease liabilities, and were immaterial for the three and six

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

months ended June 30, 2022. Furthermore, we elected to not capitalize leases with a term of 12 months or less and recognize the lease expense for such leases on a straight-line basis over the lease term.

The IBR is the rate of interest that we would have to pay to borrow on a collateralized basis over a similar term and amount equal to the lease payments in a similar economic environment. We determined our IBR by obtaining interest rates from various external financing sources and made certain adjustments to reflect the terms of the lease and type of the asset leased.

The elements of lease expense were as follows (in thousands):

| | Three Months Ended June 30, 2022 | | Six Months Ended June 30, 2022 | |
|---|---|---|---|---|
| Operating lease costs | $ | 842 | $ | 1,670 |
| Other lease income | | (87) | | (174) |
| Total lease costs | $ | 755 | $ | 1,496 |

Rent expense, excluding sublease income, under ASC 840, *Leases*, was $ 0.8 million and $1.6 million for the three and six months ended June 30, 2021, respectively. Rental income was $0.1 million and $0.2 million for the three and six months ended June 30, 2021, respectively.

Cash paid for amounts included in the initial measurement of lease liabilities were $1.8 million for the six months ended June 30, 2022.

As of June 30, 2022, the total remaining operating lease payments included in the measurement of lease liabilities were as follows (in thousands):

| | | |
|---|---|---|
| 2022 (remaining) | $ | 1,813 |
| 2023 | | 3,444 |
| 2024 | | 2,877 |
| 2025 | | 2,893 |
| 2026 | | 2,960 |
| Thereafter | | 10,114 |
| Total future minimum lease payments | | 24,101 |
| Less: imputed interest | | (4,462) |
| Total | $ | 19,639 |

The weighted average remaining lease term and discount rate for the operating leases were as follows:

| | As of June 30, 2022 |
|---|---|
| Weighted average remaining lease term (years) | 7.54 |
| Weighted average discount rate | 5.38% |

19

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

As of December 31, 2021, our future minimum payments under non-cancelable leases for operating facilities as determined prior to the adoption of ASC 842 were as follows (in thousands):

| | | |
|---|---|---|
| 2022 | $ | 3,559 |
| 2023 | | 3,352 |
| 2024 | | 2,780 |
| 2025 | | 2,885 |
| 2026 | | 2,960 |
| Thereafter | | 10,113 |
| Total | $ | 25,649 |

**12.**
**Stockholders' Equity**

*Changes in Capital Structure*

On March 5, 2021, our Board of Directors and stockholders approved an amended and restated certificate of incorporation effecting a 17-for-1 forward stock split of our issued and outstanding shares of common stock and Series A, A-1, B, C, D, E preferred stock. Additionally, all outstanding equity instruments, including our time-based stock options, performance-based SARs, and preferred stock warrants, were adjusted to reflect the 17-for-1 forward stock split. The stock split was effected on March 5, 2021. The par value of the Class B common stock and redeemable convertible preferred stock was not adjusted as a result of the stock split. All issued and outstanding Class B common stock, redeemable convertible preferred stock, warrants to purchase shares of redeemable convertible preferred stock, and stock options, as well as the per share amounts, included in the accompanying financial statements have been adjusted to reflect this stock split for all periods presented.

On March 5, 2021, our Board of Directors and stockholders approved and we implemented a dual class common stock structure where all existing shares of common stock converted to Class B common stock and we authorized a new class of common stock, Class A common stock. The authorized share capital for Class A common stock is 1,700,000,000 and the authorized share capital for Class B common stock is 185,000,000. The Class A common stock is entitled to one vote per share and the Class B common stock is entitled to ten votes per share. The Class A and Class B common stock have the same rights and privileges and rank equally, share ratably, and are identical in all respects and for all matters except for voting, conversion, and transfer rights. The Class B common stock converts to Class A common stock at any time at the option of the holder. References in the accompanying financial statements have been adjusted to reflect the dual class common stock structure and the changes in the number of authorized shares of common stock. We also authorized a total of 20,000,000 shares of undesignated preferred stock, par value $0.001 per share. Effective March 5, 2021, 124,012,926 outstanding shares of common stock were converted into an equivalent number of shares of our Class B common stock.

Class A common stock and Class B common stock reserved for future issuance consisted of the following:

| | As of June 30, 2022 | As of December 31, 2021 |
|---|---|---|
| Shares available for grant under employee stock purchase plan | 5,143,850 | 3,760,115 |
| Shares available for grant under stock option plan | 19,371,515 | 18,994,572 |
| Restricted stock units | 3,943,566 | 1,082,980 |
| Options issued and outstanding under stock option plan | 34,100,749 | 36,716,816 |
| Total common stock reserved for future issuance | 62,559,680 | 60,554,483 |

*Charitable Contributions*

In March 2021, our Board of Directors approved the issuance of 1,729,189 shares of our Class A common stock to an independent donor-advised fund sponsor, Tides Foundation, in conjunction with our Olo for Good initiative. We donated 172,918 shares of our Class A common stock to the Olo for Good Fund at Tides Foundation and recognized $5.1 million as a non-cash general and administrative expense in our condensed consolidated statement of operations for the six months ended

20

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

June 30, 2021. We did not donate any shares during the six months ended June 30, 2022. Through June 30, 2022, we have donated a total of 345,836 shares of our Class A common stock. We expect to donate 1/10th of the total remaining approved shares into the fund annually.

**13.**
**Stock-Based Compensation**

*Equity Incentive Plans*

On March 5, 2021, our Board of Directors adopted our 2021 Equity Incentive Plan ("2021 Plan"). Prior to that date, we had established our 2015 Equity Incentive Plan ("2015 Plan") and 2005 Equity Incentive Plan ("2005 Plan" and collectively with the 2021 Plan and 2015 Plan, the "Plans"). The 2021 Plan serves as the successor to the 2015 Plan and 2005 Plan and provides for the issuance of incentive and nonqualified stock options, SARs, restricted stock, and restricted stock units ("RSUs"), to employees, directors, consultants, and advisors.

Stock options under the Plans may be granted with contractual terms of up to ten years (or five years if granted to a greater than 10.0% stockholder) and at prices no less than 100.0% of the estimated fair value of the shares on the date of grant as determined by our Board of Directors; provided, however, that the exercise price of an incentive stock option and nonqualified stock option granted to a greater than 10.0% stockholder shall not be less than 110.0% of the estimated fair value of the shares on the date of grant. Awards granted under the Plans generally vest over four years.

Certain stock options have an early exercise feature. Shares purchased pursuant to the early exercise of stock options are subject to repurchase until those shares vest; therefore, cash received in exchange for unvested shares exercised is recorded as a liability on the accompanying condensed balance sheets, and is reclassified to Class B common stock and additional paid-in capital as the shares vest. There were 77,707 and 120,088 early exercised shares outstanding as of June 30, 2022 and December 31, 2021, respectively. As of June 30, 2022, there was a liability in the amount of $0.2 million recorded in accrued expenses and other current liabilities in our balance sheet because vesting is within the next 12 months.

On March 13, 2021, our Board of Directors adopted a non-employee director compensation policy that became effective upon our IPO. The policy provides for annual cash retainers for non-employee directors and an additional cash retainer for those non-employee directors that serve as chairpersons or members of our audit, compensation, nominating and corporate governance, and other committees. Additionally, directors will have the option to receive their annual retainer amounts in cash or equity. Each new non-employee director appointed to the Board of Directors after the IPO date will be granted an initial RSU award with a value of $0.3 million subject to vesting over a three-year period.

As of June 30, 2022 and December 31, 2021 the maximum number of shares authorized for issuance to participants under the Plans was 25,044,499 and 20,615,612, respectively. As of June 30, 2022 and December 31, 2021, the number of shares available for issuance to participants under the Plans was 19,371,515 and 18,994,572, respectively.

During the six months ended June 30, 2022 and 2021, no SARs were granted to employees. The SARs outstanding as of the time of the IPO were equity-classified and were measured at the grant date fair value. The SARs were vested and settled upon completion of the IPO and 1,642,570 shares of Class B common stock were issued in connection with this event. Compensation expense of $2.8 million was recognized for the six months ended June 30, 2021.

21

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

*Restricted Stock Units*

The following summarizes the activity for the unvested RSUs during the six months ended June 30, 2022:

| | Shares | | Weighted-Average Grant Date Fair Value |
|---|---|---|---|
| Unvested at December 31, 2021 | 1,082,980 | $ | 27.70 |
| Granted | 3,520,925 | | 17.14 |
| Vested | (336,400) | | 20.51 |
| Forfeited and canceled | (323,939) | | 22.07 |
| Unvested at June 30, 2022 | 3,943,566 | $ | 19.34 |

The total fair value of RSUs vested during the six months ended June 30, 2022 was $3.8 million. Future stock-based compensation for unvested RSUs awarded as of June 30, 2022 was approximately $70.9 million and is expected to be recognized over a weighted-average period of 3.42 years.

*Stock Options*

The following summarizes our stock option activity for the six months ended June 30, 2022 (in thousands, except share and per share amounts):

| | Number of options outstanding | | Weighted-average exercise price | Weighted-average remaining contractual term (In years) | Aggregate intrinsic value | |
|---|---|---|---|---|---|---|
| As of December 31, 2021 | 36,716,816 | $ | 3.55 | 5.76 | $ | 633,730 |
| Granted | 859,038 | | 15.75 | | | |
| Exercised | (2,969,665) | | 1.56 | | | |
| Forfeited | (505,440) | | 7.11 | | | |
| Vested and expected to vest as of June 30, 2022 | 34,100,749 | $ | 3.98 | 5.47 | $ | 200,923 |
| Exercisable as of June 30, 2022 | 25,640,244 | $ | 2.49 | 4.52 | $ | 189,281 |

The following table summarizes the weighted-average grant date fair value of options granted, intrinsic value of options exercised, and fair value of options vested for the three and six months ended June 30, 2022 and 2021 (in thousands, except per share amounts):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Weighted-average grant date fair value of options granted | N/A $ | 17.64 $ | 15.75 $ | 10.70 |
| Intrinsic value of options exercised | $ 10,289 $ | 18,622 $ | 41,138 $ | 71,998 |
| Total fair value of options vested | $ 11,026 $ | 12,696 $ | 24,725 $ | 18,646 |

Future stock-based compensation for unvested employee options granted and outstanding as of June 30, 2022 was $57.4 million and is expected to be recognized over a weighted-average period of 2.19 years.

22

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

*Valuation Assumptions*

We estimated the fair value of stock options granted using the Black-Scholes option pricing model with the following weighted-average assumptions:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2022** | **2021** | **2022** | **2021** |
| Expected term (in years) | N/A | 6.00 | 5.24 | 5.48 - 6.07 |
| Volatility | N/A | 65% | 32% | 52% - 65% |
| Risk-free interest rate | N/A | 1.06% | 1.62% | 0.50% - 1.06% |
| Dividend yield | N/A | 0% | 0% | 0% |
| Fair value of underlying common stock | N/A | $30.02 | $15.75 | $16.78 - $30.02 |

We elected to use the midpoint practical expedient to calculate the expected term.

*2021 Employee Stock Purchase Plan*

On March 5, 2021, our Board of Directors and stockholders adopted our employee stock purchase plan ("ESPP"). The ESPP became effective immediately prior to the IPO. The ESPP authorized the issuance of 3,900,000 shares of our Class A common stock pursuant to purchase rights granted to our employees or to employees of any of our designated affiliates. The number of shares of our Class A common stock reserved for issuance will automatically increase on January 1 of each calendar year, commencing on January 1, 2022 through January 1, 2031, by the lesser of (1) 1.0% of the total number of shares of our Class A common stock outstanding on December 31 of the preceding calendar year, or (2) 11,700,000 Class A common shares; provided, that prior to the date of any such increase, our Board of Directors may determine that such increase will be less than the amount set forth in clauses (1) and (2). Employees may contribute, normally through payroll deductions, up to 15% of their earnings for the purchase of our Class A common stock under the ESPP. Our Class A common stock will be purchased for the accounts of employees participating in the ESPP at a price per Class A common share equal to the lower of (a) 85% of the fair market value of our Class A common stock on the first trading date of an offering, or (b) 85% of the fair market value of our Class A common stock on the date of purchase. The current offering period began in June 2022 and ends in December 2022. For the six months ended June 30, 2022, we recorded approximately $0.9 million of compensation expense associated with our ESPP.

*Stock-Based Compensation Expense*

The classification of stock-based compensation expense, which includes expense for stock options, RSUs, SARs, and ESPP charges, by line item within the condensed consolidated statements of operations and comprehensive (loss) income was as follows (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2022** | **2021** | **2022** | **2021** |
| Cost of revenue - platform | $ 1,432 | $ 744 | $ 2,902 | $ 1,180 |
| Cost of revenue - professional services and other | 188 | 131 | 398 | 246 |
| Research and development | 3,413 | 2,500 | 6,811 | 5,952 |
| General and administrative | 5,087 | 4,237 | 10,125 | 8,095 |
| Sales and marketing | 1,357 | 536 | 2,949 | 924 |
| Total stock-based compensation expense | $ 11,477 | $ 8,148 | $ 23,185 | $ 16,397 |

23

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

**14.**
**Warrants**

*Redeemable Convertible Preferred Stock Warrants*

Prior to the IPO, warrants to purchase 1,682,847 shares of our outstanding redeemable convertible preferred stock were exercised and converted into redeemable convertible preferred stock. Upon completion of the IPO, all shares of our outstanding redeemable convertible preferred stock, inclusive of the shares issued pursuant to these warrant exercises, converted into 100,196,780 shares of Class B common stock. The redeemable convertible preferred stock warrant liability was reclassified to additional paid-in capital in connection with the IPO. For the six months ended June 30, 2021, we recorded a fair value adjustment of approximately $18.9 million using the intrinsic value of each warrant on the date of the conversion immediately prior to the IPO, as the warrants were significantly in-the-money and the Black-Scholes inputs have a de minimis impact on their value.

**15.**
**Income Taxes**

We had an effective tax rate of
4.53% and (0.26)% for the six months ended June 30, 2022 and 2021, respectively. The effective tax rate for the six months ended June 30, 2022 is driven primarily by the release of a portion of our valuation allowance for deferred tax assets following the recording of a deferred income tax liability as part of our accounting for the acquisition of Omnivore and adjustments to the full valuation allowance on our deferred tax assets, partially offset by state taxes. We maintain a full valuation allowance on our net federal and state deferred tax assets as we have concluded that it is more likely than not that the deferred tax assets will not be realized.

We evaluated the available evidence supporting the realization of our deferred tax assets, including the amount and timing of future taxable income, and have determined that it is more likely than not that our net deferred tax assets will not be realized. Due to uncertainties surrounding the realization of the deferred tax assets, we maintain a full valuation allowance against substantially all of our net deferred tax assets. When we determine that we will be able to realize some portion or all of our deferred tax assets, an adjustment to our valuation allowance on our deferred tax assets would have the effect of increasing net income in the period such determination is made.

We applied ASC 740, *Income Taxes*, and determined that we do not have any uncertain positions that would result in a tax reserve for each of the six months ended June 30, 2022 and 2021. Our policy is to recognize interest and penalties related to uncertain tax positions in income tax expense. We are subject to U.S. federal tax authority and state tax authority examinations.

**16.**
**Commitments and Contingencies**

*Contingencies*

Liabilities for loss contingencies arising from claims, assessments, litigation, fines, and penalties and other sources are recorded when it is probable that a liability has been incurred and the amount can be reasonably estimated. If we determine that a loss is reasonably possible, and the loss or range of loss can be estimated, we will disclose the possible loss in the notes to our financial statements. Accounting for contingencies requires us to use judgment related to both the likelihood of a loss and the estimate of the amount or range of loss. Legal costs incurred in connection with loss contingencies are expensed as incurred.

We have also received, and may in the future continue to receive, claims from third parties asserting, among other things, infringement of their intellectual property rights. Future litigation may be necessary to defend ourselves or our customers by determining the scope, enforceability, and validity of third-party proprietary rights or to establish our proprietary rights. Defending such proceedings is costly and can impose a significant burden on management and employees. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors.

Table Of Contents

**OLO INC.**

**Notes to the Condensed Consolidated Financial Statements**
*(Unaudited)*

**17.**
**Net Loss per Share Attributable to Common Stockholders**

A reconciliation of net loss available to common stockholders and the number of shares in the calculation of basic net loss per share is as follows (in thousands, except share and per share data):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2022** | **2021** | **2022** | **2021** |
| Numerator: | | | | |
| Net loss and comprehensive loss | $ (11,673) | $ (2,437) | $ (23,182) | $ (28,894) |
| Less: accretion of redeemable convertible preferred stock to redemption value | - | - | - | (14) |
| Net loss attributable to Class A and Class B common stockholders-basic and diluted | $ (11,673) | $ (2,437) | $ (23,182) | $ (28,908) |

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2022** | **2021** | **2022** | **2021** |
| Denominator: | | | | |
| Weighted-average Class A and Class B common shares outstanding-basic and diluted | 160,429,125 | 147,510,963 | 159,813,053 | 95,690,520 |
| Net loss per share attributable to Class A and Class B common stockholders--basic and diluted | $ (0.07) | $ (0.02) | $ (0.15) | $ (0.30) |

The following participating securities were excluded from the computation of diluted net loss per share attributable to common stockholders for the periods presented, because including them would have been anti-dilutive (on an as-converted basis):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2022** | **2021** | **2022** | **2021** |
| Outstanding stock options | 34,100,749 | 42,967,950 | 34,100,749 | 42,967,950 |
| Outstanding restricted stock units | 3,943,566 | 109,444 | 3,943,566 | 109,444 |
| Outstanding shares estimated to be purchased under ESPP | 134,318 | 144,841 | 134,318 | 144,841 |
| Total | **38,178,633** | **43,222,235** | **38,178,633** | **43,222,235** |

25

**Item 2.** *Management's Discussion and Analysis of Financial Condition and Results of Operations.*

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and related notes appearing elsewhere in this Quarterly Report on Form 10-Q. The discussion contains forward-looking statements, including with respect to our transaction volumes, our net revenue retention rate, and customer adoption of multi-modules, that are based on the beliefs of management, as well as assumptions made by, and information currently available to, our management. Actual results could differ materially from those discussed in or implied by forward-looking statements as a result of various factors, including those discussed elsewhere in this Quarterly Report on Form 10-Q, particularly in the section entitled "Special Note Regarding Forward-Looking Statements," and in our Annual Report on Form 10-K for the year ended December 31, 2021, filed with the Securities and Exchange Commission, or SEC, on February 25, 2022.*

**Overview**

We are Olo, a leading open SaaS platform for restaurants.

Our platform powers restaurant brands' on-demand digital commerce operations, enabling digital ordering, delivery, front-of-house, or FOH, management and payments, while further strengthening and enhancing restaurants' direct consumer relationships. Consumers today expect more on-demand convenience and personalization from restaurants, particularly through digital channels, but many restaurants lack the in-house infrastructure and expertise to satisfy this increasing demand in a cost-effective manner. We provide restaurants with a business-to-business-to-consumer, enterprise-grade, open SaaS platform to manage their complex digital businesses and enable fast and more personalized experiences for their guests. Our platform and application programming interfaces, or APIs, seamlessly integrate with a wide range of solutions, unifying disparate technologies across the restaurant ecosystem. Restaurant brands rely on us to increase their digital omni-channel sales, maximize profitability, establish and maintain direct consumer relationships, and collect, protect, and leverage valuable consumer data. As a result of our ability to meet restaurant brands' growing needs, gross merchandise value, or GMV, which we define as the gross value of orders processed through our platform, has increased on an annual basis, reaching more than $20 billion in GMV during the year ended December 31, 2021. We believe that GMV is an important metric to provide management with an indication of demand for our products. Our well-established platform has led many of the major publicly traded and top 50 fastest growing private restaurant brands, measured by overall sales, in the United States to work with us and has been a factor in our high dollar-based net revenue retention. See the section titled "Key Factors Affecting Our Performance" below for additional information on how we calculate dollar-based net revenue retention. Further, industry-recognized outlets, including Restaurant Business Online, QSR Magazine, and AP News, have also deemed Olo a leading food ordering platform for the restaurant industry.

We built Olo with the goal of being the leading SaaS platform for the restaurant industry by aligning the solutions we have developed with the needs of our customers. Our platform initially focused on our Order Management solutions, a suite of fully-integrated, white-label, on-demand digital commerce and channel management solutions, enabling guests to order and pay directly from restaurants via mobile, web, kiosk, voice, and other digital channels, through our Ordering, Network, Switchboard, Kiosk, and Virtual Brands modules. We then expanded our platform by launching our Delivery Enablement solutions, including Dispatch, our delivery enablement module, and Rails, our aggregator and channel management module. In 2021, we acquired Wisely Inc, or Wisely. This acquisition added our Guest Engagement solutions, formerly known as Customer Engagement, a suite of restaurant-centric marketing and sentiment solutions enabling restaurants to collect, analyze, and act on guest data to deepen relationships, boost revenue, and increase Customer Lifetime Value, or CLV, through the Marketing Automation, Sentiment, and Guest Data Platform, or GDP, formerly known as Customer Data Platform, modules, as well as our FOH solutions which enable restaurants to streamline the queue orders from multiple sales channels, optimize seat utilization in the dining room, and increase flow-through of reservation and waitlist parties through the Host module. The key milestones in our corporate history are the following:

•2005: Olo Founder and CEO Noah Glass accepted $0.5 million in Series A funding to start Mobo.

•2010: We began rebranding as "Olo" and shifted our focus to enterprise customers.

•2013: We surpassed $50 million in GMV and expanded our executive leadership team.

•2014: We surpassed $100 million in GMV, and restaurateur Danny Meyer joined our Board of Directors.

•2015: We launched Dispatch, our first significant product extension.

26

• 2016: We surpassed $500 million in GMV.

• 2017: We launched Rails and surpassed $1 billion in GMV.

• 2018: We surpassed $2 billion in GMV.

• 2019: We surpassed $5 billion in GMV.

• 2020: We reached nearly $14.6 billion in GMV.

• 2021: We completed our IPO, executed our first acquisition, and surpassed $20 billion in GMV.

• 2022: We announced commercial availability of Olo Pay.

Leading restaurant brands trust Olo's enterprise-grade platform for its capabilities, reliability, security, scalability, and interoperability. Our platform currently handles, on average, more than 2 million orders per day. In 2021, more than 85 million consumers transacted on our platform. We continually invest in architectural improvements so that our system can scale in tandem with our continued growth. Additionally, both internal and external security experts frequently test our system for vulnerabilities. To our knowledge, we have never experienced a material breach of customer or consumer data. Our open SaaS platform integrates with over 300 restaurant technology solutions including point-of-sale, or POS, systems, aggregators, delivery service providers, or DSPs, payment processors, user experience, or UX, user interface, or UI, providers, loyalty programs, on-premise ordering providers, kitchen display systems, or KDS, labor management providers, inventory management providers, and reservation and customer relationship management, or CRM, giving our customers significant control over the configuration and features of their distinct digital offering.

We are the exclusive direct digital ordering provider for our leading brands across all service models of the restaurant industry, including quick service, fast casual, casual dining, family dining, and coffee and snack food. Our contracts typically have initial terms of three years or longer, with continuous one-year automatic renewal periods, providing visibility into our future financial performance. Our enterprise brands, meaning those brands having 100 or more locations, tend to be highly loyal.

We have a highly efficient go-to-market model as a result of our industry thought leadership, partnership approach with our restaurant customers, and experienced enterprise sales, customer success, and deployment teams. Unlike other enterprise software businesses, where the sales team works to add a single location or division and expand to others, we enter into relationships at the brand's corporate level and strive to secure exclusivity across all locations. This enables us to deploy our modules across all new and existing brand locations without any additional sales and marketing costs, and upsell new offerings to the brand itself, rather than each individual location.

We refer to our business model as a transactional SaaS model, as it includes both subscription and transaction-based revenue streams, and we designed it to align with our customers' success. Our model allows our customers to forego the cost of building, maintaining, and securing their own digital ordering and delivery platforms and to retain direct relationships with their consumers while maximizing profitability. Our hybrid-pricing model provides us with a predictable revenue stream and enables us to further grow our revenue as our customers increase their digital order volume. We generate subscription revenue from our Ordering, Switchboard, Kiosk, Virtual Brands, Marketing Automation, Sentiment, GDP, and Host modules. In addition, a growing portion of our customers purchase an allotment of monthly orders for a fixed monthly fee and pay us an additional fee for each excess order, which we also consider to be subscription revenue. Our transaction revenue includes revenue generated from our Rails, Dispatch, Virtual Brands, and Olo Pay modules. In most cases, we also charge aggregators, channel partners, and other service providers in our ecosystem on a per transaction basis for access to our Rails and Dispatch modules. We also derive transactional revenue from other products, including Network, which allows brands to take orders from non-aggregator digital channels (e.g., Google Food Ordering, which enables restaurants to fulfill orders directly through Google search results and Maps pages). These products generate fees predominantly through revenue sharing agreements with partners.

**Key Factors Affecting Our Performance**

*Add New Large Multi-Location and High-Growth Restaurant Brands*

We believe there is a substantial opportunity to continue to grow our customer base across the U.S. restaurant industry, adding to our over 600 existing brands across approximately 82,000 active locations as of June 30, 2022, up from

27

approximately 74,000 active locations as of June 30, 2021. We define an "active location" as a unique restaurant location that is utilizing one or more modules in a given quarterly period. We consider each specific restaurant brand to be a customer, even if owned by a parent organization that owns multiple restaurant brands. We intend to continue to drive new customer growth by leveraging our brand and experience within the industry, and expanding our sales and marketing efforts. We have also historically pursued and will continue to target the most well-capitalized, fastest-growing restaurant brands in the industry. Our ability to attract new customers will depend on a number of factors, including our ability to innovate, the effectiveness and pricing of our new and existing modules, the growth of digital ordering, and the success of our marketing efforts.

### Expand Within Our Existing Customer Base

Our large base of enterprise customers and transactional SaaS revenue model represent an opportunity for further revenue expansion from the sale of additional modules, and the addition of new restaurant locations. A key factor to our success in executing our expansion strategy will be our ability to retain our existing and future restaurant customers. Our exclusive, long-term, direct digital ordering contracts with our customers provide us the opportunity to form unique, trusted partnerships with our restaurant brands, further enhancing our ability to satisfy and retain our customers. Our contracts typically have initial terms of three years or longer, with continuous one-year automatic renewal periods, providing visibility into our future performance. One indication of our ability to grow within our customer base through the development of our products that our customers value is our average revenue per unit, or ARPU. We calculate ARPU by dividing the total platform revenue in a given period by the average active locations in that same period. We believe this demonstrates our ability to grow within our customer base through the development of our products that our customers value. Our ability to retain and increase revenue from existing customers will depend on a number of factors, including fluctuations in our customers' spending levels, fluctuations in the number of transactions processed by our customers on the platform, and the ability of our customers to switch to a competitor or develop their own internal platform solutions.

The following summarizes our ARPU and number of active locations for the three months ended, or as of, each of the dates presented.

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Average Revenue Per Unit | $    544 | $    486 |
| Ending Active Locations | 82,000 | 74,000 |

A further indication of the propensity of our customers to continue to work with and expand their relationship with us over time is our dollar-based net revenue retention rate, or NRR, which compares our revenue from the same set of active customers in one period to the prior year period. We calculate dollar-based NRR as of a period-end by starting with the revenue, defined as platform revenue, from the cohort of all active customers as of 12 months prior to such period-end, or the prior period revenue. We then calculate the platform revenue from these same customers as of the current period-end, or the current period revenue. Current period revenue includes any expansion and is net of contraction or attrition over the last 12 months, but excludes platform revenue from new customers in the current period. We then divide the total current period revenue by the total prior period revenue to arrive at the point-in-time dollar-based NRR. We believe that NRR is an important metric demonstrating our ability to retain our customers and expand their use of our modules over time, proving the stability of our revenue base and the long-term value of our customer relationships.

