# EXHIBIT AB

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>BofI HOLDING, INC. SECURITIES LITIGATION | Case No. 3:15-cv-02324-GPC-KSC |

EXPERT REPLY REPORT OF FRANK C. TORCHIO

July 23, 2021

# TABLE OF CONTENTS

**I. INTRODUCTION AND SUMMARY OF OPINIONS**............................................................ 1

**II. PROF. SMITH MISCHARACTERIZES, MISUNDERSTANDS, AND IS FACTUALLY INCORRECT IN CRITICIZING THE METHODOLOGY SET FORTH IN THE TORCHIO REPORT**........................................................................................................ 3

    **A. Assertions by Prof. Smith about the Rare Use of the Damages Methodology in the Torchio Report are Factually Incorrect** ........................................................... 3

    **B. Prof. Smith Conflates Articulating a Methodology with Conducting Analysis** .. 12

    **C. Prof. Smith Raises a Number of Issues that Have Been Answered in the Torchio Report  14**

**III. THE FACT PATTERN IN THIS CASE DOES NOT PRECLUDE THE USE OF MY DAMAGES METHODOLOGY** ................................................................................... 20

    **A. Corrective Disclosure and Counterfactual Disclosure** ........................................ 20

        **i) Market Reaction to the October 13 Event** ................................................. 21

        **ii) Summary** ..................................................................................................... 24

    **B. Prof. Smith Appears to Regard the Allegations in the Erhart Complaint to be the Counterfactual Disclosure**........................................................................................ 25

        **i) Prof. Smith Makes the Unsupported and Factually Incorrect Assertion that It Is Unusual to Find a Corrective Disclosure that Consists of Disputed and Unproven Allegations** ............................................................. 25

        **ii) Prof. Smith's Analysis of the Truthfulness of the Erhart Allegations**.... 26

    **C. Prof. Smith Contends that Plaintiff's Counterfactual Disclosure is Too General; I Disagree** ................................................................................................................. 27

**IV. OPTIONS DAMAGES**............................................................................................... 29

## I.  INTRODUCTION AND SUMMARY OF OPINIONS

1.      I am the President of Forensic Economics, Inc. and have been retained by Lead Counsel Lieff Cabraser Heimann & Bernstein, LLP ("Counsel") in this Action.  Previously, I submitted an expert report (the "Torchio Report") in which I opined that "damages under Section 10(b) of the Exchange Act caused by the alleged Class Period omissions and misrepresentations in this Action are measurable on a class-wide basis for both BofI common stock and options."[1]  I also noted that "the Defendants have 'agreed not to dispute market efficiency for purposes of opposing lead plaintiff's anticipated motion for class certification,'"[2] and based on that representation, I was not asked to opine on issues of market efficiency.

2.      On June 25, 2021, Defendants filed the Expert Report of David C. Smith, Ph.D. (the "Smith Report") in response to the Torchio Report.  I have been asked to respond to the Smith Report.  After a careful review of the Smith Report, I maintain the opinion set forth in the Torchio Report.  Detailed replies to Prof. Smith's criticisms of my damages methodology are provided in the rest of this reply report.

3.      Prof. Smith's criticisms can be separated into two categories.  The first category includes representations about the damages methodology presented in the Torchio Report that mischaracterize the methodology, show a misunderstanding of the literature that underlies the methodology, or are factually incorrect.  The second category deals with views expressed by Prof. Smith about what are necessary requirements at the class certification stage for an opinion that a damages methodology is capable of measuring class-wide damages.  Prof. Smith is effectively advocating for Plaintiff to provide an equivalent analysis of loss causation as would

---

[1] Expert Report of Frank C. Torchio, May 28, 2021 (the "Torchio Report"), ¶ 3.
[2] Torchio Report, ¶ 2.

1

be provided at the merits stage. Prof. Smith's opinion appears to be based solely on his interpretation of how the law should translate a decision in an antitrust case to securities litigation. I do not proffer any legal interpretation, but because I have significant experience in performing damage calculations in securities litigation, I do express the opinion that what Prof. Smith advocates for is a loss causation analysis, which I have been instructed is not warranted for class certification.

4. Finally, although Prof. Smith "understand[s] that Defendants have agreed to not dispute market efficiency for the purposes of opposing class certification" and he "assume[s] that BofI securities traded in an efficient market during the Putative Class Period," he nonetheless notes that I have "not provided any economic analysis to independently establish the market efficiency of BofI securities."[3] As such, I have also been asked to provide an opinion regarding the efficiency of the markets for the common stock and options on the common stock of BofI for the period September 4, 2013 through October 14, 2015, inclusive (the "Class Period"). I conclude, based on my experience in analyzing market efficiency and specific analyses of BofI common stock and options, that the markets for BofI common stock and options were informationally efficient during the Class Period. *See* **Appendix A**.

5. I reserve the right to amend my conclusions to reflect new information made available to me in the discovery process, information provided by other experts in the litigation, future rulings from the Court in this Action, other rulings binding on this Court, or any motions and trial proceedings.

6. My qualifications and remuneration for this matter are set forth in the Torchio Report.

---

[3] Smith Report, footnote 3.

7.      In the course of my assignment for this report, I have reviewed numerous documents, which are listed in the attached Exhibit 1, which also contains the materials I considered in connection with the Torchio Report.  Specific documents and information relied upon in reaching my opinions are cited throughout this report.

## II.  PROF. SMITH MISCHARACTERIZES, MISUNDERSTANDS, AND IS FACTUALLY INCORRECT IN CRITICIZING THE METHODOLOGY SET FORTH IN THE TORCHIO REPORT

### A.  Assertions by Prof. Smith about the Rare Use of the Damages Methodology in the Torchio Report are Factually Incorrect

8.      Prof. Smith defines "backcasting" as the approach to determining inflation I described in the Torchio Report which involves starting with a corrective disclosure and working backward through the class period after choosing among the inflation techniques I described in the Torchio Report, Section V.D., titled "Techniques Used in Calculating Artificial Inflation."[4] He then states:

> In fact, the backcasting methodology as described by Mr. Torchio can be appropriately applied to estimate inflation only under particular and rare conditions not present here.[5]

9.      Prof. Smith's statement that such backcasting as described in the Torchio Report is used "only under particular and rare conditions" is misleading and factually incorrect.  In my over 30 years of working in the field of securities litigation, I have seen virtually all damages experts construct inflation by starting with the losses determined by an event study and then constructing inflation by working backward from the event that revealed the wrongdoing and caused losses, which is what Prof. Smith refers to as "backcasting."  From my research, I found

---

[4] Smith Report, p. 4; Torchio Report, Section V.D.

[5] Smith Report, p. 4 (emphasis added).  *See also* Smith Report, ¶ 40.  Prof. Smith's contentions are contained in Section VI.C. of the Smith Report.

3

that the approach I use to construct inflation has been used by experts including: Dr. Michael

Hartzmark, Prof. Tavy Ronen, Prof. John Finnerty, Prof. Steven Feinstein, Chad Coffman, and

Dr. Zachary Nye, among others.[6]

10.     The ubiquitous use of the so-called "backcasting" methodology can be gleaned by

the Appeals Court decision in this case in which the opinion generally discusses plaintiffs'

approach to measuring damages by establishing a link between the losses from an event that

revealed the misrepresentation and the construction of an artificial inflation line, which

corresponds with Prof. Smith's characterization of backcasting.[7]  This approach is consistent

with my damages methodology.  The Appeals Court decision states:

> To establish loss causation in a fraud-on-the-market case, the
> plaintiff must show that after purchasing her shares and before
> selling, the following occurred: (1) "the truth became known," and
> (2) the revelation caused the fraud-induced inflation in the stock's
> price to be reduced or eliminated. *Dura Pharmaceuticals*, 544 U.S.
> at 347; *see FindWhat*, 658 F.3d at 1310. At that point, the plaintiff
> has suffered an economic loss caused by the misstatements
> because she is no longer able to recoup in the marketplace the
> inflationary component of the price she originally paid. *FindWhat*,

---

[6] *See*, *e.g.*, Expert Report of Chad Coffman, CFA, *In Re NII Holdings In. Securities Litigation*, September 11, 2015, Civ. No. 1:14-cv-00227-LMB-JFA, United States District Court, Eastern District of Virginia, Alexandria Division; Expert Report of John D. Finnerty, Ph.D., *In Re Goldman Sachs Group, Inc., Securities Litigation*, November 6, 2015, Civ. No. 1:10-cv-03461-PAC, United States District Court, Southern District of New York; Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., *In Re Petrobras Securities Litigation*, October 15, 2015, Civ No. 14-cv-9662 (JSR), United States District Court, Southern District of New York; Expert Report of Michael L. Hartzmark, Ph.D., *In Re Signet Jewelers Limited Securities Litigation*, March 15, 2019, Civ No. 1:16-CV-06728-CM, United States District Court, Southern District of New York; Expert Report of Zachary Nye, Ph.D., *In Re Snap, Inc. Securities Litigation*, June 7, 2019, Civ No. 2:17-cv-03679-SVW-AGR, United States District Court, Central District of California, Western Division; Expert Report of Tavy Ronen, Ph.D., *Casey Roberts v. Zuora, Inc.*, December 4, 2020, Civ No. 3:19-cv-03422-SI, United States District Court, Northern District of California.

[7] *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781 (9th Cir. 2020) ("*BofI*") at 789-790.

> 658 F.3d at 1311; Madge S. Thorsen et al., *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 98 (2006).
>
> <u>The most common way for plaintiffs to prove that "the truth became known" is to identify one or more corrective disclosures.</u> *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753–54 (9th Cir. 2018) (per curiam); *Lloyd*, 811 F.3d at 1209.[8]

11.     The Appeals Court decision makes clear that it is "common" for experts to identify a corrective disclosure, perform an event study to determine the losses caused by the misrepresentation and, based on the measure of losses, construct an inflation line over the class period to measure the "inflationary component of the price she [plaintiff] originally paid."

12.     The benefits of the damage methodology I employ were recognized many years ago in a 1982 paper by Prof. Daniel Fischel who stated that:

> Attempting to appraise the value of the security by analyzing asset value, earnings data, and other information is inherently speculative.  Measuring the difference in the market value of a security between the date of purchase and the date of sale (or any other post transaction date) also is flawed because of the possibility that the decline was caused by factors other than the alleged wrongdoing by the defendant… These methodological difficulties can be overcome by using the standard market model developed by financial economists to measure the effect of unanticipated events on the market price of a firm's securities [event study].[9]

13.     Thus, early articles such as Fischel's changed the method of construction of inflation in securities cases from one based solely on fundamental analysis (*e.g.*, P/E ratios) to inflation based on event study results.

---

[8] *BofI* at 789-790 (emphasis added).

[9] Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38, November 1982, 1-20, at 17 (footnote omitted).

14. The U.S. Supreme Court decision in *Dura* solidified the reliance on event study results to determine inflation by requiring that inflation during a class period cannot exceed the dollar per share drop when the market learns of the wrongdoing (the corrective event).[10] Determining the dollar per share drop requires an event study. Thus, the *Dura* decision necessitates that the losses caused by revelation of the fraud are connected to the construction of daily inflation. This construction is accomplished via the methodology characterized as backcasting by Prof. Smith.

15. The more recent U.S. Supreme Court decision in *Goldman* made clear that, in securities cases, the determination of daily inflation starts with the losses measured by an event study of a disclosure that corrects the prior misrepresentation. The decision states what is the typical analysis by experts:

> Plaintiffs <u>typically</u> try to prove the <u>amount of inflation</u> indirectly: They <u>point to a negative disclosure about a company and an associated drop in its stock price</u>; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation.[11]

16. Prof. Smith's misleading statement evidently resulted from his misunderstanding of the Cornell and Morgan (1990) paper that I referenced in the Torchio Report.[12] In that paper, the authors discuss the issue of over- and under-corrective disclosures, which Prof. Smith contends, if present, would preclude the use of my damages methodology.[13] (Prof. Smith only

---

[10] *Dura Pharm. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627 (2005) ("*Dura*").

[11] *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 2021 U.S. Lexis 3391, 141 S. Ct. 1951 ("*Goldman Sachs*") at 15. In my methodology, I consider factors that may result in inflation that is less than the amount of price drop.

[12] Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, 1990, 883-924 ("Cornell and Morgan (1990)").

[13] Smith Report, ¶ 40.

discusses the circumstance in which there is an over-corrective disclosure.)  I discussed the issue of both over- and under-corrective disclosure in the Torchio Report in which I state:

> More precisely, a corrective disclosure can be an over-correction if part of corrective disclosure contains material negative information related to the misrepresentations but is not alleged to have been misrepresented.  For example, consider a company that failed to disclose but was required to disclose $2 billion write-down of its assets.  Also assume that the corrective disclosure announced that the company would take a $2.5 billion write-down of its assets. Although the corrective disclosure reveals a write-down, the magnitude of the write-down exceeds that which could have been disclosed earlier in the class period.
>
> There are also examples in which there is an under-correction, that is the market never learns of the full degree of misrepresentations in the corrective disclosures.[14]

17.     Adjusting for an over-corrective disclosure is not some intractable problem that obviates the use of the damages methodology in the Torchio Report.  An over-correction can be handled in much the same way as confounding information contained in a corrective disclosure which I discussed in Section V.C.iv.) of the Torchio Report.[15]  That is, the price reaction can be parsed out between the corrective information and the information that is deemed to be an over-correction.  This kind of analysis is performed often by experts in securities litigation.

18.     Prof. Smith overlooked the section in Cornell and Morgan (1990) that discusses that "[a] potential solution to the problem [of over- and under-correction] is construction of an equivalent disclosure price.  The equivalent disclosure price is the price at which the security

---

[14] Torchio Report, ¶¶ 49-50.

[15] The U.S. Supreme Court also recognized that simply measuring inflation as the stock price drop can "break down when there is a mismatch between the contents of a misrepresentation and the corrective disclosure." *Goldman Sachs* at 15.  The "break down" referred to in *Goldman Sachs* and the means to address it is addressed in my methodology in the Torchio Report as applied to an over-corrective disclosure or a corrective disclosure that contains confounding information.

would have traded if the omitted information and misrepresented information - and *only* the misrepresented information - were accurately disclosed at the start of the class period."[16]  This is a procedure used to parse out the total price reaction that I discussed in the Torchio Report.[17]

19.     This determination of what Cornell and Morgan (1990) refer to as the "equivalent disclosure price" is what results from my methodology which includes adjusting for an over- or under-correction, confounding information, and adjusting inflation "when economic conditions are substantially different at the time of the corrective disclosures relative to the economic conditions that existed during a class period, or if the financial impact of the wrongdoing became greater over time."[18]

20.     In the same section of the Smith Report, Prof. Smith also criticizes my damages methodology as only working in "rare circumstances" by reference to a passage in Cornell and Morgan (1990):[19]

> As *Basic* and *Liggett & Myers* illustrate, <u>only in rare circumstances</u> does the second step simply involve observing the market price of the security on a date by which all elements of the fraud have been revealed because, by that time, the market price has been affected by more information than just the information misrepresented or omitted.[20]

21.     But, what Cornell and Morgan (1990) discuss in this passage is *not* the event study approach and *not* my damages methodology, nor is it the approach used by many other experts in securities litigation.  The Cornell and Morgan (1990) passage above is referring to a very different damages method in which the market price after a full corrective disclosure is used

---

[16] Cornell and Morgan (1990), p. 894 (emphasis in original).

[17] Torchio Report, Section V.C.

