**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEAMSHIP TRADE ASSOCIATION OF BALTIMORE – INTERNATIONAL LONGSHOREMEN'S ASSOCIATION PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>  v.<br><br>OLO INC., NOAH GLASS, and PETER BENEVIDES,<br><br>       Defendants. | Case No. 1:22-cv-08228-JSR<br><br>CLASS ACTION<br><br>JURY TRIAL DEMAND |

**LEAD PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF FEDERAL SECURITIES LAWS**

## I.      INTRODUCTION

1.      Pursuant to this Court's July 26, 2023 Minute Entry granting Lead Plaintiff Steamship Trade Association of Baltimore – International Longshoremen's Association Pension Fund ("STA-ILA" or "Lead Plaintiff") leave to amend, Lead Plaintiff, by and through its attorneys, brings this Second Amended Class Action Complaint for Violations of Federal Securities Laws ("SAC") against Defendants Olo Inc. ("Olo" or the "Company"), Olo's Chief Executive Officer ("CEO") Noah H. Glass ("Glass"), and Olo's Chief Financial Officer ("CFO") Peter J. Benevides ("Benevides" and with Olo and Glass, "Defendants").  Plaintiff brings this action on behalf of itself and all persons and entities that purchased shares of Olo's Class A common stock ("Olo's common stock") between March 17, 2021 and August 11, 2022, inclusive (the "Class Period").

2.      On January 13, 2023, Lead Plaintiff filed its Amended Class Action Complaint for Violations of Federal Securities Laws ("FAC") (ECF No. 38), alleging that Defendants materially misled the market beginning on August 10, 2021 by misstating the number of its "active locations," one of Olo's "key metrics" that Defendants repeatedly claimed served as a "performance indicator" of past, present, and future growth, and beginning on February 23, 2022, omitted mention of Olo's loss at the start of the year of its most important brand client, Subway.

3.      On April 10, 2023, this Court issued a bottom-line Order (ECF No. 50), denying Defendants' Motion to Dismiss the FAC.  In its July 25, 2023 full Order (ECF No. 71) on Defendants' Motion, this Court sustained the FAC's active locations allegations in full, but dismissed the FAC's omissions-based Subway allegations as protected by the PSLRA's safe harbor for forward-looking statements.

4.      Since the filing of the FAC, the parties to this action have substantially engaged in discovery.  While vigorously pursuing discovery, Plaintiff and Plaintiff's Counsel uncovered significant confirmatory evidence of the FAC's Subway and active locations allegations, evidence

of additional actionable misstatements, including several embedded within Olo's IPO Offering Documents and Roadshow materials, as well as clear evidence of an unreported slowdown in Olo's business so severe that just weeks before Defendants issued materially false full year ("FY") 2022 public guidance, ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████[1]

5.     Now, Plaintiff brings this Second Amended Complaint alleging fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, documents obtained from the Defendants and third-parties, and upon information and belief as to all other matters.  Plaintiff's information and belief is based on the ongoing independent investigation of its undersigned counsel, which includes a review of: Defendants' press releases, conference call transcripts, filings with the SEC, and other public statements; news stories, analyst reports, and other public information concerning Olo and/or the industry within which it operates; and interviews with former Olo employees and/or others familiar with the Company, as well as the review of documents and deposition testimony obtained to date.

## II.     SUMMARY OF THE ACTION

6.     Olo, short for "online ordering," is a New York software company that connects individual restaurant locations to consumers directly through mobile and online ordering and/or indirectly through third-party applications, including DoorDash, Grubhub, and Uber Eats.

7.     Founded in 2005 by Defendant Glass, Olo found itself in the right place at the right time when the Covid-19 pandemic hit.  With in-person dining shut down, restaurants scrambled to

---

[1]     Unless otherwise noted, emphasis is added.

find ways to enable customers to order online.  Without adequate time to develop such systems in-house, restaurant groups turned to companies like Olo.  As such, Olo's revenue in 2020 soared.  Olo rode this wave created by the pandemic to go public and, on March 17, 2021, commenced an IPO, raising almost $520 million in gross proceeds.

8.      In the Company's IPO registration statement and prospectus (collectively, the "Offering Documents"), pursuant to which Olo issued its shares to the public, Olo made a number of misstatements related to "active locations" (a metric that states the number of locations allegedly "utilizing" one of Olo's products in a given quarter), to enterprise brands (brands with over 50 locations) and to the total addressable market ("TAM").  These categories of misstatements contained in the Offering Documents (and more) only continued throughout the Class Period.

9.      To begin with, with each passing quarter, the number of active locations noted in Defendants' Securities and Exchange Commission ("SEC") filings and public statements grew.  For example, in the Company's SEC Form 10-Q for 1Q 2021, issued on May 11, 2021, Defendants stated that Olo retained "approximately 69,000 active locations."  The following quarter, in another SEC Form 10-Q, issued on August 10, 2021, Defendants stated that Olo retained "approximately 74,000 active locations."  This number grew to 82,000 by the end of the Class Period.

10.      The number of active locations reported to the market was vital to the Company as it was a "***performance indicator***" of future growth.  According to Defendants, the "active location count is an important metric that demonstrates the growth and scale of our overall business and reflects our ability to attract, engage, and monetize our customers and thereby drive revenue, as well as provides a base to expand usage of our modules."  Indeed, Defendants went to great lengths to emphasize the connection between active locations growth and revenue/profitability growth,

repeatedly emphasizing that "Our ability to grow revenue is a function of adding ***more*** restaurant locations to the platform."

11.     Defendants also attempted to distinguish Olo from competitors by claiming that when Olo signed a new restaurant brand, "***all***" of that brand's locations – whether corporate-owned or franchised – were obligated to adopt Olo's technology and "***always*** go[] live really ***all at the same time*** to create that consistent experience everywhere."  This was stated (in various forms) twice in the Offering Documents and then repeatedly throughout the Class Period.

12.     Unfortunately for investors, the numerous statements about active locations were untrue and obscured an aggressive campaign by Defendants to falsify Olo's active locations numbers.  This campaign transpired in a number of ways.

13.     *First*, despite defining "active locations" as "a unique restaurant location ***live*** on the platform with at least one product module," Olo prematurely included individual restaurant locations in its active locations count before those locations had actually begun utilizing ***any*** of Olo's products.  As discussed below, Olo had a policy of including ***all*** individual restaurant locations in its active locations count after the new brand client signed with Olo, but before many of the individual brand locations were ever truly "active."  Defendants did this in spades.  The FAC identified Jack in the Box, which Defendants falsely claimed had been fully onboarded by June 30, 2021, as an example of this type of active locations fraud.  Now, the SAC has identified numerous additional brands announced by Defendants to the market as fully onboarded that were not, including several major brands (Subway, Checkers, and Dairy Queen) included in Olo's IPO Offering Documents and Roadshow materials.

14.     *Second*, Olo failed to remove inactive locations from the Company's active locations count.  On multiple occasions, individual locations turned ***off*** their Olo products and

therefore were not truly "active," but were included in the count nonetheless.  And, what's worse, despite repeatedly publicly claiming that the Company only counted "live" locations as "active" locations, for most modules, a location only needed to **possess** Olo's software to be considered "active," even if, throughout an entire quarter, not a single order was placed using Olo's software. In fact, of Olo's ten modules,[2] only Rails, Dispatch, and Network actually required **any** customer "activity" whatsoever in order to be classified as "active."[3]

15.    *Third*, not all brand locations ultimately joined Olo's platform, despite the repeated claims (in the IPO Offering Documents and elsewhere) that Olo had "100% franchisee participation" and that its products were adopted by all of the restaurant locations within a brand. In truth, numerous individual locations frequently opted not to use Olo's technology.  Internal documents show ████████████████████████████████████ and that ██████ ████████████████████  As such, the Company had a policy of ██████████████ "████████████████████████████" Internally, Defendants Glass and Benevides characterized these problem brands as "████████████████" and ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

---

[2]    Besides Olo's three "core" modules (Rails, Dispatch, Ordering), Olo's other modules during the Class Period were Network, Host, Guest Sentiment, Marketing Automation, Customer Data Platform ("CDP"), Sync, and Olo Pay.

[3]    Defendants were well aware of the lower active locations numbers than those reported. In a further attempt to increase the publicly reported numbers, in early May 2021, ████████ ████████████████████████████████████████████████████ ████████████████████████████████████ As a result, the number of active locations increased.

16.     It is clear that this campaign to misrepresent the nature and number of active locations was done to cover up what can only be described as a desperate situation at the Company. While Olo rode a wave of profitability and revenue due to the pandemic, by the summer of 2021, that wave was crashing and the slowdown in Olo's business was apparent to Olo executives, including Defendants Glass and Benevides.   The following timeline adequately paints the downward spiral at the Company during the Class Period:

- By June 2021, ██████████████████████████████████

- In July 2021, ████████████████████████████████████
  ███████

- By September 2021, ██████████████████████████████
  ██████████████████████████████████████████████████
  ████

- By October 2021, ███████████████████████████████████
  ████████████████████████████████

- In November 2021, ████████████████████████████████
  ██████████████████████████

- In December 2021, ████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████

- In March 2022, ████████████████████████████████████
  ███████████████████████

17.     Nonetheless, throughout the Class Period, Defendants projected lofty – and unattainable – revenue growth, going so far as to *raise* FY 2022 revenue guidance on February 23,

2022, despite simultaneously internally projecting a revenue shortfall.   The guidance was unattainable and fictitious.   Indeed, by the summer of 2022, as Benevides put it bluntly "██████ ██████"

18.   Adding to the troubles at the Company during the Class Period was the fragile relationship it had with Subway, its largest client both by revenue and active locations count, purportedly accounting for approximately 31% of the Company's active locations at the time of the IPO.   To begin with, in February 2020, Olo announced that "Subway's network of more than 20,000 U.S. restaurants" had signed up for Olo's Rails module. Despite that claim, as well as Defendant Glass' claim that individual brand locations "*always* go[] live really *all at the same time*" and the IPO Offering Documents' claims about brand "*100% franchisee participation*," at the time of the IPO, Olo had only contracted with ████████████████████████████ ██████████████████ Subway locations.

