N9KISTEC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STEAMSHIP TRADE ASSOCIATION,
*et al.*

           Plaintiffs,

        v.                 22 Civ. 8228 (JSR)

OLO INC, *et al.*

                        Oral Argument

           Defendants.

------------------------------x

                        New York, N.Y.
                        September 20, 2023
                        4:30 p.m.

Before:

                  HON. JED S. RAKOFF,

                        District Judge

                APPEARANCES

SCOTT & SCOTT, LLP
    Attorneys for Plaintiff Steamship Trade Association
International
BY:  AMANDA F. LAWRENCE
    JEFFREY JACOBSON
    PATRICK COUGHLIN

GOODWIN PROCTER LLP
    Attorneys for Defendant Olo Inc.
BY:  JENNIFER LUZ
    BRENDAN BLAKE
    DEBORAH S. BIRNBACH

(Case called)

MS. LAWRENCE:  Good afternoon, your Honor.  Amanda Lawrence from Scott & Scott on behalf of STA-ILA.  With me today from my firm are Jeffrey Jacobson and Patrick Coughlin.

THE COURT:  Good afternoon.

MS. LUZ:  Good afternoon, your Honor.  Jennifer Luz with Goodwin Procter on behalf of the defendants.  With me today are Brendan Blake and Deborah Birnbach.

THE COURT:  Good afternoon.  As I emailed the parties about a half hour ago, unfortunately I have to leave the courthouse in about a half hour.  I apologize for the late notice to you.  On the other hand, you are still getting more time than you would in the Court of Appeals.  So there it is.  So I have allotted ten minutes for initial statements from both sides, and five minutes for rebuttal.  So let me hear first from moving counsel.

MS. LUZ:  Thank you, your Honor.  This case has two buckets of allegations of misstatements.  The first bucket are all forward-looking statements that are protected by the PSLRA safe harbor and more of the same types of statements that your Honor already dismissed from the first amended complaint.  Plaintiff has added some soundbites to their complaint, but none of that changes the fact that the challenged statements all relate to forward-looking --

THE COURT:  Well, I instructed everyone here not to

N9KISTEC

reargue points that I had already dealt with in the original motion to dismiss.  And as near as I can tell, with respect to the -- for lack of a better term -- active locations issue where I said there was a claim to go forward, all you are saying now seems to be that you think things have changed because of one new allegation in paragraph 67 of the second amended complaint.  Do I have that right?

MS. LUZ:  Yes, your Honor.  I think paragraph 67 is a meaningful change.  We would also point out, your honor, that another point change since the last time you ruled and considered the active locations theory is that plaintiff has confirmed they no longer intend to rely on the confidential witnesses that were critical to your decision the first time in upholding that claim.

THE COURT:  I am going to ask them about that when we come to that.  But go ahead.

MS. LUZ:  I will let you ask them about that.  We have expressed our views on that in our briefing.

Your Honor, turning to paragraph 67, this is an important paragraph in the second amended complaint.  This is the only place in any of plaintiff's complaint that talks about how the company actually calculated the publicly reported active location number.  They identify the witness, who they took testimony from while discovery was open, who was responsible for calculating that, and they outline in these

N9KISTEC

allegations the precise way that she calculated that number using customer usage data that actually reflected all those customers' utilization of the models.  So, your Honor, this particular paragraph is the one place in the complaint that tells you how they calculated the utilization based upon customer usage data.

THE COURT:  Well, that is an issue that is a fact issue.  I am not sure why it changes the overall outcome on a motion to dismiss.

MS. LUZ:  Your Honor, on a motion to dismiss, the plaintiffs have to plead with particularity facts that suggest that the statements they have identified are false or misleading.  Because they have put in their complaint allegations that Olo calculated active location numbers, which are numbers which they disclose to the public, reflect the utilization of their products.  They have now pled facts that say that the calculation was done using customer usage data for those products.  All of the other allegations in the complaint that talk about length of time for deployments or issues for how the difference between the number of contracted locations versus the deployed locations at any given moment in time, none of those other allegations that your Honor relied upon before say anything about how the company calculated the publicly reported number.  And that is the number that your Honor has to consider about whether or not they have pled sufficient facts

N9KISTEC

with particularity to show that that number was incorrect.  And there are no allegations here that suggest there is anything incorrect about those numbers or that they reflect anything other than actual customer usage.