For the period ending June 30, 2022, we maintained an NRR of approximately 106%. While we maintained an NRR over 120% throughout 2021, 2020, and 2019, we observed a decline in NRR in the first and second quarters of 2022 as we lapped the last pre-vaccination period of the COVID-19 pandemic, during which time order volumes were elevated, and the final quarter operating under our prior DoorDash agreement. We expect to return to NRR in excess of 120% in the near term as customers continue to adopt additional product modules such as Olo Pay, FOH and Guest Engagement solutions.

### Enable Higher Transaction Volume

Transaction revenue will continue to be an important source of our growth. We intend to continue to work with our existing restaurant customers to enable higher transaction volume at their locations, which may enable us to generate additional subscription and transaction revenue. As on-demand digital commerce grows to represent a larger share of total food consumption, we expect to significantly benefit from this secular trend as we capture a portion of this increased on-demand digital commerce order volume. Not only does our software create the opportunity to drive more orders for our customers, but

28

we also expect the industry's secular tailwinds to help increase transaction order volume as more consumers order food through digital means, including on- and off-premise. As transaction volume increases, the subscription revenue we receive from certain subscription-based modules may also increase as customers subscribe for higher tier ordering packages to enable more transactions. Additionally, as we continue to expand our product offerings and improve our current software, we also believe that we may be able to increase our share of the transaction revenue that flows through our platform. Specifically, in February 2022, we announced the general availability of our payment solution, Olo Pay, which we believe can significantly increase our ability to generate transactional revenues. Our ability to increase transaction volume is dependent on the continued shift to digital ordering for food consumption and our ability to capture a meaningful portion of that shift.

### Investment in Innovation and Growth

We have invested and intend to continue to invest in expanding the functionality of our current platform and broadening our capabilities to address new market opportunities, particularly around payments, data analytics, and on-premise dining. We also intend to continue to invest in enhancing awareness of our brand and developing more modules, features, and functionality that expand our capabilities to facilitate the extension of our platform to new use cases and industry verticals. We believe this strategy will provide new avenues for growth and allow us to continue to deliver differentiated, high-value outcomes to both our customers and stockholders. Specifically, we intend to invest in research and development to expand our existing modules and build new modules, sales and marketing to promote our modules to new and existing customers and in existing and expanded geographies, professional services to ensure the success of our customers' implementations of our platform, and other operational and administrative functions to support our expected growth and requirements as a public company. We expect our total operating expenses will increase over time and, in some cases, have short-term negative impacts on our operating margin. We also intend to continue to evaluate strategic acquisitions and investments in businesses and technologies to drive product and market expansion. Our future success is dependent, in part, on our ability to successfully develop, market, and sell new and existing modules to new and existing customers.

### Grow Our Ecosystem

We plan to expand our current ecosystem of third-party partners to better support our customers. Our platform is highly configurable and deeply embedded into our customers' disparate existing infrastructures. Our platform seamlessly integrates with technology providers across the restaurant ecosystem, including most POS systems, DSPs, OSPs, aggregators, payment processors, loyalty programs, on-premise ordering providers, KDSs, labor management providers, inventory management providers, and reservation and CRM platforms. We believe that we can leverage these unique partnerships to deliver additional value to our customers. We see opportunity to further broaden our partnership group and build upon the integrations we currently offer. We plan to continue to invest and expand our ecosystem of compatible third-party technology providers to allow us to service a broader network of restaurant brands. We believe that these technology partnerships make us a critical component for restaurant brands looking to enhance their digital ordering and delivery platforms. We intend to continue to invest in building functionality that further integrates our platform with additional third-party technology providers, which expands our capabilities and facilitates the extension of our platform to new use cases and industry verticals. Our future success is dependent on our ability to continue to integrate with third-party technology providers in the restaurant ecosystem.

### Expand Our Longer-Term Market Opportunity

While we have not made any significant investments in this area to date, we believe there is an opportunity to partner with small- and medium-sized businesses to enable their on-demand digital commerce presence. Additionally, as many of our customers operate internationally, we believe there is a significant opportunity to expand the usage of our platform outside of the United States. We also believe that our platform can be applied to other commerce verticals, beyond the restaurant industry, that are undergoing a similar digital transformation to deliver real-time experiences and on-demand fulfillment to consumers. For example, we currently partner with a number of grocery chains who use our Ordering module to help their consumers order ready-to-eat meals and may potentially expand these or other partnerships in the future. We anticipate that our operating expenses will increase as a result of these initiatives.

29

**Components of Results of Operations**

*Revenue*

We generate revenue primarily from platform fees and professional services.

*Platform*

Platform revenue primarily consists of fees that provide customers access to one or more of our modules and standard customer support. Our contracts typically have initial terms of three years or longer, with continuous one-year automatic renewal periods. We bill monthly in arrears. A majority of our platform revenue is derived from our Order Management solutions, which consist of our Ordering, Switchboard, Kiosk, Network, and Virtual Brands modules. We also generate platform revenue from our Delivery Enablement solutions, which include our Dispatch and Rails modules, as well as from Olo Pay. We may also charge third-party aggregators and other service providers in our ecosystem a per-transaction fee for access to our Dispatch and Rails modules. Subsequent to the Wisely Acquisition, we also generate revenue from our Guest Engagement and FOH solutions.

*Professional Services and Other*

Professional services and other revenue primarily consists of fees paid to us by our customers for the implementation of our platform. The majority of our professional service fees are billed on a fixed fee basis upon execution of our agreement. While we generally expect professional services and other revenue to increase primarily as a result of continued deployment of additional active locations, we also expect that this increase will be offset as our deployment teams become more efficient and more familiar with customer systems and shorten deployment periods.

**Cost of Revenue**

*Platform*

Platform cost of revenue primarily consists of costs directly related to our platform services, including expenses for customer support and infrastructure personnel, including salaries, taxes, benefits, bonuses, and stock-based compensation, which we refer to as personnel costs, third-party software licenses, hosting, amortization of internal-use software and intangible assets, payment processing, and allocated overhead. We expect platform cost of revenue to increase in absolute dollars in order to support additional customer and transaction volume growth on our platform.

*Professional Services and Other*

Professional services and other cost of revenue primarily consists of the personnel costs of our deployment team associated with delivering these services and allocated overhead.

**Gross Profit**

Gross profit, or revenue less cost of revenue, has been, and will continue to be, affected by various factors, including revenue fluctuations, our mix of revenue associated with various modules, the timing and amount of investments in personnel, increased hosting capacity to align with customer growth, and third-party licensing costs.

**Operating Expenses**

Our operating expenses consist of research and development, general and administrative, and sales and marketing expenses. Personnel costs are the most significant component of operating expenses.

*Research and Development*

Research and development expenses primarily consist of engineering and product development personnel costs and allocated overhead costs. Research and development costs exclude internal-use software development costs, as they are capitalized as a component of property and equipment, net, and amortized to platform cost of revenue over the term of their estimated useful life. We anticipate investments in this area to increase on an absolute dollar basis and as a percentage of revenue in the short-term as we continue to invest in innovative solutions to support our customers' rapidly evolving needs.

30

*General and Administrative*

General and administrative expenses primarily consist of personnel costs and contractor fees for finance, legal, human resources, information technology, amortization of intangible assets, and other administrative functions. In addition, general and administrative expenses include travel-related expenses and allocated overhead. We also expect to incur additional general and administrative expenses as a result of operating as a public company. We expect that our general and administrative expenses will continue to grow on an absolute dollar basis while declining as a percentage of revenue as we lap the initial increase in costs associated with operating as a public company and continue to scale our operations over time.

*Sales and Marketing*

Sales and marketing expenses primarily consist of sales, marketing, and other personnel costs, commissions, general marketing, amortization of intangible assets, promotional activities, and allocated overhead costs. Sales commissions earned by our sales force are deferred and amortized on a straight-line basis over the expected benefit period. We plan to continue to invest in sales and marketing by expanding our go-to-market activities, hiring additional sales representatives, and sponsoring additional marketing events and trade shows. We expect our sales and marketing expenses to increase on an absolute dollar basis and as a percentage of revenue in the short-term as we continue to invest in our ability to sell new products and increase the visibility of our brand to new and existing customers.

**Other Income (Expenses), Net**

Other income (expenses), net consists primarily of income earned on our investments and money-market funds in cash and cash equivalents and interest expense related to any outstanding debt.

*Change in Fair Value of Redeemable Convertible Preferred Stock Warrant Liability*

The change in the fair value of warrant liability relates to warrants issued to purchase our redeemable convertible preferred stock that are classified as liabilities on the balance sheet. Prior to the IPO, warrants to purchase 1,682,847 shares of our outstanding redeemable convertible preferred stock were exercised and converted into redeemable convertible preferred stock. Upon completion of the IPO, all shares of our outstanding redeemable convertible preferred stock, inclusive of the shares issued pursuant to these warrant exercises, converted into 100,196,780 shares of Class B common stock. As a result, we will no longer have a change in fair value of redeemable convertible preferred stock warrant liability.

**Provision for Income Taxes**

Provision for income taxes primarily relates to U.S. state income taxes where we conduct business.

**Results of Operations**

The following tables set forth our results of operations for the periods presented.

| | | Three Months Ended June 30, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|---|
| | | 2022 | 2021 | | 2022 | 2021 |
| | | | | (in thousands) | | |
| Revenue: | | | | | | |
| Platform | $ | 44,538 | $ 34,526 | $ | 86,004 | $ 69,449 |
| Professional services and other | | 1,063 | 1,370 | | 2,353 | 2,570 |
| Total revenue | | 45,601 | 35,896 | | 88,357 | 72,019 |
| Cost of revenue: | | | | | | |
| Platform [2] | | 12,749 | 6,180 | | 23,773 | 11,787 |
| Professional services and other [2] | | 1,419 | 1,183 | | 3,197 | 2,426 |
| Total cost of revenue | | 14,168 | 7,363 | | 26,970 | 14,213 |
| Gross Profit | | 31,433 | 28,533 | | 61,387 | 57,806 |
| Operating expenses: | | | | | | |
| Research and development [2] | | 17,233 | 13,931 | | 34,058 | 28,387 |
| General and administrative [2] [1] | | 17,235 | 13,310 | | 35,196 | 31,764 |
| Sales and marketing [2] | | 8,897 | 3,701 | | 16,967 | 7,537 |
| Total operating expenses | | 43,365 | 30,942 | | 86,221 | 67,688 |
| Loss from operations | | (11,932) | (2,409) | | (24,834) | (9,882) |
| Other income (expenses), net: | | | | | | |
| Interest income | | 533 | - | | 585 | - |
| Interest expense | | (46) | - | | (46) | - |
| Other income (expense) | | 7 | 10 | | 13 | (8) |
| Change in fair value of warrant liability | | - | - | | - | (18,930) |
| Total other income (expenses), net | | 494 | 10 | | 552 | (18,938) |
| Loss before income taxes | | (11,438) | (2,399) | | (24,282) | (28,820) |
| Provision (benefit) for income taxes | | 235 | 38 | | (1,100) | 74 |
| Net loss | | (11,673) | (2,437) | | (23,182) | (28,894) |
| Accretion of redeemable convertible preferred stock to redemption value | | - | - | | - | (14) |
| Net loss attributable to Class A and Class B common stockholders | $ | (11,673) | $ (2,437) | $ | (23,182) | $ (28,908) |

(1) Includes charitable donation expense of $5.1 million for the six months ended June 30, 2021.

(2) Includes stock-based compensation expense as follows (in thousands):

| | | Three Months Ended June 30, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|---|
| | | 2022 | 2021 | | 2022 | 2021 |
| Cost of revenue - platform | $ | 1,432 | $ 744 | $ | 2,902 | $ 1,180 |
| Cost of revenue - professional services and other | | 188 | 131 | | 398 | 246 |
| Research and development | | 3,413 | 2,500 | | 6,811 | 5,952 |
| General and administrative | | 5,087 | 4,237 | | 10,125 | 8,095 |
| Sales and marketing | | 1,357 | 536 | | 2,949 | 924 |
| Total stock-based compensation expense | $ | 11,477 | $ 8,148 | $ | 23,185 | $ 16,397 |

The following table sets forth our statements of operations data expressed as a percentage of total revenue for the periods presented:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| Revenue: | | | | |
| Platform | 97.7% | 96.2% | 97.3% | 96.4% |
| Professional services and other | 2.3 | 3.8 | 2.7 | 3.6 |
| Total revenue | 100.0 | 100.0 | 100.0 | 100.0 |
| Cost of revenue: | | | | |
| Platform | 28.0 | 17.2 | 26.9 | 16.4 |
| Professional services and other | 3.1 | 3.3 | 3.6 | 3.4 |
| Total cost of revenue | 31.1 | 20.5 | 30.5 | 19.7 |
| Gross Profit | 68.9 | 79.5 | 69.5 | 80.3 |
| Operating expenses: | | | | |
| Research and development | 37.8 | 38.8 | 38.5 | 39.4 |
| General and administrative | 37.8 | 37.1 | 39.8 | 44.1 |
| Sales and marketing | 19.5 | 10.3 | 19.2 | 10.5 |
| Total operating expenses | 95.1 | 86.2 | 97.6 | 94.0 |
| Loss from operations | (26.2) | (6.7) | (28.1) | (13.7) |
| Other income (expenses), net: | | | | |
| Interest income | 1.2 | 0.0 | 0.7 | 0.0 |
| Interest expense | (0.1) | 0.0 | (0.1) | 0.0 |
| Other income (expense) | 0.0 | 0.0 | 0.0 | 0.0 |
| Change in fair value of warrant liability | 0.0 | 0.0 | 0.0 | (26.3) |
| Total other income (expenses), net | 1.1 | 0.0 | 0.6 | (26.3) |
| Loss before income taxes | (25.1) | (6.7) | (27.5) | (40.0) |
| Provision (benefit) for income taxes | 0.5 | 0.1 | (1.2) | 0.1 |
| Net loss and comprehensive loss | (25.6) | (6.8) | (26.2) | (40.1) |
| Accretion of redeemable convertible preferred stock to redemption value | 0.0 | 0.0 | 0.0 | 0.0 |
| Net loss attributable to Class A and Class B common stockholders | (25.6)% | (6.8)% | (26.2)% | (40.1)% |

33

**Comparison of the Three Months Ended June 30, 2022 and 2021**

*Revenue*

| | Three Months Ended June 30, | | Change | |
| | 2022 | 2021 | $ | % |
|---|---|---|---|---|
| | | (in thousands, except percentages) | | |
| **Revenue:** | | | | |
| Platform | $ 44,538 | $ 34,526 | $ 10,012 | 29.0% |
| Professional services and other | 1,063 | 1,370 | (307) | (22.4) |
| Total Revenue | $ 45,601 | $ 35,896 | $ 9,705 | 27.0% |

*Platform*

Total platform revenue increased $10.0 million, or 29.0%, to $44.5 million for the three months ended June 30, 2022 from $34.5 million for the three months ended June 30, 2021. This increase was primarily the result of an increase in new active locations coming onto the platform, an increase in module adoption within our existing customer base, and increased transaction volumes. Active locations increased to approximately 82,000 as of June 30, 2022 from approximately 74,000 as of June 30, 2021, and ARPU increased to approximately $544 for the three months ended June 30, 2022 from approximately $486 for the three months ended June 30, 2021. For the three months ended June 30, 2022 and 2021, 51.6% and 47.2% of our platform revenue was subscription revenue, respectively, and 48.4% and 52.8% was transaction revenue, respectively.

*Professional Services and Other*

Total professional services and other revenue decreased $0.3 million, or 22.4%, to $1.1 million for the three months ended June 30, 2022 from $1.4 million for the three months ended June 30, 2021, primarily due to due to labor shortages affecting our restaurant customers at both the operator and brand levels, elongating the sales cycle and delaying the start of deployments. While we generally expect professional services and other to increase primarily as a result of continued deployment of additional active locations, we also expect this increase to be offset as our deployment teams become more efficient and shorten deployment periods.

*Cost of Revenue, Gross Profit, and Gross Margin*

| | Three Months Ended June 30, | | Change | |
| | 2022 | 2021 | $ | % |
|---|---|---|---|---|
| | | (in thousands, except percentages) | | |
| **Cost of revenues:** | | | | |
| Platform | $ 12,749 | $ 6,180 | $ 6,569 | 106.3% |
| Professional services and other | 1,419 | 1,183 | 236 | 19.9 |
| Total cost of revenue | $ 14,168 | $ 7,363 | $ 6,805 | 92.4% |
| Percentage of revenue: | | | | |
| Platform | 28.0% | 17.2% | | |
| Professional services and other | 3.1 | 3.3 | | |
| Total cost of revenue | 31.1% | 20.5% | | |
| Gross Profit | $ 31,433 | $ 28,533 | $ 2,900 | 10.2% |
| Gross Margin | 68.9% | 79.5% | | |

*Platform*

Total platform cost of revenue increased $6.6 million, or 106.3%, to $12.7 million for the three months ended June 30, 2022 from $6.2 million for the three months ended June 30, 2021. This increase was primarily the result of higher compensation costs associated with additional personnel to support our revenue growth as well as higher hosting costs due to increased transaction volume and the addition of features and modules. Also contributing to the increase were the near-term

34

impacts due to our recent acquisitions of Wisely in late 2021 and Omnivore, Inc. in the first quarter of 2022, the intangible amortization costs related to these acquisitions, and the processing costs associated with Olo Pay.

*Professional Services and Other*

Total professional services and other cost of revenue increased $0.2 million, or 19.9%, to $1.4 million for the three months ended June 30, 2022 from $1.2 million for the three months ended June 30, 2021. This increase was primarily the result of increased compensation costs to support the previously-mentioned growth in new active locations.

*Gross Profit*

Gross margin decreased to 68.9% for the three months ended June 30, 2022 from 79.5% for the three months ended June 30, 2021. The decrease in gross profit margin was driven by higher platform and professional services and other compensation costs to support growth in transactions, the increase in new active locations coming onto the platform, and the addition of features and modules, as well as by the near-term impacts due to our recent Wisely and Omnivore acquisitions, and the processing costs associated with Olo Pay.

**Operating Expenses**

*Research and Development*

| | Three Months Ended June 30, | | | | Change | | |
|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | $ | | % |
| | | | (in thousands, except percentages) | | | | |
| Research and development | $ | 17,233 | $ | 13,931 | $ | 3,302 | 23.7% |
| Percentage of total revenue | | 37.8% | | 38.8% | | | |

Research and development expense increased $3.3 million, or 23.7%, to $17.2 million for the three months ended June 30, 2022 from $13.9 million for the three months ended June 30, 2021. This increase was primarily the result of higher compensation costs associated with additional personnel and an increase in the use of software tools to support further investments in our platform development and continued product innovation. As a percentage of total revenue, research and development expenses decreased to 37.8% for the three months ended June 30, 2022 from 38.8% for the three months ended June 30, 2021.

*General and Administrative*

| | Three Months Ended June 30, | | | | Change | | |
|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | $ | | % |
| | | | (in thousands, except percentages) | | | | |
| General and administrative | $ | 17,235 | $ | 13,310 | $ | 3,925 | 29.5% |
| Percentage of total revenue | | 37.8% | | 37.1% | | | |

General and administrative expense increased $3.9 million, or 29.5%, to $17.2 million for the three months ended June 30, 2022 from $13.3 million for the three months ended June 30, 2021. This increase was primarily a result of higher compensation costs due to increased headcount to support the growth and stage of the organization, as well as severance costs related to the departure of our Chief Customer Officer. As a percentage of total revenue, general and administrative expenses increased to 37.8% for the three months ended June 30, 2022 from 37.1% for the three months ended June 30, 2021.

*Sales and Marketing*

| | | Three Months Ended June 30, | | Change | | |
|---|---|---|---|---|---|---|
| | | 2022 | 2021 | $ | % |
| | | (in thousands, except percentages) | | | |
| Sales and marketing | $ | 8,897 | $ 3,701 | $ 5,196 | 140.4% |
| Percentage of total revenue | | 19.5% | 10.3% | | |

Sales and marketing expense increased $5.2 million, or 140.4%, to $8.9 million for the three months ended June 30, 2022 from $3.7 million for the three months ended June 30, 2021. This increase was primarily the result of additional compensation costs, inclusive of commission costs, due to increases in headcount, as well as costs associated with our in-person user conference, Beyond4, which we held in the second quarter of 2022 for the first time in two years, and intangible amortization costs related to our recent acquisitions. As a percentage of total revenue, sales and marketing expense increased to 19.5% for the three months ended June 30, 2022 from 10.3% for the three months ended June 30, 2021.

*Other Income (Expenses), net*

| | | Three Months Ended June 30, | | Change | | |
|---|---|---|---|---|---|---|
| | | 2022 | 2021 | $ | % |
| | | (in thousands, except percentages) | | | |
| **Other income (expenses), net:** | | | | | |
| Interest income | $ | 533 | $ - | $ 533 | - |
| Percentage of total revenue | | 1.2% | -% | | |
| Interest expense | $ | (46) | $ - | $ (46) | - |
| Percentage of total revenue | | (0.1)% | -% | | |
| Other income (expense) | $ | 7 | $ 10 | $ (3) | (30.0)% |
| Percentage of total revenue | | -% | -% | | |
| Total other income (expenses), net | $ | 494 | $ 10 | $ 484 | 4,840.0% |
| Percentage of total revenue | | 1.1% | -% | | |

Other income for the three months ended June 30, 2022 was primarily driven by income earned on our investments and money-market funds.

*Provision for Income Taxes*

| | | Three Months Ended June 30, | | Change | | |
|---|---|---|---|---|---|---|
| | | 2022 | 2021 | $ | % |
| | | (in thousands, except percentages) | | | |
| Provision for income taxes | $ | 235 | $ 38 | $ 197 | 518.4% |
| Percentage of total revenue | | 0.5% | 0.1% | | |

Provision for income taxes for the three months ended June 30, 2022 primarily consist of state income taxes. We maintain a full valuation allowance on our net federal and state deferred tax assets as we have concluded that it is more likely than not that the deferred tax assets will not be realized.

**Comparison of the Six Months Ended June 30, 2022 and 2021**

*Revenue*

| | Six Months Ended June 30, | | | | Change | | |
|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | $ | | % |
| | (in thousands, except percentages) | | | | | | |
| **Revenue:** | | | | | | | |
| Platform | $ | 86,004 | $ | 69,449 | $ | 16,555 | 23.8% |
| Professional services and other | | 2,353 | | 2,570 | | (217) | (8.4) |
| Total Revenue | $ | 88,357 | $ | 72,019 | $ | 16,338 | 22.7% |

*Platform*

Total platform revenue increased $16.6 million, or 23.8%, to $86.0 million for the six months ended June 30, 2022 from $69.4 million for the six months ended June 30, 2021. This increase was primarily the result of an increase in new active locations coming onto the platform, an increase in module adoption within our existing customer base, and increased transaction volumes. Active locations increased to approximately 82,000 as of June 30, 2022 from approximately 74,000 as of June 30, 2021, and ARPU increased to approximately $1,072 for the six months ended June 30, 2022 from approximately $1,008 for the six months ended June 30, 2021. For the six months ended June 30, 2022 and 2021, 50.9% and 44.4% of our platform revenue was subscription revenue, respectively, and 49.1% and 55.6% was transaction revenue, respectively.

*Professional Services and Other*

Total professional services and other revenue decreased $0.2 million, or 8.4%, to $2.4 million for the six months ended June 30, 2022 from $2.6 million for the six months ended June 30, 2021, primarily due to labor shortages affecting our restaurant customers at both the operator and brand levels, elongating the sales cycle and delaying the start of deployments. While we generally expect professional services and other to increase primarily as a result of continued deployment of additional active locations, we also expect this increase to be offset as our deployment teams become more efficient and shorten deployment periods.

*Cost of Revenue, Gross Profit, and Gross Margin*

| | Six Months Ended June 30, | | | | Change | | |
|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | $ | | % |
| | (in thousands, except percentages) | | | | | | |
| **Cost of revenues:** | | | | | | | |
| Platform | $ | 23,773 | $ | 11,787 | $ | 11,986 | 101.7% |
| Professional services and other | | 3,197 | | 2,426 | | 771 | 31.8 |
| Total cost of revenue | $ | 26,970 | $ | 14,213 | $ | 12,757 | 89.8% |
| Percentage of revenue: | | | | | | | |
| Platform | | 26.9% | | 16.4% | | | |
| Professional services and other | | 3.6 | | 3.4 | | | |
| Total cost of revenue | | 30.5% | | 19.7% | | | |
| Gross Profit | $ | 61,387 | $ | 57,806 | $ | 3,581 | 6.2% |
| Gross Margin | | 69.5% | | 80.3% | | | |

*Platform*

Total platform cost of revenue increased $12.0 million, or 101.7%, to $23.8 million for the six months ended June 30, 2022 from $11.8 million for the six months ended June 30, 2021. This increase was primarily the result of higher compensation costs associated with additional personnel to support the revenue growth mentioned previously as well as higher hosting costs due to increased transaction volume and the addition of features and modules. Also contributing to the increase were the near-

37

term impacts due to our recent Wisely and Omnivore acquisitions, the intangible amortization costs related to these acquisitions, and the processing costs associated with Olo Pay.

*Professional Services and Other*

Total professional services and other cost of revenue increased $0.8 million, or 31.8%, to $3.2 million for the six months ended June 30, 2022 from $2.4 million for the six months ended June 30, 2021. This increase was primarily the result of increased compensation costs to support the previously-mentioned growth in new active locations.

*Gross Profit*

Gross margin decreased to 69.5% for the six months ended June 30, 2022 from 80.3% for the six months ended June 30, 2021. The decrease in gross profit margin was driven by higher platform and professional services and other compensation costs to support growth in transactions, the increase in new active locations coming onto the platform, and the addition of features and modules, as well as by the near-term impacts due to our recent Wisely and Omnivore acquisitions and the processing costs associated with Olo Pay.

**Operating Expenses**

*Research and Development*

| | Six Months Ended June 30, | | | Change | |
| | 2022 | 2021 | | $ | % |
| | | (in thousands, except percentages) | | | |
|---|---|---|---|---|---|
| Research and development | $ 34,058 | $ 28,387 | $ | 5,671 | 20.0% |
| Percentage of total revenue | 38.5% | 39.4% | | | |

Research and development expense increased $5.7 million, or 20.0%, to $34.1 million for the six months ended June 30, 2022 from $28.4 million for the six months ended June 30, 2021. This increase was primarily the result of higher compensation costs associated with additional personnel and an increase in the use of software tools to support further investments in our platform development and continued product innovation. As a percentage of total revenue, research and development expenses decreased to 38.5% for the six months ended June 30, 2022 from 39.4% for the six months ended June 30, 2021.

*General and Administrative*

| | Six Months Ended June 30, | | | Change | |
| | 2022 | 2021 | | $ | % |
| | | (in thousands, except percentages) | | | |
|---|---|---|---|---|---|
| General and administrative | $ 35,196 | $ 31,764 | $ | 3,432 | 10.8% |
| Percentage of total revenue | 39.8% | 44.1% | | | |

General and administrative expense increased $3.4 million, or 10.8%, to $35.2 million for the six months ended June 30, 2022 from $31.8 million for the six months ended June 30, 2021. This increase was primarily a result of higher compensation costs due to increased headcount to support the growth and stage of the organization, as well as severance costs related to the departure of our Chief Customer Officer and increased insurance costs and professional fees incurred as a result of us being a public company. These increases were partially offset by the absence in the six months ended June 30, 2022 of the following costs incurred during the six months ended June 30, 2021: (i) IPO related bonus awards, vesting and settlement of stock appreciation rights, or SARs, award as a result of the IPO; and (ii) a $5.1 million non-cash charge related to the donation of 172,918 shares of our Class A common stock to an independent donor-advised fund sponsor, Tides Foundation. As a percentage of total revenue, general and administrative expenses decreased to 39.8% for the six months ended June 30, 2022 from 44.1% for the six months ended June 30, 2021.