[18] Torchio Report, ¶ 76 (footnote omitted).

[19] Smith Report, ¶ 42.  Prof. Smith evidently borrowed the language of "only in rare circumstances" from Cornell and Morgan (1990).

[20] Cornell and Morgan (1990), pp. 894-895 (emphasis added and in original).

as a measure of the true value on every day in the class period.  Again, this approach is not part of my methodology and it is not the approach advocated in Cornell and Morgan (1990).  In the figure below, I graphically explain what Cornell and Morgan (1990) refer to as the approach that only works in rare circumstances and compare that to the methodology set forth in the Torchio Report, in which inflation is constructed from the price drop on a corrective disclosure.

**FIGURE 1: ILLUSTRATIVE EXAMPLE**



22.     In this example, assume that the share price at the beginning of the class period is $50 and that it generally declines to $15 on the day before the corrective disclosure.  Assume that the corrective disclosure causes a $5 decline in the market price and the market price after the corrective disclosure is $10.  The Cornell and Morgan (1990) criticism related to a method of computing inflation that equates the true value for all days in a class period to the market price that obtains after a corrective disclosure, which in my example is $10.

9

23.     Thus, if the $10 post-disclosure price is used as the true value, then, as is seen in **Figure 1**, inflation at the beginning of the Class Period is $40 (the difference between the $50 price and the $10 true value).  Whereas, if the methodology based on the change in the market price from a corrective disclosure is used (as is done in my methodology), the inflation at the beginning of the class period is $5 per share (based on a simple dollar inflation before any scaling), which is the price change of $5 attributable to the corrective disclosure.

24.     Thus, Cornell and Morgan (1990) are correct when they say that equating true value to the market price ($10 in my example) after a correction will work only in rare circumstances (*i.e.*, when the price over the class period is constant).  This is because the price after the corrective disclosure can reflect many things that occurred over the class period; in the example above, those things would include whatever caused a price decline from $50 at the start of the class period to $15 on the day before the corrective disclosure is made.   But this caution in Cornell and Morgan (1990) does *not* apply to the "event study approach" they later discuss in the paper, which is to compute damages with what is the essence of the approach I proposed in the Torchio Report.  I also note that subsequent to the publication of Cornell and Morgan (1990), the *Dura* decision was issued, which itself would preclude the use of equating true value to the post-correction market price (*i.e.*, inflation of $40) in the example above.

25.     In a subsequent paper co-authored by Prof. Cornell in 2005, the authors state that: "An event study is an invaluable tool for evaluating various questions in a securities case, such as whether the underlying news releases support a plaintiff's contention of either causation and/or disclosure of information that reasonably can be linked to alleged frauds."[21]  Under a

---

[21] Bradford Cornell, John I. Hirshleifer and John N. Haut, "Securities Fraud Damages," *Contemporary Studies in Economic and Financial Analysis*, 87, 2005, 29-57 ("Cornell, Hirshleifer and Haut") at 34.

heading in this paper, titled "Measuring Stock Price 'Inflation'," the authors discuss the

application of "this invaluable tool," which is consistent with my damages methodology:

> Unlike the comparable index method, the event-study method is designed to filter out from damages company-specific stock price movements that are not related to alleged frauds. However, this requires proper interpretation of the event study. First, days on which fraud-related information was released and in which the residual return was significant must be isolated. Second, the residual return on those days must be partitioned into fraud-related and non-fraud-related components.[22]

Nowhere in Cornell, Hirshleifer and Haut (2005) do the authors state that this method can only

be used in rare circumstances.

26.     Therefore, Prof. Smith either misunderstands my methodology or misunderstands

the Cornell and Morgan (1990) paper, or both, concerning: (1) the over-correction discussion;

and (2) in asserting that the method that Cornell and Morgan (1990) state can only work in rare

circumstances; the event study approach advocated in Cornell and Morgan (1990) and most

certainly the methodology I propose is not the method that Cornell and Morgan (1990) conclude

only works in rare circumstances.

27.     In sum, Prof. Smith's characterization of my damages methodology is factually

incorrect. The damages methodology I described in the Torchio Report is not used only under

"rare conditions;" this methodology has been applied to many different circumstances in many

different cases by many different expert witnesses.[23]

---

[22] Cornell, Hirshleifer and Haut (2005) at 42.

[23] *See* footnote 6.

**B. Prof. Smith Conflates Articulating a Methodology with Conducting Analysis**

28.     Methodology is defined as "'a contextual framework' for research, a coherent and logical scheme based on views, beliefs, and values, that guides the choices researchers [or other users] make."[24]

29.     I have provided in the Torchio Report and described in my deposition testimony a "framework" for computing damages in this case, which describes the various "choices" that would be considered by me in a future analysis regarding specific conclusions about materiality, loss causation, artificial inflation, and ultimately damages.[25]  In other words, I have provided a methodology for calculating damages on a class-wide basis, *i.e.,* "'a contextual framework' for research, a coherent and logical scheme based on views, beliefs, and values, that guides the choices researchers [or other users] make."[26]

30.     My interpretation of paragraphs 32-36 of the Smith Report is that Prof. Smith complains that I did not perform analyses to determine whether the alleged misrepresentations were material, what losses were caused by the alleged misrepresentations, and an analysis that converts such losses into artificial inflation.  For example, Prof. Smith states, "In fact, Mr. Torchio testified in deposition that he has not performed sufficient *analysis* to describe a method for estimating inflation during the Putative Class Period that would be appropriate in this case."[27] I testified that I did not perform such analysis at this stage in the litigation but rather explained the methodology I would use to perform such analysis.[28]

---

[24] Helen Kara, <u>Creative Research Methods in the Social Sciences: A Practical Guide</u>, Bristol: Policy Press, 2015, ("Kara (2015)"), p. 4.

[25] Torchio Report, Sections V and VI; Deposition testimony of Frank C. Torchio, June 18, 2021 ("Torchio Deposition"), p. 11-14.

[26] Kara (2015), p. 4.

[27] Smith Report, ¶36 (emphasis added, footnote omitted).

[28] Torchio Deposition, pp. 13-17.

31. Although Prof. Smith refrains from using the phrases "materiality" and "loss causation," what he advocates as "analysis" I should have performed is the very same analysis that is typically included in a damages report at the merits stage of litigation.

32. Prof. Smith has made the same arguments in other cases, which have also been interpreted as arguments for analyzing loss causation. For example, in its opinion in *Insys Therapeutics, Inc.*, the court stated:

> Smith, Defendants' expert, opined that Coffman's anticipated "analysis will be insufficient to isolate only the price effect of the allegedly corrective information from other potentially confounding news that impacted the price of Insys stock but was not related to the allegations in this matter." (Doc. 165-2 at 29-30.)[29]

33. In that opinion, the court cited to the plaintiff's expert:

> Dr. Smith's criticisms of my opinion on damages as expressed in the Coffman Report do not relate to whether the general out-of-pocket damages methodology can be applied formulaically in this matter using common proof on a class-wide basis. Instead, his objections all relate to whether certain adjustments would ultimately be necessary as a matter of loss causation *at the merits stage* to address (1) the purported release of putatively confounding information, if any, on the alleged corrective disclosure dates; and (2) how far back in time any inflation per share extends, i.e., when damages, and the Class Period, started. Answering these questions requires a detailed loss causation analysis, which I understand is not required at this stage of the litigation, and, as a result, I have not been asked to perform.[30]

34. Consequently, the court held:

> Therefore, Plaintiff has proposed a method of calculating damages that is consistent with his theory of liability and can be applied

---

[29] *Di Donato v. Insys Therapeutics*, 333 F.R.D. 427 (D. Ariz. 2019) ("*Insys Therapeutics*") at 447.

[30] *Insys Therapeutics* at 447-448 (emphasis added and in original).

classwide. <u>At the class certification stage, he is not required to do more</u>.[31]

35.     Prof. Smith's opinion about what is required to establish that a damages methodology is capable of measuring damages is based on his interpretation of the *Comcast* opinion:

> My understanding of the Supreme Court's decision in *Comcast* is that although plaintiffs are not required to calculate damages for the purposes of class certification, they are required to describe a damages methodology that is capable of measuring only those damages attributable to plaintiffs' liability theory.[32]

36.     I am not a lawyer and I do not offer an interpretation of *Comcast* as does Prof. Smith, but it appears there are some differences between *Comcast* and securities cases that might be considered when applying *Comcast* to securities cases. *Comcast* was an antitrust case and not a securities case. It is my understanding that the main difference is that in *Comcast* when three of the four theories were dismissed, it resulted in measures of harm that would be different across consumers and there would be individualized issues not accounted for by the plaintiffs' damages methodology. In *BofI*, if there were a dismissal of some allegation, then this may affect the amount of inflation on each date of the Class Period, but the damages methodology would still apply across all Class members in a common manner.

37.     It is my understanding that the requirement to describe the damages methodology that I will use at the merits stage of the litigation does not require performing a loss causation analysis at this stage in the litigation.

**C.  Prof. Smith Raises a Number of Issues that Have Been Answered in the Torchio Report**

38.     Below is a bullet point list of issues raised by Prof. Smith and my responses.

---

[31] *Insys Therapeutics* at 448 (emphasis added).
[32] Smith Report, ¶ 23 (footnote omitted).

- Mr. Torchio provides no information about his purported damages methodology other than that he plans to construct a market model of BofI stock returns and conduct an event study analysis of the single alleged corrective disclosure in this case (Smith Report, ¶ 31).

39.     I disagree.  The Torchio Report provides a detailed discussion of how I expect to analyze the information released in the October 13, 2015 event,[33] including an assessment of how the market perceived the information from the October 13 disclosure and how the market would perceive information in a counterfactual disclosure, whether there is any confounding information that would cause me to parse out the price reaction to the October 13 event, an assessment of potential truth on the market disclosures, and a framework to determine an appropriate event window (*see* Torchio Report, Section V.C.).  I also provided a discussion on how I expect to convert the quantification of losses from my analysis into artificial inflation for each day in the Class Period for the stock and the options (see Torchio Report, Sections V.D. and V.E.).  As discussed above, my methodology provides a framework for future analysis that will occur at the merits stage of this litigation.

- Moreover, although the Torchio Report contains a long section about general concepts when analyzing damages in generic Section 10(b) cases, none of Mr. Torchio's discussion addresses Plaintiff's liability theory, his definition of the relevant truth, or the fact pattern in the current case (Smith Report, ¶ 32).

40.     I disagree.  I found nothing in the fact pattern of this case that would preclude me from analyzing loss causation and damages using the methodology described in the Torchio

---

[33] A former internal auditor of BofI, Mr. Charles Matthew Erhart, filed a whistleblower lawsuit against the Company on October 13, 2015.  Complaint for Damages and Other Relief, *Charles Matthew Erhart v. BofI Holding Inc.*, Civ No. 15-CV-2287 BAS NLS, United States District Court, Southern District of California, October 13, 2015, (the "Erhart Complaint").  *See also* "Ex-Auditor Sues Bank of Internet," *The New York Times*, October 13, 2015 ("NYT October 13, 2015 Article").

Report.[34]  In Section III. of this report, I provide specific responses to Prof. Smith's contentions about the fact patterns in this case.

- In fact, Mr. Torchio's generic invocation of an "event study analysis" is not, by itself, a description of a damages methodology (Smith Report, ¶ 33).

41.     Prof. Smith mischaracterizes the Torchio Report.  The Torchio Report describes a damages methodology that *includes* an event study, but the methodology goes well beyond merely performing an event study.  The methodology provides a framework, the implementation of which would include a thorough analysis of the market's perception of the information revealed in a corrective disclosure (in this case, the Erhart Complaint and related media coverage) and the ultimate determination of artificial inflation and per share damages.

- Importantly, an event study analysis does not constitute or describe a method for estimating stock price inflation daily throughout the Putative Class Period (Smith Report, ¶ 34).

42.     Again, Prof. Smith mischaracterizes the Torchio Report.  The Torchio Report provides a framework for analyzing and determining inflation in Section V.D. titled "Techniques Used in Calculating Artificial Inflation" in which I discuss the two general approaches to calculating artificial inflation from the results of a loss causation analysis as well as the kind of adjustments that can be made to account for such circumstances as differences in economic conditions over the class period or changes in the degree of alleged wrongdoing over the class period.  I also discussed this in my deposition.[35]

- Under a backcasting methodology, the price declines on the alleged corrective disclosure days attributable only to the alleged misrepresentations (rather than confounding information) are carried backwards in time as a measure of earlier inflation *under the assumption* that the level of inflation did not change through time except when corrective information was disclosed (Smith Report, ¶ 36).

---

[34] *See* Torchio Report, Section VI.
[35] Torchio Deposition, pp. 12-14.

16

43.     Prof. Smith's assumption that if I decide to rely on the simple dollar inflation technique for assessing artificial inflation, then my damages methodology necessarily results in inflation that does not change over the Class Period, is erroneous.  As discussed in the Torchio Report, my deposition, and explained again above, my framework for damages requires an analysis to assure that daily inflation agrees with changing circumstances that occur over the class period such as any changes in economic conditions or changes in the degree of wrongdoing.  I discussed this in the Torchio Report in Section V.D.ii), titled "Methods of Scaling Artificial Inflation."  I also discussed this in my deposition.[36]

- Mr. Torchio fails to articulate a method for estimating inflation in this case, for the remainder of this report, I assume that he will use the constant dollar method for estimating BofI stock price inflation during the Putative Class Period because it is the only method described in his report that he says is not contrary to Supreme Court precedent (Smith Report, ¶ 37 (footnote omitted)).

44.     Prof. Smith misquotes me and fails to understand the import of the U.S. Supreme Court decision in *Dura* and fails to understand my discussion in the Torchio Report in which I explained:

> The choice between the constant dollar method and the constant percentage method is dependent on case-specific factors relating to the disclosure failure but, based on the 2005 U.S. Supreme Court decision in *Dura Pharmaceuticals, Inc. v. Broudo*, artificial inflation from the percentage method cannot exceed the cumulative amount of dollar per share declines over the corrective disclosures (*i.e.*, cannot exceed the constant dollar artificial inflation measure) in computing Section 10(b) damages.[37]

45.     Thus, the U.S. Supreme Court did not preclude the use of the percentage method of calculating artificial inflation.  As stated in the Torchio Report, the *Dura* decision makes clear that inflation during the class period cannot exceed the dollar per share loss attributed to the

---

[36] Torchio Deposition, pp. 136-138.
[37] Torchio Report, ¶ 75 (footnote omitted).

17

correction of the misrepresentation. If, however, the percentage method results in inflation that is less than the dollar per share losses from a corrective disclosure, then use of the percentage method does not in any way violate *Dura* and it is a perfectly acceptable method if facts and circumstances dictate its use.

46. The percentage method will result in artificial inflation that is smaller than the per share losses from a corrective disclosure (and smaller than the dollar method) when the actual share price generally increases over the class period. **Figure 2** below illustrates an example that shows the actual stock price increasing over the class period. This example shows that inflation using the percentage method results in daily artificial inflation that is less than (or equal to) the per share loss from the corrective disclosure and less than inflation from a simple dollar method (with no scaling).