19.   Furthermore, Subway was always a shaky client and Defendants knew that ████████ ████████████████████████████████ Subway only signed up for one Olo product (Rails) and had no interest in other products. ███████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████ Ultimately, that is what happened.

20.   On ████████████ Subway informed Olo that it was terminating its relationship with Olo in favor of developing the same software in-house. ████████████████████ ████████████████████████

21.   Instead of coming clean about Subway, Defendants opted to mislead. ████████ ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████ Next, in Olo's FY 2021 Form 10-K, filed with the SEC

on February 25, 2022, Defendants issued a misleading risk warning, merely warning about a

hypothetical risk that had ***already*** come to pass:

> In addition, ***if*** our customers . . . reduce the number of locations using our
> platform, then our revenue ***may*** decline and our results of operations ***may***
> be harmed. Customers ***may*** not renew their contracts with us or reduce their
> use of our platform for any number of reasons, including . . . ***if they decide***
> ***to build their own solution internally*** . . .[4]

22.    In fact, this risk had already come to pass with respect to other Olo brand clients as

well.  For example, ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████ As stated best by one Olo employee (upon learning of

Subway's departure): ████████████████████████████████████████████

██████████████████████████████████████

23.    The inability of Olo to attract and retain enterprise customers (and certainly ████

████ customers) would have been fatal to its market perception and stock price and so Defendants

continued to mislead investors during the Class Period.  In fact, against the backdrop of Olo's

---

[4]    It is black letter law that "risk disclosures are [themselves] misleading where [a] company
warns only that a risk ***may*** impact its business when that risk has already materialized."  *In re
Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013)
(emphasis added); *see also In re Bioscrip, Inc. Sec. Litig.*, 2015 WL 3540736, at *6 (S.D.N.Y.
June 5, 2015) (risk warnings offer no protection "because . . . they described what had become
a *fait accompli*"); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y.
Mar. 25, 2013) (rejecting defendant's reliance on alleged cautionary language because plaintiff
alleged "that the risk factors were not merely hypothetical (*i.e.*, they 'could' happen), but were
in fact happening—indeed, had already happened").

inaccurate active locations count, sharp – yet undisclosed – slowdown in new bookings, onboarding failures, the complete loss of Subway ████████████████████████████████ ███████████████████████ and the broader restaurant industry shift toward building software solutions in-house, Defendants raised the stakes even higher.  On the Company's 4Q and FY 2021 earnings call on February 23, 2022, Defendants began touting "a 100x growth opportunity . . . representing a TAM of more than $15 billion," an unattainable goal more than twice what Defendants had touted in Olo's IPO Offering Documents and stated that in 2022 Olo would "target[] a similar number of net [active locations] adds as we achieved in 2021."

24.     This "TAM" was dependent entirely on massively growing the number of active locations and capturing the lion's share of enterprise customers.  Both of these were known to be impossible within the Company.  Indeed, ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████

25.     Thus, the guidance, the revenue growth projections, and the TAM were entirely illusory as the market would eventually learn.  The truth began to be revealed after the markets closed on August 11, 2022.  That day, Defendants disclosed that they had known about Subway's then-pending departure prior to the issuance of their FY 2022 guidance on February 23, 2022 and announced that 2,500 Subway locations, which heretofore had been utilizing Olo's Rails product, had integrated directly with third-party marketplaces and that the remaining Subway locations would be removed in 4Q 2022 and 1Q 2023.  As a result, Defendants announced that the Company

would experience *virtually no active locations growth in 2022*, correcting earlier misstatements about "targeting a similar number of net adds [15,000] as we achieved in 2021."

26.     More broadly, even though Defendants did not explicitly reveal the true extent of their inaccurate reporting of Olo's active locations count, as well the Company's failure to book new active locations and onboard existing contracted locations, the undisclosed risk of those inaccuracies materialized on the same day – August 11, 2022 – when Defendants were forced to significantly reduce FY 2022 revenue guidance.

27.     Though Defendants attempted to blame "macroeconomic challenges," such excuses fall flat in the face of (1) Olo's claims just weeks before the end of 2Q 2022 that a recession would serve as a "tailwind" for Olo's business as consumers "trade down from the high-end restaurants to the lower-cost restaurants," *i.e.*, fast-food restaurants, Olo's bread-and-butter brand clients and (2) the fact that Olo's chief competitor – Toast, Inc. ("Toast") – announced earnings the *same day* and, despite citing the "macroeconomic backdrop," *raised* its guidance. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

28.     In response to these revelations, Olo's common stock price plummeted 36% the following day, from a closing price of $12.99 per share on August 11, 2022, to a closing price of $8.26 per share on August 12, 2022, erasing more than $480 million in shareholder value.  Olo's shares have never recovered, trading below $7.00 per share as of the date of the filing of this Complaint.

## III.    JURISDICTION AND VENUE

29.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

30.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

31.    Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(a)).  At all relevant times, Olo was headquartered and conducted business in this District at 285 Fulton Street, One World Trade Center, 82nd Floor, New York, NY 10007.  In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  In addition, at all relevant times, Olo's common stock was offered, sold, and traded on the New York Stock Exchange (the "NYSE"), which is located in this District.

32.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of a national securities exchange.

## IV.    PARTIES

### A.    Plaintiff

33.    Lead Plaintiff STA-ILA, as set forth in its certification (ECF No. 16-3), purchased Olo's common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements alleged herein.

**B.      Defendants**

34.     Defendant Olo is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.  Olo provides software to restaurants to assist with online ordering and food-delivery coordination.  Olo's stock trades on the NYSE under the ticker "OLO."  During the Class Period, Olo, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, violated the securities laws and contained materially false and misleading statements.

35.     Defendant Glass founded Olo in 2005 and was, at all relevant times, Olo's CEO and a member of Olo's Board of Directors.  Throughout the Class Period, Glass signed all of the Company's SEC filings (including the IPO Offering Documents) and made statements in the Company's press releases, earnings conference calls, and at other public events, which, as alleged herein, violated the securities laws and contained materially false and misleading statements.  At all relevant times, Glass made the false and misleading statements with scienter.

36.     Defendant Benevides was, at all relevant times, Olo's CFO.  Previously, Defendant Benevides held positions with Olo as Senior Vice President and Vice President of Finance. Throughout the Class Period, Benevides signed multiple of the Company's SEC filings (including the IPO Offering Documents) and made statements in the Company's press releases, earnings conference calls, and at other public events, which, as alleged herein, violated the securities laws and contained materially false and misleading statements.  At all relevant times, Benevides made the false and misleading statements with scienter.

37.     Defendants Glass and Benevides are referred to herein together as the "Individual Defendants."  Due to the Individual Defendants' positions at the Company, they possessed the power and authority to control the contents of Olo's filings with the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional and individual

investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be materially false, misleading, and incomplete prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individuals Defendants knew that the adverse facts specified herein had not been disclosed to, but were being concealed from, the public, and that the statements at issue were materially false, misleading, and incomplete when made.

38.     Olo, Glass, and Benevides are collectively referred to herein as "Defendants."

## V.    SUBSTANTIVE ALLEGATIONS

### A.  Overview of Olo and Its Business Model

39.     Olo, short for "Online Ordering," was founded in 2005 by Defendant Glass with seed money from various investment firms (many of whose members went on to sit on the Olo Board of Directors).

40.     On March 17, 2021, Defendants commenced Olo's IPO, issuing 20,700,000 shares of Olo Class A common stock to the investing public at $25.00 per share, all pursuant to the Offering Documents, and raising gross proceeds of $517.5 million ($485.5 million net of underwriting discounts and commissions).   By then, Olo's business encompassed two information technology ("IT") solutions for generating online and mobile ordering: "Order Management" and "Delivery Enablement."[5]

41.     Olo's "Order Management" IT solution connects restaurants directly to consumers through multiple modules.   Most prominently is Olo's "Ordering" module (hereinafter

---

[5]     "IT Solutions" are sets of services, software, and/or hardware that help businesses manage complex technical operations.

"Ordering"), which allows consumers to interact directly with a restaurant location through a suite of digital commerce channels, including restaurant-branded mobile applications and websites, as well as telephonic orders.  This module allows for the storage and hosting of restaurant menus, creation and management of promotional offers and loyalty/reward programs, as well as the synchronization of menu item availability, the modification of ingredients, and per-location pricing.  Connected to each restaurant's point-of-sale system,[6] Ordering serves as the centerpiece of Olo's business model connecting restaurants directly to consumers.

42.     At all relevant times, Olo's other major IT solution was its "Delivery Enablement" solution, which connects restaurants indirectly to consumers through third-party applications. There are two significant modules within this solution: "Dispatch" module (hereinafter "Dispatch") and "Rails" module (hereinafter "Rails"), the module used by Subway.

43.     Dispatch enables orders directly from a restaurant's digital ordering channel – such as a restaurant's website or application – but then delivers the order through a third-party delivery service provider ("DSP").  Rails enables the integration of a restaurant's menu and pricing into a third-party application or website for pick-up or delivery by that third-party.  According to Defendants, during the Class Period, Olo's third-party Rails partners included "all major national digital ordering aggregators," including Uber Eats, Caviar, DoorDash, Grubhub, Postmates, Seamless, and Uber Eats, each of which were also members of Olo's DSP network, as well as "regional and local aggregators that are meaningful to operators in specific geographies."

44.     During the Class Period, almost of all of Olo's revenue was derived from what Olo calls "platform revenue," which includes both subscription and transaction-based revenue streams

---

[6]     A "point-of-sale" system is typically a combination of hardware and software that allows businesses to accept payments from customers and keep track of sales.

placed using all of the various models within both its Order Management and Delivery Enablement

Solutions.   Subscription revenue is earned from fixed monthly subscription fees from each

restaurant location that subscribes to Olo's Ordering module.   Additionally, some restaurant

locations purchase an allotment of monthly orders for a fixed monthly fee and then pay an

additional fee for each excess order utilizing the Company's Ordering module, which Olo also

classifies as subscription revenue.   Transaction revenue is earned from individual orders on a per

order, per location basis from each restaurant location that subscribes to Olo's Dispatch and Rails

modules.   In other words, when a customer orders from an Olo-brand partner – either directly,

when in excess of an agreed-upon monthly allotment, or indirectly through a third-party – Olo

receives a cut.   Therefore, as "transaction volume" (*i.e.*, the quantity of orders placed utilizing one

of Olo's modules) increases, so too does Olo's revenue.[7]

45.   During the Class Period, Olo's restaurant clients were comprised of brands across

a spectrum of restaurant types, including: quick service restaurants ("QSRs") (another term for

fast-food restaurants); fast casual restaurants; casual dining restaurants; family dining restaurants;

and coffee and snack food restaurants.   And, as noted below, the Company continually stressed its

focus on and the importance of "enterprise brands" (those brands with over 50 locations).