THE COURT:  Maybe I am not getting your point here.  So, paragraph 67 says -- it's a long paragraph, I won't go through the whole paragraph.  It starts out:

"More broadly however, despite publicly defining an active location to require actual *i.e.* to be 'live' or in defendant Benevides's words we count our location active in the quarter if they have had an order in the quarter.  The company privately maintained two active location classifications for its modules.  Under the first classification which defendants use for its rail dispatch and network modules, a location would only be considered active if a customer used that module to complete a single order within a given quarter.  This classification lines up with what Olo repeatedly informed the market.  However, under the second classification, uses for ordering -- reporting in Olo's other six modules as well as the modules required by Olo from Wisely Inc. and Omnivore Technologies during the class period, a location only needed to possess Olo's software to be considered active even if throughout an entire quarter not a single order was placed using Olo's software at that location."

So what they are saying is that they told the public

N9KISTEC

it was one form of classification, but in fact, as to many of their locations, it was a different approach and therefore the readers were misled.

MS. LUZ:  If I can respond, your Honor?

THE COURT:  Please.

MS. LUZ:  The way Olo defined active locations in all of its public filings was a unique location that utilized Olo's software modules.  Some of Olo's software modules indeed facilitated consumer-to-restaurant transactions or someone who would get an order from a restaurant.  Many of the modules, including ordering the one they lump into the second category, did not facilitate consumer orders.  Those modules generated revenue for the company by subscription fees.  If you look, your Honor, at the allegations further in the complaint -- for example, if you look at paragraph 41 or 44, paragraph 41 describes exactly what the ordering module does.  If you go to the middle of that paragraph on page 14, the plaintiff alleges this module allows for the storage and hosting of restaurant menus, creation and management of promotional offers and royalty reward programs, as well as synchronization of menu item availability, modification of agreements, and per-location pricing; nothing at all, your Honor, about consumer transactions.

THE COURT:  Well, the complaint says that the defendants publicly defined an active location to require

N9KISTEC

actual activity, i.e. to be live or, in defendant Benevides's words, we count a location active in the quarter if they have had an order in the quarter, but the deposition testimony that they cite in paragraph 67 says, that they don't have to be active.

"Q.  The other seven modules that you listed don't require any activity to be considered an active location?

"A.  No, they do not require activity.

So I don't understand how that serves to eliminate their claim.

MS. LUZ:  If I could respond.

THE COURT:  Please.

MS. LUZ:  There is a lot to unpack there.  First I point you to paragraph 48, which quotes the actual definition that Olo gave in all of its quarterly and annual reports as to how they define active location.  It is:  We define active locations as a unique restaurant location that is utilizing one or more modules in a given quarterly period.  Plaintiff's discussion and definition of activity as consumer transactions is simply their made-up framework.

In terms of Mr. Benevides's quote, that is in paragraph 67, we explain this in our briefing, but the context of that quote we have provided your Honor in our exhibits the full context of the quote.  That was in response to a direct question about how active locations for Subway were calculated.

Subway used one module, which was the rails module, which is the module that did facilitate consumer transactions and so was, in fact, calculated.  However, no reasonable investor who paid attention to the products that Olo was offering -- some that facilitated consumer transactions and some that generated revenue by subscription fees -- would be misled into thinking the only thing Olo counted as active was if there was a consumer transaction because many of the modules just simply didn't provide that function.  That would be an unreasonable way for them to define active locations.

THE COURT:  All right.  I think I have your point.  Also, again, apologies, the ten minutes have expired, though you will have five minutes later to rebut.

MS. LUZ:  Your Honor, if I can say one quick thing.

THE COURT:  Yes.

MS. LUZ:  I refer your Honor to Exhibit EE, the excerpts of the deposition of the one person responsible for calculating the active locations metrics.  Very simply, over ten pages of a deposition transcript, it explains the process that has been incorporated into the complaint by plaintiff's reference.  I think it is very illuminating.

THE COURT:  Thank you very much.  Let me hear from plaintiff's counsel.

MS. LAWRENCE:  Good afternoon, your Honor.

We agree that the allegations in the second amended

N9KISTEC

complaint with regards to active locations, if anything, are only stronger than they were in the first amended complaint.  I would like to then instead move on to discuss the Subway allegations.

THE COURT:  OK.  Let me just ask you a couple of questions not on the point we just discussed but on other points.

Why are you no longer relying on the confidential witnesses?

MS. LAWRENCE:  What our letter said is that defendants asked us to identify the names of the confidential witnesses in the 26(a)(1) initial disclosure.  We cited the advisory committee notes.  You say you don't have to identify them at the 26(a)(1) stage if you are not intending to rely on them beyond the pleading stage.  We said we're not, we think the evidence will bear out as it has.

THE COURT:  So, aren't you saying then on this motion to dismiss the second amended complaint I should take no cognizance of any allegations about what confidential witnesses would say because you have already conceded that they will not be part of your ultimate proof?