We did not donate any shares during the six months ended June 30, 2022 to the Olo for Good Fund at Tides Foundation, but we expect to donate additional shares in the future in conjunction with our Olo for Good initiative.

38

*Sales and Marketing*

| | Six Months Ended June 30, | | Change | |
|---|---|---|---|---|
| | 2022 | 2021 | $ | % |
| | (in thousands, except percentages) | | | |
| Sales and marketing | $ 16,967 | $ 7,537 | $ 9,430 | 125.1% |
| Percentage of total revenue | 19.2% | 10.5% | | |

Sales and marketing expense increased $9.4 million, or 125.1%, to $17.0 million for the six months ended June 30, 2022 from $7.5 million for the six months ended June 30, 2021. This increase was primarily the result of additional compensation costs, inclusive of commission costs, due to increases in headcount, as well as costs associated with our in-person user conference, Beyond4, which we held in the second quarter of 2022 for the first time in two years, and intangible amortization costs related to our recent acquisitions. This increase was partially offset by decreased marketing spend associated with our IPO-related costs for the six months ended June 30, 2021. As a percentage of total revenue, sales and marketing expense increased to 19.2% for the six months ended June 30, 2022 from 10.5% for the six months ended June 30, 2021.

*Other Income (Expenses), net*

| | Six Months Ended June 30, | | Change | |
|---|---|---|---|---|
| | 2022 | 2021 | $ | % |
| | (in thousands, except percentages) | | | |
| Other income (expenses), net: | | | | |
| Interest income | $ 585 | $ - | $ 585 | - |
| Percentage of total revenue | 0.7% | -% | | |
| Interest expense | $ (46) | $ - | $ (46) | - |
| Percentage of total revenue | (0.1)% | -% | | |
| Other income (expense) | $ 13 | $ (8) | $ 21 | (262.5)% |
| Percentage of total revenue | -% | -% | | |
| Change in fair value of warrant liability | $ - | $ (18,930) | $ 18,930 | (100.0)% |
| Percentage of total revenue | -% | (26.3)% | | |
| Total other income (expenses), net | $ 552 | $ (18,938) | $ 19,490 | (102.9)% |
| Percentage of total revenue | 0.6% | (26.3)% | | |

Other income for the six months ended June 30, 2022 was primarily driven by income earned on our investments and money-market funds.

The increase of $18.9 million in the fair value of warrant liability for the six months ended June 30, 2021 was the result of an increase in value of our redeemable convertible preferred stock warrant liability, which is directly related to an increase in the value of our stock underlying the warrants during the first quarter of 2021. Prior to our IPO, all outstanding warrants were exercised to purchase shares of our outstanding redeemable convertible preferred stock and converted into redeemable convertible preferred stock. Upon completion of the IPO, all shares of our outstanding redeemable convertible preferred stock, inclusive of the shares issued pursuant to these warrant exercises, converted into shares of Class B common stock.

*(Benefit) Provision for Income Taxes*

| | Six Months Ended June 30, | | Change | |
|---|---|---|---|---|
| | 2022 | 2021 | $ | % |
| | (in thousands, except percentages) | | | |
| (Benefit) provision for income taxes | $ (1,100) | $ 74 | $ (1,174) | (1586.5)% |
| Percentage of total revenue | (1.2)% | 0.1% | | |

The income tax benefit for the six months ended June 30, 2022 was driven primarily by the release of a portion of our valuation allowance for deferred tax assets following the recording of a deferred income tax liability as part of our accounting for the acquisition of Omnivore and adjustments to the full valuation allowance on our deferred tax assets, partially offset by

state taxes. We maintain a full valuation allowance on our net federal and state deferred tax assets as we have concluded that it is more likely than not that the deferred tax assets will not be realized.

**Liquidity and Capital Resources**

*General*

As of June 30, 2022, our principal sources of liquidity were cash and cash equivalents and short-term and long-term investments in marketable securities totaling $464.7 million, which was held for working capital purposes, as well as the available balance of our revolving line of credit, described further below.

We have financed our operations primarily through sales of our equity securities, payments received from customers, and borrowings under our credit facility.

On March 19, 2021, we completed our IPO, in which we issued and sold 20,700,000 shares of our Class A common stock at the public offering price of $25.00 per share. We received net proceeds of approximately $485.5 million after deducting underwriting discounts and commissions.

We believe our existing cash and cash equivalents, marketable securities, and amounts available under our outstanding credit facility will be sufficient to support our working capital and capital expenditure requirements for at least the next twelve months. Our future capital requirements will depend on many factors, including, but not limited to, our obligation to repay any balance under our credit facility if we were to borrow against the facility in the future, our platform revenue growth rate, receivable and payable cycles, and the timing and extent of investments in research and development, sales and marketing, and general and administrative expenses.

*Credit Facility*

On June 10, 2022, we entered into the Second Amended and Restated Loan and Security Agreement with Pacific Western Bank related to a revolving credit and term loan facility, or the Second Amended and Restated LSA.

The Second Amended and Restated LSA amended and restated the Amended and Restated Loan and Security Agreement, dated February 11, 2020, as amended, or the Prior LSA, to, among other things, increase our available aggregate borrowing limit to $70.0 million and to provide the ability to request Pacific Western Bank to enter into commitments to increase the credit extensions available to us under the Second Amended and Restated LSA to up to $125.0 million, or the Accordion Facility.

Borrowings under the Second Amended and Restated LSA accrue interest at a variable annual rate equal to (i) in the case of Formula Advances (as defined in the Second Amended and Restated LSA), the greater of the variable rate of interest, per annum, most recently announced by Pacific Western Bank, or the Prime Rate. or 3.25% or (ii) in the case of Term Loans (as defined in the Second Amended and Restated LSA), the greater of the Prime Rate plus 0.25% or 3.50%. The Second Amended and Restated LSA provides for a success fee payable upon an acquisition of Olo or termination of the Second Amended and Restated LSA, or a Success Fee Trigger, in an amount equal to: (i) $800,000, if the Success Fee Trigger occurs prior to June 10, 2023; (ii) $600,000, if the Success Fee Trigger occurs on or after June 10, 2023 and prior to June 10, 2024; (iii) $400,000, if the Success Fee Trigger occurs on or after June 10, 2024 and prior to June 10, 2025; (iv) $200,000, if the Success Fee Trigger occurs on or after June 10, 2025 and prior to June 10, 2026; and (v) $0, if the Success Fee Trigger occurs on or after June 10, 2026. We also required to pay a fee of 1.0% of the difference between (i) the highest outstanding principal balance during the term of the Second Amended and Restated LSA and (ii) $3.5 million if a Liquidity Event (as defined in the Second Amended and Restated LSA) occurs during the term and or within 24 months after the termination of the Second Amended and Restated LSA. Our obligations under the Second Amended and Restated LSA are secured by substantially all of our assets, including certain securities owned by us in any subsidiary.

The Second Amended and Restated LSA includes a financial covenant requiring compliance with certain minimum revenue amounts. In addition, the Second Amended and Restated LSA contains representations and warranties generally consistent with the Prior LSA, as well as certain non-financial covenants, including, but not limited to, limitations on our ability to incur additional indebtedness or liens, pay dividends, or make certain investments. We were in compliance with these covenants as of June 30, 2022.

The Second Amended and Restated LSA also contains events of default that include, among other things, non-payment defaults, covenant defaults, insolvency defaults, cross-defaults to other indebtedness and material obligations, judgment defaults, inaccuracy of representations and warranties, and a material adverse change. Any default that is not cured or waived could result in Pacific Western Bank exercising its rights and remedies under the Second Amended and Restated LSA, including, but not limited to, the acceleration of the obligations under the Second Amended and Restated LSA and related documentation, and would permit Pacific Western Bank to exercise remedies with respect to all of the collateral that secured such obligations.

Pacific Western Bank has the right to terminate its obligation to make further advances to us immediately and without notice upon the occurrence and during the continuance of an event of default. Upon our request, Pacific Western Bank will provide us a payoff letter providing for, among other things, repayment of our obligations then outstanding, including the success fee, and for termination of Pacific Western Bank's obligations to make additional credit extensions and termination of the liens under the Second Amended and Restated LSA.

As of June 30, 2022, we had $43.6 million of commitments available under the Second Amended and Restated LSA, after consideration of $25.0 million in our letter of credit to DoorDash and $1.4 million in our letter of credit on the lease of our headquarters. As of June 30, 2022, we had no outstanding borrowings under the line of credit, and no amounts have been drawn against any of our letters of credit.

### Cash Flows

The following table summarizes our cash flows for the periods presented:

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2022 | 2021 |
|  | (in thousands) | |
| Net cash (used in) provided by operating activities | $ (870) | $ 15,471 |
| Net cash used in investing activities | $ (132,930) | $ (660) |
| Net cash provided by financing activities | $ 6,025 | $ 484,669 |

### Operating Activities

For the six months ended June 30, 2022, net cash used in operating activities was $0.9 million, primarily due to net loss of $23.2 million adjusted for non-cash charges of $26.3 million and a net decrease attributable to our operating assets and liabilities of $4.0 million. The non-cash adjustments primarily relate to stock-based compensation charges of $23.2 million and depreciation and amortization expense of $2.6 million. The net decrease attributable to our operating assets and liabilities was primarily driven by an increase in prepaid expenses of $2.0 million, primarily attributable to increased prepayments for software licensing fees, and a decrease in operating lease liabilities of $1.2 million due to payments on our leases.

For the six months ended June 30, 2021, net cash provided by operating activities was $15.5 million, primarily due to a net loss of $28.9 million adjusted for non-cash charges of $41.2 million and a net increase in our operating assets and liabilities of $3.0 million. The non-cash adjustments primarily related to the change in the fair value of redeemable convertible preferred stock warrants of $18.9 million, stock-based charges of $16.4 million, inclusive of vesting of SARs of $2.8 million, and a charge related to a charitable donor-advised fund of $5.1 million in connection with the IPO. The net increase in operating assets and liabilities was primarily driven by a net increase in accrued expenses and accounts payable of $2.5 million related primarily to higher fees owed to delivery service providers and vendors as well as employee compensation accruals and a decrease in accounts receivable of $5.7 million due to improved collections. This increase was offset by an increase in prepaid expenses of $4.8 million primarily due to insurance payments, and increases in contract assets and deferred contract costs of $0.9 million primarily due to the growth of our revenue.

### Investing Activities

Cash used in investing activities was $132.9 million during the six months ended June 30, 2022, primarily due to $78.1 million of net cash paid for investments, $49.3 million to acquire Omnivore, and $5.5 million for the development of internal-use software and purchases of computer and office equipment to support further product development and to expand our employee base to support our operations.

Cash used in investing activities was $0.7 million during the six months ended June 30, 2021, primarily due to the development of internal-use software and purchases of computer and office equipment to support further product development and to expand our employee base to support our operations.

*Financing Activities*

Cash provided by financing activities was $6.0 million during the six months ended June 30, 2022, primarily driven by net proceeds from the exercise of stock options and purchases under our employee stock purchase plan.

Cash provided by financing activities was $484.7 million during the six months ended June 30, 2021, reflecting $485.5 million of net proceeds from the issuance of Class A common stock in our IPO (net of underwriters' discounts and commissions), $3.0 million of net proceeds from the exercise of stock options, and $0.4 million of net proceeds from the exercise of warrants. Increases were partially offset by payment of deferred offering costs of $4.1 million during the six months ended June 30, 2021.

**Certain Non-GAAP Financial Measures**

We report our financial results in accordance with generally accepted accounting principles in the United States, or GAAP. To supplement our financial statements, we provide investors with non-GAAP operating income (loss) and free cash flow, each of which is a non-GAAP financial measure, and certain key performance indicators, including GMV, active locations, NRR, and ARPU.

We use these non-GAAP financial measures and key performance indicators, in conjunction with financial measures prepared in accordance with GAAP for planning purposes, including in the preparation of our annual operating budget, as a measure of our core operating results and the effectiveness of our business strategy, and in evaluating our financial performance. These measures provide consistency and comparability with past financial performance as measured by such non-GAAP figures, facilitate period-to-period comparisons of core operating results, and assist shareholders in better evaluating us by presenting period-over-period operating results without the effect of certain charges or benefits that may not be consistent or comparable across periods.

We adjust our GAAP financial measures for the following items to calculate non-GAAP operating income (loss): stock-based compensation expense (non-cash expense calculated by companies using a variety of valuation methodologies and subjective assumptions) and related payroll tax expense, equity expense related to charitable contributions (non-cash expense), intangible and internal-use software amortization (non-cash expense), other non-cash charges, severance related to the departure of our Chief Customer Officer, and transaction costs incurred within one year of the related acquisition. Management believes that it is useful to exclude certain non-cash charges and non-core operational charges from non-GAAP operating income (loss) because: (1) the amount of such expenses in any specific period may not directly correlate to the underlying performance of our business operations; and (2) such expenses can vary significantly between periods. Effective as of the first quarter fiscal 2022, payroll tax expenses related to equity compensation awards were added to our calculation of non-GAAP operating income. We have historically excluded stock-based compensation expense from non-GAAP operating income, and management believes that excluding the related payroll tax expense is important and consistent, as such payroll tax expenses are directly impacted by unpredictable fluctuations in our stock price. Prior period amounts have been revised to conform with the current year presentation.

Free cash flow represents net cash provided by operating activities, reduced by purchases of property and equipment and capitalization of internal-use software. Free cash flow is a measure used by management to understand and evaluate our liquidity and to generate future operating plans. Free cash flow excludes items that we do not consider to be indicative of our liquidity. The reduction of capital expenditures facilitates comparisons of our liquidity on a period-to-period basis. We believe providing free cash flow provides useful information to investors and others in understanding and evaluating the strength of our liquidity and future ability to generate cash that can be used for strategic opportunities or investing in our business from the perspective of our management and Board of Directors.

Our use of non-GAAP financial measures and key performance indicators has limitations as an analytical tool, and these measures should not be considered in isolation or as a substitute for analysis of financial results as reported under GAAP. Because our non-GAAP financial measures and key performance indicators are not calculated in accordance with GAAP, they may not necessarily be comparable to similarly titled measures employed by other companies.

42

### Non-GAAP Operating Income (Loss)

The following table presents a reconciliation of GAAP operating loss to non-GAAP operating income (loss) for the following periods:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2022 | | 2021 | |
| | (in thousands, except percentages) | | | | | | | |
| **Operating Income (loss) reconciliation:** | | | | | | | | |
| Operating loss, GAAP | $ | (11,932) | $ | (2,409) | $ | (24,834) | $ | (9,882) |
| Plus: Stock-based compensation expense and related payroll tax expense [1] | | 11,640 | | 8,769 | | 23,718 | | 17,018 |
| Plus: Charitable donation of Class A common stock | | - | | - | | - | | 5,125 |
| Plus: Impairment of internal-use software | | - | | - | | 475 | | - |
| Plus: Amortization | | 1,365 | | 138 | | 2,325 | | 275 |
| Plus: Severance costs [2] | | 555 | | - | | 555 | | - |
| Plus: Transaction costs | | 351 | | - | | 1,486 | | - |
| Operating income, non-GAAP | $ | 1,979 | $ | 6,498 | $ | 3,725 | $ | 12,536 |
| Percentage of revenue: | | | | | | | | |
| Operating margin, GAAP | | (26)% | | (7)% | | (28)% | | (14)% |
| Operating margin, non-GAAP | | 4% | | 18% | | 4% | | 17% |

(1) For 2022, payroll tax expenses related to equity compensation awards were added to our calculation of non-GAAP operating income. We have historically excluded stock-based compensation expense from non-GAAP operating income, and management believes that excluding the related payroll tax expense is important and consistent, as such payroll tax expenses are directly impacted by unpredictable fluctuations in our stock price. Prior period amounts have been revised to conform with the current year presentation.

(2) Includes costs related to the departure of our Chief Customer Officer.

### Non-GAAP Free Cash Flow

The following table presents a reconciliation of free cash flow to net cash provided by operating activities, the most directly comparable GAAP measure, for each of the periods indicated:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2022 | | 2021 | |
| | (in thousands) | | | | | | | |
| Net cash provided by (used in) operating activities | $ | 19 | $ | 11,262 | $ | (870) | $ | 15,471 |
| Purchase of property and equipment | | (333) | | (165) | | (409) | | (271) |
| Capitalization of internal-use software | | (2,663) | | (317) | | (5,125) | | (389) |
| Non-GAAP free cash flow | $ | (2,977) | $ | 10,780 | $ | (6,404) | $ | 14,811 |

### Contractual Obligations and Commitments

There were no material changes in our contractual obligation and commitments during the six months ended June 30, 2022 from the contractual obligations and commitments disclosed in our Annual Report on Form 10-K filed with the SEC on February 25, 2022. See "Note 11-Leases" and "Note 16-Commitments and Contingencies" of the notes to our condensed consolidated financial statements included in Part I, Item 1 of this Quarterly Report on Form 10-Q for additional information regarding contractual obligations and commitments.

### Critical Accounting Policies and Estimates

Our management's discussion and analysis of financial condition and results of operations are based upon our condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q. The preparation of our

43

condensed consolidated financial statements in accordance with GAAP requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, equity, revenue, expenses, and related disclosures. We base our estimates on past experience and other assumptions that we believe are reasonable under the circumstances, and we evaluate these estimates on an ongoing basis. Actual results may differ from those estimates.

There have been no material changes to our critical accounting policies and estimates during the six months ended June 30, 2022, as compared to those disclosed under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations-Critical Accounting Policies" in our Annual Report on Form 10-K filed with the SEC on February 25, 2022.

### Recent Accounting Pronouncements

See "Note 2-Significant Accounting Policies" to our condensed consolidated financial statements included in Part I, Item 1 of this Quarterly Report on Form 10-Q for all recently issued standards impacting our condensed consolidated financial statements.

### JOBS Act Accounting Election

We currently qualify as an "emerging growth company" pursuant to the provisions of the JOBS Act. For as long as we are an "emerging growth company," we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies," including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404(b), or Section 404, of the Sarbanes-Oxley Act of 2002, or Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, exemptions from the requirements of holding advisory "say-on-pay" votes on executive compensation and stockholder advisory votes on golden parachute compensation.

The JOBS Act also permits an emerging growth company like us to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies. We have elected to "opt-in" to this extended transition period for complying with new or revised accounting standards and, therefore, we will not be subject to the same new or revised accounting standards as other public companies that comply with such new or revised accounting standards on a non-delayed basis. As a result, our financial statements may not be comparable to financial statements of issuers that are required to comply with the effective dates for new or revised accounting standards based on public company effective dates.

However, as of the last business day of our second fiscal quarter of 2022, the market value of our Class A common stock that was held by non-affiliates exceeded $700 million, and as a result, we will no longer qualify as an emerging growth company as of the end of the current fiscal year ending December 31, 2022, and we will be subject to certain requirements that apply to other public companies but did not previously apply to us due to our status as an emerging growth company, including the provisions of Section 404, which require that our independent registered public accounting firm provide an attestation report on the effectiveness of our internal control over financial reporting. In addition, we will no longer be able to take advantage of the extended transition period as of the end of the current fiscal year ending December 31, 2022, and we will be required to adopt new or revised accounting standards when they are applicable to public companies that are not emerging growth companies.

**Item 3.** *Quantitative and Qualitative Disclosures about Market Risk.*

We are exposed to market risks in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of exposure to potential changes in interest rates. We do not enter into investments for trading or speculative purposes and have not used any derivative financial instruments to manage our interest rate risk exposure.

### Interest Rate Risk

Our primary market risk exposure is changing interest rates in connection with our investments and the Second Amended and Restated LSA with Pacific Western Bank. Interest rate risk is highly sensitive due to many factors, including U.S. monetary and tax policies, U.S. and international economic factors, and other factors beyond our control.

As of June 30, 2022, advances under the formula revolving line of the Second Amended and Restated LSA bear interest equal to the greater of (A) the Prime Rate then in effect; or (B) 3.25%. As of June 30, 2022, advances under the term

44

loans bear interest equal to the greater of (A) 0.25% above the Prime Rate then in effect; or (B) 3.50%. As of June 30, 2022, we had no outstanding debt under our credit facility.

Our interest-earning instruments also carry a degree of interest rate risk. Our cash and cash equivalents have a relatively short maturity, and are therefore relatively insensitive to interest rate changes. As of June 30, 2022, we had cash and cash equivalents of $386.7 million. We invest in money market funds, U.S. and municipal government agency securities, corporate bonds and notes, certificates of deposit, and commercial paper. Our current investment policy seeks first to preserve principal, second to provide liquidity for our operating and capital needs, and third to maximize yield without putting our principal at risk. As of June 30, 2022, we invested $140.3 million in money market funds and $78.0 million in other securities, of which $73.5 million was classified as short-term. Because the majority of our investment portfolio is short-term in nature, we do not believe an immediate 10% increase in interest rates would have a material effect on the fair market value of our portfolio, and therefore we do not expect our results of operations or cash flows to be materially affected by a sudden change in market interest rates.

### Foreign Currency Exchange Risks

Our revenue and costs are generally denominated in U.S. dollars and are not subject to foreign currency exchange risk. However, to the extent we commence generating revenue outside of the United States that is denominated in currencies other than the U.S. dollar, our results of operations could be impacted by changes in exchange rates.

### Inflation Risk

In recent months, inflation has continued to increase significantly in the U.S. and overseas, resulting in rising transportation, wages, and other costs. The primary inflation factors affecting our business are increased cost of labor and overhead costs. However, we do not believe that inflation has had a material effect on our business, results of operations, or financial condition. If our costs were to become subject to significant inflationary pressures, we may not be able to fully offset such higher costs through price increases. Our inability or failure to do so could harm our business, results of operations and financial condition.

**Item 4.** *Controls and Procedures.*

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of June 30, 2022.

Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of June 30, 2022 due to the material weakness in our internal control over financial reporting described below. In light of this fact, our management has performed additional analyses, reconciliations, and other post-closing procedures and has concluded that, notwithstanding the material weakness in our internal control over financial reporting, the condensed consolidated financial statements for the periods covered by and included in this Quarterly Report on Form 10-Q fairly present, in all material respects, our financial position, results of operations, and cash flows for the periods presented in conformity with GAAP.

### Previously Reported Material Weakness

We previously identified a material weakness in our internal control over financial reporting related to the lack of properly designed controls around complex technical accounting matters within our financial statement close process. We have concluded that this material weakness arose because, as a previously private company, we did not have the necessary business processes, systems, personnel, and related internal controls necessary to satisfy the accounting and financial reporting requirements of a public company.

Accordingly, we have determined that these control deficiencies constituted a material weakness in our internal control over financial reporting. A material weakness is a deficiency or combination of deficiencies in our internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our consolidated financial

statements would not be prevented or detected on a timely basis. These deficiencies could result in additional misstatements to our condensed financial statements that would be material and would not be prevented or detected on a timely basis.

*Remediation Plans*

We have been implementing and will continue to implement measures to remediate the identified material weakness. Specifically, we have:

•initiated the process of implementing a new revenue recognition system which will significantly reduce the number of manual controls currently required to recognize revenue;

•engaged external resources to assist with remediation efforts and internal control execution as well as to provide additional training to existing personnel; and

•hired additional internal resources with appropriate knowledge and technical expertise to effectively operate financial reporting processes and internal controls.

We intend to continue to take steps to remediate the material weakness described above and further evolve our accounting processes and internal resources. We will not be able to fully remediate this material weakness until these steps have been completed and have been operating effectively for a sufficient period of time.

While we believe that these efforts will improve our internal control over financial reporting, the implementation of our remediation is ongoing and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles.

We believe we are making progress toward achieving the effectiveness of our internal controls and disclosure controls. The actions that we are taking are subject to ongoing senior management review as well as audit committee oversight. We will not be able to conclude whether the steps we are taking will fully remediate the material weakness in our internal control over financial reporting until we have completed our remediation efforts and subsequent evaluation of their effectiveness. We may also conclude that additional measures may be required to remediate the material weakness in our internal control over financial reporting, which may necessitate additional remediation time.

*Changes in Internal Control over Financial Reporting*

We are taking actions to remediate the material weakness relating to our internal control over financial reporting, as described above. Except as otherwise described herein, there were no changes in our internal control over financial reporting in connection with the evaluation required by Rule 13a-15 (d) and 15d-15 (d) of the Exchange Act that occurred during the period covered by this Quarterly Report on Form 10-Q that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Inherent Limitations on Effectiveness of Controls*

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures or our internal control over financial reporting will prevent or detect all errors and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

**PART II - OTHER INFORMATION**

**Item 1.** *Legal Proceedings.*

We have received, and may in the future continue to receive, claims from third parties asserting, among other things, infringement of their intellectual property rights. Future litigation may be necessary to defend ourselves or our customers by determining the scope, enforceability, and validity of third-party proprietary rights or to establish our proprietary rights. Defending such proceedings is costly and can impose a significant burden on management and employees. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors.

**Item 1A.** *Risk Factors.*

*Investing in our securities involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this Quarterly Report on Form 10-Q, including the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our condensed consolidated financial statements and related notes, as well as in our Annual Report on Form 10-K filed with the SEC on February 25, 2022 and other filings with the SEC, before making any investment decision with respect to our securities. The risks and uncertainties described below and in our other filings with the SEC, including our Annual Report on Form 10-K filed with the SEC on February 25, 2022, may not be the only ones we face. If any of the risks actually occur, our business could be materially and adversely affected. In that event, the market price of our Class A common stock could decline, and you could lose part or all of your investment.*

*The following description includes new risk factors and material changes to risk factors associated with our business previously disclosed in Part I, Item 1A of our Annual Report on Form 10-K for the fiscal year ended December 31, 2021, and filed with the SEC on February 25, 2022, under the heading "Risk Factors."*

**Operational Risks**

***The COVID-19 pandemic or recovery from the COVID-19 pandemic, including variants of COVID-19, and/or the impact of vaccinations, increased demand for in-person dining, and the impact of changes in response of governments and private industry to COVID-19 could materially adversely affect our business, financial condition, and results of operations.***

The COVID-19 pandemic, the measures attempting to contain and mitigate the effects of the COVID-19 pandemic, including indoor dining restrictions, business closures, stay-at-home, and similar orders limiting the movement of individuals, and the resulting changes in consumer behaviors, disrupted the restaurant industry and impacted our normal operations, employees, partners, and customers. While nearly all regions have re-opened as a result of increased vaccination rates and our employees have transitioned to remote working arrangements, we face risks related to resurgences of COVID-19, including the emergence of new variant strains of COVID-19, which have and may in the future necessitate renewed government restrictions.

We have had to expend, and expect to continue to expend, significant time, attention, and resources to respond to the COVID-19 pandemic and associated global economic uncertainty, including developing and implementing internal policies and procedures and tracking changes in laws and government guidelines and restrictions. The remote working environment may also create increased vulnerability to cybersecurity incidents or decrease the cohesiveness of our teams and our ability to maintain our culture. Additionally, a remote working environment could negatively impact our marketing efforts, our ability to enter into customer and business development contracts in a timely manner, our international expansion efforts, and our ability to recruit and retain employees across the organization.

With the onset of COVID-19, we began to see an increase in transaction volumes as consumers turned to online ordering as compared to in-person dining. This shift began at the end of the first quarter of 2020 and continued through the end of 2021. While we benefited from the acceleration of demand for off-premise dining, our profitability may be adversely impacted if orders placed for pickup grow faster or garner a greater share of off-premise orders than those placed for delivery. Furthermore, we do not expect the trends we experienced in 2020 and 2021 on number of active locations and transaction volume to continue (at least not to the extent experienced in 2020) and we expect our revenue will fluctuate in the near term.