**FIGURE 2: COMPARISON OF INFLATION**
**WHEN STOCK PRICE IS INCREASING DURING CLASS PERIOD**

47. Therefore, Prof. Smith's general statement that the percentage method for inflation cannot be used in the U.S. is incorrect. Moreover, BofI's stock price exhibits a general

18

trend of increasing stock price over the Class Period, similar to the example used above. *See*

**Figure 3** below.

**FIGURE 3: SHARE PRICE PERFORMANCE OF BOFI**
**(JANUARY 1, 2011 – DECEMBER 31, 2015)[38]**



48.     Consequently, Prof. Smith is also incorrect to assume that the only inflation

method available to me is the dollar method. As stated in the Torchio Report, if asked at a

further stage of the litigation, I will analyze the discovery and facts available and determine

which of the inflation methods is appropriate in this case.

---

[38] BofI's stock was split 4 for 1, with an ex-date of November 18, 2015 (after the end of the Class Period). The prices in the chart are shown on a pre-split basis.

19

### III. THE FACT PATTERN IN THIS CASE DOES NOT PRECLUDE THE USE OF MY DAMAGES METHODOLOGY

49.     Below I respond to Prof. Smith's contention that the "fact pattern" in this case would preclude me from analyzing loss causation and damages using the damages methodology I discussed in the Torchio Report.  Although Prof. Smith's concern about the "fact pattern" for BofI is essentially a contention that a loss causation analysis is required for class certification, I discuss why I find Prof. Smith's view that the methodology in the Torchio Report is not capable of measuring damages to be wrong.

### A.  Corrective Disclosure and Counterfactual Disclosure

50.     Prof. Smith is correct when he alludes to the two predicates necessary for a damages expert to render a damages opinion: 1) a "counterfactual disclosure"; and 2) an assumption that plaintiffs will prove at trial that defendants had a duty to make the counterfactual disclosure to correct misrepresentations.[39]  Thus, to understand whether the "fact pattern" in this case can be analyzed using the damages methodology in the Torchio Report, I discuss the connection between the counterfactual disclosure and the corrective disclosure.

51.     As described in the Torchio Report (Section VI) and discussed in my deposition, the counterfactual disclosure is that BofI had a duty to inform the market that its previously represented underwriting standards had been loosened and that its internal controls and compliance infrastructure were ineffective, which I will refer to as the "Counterfactual Disclosure."[40]  This Counterfactual Disclosure is what I assume Plaintiff will prove at trial that Defendants had a duty to disclose.[41]

---

[39] Smith Report, ¶ 24.

[40] Torchio Report, Section VI; Torchio Deposition, pp. 62-64.

[41] The Counterfactual Disclosure is based on information currently available, but could change based on new information from discovery.

52. As is done in virtually every securities litigation of which I am aware, the damages expert endeavors to find a disclosure of information that reveals to the market some material aspect of the counterfactual disclosure.[42] This is described in the *Dura* decision.[43] For BofI, this occurred when the Erhart Complaint was disclosed on October 13, 2015. As I stated in the Torchio Report and in my deposition, the disclosure of the Erhart Complaint disseminated information that the market interpreted to portend serious problems concerning BofI's underwriting standards, internal controls, and compliance infrastructure.[44] Prof. Smith, however, appears to have a much narrower view that the market was reacting only to the specific allegations in the Erhart Complaint and further that Plaintiff in this litigation is basing the counterfactual disclosure on proving that the allegations in the Erhart Complaint are true as opposed to proving the Counterfactual Disclosure articulated above.

### i) *Market Reaction to the October 13 Event*

53. On Tuesday, October 13, 2015, *The New York Times* reported that a former internal auditor of BofI, Mr. Erhart, had on the same date filed a whistleblower lawsuit against the Company.[45] The Erhart Complaint alleged that BofI management engaged in inappropriate conduct that interfered with the independent functions and findings of internal auditors, made false representations to regulatory authorities, and made high-risk loans to foreign nationals in violation the Bank Secrecy Act's Anti-Money Laundering Rules, among other misconduct. Mr. Erhart alleged that his attempts to raise these compliance issues led to retaliation within the

---

[42] *See, e.g., BofI* at 789-790.

[43] *Dura* at 1632-1633.

[44] Torchio Report, Section VI; Torchio Deposition, pp. 32-33.

[45] NYT October 13, 2015 Article.

Company and to his ultimate termination.  The Erhart Complaint contained detailed and specific descriptions of various alleged wrongdoing.

54.     **Figure 4** below shows the intraday prices during trading hours for BofI common stock during October 13-19, 2015.  On Tuesday, October 13, 2015, BofI stock price closed at $142.00 per share.  The exact times of the publication of *The New York Times* article or the whistleblower complaint are not available to me.  Based on the news stories available to me, *The New York Times* article was first reported by *Bloomberg First Word* at 9:09 pm on October 13, 2015.[46]

**FIGURE 4: INTRADAY PRICES DURING TRADING HOURS FOR BofI COMMON STOCK**



---

[46] "BofI Holdings Sued by Former Auditor Over Procedures: NYT," *Bloomberg First Word*, October 13, 2015, 9:09 pm.  Unless otherwise noted, all time stamps in this report are in Eastern Time.

55.     As can be seen from this figure above, the stock price fell dramatically on October 14, partially rebounded on October 15 and declined again on October 16 to approximately the same price it closed at on October 14.[47]  The trading volume on October 14-16 of 6.0 million, 2.5 million, and 1.6 million shares, respectively, was far greater than the average daily volume over the Class Period.  When BofI's daily volume over the Class Period, and including the volume on October 15-16, 2015, is ranked from high to low, the volume on the 3 dates during October 14-16, 2015 ranked in the top 4 out of the 535 days, which together with the dramatic price movements shows that this disclosure was complex and had significant valuation consequences.  I discuss the price movements on these three dates below.

56.     Over the October 13-16 period, there was considerable market activity and media commentary about the Erhart Complaint and the inferences from it about BofI's internal controls, compliance infrastructure, and underwriting standards.[48]  The disclosure of the complaint caused a dramatic decline in BofI's stock price on October 14.  Management's denial resulted in a partial rebound on October 15, but the price reversed negatively on October 16 with a denial from Mr. Erhart's attorney that the Erhart litigation was being funded by short sellers and that an auditor supervisor resigned from BofI because of concerns about how the bank was responding to regulators.[49]  Ultimately, BofI lost nearly 30% of its market capitalization of equity as the

---

[47] Although the Class Period ends on October 14, 2015, it is a convention in damages analysis that if the corrective information is disclosed before the market opens, then investors who purchased on that day after the disclosure are not damaged.  As can be seen from **Figure 4**, the price declined almost immediately after the open on October 14, 2015, which is consistent with the market quickly incorporating the implications of the Erhart Complaint.

[48] *See, e.g.*, NYT October 13, 2015 Article; "BofI Stock Crashes On Audit Accusations; Ex-Auditor Files A Lawsuit; Bank of Internet's lending had soared in recent years – were standards unsafe?" Investor's Business Daily, October 14, 2015.

[49] *See, e.g.*, "BofI Jumps 17% After Mgmt Held Call on Allegations, Two Upgrades," Bloomberg First Word, October 15, 2015, 8:50 am; "Bank of Internet Denies Accusation That It Defied Regulators," *The New York Times*, October 15, 2015.

market reacted to implications about BofI's operations from the Erhart Complaint and in light of the abnormally high growth of BofI relative to its peers. **Figure 5** is a chart of BofI's stock price from October 1, 2015 to December 31, 2015, which shows that the price did not reverse for the remainder of 2015.

FIGURE 5: BofI DAILY STOCK PRICE (OCTOBER 1, 2015 – DECEMBER 31, 2015)[50]

### ii) *Summary*

57. Consistent with media interpretations, the disclosure of the Erhart Complaint provided significant credence to market speculation that the abnormally high growth of BofI may be because it had loosened underwriting standards, failed to monitor and control risk within its

---

[50] BofI's stock was split 4 for 1, with an ex-date of November 18, 2015 (after the end of the Class Period). The prices in the chart are shown on a pre-split basis.

24

internal controls function, and had not effectively managed the compliance infrastructure.  This

perception corresponds to the Counterfactual Disclosure discussed above.

**B.  Prof. Smith Appears to Regard the Allegations in the Erhart Complaint to be the Counterfactual Disclosure**

58.     Of the 22 pages Prof. Smith spends critiquing my damages methodology, 14

pages are dedicated to issues about the truthfulness of the allegations in the Erhart Complaint.  I

discuss the issues raised by Prof. Smith below.

> ***i)***     ***Prof. Smith Makes the Unsupported and Factually Incorrect Assertion that It Is Unusual to Find a Corrective Disclosure that Consists of Disputed and Unproven Allegations***

59.     In the first sentence of Section VII of the Smith Report, Prof. Smith states:

> The fact pattern in this case is highly unusual because the only alleged corrective disclosure consists of disputed and unproven allegations in a separate ongoing employment lawsuit.[51]

60.     In my over 30 years of experience of conducting damages analyses in securities

litigation, I have found that it is the exception to the rule to find a "mea culpa" disclosure from a

company about prior misrepresentations.  There are many examples of corrective disclosures that

emanate from analysts, short sellers, regulatory agencies, or auditors, as well as whistleblowers,

in which the information content and interpretation of such disclosures are vigorously denied by

the company.

61.     The Ninth Circuit opinion in this case conveys a similar sentiment:

> We join the Sixth Circuit in rejecting any such categorical rule. *Norfolk County*, 877 F.3d at 696. To be sure, allegations in a lawsuit do not provide definitive confirmation that fraud occurred. But short of an admission by the defendant or a formal finding of fraud—neither of which is required, *see Amedisys*, 769 F.3d at 324–25; *Metzler*, 540 F.3d at 1064—any corrective disclosure will necessarily take the form of contestable allegations of wrongdoing. As the Sixth Circuit observed, "every representation of fact is in a

---

[51] Smith Report, ¶45.

sense an allegation, whether made in a complaint, newspaper report, press release, or under oath in a courtroom." *Norfolk County*, 877 F.3d at 696.[52]

62. Therefore, Prof. Smith's apparent predicate for his views that it is highly unusual for a corrective disclosure to consist of disputed and unproven allegations is not supported.

### ii) *Prof. Smith's Analysis of the Truthfulness of the Erhart Allegations*

63. Prof. Smith purports to conduct his own analysis to determine if the allegations in the Erhart Complaint are true. Prof. Smith concludes that:

> ... I have seen nothing that suggests that any of the wide-ranging allegations of misconduct in the Erhart Complaint have been shown to be factually true.[53]

64. Based on the materials considered in Appendix C of the Smith Report, and the analysis that followed his statement, it appears that Prof. Smith's conclusion concerning the specific Erhart allegations is based solely on publicly available information including: public denials by BofI and statements by its management that the Erhart allegations are meritless; a lack of a disclosure of regulatory discipline; and a disclosure by the Company of a conclusion of an investigation of the Erhart allegations by a law firm engaged by its Audit Committee.[54] In my experience, evidence of the falsity of the alleged misstatements oftentimes follows from information obtained through discovery. In addition, it is often the case that the ultimate damages theory and inflation will be influenced by information obtained through discovery. And moreover, it is my understanding that Plaintiff will prove the Counterfactual Disclosure — that is, that the previous representations about BofI's underwriting standards, internal controls, and

---

[52] *BofI* at 792.
[53] Smith Report, ¶ 45.
[54] Smith Report, ¶¶ 46-50.

26

compliance infrastructure were false, and that that inference was revealed to the market by the Erhart Complaint and associated news reports.

## C. Prof. Smith Contends that Plaintiff's Counterfactual Disclosure is Too General; I Disagree

65. Prof. Smith contends that I have not articulated what counterfactual disclosure I am assuming. In the Torchio Report, I articulated the Counterfactual Disclosure, which tracks the allegations in the Complaint.[55] I also responded several times in my deposition explaining what I assume to be the Counterfactual Disclosure:

> Q. So it wouldn't -- well, let me ask it this way, and maybe now I understand what you're saying. It's not your view that the counterfactual disclosure, the disclosure that would be required to avoid a disclosure failure, would be disclosing the specific misconduct that Erhart alleges?
>
> MR. CHIPLOCK: Objection.
>
> A. Well, I could well imagine it [Counterfactual Disclosure] including that, but ultimately, in order for me to compute damages, there has got to be some assumption about the basic categories of wrongdoing here, the things that the market interpreted. And the market interpreted this disclosure to mean underwriting standards and internal control problems. So, whatever and however the Plaintiff proves its liability case, those two things would be -- and my assumption is those two things would be proved, that there is a lack of underwriting standards and a lack of internal controls.[56]

66. In other words, I am assuming that the Counterfactual Disclosure would convey to the market that BofI engaged in loosened underwriting standards and that its internal controls were deficient or disregarded. Therefore, I believe I have stated what I assume the Counterfactual Disclosure is.

---

[55] Torchio Report, ¶ 92.
[56] Torchio Deposition, pp. 63-64.

27

67. After incorrectly stating that I have not specified what Counterfactual Disclosure I am assuming, Prof. Smith references my deposition in which I did provide same (*see* ¶ 65). Prof. Smith, however, contends that such a Counterfactual Disclosure is "too general."[57] I disagree for several reasons.

68. First, in my experience such a disclosure would not be an outlier among disclosures that companies make about their internal controls. Moreover, the paper that Prof. Smith cites studied disclosures about internal controls from a large sample of companies, which indicate that "general" disclosures do occur.[58] Specifically, one category that the authors used to describe internal control disclosures is called "vague" disclosures.[59] This shows that public companies do make disclosures about internal controls that do not contain specific information but rather are more general.

69. Second, the general nature of the Counterfactual Disclosure corresponds to the perception by the market about how generally BofI's underwriting standards may have loosened and internal controls may have been disregarded.[60] There was no specific information that was revealed in the Erhart event about detailed underwriting standards (such as specific FICO scores or loan to value ratios) or the extent to which its internal controls were disregarded. The market was nonetheless able to reach an unbiased estimate about the increased riskiness of BofI, which would have also obtained from the general Counterfactual Disclosure.

---

[57] Smith Report, ¶ 54.

[58] Jacqueline S. Hammersley, Linda A. Myers, and Catherine Shakespeare, "Market Reactions to the Disclosure of Internal Control Weaknesses and to the Characteristics of Those Weaknesses Under Section 302 of the Sarbanes Oxley Act of 2002," *Review of Accounting Studies* 13(1), 2008, 141-165 (Hammersley, *et al.* (2008)).

[59] Hammersley, *et al.* (2008) at 153.

[60] *See, e.g.,* "BofI Stock Crashes On Audit Accusations; Ex-Auditor Files A Lawsuit; Bank of Internet's lending had soared in recent years – were standards unsafe?" Investor's Business Daily, October 14, 2015.

70.     Third, Prof. Smith contends that the severity of this "too general" Counterfactual Disclosure cannot be assessed.[61]  I disagree.  The market's assessment of the severity of the increase in risk from inferences about BofI's underwriting and internal controls and compliance infrastructure is a function of the economic facts and circumstances surrounding BofI.  Specifically, the market recognized that BofI had dramatically outperformed its peers in writing loans and its stock price performance reflected that activity.[62]  Moreover, the memory of the financial crisis in which the predicate included many institutions' failure to disclose loosening of underwriting standards was still fresh.  These facts and circumstances serve as a reasonable basis for assessing the severity of the "general" Counterfactual Disclosure, just as it did for the corrective disclosure.

71.     Finally, because the Counterfactual Disclosure would have come from BofI, the price reaction to that disclosure would likely have been much worse than what occurred after the disclosure of the Erhart Complaint, which included a complete Company denial.  This indicates that the severity of the Counterfactual Disclosure may be worse that the severity of the market's interpretation of the corrective disclosure.