46.   However, the majority of Olo's restaurant clientele consisted of QSRs, including

Subway, Dairy Queen, Krystal, Jimmy John's, Jack in the Box, Checkers, Del Taco, and Panda

Express, a statistic Defendants did not expect would change.   As Defendant Glass explained on

the August 10, 2021 earnings call:

---

[7]     Olo has a second, far smaller source of revenue: "professional services and other," which primarily consists of fees for platform implementation services.   During the Class Period, approximately 4% of Olo's revenue  was "professional services and other" revenue, while the rest was "platform" revenue.

> As the largest component of the restaurant industry by both locations and transactions, QSR brands represent the greenfield industry segment[8] that we love for its high average location count, industry transaction share and cornerstone commitments to convenience.

47.     The Company generally held three-year contracts with continuous one-year automatic renewal periods, which it claimed provided "visibility into [the Company's] future financial performance."  *See* the IPO Offering Documents and all 10-K and 10-Qs filed during the Class Period.

### B.     Active Locations, a Key Metric

48.     Defendants steadfastly emphasized three "key metrics" for the Company: ***active locations***, ARPU, and net revenue retention.  Defendants long defined "active locations" as:  "a unique restaurant location ***live*** on the platform with at least one product module.  So for example, if an individual restaurant location subscribes to 3 modules, such as Ordering, Dispatch and Rails, we would count that location once as a unique active location."  Olo Inc., 1Q 2021 Earnings Call (May 11, 2021).  In Olo's 1Q 2021 Form 10-Q, Defendants clarified the precise meaning of "live" when used in the context of "active locations": "We define active locations as a unique restaurant location that ***is utilizing*** one or more modules in a given quarterly period."  Defendants would go on to repeat this exact definition in every quarterly and annual filing through the end of the Class Period.  Indeed, as Defendant Benevides stated plainly on the 2Q 2022 earnings call, "[W]e count a location active in the quarter if they've had an order in the quarter."

49.     Importantly, Defendants repeatedly emphasized that when Olo signed a new brand customer, Olo products would be deployed in "***all***" of that brand's locations.  For example, in the IPO Offering Documents, Defendants claimed that "In every one of our customer relationships,

---

[8]     In this context, a "greenfield" investment refers to an investment opportunity in a market that has never been commercially explored.

we are the exclusive provider of direct digital ordering services **with 100% franchisee participation**."   Later, at the January 10, 2022 ICR Conference, Defendant Benevides claimed "We also contract directly, or always contract directly, with brand headquarters to long-term exclusive contracts **and secure all locations within the brand** . . ."  On the 1Q 2022 earnings call, held on May 10, 2022, Defendant Glass stated that "we always sell to the brand, **and then we're adopted across the entire location base**, whether those are corporate owned or franchise owned." When asked at the May 23, 2022 JPMorgan Global Technology, Media & Communications Conference "when Olo signs on a large enterprise, are all of the franchises also obligated to come onto the platform? And what does that process look like?" Defendant Glass responded:

> So we sell into one brand decision maker and **then we['re adopted by all of the** restaurant locations within that brand, the corporate-owned locations, the franchise locations, the mix of the 2, however, they're set up in their organizational structure . . . **So yes, we are deployed in all locations.**

And at the William Blair Growth Stock Conference held on June 6, 2022 Presentation, Defendant Glass claimed yet again that:

> Unlike other enterprise software businesses where the sales teams works to add a single location or division and expand to others, Olo enters into relationships at the brand's corporate level and secures exclusivity across all company owned and franchised locations. And this enables us to deploy our modules across **all existing and new brand locations** without any additional sales and marketing costs and upsell new offerings to the brand itself rather than each individual location.

50. Similarly, in his answer to the above stated question from the JPMorgan Conference, Defendant Glass claimed that "And then brands are always going live really **all at the same time** to create that consistent experience everywhere."

51. Defendants also went to great lengths to emphasize the direct connection between active locations and revenue.  For example, in Olo's 4Q & FY 2021 press release issued on Form 8-K on February 23, 2022, Defendants explained that the "active location count is an important

metric that demonstrates the growth and scale of our overall business and reflects our ability to

attract, engage, and monetize our customers and thereby *drive revenue*, as well as provides a base

to expand usage of our modules."  More plainly, Defendants repeatedly issued statements like the

following by Defendant Benevides (from the 1Q 2021 earnings call held on May 11, 2021): "Our

ability to grow revenue is a function of adding *more* restaurant locations to the platform."

### C.    Olo Rode a Wave of Covid-Era Popularity to Raise Over $500 Million in its IPO

52.    With the onset of Covid-19 at the start of 2020, demand for restaurant software

solutions skyrocketed as in-person dining came to a halt and the entire restaurant industry was

forced to resort to other methods of sale – particularly mobile and online ordering – in order to

survive.  That year, Olo's revenue essentially doubled from the year prior, growing to $98.4 million

from 2019's $50.7 million.  Profit similarly followed, doubling from  $35.1 million in 2019 to

$79.8 million in 2020.

53.    Olo was in the right place at the right time.  At the start of 2021, Olo seized on this

apparent momentum to become a publicly-traded company.

54.    On February 19, 2021, Defendants filed an initial registration statement on Form

S-1 with the SEC and on March 15, 2021, Defendants filed an amended registration statement on

Form S-1/A.  The amended registration statement was declared effective on March 16, 2021 and

incorporated by reference any future filings made with the SEC, including a prospectus, which the

Company filed with the SEC on Form 424B4 on March 18, 2021.

55.    The IPO Offering Documents made a number of significant claims about the

Company. First, the Offering Documents claimed Olo had "64,000 active locations" as of

December 31, 2020, 91% of which came from "enterprise brands" (*i.e.*, "those brands [with] 50 or

more locations").  Indeed, the Offering Documents claimed that Olo's enterprise customers were

so "highly loyal" that "[o]ver the last five years, on average nearly 99% of our enterprise brand customers . . . have continued using our Ordering module each year."

56.    Next, the Offering Documents claimed that "[i]n every one of our customer relationships, we are the exclusive provider of direct digital ordering services *with 100% franchisee participation*," adding that:

> Unlike other enterprise software businesses, where the sales team works to add a single location or division and expand to others, we enter into relationships at the brand's corporate level and secure exclusivity across *all* company-owned and franchise locations.

57.    Finally, Defendants boasted about Olo's $7 billion TAM "based on our current product offerings and focus on enterprise restaurants primarily in the United States."

58.    On the strength of these statements, Olo's IPO Offering Documents sold the public 20,700,000 shares of Olo common stock at an offering price of $25.00 per share.[9] All told, Defendants raised almost $520 million in the IPO.  In addition, as the Offering Documents provided, Defendant Glass received a bonus of up to $2,335,484 for consummating Olo's IPO.

**D.    Olo Repeatedly Announced False Active Locations Numbers**

59.    From the issuance of the IPO Offering Documents and Roadshow materials and throughout the Class Period, Defendants' active location counts, as well as the very definition of active locations, were materially false and misleading in three critical respects.

**1.    *Defendants prematurely included locations not yet onboarded***

60.    *First*, despite repeatedly defining an "active location" as "a unique restaurant location *live* on the platform with at least one product module" and claiming brand locations "*always* go[] live really *all at the same time*," Olo prematurely included individual restaurant

---

[9]    Olo's IPO Offering Documents provided for 18,000,000 shares plus a "greenshoe" or overallotment of 2,700,000 shares, which the underwriters exercised.

locations in its active locations count – and informed investors of those locations' onboarding – before those locations had actually begun using any of Olo's products.  The FAC's CW1 corroborates this allegation, as do Defendants' own internal documents.

61.     CW1 was a Delivery Solutions Manager within Olo's Dispatch module segment from December 2020 to August 2021 and reported to Olo's Vice President of Delivery.  CW1's primary role was to help onboard new clients to Olo's Dispatch service.  According to CW1, after signing a new customer, CW1 was instructed to prematurely report the ***total*** contracted number of individual locations as active locations, before all of those locations were ever truly "active."  As an example, Defendants announced on the August 10, 2021 earnings call that QSR brand Jack in the Box had joined Olo on or before June 30, 2021.  Jack in the Box had over 2,200 locations at the time, all of which were included in Olo's active locations count in Olo's 2Q 2021 Form 10-Q, press release, and earnings call.[10]  However, according to CW1, in truth, by the end of 2Q 2021, Jack in the Box really only ***had at most 200 live locations*** utilizing Olo's Dispatch platform.  And while the initiation of Olo's module proceeded to ramp up, by the time CW1 left Olo, approximately 30% of Jack in the Box locations were still not utilizing Olo's module.

62.     CW1 also reported that upon joining Olo, CW1 took over the Dispatch accounts for two small regional chains of casual dining restaurants, Berg Hospitality Group, located in Texas, and Newport Restaurant Group, located in New England.[11]  According to CW1, multiple Berg

---

[10]     According to Jack in the Box's 2021 annual report filed on SEC Form 10-K, as of October 3, 2021, it had "2,218 Jack in the Box quick-service restaurants, primarily in the western and southern United States, including one in Guam."