MS. LAWRENCE:  So, I wouldn't necessarily agree with that.  At the time that we made the statement -- and I should point out that they got the names of the CWs within weeks after that, so some of this is academic.  If your Honor wishes, as we

N9KISTEC

said in our letter, we are happy to amend and resend the names.

THE COURT:  Well, I just want to know, is it your position that if this case goes forward you will not be relying on testimony from any of the confidential witnesses, or will you be?

MS. LAWRENCE:  At this point in time, we feel that the confidential witnesses will not be necessary at summary judgment or at trial because the documents and the evidence produced in this case to date has corroborated --

THE COURT:  I take that to be barring intervening, unforeseen consequences or the like, a concession that you won't be calling them, you won't be relying on them for your case; yes?

MS. LAWRENCE:  Beyond the pleading stage, that is our current intention.

THE COURT:  Right.  So then my question is, why should I consider them at the pleading stage?

MS. LAWRENCE:  We never ever suggested to defense counsel that we wouldn't rely on them at the pleading stage.

THE COURT:  No, I know you didn't.  I am asking, If I understand your position -- and maybe I have misunderstood it -- it goes like this, Judge, we think our claims are supported even without the confidential witness allegations, but if you don't agree, at least consider whether we cross the line because of what the confidential witnesses have told us

N9KISTEC

even though, for whatever reason, to protect their identity or whatever reason, we are actually never ever going to be able to produce them in any of the substantive parts of this case. That seems to me a very strange position.

MS. LAWRENCE:  I think I should clarify one thing. Both CW-1 and CW-2 are available to testify.  We are not saying we -- they have their names.  They noticed their depositions, they subpoenaed them from documents.  The defendants choose to withdraw those.  That was a possibility.  We were simply saying we didn't think at the 26(a)(1) stage we needed to give their names.  We did eventually give them their names.  They have been subpoenaed.

THE COURT:  I just want to make sure going forward, assuming I allow any of the claims in this case to go forward, you are not withdrawing the possibility that you would call the confidential witnesses as part of your case.

MS. LAWRENCE:  That's correct, your Honor.

THE COURT:  All right.

MS. LAWRENCE:  I apologize for the confusion there.

THE COURT:  OK.  Now with respect to Mr. Benevides, I think your amended complaint omits certain facts that I relied on in finding that he acted with scienter.  How are the facts alleged in the second amended complaint sufficient to show his scienter?

MS. LAWRENCE:  Your Honor, it is the Looker complaint

from the first amended complaint.  We did that.  We cite to copious amounts of emails, internal documents.  Also, they used Snapchat, chat documents with Mr. Benevides's names on them.  Often he is the author.  A number of those emails do contain data from Looker itself.  So, it seemed redundant to say he had access to Looker when we were citing emails that cited directly to Looker.  That is why that paragraph was removed.  I can cite your Honor to certain paragraphs in the complaint.  We cite the emails that Mr. Benevides was on about deployment issues with specific brands that could only be derived from Looker.  That is in paragraph 190.

THE COURT:  Hang on a minute.

MS. LAWRENCE:  Sure.

THE COURT:  Let me find paragraph 190 of what the Federal Rules of Civil Procedure define as a short statement of your claims.

MS. LAWRENCE:  It is page 56 your Honor.

THE COURT:  Even though I only have ten fingers and ten toes, I have found page 56.  190, all right.  Quote, internal documents show that Glass and Benevides were informed of every issue discussed herein including -- then there is a long list including reference to emails.

MS. LAWRENCE:  I could also cite your Honor to paragraph 102.  I can read it.  It is a shorter one instead of everybody turning the pages.  In paragraph 102, we talk about

N9KISTEC

an email from Mr. Benevides in July of 2021 where he says that the company was at the point of diminishing returns for rails and dispatch, vital upside from existing customers. The only way he could know that information was to have access to the data that discussed the number of customers and the number of customers onboarded.

THE COURT: OK. Actually, this leads to a more general question. In your briefs on this current motion, you at times say that this is a misstatements case, not an omissions case. But when you talk about the so-called forward-looking statements, you say you are alleging material omissions. Which is it?

MS. LAWRENCE: I think it can be both. I would say it is primarily a misstatements case. Of course, there are some elements of omissions. But I would say this is the misstatements case. As I would say for the forward-looking statements, the larger issue with the forward-looking statements and with the PSLRA safe harbor here is that the second amended complaint now shows actual knowledge by Mr. Glass and Mr. Benevides of facts contrary to their statements made if those statements could arguably be classified.