The degree to which the ongoing COVID-19 pandemic and recovery will affect our business and results of operations will depend on future developments that are highly uncertain and cannot currently be predicted. These developments include but are not limited to the duration, extent, and severity of the COVID-19 pandemic, the emergence of new variant strains of COVID-19, actions taken to contain the COVID-19 pandemic, including any restrictions on economic activity and domestic and international trade, the timing of any future booster shot rollouts, the acceptance of the vaccine and booster shots, and the extent of the impact of these and other factors on our employees, partners, vendors, guests, and restaurant customers. The COVID-19 pandemic and related restrictions could limit our restaurant customers' ability to continue to operate, serve guests, or make timely payments to us. It could disrupt or delay the ability of employees to work because they become sick or are required to care for those who become sick, or for dependents for whom external care is not available. It could cause delays or disruptions in services provided by key suppliers and vendors, increase vulnerability of us and our partners and service providers to security breaches, denial of service attacks, or other hacking or phishing attacks, or cause other unpredictable effects.

The ongoing COVID-19 pandemic, in addition to other factors, also has caused heightened uncertainty in the global economy. If economic conditions further deteriorate, guests may not have the financial means to make purchases from our restaurant customers and may delay or reduce discretionary purchases, negatively impacting our restaurant customers and our results of operations. Uncertainty may cause prospective or existing restaurant customers to defer purchasing decisions in anticipation of new modules or enhancements by us or our competitors. Our small and medium business, or SMB, brands may be more susceptible to general economic conditions than our enterprise brands, which may have greater liquidity and access to capital. Uncertain and adverse economic conditions also may lead to increased refunds and chargebacks, reduced demand for our platform, lengthening of sales cycles, loss of customers, and difficulty in collections.

***Our growth may not be sustainable and depends on our ability to attract new customers, retain revenue from existing customers, and increase sales to both new and existing customers.***

We principally generate subscription revenue from our Ordering, Switchboard, Kiosk, Virtual Brands, Marketing Automation, Sentiment, Guest Data Platform, or GDP, and Host modules and transaction revenue from our Rails, Dispatch, Virtual Brands, and Olo Pay modules. We also derive transactional revenue from other products, including Network, which allows brands to take orders from non-marketplace digital channels (e.g., Google Food Ordering, which enables restaurants to fulfill orders directly through Google search results and Maps pages). While the number of customers using our platform, the number of modules that each customer uses, and the volume of transactions on our platform have grown in recent years, there can be no assurance that we will be able to retain these customers or acquire new customers, deploy additional modules to these customers, or continue to increase the volume of transactions on our platform. Our costs associated with subscription renewals and additional module deployments are substantially lower than costs associated with generating revenue from new customers. Therefore, if we are unable to retain or increase revenue from existing customers, even if such losses are offset by an increase in new customers or an increase in other revenues, our operating results could be adversely impacted.

As the circumstances that have accelerated the growth of our business stemming from the effects of stay at home orders and increased online ordering during the ongoing COVID-19 pandemic have eased, and along with general economic uncertainty, among other factors, our revenue may fluctuate in the near term. You should not rely on our revenue or other operating and liquidity metrics for any previous quarterly or annual period as an indication of our revenue or revenue growth or other operating and liquidity metrics or their growth in future periods.

We may also fail to attract new customers, increase the volume of transactions on our platform, retain or increase revenue from existing customers, or increase sales of our modules to both new and existing customers as a result of a number of factors, including:

•reductions in our current or potential customers' spending levels;
•reduction in the number of transactions using our modules due to the easing of efforts to reduce the spread of COVID-19 and any reductions in consumer spending on dining due to the general economic climate;
•actions taken to contain the ongoing COVID-19 pandemic due to new variants or resurgences, including governmental and other restrictions that could impact our customers;
•the labor shortage facing the restaurant industry, which may limit the ability of new or existing customers to adopt our modules;
•the absence of ongoing U.S. federal government stimulus directed at consumers;
•competitive factors affecting the software as a service, or SaaS, or restaurant brand software applications markets, including the introduction of competing platforms, discount pricing, and other strategies that may be implemented by our competitors;
•our ability to execute on our growth strategy and operating plans;
•a decline in our customers' level of satisfaction with our platform and customers' usage of our platform;
•a decline in the number of customer locations utilizing our services;
•the ability of our customers to switch to a competitor or develop their own internal platform solutions;
•changes in the size and complexity of our customer relationships;
•changes in our relationships with third parties, including our delivery service provider, or DSP, ordering aggregator, customer loyalty, and payment processor partners;
•failure to maintain compatibility with third party systems or failure to integrate with new systems;
•the timeliness and success of new modules we may develop;
•concerns relating to actual or perceived security breaches;
•the frequency and severity of any system outages; and
•technological changes or problems.

49

Additionally, we anticipate that our revenue growth rate will decline over time as the number of customers using our platform increases and we achieve higher market penetration rates. Furthermore, as our market penetration among larger potential customers increases, we may be required to target smaller customers to maintain our revenue growth rates, which could result in lower gross profits. As our growth rate declines, investors' perception of our business may be adversely affected and the trading price of our Class A common stock could decline as a result. To the extent our growth rate slows, our business performance will become increasingly dependent on our ability to retain revenue from existing customers and increase sales to existing customers.

**Commercial Risks**

***We currently generate significant revenue from our largest restaurant customers, and the loss or decline in revenue from any of these customers could harm our business, results of operations, and financial condition.***

For the year ended December 31, 2021, our 10 largest restaurant customers generated an aggregate of approximately 19% of our revenue. Although these customers enter into contracts with us, our large customers have in the past and may in the future reduce or terminate their usage of our platform, reduce the number of locations using our platform, or decide not to renew their agreements with us. Our customers have in the past and may in the future choose to develop their own solutions that do not utilize any or all of modules. They also may demand price reductions as their usage of our modules increases, due to competitive pressures, changes in economic conditions, or otherwise, which could have an adverse impact on our gross margin. If we are unable to increase the revenue that we derive from these customers, then our business, results of operations, and financial condition may be adversely affected.

We have lost in the past, and we may lose in the future, one or more of our largest restaurant customers. While no such losses have been material to date, in the event that any of our largest restaurant customers do not continue to use our platform, use fewer of our modules, use our modules in a more limited capacity, or not at all, or if the volume of transactions processed on our platform declines, our business, results of operations, and financial condition could be adversely affected.

***Our sales cycles can be long and unpredictable, and our sales efforts require considerable investment of time and expense. If our sales cycle lengthens, we invest substantial resources pursuing unsuccessful sales opportunities, or our customers do not timely onboard and deploy our modules, our operating results and growth would be harmed.***

We have historically incurred significant costs and experienced long sales cycles when selling to customers. In the restaurant brand market segment, the decision to adopt our modules may require the approval of multiple technical and business decision makers, including security, compliance, operations, finance and treasury, marketing, and IT. In addition, before committing to deploying our modules at scale, restaurant brand customers often require extensive education about our modules and significant support time with our employees or pilot programs, engage in protracted pricing negotiations, and seek to secure development resources.

Additionally, sales cycles for restaurant brand customers in general and larger restaurant brands in particular are inherently complex and unpredictable. These complex and resource intensive sales efforts could place additional strain on our development and engineering resources. Further, even after our customers contract to use our platform, they may require extensive integration or deployment resources from us before they become active customers, which have at times extended to multiple quarterly periods following the execution of an agreement with us. Because we generally only generate transaction revenue after our platform is deployed, if we are unable to deploy our platform with our customers in a timely manner, our results of operations and financial condition may be harmed. Our sales cycle has extended, and may continue to be extended, due to our restaurant brand customers' budgetary constraints and shifting priorities in response to labor and staffing challenges at both the operator and brand level. If we are unsuccessful in closing sales after expending significant funds and management resources, or we experience delays in the deployment of our platform to customers or incur greater than anticipated costs, our business, financial condition, and results of operations could be adversely affected.

**Financial Risks**

***As a result of being a public company, we are obligated to develop and maintain proper and effective internal controls over financial reporting, and any failure to maintain the adequacy of these internal controls may adversely affect investor confidence in our company and, as a result, the value of our Class A common stock.***

We are a public company required to comply with the SEC's rules implementing Sections 302 and 404 of the Sarbanes-Oxley Act of 2002, which requires management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of controls over financial reporting. As of December 31, 2022, we will be a large accelerated filer and cease to be an emerging growth company. Due to our change in status, our independent registered public accounting firm will be required to attest to the effectiveness of our internal control over financial reporting pursuant to Section 404 beginning with our Annual Report on Form 10-K for the year ending December 31, 2022. At such time, our independent registered public accounting firm may issue a report that is adverse in the event material weaknesses have been identified in our internal control over financial reporting.

We continue to compile the system and processing documentation necessary to perform the evaluation needed to comply with Section 404, but we may not be able to complete our evaluation, testing, and any required remediation in a timely fashion once initiated. Our compliance with Section 404 will require that we incur substantial expenses and expend significant management efforts. We continue to develop our internal audit function, and we have hired, and may need to hire additional, accounting and financial staff with appropriate public company experience and technical accounting knowledge and compile the system and process documentation necessary to perform the evaluation needed to comply with Section 404.

During the evaluation and testing process of our internal controls, if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to certify that our internal control over financial reporting is effective. We cannot assure you that there will not be material weaknesses or significant deficiencies in our internal control over financial reporting in the future. As we have identified a material weakness in the past, any failure to maintain internal control over financial reporting could severely inhibit our ability to accurately report our financial condition or results of operations. If we are unable to conclude that our internal control over financial reporting is effective, or if our independent registered public accounting firm determines we have a material weakness or significant deficiency in our internal control over financial reporting, we could lose investor confidence in the accuracy and completeness of our financial reports, the market price of our Class A common stock could decline, and we could be subject to sanctions or investigations by the SEC or other regulatory authorities. In addition, in connection with the results of such evaluation, we may need to upgrade our systems, including information technology; implement additional financial and management controls, reporting systems, and procedures; and hire additional staff. Failure to remedy any material weakness in our internal control over financial reporting, or to implement or maintain other effective control systems required of public companies, could also restrict our future access to the capital markets.

***We may require additional capital, which additional financing may result in restrictions on our operations or substantial dilution to our stockholders, to support the growth of our business, and this capital might not be available on acceptable terms, if at all.***

We have financed our operations since inception primarily through sales of our equity securities, including our completed IPO, payments received from customers, and borrowings under our credit facility. We cannot be certain when or if our operations will generate sufficient cash to fully fund our ongoing operations or the growth of our business. We intend to continue to make investments to support our business, which may require us to engage in equity or debt financings to secure additional funds.

Additional financing may not be available on terms favorable to us, if at all. In particular, we are currently operating in a period of economic uncertainty and capital markets disruption, which has been impacted by geopolitical instability, an ongoing war in Ukraine, the ongoing COVID-19 pandemic, and record inflation. It is impossible to predict the extent to which our business will be impacted in the short and long term, but such uncertainty and disruption may reduce our ability to access capital and negatively affect our liquidity in the future. Additionally, rising interest rates may reduce our access to debt capital, which may adversely affect our future business plans and expected growth, and will increase the cost of any future borrowings and our variable rate borrowings, which would reduce our earnings. If adequate funds are not available on acceptable terms, we may be unable to invest in future growth opportunities, which could harm our business, operating results, and financial condition. If we incur additional debt, the debt holders would have rights senior to holders of our equity to make claims on our assets, and the terms of any debt could restrict our operations, including our ability to pay dividends on our Class A common

51

stock. Furthermore, if we issue additional equity securities, stockholders will experience dilution, and the new equity securities could have rights senior to those of our Class A common stock. Volatility in equity capital markets may also adversely affect market prices of our securities, which may materially and adversely affect our ability to fund our business through public or private sales of equity securities, and the retentive power of our equity compensation plans, which we rely upon in part to retain key executives and employees. Because our decision to issue securities in the future will depend on numerous considerations, including factors beyond our control, we cannot predict or estimate the amount, timing, or nature of any future issuances of debt or equity securities. As a result, our stockholders bear the risk of future issuances of debt or equity securities reducing the value of our Class A common stock and diluting their interests.

**Legal, Regulatory, Compliance, and Reputational Risks**

***We are subject to stringent and changing privacy laws, regulations and standards, and contractual obligations related to data privacy and security. Our actual or perceived failure to comply with such obligations could harm our reputation, subject us to significant fines and liabilities, or adversely affect our business.***

In the United States, there are numerous federal and state consumer, privacy and data security laws and regulations governing the collection, use, disclosure, and protection of personal information, including security breach notification laws and consumer protection laws. The regulatory framework for privacy and security issues in the United States is rapidly evolving. Violating consumers' privacy rights, making deceptive use of prospective or current customers' personal information, or failing to take appropriate steps to keep personal information secure may constitute unfair acts or practices in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission, or FTC, Act, 15 U.S.C § 45(a). The FTC has broad powers to investigate, which may result in binding consent orders and fines, as do states' attorneys general under comparable state unfair and deceptive act laws.

Additionally, laws in all 50 states require us to provide notice to customers when certain sensitive personal information has been disclosed as a result of a data breach. These laws are frequently inconsistent, and compliance in the event of a widespread data breach is costly. Moreover, states regularly enact new laws and regulations, which require us to provide consumers with certain disclosures related to our privacy practices, as well as maintain systems necessary to allow customers to invoke their rights. For example, on January 1, 2020, California adopted the California Consumer Privacy Act of 2018, or CCPA, which provides data privacy rights for consumers and operational requirements for covered businesses. The CCPA gives California residents more control over their personal information and includes a statutory damages framework and private right of action imposing civil penalties against businesses that fail to comply with certain security practices. Although the CCPA's implementation standards and enforcement practices are likely to remain uncertain for the foreseeable future, the CCPA may increase our compliance costs and exposure to liability. More so, additional states that adopt privacy laws that differ from the CCPA may require us to do unanticipated and unbudgeted work in order to comply with additional privacy and data security requirements.

We anticipate that more states may enact legislation similar to the CCPA, providing consumers around the United States with new privacy rights and increasing the privacy and security obligations of entities handling certain personal information of such consumers. The CCPA has already prompted a number of proposals for new federal and state-level privacy legislation. Such proposed legislation, if enacted, may add additional complexity, variation in requirements, restrictions and potential legal risk, require additional investment of resources in compliance programs, or impact strategies and the availability of previously useful data, and could result in increased compliance costs and/or changes in business practices and policies. Additionally, these costs may impede our development and could limit the adoption of our services. Finally, any failure by our vendors to comply with applicable law or regulations could result in proceedings against us by governmental entities or others.

Additionally, a new California ballot initiative, the California Privacy Rights Act, or the CPRA, was passed in November 2020. Effective starting on January 1, 2023, the CPRA imposes additional obligations on companies covered by the legislation and will significantly modify the CCPA, including by expanding consumers' rights with respect to certain sensitive personal information. The CPRA also creates a new state agency that will be vested with authority to implement and enforce the CCPA and the CPRA. Several other states recently passed new privacy laws similar to the CCPA and the CPRA. For example, on March 2, 2021, Virginia enacted the Consumer Data Protection Act, or the CDPA, and, on July 8, 2021, Colorado's governor signed the Colorado Privacy Act, or CPA, into law. The CDPA and the CPA will both become effective January 1, 2023. On March 24, 2022, Utah's governor signed into law the Utah Consumer Privacy Act, effective December 31, 2023. Additionally, on May 10, 2022, Connecticut enacted An Act Concerning Personal Data Privacy and Online Monitoring, which will go into effect on July 1, 2023. The effects of these new state laws are potentially significant and may require us to modify our data collection or processing practices and policies and to incur substantial costs and expenses in an effort to comply and increase our potential exposure to regulatory enforcement and litigation.

52

Additionally, virtually every foreign jurisdiction in which our current or potential future customers may operate has established privacy and data security laws, rules, and regulations. The European Union, or EU, has adopted the General Data Protection Regulation, or GDPR, which went into effect on May 25, 2018. Among other requirements, the GDPR regulates transfers of personally identifiable information from the EU to non-EU countries, such as the United States. Under the GDPR, fines of up to €20 million or up to 4% of the annual global revenue of the noncompliant company, whichever is greater, could be imposed for violations of certain GDPR requirements. Moreover, individuals can claim damages as a result of GDPR violations. Other jurisdictions outside the EU are similarly introducing or enhancing privacy and data security laws, rules, and regulations, which may increase the risks associated with non-compliance. Certain current or potential future customers are subject to the GDPR and we may be required to assist such customers with their compliance obligations. While we are not currently subject to the GDPR ourselves, many of our customers are subject to the GDPR. We may be required to expend resources to assist our customers with such compliance obligations. Assisting our customers in complying with the GDPR, or complying with the GDPR ourselves if we expand our business to the EU in the future, may cause us to incur substantial operational costs or require us to change our business practices to maintain such information in the European Economic Area.

We previously relied upon the EU-U.S. Privacy Shield program to legitimize certain transfers of personal data from the EU and European Economic Area, or EEA, to the United States pursuant to the GDPR. However, on July 16, 2020, the Court of Justice of the European Union, or the CJEU, invalidated the EU-U.S. Privacy Shield program. As a result of this decision, companies that previously relied upon Privacy Shield will be required to use another GDPR-approved method to legitimize transfers of personal data to the United States and other third countries in compliance with the GDPR. Although in its ruling about the Privacy Shield, the CJEU deemed that the Standard Contractual Clauses, or SCCs, approved by the European Commission for transfers of personal data between EU controllers and non-EU processors, such as us, are valid, the CJEU also noted that transfers made pursuant to the SCCs need to be analyzed on a case-by-case basis to ensure EU standards of data protection are met in the jurisdiction where the data importer is based. On June 4, 2021, the European Commission published new versions of the SCCs, which have been required of all new transfers of personal data from the EEA to third countries (including the United States) since September 2021, and must be used for all existing transfers of personal data from the EU to third countries relying on the prior versions of the SCCs by December 2022. The new versions of the SCCs seek to address the issues identified by the CJEU's decision and provide further details regarding the transfer assessments that the parties are required to conduct when implementing the new SCCs. However, there continue to be concerns about whether the SCCs and other mechanisms will face additional challenges. Until the remaining legal uncertainties regarding how to legally continue these transfers are settled, and despite not being currently subject to the GDPR, we will continue to face uncertainty as to whether efforts to comply with European transfer restrictions will be sufficient. This and other future developments regarding the flow of data across borders could increase the cost and complexity of delivering our products and services in some markets and may lead to governmental enforcement actions, litigation, fines and penalties, or adverse publicity, which could have an adverse effect on our reputation and business.

We publish privacy policies, self-certifications, such as the EU-U.S. Privacy Shield, and other documentation regarding our collection, processing, use, and disclosure of personal information, credit card information, and other confidential information.

Although we endeavor to comply with our published policies, certifications, and documentation, we may at times fail to do so or may be perceived to have failed to do so. Such failures can subject us to potential international, local, state, and federal action if they are found to be deceptive, unfair, or misrepresentative of our actual practices, resulting in reputational or financial harm to us. Globally, there have been numerous lawsuits brought against technology companies related to their privacy and data security practices. If those lawsuits are successful, it could increase the risk that we may be exposed to liability for similar practices. Furthermore, if customer concerns regarding data security increase, customers may be hesitant to provide us with the data necessary to provide our service effectively. This could generally limit the adoption of our product and the growth of our company.

***Payment transactions processed on our platform and through the Olo Pay module may subject us to regulatory requirements and the rules of payment card networks, and other risks that could be costly and difficult to comply with or that could harm our business.***

The payment card networks require us to comply with payment card network operating rules, including special operating rules that apply to us as a "payment service provider" that provides payment processing-related services to merchants and payment processors. The payment card networks set these network rules and have discretion to interpret them and change them. We are also required by our payment processors to comply with payment card network operating rules and we have agreed to reimburse our payment processors for any fines they are assessed by payment card networks as a result of any rule violations by us or our customers. Any changes to or interpretations of the network rules that are inconsistent with the way we and the payment processors and merchants currently operate may require us to make changes to our business that could be costly or difficult to implement. If we fail to make such changes or otherwise resolve the issue with the payment card networks,

the networks could fine us, cancel or suspend our registration as a payment service provider, or prohibit us from processing payment cards, which could have an adverse effect on our business, financial condition, and operating results. In addition, violations of the network rules or any failure to maintain good standing with the payment card networks as a payment service provider could impact our ability to facilitate payment card transactions on our platform, increase our costs, or otherwise harm our business. If we were unable to facilitate payment card transactions on our platform, or were limited in our ability to do so, our business would be materially and adversely affected.

We released a beta version of our Payment solution, Olo Pay, to select restaurant brands in October 2020. We began commercially offering Olo Pay in the first quarter of 2022. We also released a new feature, Borderless, to a limited number of customers in July 2022, to allow guests to securely speed through an accelerated checkout process across brands within the Olo Pay network.

If we fail to comply with the rules and regulations adopted by the payment card networks, we would be in breach of our contractual obligations to our payment processors, financial institutions, or partners. Such failure to comply may subject us to fines, penalties, damages, higher transaction fees, and civil liability, and could eventually prevent us from processing or accepting payment cards or could lead to a loss of payment processor partners, even if there is no compromise of customer or consumer information. In the event that we are found to be in violation of any of these legal or regulatory requirements, our business, financial condition, and results of operations could be harmed.

We believe the licensing requirements of the Financial Crimes Enforcement Network and state agencies that regulate banks, money service businesses, money transmitters, and other providers of electronic commerce services do not apply to us. One or more governmental agencies may conclude that, under its statutes or regulations, we are engaged in activity requiring licensing or registration. In that event, we may be subject to monetary penalties and adverse publicity, and may be required to cease doing business with residents of those states until we obtain the requisite license or registration.

### *Our DSP and other partners may be subject to pricing, licensing, and data regulations, which may impact our business.*

Our DSP and other partners' revenue is dependent on the pricing models they use to calculate earnings. In particular, the DSPs' pricing models have been, and will likely continue to be, challenged, banned, limited in emergencies, and capped in certain jurisdictions. An increasing number of municipalities have proposed delivery network fee caps with respect to DSPs' delivery offerings. For example, in 2022, New York City began requiring DSPs to obtain a license in order to do business within the city; instituted a percentage cap on service, transaction, and other fees that DSPs may charge food service establishments; and began allowing food delivery workers to unilaterally cap the distances they are required to travel for delivery. Additional regulation of the DSPs, including with regard to licensing, sharing of end user data, and pricing, could increase their operating costs and adversely affect their business, which may in turn adversely affect our business. Furthermore, our partners may be forced to change their pricing models, or otherwise limit or abandon their business operations altogether, in jurisdictions where laws or regulations significantly impact their business, which could ultimately harm our revenue.

### Employee Related Risks

### *If we are unable to hire, retain, and motivate qualified personnel, our business may be adversely affected.*

Our future success depends, in part, on our ability to continue to attract and retain highly skilled personnel. Competition for these personnel is intense, especially for engineers experienced in designing and developing SaaS or on-demand digital commerce applications, products managers and designers, and experienced enterprise sales professionals.

Further, our ability to increase our customer base, especially among restaurant brands, SMBs, potential international customers, and other customers we may pursue, or to achieve broader market acceptance of our platform will depend, in part, on our ability to effectively organize, focus, and train our sales, marketing, and customer success personnel.

Our ability to convince restaurant brands to use our platform or adopt additional modules will depend, in part, on our ability to attract and retain sales personnel with experience selling to large enterprises. We believe that there is significant competition for experienced sales professionals with the skills and technical knowledge that we require. Our ability to achieve revenue growth in the future will depend, in part, on our ability to recruit, train, and retain a sufficient number of experienced sales professionals, particularly those with experience selling to restaurant brands or large enterprises. In addition, even if we are successful in hiring qualified sales personnel, new hires require significant training and experience before they achieve full productivity, particularly for sales efforts targeted at restaurant brands and new territories. Our recent hires and planned hires

54

may not become as productive as quickly as we expect and we may be unable to hire or retain sufficient numbers of qualified individuals in the future in the markets where we do business.

In the past we have experienced, and we expect to continue to experience, difficulty in hiring employees with appropriate qualifications. In many markets, competition for qualified individuals is intense and we may be unable to identify and attract a sufficient number of individuals to meet our growing needs, especially in markets where our brand is less established. As a result, because we aim to hire top talent, we may be required to pay higher wages or provide increased levels of benefits. Our commitment to taking care of our team may cause us to incur higher labor costs compared to other technology companies. We also place a heavy emphasis on the qualification and training of our team members, and spend a significant amount of time and money training our team members. Any inability to recruit and retain qualified individuals may result in higher turnover and increased labor costs, and could compromise the quality of our service, all of which could adversely affect our business. Many of the companies with which we compete for experienced personnel have greater resources than we have. If we hire employees from competitors or other companies, their former employers may attempt to assert that these employees or we have breached their legal obligations, resulting in additional costs and a diversion of our time and resources. In addition, prospective and existing employees often consider the value of the equity awards they receive in connection with their employment. Capital markets have been volatile, which may cause the perceived value of our equity awards to decline and cause prospective employees to believe there is limited upside to the value of our equity awards, which would adversely affect our ability to recruit and retain key employees. If we fail to attract new personnel or fail to retain and motivate our current personnel, our business and future growth prospects could be harmed.

**Industry Risks**

***Unfavorable conditions in our industry or the global economy, or reductions in digital ordering transaction volume or technology spending, could adversely impact the health of our customers and limit our ability to grow our business and negatively affect our results of operations.***

Our results of operations may vary based on the impact of changes in our industry or the global economy on us or our customers and potential customers. In recent months, we have observed increased economic uncertainty in the United States and abroad. Negative conditions in the general economy both in the United States and abroad, including conditions resulting from changes in gross domestic product growth, decreases in restaurant and digital ordering spending, inflationary pressures, rising interest rates, lower consumer confidence or spending, volatile equity capital markets, the impact of a housing crisis and other conditions in the residential real estate and mortgage markets, high unemployment, gasoline prices, energy and other utility costs, inclement weather, health care costs, access to credit, disposable consumer income, availability of continued federal economic stimulus and other governmental efforts, financial and credit market fluctuations, international trade relations, political turmoil, natural catastrophes, epidemics, warfare, including the ongoing war in Ukraine, and terrorist attacks on the United States, Canada, or elsewhere, have caused, and in the future may cause, a reduction in customer locations and digital ordering transaction volumes, a decrease in business investments, including spending on technology, or business interruptions resulting from a destruction of our headquarters, and negatively affect the growth of our business, revenue, and earnings.

More specifically, we are heavily reliant on the restaurant, food, and delivery industries, and any downturn or shift in those industries could significantly impact our results. In poor or uncertain economic conditions, restaurant guest traffic could be adversely impacted if guests choose to dine out or order less frequently or reduce the amount they spend on meals. In addition, inflation and the rising costs of food and labor have caused some businesses in the restaurant food and delivery industries to raise their prices which could cause a decline in guest traffic. Further, to the extent there is a sustained general economic downturn and our solutions are perceived by restaurant customers and potential restaurant customers as costly, or too difficult to deploy or migrate to, our revenue may be disproportionately affected by delays or reductions in on-demand digital commerce spending. Competitors may respond to market conditions by lowering prices and attempting to lure away our customers. Additionally, reports, whether true or not, of foodborne illnesses and injuries caused by food tampering have severely injured the reputations of participants in the food business and the restaurant industry generally, and could continue to do so in the future, and those reports could harm our business and results of operations. The potential for acts of terrorism on the United States' food supply also exists and, if such an event occurs, it could harm our business and results of operations.

In addition, we contract directly with our DSPs to provide delivery services to our restaurant customers through our Dispatch module and then invoice our restaurant customers for the cost associated with DSP services. As a result, we may be required to make payments to DSPs prior to receiving payment from our restaurant customers for DSP transactions, which could reduce the amount of cash and cash equivalents we have available for the period between payment to the DSPs and receipt of payment from the restaurant customer. In addition, if any of our restaurant customers were to go out of business, become insolvent, or otherwise be unable to pay for DSP transactions, we would be responsible for making payments to the DSPs that our customers otherwise would have made, which could adversely affect our business. Additionally, our DSPs and other vendors, suppliers, or partners may raise prices that we may not be able to pass on to our restaurant customers. This may materially and adversely affect our business, including our competitive position, market share, revenues, and earnings.