## IV.  OPTIONS DAMAGES

72.     Prof. Smith contends that damages for options cannot be reasonably determined for two reasons.  First, he states that inflation for options cannot be determined because he contends that artificial inflation cannot be computed for BofI stock.[63]  Because I explained above

---

[61] Smith Report, ¶ 54.

[62] *See*, *e.g.*, "Former auditor sues Bank of Internet," The Kansas City Star, October 14, 2015.

[63] Smith Report, ¶ 77.

29

that the damages methodology in the Torchio Report can reliably determine artificial inflation for the stock, then the artificial inflation/deflation in options, as derivative securities, can also be determined.

73.     Second, Prof. Smith takes issue with one of the seven inputs to the Black-Scholes model I would use to calculate inflation/deflation for options.  Specifically, Prof. Smith advocates to adjust the volatility input in the model to account for how the volatility may change because of the Counterfactual Disclosure.[64]  I did not specify what measure of volatility I would use to compute the artificial inflation/deflation for options, but rather described how the calculation of option inflation/deflation is derived from the inflation in the stock.  To the extent that my analysis at the merits stage shows a causal connection to an increased volatility because of the corrective disclosure, the volatility input I choose to measure option inflation/deflation may well be greater than the actual volatility as of the date of the option transaction.  In any case, the choice of this input would be applied on a class-wide basis.

---

[64] Smith Report, ¶ 78.

I certify that, to the best of my knowledge and belief:

— the statements of fact contained in this Report are true and correct;

— the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions;

— I have no present or prospective interest in the parties to this case, and I have no personal interest or bias with respect to the parties involved;

— I have made all the inquiries that I believe are desirable and appropriate and that no matters of significance that I regard as relevant have, to my knowledge, been withheld from the Court; and

— my compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this Report.

July 23, 2021
Date

Frank C. Torchio

**Exhibit 1**
**Materials Reviewed**

Third Amended Class Action Complaint for Violations of the Federal Securities Laws, dated December 22, 2017.

Letter from Ms. Madalyn A. Macarr of Sheppard, Mullin, Richter & Hampton LLP addressed to Mr. Richard Heimann and Mr. Mike Sheen of Lieff Cabraser Heimann & Bernstein, LLP, dated March 10, 2021.

Expert Report of Frank C. Torchio, May 28, 2021.

Expert Report of David C. Smith, Ph.D., June 25, 2021, and production.

Deposition testimony of Frank C. Torchio, June 18, 2021.

*Charles Matthew Erhart v. BofI Holding Inc.*, Civ No. 15-CV-2287 BAS NLS, United States District Court, Southern District of California, October 13, 2015.

BofI SEC filings.

Daily reported composite volume and prices for BofI common stock (Bloomberg ticker "AX US") for the period January 2011 – December 2015.  Source: Bloomberg.

Daily index levels for the following indexes for the period September 2012 – October 2015 (Bloomberg identifier in parenthesis): the S&P 500 Total Return Index (SPTR), the Nasdaq Composite Total Return Index (XCMP), the ABA Nasdaq Community Bank Total Return Index (XABQ), the Nasdaq OMX ABA Community Bank Total Return Index (ABQX), S&P 600 Financials Sector Total Return Index (SP6TFINL); S&P 600 Banks Industry Group Index (S6BANKX); S&P 600 Thrifts & Mortgage Finance Industry Index (S6THMFX); S&P Bank Select Industry Total Return Index (SPSIBKT); and S&P Regional Banks Select Industry Index Total Return Index (SPSIRBKT).  Source: Bloomberg.

Daily weights of BofI common stock in the following indexes for the period September 2013 – October 2015 (Bloomberg identifier in parenthesis): S&P 600 Financials Sector Total Return Index (SP6TFINL); S&P 600 Banks Industry Group Index (S6BANKX); and S&P 600 Thrifts & Mortgage Finance Industry Index (S6THMFX).  Source: Bloomberg.

Daily market capitalization of BofI common stock, the Nasdaq Composite Index (Bloomberg identifier "CCMP"), and the Nasdaq OMX ABA Community Bank Total Return Index (Bloomberg identifier "ABQX") for the period September 2012 – December 2015.  Source: Bloomberg.

Daily data on options on BofI common stock for the period September 2013 – October 2015. Sources: Cboe Exchange, Inc., Cboe DataShop, and iVolatility.

Interest rate data obtained from the Federal Reserve Board database (available at https://www.federalreserve.gov/datadownload/Download.aspx?rel=H15&series=bf17364827e38

**Exhibit 1**
**Materials Reviewed**

702b42a58cf8eaa3f78&filetype=csv&label=include&layout=seriescolumn&from=01/01/1999&to=03/01/2021).

Number of analysts making recommendations to BofI for the period August 2013 – October 2015. Source: Bloomberg.

Number of analysts providing EPS estimates for current fiscal year for BofI for the period September 2013 – October 2015. Source: Refinitiv IBES estimates via S&P Capital IQ.

Number of market maker count for BofI common stock for the period September 2013 – October 2015. Source: Center for Research in Security Prices, LLC (CRSP) via Wharton Research Data Services.

Short interest for BofI common stock for the period August 2013 – October 2015. Source: Bloomberg.

Quarterly institutional ownership of BofI common stock for the period June 30, 2013 to December 2015. Source: Eikon.

Shares outstanding for BofI common stock for the period September 2013 – October 2015. Source: SEC filings.

News stories regarding BofI during the period September 2013 – October 2015. Sources: Bloomberg and Factiva.

Analyst reports/list of reports regarding BofI during the period September 2013 – October 2015. Sources: Counsel, Thomson Eikon and Capital IQ electronic databases.

**Academic literature, treatises, or articles relied on:**

David R. Anderson, Dennis J. Sweeney, and Thomas A. Williams, <u>Statistics for Business and Economics</u>, 9th ed., Thomson Learning, 2005.

Brad M. Barber, Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, Winter 1994, 285-312.

William H. Beaver, Maureen F. McNichols, and Zach Z. Wang, "Increased Information Content of Earnings Announcements in the 21st Century: An Empirical Investigation," Working Paper, June 19, 2018.

Bharat Bhole, Sunita Surana, and Frank Torchio, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Online Law Review* 96, 2020.

Fisher Black and Myron Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81(3), May-June 1973, 637-54.

John Y. Campbell, Andrew W. Lo and A. Craig MacKinlay, <u>The Econometrics of Financial Markets</u>, Princeton University Press, 1997.

Lucy Chang, "The Truth-on-the-Market Defense and its Relevance in SEC Enforcement Actions," *Law and Contemporary Problems* 76(3/4), 2013, 341-365.

**Exhibit 1**
**Materials Reviewed**

Qi Chen, Itay Goldstein, and Wei Jiang, "Price Informativeness and Investment Sensitivity to Stock Price," *The Review of Financial Studies* 20(3), 2007, 619-650.

Bradford Cornell, John I. Hirshleifer and John N. Haut, "Securities Fraud Damages," *Contemporary Studies in Economic and Financial Analysis*, 87, 2005, 29-57.

Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, 1990, 883-924.

Bradford Cornell and James Rutten, "Collateral Damage and Securities Litigation," *Utah Law Review* 3, 2009, 717-747.

Steven S. Crawford, Darren T. Roulstone, and Eric C. So, "Analyst Initiations of Coverage and Stock Return Synchronicity," *The Accounting Review* 87(5), 2012, 1527-1553.

Nicolas I. Crew, Kevin L. Gold, and Marnie A. Moore, "Federal Securities Acts and Areas of Expert Analysis," in Litigation Services Handbook: The Role of the Financial Expert, Fifth Edition, ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, Wiley, 2012.

Sudipto Dasgupta, Jie Gan, and Ning Gao, "Transparency, Price Informativeness, and Stock Return Synchronicity: Theory and Evidence," *Journal of Financial and Quantitative Analysis* 45(5), Oct. 2010, 1189-1220.

Frederick Dunbar and Arun Sen, "Counterfactual Keys to Causation and Damages in Shareholder Class Actions," *Wisconsin Law Review* 2009(2), 2009, 199-242.

Edwin J. Elton, Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, Modern Portfolio Theory and Investment Analysis, 6th ed., John Wiley & Sons, Inc., 2003.

Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46(5), December 1991, 1575-1617.

Eugene F. Fama, Lawrence Fisher, Michael C. Jensen and Richard Roll, "The Adjustment of Stock Prices to New Information," *International Economic Review* 10(1), February 1969, 1-21.

Daniel Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38(1), November 1982, 1-20.

Jacqueline S. Hammersley, Linda A. Myers, and Catherine Shakespeare, "Market Reactions to the Disclosure of Internal Control Weaknesses and to the Characteristics of Those Weaknesses Under Section 302 of the Sarbanes Oxley Act of 2002," *Review of Accounting Studies* 13(1), 2008, 141-165.

Lawrence Harris, "The Homogenization of US Equity Trading," Working Paper, September 30, 2011.

Larry Harris, Trading & Exchanges: Market Microstructure for Practitioners, Oxford University Press, 2003.

Robert W. Holthausen and Mark E. Zmijewski, Corporate Valuation: Theory, Evidence & Practice, First Edition, Cambridge Business Publishers, 2014.

J. C. Hull, Options, Futures, and Other Derivatives, Sixth Edition, Prentice Hall: New Jersey, 2006.

Robert Jennings and Laura Starks, "Information Content and the Speed of Stock Price Adjustments," *Journal of Accounting Research* 23(1), Spring 1985, 336-350.

Joshi, Madrid, Mulholland, "Causation Issues and Expert Testimony, The Fundamentals of Causation," Litigation Services Handbook: The Role of the Financial Expert, 5th Ed., ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman.

**Exhibit 1**
**Materials Reviewed**

Helen Kara, <u>Creative Research Methods in the Social Sciences: A Practical Guide</u>, Bristol: Policy Press, 2015.

Jonathan M. Karpoff, "The Relation Between Price Changes and Trading Volume: A Survey," *Journal of Financial and Quantitative Analysis* 22(1), March 1987, 109-126.

Burton G. Malkiel, "Efficient Market Hypothesis," in <u>The New Palgrave: A Dictionary of Economics</u>, Volume 2, E to J, ed. by John Eatwell, Murray Milgate and Peter Newman, The Macmillan Press Limited, 1998.

Robert C. Merton, "Theory of Rational Option Pricing," *Bell Journal of Economics and Management Science* 4(1), Spring 1973, 141-83.

Mark Mitchell and Jeffrey Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49, February 1994, 545-590.

David S. Moore and George P. McCabe, <u>Introduction to the Practice of Statistics</u>, 4th ed., W. H. Freeman and Company, 2003.

Shannon P. Pratt, <u>The Market Approach to Valuing Businesses</u>, Second Edition, John Wiley & Sons, Inc., 2005.

G. William Schwert, "Using Financial Data to Measure Effects of Regulation," *The Journal of Law and Economics* 24(1), 1981, 121-158.

David Tabak, "Loss Causation And Damages in Shareholder Class Actions: When It Takes Two Steps To Tango," NERA White Paper, May 2004.

David Tabak, "Inflation and Damages in a Post-*Dura* World," NERA White Paper, September 2007.

David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in <u>Litigation Services Handbook: The Role of the Financial Expert</u>, 3rd ed., ed. by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Wiley, 2001.

David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA White Paper, July 2002.

Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63(3), Summer 2000, 105-122.

Frank Torchio, "Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law* 35(1), 2009, 159-168.

Jeffrey M. Wooldridge, <u>Introductory Econometrics, A Modern Approach</u>, 2nd ed., Thomson South-Western, 200.

**<u>Court opinions and reports:</u>**

*Amgen, Inc., et al. v. Connecticut Retirement Plans and Trust Funds*, Brief of Financial Economists as *Amici Curiae* in Support of Respondent (9th Cir. Court of Appeals).

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

*Cheney v. Cyberguard Corp.*, 211 F.R.D 484 (S.D. Fla. 2003).

*DCD Programs v. Michael W. Leighton, et al.*, 90 F.3d 1442 (9th Cir. 1996).

*Di Donato v. Insys Therapeutics*, 333 F.R.D. 427 (D. Ariz. 2019).

*Dura Pharm. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627 (2005).

*Enron*, 529 F. Supp. 2d 644 (S.D. Tex. 2006).

**Exhibit 1**
**Materials Reviewed**

*Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357 (8th Cir. 1977).

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 2021 U.S. Lexis 3391, 141 S. Ct. 1951.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 134 S. Ct. 2398 (2014).

*Halliburton Co. v. Erica P. John Fund, Inc.*, Brief of Financial Economists as *Amici Curiae* in Support of Respondent (9th Cir. Court of Appeals), February 5, 2014.

*In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008).

*In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781 (9th Cir. 2020).

*In re California Micro Devices Sec. Litig.*, 965 F. Supp. 1327 (N.D. Cal. 1997).

Expert Report of Tavy Ronen, Ph.D., *Casey Roberts v. Zuora, Inc.*, December 4, 2020, Civ No. 3:19-cv-03422-SI, United States District Court, Northern District of California.

*In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000).

Declaration of Frank C. Torchio for Settlement Purposes, *In re Countrywide Fin. Corp. Sec. Litig.*, Lead Case No. CV 07-05295 MRP (MANx) (C.D. Cal. June 29, 2010).

Expert Report of John D. Finnerty, Ph.D., *In Re Goldman Sachs Group, Inc., Securities Litigation*, November 6, 2015, Civ. No. 1:10-cv-03461-PAC, United States District Court, Southern District of New York.

*In re Merck & Co., Sec. Derivative & ERISA Litig.*, LEXIS 13511, (D.N.J. Jan. 30, 2013).

Expert Report of Chad Coffman, CFA, *In Re NII Holdings In. Securities Litigation*, September 11, 2015, Civ. No. 1:14-cv-00227-LMB-JFA, United States District Court, Eastern District of Virginia, Alexandria Division.

*In re: Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016).

Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., *In Re Petrobras Securities Litigation*, October 15, 2015, Civ No. 14-cv-9662 (JSR), United States District Court, Southern District of New York.

*In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir. 2005).

*In Re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260.

Expert Report of Michael L. Hartzmark, Ph.D., *In Re Signet Jewelers Limited Securities Litigation*, March 15, 2019, Civ No. 1:16-CV-06728-CM, United States District Court, Southern District of New York.

Expert Report of Zachary Nye, Ph.D., *In Re Snap, Inc. Securities Litigation*, June 7, 2019, Civ No. 2:17-cv-03679-SVW-AGR, United States District Court, Central District of California, Western Division.

*In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007).

*In re Williams Securities Litigation - WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009).

*In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005).

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

*Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004).

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415 (S.D.N.Y. 2014).

*Nguyen vs. Radient Pharm. Corp.*, 287 F.R.D. 563 (C.D. Cal. 2012).

*Norfolk County Retirement System v. Community Health Systems, Inc.*, 877 F.3d 687 (6th Cir. 2017).

Opinion Denying Attorney's Fees and Expenses, *Oscar Wyatt, et al., v. El Paso Corp., et al.*, United States District Court, Southern District of Texas, Civil Action H-02-2717; and Declaration of Frank C. Torchio dated February 13, 2007.

**Exhibit 1**
**Materials Reviewed**

Expert Report of Paul A. Gompers dated October 24, 2011, in *Paul Luman v. Paul G. Anderson, et al. (FCStone)*, in U.S. District Court, Western District of Missouri, Western Division, No. 4:08-cv-00514-C-W-HFS.

*Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014).

*SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276 (N.D. Cal. 2020).

*The Ambassador Hotel Company, Ltd. v. Wei-Chuan Investment, et al.*, 189 F. 3d 1017 (9th Cir. 1999).

*Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005).

**Cited News and Analyst Reports:**

"Affirming Strong Buy Rating," Raymond James research report, October 14, 2015.

"After BofI Plunge, Stock Seen Recovering All Its Loss," Investor's Business Daily, October 15, 2015.

"Bank of Internet Denies Accusation That It Defied Regulators," *The New York Times*, October 15, 2015.

"BofI 30% Selloff 'Significant' Buying Opportunity: FBR," Bloomberg First Word, October 15, 2015, 5:39 am.

"BofI Holding Inc M&A/Other Business Update Call Teleconference," Bloomberg Transcripts, October 14, 2015, 7:32 pm.

"BofI Holding plummeting following lawsuit news," SNL Financial Extra, October 14, 2015.

"BofI Holdings Sued by Former Auditor Over Procedures: NYT," *Bloomberg First Word*, October 13, 2015, 9:09 pm.

"BofI Jumps 17% After Mgmt Held Call on Allegations, Two Upgrades," Bloomberg First Word, October 15, 2015, 8:50 am.

"BofI Stock Crashes On Audit Accusations; Ex-Auditor Files A Lawsuit; Bank of Internet's lending had soared in recent years – were standards unsafe?" Investor's Business Daily, October 14, 2015.

"Ex-Auditor Sues Bank of Internet," *The New York Times*, October 13, 2015.

"Former auditor sues Bank of Internet," The Kansas City Star, October 14, 2015.

"Here's Why BofI Stock is Plummeting Today," TST, October 14, 2015, 12:54 pm.

"Midday Thursday: Banks in positive territory; BofI Holding up more than 12%," SNL Financial Extra, October 15, 2015.

"Stocks Lower As Earnings Disappoint; BofI Holding Crushed," Investor's Business Daily, October 14, 2015.

"Upgrading to BUY Following Big Drop in Share Price," Sandler O'Neill research report, October 15, 2015.

"WMT: On The Fly: Top stock stories for Wednesday," TheFlyontheWall.com, October 14, 2015, 4:28 pm.

**Miscellaneous:**

Private Securities Litigation Reform Act of 1995.

Nasdaq Initial Listing Guide, March 2021, available at: https://listingcenter.nasdaqomx.com/assets/initialguide.pdf (accessed July 14, 2021).

**Exhibit 1**
**Materials Reviewed**

Market Maker, Nasdaq (https://www.nasdaq.com/glossary/m/market-maker, last accessed on July 14, 2021).

SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933," General Instructions, updated January 2012.

https://www.aba.com/about-us/our-story/nasdaq-indices (last visited July 17, 2021).

https://indexes.nasdaqomx.com/Index/Overview/ABQX (last visited July 17, 2021).

https://www.aba.com/about-us/our-story/nasdaq-indices (last visited July 17, 2021).


All other materials cited in the text of the Report.

# Appendix A

1. I have been asked to provide an opinion regarding the efficiency of the markets for the common stock and options on the common stock of BofI for the period September 4, 2013 through October 14, 2015, inclusive (the "Class Period").

2. The Efficient Market Hypothesis ("EMH") is conventionally divided into three categories by economists, each dealing with a different type of information:

   a) Weak-form – information contained in historic prices is fully reflected in current prices;

   b) Semi-strong form – publicly available information is fully reflected in current prices; and

   c) Strong-form – all information, public and non-public, is fully reflected in current prices.[1]

3. A finding of market efficiency for a security generally means that the price of the security reflects all relevant, publicly available information or, in other words, that it satisfies the semi-strong form of the EMH. Similarly, for litigation purposes, courts in the United States have accepted the semi-strong form of the EMH.[2]

4. The factors or indicators economists use – and I have used in preparing this report – to assess market efficiency are designed to directly or indirectly measure: i) the degree of information flow; ii) the level of transaction costs; or iii) the competition among investors.

---

[1] *See* Edwin J. Elton, Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, Modern Portfolio Theory and Investment Analysis, 6th ed., John Wiley & Sons, Inc., 2003, p. 402.

[2] *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") at 246.

## I. OVERVIEW OF ANALYSES AND SUMMARY OF OPINIONS

### A. Common Stock

5.          Courts have approved many of the indicators or factors that economists consider in assessing market efficiency in ruling on the issue of market efficiency for a stock that is the subject of securities litigation.  For example, the court in *Cammer v. Bloom* listed five factors to assess whether the market for a security is efficient.[3]  Those five factors are: i) "average weekly trading volume during the class period"; ii) number of analysts following the stock during the class period; iii) number of market makers for the stock; iv) whether the company was entitled to "file an S-3 Registration Statement in connection with public offerings"; and v) "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[4]

6.          Other courts have looked at additional factors bearing on the efficiency of a particular stock, including the Fifth Circuit, which adopted the use of three additional factors: i) the company's market capitalization; ii) the bid-ask spread; and iii) the stock's float,[5] as well as the First Circuit, which approved of the consideration of: i) the presence of autocorrelation in stock-price returns; ii) constraints on short selling; and iii) violations of put-call parity.[6]

7.          "Economists broadly agree that stock prices in developed markets generally do respond to information."[7]  This tenet was also affirmed in the U.S. Supreme Court decision in

---

[3] *See Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*") at 1286-87.

[4] *Id.*

[5] *See Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*") at 477-78; *Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005) ("*Unger*") at 323.

[6] *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir. 2005) ("*PolyMedica*") at 18.

[7] *See Halliburton Co. v. Erica P. John Fund, Inc.*, Brief of Financial Economists as *Amici Curiae* in Support of Respondent (9th Cir. Court of Appeals), February 5, 2014, p. 12.

*Halliburton II.*[8]  Thus, because stocks in developed markets are generally informationally efficient,[9] economists can compare the factors of efficiency for a given stock with the same factors for the universe of stocks traded in a developed market, such as the NYSE or Nasdaq, as an objective measure of efficiency.  This ranking of efficiency that measures a specific stock against the universe of stocks in a well-developed market provides the basis for an assessment of the "relative" degree of efficiency for that stock.[10]  As discussed in a well-regarded treatise on econometrics, the notion of relative efficiency may be a useful concept.[11]  Therefore, my analysis discussed below includes an applicable comparison of BofI to the norm from the universe of stocks listed on the NYSE or Nasdaq.

8.     No one factor can determine whether a market for a stock is or is not efficient.  In my experience, that determination is generally based on a review of the economic evidence.

**B.  Options on Common Stock**

9.     Options are a type of "derivative" financial security whose value is dependent on the value of another financial security or asset, which in the case of BofI options is BofI common stock.  It is, thus, expected that to the extent that BofI common stock share price reflects all publicly available information and rapidly adjusts to account for new, important and unanticipated information about the Company, so too will the BofI options.  In an efficient

---

[8] *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 134 S. Ct. 2398 (2014) ("*Halliburton II*") at 2410.

[9] "The SSEMH [Semi-Strong Efficient Market Hypothesis] is a theory of *informational* efficiency and must be distinguished from theories of *fundamental* efficiency."  *See Amgen, Inc., et al. v. Connecticut Retirement Plans and Trust Funds*, Brief of Financial Economists as *Amici Curiae* in Support of Respondent (9th Cir. Court of Appeals), p. 7.

[10] The U.S. Supreme Court endorsed the concept that "market efficiency is a matter of degree," *see Halliburton II* at 2410.

[11] *See* John Y. Campbell, Andrew W. Lo, and A Craig MacKinlay, The Econometrics of Financial Markets, Princeton University Press, 1997, p. 24.

market, the various call and put options of a stock will be priced relative to one another (and the stock) so as to provide zero profits from arbitraging these securities against one another. Economists refer to this no-arbitrage state as put-call parity.

10.     Based on my experience and the financial-economic analysis I present below, the factors I considered are appropriate in determining market efficiency for BofI common stock and options on the common stock.  **Table 1** below summarizes my findings (contained in **Exhibit A-8**) for the factors analyzed.

**TABLE 1**
**SUMMARY OF MARKET EFFICIENCY FINDINGS**

**Common Stock**

*Cammer*

| Factor | Name | Results | Supports Efficiency |
|---|---|---|---|
| 1 | Average Weekly Trading Volume | 7.3% of shares/out | Yes |
| 2 | Analyst Coverage | Adequate Coverage | Yes |
|  | News Coverage | Thousands of News Stories | Yes |
| 3 | Market Makers | 41 | Yes |
| 4 | Float (SEC Form S-3) | > $75 million | Yes |
| 5 | Cause-and-Effect Relationship |  |  |
|  | - Market Model (Average Adjusted R-Squared) | 25.74% | Yes |
|  | - Analysis of News Days |  |  |
|  | Versus Non-News Days | Statistically Significant Differences | Yes |
|  | - Event Study of Alleged |  |  |
|  | Corrective Disclosure | Statistically Significant | Yes |
|  | - Correlation Between Returns and Volume | Statistically Significant | Yes |

*Krogman/Unger*

| Factor | Name | Results | Supports Efficiency |
|---|---|---|---|
| 1 | Market Capitalization | $1.3 billion | Yes |
|  | Institutional Ownership (Percent of Shares) | 71.7% | Yes |
| 2 | Bid-Ask Spread | 0.06% | Yes |
| 3 | Public Float (Percent of Shares Outstanding) | 92.5% | Yes |
|  | Public Float (Market Capitalization) | $1.2 billion | Yes |

*PolyMedica*

| Factor | Name | Results | Supports Efficiency |
|---|---|---|---|
| 1 | Autocorrelation | None | Yes |
| 2 | Short Interest | Present | No |

**Options on Common Stock**

| | | |
|---|---|---|
| Put-Call Parity | 0.02% Violations | Yes |

11.     Based on my experience and expertise, and the findings summarized in the table above (which are discussed in detail in the sections that follow), I conclude that the markets for BofI common stock and options on the common stock were informationally efficient during the Class Period.

5

## II. MARKET EFFICIENCY FOR COMMON STOCK

### A. The *Cammer* Factors for Market Efficiency

12.     In *Cammer*, five factors were listed that indicate that a security is traded in an efficient market: i) average weekly share turnover of more than 1%; ii) coverage of the company by securities analysts; iii) the presence of market makers or arbitrageurs; iv) the eligibility of the company to file a Form S-3 with the SEC; and v) evidence of the stock price reacting to material information.  I discuss each of these five factors below.

### i)      *Weekly Trading Volume*

13.     The first indication of an efficient market in *Cammer* is that the average trading volume per week exceeds one percent of shares outstanding.[12]  Trading volume is generally viewed as an indicator of market efficiency because high volume implies significant investor interest in the company and liquidity.  The more liquid is a market, the lower the costs of trading in the market.

14.     The average weekly trading volume for BofI common stock was 1.1 million shares during the Class Period.  The average weekly trading volume as a percent of shares outstanding over the Class Period was 7.32%.[13]  *See* **Exhibit A-1**.

15.     In a recently published paper, for the commonly-accepted factors of market efficiency, my co-authors and I ranked the stocks listed on the NYSE and NASDAQ exchanges ("NYSE/Nasdaq Universe"), two of the most open and well-developed markets in the world,

---

[12] The *Cammer* opinion states that weekly trading volume that represents two percent or more of the outstanding shares would justify a "strong presumption" of market efficiency; one percent would justify a "substantial presumption."  *See Cammer* at 1286.

[13] The partial first and last weeks of the Class Period are excluded from the analysis.

6

from best to worst.[14]  This allows for the benchmarking of BofI statistics relative to the stocks in the NYSE/Nasdaq Universe.  The weekly turnover of BofI shares during the Class Period is between the 75th and 90th percentiles of the universe of NYSE/NASDAQ stocks during 2013-2015, meaning that the turnover of BofI stock is better than at least 75% of stocks that trade in well-developed markets.[15]

16.      In my opinion, the Company's weekly trading volume provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.  In addition, BofI's trading volume exceeds the benchmark of weekly volume of 2% of shares outstanding that has been considered to justify "a strong presumption" that the market for a security is efficient.[16]

### ii)      *Analyst Coverage*

17.      The second indication of an efficient market in *Cammer* is the number of securities analysts following and reporting on the stock.  Reports issued by analysts serve the purpose of disseminating publicly available information along with analysis and recommendations by the analysts to investors.  *Cammer* stated it would be "persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the Class Period."[17]  The greater the number of analysts, the more likely information about the company is "relied upon by investors."[18]

---

[14] The details of the analysis are discussed in: Bharat Bhole, Sunita Surana, and Frank Torchio, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Online Law Review* 96, 2020, 96-116 ("BST 2020").

[15] *See* BST 2020, Table 1 (p. 102).  I calculate daily average turnover for BofI common stock as the weekly average divided by 5.

[16] *See Cammer* at 1286 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

[17] *See Cammer* at 1286 (footnote omitted).

[18] *See In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005) ("*Xcelera*") at 514.

18. According to Bloomberg data, there were between 4 and 7 research analysts providing Buy/Sell/Hold recommendations for BofI during the Class Period, with an average of 6 analysts. Further, between 3 and 7 research analysts during the Class Period, with an average of 5 analysts, were part of the Refinitiv I/B/E/S consensus EPS estimate for the current fiscal year. *See* **Exhibit A-1**. Over 250 analyst reports were issued during the Class Period by firms including: D.A. Davidson; FBR Capital Markets; Keefe, Bruyette & Woods; Maxim Group; Oppenheimer; Raymond James; Sandler O'Neil; Sidoti & Co.; and Sterne Agee.[19,20,21] I have reviewed many of these reports and they generally provide analyses and recommendations that would be of interest to investors.

19. As before, I benchmark BofI statistics relative to the stocks in the NYSE/Nasdaq Universe. On average, analyst coverage for the Company (based on Refinifiv I/B/E/S data) was between the 25th and 50th percentiles of the stocks in the NYSE/Nasdaq Universe during 2013-2015, meaning that BofI's analyst coverage is better than at least 25% of stocks that trade in well-developed markets.[22] Consequently, BofI's analyst coverage provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.

---

[19] Based on reports provided by Counsel, or those available on either the Thomson Eikon or S&P Capital IQ databases. Analyst reports in Thomson Eikon are searched for "Axos Financial Inc" with "Primary Company" checked. Analyst reports in S&P Capital IQ are searched for symbol "AX" with "Primary Symbol Only" checked.

[20] The number of analyst reports also includes reports by quantitative firms such as: BuySellSignals Research; Pechala's Reports; Validea; and ValuEngine, Inc.

[21] Appendix C of the Smith Report identifies over 75 analyst reports published during the Class Period.

[22] *See* BST 2020 at Table 2, p. 104. What was earlier known as Thomson Reuters I/B/E/S is now known as Refinitiv I/B/E/S.

Media Coverage[23]

20.     During the approximately 25-month Class Period, over 2,700 news articles about BofI appeared in a leading financial and trade publications, including Bloomberg News, Dow Jones Institutional News, MarketWatch, Reuters News, *The New York Times*, and *The Wall Street Journal Online*.[24,25]  According to the SEC Edgar database, additional information about BofI was distributed through over 140 Company SEC filings.  These filings include, among others, Current Reports on Form 8-K, Quarterly (Form 10-Q) and Annual (Form 10-K) Reports, and Proxy Statements.  **Appendix B** is a chronology spanning the period September 4, 2013 through October 16, 2015 that lists analyst reports, news articles, press releases, and other filings disseminated during this period.