[11]     According to archived versions of their websites, as of August 2021, Berg Hospitality Group had seven locations and as of July 2021, Newport Restaurant Group had 13 locations.  *Reservations*, BERG HOSP. GRP., http://web.archive.org/web/20210803070350/https://www.berghospitality.com/ (last visited Jan. 11, 2023); *Our Restaurants*, NEWPORT REST. GRP., http://web.archive.org/web/20210725160848/https://www.newportrestaurantgroup.com/dining-options (last visited Jan. 11, 2023).

locations were counted as "active," despite the fact that those restaurant locations had yet to begin utilizing Olo's module.  Moreover, by the time of CW1's departure in August 2021, CW1 stated that an accurate location count for Berg had still not been completed.  With respect to Newport, CW1 stated that upon taking over that account, CW1 discovered that multiple locations were not open for business, including several that were still under construction, and yet were marked as "active."

63.     Defendants' own documents reveal numerous other examples of the exact same type of active locations fraud, starting with the IPO Offering Documents and Roadshow materials, both of which claimed that as of the date of the IPO, Olo had ***fully*** onboarded customers including Subway, Checkers, and Dairy Queen.  However, internal Olo ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

64.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

## 2.     *Defendants included inactive locations in Olo's active locations count*

65.     *Second*, Olo included ***inactive*** locations in its active locations count, a fact corroborated by both CW1 and Defendants' own deposition testimony.

66.     According to CW1, Olo had "various ways" of tracking whether a client had its Dispatch or Rails modules turned on and the quantity of orders coming through each.  In fact, in monthly Delivery Enablement Solutions meetings – which included participants from both Rails and Dispatch module teams – CW1 noticed discrepancies between the number of reported active locations and the restaurant locations actually using Olo's modules.  As CW1 explained, these discrepancies were due, in part, to individual locations turning off their Olo modules, either because of Olo's module issues in keeping up with customer demand – which CW1 found to be the case with certain Berg Hospitality Group locations – or when restaurants shut down during the Covid-19 pandemic.  In fact, when CW1 asked CW1's supervisor at one of the meetings whether they should correct the inaccurate active locations count, CW1 was instructed to continue reporting all locations as active because "they'll turn it [Olo's modules] on next week for all we know." Moreover, discovery has also revealed a June 14, 2021 note penned by CW1 in which CW1 flags for CW1's supervisor "Newport Restaurant Group as the brand turned Dispatch off entirely."

67.     More broadly, however, despite publicly defining an active location to require actual activity – *i.e.*, be "***live***" or in Defendant Benevides' words "[W]e count a location active in the quarter if they've had an order in the quarter" – ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



**3.** ***All locations did not sign on to Olo's products***

68.     *Third,* not all brand locations within a single chain joined Olo's platform, despite

Defendants' repeated statements that Olo sells to and is deployed in "***all locations***" whether

---

[12]     Later  in  the  deposition, ███████████████████████████████████████
███████████████████████████████████████████████████████████████████

corporate-owned, franchised, or a mix of the two.   CW2 and Defendants' own documents corroborate this allegation.

69.     Olo rarely (if ever) signed up "all locations."   On April 2, 2021, just two weeks after the IPO Offering Documents claimed that "In *every one* of our customer relationships, we are the exclusive provider of direct digital ordering services *with 100% franchisee participation*," Olo's ███████████████████████████████████████████ to Defendant Glass' Chief of Staff that ████████████████████████████████████████████████████ In fact, an ████████████████████████████████████████████████████████ ██████████████████████████████████████████

70.     Against this backdrop, CW2 was a Deployment Manager at Olo from March 2021 through February 2022 and reported to an Olo Director of Deployment.   CW2's role involved onboarding new restaurant locations and project management to ensure each product the customer selected was implemented.   CW2 served as a "point person" between the customer and Olo product specialists.   CW2 worked across all Olo modules, from Ordering (within Olo's Order Management Solutions) to Dispatch and Rails (within Olo's Delivery Enablement Solutions).

71.     QSR chain CKE Restaurants fell under CW2's purview.   On November 9, 2021, Olo announced CKE as a new brand client in both a press release announcing 3Q 2021 earnings, as well as on that day's earnings call.   CKE, the parent company for Carl's Jr. Restaurants LLC, Hardee's Restaurants LLC, as well as multiple other fast-food chains, had approximately 4,000 individual locations at the time, over 90% of which were franchises.[13]   According to CW2,

---

[13]     According to an archived version of CKE's website, as of November 2021, CKE had "over 3,800 franchised or company-operated restaurants in 44 states and 43 foreign countries and U.S. territories.   *Our Brands*, CKE RESTS., http://web.archive.org/web/2021 1109222135/https://www.ckr.com/ (last visited Jan. 11, 2023).   According to one source, over

numerous of these franchises decided not to use Olo's technology.  As a result, Olo was installed in only about 50% of overall CKE locations ████████████████████████████████████████ Yet Defendants included 100% of the CKE locations in the active locations count reported to the investing public.

72.   ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████ [14] ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

73.   Two weeks later, ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████

74.   Indeed, the documentary evidence to date is replete with examples of ████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

90% of CKE locations are franchises.  *See CKE Restaurants Franchise Overview*, FRANCHISING.COM, https://www.franchising.com/ckerestaurants/ (last visited Jan. 11, 2023) ("The Carl's Jr./Hardee's system is now 93 percent franchised.").

[14] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

75. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

**E.     The Ever-Present "Build vs. Buy" Trend and Threat**

76.     As stated herein, Olo was highly dependent upon "enterprise" restaurant brands both for the real benefits they brought (number of locations, amount of revenue) and the benefits to the perception of Olo in the market they added (that the market saw that Olo could get and retain large customers).   Throughout their public statements from the IPO forward, Defendants repeatedly stressed the importance of enterprise brands to Olo.  Indeed, the $7 billion TAM figure given by Defendants in the IPO Offering Documents is based almost entirely on potential enterprise clients.

77. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

78.     Building an in-house online ordering platform and hiring the necessary persons to create it and maintain it takes time.  When the pandemic hit, very few restaurants had already

developed their own comprehensive in-house online ordering systems.  As restaurants had to adapt quickly to the Covid-19 challenges or shut down, they by and large did not have the time to develop software internally.  Therefore, vendors such as Olo were attractive and restaurants rushed into Olo in 2020.  But Olo was a band aid for many of the enterprise customers that it did attract, and Defendants were well aware of that fact.

79. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

80. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

81.     And this was ultimately what Subway chose to do.  In January 2022, it officially
informed Olo of its plans to leave Olo's product in favor of an in-house platform.  However, this
was always a real possibility for Subway as a customer.[15] ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

82.     ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

83.     ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

84.     ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[15] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

85.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

86.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

**F.**   **Subway's Importance as Olo's Largest Client Brand by Revenue and Location Count**

87.   On February 12, 2020, Olo issued a press release announcing a partnership with Subway to connect the mega-sandwich chain to third-party marketplaces via Olo's Rails module.

According to the press release, "The partnership allows Subway's network of more than **20,000** U.S. restaurants to more seamlessly handle digital orders from third-party marketplaces."

88.     Immediately, Subway, by utilizing the Rails module to integrate with DoorDash and Uber Eats, became Olo's largest brand partner and a source of at least ██████ in annual recurring revenue.

89.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

90.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

91.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

92.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████

93.     Every single Olo SEC Form 10-Q and 10-K filed to date states that "[Olo's] contracts typically have initial terms of ***three years*** or longer, with continuous one-year automatic renewal periods, ***providing visibility into our future performance***."  Therefore, at the start of 2022, the third year of Subway's contract with Olo, securing a renewal of the Company's largest brand client would have been a high priority for Defendants.  This was far from occurring.

94.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

95.     At the ███████████████████, ***Subway informed the Olo group that Subway had decided to terminate its relationship with Olo***.

96.     Leaving no room for ambiguity, Subway's representatives provided to Olo the ███████████████████ which  stated  that  Subway ██████████████████████████ ████████████████████ and that ████████████████████████████████ ███████████████

97.     According to Juan George, Subway's representatives explained at the meeting that they were leaving Rails because Subway was ████████████████████████ in reference to the ██████████ of Subway ██████████████████████████ ██████████████

98.     Jon Graves, who had attended the Executive Business Review, later summarized the meeting in a chat message to Juan George:

99.     ████████████████████████████████████████████████

100.    ████████████████████████████████████████████████

**G.     Olo Was Already Experiencing a Slowdown Soon After the IPO**

101.    ████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

102.   █████████████████████████████████████   ███████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████

103.   As discussed herein, despite these serious concerns about the Company's revenue,

performance, and future prospects, Defendants gave no hint of this to the market in the August 10,

2021 investor call.

104.   ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████

105.   ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



106. ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████ Again, as discussed herein, despite these

serious concerns about the Company's revenue and future prospects, Defendants gave no hint of

this to the market on the November 9, 2021 investor call.

107. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

108. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████ Therefore, Defendants knew that, even without disclosing the January 2022

loss of Subway as a customer, they were in for questions and potentially negative responses from

investors.  Shockingly, on that call, Defendants increased the Company's FY 2022 guidance.

109. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

110.    Once again, none of this was mentioned on the May 2022 investor call, Form 10-

Q, or earnings press release.  By ██████████, as Defendant Benevides put it succinctly, ████████

████████

**H.     Defendants Knew Their Core Products Were Saturated and Were Thus
        Shifting Course to a New Product**

111. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

112. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

113.

114.

115.

███████████████████████████████████

██████████████████████

### I.     Defendants Made Numerous Material Misstatements and Omissions

116.    Throughout the Class Period, in numerous SEC filings and public statements, Defendants issued a host of materially false and misleading statements about Olo's active locations, the nature of its relationship with Subway, its prospects with enterprise customers, and its financial state of affairs, including FY 2022 guidance.

117.    Defendants' actionably false or misleading Class Period statements are separately enumerated below and further set out in Exhibit 1 hereto.

#### 1.     *Throughout the Class Period, Defendants Hyped Olo's Growing Number of Active Locations, Materially Misleading Investors*

118.    Starting with the IPO Offering Documents and continuing throughout the duration of the Class Period, on every earnings call, in every SEC Form 10-K and 10-Q, and in numerous press releases (including those attached to SEC Form 8-K), presentations, and investor conferences, Defendants emphasized and touted the Company's active locations count, painting a rosy picture of ever-upward active locations growth (in addition to reiterating the Company's definition of "active locations" in no fewer than twelve of the aforementioned SEC filings and public statements).