THE COURT: Well, I am looking the some of the statements. This is not all but just some. This is mostly in paragraphs 150-154 of your complaint. "We see a lot of

opportunity ahead."  That is a false actionable statement?  That is in paragraph 150.

"I don't think we have ever been more excited about our sales and deployment pipeline really on two fronts in terms of new location ads as well as the various upsell opportunities that continue to emerge."  The verb there being -- or the independent clause followed by the dependent clause is, "We have never been more excited about our sales and deployment pipeline."  That is paragraph 152.

Paragraph 154, "As we enter 2022, we have never been more confident in our position and more excited about our opportunity ahead."

How can those possibly be actionable misstatements?

MS. LAWRENCE:  I will address those.  I wanted to point out in paragraph 154 that you are reading, it goes on to say --

THE COURT:  I am not saying this is all that you are claiming in terms of statements.  I am just picking those as, if you will, the ones that gave me the most pause.

MS. LAWRENCE:  OK.  As long as your Honor is aware that there are other ones.  So, I will take them one by one.

In the first one in paragraph 150, if you look at the whole paragraph, Mr. Benevides says the big takeaway here is a lot of upside and a lot of opportunity that your Honor quoted at the end.  These are based upon the 75,000-74,000 -- or it

N9KISTEC

should be 74,000-75,000 active locations, which we know are false numbers. So, that means Mr. Benevides was aware of information at the time that ran directly contrary to that statement. So even if it were forward-looking -- and I would cite your Honor to the Second Circuit's decision in *in re Slayton* for the exceptions when a defendant has a reasonable belief that the statements are incorrect or the foundation for them are dubious.

And then same thing goes for paragraph 152. If you look at paragraph 152, he says I don't --

THE COURT: I understand what you are saying. But the actual statement which you put in boldface at the end of paragraph 150 is, "We see a lot of opportunity ahead." I can't recall any case -- but maybe you can point me to one -- where that kind of statement was actionable. I mean someone who has devoted their energy to a company may have a totally unrealistic view of the opportunities ahead, but all they are saying, and all a reasonable reader could infer from that statement is yeah, they think things are going to go well or better or whatever. It is vague, forward-looking, and subjective.

MS. LAWRENCE: So, the case I would cite your Honor to is the *Vivendi* decision from the Second Circuit. Those statements were very similar: We are off to a fast start. We are very confident in our future. The Second Circuit found

those to be forward-looking but not to be protected by the PSLRA safe harbor because internal documents showed that defendants were aware of internal forecasts that contradicted their public statements making them misleading.

I know our time is running. I want to cite to a few reasons why, at this point in time, in October and November 2021 -- not to mention the later misstatements where the avalanche continues -- by this point in time, Benevides had already said that in order to reach their financial metrics, they would have to double their best quarter twice. The chief customer officer had already told Benevides that they were at the point of diminishing returns for their products. The company had already admitted it was, I quote, "desperately searching for new unique locations to add to the platform to make up for what we expect will be a rough Q4." Benevides, Glass and others senior executives had written back and forth about the razor-thin beats, razor-thin deployments, razor-thin bookings, razor-thin revenue in September of 2021. I believe that is when Benevides said he would be bald by the end of year because they were doing so poorly.

THE COURT: With apologies, I need to cut you off.

MS. LAWRENCE: Understood.

THE COURT: Let's hear five minutes from defense counsel.

MS. LUZ: Thank you, your Honor.

Your Honor, I am going to take the last point first. Counsel was just talking about the soundbites that they put in their complaint. But there is not a single fact or deposition testimony or document that says that any of the facts that they allege are false or misleading, that any of the defendants knew they were false or misleading. There is no internal forecasts that are different that have been alleged like in the *Vivendi* case that counsel just described. There is not a single conversation alleged that somebody told either the individuals that the active location count was wrong or that they couldn't meet their forecast.

In fact, your Honor, the important context to keep the entire case in is the actual financial results of this company, which are not disputed. This is a company that experienced exponential growth during Covid, and then as the world normalized, so did its growth pattern. It warned of all of those risks and the company still maintained and beat, as counsel just said, its guidance every single quarter of the entire class period. This is very similar to the *Peloton* case where the Court considered very similar allegations and ruled that Peloton's performance exceeded its sales guidance throughout the class period. The challenge statements were entirely consistent with Peloton's actual financial results. Thus, plaintiff's claim that the defendants were concealing an actual decrease in overall demand are not borne out by the

N9KISTEC

totality of the facts and need not be credited.