Lastly, the increased pace of consolidation in the restaurant industry, the loss of partners that may have gone out of business or may have merged with other of our partners, or if any of our customers are acquired by another company that does not use our solutions, may result in reduced overall spending on our platform. We cannot predict the timing, strength, or duration of any economic slowdown, instability, or recovery, generally or within the restaurant industry. If the economic conditions of the general economy or markets in which we operate worsen, our business, results of operations, and financial condition could be materially and adversely affected.

**Risks Related to Ownership of Our Class A Common Stock**

***If our operating and financial performance in any given period does not meet the guidance that we provide to the public or the expectations of investment analysts, the market price of our Class A common stock may decline.***

We may, but are not obligated to, continue to provide public guidance on our expected operating and financial results for future periods. Any such guidance will comprise forward-looking statements, subject to the risks, assumptions, and uncertainties described in this Quarterly Report on Form 10-Q, our Annual Report on Form 10-K, and in our other public filings and public statements. Our ability to provide this public guidance, and our ability to accurately forecast our results of operations, may be impacted by the ongoing COVID-19 pandemic and changes in the macroeconomic environment. Our actual results may not always be in line with or exceed any guidance we have provided, and may differ materially from such projections, especially in times of economic uncertainty, such as the current global economic uncertainty being experienced as a result of the COVID-19 pandemic, the war in Ukraine, rising interest rates and inflation, and other factors. Factors that could cause or contribute to such differences include, but are not limited to, those identified in these Risk Factors, some or all of which are not predictable or in our control. Other unknown or unpredictable factors also could adversely impact our performance, and we undertake no obligation to update or revise any projections, whether as a result of new information, future events, or otherwise. In addition, various news sources, bloggers, and other publishers often make statements regarding our historical or projected business or financial performance, and you should not rely on any such information even if it is attributed directly or indirectly to us. If our operating or financial results for a particular period do not meet any guidance we provide or the expectations of investment analysts, or if we continue to reduce our guidance for future periods, the market price of our Class A common stock may decline. While we currently issue public guidance, there can be no assurance that we will continue to do so in the future.

***We expect fluctuations in our financial results, making it difficult to project future results, and if we fail to meet the expectations of securities analysts or investors with respect to our results of operations, our stock price and the value of your investment could decline.***

Our quarterly operating results, including our revenues, operating margin, profitability, cash flow, number of locations, and transaction volumes may vary significantly in the future and period-to-period comparisons of our operating results may not be meaningful. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Our quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of our control, and as a result, may not fully reflect the underlying performance of our business. Fluctuations in our quarterly results and related impacts to any earnings guidance we may issue from time to time, including any modification or withdrawal thereof, may negatively impact the value of our securities. Additional factors that may cause fluctuations in our quarterly financial results include, without limitation, those listed below:

•fluctuations in demand for or pricing of our platform, or any of our modules, including any governmental regulations that restrict the amount we can charge;
•fluctuations in usage of our platform, or any of our modules, including due to the potential lack of durability of the growth we have experienced in the near term due to the impact of COVID-19 and the associated measures to contain the spread of COVID-19 on consumer preferences for digital ordering and customer adoption of multi-modules as COVID-19 associated restrictions continue to abate;
•our ability to attract new customers;
•our ability to retain our existing customers;
•our ability to retain and increase revenue, locations, and transaction volumes from existing customers;
•fluctuations in the amount of revenue from our existing customers, the number of existing customers, and the number of locations that we serve for our existing customers;
•delays in our customers' adoption of new products, including Olo Pay;
•the timing of our customer purchases and deployments;
•the amount of time it takes for our customers to be onboarded to our platform and modules;

- customer expansion rates and the pricing and quantity of subscriptions renewed and transactions processed through our platform;
- competition and the actions of our competitors, including pricing changes and the introduction of new products, services, and geographies;
- reductions in pricing or customer locations, including as a result of negotiations with our larger customers;
- changes in the size and complexity of our customer relationships;
- actions by our customers related to implementation of internal or competitive products and tools that may displace their need for our services;
- changes in spending by our existing or prospective customers;
- pricing our platform subscriptions effectively so that we are able to attract and retain customers without compromising our profitability;
- customer renewal rates and the amounts for which agreements are renewed;
- timing and amount of our investments to expand the capacity of our third-party cloud infrastructure providers;
- the investment in and success of new modules relative to our existing infrastructure and platform;
- fluctuations or delays in purchasing decisions in anticipation of new modules or enhancements by us or our competitors;
- changes in customers' budgets and in the timing of their budget cycles and purchasing decisions;
- our ability to control costs, including our operating expenses;
- the amount and timing of payment for operating expenses, particularly research and development and sales and marketing expenses, including sales commissions;
- the amount and timing of non-cash expenses, including stock-based compensation, goodwill impairments, and other non-cash charges;
- the amount and timing of costs associated with recruiting, training and integrating new employees, and retaining and motivating existing employees;
- the effects of acquisitions and their integration;
- general economic conditions, both domestically and internationally, as well as economic conditions (including rising inflation and interest rates) specifically affecting industries in which our customers participate;
- health epidemics or pandemics, such as the COVID-19 pandemic;
- the impact of new accounting pronouncements;
- changes in regulatory or legal environments that may cause us to incur, among other elements, expenses associated with compliance;
- changes in the competitive dynamics of our market, including consolidation among competitors or customers; and
- significant security breaches of, technical difficulties with, or interruptions to, the delivery and use of our modules and platform capabilities or third-party applications or point of sale or management systems with which our platform integrates.

Any of these and other factors, or the cumulative effect of some of these factors, may cause our results of operations to vary significantly. If our results of operations or key performance indicators fall below the expectations of investors and securities analysts who follow our stock, the price of our Class A common stock could decline substantially, and we could face costly lawsuits, including securities class action suits.

***Our stock price may be volatile, and the value of our Class A common stock may decline.***

The market price of our Class A common stock may be highly volatile and may fluctuate or decline substantially as a result of a variety of factors, some of which are beyond our control, including:

- price and volume fluctuations in the overall stock market from time to time, including fluctuations due to general economic uncertainty or negative market sentiment, in particular related to the ongoing COVID-19 pandemic, rising inflation, and interest rates;
- actual or anticipated fluctuations in our financial condition or results of operations;
- variance in our financial performance from expectations of securities analysts;
- changes in the pricing and adoption rates of our modules;
- changes in our projected operating and financial results;
- changes in laws or regulations applicable to our platform and modules;
- investor sentiment and the public's reaction to announcements by us or our competitors of significant business developments, acquisitions, or new offerings;

•the trading volume of our Class A common stock;
•future sales of our Class A common stock by us or our stockholders;
•our involvement in litigation;
•significant data breaches, disruptions to or other incidents involving our software;
•changes in senior management or key personnel;
•changes in the anticipated future size and growth rate of our markets; and
•general economic conditions and slow or negative growth of our markets.

Broad market and industry fluctuations, as well as general economic, political, regulatory, and market conditions, may also negatively impact the market price of our Class A common stock. In addition, the stock market in general, and the market for technology companies in particular, has experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of those companies. Broad market and industry factors may seriously affect the market price of our Class A common stock, regardless of our actual operating performance. In addition, in the past, following periods of volatility in the overall market and the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. Securities litigation, if instituted against us, could result in substantial costs and divert our management's attention and resources from our business. This risk could materially adversely affect our business, results of operations, and financial condition.

The occurrence of one or more of the foregoing and other factors may cause our results of operations to vary significantly. In addition, a significant percentage of our operating expenses is fixed in nature and is based on forecasted revenue and trends. Accordingly, in the event of a revenue shortfall, we may not be able to mitigate the negative impact on our income (loss) and margins in the short term. If we fail to meet or exceed the expectations of investors or securities analysts, then the trading price of our Class A common stock could fall substantially.

***We are currently an "emerging growth company" and we cannot be certain if the reduced reporting and disclosure requirements applicable to emerging growth companies will make our Class A common stock less attractive to investors. As of December 31, 2022, we will no longer qualify as an "emerging growth company" and as a result will incur additional costs.***

We are currently an "emerging growth company," as defined in the JOBS Act, but will no longer qualify as an emerging growth company as of December 31, 2022. For so long as we remain an emerging growth company, we are permitted and intend to rely on exemptions from certain disclosure requirements that are applicable to other public companies that are not emerging growth companies. We have taken advantage of those exemptions in previous reports and filings, as well as in this in this Quarterly Report on Form 10-Q, including the auditor attestation requirements of Section 404, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. Pursuant to Section 107 of the JOBS Act, as an emerging growth company, we have elected to use the extended transition period for complying with new or revised accounting standards until those standards would otherwise apply to private companies. As a result, our consolidated financial statements may not be comparable to the financial statements of issuers who are required to comply with the effective dates for new or revised accounting standards that are applicable to public companies, which may make our Class A common stock less attractive to investors. We cannot predict if investors will find our Class A common stock less attractive based on our decision to rely on these exemptions during the period that we are an emerging growth company.

As of December 31, 2022, we will cease to be an emerging growth company and we will be subject to certain disclosure and compliance requirements that apply to other public companies that did not previously apply to us due to our status as an emerging growth company.

We expect that the loss of emerging growth company status and compliance with the additional requirements of being a large accelerated filer will increase our legal and financial compliance costs and cause management and other personnel to divert their attention from operational and other business matters to devote substantial time to public company reporting requirements. In addition, if we are not able to comply with changing requirements in a timely manner, the market price of our stock could decline and we could be subject to sanctions or investigations by the New York Stock Exchange, or NYSE, the SEC, or other regulatory authorities, which would require additional financial and management resources.

***We incur increased costs as a result of operating as a public company, and our management is required to devote substantial time to compliance with our public company responsibilities and corporate governance practices.***

As a public company, we incur significant legal, accounting, and other expenses that we did not incur as a private company, which we expect to further increase as we prepare for, and following, December 31, 2022, when we no longer qualify as an "emerging growth company." The Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the listing requirements of the NYSE, and other applicable securities rules and regulations impose various requirements on public companies. Our management and other personnel devote a substantial amount of time to compliance with these requirements. Moreover, these rules and regulations increase our legal and financial compliance costs and make some activities more time-consuming and costly.

**Item 2. *Unregistered Sales of Equity Securities and Use of Proceeds.***

*Unregistered Sales of Equity Securities*

None.

*Use of Proceeds*

On March 19, 2021, we closed our IPO of 20,700,000 shares of our Class A common stock at a price to the public of $25.00 per share, including the full exercise by the underwriters of their option to purchase up to an additional 2,700,000 shares of Class A common stock, resulting in net proceeds to us of approximately $485.5 million, after deducting underwriting discounts and commissions. All of the shares issued and sold in our IPO were registered under the Securities Act of 1933, as amended, or the Securities Act, pursuant to a registration statement on Form S-1 (File No. 333-253314), which was declared effective by the SEC, on March 16, 2021. Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, RBC Capital Markets, LLC, Piper Sandler & Co., Stifel, Nicolaus & Company, Incorporated, Truist Securities, Inc., and William Blair & Company, L.L.C. acted as underwriters for the IPO.

No payments were made to our directors or officers or their associates, holders of 10% or more of any class of our equity securities, or to our affiliates in connection with the issuance and sale of the securities registered, other than payments in the ordinary course of business to officers for salaries and to non-employee directors pursuant to our director compensation policy. There has been no material change in the planned use of proceeds from our IPO from those disclosed in our final prospectus dated March 16, 2021 and filed with the SEC pursuant to Rule 424(b) under the Securities Act.

**Item 3. *Defaults Upon Senior Securities.***

Not applicable.

**Item 4. *Mine Safety Disclosures.***

Not applicable.

**Item 5. *Other Information.***

Not applicable.

**Item 6.** *Exhibits.*

The documents listed in the Exhibit Index of this Quarterly Report on Form 10-Q are incorporated by reference or are filed with this Quarterly Report on Form 10-Q, in each case as indicated therein.

<div align="center">

**EXHIBIT INDEX**

</div>

| Exhibit Number | Description | Filing Date |
|---|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant (incorporated by reference to Exhibit 3.1 to the Registrant's Form 8-K (File No. 001-40213) filed on March 22, 2021). | March 22, 2021 |
| 3.2 | Amended and Restated Bylaws of the Registrant (incorporated by reference to Exhibit 3.2 to the Registrant's Form 8-K (File No. 001-40213) filed on March 22, 2021). | March 22, 2021 |
| 4.1 | Form of Class A Common Stock Certificate (incorporated by reference to Exhibit 4.1 to the Registrant's Form S-1/A (File No. 333-253314) filed on March 8, 2021). | March 8, 2021 |
| 10.1+ | Separation Agreement and Release, by and between Registrant and Marty Hahnfeld, dated May 9, 2022. | Filed herewith |
| 10.2+ | Advisor Agreement, by and between Registrant and Marty Hahnfeld, dated May 9, 2022. | Filed herewith |
| 10.3+ | Employment Agreement, by and between Registrant and Diego Panama, dated April 26, 2022. | Filed herewith |
| 10.4 | Sixth Amendment to Amended and Restated Loan and Security Agreement, by and between the Registrant and Pacific Western Bank, dated May 9, 2022. | Filed herewith |
| 10.5# | First Amendment to the Restated Delivery Network Agreement, by and between the Registrant and DoorDash, Inc., dated July 30, 2021. | Filed herewith |
| 10.6# | Second Amendment to the Restated Delivery Network Agreement, by and between the Registrant and DoorDash, Inc., dated April 4, 2022. | Filed herewith |
| 10.7† | Second Amended and Restated Loan and Security Agreement, dated June 10, 2022, by and among the Registrant, Wisely, LLC, Omnivore Technologies, Inc. and Pacific Western Bank (incorporated by reference to Exhibit 10.1 to the Registrant's Form 8-K (File No. 001-40213) filed on June 15, 2022). | June 15, 2022 |
| 31.1 | Certification of the Chief Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | Filed herewith |
| 31.2 | Certification of the Chief Financial Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | Filed herewith |
| 32.1* | Certification of the Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | Furnished herewith |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | Filed herewith |
| 101.SCH | XBRL Taxonomy Extension Schema Document | Filed herewith |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | Filed herewith |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | Filed herewith |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | Filed herewith |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | Filed herewith |
| 104 | Cover Page with Interactive Data File (formatted as Inline XBRL with applicable taxonomy extension information contained in Exhibits 101). | |

_____

\*      The certifications furnished in Exhibit 32.1 hereto are deemed to accompany this Quarterly Report on Form 10-Q and will not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, except to the extent that the registrant specifically incorporates it by reference.

\#      Portions of this exhibit (indicated by asterisks) have been omitted because the registrant has determined they are not material and is the type of information that the registrant treats as private or confidential.

†      Certain schedules have been omitted pursuant to Item 601(a)(5) of Regulation S-K. The registrant hereby undertakes to furnish supplementally a copy of any omitted exhibit or schedule upon request by the SEC.

\+      Indicates management contract or compensatory plan.

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Olo Inc.

|  |  |
|---|---|
|  | /s/ Noah H. Glass |
|  | Noah H. Glass |
| August 11, 2022 | *Chief Executive Officer (Principal Executive Officer)* |
|  |  |
|  | /s/ Peter Benevides |
|  | Peter Benevides |
| August 11, 2022 | *Chief Financial Officer (Principal Accounting and Financial Officer)* |

62

**Exhibit 10.1**

**SEPARATION AGREEMENT AND RELEASE**

This Separation Agreement and Release ("Agreement") is made by and between Marty Hahnfeld ("Employee") and Olo Inc. (the "Company") (collectively referred to as the "Parties" or individually referred to as a "Party").

**RECITALS**

WHEREAS, Employee is employed by the Company;

WHEREAS, Employee signed an Employment Agreement with the Company, originally effective January 1, 2018, and most recently revised effective January 1, 2021 (the "Employment Agreement");

WHEREAS, Employee signed an Employee Confidential Information and Invention Assignment Agreement with the Company on July 19, 2013 (the "Confidentiality Agreement");

WHEREAS, the Company and Employee have entered into a Stock Option Agreement (the "Stock Option Agreement"), with grant dates as listed in  Exhibit A, granting Employee the option to purchase shares of the Company's common stock (the "Options") subject to the terms and conditions of the Mobo Systems, Inc. 2005 Equity Incentive Plan, Olo Inc. 2015 Equity Incentive Plan or Olo Inc. 2021 Equity Incentive Plan, as applicable, each as amended from time to time (together, the "Equity Incentive Plans"), and the respective Stock Option Agreement;

WHEREAS, the Company and Employee have entered into a restricted stock unit award agreement (the "RSU Agreement"), with grant dates as listed in Exhibit A, each granting Employee the right to receive Restricted Stock Units ("RSUs") subject to the terms and conditions of the Company's 2021 Equity Incentive Plan and the RSU Award Agreement (the RSU Award Agreement along with the Stock Option Agreement, the "Equity Award Agreements");

WHEREAS, effective June 30, 2022, Employee will no longer be employed by the Company (the "Separation Date");

WHEREAS, Employee's termination from the Company is not severance-eligible under Section 5.2 of the Employment Agreement, however the Company wishes to provide the Employee with certain post-termination benefits pursuant to the terms of this Agreement;

WHEREAS, conditioned upon Employee's signing and not revoking this Agreement, and complying with the terms of this Agreement, Employee shall be given the opportunity to provide advisory services to Company pursuant to a written advisory agreement (the "Advisor Agreement") and receive certain other post-termination benefits to which Employee would not otherwise be entitled;

WHEREAS, the Parties wish to resolve any and all disputes, claims, complaints, grievances, charges, actions, petitions, and demands that the Employee may have against the Company and any of the Releasees as defined below, including, but not limited to, any and all claims arising out of or in any way related to Employee's employment with or separation from the Company; and

WHEREAS, regardless of whether Employee enters into this Agreement, the Company shall (i) pay Employee salary, Earned Commissions (as defined in the Sales Compensation Plan) that are due and payable as of the Separation Date under the terms of the Sales Compensation Plan (as defined in the Employment Agreement), unpaid and properly documented expenses, in each case that have accrued to Employee through the Separation Date; and (ii) provide Employee with opportunity to continue group health coverage at Employee's own sole expense under the law known as "COBRA," subject to Employee's COBRA eligibility; provided that if this Agreement becomes effective, Section 1(d) shall apply. Except as provided herein, Employee's participation in all benefits and incidents of employment, including, but not limited to, the accrual of bonuses, vacation, and paid time off, will cease as of the Separation Date.

NOW, THEREFORE, in consideration of the mutual promises made herein, the Company and Employee hereby agree as follows:

**COVENANTS**

1.Consideration.  In consideration of Employee's execution of this Agreement and Employee's fulfillment of all of its terms and conditions, and provided that Employee does not revoke the Agreement under the Acknowledgement of Waiver of Claims Under ADEA Section below, the Company agrees as follows:

a.Advisor Arrangement. Pursuant to the terms of the Advisor Agreement, Employee shall provide advisory and consulting services as agreed between Employee and the Company until December 31, 2022, unless terminated earlier ("Advisory Termination Date").

b.Payment.  The Company agrees to pay Employee a payment of $190,000 (the "Separation Payment"), less applicable withholding, which is the equivalent of six (6) months of the Employee's base pay. The Separation Payment will be paid in equal installments on the Company's regular payroll schedule over the six (6) month period following the Separation Date, commencing within 60 days following the Separation Date; *provided that* the Company shall not be obligated to include Employee on the payroll before this Agreement becomes effective. If the Company does not make one or more payments of the Separation Payment on a regular payroll date because this Agreement has not yet become effective, the Company shall make all such delayed payments by the first payroll date when it is practicable to do so after the Agreement becomes effective.

c.Commissions. The Company agrees to pay Employee a Target Commission (as defined in the Employment Agreement) in an amount equal to the average sales commissions and/or bonuses earned monthly during the 12 months prior to the Separation Date (total sales commissions and/or bonuses earned during the trailing 12-month period, divided by 12), multiplied by six (6), payable on the date the first installment of the Separation Payment is payable hereunder.

d.Benefits. If Employee is eligible for and elects COBRA continuation coverage, the Company shall pay the same portion of premiums that it pays for active employees for the same level of health coverage as in effect for Employee on the Separation Date up until the Advisory Termination Date, unless Employee is eligible for group medical care coverage through other employment. Employee agrees to notify the Company promptly if Employee becomes eligible for group medical care coverage through another employer. Employee also agrees to respond

promptly and fully to any reasonable requests for information by the Company concerning Employee's eligibility for such coverage. Employee may continue coverage after the Advisory Termination Date at Employee's own expense for the remainder of the COBRA continuation period, subject to continued eligibility. Notwithstanding the foregoing, if the Company determines at any time that its payments pursuant to this paragraph may be taxable income to the Employee, it may convert such payments to payroll payments directly to Employee.

e.Electronics. The Company agrees that Employee may retain, for Employee's personal use, the possession of, and the Company hereby transfers ownership of, the Company-issued laptop computer and iPad used by Employee prior to the Separation Date. Employee represents that all proprietary or confidential information will be permanently deleted from the devices.

f.General. Employee acknowledges that without this Agreement, Employee is otherwise not entitled to the consideration listed in this Section 1.

2.Payments and Benefits Under Employment Agreement. In consideration of the payments and
benefits set forth in Section 1 herein, Employee waives the right to any further severance payment or benefit pursuant to Section 5.2(ii) of the Employment Agreement.

3.Stock.

a.Conditioned upon Employee's signing of the Advisor Agreement and that the Advisor Agreement is not terminated by Employee or the Company, the Parties agree that for purposes of determining the number of shares of the Company's common stock that Employee is entitled to purchase from the Company, pursuant to the exercise of outstanding Options, and the number of RSUs that will be settled to Employee upon vesting, Employee will be considered to have vested only up to the Advisory Termination Date. Employee acknowledges that as of December 31, 2022 (unless the Advisor Agreement is terminated earlier), Employee will have vested in the number of Options and RSUs as listed in Exhibit B, and no more.

b.The exercise of Employee's vested options and shares, and the settlement of Employee's vested RSUs, shall continue to be governed by the terms and conditions of the Company's Equity Award Agreements, as applicable; *provided however*, Employee and the Company agree that the period of time in which Employee has to exercise the shares subject to the Options shall be extended until the earlier of (i) the expiration of the original term of each Option or (ii) on the one-year anniversary of the Advisory Termination Date (the "Exercise Period Extension"). Notwithstanding the foregoing, in no event shall any Option remain outstanding or exercisable: (i) more than 10 years following the date of grant of the Option; or (ii) following termination of the Option (i.e., such Option's original expiration date). The Employee acknowledges that as a result of the Exercise Period Extension, to the extent any of the Employee's vested stock options were incentive stock options, the Employee's vested stock options will convert from incentive stock options to nonqualified stock options, consistent with the Equity Incentive Plan, Equity Award Agreements, and applicable law. The Employee is advised to seek tax guidance from the Employee's personal tax advisors with regard to the potential change in tax treatment of the Employee's vested equity.

c.For the purposes of vesting in the Options and RSUs, Employee's service under the Advisor Agreement shall be deemed uninterrupted continuous service under the applicable Equity Incentive Plan and Equity Award Agreement. For the avoidance of doubt, the Employee will cease all vesting in the Options and RSUs on the later of (i) the Separation Date or (ii) the Advisory Termination Date.

4.<u>Payment of Salary and Receipt of All Benefits</u>.  Employee acknowledges and represents that, other than the consideration set forth in this Agreement, the Company and its agents have paid or provided all salary, wages, bonuses, accrued vacation/paid time off, notice periods, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, Options, RSUs, vesting, and any and all other benefits and compensation due to Employee.

5.<u>Release of Claims</u>.  Employee agrees that the foregoing consideration represents settlement in full of all outstanding obligations owed to Employee by the Company and any of its current, future and former parents, subsidiaries, divisions, affiliates and related entities and its and their predecessors, successors and assigns, and any and all of its and their current, future and former officers, directors, employees, agents, investors, attorneys, shareholders, members, administrators, benefit plans, plan administrators, professional employer organization or co-employer, insurers and trustees (individually and collectively, the "Releasees"). Employee, on Employee's own behalf and on behalf of Employee's respective heirs, family members, executors, agents, and assigns (collectively, the "Employee Releasors"), hereby and forever releases the Releasees from, and agrees not to sue concerning, or in any manner to institute, prosecute, or pursue, any claim, complaint, charge, duty, obligation, demand, or cause of action relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected, that any Employee Releasor may possess or have possessed against any of the Releasees arising from any omissions, acts, facts, or damages that have occurred up until and including the Effective Date of this Agreement, including, without limitation:

a.any and all claims relating to or arising from Employee's employment relationship with the Company or any other Releasee and the termination of that relationship;

b.any and all claims relating to, or arising from, Employee's right to purchase, or actual purchase of shares of stock of the Company or any other Releasee, including, without limitation, any claims for fraud, misrepresentation, breach of fiduciary duty, breach of duty under applicable state corporate law, and securities fraud under any state or federal law;

c.any and all claims for wrongful discharge of employment; termination in violation of public policy; discrimination; harassment; retaliation; breach of contract, both express and implied; breach of covenant of good faith and fair dealing, both express and implied; promissory estoppel; negligent or intentional infliction of emotional distress; fraud; negligent or intentional misrepresentation; negligent or intentional interference with contract or prospective economic advantage; unfair business practices; defamation; libel; slander; negligence; personal injury; assault; battery; invasion of privacy; false imprisonment; conversion; and disability benefits;

d.any and all claims for violation of any federal, state, county or municipal statute, including, but not limited to, Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Rehabilitation Act of 1973; the Americans with Disabilities Act of 1990; the Equal Pay Act; the Fair Labor Standards Act; the Fair Credit Reporting Act; the Age Discrimination in Employment Act of 1967; the Older Workers Benefit Protection Act; the Employee Retirement Income Security Act of 1974; the Worker Adjustment and Retraining Notification Act; the Family and Medical Leave Act; the Uniformed Services Employment and Reemployment Rights Act; the California Fair Employment and Housing Act, as amended; the Unruh Civil Rights Act, as amended; the Moore-Brown-Roberti Family Rights Act, as amended; the California Pregnancy Disability Leave Law, as amended; the California Constitution; any applicable California Industrial Welfare Commission Wage Order; the California Access to Personnel Files Law, as amended; the California Arrest History Law; the California Equal Pay Law; the California Ban the Box Law; the California Sex Offender Discrimination Law; the California Job Reference Disclosures Law; the Annual Pay Data Report; the California Crime Victim Leave

Law; the California Nursing Mothers Break Time Law; the California Military Leave Law; the California Organ and Bone Marrow Donation Leave Law; the California Overtime Law; the California Plant Closing Law; the California Security Breach Notification Requirements, as amended; the California Social Security Number Privacy Law; the California Wage Payment Law; the California Employee Personal Information Protection Act; the California Occupational Safety and Health Act; the California Family Rights Act; the California Wage Theft Prevention Act of 2011; the California Healthy Workplace Healthy Family Act of 2014; and the California Anti-Retaliation law;

e.any and all claims for violation of the federal or any state constitution;

f.any and all claims arising out of any other federal, state or local laws or regulations relating to employment or employment discrimination;

g.any claim for any loss, cost, damage, or expense arising out of any dispute over the nonwithholding or other tax treatment of any of the proceeds received by Employee as a result of this Agreement; and

h.any and all claims for attorneys' fees and costs.

Employee agrees that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including any Protected Activity (as defined below). This release does not extend to any right Employee may have to unemployment compensation benefits or workers' compensation benefits. Employee represents that Employee has made no assignment or transfer of any right, claim, complaint, charge, duty, obligation, demand, cause of action, or other matter waived or released by this Section.