21.     In my opinion, the Company's analyst and media coverage provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.

### *iii)     Market Makers*

22.     The third *Cammer* factor indicating market efficiency is the presence of market makers.[26]  Market makers provide liquidity to traders, which facilitates economically efficient trading and thus is an indicator of an efficient market.[27]

---

[23] In addition to analyst coverage, courts have recognized media coverage as an indicator of market efficiency.  *See Cheney v. Cyberguard Corp.*, 211 F.R.D 484 (S.D. Fla. 2003) ("*Cyberguard*") at 499-501.

[24] Based on searches in Bloomberg and Factiva.  For Factiva, I searched for the words "Bank of Internet" or "BofI," and included all sources in the search.  For Bloomberg, I used the ticker symbol "BOFI" and searched for all sources with "medium" relevance excluding Internet-linked headlines, SEC EDGAR filings, Company Filings, Bloomberg Social Velocity Alerts, Makor Capital Ltd, and Banorte Ixe.  Bloomberg articles were downloaded in August 2017.

[25] I note that in *Cyberguard* there were 524 news articles issued over the approximately 21-month class period.  *See Cyberguard* at 499.

[26] *See Cammer* at 1286-87.

[27] *See* Larry Harris, Trading & Exchanges: Market Microstructure for Practitioners, Oxford University Press, 2003, pp. 401, 408.

23.     Throughout the Class Period, BofI was listed on the Nasdaq Global Select Market under the symbol "BOFI."[28]  The Nasdaq has three tiers: the Nasdaq Global Select Market; the Nasdaq Global Market; and the Nasdaq Capital Market.[29]  The listing requirements are most stringent for the Global Select Market, followed by the Global Market, and then the Capital Market.  A stock listing on such an exchange is generally considered a good general indication of market efficiency for that stock.[30]

24.     Large, well-established exchanges such as the Nasdaq Global Select Market have processes and systems to provide liquidity if needed to allow investors to execute trades quickly and efficiently.  According to Nasdaq, a market maker is "[o]ne who maintains firm bid and offer prices in a given security by standing ready to buy or sell round lots at publicly quoted prices."[31]

25.     The *Cammer* market-maker factor originally related to over-the-counter stocks that were traded in a quote-driven system.

26.     The number of Nasdaq market makers for BofI common stock ranged from 37 to 43, with an average of 41 during the Class Period.  *See* **Exhibit A-1**.

27.     Much of the liquidity on Nasdaq as well as the New York Stock Exchange ("NYSE") is now provided by high frequency traders.  Indeed, recent research has shown that

---

[28] *See* BofI's Forms 10-K filed with the SEC on September 4, 2013, p. 20, August 28, 2014, p. 28, and August 26, 2015, p. 28.

[29] *See* Nasdaq Initial Listing Guide, March 2021, p. 5, available at: https://listingcenter.nasdaqomx.com/assets/initialguide.pdf (accessed July 14, 2021).

[30] For example, in *Nguyen v. Radient Pharm. Corp.*, the court quoted *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277 (S.D.N.Y. 2008) at 296 n.133: "'[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency.'" *Nguyen vs. Radient Pharm. Corp.*, 287 F.R.D. 563 (C.D. Cal. 2012) at 573 n.7.  *See also SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276 (N.D. Cal. 2020) at 287 (calling it "unsurprising" that defendants did not contest market efficiency, "as Symantec stock traded on NASDAQ.").

[31] *See* Market Maker, Nasdaq (https://www.nasdaq.com/glossary/m/market-maker, last accessed on July 14, 2021).

Nasdaq's market structure is now indistinguishable from the NYSE.  For instance, one study concludes that:

> This study provides evidence of the homogenization of trading in the United States.  The empirical results show that two significant characteristics of market quality—trading volume and transitory volatility—have become indistinguishable, on average, between NASDAQ stocks and those listed at the traditional listing [NYSE] exchanges.  These results provide concrete evidence of a reality that is obvious to most practitioners: The market structures used for trading stocks are now essentially the same regardless of their primary listing markets.[32]

28.     Nonetheless, the existence of market makers provides some assurance that liquidity will be available when needed.  Thus, having market makers is preferred to no market makers.

29.     In my opinion, the third *Cammer* factor provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.

### iv)     Form S-3 Eligibility

30.     The fourth indication of an efficient market in *Cammer* is the eligibility of the company to file a Form S-3 with the SEC.[33]  According to *Cammer*: "The 'public float' aspect of the Form S-3 requirements ensures that enough investors have in fact read the previously filed document…  It is this aspect of the Form S-3 requirements that calls into play the efficient market hypothesis."[34]

31.     At the time of the *Cammer* decision, the filing of a Form S-3 registration statement required firms to file periodic reports with the SEC under the Exchange Act of 1934

---

[32] *See* Lawrence Harris, "The Homogenization of US Equity Trading," Working Paper, September 30, 2011, p. 2.

[33] *See Cammer* at 1287.

[34] *See Cammer* at 1285 and n.33.

for three years prior to the Form S-3 filing and to have $150 million of stock held by non-affiliates (or $100 million of stock held by non-affiliates coupled with annual trading volume of 3 million shares per year).[35]  The SEC has since modified the requirements for filing a Form S-3. Among the current requirements for filing a Form S-3 registration statement are that a company has filed reports under the Exchange Act for 12 calendar months and has an aggregate market value of common equity held by non-affiliates of $75 million or more.[36]  The value of BofI common stock held by non-affiliates (*i.e.*, public float) during the Class Period ranged between $738.8 million and $2.1 billion, far exceeding the $75 million threshold requirement.  *See* **Exhibit A-1**.  BofI was also organized and operated under the laws of the United States during the Class Period, satisfying the organizational requirement.[37]  In addition, BofI filed a Form S-3 during the Class Period on February 20, 2015.[38]

32.     In my opinion, the Company's substantial public float, in accordance with the float requirement for filing a Form S-3, provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.

### v)     *Cause-and-Effect Relationship*

33.     The fifth factor for an efficient market adopted by *Cammer* is a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[39]  Economists in academia and private practice have published

---

[35] *See Cammer* at 1271.

[36] *See* SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933," General Instructions, updated January 2012, pp. 2-4.

[37] Among the requirements for filing a Form S-3 registration statement during the Class Period were that a company be organized under the laws of the United States or its territories. *See* SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933," General Instructions, updated January 2012, p. 2.

[38] *See* BofI Form S-3ASR filed with the SEC on February 20, 2015.

[39] *See Cammer* at 1287.

scholarly research of large sample studies that present various tests and statistical methodologies that can provide probative economic evidence concerning the existence of a cause-and-effect relationship consistent with market efficiency.[40]

### a) *Reaction to Market-wide and Industry-wide Information*

34.     As explained in the Torchio Report, a market model describes the normal relationship between the return on the company's security and the return on a broad-based market index, such as the S&P 500 Index or the Nasdaq Composite Index, and possibly an industry index of stocks of companies that are similar to the company of interest or an index of stocks of companies from which the company of interest derives its revenues.[41]   I next describe the market models I estimated for BofI.

### *Proxies for Market and Industry*

35.     Because BofI was listed on the Nasdaq Global Select Market during the Class Period, I tested both the S&P 500 Total Return Index (Bloomberg identifier: SPTR) and the Nasdaq Composite Total Return Index (Bloomberg identifier: XCMP) as a proxy for the market.[42]

36.     As a proxy for the industry, I tested the ABA Nasdaq Community Bank Total Return Index (Bloomberg identifier: XABQ), against which BofI benchmarked its performance.[43]   I also tested the Nasdaq OMX ABA Community Bank Total Return Index

---

[40] *See* Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46(5), December 1991, 1575-1617, p. 1602.

[41] *See* Torchio Report, ¶ 25.

[42] BofI was not a member of the S&P 500 Index and comprised less than 0.03% of the Nasdaq Composite Index during the Class Period.  Source: Bloomberg.

[43] *See* BofI SEC Forms DEF 14A filed on September 9, 2013 (p. 33), September 8, 2014 (p. 34), and September 4, 2015 (p. 33).  The identifier listed on BofI's SEC filings was "ABAQ." I use the total return version of this index with Bloomberg identifier of "XABQ."

(Bloomberg identifier: ABQX), which tracks the performance of the most actively traded community banks of the XABQ Index.[44] Because BofI is a diversified financial services company that provides consumer and business banking products, I further tested multiple financial and banking industry indexes, including (Bloomberg identifiers in parentheses, total return indexes used if available): S&P 600 Financials Sector Total Return Index (SP6TFINL); S&P 600 Banks Industry Group Index (S6BANKX); S&P 600 Thrifts & Mortgage Finance Industry Index (S6THMFX); S&P Bank Select Industry Total Return Index (SPSIBKT); and S&P Regional Banks Select Industry Index Total Return Index (SPSIRBKT). For those industry indexes of which BofI was a member, I removed BofI's daily return based on weights obtained from Bloomberg.[45]

---

[44] *See* https://www.aba.com/about-us/our-story/nasdaq-indices (last visited July 17, 2021).

[45] The effects of BofI's daily returns are removed based on daily weightings of BofI in an index using the following formula. Let $IND_i$ denote the daily index return on date $i$, $w_{i-1}$ denote the daily weight in the index of BofI on prior date, and $r_i$ denote the daily return for BofI. The index return for each day after removing the effects of the daily returns of BofI is: $(IND_i - w_{i-1}r_i)/(1 - w_{i-1})$, except for the first day when BofI became a member of an index for which I use the weight on date $i$.

BofI was a member of the SP6TFINL, S6BANKX, and S6THMFX indexes starting on September 19, 2013. Daily weights of BofI in these indexes are obtained from Bloomberg.

BofI was not a member of the SPSIBKT and SPSIRBKT indexes during the Class Period or one year prior to the Class Period. Source: Bloomberg.

BofI was a member of the XABQ and ABQX indexes on or after September 27, 2012 (member information was not available prior to it). Source: Bloomberg. Information on weights of members of these two indexes are not available to me from Bloomberg. Both of these indexes are market capitalization weighted. *See* https://indexes.nasdaqomx.com/Index/Overview/ABQX (last visited July 17, 2021) and https://www.aba.com/about-us/our-story/nasdaq-indices (last visited July 17, 2021). As such, I used the ratio of the market capitalization of BofI as a percent of the market capitalization of the ABQX Index on the prior trading day as a proxy for daily weights to remove the impact of BofI from the ABQX Index. The market capitalization data for the XABQ Index is not available to me, and thus, I was not able to remove the impact of BofI from the XABQ Index. Because BofI's weights in the ABQX Index from the one year period prior to Class Period and through the end of the Class Period is at maximum 1.25% and the XABQ Index is a broader index than ABQX, BofI's weights in the XABQ Index would be

37.     I ran market model regressions over the Class Period (531 trading days)[46] and over the one-year period (250 trading days) prior to the Class Period. Each of these market model regressions includes a market index. Most also include one of the potential industry indexes, measured net-of-market. I ran a total of 32 market models; 16 over the one-year period prior to the Class Period and 16 estimated over the Class Period. To determine which market and industry proxies to use, I examined the R-squared (and adjusted R-squared) statistics, the t-statistics for the index coefficients, and the standard errors of the regressions. The R-squared measures how well the variation in the independent variables (the market and the net-of-market industry index returns) explain the variation in the day-to-day stock price returns of BofI. The adjusted R-squared makes an adjustment to the R-squared statistic to account for the number of independent variables in the model. The adjusted R-squared ranged between 12.83% and 15.88% for market models estimated over the one-year prior to the Class Period and between 12.84% and 22.19% for those estimated over the Class Period. The t-statistics on the index coefficients provide a measurement of whether there is a non-zero statistical relationship between the index returns and BofI returns. A t-statistic greater than 1.96 in absolute value (either positive or negative) means that the excess return is significant at the 5% significance level; a t-statistic greater than 2.58 in absolute value means that the excess return is significant at the 1% significance level. As is common in financial economics research, I use the 5% level of significance for my analyses and consider excess returns with a t-statistic greater than 1.96 in

---

smaller than that in the ABQX Index. Therefore, the impact of not removing BofI's return from the return of the XABQ Index is expected to be de minimis.

[46] Although the Class Period ends on October 14, 2015, it is alleged that the corrective information was released on October 13, 2015. Because the precise time of the release is not specified, to exclude any potential impact of the alleged corrective disclosure on the selection of market model, I end the regression period on October 12, 2015.

15

absolute value as statistically significant.  The standard error of the regression provides a measurement of the variability of the residual returns of the model (*i.e.*, the variability of the returns to the security that is not explained by the model).   The standard error of the regression ranged between 1.74% and 1.77% for market models estimated over the one-year prior to the Class Period and between 1.95% and 2.06% for those estimated over the Class Period

38.     Based on my analysis, I chose the Nasdaq Composite Total Return Index (XCMP) (the "Market Index") as the market proxy, and the ABA Nasdaq Community Bank Total Return Index (XABQ) (the "Industry Index") as the industry proxy.  I found that the market model with these indexes had the highest explanatory power (measured by the adjusted R-squared regression statistic) over both the Class Period and the one-year period prior to the Class Period.  I therefore selected the XCMP and XABQ indexes as the Market Index and the Industry Index, respectively, for my rolling regression analysis (discussed below).

### *Time Period for Regression Analysis*

39.     In the context of securities litigation, a market model regression is often estimated using stock prices during a time period before the beginning of a class period because it normally represents a period during which the returns are not affected by the alleged wrongdoing.  This approach minimizes the effect that the alleged misrepresentations have on the determination of a proper market model.

40.     There are circumstances, however, in which using returns during the class period may be preferred over pre-class period returns for computing a market model.  This is because a market model is more reliable if the market/industry volatility and the beta parameters over the class period are relatively similar to, or stationary compared with, that over the regression estimation period (*i.e.*, the period over which the market model is computed).  Volatility means

16

the variation of returns over a given time period.  Substantial differences between market/industry conditions during the class period and the conditions that existed before the class period can potentially result in market model results that are not representative of the underlying relationships between the company's stock and the market and the industry during the class period.  For the same reason, it may be preferable to use class period returns for computing a market model when the class period is long.

41.     In this case, due to the length of the Class Period and to account for changes in volatility during the Class Period, I used a technique called "rolling regression."  In this technique, for each date in the Class Period, a market model is estimated for the prior 120 trading days (which is approximately six months).[47]

42.     *See* **Exhibit A-2** for the statistical details regarding the market models I used for BofI common stock.

43.     As mentioned above, the adjusted R-squared measures how well the variation in the independent variables (returns for the Market Index and the Industry Index) explain the variation in the day-to-day stock price returns of BofI.[48]  For BofI's market models, the adjusted R-squared is on average 25.74% during the Class Period, indicating that BofI's common stock prices reacted to new general market and industry information over the Class Period, which

---

[47] This technique has been used by experts for defendants, as well as plaintiffs, in securities litigation cases.  *See*, *e.g.*, Expert Report of Paul A. Gompers dated October 24, 2011, ¶¶ 27-28, in *Paul Luman v. Paul G. Anderson, et al. (FCStone)*, in U.S. District Court, Western District of Missouri, Western Division, No. 4:08-cv-00514-C-W-HFS; and Expert Report of Chad Coffman, CFA, *In Re NII Holdings In. Securities Litigation*, September 11, 2015, ¶¶ 51-52, Civ. No. 1:14-cv-00227-LMB-JFA, United States District Court, Eastern District of Virginia, Alexandria Division.