119.    Indeed, Defendants pitched their active locations metric as more than a tracking tool of historical and present performance, but one that additionally "demonstrates the growth and scale of our overall business and reflects our ability to attract, engage, and monetize our customers and thereby drive revenue, as well as provides a base to expand usage of our modules."[16]

---

[16]     *See, e.g.,* Olo Inc., 4Q & FY 2021 Press Release, attached to SEC Form 8-K (Feb. 23, 2022) (characterizing "Active Locations" as one of three "Key Business Metrics"); Olo Inc., 1Q

120.    The misstatements concerning active locations during the Class Period include:

**a.      March 15 & 18, 2021 IPO Offering Documents**

121.    According to the Offering Documents, "As of December 31, 2020, we had approximately 400 brand customers representing over 64,000 active locations using our platform." The Offering Documents provided examples of brand partners, including Subway and Checkers.

122.    The Offering Documents went on to explain that

> Unlike other enterprise software businesses, where the sales team works to add a single location or division and expand to others, we enter into relationships at the brand's corporate level and secure exclusivity across *all* company-owned and franchise locations.

123.    Additionally, the Offering Documents claimed that "In every one of our customer relationships, we are the exclusive provider of direct digital ordering services ***with 100% franchisee participation***."

**b.      March 2021 IPO Roadshow Materials**

124.    In advance of Olo's March 2021 IPO, Defendants issued a Roadshow video, repeating multiple of the claims issued in Olo's Offering Documents, including repeating the claim about Olo's 64,000 locations and exclusivity across "***all*** company-owned locations." The Roadshow materials also cite to a number of Olo customers, including Dairy Queen.

**c.      May 11, 2021 Press Release, Earnings Call, Form 10-Q**

125.    After the market closed on August 10, 2021, Defendants issued a press release and Form 10-Q disclosing its 2Q 2021 earnings, signed by Glass and Benevides.  According to the press release, Olo's "[e]nding active locations increased 42% year-over-year to approximately

---

2022 Press Release, attached to SEC Form 8-K (May 10, 2022) (characterizing "Active Locations" as one of three "Key Performance Indicators").

69,000" locations, a claim also stated in the Company's Form 10-Q and on the earnings call that day.

126.    The press release provided that Olo "define[s] active locations as a unique restaurant location that is utilizing one or more modules in a given quarterly period." This definition was, in fact, included in all SEC filings during the Class Period, including the Form 10-Q filed the same day.

<strong>d.      August 10, 2021 Press Release, Earnings Call, Form 10-Q</strong>

127.    After the market closed on August 10, 2021, Defendants issued a press release and Form 10-Q disclosing its 2Q 2021 earnings, signed by Glass and Benevides. According to the press release, Olo's "ending active locations increased 30% year-over-year to approximately 74,000" locations, a claim also stated in the Company's Form 10-Q.

128.    On the earnings call that day, Defendant Benevides reiterated that "[i]n terms of key metrics, we ended the quarter with approximately 74,000 active locations on the platform, a 30% increase year-over-year and a 7% increase sequentially."

129.    On the same earnings call, Defendant Glass touted the 2Q 2021 onboarding of Jack in the Box and compared it to Olo's success with its top brand client, Subway:

> A great example of customers realizing Dispatch's value was the Q2 launch of Jack in the Box as a Dispatch-only deployment, which will enhance their existing digital ordering for takeout program. This deployment with Jack in the Box further demonstrates Olo's ability to land major enterprise brands with one product module to initiate the customer relationship. Just as Subway launched with Olo Rails, Jack in the Box is another major enterprise brand launching with Olo Dispatch and gaining familiarity with Olo's broader capabilities and overall platform security, stability and extensibility. Jack in the Box is also an exciting example of our success in the quick service restaurant, or QSR, category.

<strong>e.      October 21, 2021 Wisely Acquisition Press Release and Call</strong>

130.    After the market closed on October 21, 2021, Defendants issued a press release that again reiterated the 74,000 active restaurant locations.

131.    On the conference call with analysts later that day, Defendants repeated the misstatement and 74,000 number.  Similarly, on the same call, Defendant Benevides stated:  "I think the big takeaway here is a lot of upside when you think about the 75,000 – 74,000 restaurant locations on the platform today."

**f.     November 9, 2021 Press Release, Earnings Call, Form 10-Q**

132.    After the market closed on November 9, 2021, Defendants issued a press release and SEC Form 10-Q disclosing its 3Q 2021 earnings, signed by Glass and Benevides.  That same day, the Company also conducted an earnings call with analysts.

133.    As with the prior quarter's earnings announcement, this press release also claimed that Olo had onboarded another major brand client, "CKE Restaurant Holdings, Inc., parent company to leading QSR brands Carl's Jr. and Hardee's," and stated that "[e]nding active locations increased 26% year-over-year to approximately 76,000."

134.    On the same call, in response to Stifel, Nicolaus & Company analyst Brad Reback's question – "As we look forward, what should we think of as the durable growth rate of the business? – Benevides stressed that "As we look ahead, we see a lot of opportunity for growth and a lot of different levers to pull to get there. *I think in the most simplest form, continuing to add more active locations to the platform*."

**g.     January 10, 2022 Presentation at ICR Conference**

135.    After the market closed on January 10, 2022, Defendants presented at the ICR Conference.  At that conference, Defendant Glass stated, "[t]oday we are a proud partner to over

500 restaurant brands representing 76,000 individual restaurant locations to enable consumers to order ahead, pay ahead and get their food faster for takeout, delivery and more."

136.    At the same conference, Defendant Benevides stated, "[w]e also contract directly, or always contract directly, with brand headquarters to long-term exclusive contracts ***and secure all locations within the brand***, ensuring end consumer experience is consistent, regardless of which location within a brand the end consumer interacts with."

### h.    February 23 & 25, 2022 Press Release, Earnings Call, Form 10-K

137.    After the market closed on February 23, 2022, Defendants issued a press release for Olo's 4Q and FY 2021 earnings.  That same day, the Company also conducted an earnings call with analysts.  According to the press release, Olo's "[e]nding active locations increased 23% year-over-year to approximately 79,000" locations, which was also stated in the Company's SEC Form 10-K, filed on February 25, 2022 and signed by Glass and Benevides.

138.    On the conference call with analysts, Defendants repeated the misstatement, with Defendant Glass stating that "[w]e ended the year with our platform connecting approximately 79,000 active restaurant locations . . ."

### i.    May 10, 2022 Press Release, Earnings Call, Form 10-Q

139.    After the market closed on May 10, 2022, Defendants issued a press release and SEC Form 10-Q disclosing its 1Q 2022 earnings, signed by Glass and Benevides.  That same day, the Company also conducted an earnings call with analysts.

140.    According to the press release, Olo's "[e]nding active locations increased 19% year-over-year to approximately 82,000" locations, which was also stated in the Company's SEC Form 10-Q.

141.    On the conference call with analysts later that day, Defendants repeated the misstatement, with Defendant Glass stating "[o]ur ending active location counts increased 19% year-over-year to approximately 82,000, and we surpassed more than 600 restaurant brands utilizing our platform."

142.    On the same call, Defendant Glass also reiterated that "we always sell to the brand, and then we're adopted across the entire location base, whether those are corporate owned or franchise owned."

> **j.    May 23, 2022 Presentation at the JPMorgan Global Technology, Media & Communications Conference**

143.    After the market closed on May 23, 2022, Defendants presented at the JPMorgan Technology, Media & Communications Conference.  When an analyst inquired "when Olo signs on a large enterprise, are all of the franchises also obligated to come on to the platform? And what does that process look like?"  Defendant Glass responded:

> So we sell into one brand decision maker and ***then we['ʼ]re adopted by all of the restaurant locations within that brand***, the corporate-owned locations, the franchise locations, the mix of the 2, however, they're set up in their organizational structure.  And then brands are always going live really all at the same time to create that consistent experience everywhere.  ***So yes, we are deployed in all locations.***

144.    Defendant Glass also reiterated the 82,000 active locations number.

145.    Additionally, Defendant Glass stated that:

> I really believe that we've demonstrated that we can start a relationship with even the largest restaurant brands out there ***with a single module*** and maybe that's a convenient way for them to fortify their internal efforts, prove ourselves out and then expand into a larger deployment.

> **k.    June 6, 2022 Presentation at the William Blair Growth Stock Conference**

146.   On June 6, 2022, Defendants presented at the William Blair Growth Stock Conference.  At the conference, Glass stated that "[a]s of March 21, we are a proud partner to over 600 restaurant brands representing approximately 82,000 individual restaurant locations . . ."

147.   Unfortunately for investors, each of the above statements regarding active locations was false and misleading for three reasons.  *First*, despite repeatedly defining "active locations" as "a unique restaurant location ***live*** on the platform with at least one product module" and claiming brand locations "***always*** go[] live really ***all at the same time***," Olo prematurely included individual restaurant locations in its active locations count (and informed investors of those locations' onboarding) before those locations had actually begun utilizing any of Olo's products.  *Second*, despite Defendants' claims that an active location needed to be "***live***" – in Defendant Benevides' words "[W]e count a location active in the quarter if they've had an order in the quarter" – Defendants included ***inactive*** locations in the Company's active locations count, including privately maintaining two "active locations" classifications for its modules, one that required "activity" to be counted as "active" and one that did not.  *Third,* despite Defendants' repeated statements that Olo sells to and is deployed in "***all locations***" whether corporate-owned, franchised, or a mix of the two, not all brand locations within a single chain joined Olo's platform.

148.   As a result, the definition of what counts as an active location, as well as the active locations numbers, issued by Defendants throughout the Class Period were materially false and misleading.

### 2.   *Defendants Misrepresented the Company's Financial Position Throughout the Class Period*

149.   Despite the mountain of internal documents showing that Defendants, as early as the summer of 2021, knew that Olo was in trouble and could not and would not continue its momentum, Defendants provided the market with rosy financial reports and outlooks.