What plaintiffs have put in their second amended complaint are a number of soundbites.  They are suggesting this should be enough to contradict the defendant's belief in their forecast.  They actually hit their forecast.  *Omnicare* takes care of this.  *Omnicare* says there that, yes, there can be some facts that cut the other way.  That doesn't make an opinion false or misleading.  Reasonable investors expect that when a company puts forward an opinion about what their revenues will be or their future will look like, that it's weighing competing facts.  That is exactly what plaintiffs have alleged here.  It is classically within that *Omnicare* framework.

Your Honor, I also want to turn back to the confidential --

THE COURT:  The Senate might say a reasonable investor understands what the company says about its future prospects is always grossly exaggerated but therefore not actionable.  But that would be a very cynical view.  Go ahead.

MS. LUZ:  Your Honor, I want to briefly touch on the issue of the confidential witnesses.  We looked really hard for any case where a plaintiff told the Court, like they did in footnote 4 of their brief, that they do not intend to rely on the confidential witnesses going forward.

THE COURT:  I think they modified that.  I was troubled by that statement, and you are right to call it to my

attention.  But I think, at this stage, what they have now asserted is that while they don't think they need it, they are not, in any way, precluding their right to call those witnesses if they feel they do need it.

MS. LUZ:  Understood, your Honor.  Two quick points on that.  One, they talked about how we subpoenaed those confidential witnesses.  We did.  We stood on those based upon their representations.

The second point, your Honor, is that even you take my representation today about --

THE COURT:  Well, you are free to take -- given their different spin on their footnote today, you can, of course, renew those depositions.

MS. LUZ:  Of course.  Your Honor, we would also submit that there is not enough facts alleged in the complaint that suggest that either of confidential witnesses in the complaint have information about how active location counts were actually calculated.  They are in deployment and other noncustomer-facing roles; they were not in the finance department.  The incorporated testimony from Ms. Jeon confirms that neither of those individuals have anything to say about how the actual counts of active locations were calculated, and they had no insight whatsoever into what was included or not included.  So, it should be disregarded for that additional reason.  Thank you.

N9KISTEC

THE COURT:  Thank you so much.  Let me hear finally from plaintiff's counsel.

MS. LAWRENCE:  I will be as brief as possible respecting the time.  First, just to mention the *Peloton* case from Judge Carter that came out recently, it is very important to note in the *Peloton* case -- I read that entire complaint -- the plaintiffs could not allege actual knowledge on behalf of the defendants.  They don't have the evidence.  I say evidence even though evidence isn't required, as we have in this complaint.  It doesn't come anywhere close to it.  This is a unique situation.  I read some of the soundbites, which are far more than soundbites, especially when considered in context and holistically, as it must be at this point.

I'm going to do three more in the interest of time. In June 2021, Red Lobster, a large restaurant, chain --

THE COURT:  I have heard of them.

MS. LAWRENCE:  OK.  And Benevides says this is the canary in the coal mine, meaning we are in big trouble here, these big enterprises are leaving.  In October 2021, he conferred with Glass that they couldn't meet the 30 percent growth target they were projecting to the public.  In December 2021, a board member meets with Benevides and says how believable are our 2022 numbers given our back-to-back misses. Benevides then tells Glass:  Hey, we are going to get a pass through Q1 because of the Covid comps.  But after that, and I

N9KISTEC

quote, "All bets are off."  These show actual knowledge of the falsity of their statements and are far more than soundbites.

Your Honor mentioned the senate quotation.  I would just like to counter that with a recent quotation from Judge Schofield in *Romeo Power* where she says, "It is misleading to disclose expectations of future revenue while concealing present reasons as opposed to future risks why that revenue may never be realized."  That is exactly the situation we have here.

Again, the last thing I want to bring up -- I never got to it -- is Subway.  Your Honor did dismiss the Subway claims.  Your Honor said it was an omissions-based case.  We have a misstatement for Subway.  The misstatement is clearly false given not just the departure of Subway, which we have alleged, but we have also alleged the departure of other large brands that was becoming or had become a trend at Olo by that point, they were well aware of this trend.  So, it isn't just Subway that definitely had left a few weeks prior or a month prior to the risk disclosure.  It is a string of clients, including Red Lobster, including TGI Fridays, including RBI, who never a client but ended up not going with them because they were developing internally.  So, the allegations to as to Subway have changed dramatically.

THE COURT:  All right.  Thank you very much.  My great thanks to both counsel.  And you both did a very excellent job

N9KISTEC

under the very tight time constraints I was unfortunately obliged to impose unexpectedly.  So, what I will do is get you a bottom line decision by no later than the end of next week. I hope to do better than that, I hope to have a full opinion, but my guarantee is that you will have at least a bottom line on this motion by the end of next week and then we can see where we go from there.  So thanks again.

(Adjourned)