6.California Civil Code Section 1542. Employee acknowledges that Employee has been advised to consult with legal counsel and is familiar with the provisions of California Civil Code Section 1542, a statute that otherwise prohibits the release of unknown claims, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

7.Acknowledgment of Waiver of Claims under ADEA. Employee acknowledges that Employee is waiving and releasing any rights Employee may have under the Age Discrimination in Employment Act of 1967 ("ADEA") against the Releasees, and that this waiver and release is knowing and voluntary. Employee agrees that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. Employee acknowledges that the consideration given for this waiver and release is in addition to anything of value to which Employee was already entitled. Employee further acknowledges that Employee has been advised by this writing that: (a) Employee should consult with an attorney prior to executing this Agreement; (b) Employee has twenty-one (21) days within which to consider this Agreement (the "Due Date"); (c) Employee has seven (7) days following Employee's execution of this Agreement to revoke this Agreement; (d) this Agreement shall not be effective until after the revocation period has expired; and (e) nothing in this Agreement prevents or precludes Employee from challenging or seeking a determination in good faith of the

validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. In the event Employee signs this Agreement and returns it to the Company before the Due Date, Employee hereby acknowledges that Employee has freely and voluntarily chosen to waive the time period allotted for considering this Agreement. Employee acknowledges and understands that revocation must be accomplished by a written notification to the undersigned Company representative that is received prior to the Effective Date. The Parties agree that changes, whether material or immaterial, do not restart the running of the 21-day period for reviewing the Agreement or extend the Due Date.

8.<u>No Pending or Future Lawsuits</u>. Employee represents that Employee has no lawsuits, claims, or actions pending in Employee's name, or on behalf of any other person or entity, against the Company or any of the other Releasees. Employee also represents that Employee does not currently intend to bring any claims on Employee's own behalf or on behalf of any other person or entity against the Company or any of the other Releasees.

9.<u>No Right to Employment</u>. Employee understands and agrees that, as a condition of this Agreement, Employee shall not be entitled to any employment with the Company, and Employee hereby waives any right, or alleged right, of employment or re-employment with the Company.

10.<u>Confidentiality</u>. Employee agrees to maintain in complete confidence the existence of this Agreement, the contents and terms of this Agreement, and the consideration for this Agreement (hereinafter collectively referred to as "Separation Information"). Except as required by law, Employee may disclose Separation Information only to Employee's immediate family members, the Court in any proceedings to enforce the terms of this Agreement, Employee's counsel, and Employee's accountant and any professional tax advisor to the extent that they need to know the Separation Information in order to provide advice on tax treatment or to prepare tax returns, and must prevent disclosure of any Separation Information to all other third parties. Employee agrees that Employee will not publicize, directly or indirectly, any Separation Information.

11.<u>Trade Secrets and Confidential Information/Company Property</u>. Employee reaffirms and agrees to observe and abide by the terms of the Confidentiality Agreement, specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information, noncompetition, and nonsolicitation of Company employees. Employee agrees that the above reaffirmation and agreement with the Confidentiality Agreement shall constitute a new and separately enforceable agreement to abide by the terms of the Confidentiality Agreement, entered and effective as of the Effective Date. Employee specifically acknowledges and agrees that any violation of the restrictive covenants in the Confidentiality Agreement shall constitute a material breach of this Agreement. Employee's signature below constitutes Employee's certification under penalty of perjury that Employee has returned all documents and other items provided to Employee by the Company, developed or obtained by Employee in connection with Employee's employment with the Company, or otherwise belonging to the Company, including, but not limited to, all passwords to any software or other programs or data that Employee used in performing services for the Company.

12.<u>No Third Party Cooperation</u>. Employee agrees that Employee will not knowingly encourage, counsel, or assist any attorneys or their clients in the presentation or prosecution of any disputes, differences, grievances, claims, charges, or complaints by any third party against any of the Releasees, unless under a subpoena or other court order to do so or as related directly to the ADEA waiver in this Agreement. Employee agrees both to immediately notify the Company upon receipt of any such subpoena or court order, and to furnish, within three (3) business days of its receipt, a copy of such subpoena or other court order. If approached by anyone for counsel or assistance in the presentation or prosecution of any disputes, differences,

grievances, claims, charges, or complaints against any of the Releasees, Employee shall state no more than that Employee cannot provide counsel or assistance.

13.Cooperation with the Company. Employee agrees that Employee will assist and cooperate with the Company in connection with the defense or prosecution of any claim that may be made against or by the Company or any Releasees, or in connection with any ongoing or future investigation or dispute or claim of any kind involving the Company, including meeting with the Company's counsel, any proceeding before any arbitral, administrative, judicial, legislative, or other body or agency, including testifying in any proceeding to the extent such claims, investigations or proceedings relate to services performed or required to be performed by Employee, pertinent knowledge possessed by Employee, or any act or omission by Employee. Employee further agrees to perform all acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this paragraph. Company shall reimburse Employee for all reasonable expenses incurred in connection with such cooperation.

14.Communications. Employee agrees to refrain from any disparagement, defamation, libel, or slander of any of the Releasees, and agrees to refrain from any tortious interference with the contracts and relationships of any of the Releasees, including, but not limited to, anonymous or named reviews, tweets, posts, or other comments published on the Internet. Employee affirms that Employee has not disparaged the Company from the date Employee received this Agreement through the date Employee signs this Agreement. Employee furthers agrees that, by no later than the Effective Date, Employee shall delete or otherwise remove any and all disparaging public comments or statements that Employee made prior to the Effective Date about or relating to the Company, including, but not limited to, comments in online forums or on websites (including, but not limited to, Facebook, Glassdoor, Yelp, and LinkedIn). Employee shall direct any inquiries by potential future employers to the Company's human resources department, which shall use its best efforts to provide only the Employee's last position and dates of employment. Employee agrees to revise and update publicly available information, including professional and social networking websites such as LinkedIn and Facebook, within one (1) week of the Separation Date to remove any indication that Employee is employed by the Company. Employee's violation of this provision shall be a material breach of this Agreement.

15.Breach. In addition to the rights provided in the "Attorneys' Fees" section below, Employee acknowledges and agrees that any material breach of this Agreement, unless such breach constitutes a legal action by Employee challenging or seeking a determination in good faith of the validity of the waiver herein under the ADEA, or of any provision of the Confidentiality Agreement shall entitle the Company immediately to recover and/or cease providing the consideration provided to Employee under this Agreement and to obtain damages, except as provided by law, provided, however, that the Company shall not recover One Hundred Dollars ($100.00) of the consideration already paid pursuant to this Agreement and such amount shall serve as full and complete consideration for the promises and obligations assumed by Employee under this Agreement and the Confidentiality Agreement.

16.No Admission of Liability. Employee understands and acknowledges that this Agreement constitutes a compromise and settlement of any and all actual or potential disputed claims by Employee. No action taken by the Company hereto, either previously or in connection with this Agreement, shall be deemed or construed to be (a) an admission of the truth or falsity of any actual or potential claims or (b) an acknowledgment or admission by the Company of any fault or liability whatsoever to Employee or to any third party.

17.Costs. The Parties shall each bear their own costs, attorneys' fees, and other fees incurred in connection with the preparation of this Agreement.

18.ARBITRATION. THE PARTIES AGREE THAT ANY AND ALL DISPUTES ARISING OUT OF THE TERMS OF THIS AGREEMENT, THEIR INTERPRETATION, AND ANY OF THE MATTERS HEREIN RELEASED, SHALL BE SUBJECT TO ARBITRATION IN NEW YORK COUNTY (OR IN CALIFORNIA, IF EMPLOYEE RESIDES IN CALIFORNIA), BEFORE THE JUDICIAL ARBITRATION AND MEDIATION SERVICE ("JAMS") UNDER ITS EMPLOYMENT ARBITRATION RULES ("JAMS RULES") AND THE LAWS OF THE STATE OR COMMONWEALTH IN WHICH EMPLOYEE PRIMARILY PERFORMED SERVICES FOR THE COMPANY.  THE ARBITRATOR MAY GRANT INJUNCTIONS AND OTHER RELIEF IN SUCH DISPUTES.  THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH THE LAWS OF THE STATE OR COMMONWEALTH IN WHICH EMPLOYEE PRIMARILY PERFORMED SERVICES FOR THE COMPANY AND THE ARBITRATOR SHALL APPLY THE SUBSTANTIVE AND PROCEDURAL LAWS OF THE STATE OR COMMONWEALTH IN WHICH EMPLOYEE PRIMARILY PERFORMED SERVICES FOR THE COMPANY TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO ANY CONFLICT-OF-LAW PROVISIONS OF ANY JURISDICTION. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH THE LAWS OF THE STATE OR COMMONWEALTH IN WHICH EMPLOYEE PRIMARILY PERFORMED SERVICES FOR THE COMPANY, THE LAWS OF THE STATE OR COMMONWEALTH IN WHICH EMPLOYEE PRIMARILY PERFORMED SERVICES FOR THE COMPANY SHALL TAKE PRECEDENCE. THE DECISION OF THE ARBITRATOR SHALL BE FINAL, CONCLUSIVE, AND BINDING ON THE PARTIES TO THE ARBITRATION.  THE PARTIES AGREE THAT THE PREVAILING PARTY IN ANY ARBITRATION SHALL BE ENTITLED TO INJUNCTIVE RELIEF IN ANY COURT OF COMPETENT JURISDICTION TO ENFORCE THE ARBITRATION AWARD.  THE PARTIES TO THE ARBITRATION SHALL EACH PAY HALF THE COSTS AND EXPENSES OF SUCH ARBITRATION (UNLESS REQUIRED OTHERWISE BY APPLICABLE LAW), AND EACH PARTY SHALL SEPARATELY PAY FOR ITS RESPECTIVE COUNSEL FEES AND EXPENSES; PROVIDED, HOWEVER, THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW.  THE PARTIES AGREE THAT PUNITIVE DAMAGES SHALL BE UNAVAILABLE IN ARBITRATION.  THE PARTIES HEREBY AGREE TO WAIVE THEIR RIGHT TO HAVE ANY DISPUTE BETWEEN THEM RESOLVED IN A COURT OF LAW BY A JUDGE OR JURY. NOTWITHSTANDING THE FOREGOING, THIS SECTION WILL NOT PREVENT EITHER PARTY FROM SEEKING INJUNCTIVE RELIEF (OR ANY OTHER PROVISIONAL REMEDY) FROM ANY COURT HAVING JURISDICTION OVER THE PARTIES AND THE SUBJECT MATTER OF THEIR DISPUTE RELATING TO THIS AGREEMENT AND THE AGREEMENTS INCORPORATED HEREIN BY REFERENCE. THE EMPLOYEE UNDERSTANDS THAT THE EMPLOYEE MAY ONLY BRING CLAIMS IN THE EMPLOYEE'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS PROCEEDING OR ANY PURPORTED REPRESENTATIVE PROCEEDING. THE EMPLOYEE AGREES THAT THE EMPLOYEE WILL NOT ASSERT A CLASS OR COLLECTIVE ACTION AGAINST THE COMPANY OR ANY OTHER RELEASEE IN ARBITRATION, IN COURT OR OTHERWISE, NOR WILL THE EMPLOYEE JOIN AS A MEMBER OF A CLASS OR COLLECTIVE ACTION. THE ARBITRATOR IS NOT EMPOWERED TO CONSOLIDATE CLAIMS OF DIFFERENT INDIVIDUALS INTO ONE PROCEEDING, TO HEAR ARBITRATION AS A CLASS ARBITRATION OR TO ADJUDICATE THE ENFORCEABILITY OF THIS CLASS ACTION WAIVER PROVISION. A COURT, NOT AN ARBITRATOR, SHALL DETERMINE WHETHER ANY CLAIMS MUST PROCEED ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS. SHOULD ANY PART OF THE ARBITRATION AGREEMENT CONTAINED IN THIS PARAGRAPH CONFLICT WITH ANY OTHER ARBITRATION AGREEMENT BETWEEN THE PARTIES, THE PARTIES AGREE THAT THIS ARBITRATION AGREEMENT SHALL GOVERN.

19.<u>Authority</u>. The Company represents and warrants that the undersigned has the authority to act on behalf of the Company and to bind the Company and all who may claim through it to the terms and conditions of this Agreement. Employee represents and warrants that Employee has the capacity to act on Employee's own behalf and on behalf of all who might claim through Employee to bind them to the terms and conditions of this Agreement. Each Party warrants and represents that there are no liens or claims of lien or assignments in law or equity or otherwise of or against any of the claims or causes of action released herein.

20.<u>Protected Activity</u>.  Employee understands that nothing in this Agreement shall in any way limit or prohibit Employee from engaging for a lawful purpose in any Protected Activity,  provided, however, that Employee agrees not to seek or accept any monetary award from such a proceeding (except with respect to proceedings before the Securities and Exchange Commission). For purposes of this Agreement, "Protected Activity" shall mean filing a charge, complaint, or report with, or otherwise communicating with, cooperating with or participating in any investigation or proceeding that may be conducted by, any federal, state or local government agency or commission, including the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, and the National Labor Relations Board ("Government Agencies"), discussing the terms and conditions of Employee's employment with others to the extent expressly permitted by Section 7 of the National Labor Relations Act, or discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the Employee has reason to believe is unlawful. Employee understands that in connection with such Protected Activity, Employee is permitted to disclose documents or other information to Government Agencies as permitted by law, and without giving notice to, or receiving authorization from, the Company. Notwithstanding the foregoing, Employee agrees to take all reasonable precautions to prevent any unauthorized use or disclosure of any information that may constitute Company confidential information under the Confidentiality Agreement to any parties other than the relevant Government Agencies. Employee further understands that "Protected Activity" does not include the disclosure of any Company attorney-client privileged communications, and that any such disclosure without the Company's written consent shall constitute a material breach of this Agreement. In addition, pursuant to the Defend Trade Secrets Act of 2016, Employee is notified that an individual will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (i) is made in confidence to a federal, state, or local government official (directly or indirectly) or to an attorney *solely* for the purpose of reporting or investigating a suspected violation of law, or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if (and only if) such filing is made under seal. In addition, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the individual's attorney and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

21.<u>Waiver of Statutory Information Rights</u>. Employee hereby waives any current or future rights Employee may have under Section 220 of the Delaware General Corporation Law (and similar rights under other applicable law) to inspect, or make copies and extracts from, the Company's stock ledger, any list of its stockholders, or any other books and records of the Company or any of its affiliates or subsidiaries, in Employee's capacity as a holder of stock, shares, units, Options, RSUs or any other equity instrument.

22.<u>No Representations</u>. Employee represents that Employee has had an opportunity to consult with an attorney, and has carefully read and understands the scope and effect of the provisions of this Agreement. Employee has not relied upon any representations or statements made by the Company that are not specifically set forth in this Agreement. Employee

acknowledges that there has been an opportunity to negotiate the terms of this Agreement and that the Agreement will not be interpreted as an employer promulgated agreement.

23. <u>Waiver</u>. No Party shall be deemed to have waived any right, power or privilege under this Agreement or any provisions hereof unless such waiver shall have been duly executed in writing and delivered to the Party to be charged with such waiver. The failure of any Party at any time to insist on performance of any of the provisions of this Agreement shall in no way be construed to be a waiver of such provisions, nor in any way to affect the validity of this Agreement or any part hereof. No waiver of any breach of this Agreement shall be held to be a waiver of any other subsequent breach.

24. <u>Severability</u>. In the event that any provision or any portion of any provision hereof or any surviving agreement made a part hereof becomes or is declared by a court of competent jurisdiction or arbitrator to be illegal, unenforceable, or void, this Agreement shall continue in full force and effect without said provision or portion of provision, and such provision or portion of provision shall be modified and enforced to the greatest extent permitted by law.

25. <u>Attorneys' Fees</u>. Except with regard to a legal action challenging or seeking a determination in good faith of the validity of the waiver herein under the ADEA, In the event that either Party brings an action to enforce or effect its rights under this Agreement, the prevailing Party shall be entitled to recover its costs and expenses, including the costs of mediation, arbitration, litigation, court fees, and reasonable attorneys' fees incurred in connection with such an action.

26. <u>Entire Agreement</u>. Except as expressly set forth herein, this Agreement represents the entire agreement and understanding between the Company and Employee concerning the subject matter of this Agreement, and supersedes and replaces any and all prior agreements and understandings between Employee, on the one hand, and Company, on the other hand, concerning the subject matter of this Agreement. For the avoidance of doubt, the Confidentiality Agreement, and, if applicable, any Equity Incentive Plans and Equity Award Agreements, survive and remain in effect.

27. <u>No Oral Modification</u>. This Agreement may only be amended in a writing signed by Employee and the Company's Chief Executive Officer.

28. <u>Governing Law</u>. The Agreement is governed by the laws of the State of California, without regard to conflicts of law principles.

29. <u>Effective Date</u>. Employee understands that this Agreement shall be null and void if not executed by Employee, and returned to the Company, by the Due Date. Each Party has seven (7) days after that Party signs this Agreement to revoke it. This Agreement will become effective on the eighth (8th) day after Employee signed this Agreement, so long as it has been signed by the Parties and has not been revoked by either Party before that date (the "Effective Date").

30. <u>Counterparts</u>. This Agreement may be executed in counterparts that may be executed, exchanged, and delivered by facsimile, photo, e-mail PDF, Docusign/Echosign or a similarly accredited secure signature service, or other electronic transmission or signature. Each counterpart will be deemed an original and all of which counterparts taken together shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.

31. <u>Voluntary Execution of Agreement</u>. Employee understands and agrees that Employee executed this Agreement voluntarily, without any duress or undue influence on the part or behalf

of the Company or any third party, with the full intent of releasing all of Employee's claims against the Company and any of the other Releasees. Employee acknowledges that:

d.Employee has read this Agreement;

e.Employee has been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of Employee's own choice or has elected not to retain legal counsel;

f.Employee understands the terms and consequences of this Agreement and of the releases it contains; and

g.Employee is fully aware of the legal and binding effect of this Agreement.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the respective dates set forth below.

**Marty Hahnfeld**, an individual


Dated: May 9, 2022 /s/ Marty Hahnfeld_____
Marty Hahnfeld


**OLO INC.**


Dated: May 9, 2022 /s/ Noah H. Glass _____

By: Noah H. Glass
Chief Executive Officer


Page 12 of 12

**Exhibit A**

Equity Awards Granted

| Grant ID | Equity Plan | Grant Date | Grant Type | Grant Price | Grant Amount |
|---|---|---|---|---|---|
| ES-0063 | 2005 Olo Equity Incentive Plan | 09/10/2013 | ISO | $0.16 | 1,399,916 |
| ES-0127 | 2015 Olo Equity Incentive Plan | 01/12/2016 | ISO | $1.67 | 59,891 |
| ES-0128 | 2015 Olo Equity Incentive Plan | 01/12/2016 | NSO | $1.67 | 1,488,928 |
| ES-0757_ISO | 2015 Olo Equity Incentive Plan | 01/21/2020 | ISO | $2.74 | 114,240 |
| ES-0757_NQ | 2015 Olo Equity Incentive Plan | 01/21/2020 | NSO | $2.74 | 117,810 |
| ES-1182_ISO | 2015 Olo Equity Incentive Plan | 02/01/2021 | ISO | $9.72 | 12,512 |
| ES-1182_NQ | 2015 Olo Equity Incentive Plan | 02/01/2021 | NSO | $9.72 | 160,038 |
| ISO-22-00039 | 2021 Olo Equity Incentive Plan | 01/19/2022 | ISO | $15.75 | 5,598 |
| NSO-22-00039 | 2021 Olo Equity Incentive Plan | 01/19/2022 | NSO | $15.75 | 64,958 |
| RSU-22-00907 | 2021 Olo Equity Incentive Plan | 01/19/2022 | RSU | $0.00 | 35,278 |

**Exhibit B**

Equity Awards Vested as of December 31, 2022

| Grant ID | Equity Plan | Grant Date | Grant Type | Grant Price | Vested Amount |
|---|---|---|---|---|---|
| ES-0063 | 2005 Olo Equity Incentive Plan | 09/10/2013 | ISO | $0.16 | 1,399,916 |
| ES-0127 | 2015 Olo Equity Incentive Plan | 01/12/2016 | ISO | $1.67 | 59,891 |
| ES-0128 | 2015 Olo Equity Incentive Plan | 01/12/2016 | NSO | $1.67 | 1,488,928 |
| ES-0757_ISO | 2015 Olo Equity Incentive Plan | 01/21/2020 | ISO | $2.74 | 72,930 |
| ES-0757_NQ | 2015 Olo Equity Incentive Plan | 01/21/2020 | NSO | $2.74 | 96,271 |
| ES-1182_ISO | 2015 Olo Equity Incentive Plan | 02/01/2021 | ISO | $9.72 | 0 |
| ES-1182_NQ | 2015 Olo Equity Incentive Plan | 02/01/2021 | NSO | $9.72 | 82,671 |
| ISO-22-00039 | 2021 Olo Equity Incentive Plan | 01/19/2022 | ISO | $15.75 | 0 |
| NSO-22-00039 | 2021 Olo Equity Incentive Plan | 01/19/2022 | NSO | $15.75 | 16,169 |
| RSU-22-00907 | 2021 Olo Equity Incentive Plan | 01/19/2022 | RSU | $0.00 | 8,819 |

**Exhibit 10.2**

## ADVISOR AGREEMENT

This Advisor Agreement ("Advisor Agreement") is made as of May 9, 2022, by and between Olo Inc. (hereafter "Olo" or the "Company") and Marty Hahnfeld (hereafter "Advisor"). Collectively, the Company and Advisor are referred to herein as the "Parties."

## WITNESSETH

WHEREAS, pursuant to the Separation Agreement and Release, by and between the Company and Advisor, dated May 9, 2022 (the "Separation Agreement"), Employee will no longer be employed by the Company;

WHEREAS, the Company desires to retain Advisor to provide advisory and consulting services on an independent contractor basis; and

WHEREAS, to avoid any confusion as to Advisor's employment status during the performance of his activity, the Parties desire to set forth in writing the terms and conditions under which Advisor is to perform services.

NOW, THEREFORE, the Parties agree that in exchange for the compensation described herein, the Company and Advisor agree to the following independent contractor terms:

## 1. TERM OF AGREEMENT

**1.1.** This Advisor Agreement shall be effective July 1, 2022; *provided that*, the Separation Agreement is executed and not revoked.

**1.2.** Absent an effective written extension wherein reference is made to this Advisor Agreement, or an earlier termination pursuant to this section, this Advisor Agreement will automatically terminate on December 31, 2022.

**1.3.** Notwithstanding the foregoing, during the term of this Advisor Agreement, Advisor may terminate this Advisor Agreement for any or no reason by giving thirty (30) days written notice to the Company; *provided that*, if Advisor gives notice to the Company, the Company may unilaterally waive the notice period in its sole discretion.

**1.4.** Notwithstanding the foregoing, the Company may terminate this Advisor Agreement for Cause by giving Advisor thirty (30) days written notice. Such notice must specify the basis for termination and allow Advisor ten (10) days to address the deficiency to the satisfaction of the Company. Cause for purposes of this Advisor Agreement includes the Company's reasonable conclusion that Advisor has: (i) materially breached any term of the Advisor Agreement; (ii) failed to perform the duties which Advisor is required to perform under the terms of the Advisor Agreement; or (iii) committed acts of dishonesty, fraud or misrepresentation in the performance of Advisor's duties.

**1.5.** In the event Advisor accepts a position with another company (whether acting as an employee, independent contractor, director or in any other role), Advisor shall provide written notice to the Company within five (5) days of accepting such position.

**2. ADVISOR DUTIES.** Attached hereto as Schedule A is a description of the Advisor services to be provided by Advisor pursuant to the terms of this Advisor Agreement.

## 3. COMPENSATION

**3.1.**Attached hereto as Schedule B is a description of the compensation terms for all services to be performed by Advisor pursuant to this Advisor Agreement.

## 4.EXPENSE, TAX AND INSURANCE OBLIGATIONS

**4.1.**Advisor shall be responsible for all expenses related to the performance of services under this Advisor Agreement, including all travel-related expenses (e.g., air travel, mileage, meals, lodging) and business supplies/equipment (e.g., computer(s), cell phone(s), Internet service, business cards).

**4.2.**Advisor shall also be responsible for all federal, state, and local income tax payments, including self-employment taxes, related to compensation paid pursuant to Schedule B for services provided by Advisor and any workers hired and utilized by Advisor. Advisor acknowledges that because he is being retained as an independent contractor, the Company will not make any payroll withholdings for amounts paid or accrued pursuant to Schedule B.

**4.3.**Advisor acknowledges his responsibility to maintain at his own cost all required insurance related to the performance of services under this Advisor Agreement, including any necessary workers' compensation or unemployment insurance.

## 5.CONFIRMATION OF INDEPENDENT CONTRACTOR STATUS

**5.1.**Advisor and Company acknowledge and agree that Advisor is being retained as an independent contractor. Advisor expressly acknowledges that during the term of this Advisor Agreement, he will not be an employee of the Company with respect to the duties outlined in Schedule A. Advisor shall act in accordance with this status and shall not hold himself out as an employee of the Company with respect to his advisor services. Advisor shall not be entitled to any benefits afforded to Company's employees by virtue of this contractor relationship, including health insurance, workers' compensation, disability insurance, pension benefits, vacation, or sick pay. To the extent Advisor is provided with any or all such benefits pursuant to a collateral employment relationship, any such benefits shall cease upon the cessation of that employment relationship.

**5.2.**Advisor will determine the method, details, and means of performing the services described in Schedule A. With the exception of compliance with legal requirements, customer specifications, and generally ethical business practices, the Company understands and agrees that it retains no right to control the Advisor, Advisor's agents, employees, or assistants in the performance of the services described in Schedule A.

**5.3.**The Company acknowledges and understands that during the term of this Advisor Agreement, Advisor may contract with other entities to perform similar Advisor services, so long as such activity is consistent with his confidentiality, non-competition, and non-solicitation obligations outlined below.  Specifically, and without limiting the scope of any other provision of this Advisor Agreement, the Parties acknowledge that during the term of this Advisor Agreement, Advisor is prohibited from offering advisor services related to any company that competes with the Company.

**5.4.**The Company also acknowledges that Advisor has the right to hire or retain others to perform services contemplated by this Advisor Agreement. In the event Advisor retains others to perform such services, he shall promptly disclose that fact to the Company. Advisor also acknowledges that such individuals shall not be employees of the Company, unless approved in writing by the Company. Advisor agrees to indemnify and hold harmless the Company against any loss or damages, including attorney fees, resulting from Advisor's decision to employ or retain others to provide services under this Advisor Agreement.

2

**6.ADVISOR'S REPRESENTATIONS AND INDEMNITIES**

**6.1.**Advisor represents that he is fully authorized to enter into and to perform under this Advisor Agreement without conflicting with any of Advisor's other commitments, agreements, or understandings.

**6.2.**Advisor shall and does hereby indemnify, defend, and hold harmless the Company, and the Company's officers, directors, employees and shareholders from and against any and all claims for damages for personal injury or property damages, or any other claims, demands, damages, costs or expenses, including attorney fees and costs, that Company may incur or suffer as a result of Advisor's performance of services under this Advisor Agreement.

**6.3.**Advisor further acknowledges that the Company will not carry general liability insurance to cover losses relating to any alleged negligent acts committed by Advisor or Advisor's employees or agents during the performance of the services described in Schedule A. Advisor agrees that he is responsible for obtaining at his own expense all required insurance policies with respect to the services described in Schedule A.

**7.CONFIDENTIALITY PROVISIONS**

**7.1.**Advisor acknowledges the Company is engaged in a highly competitive business and that the Company has expended considerable time, money and effort in the development of proprietary confidential information that is vital to its continued success and profitability. Advisor has and will continue to be enabled to acquire confidential business information about the Company and its actual and prospective customers. Advisor further agrees that the Company has taken reasonable measures to protect the same, and that the confidentiality provisions of this Advisor Agreement are a reasonable means through which the Company can protect such interests with regard to Advisor.