[48] For a discussion of R-squared and how it relates to market efficiency, *see*, for example, Sudipto Dasgupta, Jie Gan, and Ning Gao, "Transparency, Price Informativeness, and Stock Return Synchronicity: Theory and Evidence," *Journal of Financial and Quantitative Analysis* 45(5), Oct. 2010, 1189-1220, pp. 1189-1190.

provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.  Studies indicate that, on average, R-squared across large samples of stocks can range from 11% to 17%.[49]

44.  Based on the results of the market models, **Exhibit A-2** shows the excess stock-price returns and their statistical significance for the period September 4, 2013 through October 16, 2015, which encompasses the Class Period.[50]  The exhibit also presents BofI's daily common stock volume, prices, returns, and market and industry returns.

b)  *Event Study of "News" Days versus "Non-News" Days*

45.  Another test of a cause-and-effect relationship that has been employed by financial economists evaluating market efficiency in securities litigation is a statistical comparison of stock-price movements for days during the relevant period on which firm-specific news was released to those on days on which no such firm-specific news was released.  For this test of a cause-and-effect relationship, I determine an appropriate definition of a "news day."  To avoid making subjective decisions based on reading and attempting to "value" the actual news stories to determine "news days," I rely on a pre-set "objective" definition of "news day" – days

---

[49] *See*, for example, Qi Chen, Itay Goldstein, and Wei Jiang, "Price Informativeness and Investment Sensitivity to Stock Price," *The Review of Financial Studies* 20(3), 2007, 619-650, pp. 630-632.  *See also* Steven S. Crawford, Darren T. Roulstone, and Eric C. So, "Analyst Initiations of Coverage and Stock Return Synchronicity," *The Accounting Review* 87(5), 2012, 1527-1553, p. 1537.

[50] The methodology to calculate excess returns and their significance is described in the Torchio Report, ¶¶ 28-37.

18

with a Company-issued press release.[51,52]   I use this definition with the understanding that no single definition of "news days" will perfectly identify all the days that in fact have value-relevant news and that news about BofI, like any other company, can and was disclosed by means other than through Company press releases.[53]  "Non-news days," for purposes of this analysis, includes all days without a Company-issued press release.  I note that the term "non-news days" is not meant to imply that there was no value-relevant news on any of these days, and that it simply identifies the days that do not fit the definition of "news days" used for this analysis.

---

[51] Sources for Company-issued press releases, including press releases issued by BofI and BofI Federal Bank, the bank subsidiary of BofI: **Appendix B**.  Excluded from "news days" are any press releases in which the Company simply disclosed the existence of a future event, such as the date on which earnings would be disclosed.  News released after the close of market are mapped to the following trading day.

[52] The Court in *Petrobras* noted, "However, evidence of directionality or the degree of fit between expected and observed moves in a market need not be substantial to allow a finding of market efficiency.  Such evidence goes to the accuracy of the price of a security, and the Supreme Court has explained that it is not the accuracy of a price as a reflection of underlying value but instead the sensitivity of the price to false statements that underlies the *Basic* presumption. …. Whether the market, upon receiving new information, moved in the precise way analysts or experts would expect it to move is not the key to unlocking *Basic*'s presumption of reliance.  What is essential is evidence that, when the market received new information, it 'generally affect[ed]' the price." *See In re: Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016) at 370.

[53] The news might not have a valuation effect great enough to cause a stock-price reaction that is statistically significant at 5% level.  To illustrate this point, first note that an excess stock return must exceed 1.98 times the standard error of the market model to be significant at the 5% level.  1.98 is the t-statistic associated with a 5% p-value for my market models (with 120 observations and degrees of freedom of 117).  When using the standard errors from my market models for BofI, this means that the daily excess return must be at least 3.83% (*i.e.*, the median of standard errors from the market models during the Class Period of 1.94% X 1.98) in this example to be significant at the 5% level.  Given that BofI's average market capitalization during the Class Period was $1.3 billion (*see* **Exhibit A-1**), a 3.83% excess return translates to a market value increase (or decrease) of roughly $48.87 million (*i.e.*, $1.3 billion x 3.83%).

19

46. **Exhibit A-3** identifies the 25 Company disclosures which I identified as passing my pre-set objective criteria of a "news day."

*Test of Proportion of Statistically Significant Excess Returns*

47. Of these 25 "news" days, 7 days (or 28.0%) were accompanied by statistically significant stock-price movements at the 5% significance level. Conversely, of the 508 "non-news" days, only 21 (or 4.1%) were statistically significant at the 5% significance level, indicating that BofI's stock was approximately 6.8 times (28.0% / 4.1%) more likely to react in a statistically significant manner on days when the Company issued press releases containing potentially value-relevant information than on days without.[54]

48. I tested whether the proportion of statistically significant stock-price reactions on news days is statistically significantly different from the proportion on non-news days using Fisher's Exact Test. With a p-value of 0.01%, Fisher's Exact Test shows that the difference in proportions is statistically significant at the 1% significance level.[55] *See* **Exhibit A-4**.

49. Thus, because the proportion of statistically significant excess returns for news days is statistically greater than for non-news days, this analysis supports a finding of market efficiency for BofI.

*Test of Variance of Returns on News Days versus Non-News Days*

50. If important, value-relevant information is disclosed on news days, one would expect greater volatility from news days relative to non-news days. For example, Beaver *et al*.

---

[54] Courts have accepted the test of proportions for analyzing cause-and-effect. *See, e.g., In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008) at 280.

[55] I also tested the difference in proportions using the standard z-test. A z-statistic of 5.22 and a p-value of less than 0.01%, also shows that the difference in proportions is statistically significant at the 1% significance level. *See* **Exhibit A-4**.

20

(2018) found a positive association between relative return variability at earnings announcements and the increase in information content disclosed concurrently with financial statement items.[56]

51.     I analyzed the volatility of BofI's stock price returns on the 25 news days.  To analyze whether the variance of the excess returns on the 25 news days is the same as the non-news days, I performed a standard F-test.[57]  As shown in **Exhibit A-5**, the variance of the excess returns on the 25 BofI news days is approximately 3.39 times greater than the variance for non-news days (0.16%/0.05%).  With an F-statistic of 3.39 and a p-value less than 0.01%, the difference of the variances is statistically significant at the 1% significance level.[58]

52.     Thus, the results of my analysis of the variance of excess returns for news days support a finding of market efficiency for BofI stock.

c)  *Event Study of the Alleged Corrective Disclosure*

53.     Plaintiff alleges that the revelations in a whistleblower lawsuit against the Company filed by a former internal auditor of BofI, Mr. Charles Matthew Erhart (the "Erhart Complaint"), corrected previous false or misleading public statements by Defendants.[59]  The Erhart Complaint was filed on October 13, 2015, and was reported by *The New York Times*.[60]

---

[56] *See* William H. Beaver, Maureen F. McNichols, and Zach Z. Wang, "Increased Information Content of Earnings Announcements in the 21st Century: An Empirical Investigation," Working Paper, June 19, 2018.

[57] For a detailed discussion of the F-test, *see* David R. Anderson, Dennis J. Sweeney, and Thomas A. Williams, Statistics for Business and Economics, 9th ed., Thomson Learning, 2005, pp. 498-499.

[58] A p-value is the probability of obtaining a result equal to or more extreme than the observed result if the null hypothesis is true.  This means that small p-values are evidence against the null hypothesis.  *See*, for example, Jeffrey M. Wooldridge, Introductory Econometrics, A Modern Approach, 2nd ed., Thomson South-Western, 2003, p. 132.  I also performed a Brown-Forsythe test, which also showed that the difference of the variances is statistically significant at the 1% level.

[59] *See*, *e.g.*, Complaint, ¶¶ 124-126.

[60] *See* "Ex-Auditor Sues Bank of Internet," *The New York Times*, October 13, 2015

21

The exact times of the publication of *The New York Times* article and the whistleblower complaint are not available to me. Based on the news stories available to me, *The New York Times* article was first reported by *Bloomberg First Word* at 9:09 pm on October 13, 2015.[61,62]

54.    BofI stock opened at $133.60 per share on Wednesday, October 14, 2015, and closed at $99.13 per share, down $42.87 per share, or -30.19%, from the previous day's closing price of $142.00 per share. The excess share price return on October 14, 2015 was -28.27% and was statistically significant at the 1% level. *See* **Exhibit A-2**. The daily trading volume of 5,954,534 shares on October 14, 2015 was approximately 27 times the average daily trading volume of 221,956 shares during the Class Period prior to this disclosure.

55.    The financial press reported that the cause of the dramatic decline in BofI's share price on October 14, 2015 was the disclosure of the Erhart Complaint.[63] Multiple analyst reports were issued on October 14, 2015 and October 15, 2015.[64]

56.    The next day on Thursday, October 15, 2015, BofI's stock price opened at $115.29 per share and closed at $118.36 per share, up $19.23 per share, or 19.40%, from the previous day's closing price of $99.13 per share. The excess share price return on October 15,

---

(available at https://www.nytimes.com/2015/10/14/business/dealbook/ex-auditor-sues-bank-of-internet.html; last visited July 19, 2021).

[61] *See* "BofI Holdings Sued by Former Auditor Over Procedures: NYT," *Bloomberg First Word*, October 13, 2015, 9:09 pm.

[62] Unless otherwise noted, all time stamps in this report are in Eastern Time.

[63] *See, e.g.*, "Stocks Lower As Earnings Disappoint; BofI Holding Crushed," Investor's Business Daily, October 14, 2015; "Here's Why BofI Stock is Plummeting Today," TST, October 14, 2015, 12:54 pm; "WMT: On The Fly: Top stock stories for Wednesday," TheFlyontheWall.com, October 14, 2015, 4:28 pm; "BofI Holding plummeting following lawsuit news," SNL Financial Extra, October 14, 2015.

[64] *See, e.g.*, "Upgrading to BUY Following Big Drop in Share Price," Sandler O'Neill research report, October 15, 2015; "Affirming Strong Buy Rating," Raymond James research report, October 14, 2015.

2015 was 17.16% and was statistically significant at the 1% level. *See* **Exhibit A-2**. The price increase followed a BofI conference call after the close of market on October 14, 2015, in which management strongly refuted the allegations contained in the Erhart Complaint and answered questions from analysts.[65] The daily trading volume of 2,540,713 shares on October 15, 2015 was approximately 11 times the average daily trading volume during the Class Period prior to this disclosure.

57. News media discussed the Company's conference call and also discussed the stock upgrades by analysts in the aftermath of the stock price decline on October 14, 2015 and attributed the stock price increase on October 15, 2015 to these upgrades as well as management's denial of the allegations.[66]

58. On October 16, 2015, *The New York Times* published an article discussing management's denial of Mr. Erhart's allegations and the suggestion that the "lawsuit might have been financed by investors betting against Bank of Internet's stock," and a response from Mr. Erhart's lawyer denying that she or Mr. Erhart had received money from investors to finance the lawsuit.[67]

---

[65] *See* "BofI Holding Inc M&A/Other Business Update Call Teleconference," Bloomberg Transcripts, October 14, 2015, 7:32 pm.

[66] *See, e.g.*, "BofI Jumps 17% After Mgmt Held Call on Allegations, Two Upgrades," Bloomberg First Word, October 15, 2015, 8:50 am; "After BofI Plunge, Stock Seen Recovering All Its Loss," Investor's Business Daily, October 15, 2015; "Midday Thursday: Banks in positive territory; BofI Holding up more than 12%," SNL Financial Extra, October 15, 2015; "BofI 30% Selloff 'Significant' Buying Opportunity: FBR," Bloomberg First Word, October 15, 2015, 5:39 am.

[67] *See* "Bank of Internet Denies Accusation That It Defied Regulators," *The New York Times*, October 15, 2015. The version of the article available on *The New York Times'* website is dated October 15, 2015 (available at https://www.nytimes.com/2015/10/16/business/dealbook/bank-of-internet-denies-accusation-that-it-defied-regulators.html; last visited July 19, 2021). Its discussion of the closing price on October 15, 2015 suggests that the article was published after market close on October 15, 2015.

59.    On Friday, October 16, 2015, BofI's stock price opened at $118.00 per share, near the previous day's close, and closed at $100.78 per share, down $17.58 per share, or -14.85%, from the previous day's closing price of $118.36 per share.  The excess share price return on October 16, 2015 was -15.09% and was statistically significant at the 1% level. *See* **Exhibit A-2**. The daily trading volume of 1,570,394 shares on October 16, 2015 was approximately 7 times the average daily trading volume during the Class Period prior to this disclosure.

60.    The statistically significant price reactions during October 14-16, 2015, and the much higher than normal trading volume supports a finding that BofI common stock traded in an informationally efficient market during the Class Period.

### d)    *Correlation Between Price Changes and Trading Volume*

61.    Economists have studied the empirical correlation between absolute stock returns and volume since 1970 for stocks and other securities traded in the United States and elsewhere.[68]  A strong, direct relationship is the widespread finding, and this evidence is generally interpreted as meaning that both volume and stock-price changes have common ties to the flow of new information about the security.  Thus, new important information about a company that is perceived by different investors as having differing valuation effects for the security will typically also cause greater than normal trading volume.

---

I note, however, the closing price of $118.41 per share noted in *The New York Times* is slightly different from the closing price of $118.36 according to Bloomberg.  The version of *The New York Times* article available from Factiva is dated October 16, 2015.

[68] For a survey of the literature, *see* Jonathan M. Karpoff, "The Relation Between Price Changes and Trading Volume: A Survey," *Journal of Financial and Quantitative Analysis* 22(1), March 1987, 109-126.

62. Because of this, days with important news will tend to correspond with greater-than-normal trading volume as different investors alter positions in accordance with their differing valuation views.

63. Thus, I check for this statistical correlation between BofI's reported volume and stock-price changes using both the Company's absolute returns and absolute excess stock returns. An "absolute return" means that each negative return is transformed into a positive return (*i.e.*, only the magnitude but not the direction of the return is considered). Both returns are regressed on (the natural log of) BofI's trading volume on a daily basis over the Class Period.

64. In both regressions, consistent with an efficient market, I find a strong, positive relationship between daily volume and the absolute value of BofI's common stock price returns. The t-statistics of 14.34 and 14.50, respectively, indicate that these two estimated coefficients are positive at greater than the 1% significance level. *See* **Exhibit A-6**.

65. The results of my analysis of correlation between price changes and trading volume provide support for my opinion that BofI common stock traded in an efficient market during the Class Period.

66. Based on the analyses discussed above, in my opinion, the fifth *Cammer* factor provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.

**B. The *Krogman* and *Unger* Factors for Market Efficiency**

67. In addition to the five *Cammer* factors discussed above, I analyzed three additional factors accepted by the courts in *Krogman* and *Unger* as providing evidence of an efficient market. These additional factors include the: i) market capitalization of the company;

ii) bid-ask spread of the stock; and iii) percentage of stock not held by insiders (the "float").[69] I analyze these factors below.

### i) *Market Capitalization*

68. A large market capitalization is an indicator of market efficiency because there is a greater incentive for investors to collect and analyze information about large corporations.[70] During the Class Period, BofI's market capitalization ranged from approximately $817.9 million to approximately $2.2 billion, with an average of $1.3 billion. *See* **Exhibit A-1**.

69. BofI's average market capitalization was between the 50th and 75th percentiles of the stocks in the NYSE/Nasdaq Universe during 2013-2105, meaning that BofI's market capitalization is better than at least 50% of stocks that trade in well-developed markets.[71,72]

70. In my opinion, BofI's market capitalization provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.

71. According to data from Thomson Eikon, institutions held approximately 71.7% of the Company's shares outstanding during the Class Period. *See* **Exhibit A-1**. Institutional ownership of a stock is typically associated with strong competition for generating returns from the stock. Generally, institutional investors have significant experience in evaluating investments and assessing the effect of new information on the future prospects of a traded company's stock. Indeed, several articles comment on the use of institutional holdings as a proxy for market efficiency. For example, a study by Barber et al. (1994) concludes that, in

---

[69] *See Krogman* at 478; *Unger* at 323.

[70] *See Krogman* at 478.

[71] *See* BST 2020 at Table 5, p. 107.

[72] I note that the market capitalization in *Krogman* was at the 60th percentile of a sample group of NYSE, Nasdaq, and Amex stocks. *See Krogman* at 478.

isolation, institutional holdings are a proxy for market efficiency.[73]  Thomas and Cotter (2000)

argue that the level of institutional investors' ownership in a company's stock is a proxy for

market efficiency.[74]

72.      BofI's average institutional ownership as a percent of shares outstanding is

between the 50th and 75th percentiles of the stocks in the NYSE/Nasdaq Universe during 2013-

2015, meaning that BofI's institutional ownership is better than at least 50% of stocks that trade

in well-developed markets and provides support for my opinion that BofI common stock traded

in an efficient market during the Class Period.[75]

### ii)      *Bid-Ask Spread*

73.      Bid-ask spreads are one component of the cost of trading financial securities.

They provide a measure of the difference in price between the highest price that a buyer is

willing to pay for the stock and the lowest price that a seller is willing to accept.  Bid-ask spreads

are an indication of market efficiency because the lower the bid-ask spreads, the lower the costs

of trading.  Lower costs of trading reduce impediments to trade as new information enters the

market.[76]

74.      The average bid-ask spread for BofI common stock during the Class Period was

0.06%.  *See* **Exhibit A-1**.

---

[73] *See* Brad M. Barber, Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, Winter 1994, 285-312, p. 302.

[74] *See* Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63(3), Summer 2000, 105-122, p. 106.

[75] *See* BST 2020 at Table 4, p. 106.

[76] The court in *Cyberguard* found that a bid-ask spread of 2.44% weighed in favor of market efficiency.  *See Cyberguard* at 501 (citing *Krogman).*

27

75. BofI's average bid-ask spread is between the 25th and 50th percentiles for stocks in the NYSE/Nasdaq Universe for this measure of efficiency, meaning that BofI's average bid-ask spread was lower (better) than at least 50% of the stocks within the universe.[77]

76. Based on this evidence, BofI's average bid-ask spread of 0.06% was not a deterrent to investor trading activity in BofI common stock and provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.

### iii) Public Float

77. The court in *Krogman* used the size of the public float as an indicator of market efficiency.[78] BofI's public float during the Class Period ranged from 12.4 million to 14.8 million shares, representing on average over 92% of the Company's shares outstanding.[79] *See* **Exhibit A-1**.

78. On a dollar basis, BofI's float ranged from $738.8 million to $2.1 billion, with an average of $1.2 billion during the Class Period. *See* **Exhibit A-1**.

79. BofI's public float provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.

### C. The *Polymedica* Factors for Market Efficiency

80. In addition to the factors discussed above, the court in *PolyMedica* considered several other factors as evidence of market inefficiency. These factors include: i) the presence of serial correlation in PolyMedica's stock price returns; ii) constraints on short selling; and iii) violations of put-call parity.[80] I analyze these factors below.

---

[77] *See* BST 2020 at Table 3, p. 105.

[78] *See Krogman* at 478.

[79] 92% represents the average public float of 13.6 million shares divided by the average shares outstanding of 14.7 million shares over the Class Period.

[80] *See PolyMedica* at 18.

28

### *i)* *Autocorrelation*

81.     I conducted statistical tests to determine whether the returns for BofI common stock exhibited "autocorrelation," which is also referred to as "serial correlation." Autocorrelation has been studied in the financial economics literature and accepted by the courts.[81]

82.     Autocorrelation in a stock's returns means that tomorrow's stock price movement can be systematically predicted with a degree of statistical confidence based solely on the price movement today.  This ability to predict stock price movements is a consequence of either of two problems.  First, the market systematically overreacts to new information.  A systematic overreaction allows investors to earn arbitrage profits by buying on days containing bad news (or selling short on the days containing good news) because there will be a reversal the next day (negative autocorrelation).  Second, the market takes excessive time to incorporate new information or systematically underreacts to new information.  A systematic underreaction to news allows investors to earn arbitrage profits by buying on a day with good news and selling short on days containing bad news (positive autocorrelation).

83.     The presence of statistically significant autocorrelation over short subperiods may mean that there were instances in which there were consecutive days for which important news

---

[81] The lack of autocorrelation generally corresponds to the theory of random walk.  "The term 'random walk' is usually used loosely in the finance literature to characterize a price series where all subsequent price changes represent random departures from previous prices.  Thus, changes in price will be unrelated to past price changes."  *See* Burton G. Malkiel, "Efficient Market Hypothesis," in <u>The New Palgrave: A Dictionary of Economics</u>, Volume 2, E to J, ed. by John Eatwell, Murray Milgate and Peter Newman, The Macmillan Press Limited, 1998, pp. 120-123.  *See also Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-07 (S.D. Tex. 2004); *In Re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 ("*PolyMedica II*") at 276-77.

was disseminated.  Under these circumstances, statistically significant autocorrelation would not indicate that any arbitrage opportunity existed, but rather is a figment of consecutive news days.

84.    To test for autocorrelation, I first performed a regression analysis of BofI's daily common stock returns on the returns from the previous day over the Class Period.  I did not find the autocorrelation for BofI's returns to be statistically significant, which means there is no statistical evidence of autocorrelation of BofI's returns.[82]  I also performed a regression analysis of BofI's daily common stock excess returns on the excess return from the previous day over the Class Period.  Similar to the raw returns, I found no statistically significant autocorrelation for BofI's excess returns, which means there is no statistical evidence of autocorrelation of BofI's excess returns.[83]  *See* **Exhibit A-7**.

85.    In my opinion, the lack of autocorrelation provides support for my opinion that BofI common stock traded in an efficient market during the Class Period.[84]

### ii)    *Short Interest*

86.    The presence of short sellers is another indication of investor activity.  Investor activity is a key component of a well-functioning efficient market.  The level of short interest for BofI common stock during the Class Period averaged 1.7 million shares, which is 11.4% of the Company's common shares outstanding.[85]  *See* **Exhibit A-1**.

---

[82] The coefficient for BofI's return from the previous day over the Class Period is 0.005 with a t-statistic of 0.11, which is not statistically significant at the 5% significance level. *See* **Exhibit A-7**.

[83] The coefficient for BofI's excess return from the previous day over the Class Period is -0.025 with a t-statistic of -0.48, which is not statistically significant at the 5% significance level. *See* **Exhibit A-7**.

[84] I note that the court in *PolyMedica* found the presence of autocorrelation to be direct evidence of an inefficient market.  *See PolyMedica II* at 276-77.

[85] Short interest ranged between 7.8% and 66% in *PolyMedica*.  *See PolyMedica II* at 273.

87.     BofI's average short interest as a percent of shares outstanding is between the 90th and 95th percentiles for securities in the NYSE/Nasdaq Universe during 2013-2015 for this measure of efficiency, meaning that BofI's average short interest as a percent of shares outstanding was higher than 90% of the stocks within the universe.[86]  If short selling in BofI stock were constrained during the Class Period, it would likely manifest itself as relative mispricing between the Company's common stock and traded options.  As discussed in Section III. below, I analyze the relationship between the price of BofI common stock and traded options (called the put-call parity) during the Class Period and find no evidence of constraints in short selling.

88.     I also examined the short interest coverage ratio, which indicates how many trading days it takes to cover a short position given the reported trading volume.  The short interest coverage ratio equals short interest divided by average daily trading volume.[87]  The average short interest coverage ratio for BofI common stock was approximately 8.2 days during the Class Period.  *See* **Exhibit A-1**.  This indicates that, on average, it would take short sellers approximately 8.2 trading days to cover their entire short position in BofI common stock, assuming historical trading volume remained constant.

89.     Although short interest analyses for BofI are not supportive of market efficiency, the other factors analyzed provide strong support for market efficiency.  Moreover, if the degree of short interest caused significant deviations from an efficient market price, then one would observe that the other factors such as put call parity (discussed next) and autocorrelation would also not support a finding a market efficiency.  Because these other related factors support an

---

[86] *See* BST 2020 at Table 6, p. 107.

[87] For each day, the average trading volume equals the average volume for the previous 20 trading days through the current day.

31

efficient market, and the preponderance of all the evidence supports an efficient market, the lack

of support from the short interest does not alter my opinion that the market for BofI stock is

efficient.

### III. MARKET EFFICIENCY FOR OPTIONS ON COMMON STOCK

90.     As explained in the Torchio Report, options are a type of "derivative" financial

security whose value is dependent on the value of another financial security or asset, which in

the case of BofI options is BofI common stock.[88]  Therefore, to the extent that the BofI common

stock share price reflects all publicly available information about the Company and adjusts

rapidly to account for new, important and unanticipated information, it would be expected that

prices for BofI options would also reflect all publicly available information about the Company,

and adjust rapidly to account for the new, important and unanticipated information.  Several

court rulings are consistent with this understanding in that they have considered the satisfaction

of certain efficiency factors for common stock to be sufficient to demonstrate that the derivative

options also trade in an efficient market.[89]

---

[88] Torchio Report, ¶ 79.  A call option gives the holder the right, but not the obligation, to purchase the underlying security at a specific price (the "exercise price") on, or possibly before, a specific date (the "expiration date").  A put option gives the holder the right, but not the obligation, to sell the underlying security at the exercise price on, or possibly before, the expiration date.

[89] *See Enron*, 529 F. Supp. 2d 644 (S.D. Tex. 2006) at 754 ("The Court finds that Dr. Nye's evidence applying the *Cammer/Unger/Bell* factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' § 10(b) claims based on the options."); *In re Merck & Co., Sec. Derivative & ERISA Litig.*, LEXIS 13511, (D.N.J. Jan. 30, 2013) at 60-61 ("Moreover, insofar as the alleged Rule 10b-5 violations are predicated on put or call options transactions, the trading of Merck stock on the efficient NYSE suffices to establish that the options also traded on an efficient market."); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415 (S.D.N.Y. 2014) at 433-34 ("where a court finds the Market Efficiency Requirement satisfied, '[o]ption traders ... may use the fraud-on-the-market presumption of reliance absent special circumstances compelling a different result.' *In re Priceline.com Inc.*, 236

32

91.    The relationship between the stock price and the option prices can also be empirically tested.  In an efficient market, the various call and put options of a stock will be priced relative to one another (and the stock) so as to provide zero profits from arbitraging these securities against one another.  Economists refer to this no-arbitrage state as put-call parity.  Thus, if put-call parity holds and there are minimal violations, then this supports a finding of market efficiency.

92.    Because in addition to trading the stock directly, arbitrageurs can also profit from perceived mispricing of the common stock by trading in call and put options on the common stock, the test of the put-call parity relationship can also be considered a test of efficiency for common stock as was the case in *Polymedica*.[90]

## A.  Put-Call Parity

93.    Put-call parity is a theoretical relation between call option prices, put option prices, and stock prices that should hold because a portfolio of put and call options plus risk-free bonds can be constructed to replicate the payoff from purchasing the underlying common stock.  An American-style option (unlike European-style) can be exercised at any time during its life.  For American-style options (such as BofI's), the put-call parity relation implies an upper and lower bound on the value of the put and call option prices such that:

$$S - D - X \leq C - P \leq S - Xe^{-rt},$$

---

F.R.D. 89 (D.Conn. 2006)".).

[90] *See PolyMedica* at 18.

where $S$ denotes the current price of common stock, $D$ denotes the present value of future dividends, $X$ denotes the exercise price of the option, $C$ is the call option price, $P$ is the put option price, $r$ is the risk-free interest rate, and $t$ is the time to expiration of the options.[91]

94.     I conducted an empirical test to determine whether BofI's common stock and exchange-traded options on BofI's common stock violated put-call parity on any day during the Class Period.

95.     I obtained daily bid and ask data for options on BofI's common stock from IVolatility.[92]  The IVolatility database includes daily open interest, volume, expiration date, exercise price, and bid and ask prices for each option.[93]

96.     For the risk-free interest rate, I use the U.S. Treasury constant maturity rate closest to days to expiration.[94,95]

---

[91] *See*, for example, John C. Hull, <u>Options, Futures, and Other Derivatives</u>, 6th ed., Pearson Prentice Hall, 2006, p. 219.  BofI did not declare or distribute any dividends during the Class Period.  *See* BofI SEC Form 10-K dated August 25, 2016, p. 30.  Therefore, the term $D$ in the equation is set to zero.

[92] Available at http://www.ivolatility.com.

[93] Open interest is the number of outstanding option contracts at a given point in time.  In general, equity option contracts represent 100 shares of the underlying equity and option prices are quoted on a per-underlying share basis.

[94] Interest rate data is obtained from the Federal Reserve Board database available at https://www.federalreserve.gov/datadownload/Download.aspx?rel=H15&series=bf17364827e38 702b42a58cf8eaa3f78&filetype=csv&label=include&layout=seriescolumn&from=01/01/1999&t o=03/01/2021.  The following cut-offs are used in assigning interest rates to time to maturity: 1-60 days, 1 month rate; 61-136 days, 3 month rate; 137-273 days, 6 month rate; 274-547 days, one year rate; and 548-913 days, two year rate.  I converted the interest rates to continuous compounding, $2 \times \ln(1+r/2)$, where $r$ is the interest rate based on semiannual compounding.

[95] The number of days to expiration is set as the expiration date less the trading date.  If the expiration date is a Saturday or Sunday, I further deduct the number of days to expiration by one or two, respectively.

34

97. Both the upper and lower bounds were tested over pairs of options with valid bid and ask prices on days on which bid and ask quotes for BofI's common stock were available.[96] Because these bounds are derived from the economic assumption of no arbitrage, the lower bound was tested using the ask price for the call option, the bid price for the put option, and the bid price of the stock; the upper bound was tested using the bid price for the call option, the ask price for the put option, and the ask price of the stock.[97]

98. The results obtained from my analysis showed 7 (or 0.02%) violations of put-call parity out of the 33,221 option pairs during the Class Period. Thus, BofI's common stock and options exhibited adherence to put-call parity theory. This observation provides support for my opinion that BofI common stock and options on the common stock traded in efficient markets during the Class Period.[98]

99. For a summary of the results of my various analyses of market efficiency discussed above, *see* **Exhibit A-8**.

---

[96] I checked for observation anomalies in which the bid price was greater than the ask price for the call option, put option, or common stock, or if both the ask price and the bid price for the call option or the put option were zero. I excluded 3 anomalies from the data.

[97] The lower bound is violated if $S^{bid} > C^{ask} - P^{bid} + D + X$; the upper bound is violated if $S^{ask} < C^{bid} - P^{ask} + Xe^{-rt}$. As mentioned in footnote 91, the term $D$ is zero in the case of BofI.

[98] I note that the court in *PolyMedica* determined that substantial violations of put-call parity were indicative of an inefficient market. *See PolyMedica II* at 275.

35