150.     Indeed, on the October 21, 2021 Wisely acquisition call, Benevides boasted that:

the big takeaway here **is a lot of upside** when you think about the 75,000-74,000 restaurant locations on the platform today.  Our history of success first with dispatch, subsequently with rails in being able to sell effectively and efficiently into that captive audience, **we see a lot of opportunity ahead . . . .**

151.     Benevides made this statement despite the fact that, at the same time, Olo was internally "desperately searching for new, unique locations to add to the platform" and Benevides was complaining about "razor thin" beats, revenue, and deployments.

152.     Within weeks of these internal statements, Defendant Glass told the market, on the November 9, 2021 3Q 2021 earnings call, that "Quarter-over-quarter, we continue to add new locations to our platform as restaurant brands recognize our ability to partner and add value for them."  On that same call, Defendant Benevides summarized "**we're extremely proud of our financial performance this quarter . . . and we're even more excited about our position, the market opportunity ahead of us and the impact we can have . . .**"  He further touted "continuing to add more active locations to the platform."  On that same call, Benevides stated that "**I don't think we've ever been more excited about our sales and deployment pipeline really on 2 fronts in terms of new location adds as well as the various upsell opportunities that have continued to emerge.**"

153.     Again, these statements were made at a time when the Company was desperate for any new locations, when Benevides had serious concerns about a lack of momentum in revenue growth, and when Olo was on pace for the worst second half of the year performance in four years.

154.     In 2022, Defendants continued to make misstatements about the health of the Company.  On the February 23, 2022 4Q & FY 2021 earnings call, Defendants made a host of misstatements including:

- "As we enter 2022, *we've never been more confident in our position and more excited about our opportunity ahead*. *We believe that we have a 100x growth opportunity in U.S. enterprise restaurants, representing a TAM of more than $15 billion within the U.S. enterprise segment.*" (Glass);

- "*The fourth quarter was a great close to our first fiscal year as a public company . . . Olo continued to drive momentum and beat expectations in the fourth quarter*, demonstrating the mission-critical nature of our solutions . . ." (Benevides)

- "So our expectation for 2022 is to add a similar amount of net new locations to the platform . . ." (Benevides)

- "So I think from a high level, *the underlying fundamentals of the business remain really strong.*" (Benevides)

155.    On that call, Defendants also provided increased and updated guidance for the fiscal year of 2022 revenue of between $194 and $196 million and discussed 30% revenue growth for the year.  They reiterated the same guidance on the May 10, 2022 1Q 2022 earnings call and, at the June 6, 2022 William Blair Conference, Defendant Glass showed the same guidance and stated "we anticipate a reacceleration of revenue growth as implied in our quarter and full year guidance."

156.    At the May 23, 2022 JPMorgan Global Technology Conference, Benevides told the market that "[w]e feel pretty confident in being able to deliver high growth we define as 30% year-on-year growth."

157.    These statements were false and misleading because:

1) Olo's business had already slowed down massively and it was scrambling to get any new locations at all and by July 2021, it was already at the point of "diminishing returns" with its core products;

2) Far from having strong quarters or years, internally they were acknowledged to be "rough" or "razor thin" with the worst six month performance in years;

3) Defendants were internally aware and discussed the fact that the Company already, by the end of 2021, had insufficient revenue growth to maintain its 2022 growth targets, especially the 30% figure;

4) By 2022, 1Q was so "woeful" that the deployment team was sitting idle at 20% behind pace and there was a massive revenue gap the Company was scrambling to fill;

5) Defendants well knew that "all bets were off" after 1Q 2022 as far as revenue acceleration; and

6) The $196 million guidance was thus completely illusory and fictitious.

### 3.    Defendants Made Misrepresentations About the Enterprise Segment of the Market

158.    Defendants made a number of material misstatements and omitted relevant information from the market concerning both the trend of large restaurant brands building their own in-house platforms and Olo's dim prospects with those larger enterprise brands.

159.    At the beginning of the Class Period, the Offering Documents stressed the importance of "enterprise brands" to the business.   Indeed, in telling the market the total addressable market opportunity for Olo was $7 billion, the Offering Documents stated that this was "based on our current product offerings *and focus on enterprise restaurants primarily in the United States.*"   The Offering Documents also touted that  "Our enterprise brands, meaning those brands having 50 or more locations, *are also highly loyal*.   Over the last five years, on average nearly 99% of our enterprise brand customers, which accounted for 91% of our total active locations as of December 31, 2020, have continued using our Ordering module each year."

160.    This continued on the May 11, 2021 1Q 2021 earnings call.   When asked directly about the pipeline for larger "replatforming opportunities," Defendant Glass proceeded to state:

> *And we think that long-term Saas wins* and that there's a great opportunity for brands that have built in-house to see, okay, there is some capital in the initial CapEx, but it's really the OpEx, that ongoing cost of doing this in-house that I could save money on and have better innovation, better benchmarking against other brands, a broader partner ecosystem by moving to a mature, enterprise-grade SaaS provider.

161.    On that same call, Defendant Glass told the market that the Company's focus lay in:

> serving the enterprise restaurants in the U.S. and Canada markets because we think there's just a great opportunity for us there and it is the fastest path for us to become a $1 billion revenue company in the fastest and most efficient path for us to do so.  So I believe that we're developing the relationship with those large, multinational restaurant brands, most of which are domiciled here in the U.S.  And we're proving out how vital Olo is to their success as a mission-critical platform . . .

162.    On October 21, 2021, during the Wisely acquisition call, Defendant Benevides explained that the Wisely acquisition would expand the total addressable market by "approximately $1 billion by applying Wisely's existing suite of products to the approximately 300,000 U.S. enterprise restaurant locations."  Glass reiterated almost this exact statement on the February 23, 2022 4Q & FY 2021 Earnings Call when he said "through focusing on the enterprise restaurant segment, we have a 4x opportunity to capture all 300,000 enterprise restaurant locations."  He repeated the exact statement word for word at the June 6, 2022 William Blair Conference.

163.    Glass continued his stream of misstatements at the January 10, 2022 ICR Conference where he said:

> [I]t has been our long held conviction at Olo that *SaaS is a better alternative to homegrown solutions.  We're excited to see the industry agrees with that premise.*
>
> We've proven through hundreds of instances that investing in an enterprise grade SaaS platform is a compelling alternative to all the expenses of building in-house.  That means lower costs, faster time-to-market, tapping into platform best practices and leveraging a large partner and customer ecosystem.  In short, SaaS wins over homegrown software.

164.    These statements were false and misleading for numerous reasons including:

1)   ████████████████████████████████████████████████████████████████████

2)   Olo thus had no chance of capturing even a small portion of the 300,000 enterprise restaurant locations;

3)   Enterprise customers were not loyal as numerous were switching from Olo to develop their own in-house ordering platforms;

4)   SaaS (third-party systems offered by companies such as Olo) were definitively not "winning" over homegrown platforms as Olo employees long knew that "Big Dawgs always have an affinity to build their own . . ." given the cost and IT advantages of in-house platforms;

5)   Even at the start of the Class Period, Defendants knew that "Build versus Buy" was the single largest threat to the Company; and

6)   By the October 2021 and January 2022 calls, Defendants were well aware that major customers had churned in favor of building their own in-house systems and that these were merely the "canary in the coal mine" of the cascading trend.

### 4.    *Defendants Materially Mislead the Market about Subway's Pending Departure*

165.    On February 25, 2022 – the date Olo released 4Q and FY 2021 earnings and an increased FY 2022 guidance – Defendants issued a misleading risk warning, merely warning about a hypothetical risk that had *already* come to pass:

> In addition, *if* our customers . . . reduce the number of locations using our platform, then our revenue *may* decline and our results of operations *may* be harmed. Customers *may* not renew their contracts with us or reduce their use of our platform for any number of reasons, including . . . *if* they decide to build their own solution internally.

166.    Although the Form 10-K contained "risk factor" language that purported to "warn" investors of possible risks about customers that could materialize *in the future*, the Form 10-K failed to apprise investors of Subway's decision to leave Olo – a trend in fact established by other

large brands leaving in favor of in-house development. Defendants, instead, misleadingly

presented this "risk" as merely a future, contingent possibility, 

167.    For example, the Form 10-K states that "customers *may* not renew their contracts

with us or reduce their use of our platform for any number of reasons" when in fact this "risk" had

already materialized *by* ████████████████████████████████

████████████████████████████████████████████████

████████████████████████

168.    Similarly, the Form 10-K states that customers may not renew their contracts "*if*

they decide to build their own solution internally," when in fact, Subway, like other large restaurant

brands, ████████████████████████████████████████████

████

169.    Indeed, the foregoing "risk warning" was not only inadequate, but was itself

misleading for portraying a risk – and, in fact, a trend amongst large restaurant brands – that had

*already* materialized.

**J.      On August 11, 2022, the Truth Emerges**

170.    After the market closed on Monday, August 11, 2022, Olo reported its 2Q 2022

earnings results, falling short of expectations across multiple metrics, including revenue, cash

flow, and active locations, which ***experienced zero growth***, remaining unchanged from the prior

quarter at 82,000 active locations.   Moreover, Defendants lowered Olo's FY 2022 revenue

guidance from a prior range of $195 million to $197 million to a new range of $183 million to

$184 million.

      **1.**      ***Defendants Disclosed that They Had Known About Subway's Pending Departure Since Early 2022***

171.    In a stunning revelation on that day's earnings call, Defendants revealed that Subway, the Company's largest client by revenue and active locations count, had opted not to renew its contract with Olo, removing "roughly 2,500 locations in the second quarter [of 2022] . . . with the balance of their locations being removed from our total active location count in the fourth quarter of this year or the first quarter of 2023."[17]  As a result, as Defendant Benevides conceded, the loss of all Subway locations "will likely impact our ending active location counts in the fourth quarter of this year or the first quarter of 2023" and the Company would likely add just "2,000 locations per quarter between now and the balance of the year," *i.e.*, just 4,000 more locations in total.