**7.2.**As used in this Advisor Agreement, the term Confidential Information means: (a) proprietary or trade secret information of the Company; (b) information marked or designated by the Company as confidential; (c) information, whether or not in written form and whether or not designated as confidential, that is known to Advisor as being treated by the Company as confidential; (d) information, whether or not in written form and whether or not designated as confidential, that Advisor should reasonably recognize as being treated by the Company as confidential; and (e) information provided to the Company by third parties that the Company is obligated to keep confidential. Advisor understands that Confidential Information includes, but is not limited to: (a) information regarding the Company's sales and marketing strategies; (b) the identity, history, needs, contracts, profitability and preferences of the Company's customers and prospective customers; (c) customer lists; and (d) other financial and technical information relating to the Company's business. The Company acknowledges the notion of Confidential Information does not include any of the foregoing items which have become publicly known and generally available through no wrongful act of Advisor or others who were under confidentiality obligations as to the item or items involved. Notwithstanding the foregoing, the Parties acknowledge Confidential Information may include unique aggregations of otherwise publicly known or generally available information developed by the Company.

**7.3.**Advisor agrees not to disclose Confidential Information, directly or indirectly, to any third person without the express written consent of the Company at any time following the effective date of this Advisor Agreement, except where such disclosure is necessary for the performance of Advisor's activities on behalf of the Company. Advisor further represents that prior to the effective date of this Advisor Agreement, Advisor has not disclosed Confidential Information to any third person except in circumstances where such disclosure was necessary for the performance of Advisor's activities on behalf of the Company.

**7.4.**Advisor agrees that he will not copy, transmit, reproduce, summarize, quote, or make any commercial or other use whatsoever of Confidential Information following the cessation of this Advisor Agreement, except in circumstances where such disclosure is necessary for the performance of Advisor's activities on behalf of the Company.

**7.5.**On termination of this Advisor Agreement, Advisor will: (1) promptly return to the Company (or destroy if specifically requested and authorized by the Company in writing) all documents and materials in any form, including electronic, in Advisor's possession, custody or control which contain or reference Confidential Information; and, thereafter (2) certify under oath to the Company if requested that Advisor does not possess any documents or materials containing or referencing Confidential Information and that Advisor has not transmitted the same to any third party.

**8.RESTRICTIVE COVENANTS**

**8.1.**Advisor and Company agree that in order to protect and preserve the good will and other value of the Company following the execution of this Advisor Agreement, it is necessary for Advisor's activities to be reasonably restricted during and following the termination of this Advisor Agreement. As such, the Parties agree to the following restrictive covenants:

**8.1.1.**<u>Non-Competition</u>.  During the effective period of this Advisor Agreement, Advisor shall not, directly or indirectly, as an individual, owner, manager, contractor, consultant, or employee, provide the same or similar services as those outlined in Schedule A to any person or business entity that competes, directly or indirectly, with Company. Advisor acknowledges this non-competition provision is executed as part of a valid independent contractor relationship.

**8.1.2.**<u>Customer Non-Solicitation</u>.  During the effective period of this Advisor Agreement, Advisor shall not, directly or indirectly, as an individual, owner, manager, contractor, consultant, or employee, solicit, divert or take away or attempt to solicit, divert or take away any customer of the Company with whom Advisor had contact, or about whom Advisor gained the Company's Confidential Information, during the effective dates of this Advisor Agreement.  The Parties agree this customer non-solicitation provision is limited to the goods and services offered by the Company during the effective dates of this Advisor Agreement.

**8.1.3.**<u>Employee Non-Solicitation</u>.  During the effective period of this Advisor Agreement and for a period of twelve (12) months following the termination of this Advisor Agreement, Advisor shall not, directly or indirectly, as an individual, owner, manager, contractor, consultant, or employee, encourage any employee of the Company to leave the employ of the Company, or to otherwise alter the nature of any employment relationship with the Company.

**8.2.**Advisor has carefully read and considered the non-compete and non-solicitation provisions set forth above and agrees they are fair, reasonable and reasonably required to protect the Company's protectable business interests.

**8.3.**If any part of the non-compete or non-solicitation clauses are found by a court to be unreasonable or otherwise unenforceable, any such portion shall nevertheless be enforced to the greatest extent such court shall deem reasonable, and, in such event, it is the Parties' intention that the court reform such portion in order to make it enforceable. In the event of such judicial reformation, the Parties agree to be bound by the confidentiality, non-compete and non-solicitation provisions as reformed in the same manner and to the same extent as if they had agreed to such reformed agreement in the first instance.

**8.4.** In the event that Advisor breaches any provision of the non-solicitation provision set forth above, the corresponding restrictive period shall be tolled and suspended during any period of Advisor's breach.

**9. INJUNCTIVE RELIEF.** Advisor agrees that if he violates the confidentiality, non-compete or non-solicitation provisions set forth above, the Company will suffer irreparable harm, for which money damages would not fully compensate the Company. Advisor agrees that temporary, preliminary and permanent injunctions are appropriate remedies for a breach or threatened breach of the confidentiality, non-compete or non-solicitation provisions set forth above and that these remedies shall be in addition to, and not in limitation of, any other rights or remedies to which the Company is or may be entitled. Advisor further agrees that in the event a court issues a temporary or preliminary injunction, the Company shall not be required to post a bond.

**10. GOVERNING LAW AND INTERPRETATION.** This Agreement shall be governed and conformed in accordance with the laws of the State of California without regard to its conflict or choice of law provisions. If any provision of this Advisor Agreement is declared illegal or unenforceable by any court of competent jurisdiction, the Parties agree the court shall have the authority to modify, alter or change the provision(s) in question to make the Advisor Agreement legal and enforceable. If any provision of this Advisor Agreement cannot be modified to be enforceable, such provision shall immediately become null and void, leaving the remainder of this Advisor Agreement in full force and effect.

**11. ENTIRE AGREEMENT.** This Advisor Agreement expresses, embodies, and supersedes all previous understandings and agreements, whether written or oral, between the Parties with respect to the subject matter hereof and fully and finally sets forth the entire agreement between the Parties hereto with respect to Advisor providing advisor services to the Company; provided that the Separation Agreement and all agreements and obligations preserved therein remain in full force and effect. Notwithstanding the foregoing, the Parties acknowledge that Advisor previously performed services for the Company as an employee and in that capacity was subject to certain employment-related obligations regarding confidentiality, non-solicitation, and non-competition. The Parties hereby agree that nothing contained in this Advisor Agreement is intended to, or shall, supersede or limit in any way such employment-related obligations with respect to confidentiality, non-solicitation, and non-competition, all of which remain in full force and effect. This Advisor Agreement may not be modified, altered or changed except upon express written consent of both Parties, wherein specific reference is made to this Advisor Agreement.

**12. BINDING EFFECT.** This Advisor Agreement shall be binding upon Advisor, Advisor's heirs, executors and administrators, and upon the Company and its successors and assigns, and shall inure to the benefit of the Company, and its successors and assigns. This Advisor Agreement may not be assigned by Advisor. This Advisor Agreement may be enforced by the Company's successors and assigns.

**13. AVAILABLE REMEDIES.** In addition to any other remedies available under this Advisor Agreement, or pursuant to applicable law, the Parties agree that should either Party be compelled to commence legal action because of a suspected violation of this Advisor Agreement, the prevailing party to any such action shall be entitled to an award of its attorneys' fees and costs, including expert costs, through and including any appeal(s).

**14. NON-WAIVER.** The failure of either the Company or Advisor to exercise in any instance any right under this Advisor Agreement shall not constitute a waiver of the same or any other right, power, or privilege in any other instance. Any waiver must be in writing and signed by the party against whom a waiver is alleged.

5

**15.CONSTRUCTION.** The headings contained in this Advisor Agreement are for convenience only and do not constitute part of and shall not be used to interpret this Advisor Agreement. The language in all parts of this Advisor Agreement shall be in all cases construed according to its fair meaning and not strictly for or against the Company or Advisor because that party or that party's legal representative drafted it.

**16.COUNTERPARTS**. This Advisor Agreement may be executed in counterparts, each of which shall be deemed an original and each of which shall together constitute one and the same agreement. This Advisor Agreement will not become enforceable until executed by the Company.

**17.NOTICE.** Any notice required to be given by this Advisor Agreement, including the cancellation provisions of Section 1, shall be in writing and personally delivered, sent via First Class U.S. Mail to the addresses set forth below, or sent by email. Delivery shall be deemed complete at the time of personal delivery or upon the deposit of mailing.

**For Advisor:**

Marty Hahnfeld
[***]

**For the Company:**

Olo Inc.
Attn: Olo Legal
285 Fulton Street, 82nd Floor
New York, NY 10007

[*Remainder of Page Intentionally Left Blank*]

6

IN WITNESS WHEREOF, the Advisor and Company have executed this Advisor Agreement:

**Marty Hahnfeld OLO INC.**

/s/ Marty Hahnfeld_____ /s/ Noah H. Glass_____

By: Marty Hahnfeld By: Noah H. Glass

Date: May 9, 2022 Date: May 9, 2022

**Schedule A**

The advisor services to be provided by Advisor shall include the provision of advice on Company strategy and initiatives, working with Noah Glass, Nithya Das and the Chief Revenue Officer. Prior to the start of each month of the term of this Advisor Agreement, Advisor shall provide Company with hours of availability to be mutually agreed upon in good faith between both parties.

## Schedule B

Pursuant to the terms of the Separation Agreement and Release, by and between the Company and Advisor, dated May 9, 2022, all existing unvested RSU awards and stock option grants ("Equity Awards") which have previously been awarded to Advisor prior to the effective date of this Advisor Agreement shall continue vesting for the duration of the term of this Advisor Agreement. Upon termination of this Advisor Agreement for any reason, such Equity Awards shall cease vesting. The foregoing shall be the sole compensation provided to the Advisor in connection with the advisor services.

**Exhibit 10.3**

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "*Agreement*") is made between Olo Inc. (the "*Company*") and Diego Panama (the "*Executive*") (collectively, the "*Parties*"), and is effective as of July 5, 2022 (the "*Effective Date*").

**WHEREAS**, the Company desires for Executive to provide services to the Company on the terms and conditions of this Agreement from and after the Effective Date, and wishes to provide Executive with certain compensation and benefits in return for such employment services; and

**WHEREAS**, Executive wishes to be employed by the Company and to provide personal services to the Company in return for certain compensation and benefits.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1. **Employment by the Company.**

1.1. **Position.** Executive shall serve as the Company's Chief Revenue Officer. During the term of Executive's employment with the Company, Executive will devote Executive's best efforts and substantially all of Executive's business time and attention to the business of the Company, except for approved time off permitted by the Company's general employment policies.

1.2. **Duties and Location.** Executive shall perform such duties as are required by the Chief Executive Officer to whom Executive reports as of this date or in the future. The Company reserves the right to reasonably require Executive to perform Executive's duties at places other than Executive's primary office location from time to time, and to require reasonable business travel in business class, to the extent Executive deems business class travel necessary and prudent in Executive's good faith judgment. Executive's employment with the Company is contingent on the satisfactory completion of Company background checks.

1.3. **Policies and Procedures.** The employment relationship between the Parties shall be governed by the general employment policies and practices of the Company, except that when the terms of this Agreement differ from or are in conflict with the Company's general employment policies or practices, this Agreement shall control.

2. **Compensation.**

2.1. **Salary.** For services to be rendered hereunder, Executive shall receive a base salary at the rate of $550,000 per year (the "**Base Salary**"), subject to standard payroll deductions and withholdings and payable in accordance with the Company's regular payroll schedule.

2.2. **Commission.** Executive will be eligible to participate in a commission structure that the Company's Board of Directors (the "***Board***"), or the Compensation Committee of the Board (the "***Compensation Committee***"), may approve for senior executives of the Company (the "***Commission***"). The target amount of Executive's Commission is equal to 100% of Executive's Base Salary (the "***Target Commission***"). Whether Executive receives a Commission for any given period, and the amount of any such

Commission, will be determined by the Board or the Compensation Committee in their good faith discretion based upon Executive's achievement of objectives and milestones as set forth in the Company's Sales Compensation Plan (the "**Sales Compensation Plan**"). If Executive earns any Commissions under the Sales Compensation Plan, but Executive's employment terminates for any reason before the Company pays any such earned Commissions, the Company shall pay Executive any such earned Commission in accordance with the terms of this Section and the Sales Compensation Plan. With respect to the first six months of the Executive's employment with the Company, the Company shall pay the Executive the greater of (i) six months of the Target Commission (i.e. 50% of Base Salary); or (ii) the actual earned Commission for such six-month period (in either event the "**Guaranteed Ramp-Up Commission**"). The Company shall pay the Guaranteed Ramp-Up Commission when commissions for such period typically would be paid. If the Commission payment schedule so requires or permits, the Company may pay the Guaranteed Ramp Up-Commission in installments. Any Guaranteed Ramp-Commissions shall be credited against commissions otherwise earned under the Sales Compensation Plan and are non-refundable if the applicable targets are not achieved.

**2.3. Company Equity Awards**.

**i.** New Hire Equity Grant: Subject to approval by the Compensation Committee and the occurrence of the Effective Date, Executive shall be granted a quantity of stock options to purchase shares of the Company's Class A Common Stock, $.001 par value (the "**Common Stock**"), at the fair market value on the date of grant ("**Options**"), and restricted stock units ("**RSUs**"), for which the underlying shares will have a combined fair market value on the date of grant equivalent to $5,000,000 (the "**New Hire Equity Grant**"). Approximately seventy-five percent (75%) of the New Hire Equity Grant shall consist of RSUs. The number of RSUs shall be determined by dividing Three Million Seven Hundred Fifty Thousand Dollars($3,750,000) by the average of the closing price of Olo's stock over the thirty (30) trading-days prior to the date of grant. The number of Options issued pursuant to the New Hire Equity Grant shall be determined by dividing One Million Two Hundred Fifty Thousand Dollars ($1,250,000) by the average of the closing price of Olo's stock over the thirty (30) trading-days prior to the date of grant and multiplying such result by two (2). The Options granted pursuant to the New Hire Equity Grant shall be granted under and governed in all respects by the terms and conditions of the Company's 2021 Equity Incentive Plan (the "**Plan**") and option agreement between Executive and the Company, and shall be subject to a vesting schedule whereby one-quarter (1/4) of the shares subject to the Options shall vest one year after the vesting commencement date provided in the option agreement, with the remaining shares vesting in a series of thirty-six (36) successive equal monthly installments measured from the first anniversary of the vesting commencement date, subject to Executive's continuous service through each such vesting date. The RSUs granted pursuant to the New Hire Equity Grant shall be granted under and governed in all respects by the terms and conditions of the Plan and RSU agreement between Executive and the Company, and shall be subject to a vesting schedule whereby one-quarter (1/4) of the RSUs shall vest on the first Quarterly Vest Date (as defined below) that occurs following the first anniversary of the vesting commencement date provided in the RSU agreement, and 6.25% of the RSUs will vest on each Quarterly Vest Date thereafter, subject to Executive's continuous service through each such Quarterly Vest Date. The "**Quarterly Vest**

***Date***" means each of March 5, June 5, September 5 and December 5 of a given calendar year.

**ii.**Sign-On Equity Grant: Subject to approval by the Compensation Committee and the occurrence of the Effective Date, Executive shall be granted RSUs, the underlying shares for which shall have a fair market value on the date of grant equal to $1,500,000 (the "***Sign-On Equity Grant***"). The RSUs granted pursuant to the Sign-On Equity Grant shall be granted under and governed in all respects by the terms and conditions of the Plan and RSU agreement between Executive and the Company, and shall be subject to a vesting schedule whereby $500,000 of the target value of the RSUs shall vest on the first day of the first open trading window to occur following the six month anniversary of the vesting commencement date provided in the applicable RSU agreement with the remainder vesting on the first day of the first open trading window to occur following the one-year anniversary after the vesting commencement date, subject to Executive's continuous service on each such vesting date.

**iii.**2023 Annual Refresh Grant: Subject to approval by the Compensation Committee and the occurrence of the Effective Date, Executive shall be granted a quantity of Options and RSUs, the underlying shares for which shall have a fair market value on the date of grant equal to $2,000,000 (the "***2023 Annual Refresh Grant***"), provided Executive is employed by the Company in good standing and has not provided any notice of resignation, in each case as of the grant date, in accordance with the Company's usual practices for annual equity grants to employees. The Options granted pursuant to the 2023 Annual Refresh Grant shall be granted under and governed in all respects by the terms and conditions of the Plan and option agreement between Executive and the Company, and shall be subject to a vesting schedule whereby the shares subject to the Options shall vest and become exercisable in a series of forty-eight (48) successive equal monthly installments measured from the vesting commencement date in the applicable option agreement, subject to Executive's continuous service with the Company through each such vesting date. Any RSUs granted pursuant to the 2023 Annual Refresh Grant shall be granted under and governed in all respects by the terms and conditions of the Plan and RSU agreement between Executive and the Company, and shall be subject to a vesting schedule whereby the RSUs shall vest in equal quarterly installments over four years, commencing on the first Quarterly Vest Date that occurs following the vesting commencement date provided in the RSU agreement, subject to Executive's continuous service through each such Quarterly Vest Date.

**iv.**Executive remains eligible to be considered for future equity awards as may be determined by the Board or the Compensation Committee at its discretion in accordance with the terms of any applicable equity plan or arrangement that may be in effect from time to time.

**3.Standard Company Benefits.** Executive shall be entitled to participate in all employee benefit programs for which Executive is eligible under the terms and conditions of the benefit plans that may be in effect from time to time and provided by the Company to its employees. The Company reserves the right to cancel or change the benefit plans or programs it offers to its employees at any time.

**4.Expenses.** The Company will reimburse Executive for reasonable travel, entertainment or other expenses incurred by Executive in furtherance or in connection with the performance

of Executive's duties hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**5.Termination of Employment; Severance.**

**5.1.At-Will Employment.**  Executive's employment relationship is at-will. Either  Executive or the Company may terminate the employment relationship at any time, with or without cause or advance notice.

**5.2.Termination Without Cause; Resignation for Good Reason.**

**v.**The Company may terminate Executive's employment with the Company at any time without Cause (as defined below). Further, Executive may resign at any time for Good Reason (as defined below).

**vi.**In the event Executive's employment with the Company is terminated by the Company without Cause or Executive resigns for Good Reason, and provided that Executive remains in compliance with the terms of this Agreement and the Confidentiality Agreement, the Company shall provide Executive with the following severance benefits:
**a.**Severance in an amount equal to 9 months of Executive's base salary in effect as of the date of Executive's employment termination, subject to standard payroll deductions and withholdings (the "***Severance***"). The Severance will be paid in equal installments on the Company's regular payroll schedule over the 9 month period following Executive's termination of employment, commencing within 60 days following Executive's termination of employment; provided, however, that if the 60-day period begins in one calendar year and ends in a second calendar year, the Severance shall begin to be paid in the second calendar year by the last day of such 60-day period, and such initial payment shall include a catch-up payment to cover amounts retroactive to the day immediately following the Executive's date of termination.

**b.**Provided Executive timely elects continued coverage under COBRA, the Company shall pay Executive's COBRA premiums to continue Executive's coverage (including coverage for eligible dependents, if applicable) ("***COBRA Premiums***") through the period (the "***COBRA Premium Period***") starting on Executive's termination of employment and ending on the earliest to occur of: (i) 9 months following Executive's termination of employment; (ii) the date Executive becomes eligible for group health insurance coverage through a new employer; or (iii) the date Executive ceases to be eligible for COBRA continuation coverage for any reason, including plan termination. In the event Executive becomes covered under another employer's group health plan or otherwise cease to be eligible for COBRA during the COBRA Premium Period, Executive must immediately notify the Company of such event. Notwithstanding the foregoing, if the Company determines, in its sole discretion, that it cannot pay the COBRA Premiums without a substantial risk of violating applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company instead shall pay to Executive, on the first day of each calendar month, a fully taxable cash payment equal to the applicable COBRA premiums for that month (including premiums for Executive and Executive's eligible dependents who have elected and remain enrolled in such COBRA coverage), subject to applicable tax withholdings (such

amount, the "***Special Cash Payment***"), for the remainder of the COBRA Premium Period. Executive may, but is not obligated to, use such Special Cash Payments toward the cost of COBRA premiums.

**c.**The Company will pay Executive a bonus payment for the calendar year in which the Executive's termination of employment occurs. The bonus payment will be equal to the Executive's monthly commission target for the period from the beginning of the calendar year up to the Termination Date, pro-rated and less any amounts already paid to the Executive, and payable on the date the first installment of the Severance is payable hereunder..

**vii.**If the Company terminates Executive's employment with the Company without Cause, or Executive resigns for Good Reason, in either case within three (3) months prior to or eighteen (18) months following the closing of a Change in Control (as defined in the Company's 2021 Equity Incentive Plan), provided such transaction constitutes a change in the ownership or effective control of the Company or a change in the ownership of a substantial portion of the Company's assets within the meaning of Section 409A of the Code, and provided that Executive remains in compliance with the terms of this Agreement, then in lieu of the payments and benefits described in Section 5.2(ii), above, the Company (or its successor) shall provide Executive with the following severance payments and benefits:

**a.**Severance in an amount equal to 12 months of Executive's base salary in effect as of the date of Executive's employment termination, subject to standard payroll deductions and withholdings (the "***CIC Severance***"). The CIC Severance will be paid in a single lump sum within 60 days following Executive's termination of employment; provided, however, that if the 60-day period begins in one calendar year and ends in a second calendar year, the CIC Severance shall begin to be paid in the second calendar year by the last day of such 60-day period. Notwithstanding the foregoing, if such termination occurs prior to a Change in Control, the CIC Severance shall commence to be paid in installments in accordance with Section 5.2(ii)(a), above, and upon the occurrence of such Change in Control, the remainder of the CIC Severance shall be payable in a lump-sum in accordance with this section.

**b.**Provided Executive timely elects continued coverage under COBRA, the Company shall pay Executive's COBRA premiums to continue Executive's coverage (including coverage for eligible dependents, if applicable) ("***CIC COBRA Premiums***") through the period (the "***CIC COBRA Premium Period***") starting on Executive's termination of employment and ending on the earliest to occur of: (i) 12 months following Executive's termination of employment; (ii) the date Executive becomes eligible for group health insurance coverage through a new employer; or (iii) the date Executive ceases to be eligible for COBRA continuation coverage for any reason, including plan termination. In the event Executive becomes covered under another employer's group health plan or otherwise cease to be eligible for COBRA during the COBRA Premium Period, Executive must immediately notify the Company of such event. Notwithstanding the foregoing, if the Company determines, in its sole discretion, that it cannot pay the CIC COBRA Premiums without a substantial risk of violating applicable law (including, without limitation, Section 2716 of the Public Health Service

Act), the Company instead shall pay to Executive, the Special Cash Payment for the remainder of the CIC COBRA Premium Period. Executive may, but is not obligated to, use such Special Cash Payments toward the cost of CIC COBRA premiums.

**c.**The Company will pay Executive a bonus payment for the calendar year in which the Executive's termination of employment occurs. The bonus payment will equal to the Executive's monthly commission target for the period from the beginning of the calendar year up to the termination date, pro-rated and less any amounts already paid to the Executive, and payable on the date the first installment of the Severance is payable hereunder.

**d.**Effective as of Executive's termination date or, if later, the date of such Change in Control, the vesting and exercisability of all outstanding equity awards held by Executive immediately prior to the termination date (if any) subject to time-based vesting requirements, shall be accelerated in full and the vesting and exercisability of all outstanding equity awards subject to performance-based vesting will be treated as set forth in Executive's equity award agreement governing such award.

**5.3.Termination for Cause; Resignation Without Good Reason; Death or Disability.**

**viii.**The Company may terminate Executive's employment with the Company at any time for Cause. Further, Executive may resign at any time without Good Reason. Executive's employment with the Company may also be terminated due to Executive's death or Permanent Disability. For purposes of this Agreement, "***Permanent Disability***" means Executive is unable to perform the essential functions of Executive's position, with reasonable accommodation, for a period of at least 180 consecutive days because of a physical or mental impairment as determined by the Board on the basis of such medical evidence as the Board deems warranted under the circumstances.

**ix.**If Executive resigns without Good Reason, or the Company terminates Executive's employment for Cause, or upon Executive's death or Permanent Disability, then (i) Executive will cease to vest in any time-vested equity award, (ii) any equity awards subject to performance-based vesting will be treated as set forth in Executive's equity award agreement governing such award, (iii) all payments of compensation by the Company to Executive hereunder will terminate immediately (except as to amounts already earned and vested benefits as required by law), and (iv) Executive will not be entitled to any severance benefits, including (without limitation) the payments and benefits described in Section 5.2, above. Notwithstanding the foregoing, Executive is entitled to any continuation of benefits required by COBRA or applicable law and, in the case of termination upon Executive's death or Permanent Disability, payment of an amount equal to the bonus payment, pro-rated based on the Executive's monthly commission target for the period from the beginning of the calendar year up to the termination date and less any amounts already paid to the Executive, and payable in accordance with the terms of the Sales Compensation Plan.

**6.Conditions to Receipt of Severance Payments and Benefits.** The receipt of the severance payments and benefits described in Section 5.2, above, will be subject to Executive signing and not revoking a separation agreement and release of claims (including nondisparagement

and no cooperation provisions) in the form provided by the Company (the "***Separation Agreement***") within a time period specified by the Company, but not to exceed fifty-three (53) days (such deadline, the "***Release Deadline***"). No such payments or benefits will be paid or provided until the Separation Agreement becomes effective. If the Separation Agreement does not become effective by the Release Deadline, Executive will forfeit any rights to receive or retain the severance payments and benefits described in Section 5.2, or other benefits under this Separation Agreement. Executive shall also resign from all positions and terminate any relationships as an employee, advisor, officer or director with the Company and any of its affiliates, each effective on the date of termination.

**7.Section 409A.** It is intended that all of the severance benefits and other payments payable under this Agreement satisfy, to the greatest extent possible, the exemptions from the application of Section 409A of the Internal Revenue Code of 1896, as amended (the "***Code***") provided under Treasury Regulations 1.409A-1(b)(4), 1.409A-1(b)(5) and 1. 409A-1(b)(9), and this Agreement will be construed to the greatest extent possible as consistent with those provisions, and to the extent not so exempt, this Agreement (and any definitions hereunder) will be construed in a manner that complies with Section 409A. For purposes of Section 409A of the Code (including, without limitation, for purposes of Treasury Regulation Section 1.409A-2(b)(2)(iii)), Executive's right to receive any installment payments under this Agreement (whether severance payments, reimbursements or otherwise) shall be treated as a right to receive a series of separate payments and, accordingly, each installment payment hereunder shall at all times be considered a separate and distinct payment. To the extent that any payment or benefit described in this Agreement constitutes "non-qualified deferred compensation" under Section 409A of the Code, and to the extent that such payment or benefit is payable upon the Executive's termination of employment, then such payments or benefits shall be payable only upon the Executive's "separation from service" (Executive's "***Separation from Service***"). The determination of whether and when a separation from service has occurred shall be made in accordance with the presumptions set forth in Treasury Regulation Section 1.409A-1(h). Notwithstanding any provision to the contrary in this Agreement, if Executive is deemed by the Company at the time of Executive's Separation from Service to be a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code, and if any of the payments upon Separation from Service set forth herein and/or under any other agreement with the Company are deemed to be "deferred compensation", then to the extent delayed commencement of any portion of such payments is required in order to avoid a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code and the related adverse taxation under Section 409A, such payments shall not be provided to Executive prior to the earliest of (i) the expiration of the six-month period measured from the date of Executive's Separation from Service with the Company, (ii) the date of Executive's death or (iii) such earlier date as permitted under Section 409A without the imposition of adverse taxation. Upon the first business day following the expiration of such applicable Section 409A(a)(2)(B)(i) of the Code period, all payments deferred pursuant to this Paragraph shall be paid in a lump sum to Executive, and any remaining payments due shall be paid as otherwise provided herein or in the applicable agreement. No interest shall be due on any amounts so deferred. The Company makes no representation or warranty and shall have no liability to the Executive or any other person if any provisions of this Agreement are determined to constitute deferred compensation subject to Section 409A of the Code but do not satisfy an exemption from, or the conditions of, such Section.