172.    Equally as troubling, however, was the fact that Defendants had known about Subway's pending departure since at least the beginning of the year, as Defendant Benevides explained in response to an analyst's question about whether FY 2022 guidance, issued on February 23, 2022, had included an expected drop in revenue from the loss of Subway as an Olo brand client:

> ***So when we entered the year, there was indication that Subway may plan to directly integrate with marketplaces.***  But at that point in time, the time line was unclear.  So like all data points and assumptions that feed the model, we took that information, we factored in the possibility that Subway may integrate directly by doing 2 things: one, reducing their transaction volumes throughout the year and in turn, reducing a portion of their revenue

---

[17]      On the same August 11, 2022 earnings call, Defendant Glass also stated that "In February of 2020, we announced a relationship with Subway in which approximately **15,000** locations would utilize the Rails module to integrate and manage third-party marketplace orders."  This constituted a further corrective disclosure, as Olo's February 2020 press release had declared that the Subway "partnership allows Subway's network of more than **20,000** U.S. restaurants to more seamlessly handle digital orders from third-party marketplaces."

contribution throughout the year. So as that has begun to happen, the guidance for both the third quarter and the full year are aligned.

173.     When pressed on the point by RBC Capital analyst Matthew Hedberg – "just to be clear, when you started the year, you assumed less Subway contributions, and it seems like that is playing out" – Benevides admitted that "what we had done *during the year* is really start to tail that off in the second quarter through the balance of the year, really as a hedge to some of the indications that we had heard as we entered the year."

174.     As stated herein, there can be zero question Defendants knew of Subway's departure as of the January 13, 2022 Subway meeting, but they likewise at least were aware of the very real possibility of Subway departing by mid-2021 given Subway's preference for "build versus buy" that was common in the enterprise restaurant marketplace.

### 2.     *The Undisclosed Risk of Defendants' Inaccurate Active Locations Count Materializes*

175.     In explaining why they had lowered FY 2022 guidance, in light of the fact that they had supposedly incorporated the pending loss of Subway into the original FY 2022 guidance (issued on February 23, 2022), Defendants cited "macroeconomic challenges at the brand and operator level [which] have resulted in elongated deployment in sales cycles, impacting revenue in the back half of the year."

176.     In truth, Defendants' downward projections represented a materialization of the undisclosed risk of their repeated misreporting of Olo's active locations count.  Defendants' own words reveal this.  During the Class Period, when discussing how "macroeconomic challenges" would impact the Company, Defendants not only shrugged off an economic downturn, *they welcomed it*.  For example, on May 23, 2022, at the JPMorgan Conference, Defendant Glass stated that a recession would lead to increased volume for Olo at QSRs, Olo's bread-and-better brand clients:

[E]ven during a recession, if we had a recession, and we've seen this in 2008, '09, they [consumers] have to eat 3 times a day or more.  They don't magically start cooking, consumers go to restaurants, they get food at restaurants, ***and they trade down from the high-end restaurants to the lower-cost restaurants***.

***And that is something that has been a tailwind for our business in past recessions as it's been a benefit to our restaurant customers, picking up order volume.***[18]

177.  Additionally, on the same day that Olo lowered its guidance, one of Olo's chief competitors, Toast, released its 2Q 2022 earnings report as well.[19]  While similarly acknowledging "the current macroeconomic backdrop," Toast ***raised*** FY 2022 revenue guidance by 5%.  Toast, Inc., 2Q 2022 Earnings Call (Aug. 11, 2022).

### 3.  *Defendants Lowered the Company's FY 2022 Guidance*

178.  On the same day, Olo also provided revenue and operating income guidance for the third quarter of 2022 and lowered its guidance for the 2022 fiscal year.  Specifically, Olo provided:

- Third quarter of 2022 revenue guidance of $46.5M – $47.0M (midpoint of $46.75M) (which  was below consensus estimates of $51.1M).

- Third quarter of 2022 operating income guidance of $1.8M – $2.2M (midpoint of $2.0M) (which was below consensus estimates of $2.3M).

- 2022 fiscal year revenue guidance of $183 – $184M (midpoint of $183.5M) (which was below consensus estimates of $195.6M and also below previous guidance of $195 - $197M (midpoint of $196M)).

---

[18]   In fact, just days before the August 2022 earnings announcement, Benevides ███████ ███████████████████████████████████████████████████████████

[19]   According to its corporate description, Toast "is a cloud-based all-in-one digital technology platform purpose-built for the entire restaurant community.  Our platform provides a comprehensive suite of software as a service, or SaaS, products, financial technology solutions, including integrated payment processing, restaurant-grade hardware, and a broad ecosystem of third-party partners.  We serve as the restaurant operating system, connecting front of house and back of house operations across dine-in, takeout, and delivery channels."  Toast, Inc., 2Q 2022 SEC Form 10-Q (Aug. 12, 2022).

- 2022 fiscal year operating income guidance of $7.6 – $8.4M (midpoint of $8.0M) (which was below consensus estimates of $8.3M and also below previous guidance of $7.6 – $9.2M (midpoint of $8.4M)).

179.     During the conference call, Olo management attributed the lower guidance to

elongated sales cycles and elongated deployment cycles.  Specifically:

> In terms of sales cycles, there's really 2 underlying dynamics driving our year-to-date performance. So first, for deals that we've signed, many of the large deals happened really late into the second quarter, which means based on our standard deployment time line, revenue won't be recognized on those deals until sometime in 2023. And then for deals that did not close in the quarter, those conversations are ongoing and have been ongoing longer than our typical sales cycle. So those 2 are pushing into 2023.

> As for deployments, now we walked into the year with a sufficient pipeline of activity to deploy, but the time to deploy projects really across all modules have elongated for the primary reasons that we talked about on our prepared remarks, constraints at the brand and operator level. And just to go a level deeper there, we have several brands, which in total represent several thousands of locations that are partially deployed.

> So they're at some stage of the deployment process. And it is our practice that we don't announce brand deployments until we've reached a critical mass, until we've nearly deployed the entire franchisee network. That's when we typically announce the deployment. We have a number of brands again that are in the deployment process and making progress, but the progress has been much slower than we anticipated and much slower than we've historically done, which is what's creating some of that impact in the back half of the year.

180.     As one news outlet noted:

> Shares of Olo Inc. slid more than 30% in premarket trading Friday after the online food-delivery platform cut its guidance for the year. The New York company reported second-quarter revenue that was in line with expectations but said it now expects full-year revenue of $183 million to $184 million, down from a May forecast of $195 million to $197 million. Analysts polled by FactSet, on average, were expecting the company to post full-year revenue of $195.6 million. Olo also said it now expects a full-year adjusted operating profit of $7.6 million to $8.4 million, compared with earlier

guidance of $7.6 million to $9.2 million. Olo shares, which closed Thursday at $12.99, were recently down about 32% to $8.80 in premarket trading.[20]

181.    As the market digested these astonishing revelations, the price of Olo Class A common stock plummeted approximately 36%, from a closing price of $12.99 per share on August 11, 2022, to a closing price of $8.26 per share on August 12, 2022, erasing more than $480 million of shareholder value.   On September 26, 2022, the date the initial complaint in this action was filed, Olo shares closed at $7.72.   Since then, Olo shares have fallen further, trading below $7.00 per share.   Olo has also recently been forced to lay off a substantial number of employees.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Glass and Benevides Profited from Their False and Misleading Statements

182.    While Defendants were issuing the false and misleading statements identified herein, Glass and Benevides sold their personally-held stock, generating $10.3 million in insider sales.  That these insider sales were made pursuant to Rule 10b5-1 plans does nothing to rebut the inference of scienter drawn from the suspicious timing and amount of the insider sales.   For example, on September 15, 2021, when Olo's stock was at or near its highest price during the entire Class Period as a result of Defendants' false and misleading statements, Glass sold nearly 96,000 shares for over $3 million.  And then again, on October 2, 2021, Glass sold nearly another 96,000 shares for over $2.8 million, and then, on November 8, 2021 (the day before the earnings release and call where Defendants touted increasing active locations), Glass again sold nearly 96,000 shares for over $2.8 million.

183.    Benevides also profited handsomely from his stock sales, drawing nearly $1.5 million in sales over the Class Period.

---

[20]    *See Olo Inc. Shares Tumble Premarket on Lowered Guidance >OLO*, DOW JONES INSTITUTIONAL NEWS, Aug. 12, 2022, 6:46 am.

**B.     Defendants' Materially False and Misleading Statements Provided Olo an Opportunity to Acquire Wisely with An Inflated Stock Price**

184.    By reason of Defendants' repeated material misstatements, Olo's common stock was artificially inflated throughout the Class Period and Defendants took full advantage in order to facilitate acquisitions that would have otherwise been more expensive, difficult, and/or impossible without an artificially inflated share price.

185.    On October 21, 2021, the Company filed an SEC Form 8-K to inform investors that it had entered into an agreement to acquire Wisely, a customer intelligence and engagement platform, paying Wisely securityholders approximately $187 million, comprised of $77 million in cash and $110 million in Class A Common Stock, based on a price per share of $29.85.

186.    In acquiring Wisely, the Company benefited from its elevated share price because, had the market known the truth about the Company's misleading statements, Olo's common stock would have traded at a significantly lower value, which in turn would have adversely impacted the Company's ability to acquire Wisely on favorable terms – for example, by financing the agreement with almost 60% of the Company's stock – and would have made the acquisition more expensive, if not impossible.

**C.     Defendants' Materially False and Misleading Statements Also Provided Olo an Opportunity to Acquire Omnivore**

187.    On February 23, 2022, the Company announced on an earnings call that it had entered into an agreement to acquire Omnivore.  Two days later, in the Form 10-K for FY 2022, Olo disclosed that it paid approximately $50 million in cash for Omnivore.

188.    Again, Defendants benefitted from the inflated share price by their material misstatements.  Had the market known the truth prior to the Wisely acquisition, Olo shares would have traded at a lower price, and perhaps would have forced Olo to dip further into its cash reserves, leaving little, if anything, available for the Omnivore acquisition just four months later.

**D.    Glass and Benevides Knew About Each Aspect of the Fraud Alleged**

189.    Throughout the Class Period, the Individual Defendants knew about each aspect of the fraud alleged.  For example, Glass and Benevides were regularly apprised about onboarding issues with the specific brand clients going to the heart of Defendants' active locations fraud, ███

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

190.    Internal documents show that Glass and Benevides were informed of every issue discussed herein, including: ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████

191.    Additionally, upon information and belief, Defendant Glass is intimately involved with Olo's day-to-day operations.  For example, in a November 15, 2021 interview with a Public Company Research Organization ("PCRO"), a former Senior Customer Success Manager at Olo described Glass as "engage[d] with [his] followership."  In another interview with the PCRO on March 16, 2021, a former Senior Director of Customer Success at Olo even described Glass as involved with key business partnerships, as he was leading Olo's "negotiations" between "the heads of DoorDash" and other companies.

192.    Further, upon information and belief, Defendant Glass also has regular interactions with Olo's clients.  In addition to attending Olo's annual "customer conference," Glass also

answers client concerns.  For example, according to the transcript of an interview the Executive Chairman at Tender Greens, an Olo brand client, had with the PCRO on October 21, 2021, he [the executive] "could call Noah [Glass] and he would respond" in the "early bumpy onboarding days" and that "if some things aren't right, they [Olo] fix it."

## VII.   LOSS CAUSATION

193.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class (defined herein).  During the Class Period, Plaintiff and Class Members purchased Olo's Class A common stock at artificially inflated prices caused by Defendants' misconduct, as alleged herein.  The price of the Company's Class A common stock declined significantly when the substantial problems and risks concealed by Defendants were disclosed and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

194.   Before the end of the Class Period, on August 11, 2022, investors had been unaware of the following material facts about Olo that had been known to Defendants:

(a)   throughout the Class Period, Defendants reported an inaccurate active locations count and definition;

(b)   ███████████████████████████████████████████████████████ ██████████████████████ and

(c)   ███████████████████████████████████████████████████████ ██████████████████ and were aware – at the latest in January 2022 – that Subway would not be renewing its contract with Olo for this reason.

195.   Defendants' misrepresentations and omissions and fraudulent scheme, as alleged above, misrepresented and concealed the true adverse material facts from the market during the

Class Period, leading investors to wrongly believe that Olo had exponentially increasing active locations and a positive guidance and financial prospects.

196.     As alleged above, these material facts were revealed to investors – and/or the undisclosed risks materialized – for the first time on August 11, 2022 when Defendants told the market that Subway had ended its contract with Olo, that the number of active locations did not increase, and lowered Olo's FY 2022 guidance.

197.     The market reacted swiftly and negatively to these disclosures, which were made after trading hours on August 11, 2022.  As a result of them, on the next trading day, August 12, 2022, the price of Olo's Class A common stock dropped 36%, from $12.99 per share to $8.26 per share, on a volume of 11,582,335 million shares.  More than $480 million of shareholder value was erased, and the price of Olo's Class A common stock remains depressed, closing at just $7.72 as of the date of the initial complaint (ECF No. 1) in this action and below $7.00 on the date of the filing of this Second Amended Complaint.

## VIII.   CLASS ACTION ALLEGATIONS

198.     Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, the securities of Olo during the Class Period (March 17, 2021 to August 11, 2022, inclusive), seeking to pursue remedies under the Exchange Act (the "Class").  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

199.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Olo's common stock was actively traded on the NYSE.  While the exact number of Class Members is unknown to Plaintiff at this time, and can

only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, millions of Olo common stock were actively traded on the NYSE (an open and efficient market) under the symbol "OLO."  Record owners and other members of the Class may be identified from records maintained by Olo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

200.    Plaintiff's claims are typical of the claims of Class Members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws, which is complained of herein.  Further, Plaintiff will fairly and adequately protect the interests of Class Members and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

201.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws by the acts and omissions as alleged herein;

(b)     whether statements made by Defendants to the investing public and the Company's shareholders during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of Olo;

(c)     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of Olo;

(d)     whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     whether the market price of Olo Class A common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)     to what extent Class Members have sustained damages and the proper measure of damages.

202.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impossible for Class Members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.   APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

203.    The market for Olo common stock was open, well developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to Olo.  Plaintiff and Class Members have been damaged thereby.

204.    During the Class Period, the artificial inflation of the value of Olo common stock was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class Members.  As alleged herein, during

the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's common stock, causing Plaintiff and other Class Members that had purchased the securities at artificially inflated prices to be damaged as a result.

205.    At all relevant times, the market for Olo common stock was efficient for the following reasons, among others:

>   (a)    Olo stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;
>
>   (b)    As a regulated issuer, Olo filed periodic public reports with the SEC and/or the NYSE;
>
>   (c)    Olo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
>   (d)    Olo was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

206.    Based on the foregoing, during the Class Period, the market for Olo common stock promptly digested information regarding the Company from all publicly available sources and

reflected such information in the price of Olo stock.  Under these circumstances, the market for Olo common stock was efficient during the Class Period and, therefore, investors' purchases of Olo common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

207.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions, which concealed that:

(a)   throughout the Class Period, Defendants reported an inaccurate active locations count;

(b)   ███████████████████████████████████████████████ ████████████████████████ and

(c)   starting by the middle of January 2022 and continuing through the end of the Class Period, Defendants were aware Subway would not be renewing its contract with Olo.

208.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects – information that Defendants were obligated to disclose during the Class Period but did not – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.   NO SAFE HARBOR

209.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.  To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

210.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Olo who knew that the statement was false when made.

## XI.   COUNTS

**COUNT I**
**Violation of §10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

211.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.  This claim is asserted against all Defendants.

212.   During the Class Period, Defendants: (i) knowingly, or with reckless disregard, deceived the investing public, including Plaintiff and Class Members, as alleged herein; (ii) artificially inflated and/or maintained the market price of Olo common stock; and (iii) caused Plaintiff and Class Members to purchase, or otherwise acquire, Olo common stock at artificially inflated prices.

213.   Each of the Defendants, in violation of §10(b) of the Exchange Act and Rule 10b-5(b), made false statements of material facts and omitted to state material facts necessary to make the statements made by Defendants not misleading, which operated as a fraud and deceit upon Plaintiff and the Class, in an effort to create or maintain an artificially inflated price of Olo common stock during the Class Period.  Defendants' material misrepresentations and omissions are alleged above.

214.   As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

215.   As officers, directors, and controlling persons of a publicly held Company, whose common stock is registered with the SEC, pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, Glass and Benevides had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

216.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, made, or substantially participated in, the creation and/or dissemination of false or misleading statements of material fact, as set forth herein, or with reckless disregard failed to ascertain and disclose truthful facts, even though such facts were available to them.

217.    The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter.  Each of the Defendants knew, or recklessly disregarded, that the Class Period statements set forth above, contained material misrepresentations and omissions for the reasons set forth herein.

218.    By virtue of Glass and Benevides' positions of management and control within Olo, they had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects.  Glass and Benevides would ascertain such information through the Company's internal corporate documents; conversations and connections with corporate officers and employees; attendance at conferences and management and Board of Directors meetings, including committees thereof; and reports and other information provided to them in connection with their roles and duties as Olo officers and directors.

219.    Glass and Benevides were aware of, or recklessly disregarded, that material misrepresentations and omissions were being made regarding the Company, and approved or ratified such statements in violation of the federal securities laws.

220.    As a result of Defendants' dissemination of the materially false or misleading information, and their failure to disclose material facts, as alleged herein, the market price of Olo common stock was artificially inflated throughout the Class Period.  Unaware that the market price

of Olo common stock was artificially inflated, relying directly or indirectly on the false or misleading statements made by Defendants, at the times such statements were made, or relying upon the integrity of the markets in which Olo common stock traded; and in the absence of material adverse information that was known, or recklessly disregarded, by Defendants, but not disclosed to the public, Plaintiff and Class Members purchased or otherwise acquired Olo common stock at artificially inflated prices.

221.    Had Plaintiff and the other Class Members known the truth regarding the problems that Olo was experiencing, which was not disclosed by Defendants, Plaintiff and other Class Members would not have purchased, or otherwise acquired, Olo common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

222.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class Members suffered damages in connection with their respective purchases and sales of Olo common stock during the Class Period, when the artificial inflation in the price of such securities dissipated, as the truth regarding Defendants' conduct was revealed and/or the undisclosed risks materialized, causing the price of Olo common stock to decline, resulting in economic losses to Plaintiff and the Class.

223.    By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and they are liable to Plaintiff and the Class for damages suffered in connection with their transactions in Olo common stock during the Class Period.

**COUNT II**
**Violation of §20(a) of the Exchange Act**
**(Against Defendants Glass and Benevides)**

224.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.  This claim is asserted against Defendants Glass and Benevides.

225.     Olo is a primary violator of §10(b) and Rule 10b-5, promulgated thereunder.

226.     Glass and Benevides acted as controlling persons of Olo within the meaning of §20(a) of the Exchange Act.  Glass and Benevides had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence, and during the Class Period, did exercise their power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein.  Glass and Benevides prepared, or were responsible for preparing, the Company's press releases and SEC filings, and made statements to the market in SEC filings, annual reports, press releases, news articles, and conference calls.  Glass and Benevides controlled Olo and each of its employees.

227.     Glass and Benevides were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Glass and Benevides were provided with copies of the documents, as alleged herein, containing material misrepresentations and omissions prior to, or shortly after, their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be corrected.  Accordingly, Glass and Benevides are responsible for the accuracy of the Company's public reports and releases.

228.     By virtue of their positions as controlling persons of Olo, and by reason of the conduct described in this Count, Glass and Benevides are liable pursuant to §20(a) of the Exchange Act for controlling a primary violator of the federal securities laws.  As a direct and proximate result of Glass and Benevides' wrongful conduct, Plaintiff and other Class Members suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

A.     Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding compensatory damages in favor of Plaintiff and all other Class Members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## XIII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  August 9, 2023                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 *s/ Amanda F. Lawrence*
Amanda F. Lawrence
Patrick Coughlin
Donald A. Broggi
Jeffrey P. Jacobson
Mandeep S. Minhas
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
alawrence@scott-scott.com
pcoughlin@scott-scott.com
dbroggi@scott-scott.com
jjacobson@scott-scott.com
mminhas@scott-scott.com

*Counsel for Lead Plaintiff Steamship Trade Association of Baltimore – International Longshoremen's Association Pension Fund*