**8.Definitions.**

**x.Cause.** For purposes of this Agreement, **"*Cause*"** means and only means any of the following: (i) a conviction of, or plea of "guilty" or "no contest" to, a felony or any crime involving fraudulent conduct under the laws of the United States or any State by

Executive; (ii) any unauthorized use or disclosure by Executive of confidential information or trade secrets of the Company or any successor or affiliate thereof that causes material harm to such entity, but excluding any disclosure required by subpoena, court order or applicable law; (iii) Executive's fraud or willful misconduct that causes material harm to the Company; (iv) Executive's continuing failure to perform Executive's assigned material duties, after receiving written notification of such failure from the Board that specifies such failure and such failure is not materially cured by Executive within thirty (30) days thereafter; (v) Executive's material breach of any written agreement between Executive and the Company if such breach is not cured by Executive within thirty (30) days of written notice thereof from the Company that specifies such material breach; (vi) Executive's material failure to comply with the Company's reasonable and legal written policies or rules applicable to all executives if such failure is not cured by Executive within thirty (30) days of notice thereof from the Company that specifies such material failure; or (vii) Executive's failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested Executive's cooperation. The foregoing definition shall not in any way preclude or restrict the right of the Company or any successor or affiliate thereof to discharge or dismiss Executive for any other acts or omissions, but such other acts or omissions shall not be deemed or construed, for purposes of this Agreement, to constitute grounds for termination for Cause. It is understood and agreed that, where a cure period is specified above, but the condition constituting Cause is legally incapable of being cured, Executive shall not be entitled to such cure period. Whether a termination is for Cause shall be determined by the Board in its judgment and discretion, which shall be exercised in good faith.

**xi.Good Reason.** For purposes of this Agreement "**Good Reason**" means that Executive resigns as set forth in this Agreement after the Executive has first learned that one or more of the following conditions has come into existence without Executive's prior written consent: (i) a material diminution of Executive's base salary, commission target or benefits (for the avoidance of doubt, a reduction in Executive's base salary by more than 10% shall be considered a material diminution); (ii) a material diminution of Executive's authority, duties or responsibilities (including reporting responsibilities), provided, however, that a change in Executive's title shall not, in and of itself, constitute Good Reason; (iii) a change by the Company in the primary geographic location (which is the Seattle, Washington metropolitan area) at which Executive must perform Executive's services for the Company; or (iv) a material breach by the Company of this Agreement or of any other agreement between the Company and Executive. A condition will not be considered "Good Reason" unless Executive gives the Company written notice of the condition within 90 days after Executive has learned that the condition has come into existence, the Company fails to remedy the condition within 30 days after receiving Executive's written notice and Executive resigns Executive's employment within 60 days after the Company receives Executive's written notice.

**9.Proprietary Information Obligations.**

**9.1.Confidential Information Agreement.** As a condition of employment, Executive acknowledges Executive's continuing obligations pursuant to Executive's Restrictive Covenant and Proprietary Information and Inventions Assignment Agreement with the Company, dated as of the date hereof (the "**Confidentiality Agreement**").

**9.2.Third-Party Agreements and Information.** Executive represents and warrants that Executive's employment by the Company does not conflict with any prior employment or consulting agreement or other agreement with any third party, and

that Executive will perform Executive's duties to the Company without violating any such agreement. Executive represents and warrants that Executive does not possess confidential information arising out of prior employment, consulting, or other third party relationships, that would be used in connection with Executive's employment by the Company, except as expressly authorized by that third party. During Executive's employment by the Company, Executive will use in the performance of Executive's duties only information which is generally known and used by persons with training and experience comparable to Executive's own, common knowledge in the industry, otherwise legally in the public domain, or obtained or developed by the Company or by Executive in the course of Executive's work for the Company.

**10.Outside Activities During Employment.**

**10.1.Non-Company Business.** Except with the prior written consent of the Board, which will not be unreasonably withheld, Executive will not during the term of Executive's employment with the Company undertake or engage in any other employment, occupation or business enterprise, other than ones in which Executive is a passive investor. In any event, Executive may engage in civic and not- for-profit activities so long as such activities do not materially interfere with the performance of Executive's duties hereunder.

**10.2.No Adverse Interests.** Executive agrees not to acquire, assume or participate in, directly or indirectly, any position, investment or interest known to be adverse or antagonistic to the Company, its business or prospects, financial or otherwise.

**11.Dispute Resolution.** To ensure the timely and economical resolution of disputes that may arise in connection with Executive's employment with the Company, Executive and the Company agree that any and all disputes, claims, or causes of action arising from or relating to the enforcement, breach, performance, negotiation, execution, or interpretation of this Agreement, the Confidential Information Agreement, or Executive's employment, or the termination of Executive's employment, including but not limited to all statutory claims, with the exception of discrimination and harassment claims, will be resolved pursuant to the Federal Arbitration Act, 9 U.S.C. §1-16 (the "*FAA*"), and to the fullest extent permitted by law, by final, binding and confidential arbitration by a single arbitrator conducted in Seattle, Washington by Judicial Arbitration and Mediation Services Inc. ("*JAMS*") under the then applicable JAMS rules (at the following web address: https://www.jamsadr.com/rules-employment-arbitration/); provided, however, this arbitration provision shall not apply to sexual harassment and discrimination claims, in each case to the extent prohibited by applicable law that is not preempted by the FAA. A hard copy of the rules will be provided to Executive upon request. A hard copy of the rules will be provided to Executive upon request. By agreeing to this arbitration procedure, both Executive and the Company waive the right to resolve any such dispute through a trial by jury or judge or administrative proceeding. In addition, all claims, disputes, or causes of action under this section, whether by Executive or the Company, must be brought in an individual capacity, and shall not be brought as a plaintiff (or claimant) or class member in any purported class or representative proceeding, nor joined or consolidated with the claims of any other person or entity. The Arbitrator may not consolidate the claims of more than one person or entity, and may not preside over any form of representative or class proceeding. To the extent that the preceding sentences regarding class claims or proceedings are found to violate applicable law or are otherwise found unenforceable, any claim(s) alleged or brought on behalf of a class shall proceed in a court of law rather than by arbitration. The Company acknowledges that Executive will have the right to be represented by legal counsel at any arbitration proceeding. Questions of whether a claim is subject to arbitration under this Agreement) shall be decided by a federal court in the State of Washington. However, procedural

questions which grow out of the dispute and bear on the final disposition are matters for the arbitrator. The arbitrator shall: (a) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; (b) issue a written arbitration decision, to include the arbitrator's essential findings and conclusions and a statement of the award; and (c) be authorized to award any or all remedies that Executive or the Company would be entitled to seek in a court of law. Executive and the Company shall equally share all JAMS' arbitration fees. To the extent JAMS does not collect or Executive otherwise does not pay to JAMS an equal share of all JAMS' arbitration fees for any reason, and the Company pays JAMS Executive's share, Executive acknowledges and agrees that the Company shall be entitled to recover from Executive half of the JAMS arbitration fees invoiced to the parties (less any amounts Executive paid to JAMS) in a federal or state court of competent jurisdiction. Except as modified in the Confidential Information Agreement, each party is responsible for its own attorneys' fees. Nothing in this Agreement is intended to prevent either Executive or the Company from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. Any awards or orders in such arbitrations may be entered and enforced as judgments in the federal and state courts of any competent jurisdiction. To the extent applicable law prohibits mandatory arbitration of sexual harassment or discrimination claims and is not preempted by the FAA, in the event Executive intends to bring multiple claims, including a sexual harassment or discrimination claim, the sexual harassment and/or discrimination claims may be publicly filed with a court, while any other claims will remain subject to mandatory arbitration.

**12. Section 280G Matters.**

**i.** If any payment or benefit Executive will or may receive from the Company or otherwise (a "***280G Payment***") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code, and (ii) but for this Section, be subject to the excise tax imposed by Section 4999 of the Code (the "***Excise Tax***"), then any such 280G Payment provided pursuant to this Agreement (a "***Payment***") shall be equal to the Reduced Amount. The "***Reduced Amount***" shall be either (x) the largest portion of the Payment that would result in no portion of the Payment (after reduction) being subject to the Excise Tax, or (y) the largest portion, up to and including the total, of the Payment, whichever amount (i.e., the amount determined by clause (x) or by clause (y)), after taking into account all applicable federal, state, and local employment taxes, income taxes, and the Excise Tax (all computed at the highest applicable marginal rate), results in Executive's receipt, on an after-tax basis, of the greater economic benefit notwithstanding that all or some portion of the Payment may be subject to the Excise Tax. If a reduction in a Payment is required pursuant to the preceding sentence and the Reduced Amount is determined pursuant to clause (x) of the preceding sentence, the reduction shall occur in the manner (the "***Reduction Method***") that results in the greatest economic benefit for Executive. If more than one method of reduction will result in the same economic benefit, the items so reduced will be reduced pro rata (the "***Pro Rata Reduction Method***").

**ii.** Notwithstanding any provision of this Section 12 to the contrary, if the Reduction Method or the Pro Rata Reduction Method would result in any portion of the Payment being subject to taxes pursuant to Section 409A that would not otherwise be subject to taxes pursuant to Section 409A, then the Reduction Method and/or the Pro Rata Reduction Method, as the case may be, shall be modified so as to avoid the imposition of taxes pursuant to Section 409A as follows: (A) as a first priority, the modification shall preserve to the greatest extent possible, the greatest economic benefit for Executive as determined on an after-tax basis; (B) as a second priority, Payments that are contingent on future events (*e.g.*, being terminated without Cause), shall be reduced

(or eliminated) before Payments that are not contingent on future events; and (C) as a third priority, Payments that are "deferred compensation" within the meaning of Section 409A shall be reduced (or eliminated) before Payments that are not deferred compensation within the meaning of Section 409A.

**iii.**Unless Executive and the Company agree on an alternative accounting firm or law firm, the accounting firm engaged by the Company for general tax compliance purposes as of the day prior to the effective date of the Change in Control transaction shall perform the foregoing calculations. If the accounting firm so engaged by the Company is serving as accountant or auditor for the individual, entity, or group effecting the Change in Control transaction, the Company shall appoint a nationally-recognized accounting or law firm to make the determinations required by this Section 12. The Company shall bear all expenses with respect to the determinations by such accounting or law firm required to be made hereunder. The Company shall use commercially reasonable efforts to cause the accounting or law firm engaged to make the determinations hereunder to provide its calculations, together with detailed supporting documentation, to Executive and the Company within fifteen (15) calendar days after the date on which Executive's right to a 280G Payment becomes reasonably likely to occur (if requested at that time by Executive or the Company) or such other time as requested by Executive or the Company.

**iv.**If Executive receives a Payment for which the Reduced Amount was determined pursuant to clause (x) of and the Internal Revenue Service determines thereafter that some portion of the Payment is subject to the Excise Tax, Executive agrees to promptly return to the Company a sufficient amount of the Payment (after reduction pursuant to clause (x) of Section 12(i)) so that no portion of the remaining Payment is subject to the Excise Tax. For the avoidance of doubt, if the Reduced Amount was determined pursuant to clause (y) of Section 12(i), Executive shall have no obligation to return any portion of the Payment pursuant to the preceding sentence.

**13.General Provisions.**

**13.1.Notices.** Any notices provided must be in writing and will be deemed effective upon the earlier of personal delivery (including personal delivery by email) or the next day after sending by overnight carrier, to the Company at its primary office location and to Executive at the address as listed on the Company payroll.

**13.2.Severability.** Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction to the extent possible in keeping with the intent of the parties.

**13.3.Waiver.** Any waiver of any breach of any provisions of this Agreement must be in writing to be effective, and it shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.

**13.4.Complete Agreement.** This Agreement, together with the Confidentiality Agreement, constitutes the entire agreement between Executive and the Company with regard to this subject matter and is the complete, final, and exclusive embodiment of the Parties' agreement with regard to this subject matter and supersede any prior oral discussions or written communications and agreements.

This Agreement is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties or representations. It is entered into without reliance on any promise or representation other than those expressly contained herein, and it cannot be modified or amended except in a writing signed by a duly authorized officer of the Company.

**13.5.Counterparts.** This Agreement may be executed in separate counterparts, any one of which need not contain signatures of more than one party, but all of which taken together will constitute one and the same Agreement.

**13.6.Headings.** The headings of the paragraphs hereof are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning thereof.

**13.7.Successors and Assigns.** This Agreement is intended to bind and inure to the benefit of and be enforceable by Executive and the Company, and their respective successors, assigns, heirs, executors and administrators, except that Executive may not assign any of Executive's duties hereunder and Executive may not assign any of Executive's rights hereunder without the written consent of the Company, which shall not be withheld unreasonably.

**13.8.Tax Withholding and Indemnification.** All payments and awards contemplated or made pursuant to this Agreement will be subject to withholdings of applicable taxes in compliance with all relevant laws and regulations of all appropriate government authorities. Executive acknowledges and agrees that the Company has neither made any assurances nor any guarantees concerning the tax treatment of any payments or awards contemplated by or made pursuant to this Agreement. Executive has had the opportunity to retain a tax and financial advisor and fully understands the tax and economic consequences of all payments and awards made pursuant to the Agreement.

**13.9.Choice of Law.** All questions concerning the construction, validity and interpretation of this Agreement will be governed by the laws of Washington.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement to be effective as of the Effective Date.

**Olo Inc.**

| | | | | |
|---|---|---|---|---|
| By | /s/ Diego Panama | | By | /s/ Noah H. Glass |
| Name | Diego Panama | | Name | Noah H. Glass |
| Title | Chief Revenue Officer | | Title | Founder and Chief Executive Officer |
| Date | April 26, 2022 | | Date | April 26, 2022 |

**Exhibit 10.4**

## SIXTH AMENDMENT
## TO
## AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

This Sixth Amendment to Amended and Restated Loan and Security Agreement (this "Amendment"), dated as of May 9, 2022, is executed and delivered by OLO INC. (f/k/a Mobo Systems, Inc.) and WISELY, LLC (collectively, "Borrower") and PACIFIC WESTERN BANK, a California state chartered bank ("Bank"). Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to those terms in the Loan Agreement (as defined below).

## RECITALS

a. Borrower and Bank are parties to that certain Amended and Restated Loan and Security Agreement dated as of February 11, 2020, as amended by that certain First Amendment to Amended and Restated Loan and Security Agreement dated as of April 29, 2021, that certain Second Amendment to Amended and Restated Loan and Security Agreement dated as of August 13, 2021, that certain Third Amendment to Amended and Restated Loan and Security Agreement dated as of December 9, 2021, that certain Fourth Amendment to Amended and Restated Loan and Security Agreement dated as of January 13, 2022, and that certain Fifth Amendment to Amended and Restated Loan and Security Agreement (the "Fifth Amendment") dated as of March 3, 2022 (the "Original Agreement").

b. From and after the date hereof, Borrower and Bank desire to supplement the terms and provisions of the Original Agreement as provided herein. The Original Agreement as amended hereby and as the same may be hereafter supplemented, amended, modified or restated from time to time is hereinafter referred to as the "Loan Agreement."

NOW, THEREFORE, in consideration of the promises herein contained, and for other good and valuable consideration (the receipt, sufficiency and adequacy of which are hereby acknowledged), the parties hereto (intending to be legally bound) hereby agree as follows:

1. Incorporation. The foregoing preamble and recitals are incorporated herein by this reference.

2. Consent.

(a) Bank previously consented to the Project Ramsey Transactions (as defined in the Fifth Amendment), subject to certain conditions including that New Subsidiary (as defined in the Fifth Amendment) take certain actions set forth in Section 2(c) of the Fifth Amendment within the time period prescribed in Section 2(c) of the Fifth Amendment. Bank hereby agrees to extend such time period to June 30, 2022.

(b) This Consent is effective for the purposes set forth herein and shall be limited precisely as written and shall not be deemed to (i) be a consent to any amendment, waiver or modification of any other term or condition of the Loan Agreement or any other Loan Document (except as specifically set forth herein), or (ii) otherwise prejudice any right or remedy which Bank may now have or may have in the future under or in connection with the Loan Agreement or any other Loan Document.

3. Amendment. The Loan Agreement is hereby amended, as follows:

(c) The following defined terms in Exhibit A to the Agreement are hereby amended and restated as follows:

"Formula Revolving Maturity Date" means June 30, 2022.

"Non-Formula Revolving Maturity Date" means June 30, 2022.

4. Representations and Warranties. Borrower hereby represents and warrants to Bank, which representations and warranties shall survive the execution and delivery hereof, that: (a) this Amendment is the legally valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, and (b) except as otherwise set forth below, each of the representations and warranties contained in the Loan Agreement, as well as all other representations and warranties contained in the other Loan Documents, are true and correct in all respects to the extent required under the Loan Agreement.

5. Successors and Assigns. This Amendment shall be binding upon Borrower and Bank's successors and assigns and shall inure to the benefit of Borrower and Bank's successors and assigns. No other person or entity shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Amendment. Borrower may not assign or transfer any of its rights or obligations under this Amendment without the prior written consent of Bank.

6. Severability; Construction. Wherever possible, each provision of this Amendment shall be interpreted in such a manner so as to be effective and valid under applicable law, but, if any provision of this Amendment shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such provision or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Amendment. All obligations of Borrower and rights of Bank expressed herein shall be in addition to and not in limitation of those provided by applicable law.

7. Counterparts; Facsimile and Other Electronic Transmission. This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Amendment. Receipt of an executed signature page to this Amendment by facsimile or other electronic transmission shall constitute for all purposes effective delivery thereof. Electronic records of this executed Amendment maintained by Bank shall be deemed to be originals.

8. **GOVERNING LAW. THIS AMENDMENT SHALL BE A CONTRACT MADE UNDER AND BE CONSTRUED, ENFORCED AND GOVERNED BY THE LAWS OF THE STATE OF NORTH CAROLINA APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.**

9. **WAIVER OF JURY TRIAL. BANK AND BORROWER WAIVE ANY RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AMENDMENT OR ANY TRANSACTION CONTEMPLATED HEREIN, INCLUDING CLAIMS BASED ON CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER COMMON LAW OR STATUTORY BASES. ALL DISPUTES, CONTROVERSIES, CLAIMS, ACTIONS AND SIMILAR PROCEEDINGS ARISING WITH RESPECT TO BORROWER'S ACCOUNT(S) OR ANY RELATED AGREEMENT OR TRANSACTION SHALL BE BROUGHT IN THE GENERAL COURT OF JUSTICE OF NORTH CAROLINA SITTING IN DURHAM COUNTY, NORTH CAROLINA OR THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA, EXCEPT AS PROVIDED BELOW WITH RESPECT TO ARBITRATION OF SUCH MATTERS. IF THE JURY WAIVER SET FORTH IN THIS SECTION IS NOT ENFORCEABLE, THEN ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS**

2

**AMENDMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN WILL BE FINALLY SETTLED BY BINDING ARBITRATION IN DURHAM COUNTY, NORTH CAROLINA IN ACCORDANCE WITH THE THEN-CURRENT COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION BY ONE ARBITRATOR APPOINTED IN ACCORDANCE WITH SAID RULES. THE ARBITRATOR SHALL APPLY NORTH CAROLINA LAW TO THE RESOLUTION OF ANY DISPUTE, WITHOUT REFERENCE TO RULES OF CONFLICTS OF LAW OR RULES OF STATUTORY ARBITRATION. JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. NOTWITHSTANDING THE FOREGOING, THE PARTIES MAY APPLY TO ANY COURT OF COMPETENT JURISDICTION FOR PRELIMINARY OR INTERIM EQUITABLE RELIEF OR TO COMPEL ARBITRATION IN ACCORDANCE WITH THIS PARAGRAPH.  THE EXPENSES OF THE ARBITRATION, INCLUDING THE ARBITRATOR'S FEES, REASONABLE ATTORNEYS' FEES AND EXPERT WITNESS FEES, INCURRED BY THE PARTIES TO THE ARBITRATION MAY BE AWARDED TO THE PREVAILING PARTY, IN THE DISCRETION OF THE ARBITRATOR, OR MAY BE APPORTIONED BETWEEN THE PARTIES IN ANY MANNER DEEMED APPROPRIATE BY THE ARBITRATOR. UNLESS AND UNTIL THE ARBITRATOR DECIDES THAT ONE PARTY IS TO PAY FOR ALL (OR A SHARE) OF SUCH EXPENSES, ALL PARTIES SHALL SHARE EQUALLY IN THE PAYMENT OF THE ARBITRATOR'S FEES AS AND WHEN BILLED BY THE ARBITRATOR.**

10. Conditions to Effectiveness.  As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

(a) this Amendment, duly executed by Borrower;

(b) payment of all Bank Expenses, including Bank's expenses for the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from Borrower's accounts; and

(c) such other documents and completion of such other matters as Bank may reasonably request.

*[Signature Page Follows]*

3

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be duly executed and delivered as of the date first above written.

**BORROWER:**

**OLO INC.**

By: /s/ Peter Benevides
Name: Peter Benevides
Title: Chief Financial Officer

**WISELY, LLC**

By: /s/ Noah H. Glass
Name: Noah H. Glass
Title: President

**BANK:**

**PACIFIC WESTERN BANK**

By: /s/ James Londono
Name: James Londono
Title: Senior Vice President

*Signature Page to Sixth Amendment to Amended and Restated Loan and Security Agreement*

**Exhibit 10.5**

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE OLO INC. HAS DETERMINED THE INFORMATION (I) IS NOT MATERIAL AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO OLO INC. IF PUBLICLY DISCLOSED**

**AMENDMENT TO THE RESTATED DELIVERY NETWORK AGREEMENT**
Effective Date: July 30, 2021

This Amendment to the Restated Delivery Network Agreement (this "**Amendment**") by and between Olo Inc. f/k/a Mobo Systems, Inc ("**Olo**") and DoorDash, Inc. ("**DoorDash**") is hereby entered into effective as of the Effective Date set forth above between. Capitalized terms used but not defined in this Amendment have the meanings given to those terms in the Agreement.

**WHEREAS,** on April 22, 2021, Olo and DoorDash entered into the Restated Delivery Network Agreement (as amended, supplemented, and modified from time to time, the "**Agreement**"); and

**WHEREAS,** the parties wish to modify or amend the terms of the Agreement as set forth in this Amendment.

The parties agree as follows:

A.**Changes.** Pursuant to Section P(8) (*Amendment/Modifications*) of the Agreement which requires amendments to be made in writing, the parties hereby agree that the "Targeted Availability" column of Exhibit B (*Mutual Product Commitments*), [***] of the Agreement which currently reads "[***]" shall be deleted and the following inserted in lieu thereof:

"[***]"

B.**Fees.** Notwithstanding anything to the contrary in Section G(1) (*Fees*) of the Agreement, and notwithstanding the fact that [***], (i) Olo shall not [***].

C.**Conflicts.** In the event of any conflict between this Amendment and the Agreement, this Amendment shall control.

D.**No Other Changes.** Except as specifically set forth herein, there are no other modifications to the Agreement and all obligations outlined in the Agreement are in full force and effect. This Amendment may be modified or amended only by a separate writing signed by Olo and DoorDash expressly so modifying or amending this Amendment

E.**Entire Agreement.** The Agreement and this Amendment constitute the entire and complete understanding of the parties regarding its subject matter, and supersede all written agreements and understandings between the parties regarding its subject matter. Except as expressly amended and supplemented hereby, the Agreement shall remain in full force and effect.

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE OLO INC. HAS DETERMINED THE INFORMATION (I) IS NOT MATERIAL AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO OLO INC. IF PUBLICLY DISCLOSED**

ACCEPTED AND AGREED:

**DOORDASH, INC. OLO INC**

By: /s/ Brian Busovsky By: /s/ Shalin Sheth_______________

Name: Brian Busovsky Name: Shalin Sheth_______________

Title: Senior Manager, Drive Title: VP & GM, Dispatch_________

Date: July 30, 2021________________ Date: July 30, 2021________________

**Exhibit 10.6**

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE OLO INC. HAS DETERMINED THE INFORMATION (I) IS NOT MATERIAL AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO OLO INC. IF PUBLICLY DISCLOSED**

## SECOND AMENDMENT TO THE RESTATED DELIVERY NETWORK AGREEMENT

Effective Date: April 4, 2022

This Second Amendment to the Restated Delivery Network Agreement (this "**Second Amendment**") by and between Olo Inc. f/k/a Mobo Systems, Inc. ("**Olo**") and DoorDash, Inc. ("**DoorDash**") is hereby entered into effective as of the Effective Date set forth above. Capitalized terms used but not defined in this Amendment have the meanings given to those terms in the Agreement (as defined below).

**WHEREAS,** on April 22, 2021, Olo and DoorDash entered into the Restated Delivery Network Agreement (as amended, supplemented, and modified from time to time, the "**Agreement**");

**WHEREAS,** on July 30, 2021, Olo and DoorDash entered into the Amendment to the Restated Delivery Network Agreement; and

**WHEREAS,** the parties wish to further modify or amend the terms of the Agreement as set forth in this Amendment.

The parties agree as follows:

A.Pursuant to Section P(8) (*Amendment/Modifications*) of the Agreement which requires amendments to be made in writing, the parties hereby agree that the following shall be added to the end of Section E(2) of the Agreement ("DoorDash Obligations"):

"In the event DoorDash responds affirmatively to a Merchant's request for delivery by DoorDash's independent delivery providers, and the Product contained in such delivery includes [***]."

B.Pursuant to Section P(8) (Amendment/Modifications) of the Agreement which requires amendments to be made in writing, the parties hereby agree that the following shall be added to Section E(1) ("Olo Obligations"):
"Olo shall send DoorDash a [***] report containing a list of all Olo Merchants that sign up for the Delivery Services [***], including those Merchants that desire to use the Delivery Services for Products including [***]. The parties agree that DoorDash will enable Delivery Services for Products [***] for such Merchants only [***]."

C.**Conflicts.** In the event of any conflict between this Second Amendment and the Agreement, this Second Amendment shall control.

D.**No Other Changes.** Except as specifically set forth herein, there are no other modifications to the Agreement and all obligations outlined in the Agreement are in full force and effect. This Second Amendment may be modified or amended only by a separate writing signed by Olo and DoorDash expressly modifying or amending this Second Amendment.

E.**Entire Agreement.** The Agreement and this Second Amendment constitute the entire and complete understanding of the parties regarding its subject matter, and supersede all written agreements and understandings between the parties regarding its subject matter. Except as expressly amended and supplemented hereby, the Agreement shall remain in full force and effect.

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE OLO INC. HAS DETERMINED THE INFORMATION (I) IS NOT MATERIAL AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO OLO INC. IF PUBLICLY DISCLOSED**

ACCEPTED AND AGREED:

**DOORDASH, INC. OLO INC**

By: /s/ Brian Busovsky By: /s/ Shalin Sheth______________

Name: Brian Busovsky Name: Shalin Sheth______________

Title: Senior Manager, Drive Title: VP & GM, Dispatch________

Date: April 4, 2022_______________ Date: April 4, 2022_______________

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a), AS ADOPTED**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Noah Glass, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Olo Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    August 11, 2022                              By:    /s/ Noah H. Glass
                                                             Noah H. Glass
                                                             Chief Executive Officer
                                                             *(Principal Executive Officer)*

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a), AS ADOPTED**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Peter Benevides, certify that:

1.I have reviewed this Quarterly Report on Form 10-Q of Olo Inc.;

2.Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

| Date: | August 11, 2022 | By: | /s/ Peter Benevides |
|---|---|---|---|
| | | | Peter Benevides |
| | | | Chief Financial Officer |
| | | | *(Principal Financial and Accounting Officer)* |

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Noah Glass, Chief Executive Officer of Olo Inc. (the "Company"), and Peter Benevides, Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

1.The Company's Quarterly Report on Form 10-Q for the period ended June 30, 2022, to which this certification is attached as Exhibit 32.1 (the "Periodic Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act; and

2.The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 11, 2022

/s/ Noah H. Glass
Noah H. Glass
*Chief Executive Officer (Principal Executive Officer)*

/s/ Peter Benevides
Peter Benevides
*Chief Financial Officer (Principal Accounting and Financial Officer)*

This certification accompanies the Quarterly Report on Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Exchange Act (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing.