**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEAMSHIP TRADE ASSOCIATION OF BALTIMORE – INTERNATIONAL LONGSHOREMEN'S ASSOCIATION PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> OLO INC., NOAH GLASS, and PETER BENEVIDES, <br><br> Defendants. | Case No. 1:22-cv-08228-JSR <br><br> <u>CLASS ACTION</u> |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S AMENDED MOTION FOR CLASS CERTIFICATION AND
<u>APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL</u>**

Deborah S. Birnbach
Jennifer B. Luz
Katherine G. McKenney (*pro hac vice*)
Justin D. Ward
Brendan Blake (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
DBirnbach@goodwinlaw.com
JLuz@goodwinlaw.com
KMcKenney@goodwinlaw.com
JWard@goodwinlaw.com
BBlake@goodwinlaw.com

*Counsel for Defendants Olo Inc., Noah
Glass, and Peter Benevides*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 3

       A.    Olo's Business ................................................................................................ 3

       B.    Summary of Plaintiff's Allegations ............................................................... 4

       C.    Plaintiff's Trading History in Olo Stock ....................................................... 4

       D.    Plaintiff's Expert, Dr. Micah Officer ............................................................ 6

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ....................................................................................................................... 8

I.     PLAINTIFF CANNOT SATISFY TYPICALITY OR ADEQUACY UNDER
      RULE 23(A) BECAUSE IT IS SUBJECT TO UNIQUE DEFENSES ............................. 8

II.    PLAINTIFF HAS NOT SATISFIED RULE 23(B)'S PREDOMINANCE
      REQUIREMENT. .................................................................................................. 13

       A.    Defendants Have Rebutted the *Basic* Presumption of Reliance by Showing
            a Lack of Price Impact. ................................................................................ 14

       B.    Plaintiff Has Not Established a Viable Classwide Damages Theory. ................. 20

            1.    Plaintiff's Expert Relies on a "Generic Background" Damages
                 Model Copied from Another Expert's Report. ....................................... 20

            2.    Plaintiff's Expert Has Not Provided Any Methodology Suitable to
                 Measure the Alleged Risk-Materialization Damages. ............................ 22

            3.    Plaintiff's Expert Has Not Provided Any Methodology that
                 Disaggregates the Active Locations Claim from Confounding
                 Factors, Including the Subway Transition. ............................................ 24

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)..........................................................................................................14

*Alharbi v. Miller*,
    368 F. Supp. 3d 527, 547 (E.D.N.Y. 2019) ...................................................................19

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
    568 U.S. 455, 469 (2013)................................................................................................13

*In re Amla Litig.*,
    282 F. Supp. 3d 751, 759 (S.D.N.Y. 2017)....................................................................13

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74, 80 (2d Cir. 2023) .......................................................................................15

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
    2022 WL 151302, at *2 (2d Cir. Jan. 18, 2022) ...........................................................24

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52, 59 (2d Cir. 2000)........................................................................................9

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................................14

*Berwecky v. Bear, Stearns & Co.*,
    197 F.R.D. 65, 69 (S.D.N.Y. 2000) ...............................................................................13

*In re BP p.l.c. Sec. Litig.*,
    2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014) ...................................................23

*Comcast Corp. v. Behrend*,
    569 U.S. 27, 33-37 (2013) ...........................................................1, 7, 20, 21, 22, 25

*In re Crayfish Co. Sec. Litig.*,
    2002 WL 1268013, at *4 (S.D.N.Y. June 6, 2002)..........................................................8

*In re Credit Suisse First Bos. Corp. (Lantronix, Inc.) Analyst Sec. Litig.*,
    250 F.R.D. 137, 143 n.14 (S.D.N.Y. 2008) ...................................................................18

*DeMarco v. Lehman Brothers*,
    222 F.R.D. 243, 248-49 (S.D.N.Y. 2004)......................................................................22

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116, 142 (S.D.N.Y. 2014) .................................................................................21

*GAMCO Inv'rs, Inc. v. Vivendi, S.A.*,
  917 F. Supp. 2d 246, 257-58 (S.D.N.Y. 2013) .........................................................................11

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176, 179-80 (2d Cir. 1990) ...............................................................................8, 13

*George v. China Auto. Sys., Inc.*,
  2013 WL 3357170, at *6-7 (S.D.N.Y. July 3, 2013) ..........................................................11, 13

*Goldkrantz v. Griffin*,
  1999 WL 191540, at *5 (S.D.N.Y. Apr. 6, 1999) ................................................................17

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
  141 S. Ct. 1951, 1958, 1961 (2021) .............................................................................7, 15, 19

*Gordon v. Sonar Capital Mgmt. LLC*,
  92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015) ...........................................................................8

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258, 263-64, 267-68, 275, 282 (2014) ........................................................1, 7, 15, 20

*In re IMAX Sec. Litig.*,
  272 F.R.D. 138, 147 (S.D.N.Y. 2010) .................................................................................8

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
  2023 WL 2592134, at *23-25 (M.D. Tenn. Feb. 24, 2023) ....................................................24

*In re Intuitive Surgical Sec. Litig.*,
  2016 WL 7425926, at *16 (N.D. Cal. Dec. 22, 2016) ......................................................16, 20

*Loritz v. Exide Techs.*,
  2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) .............................................................22

*Ludlow v. BP, P.L.C.*,
  800 F.3d 674, 690 (5th Cir. 2015) ...............................................................................23, 24

*In re Monster Worldwide, Inc. Sec. Litig.*,
  251 F.R.D. 132, 135 (S.D.N.Y. 2008) .................................................................................13

*Mulderrig v. Amyris, Inc.*,
  340 F.R.D. 575, 590-91 (N.D. Cal. 2021) ...........................................................................24

*In re Petrobras Sec. Litig.*,
  104 F. Supp. 3d 618, 623-24 (S.D.N.Y. 2015) ......................................................................13

*Rocco v. Nam Tai Elecs., Inc.*,
   245 F.R.D. 131, 135-136 (S.D.N.Y. 2007)......................................................................8, 12, 13

*Scott v. Chipotle Mexican Grill, Inc.*,
   954 F.3d 502, 512 (2d Cir. 2020)..............................................................................................8

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084, at *19 (S.D.N.Y. July 10, 2019) .........................................................16, 20

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   2023 WL 2918982, at *5-9 (S.D.N.Y. signed Mar. 21, 2023, filed Apr. 12, 2023)...................7

*In re Vivendi Universal, S.A. Sec. Litig.*,
   183 F. Supp. 3d 458, 466 (S.D.N.Y. 2016)..............................................................................11

*Waggoner v. Barclays PLC*,
   875 F.3d 79, 95, 106 (2d Cir. 2017)...................................................................................14, 20

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338, 350-51 (2011) ...................................................................................................7

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................................................1, 2, 7, 8, 13, 25

Defendants Olo Inc. ("Olo"), Noah Glass, and Peter Benevides ("Defendants") respectfully submit this memorandum of law in opposition to the Amended Motion for Class Certification and Appointment of Class Representative and Class Counsel, ECF No. 90, filed by Lead Plaintiff Steamship Trade Association of Baltimore – International Longshoremen's Association Pension Fund ("Plaintiff").

## PRELIMINARY STATEMENT

In a string of cases over the last decade, the Supreme Court has reminded putative class representatives that they "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*"). This showing must reflect a "rigorous analysis" tailored to the case at hand. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013). Plaintiff has failed to heed these admonitions, trying to satisfy Rule 23 through a "generic" expert report, much of it lifted from another expert's report in another case. Multiple issues warrant denying class certification.

***First***, Plaintiff cannot satisfy Rule 23(a)'s typicality and adequacy requirements because it is subject to unique defenses. Brown Capital Management, LLC ("Brown Capital")—the investment adviser that made the decision to buy Olo stock for Plaintiff—decided to invest in Olo despite knowing that ████████████████████████████████ ████████████████████████████████████████ Moreover, Brown Capital has admitted ███████████████ and continued to buy Olo shares after the "corrective" disclosure and the filing of this action. Brown Capital uses a proprietary investment strategy focused on a select handful of companies based on their long-term growth prospects, not stock-price movements. Brown Capital selects these companies based on ████████████████████ ████████████████████████████████████████ ██████████████████████████████. Consistent with this strategy, Brown Capital

1

bought Olo stock on Plaintiff's behalf at a range of prices during and after the putative class period. On this record, reliance presents a unique defense for Plaintiff, which should not be allowed to represent the putative class.

*Second*, Plaintiff has not satisfied Rule 23(b)'s predominance requirement, for two reasons. First, there was no price impact from the alleged misrepresentations about active locations (the "Active Locations Claim"), the only claim that survived the Court's recent ruling on Defendants' motion to dismiss. In this case, where Plaintiff is proceeding under an inflation-maintenance theory, price impact can only be observed at the "back end"—*i.e.*, the date of the alleged corrective disclosure. But there was no back-end "corrective" disclosure. While Plaintiff alleges that Olo disclosed false active locations counts, no one besides Plaintiff—neither Olo itself nor equity analysts covering Olo—has ever said that Olo's historical disclosure about active locations was false. No disclosure said the active locations number was off by a single location, much less a material amount. The alleged "corrective" disclosure on August 11, 2022 did not reveal any "truth" about the Active Locations Claim, and so the Court should find, by a preponderance of the evidence, that there was no impact. Thus, individualized issues of reliance will predominate.

In addition, Plaintiff has not provided a viable classwide damages model. Plaintiff's expert, Dr. Micah Officer, admitted at deposition that (i) he had not analyzed how he would calculate damages in this particular case; (ii) he was only providing "generic background information"; and (iii) much of that "generic background" was lifted, often word-for-word, from another expert's report. It is hardly surprising that Dr. Officer's "generic" damages model does not reflect any of the damages issues likely to arise in *this case*. Even though Plaintiff has alleged a loss causation theory based on materialization of an undisclosed risk, Dr. Officer has not analyzed how to calculate damages for that theory. He does not even know what the alleged "undisclosed risk" was.

2

And Dr. Officer has not done any of the work necessary to explain how he would disaggregate losses among the Active Locations Claim, the non-actionable disclosures about Subway's transition of its partnership with Olo (the "Subway Transition"), and other confounding factors. This boilerplate theory is completely inadequate. Thus, class certification should be denied.

## BACKGROUND[1]

### A.    Olo's Business

Olo, a leading SaaS (software as a service) platform for restaurants, went public on March 17, 2021. SAC ¶¶ 6-7. By June 30, 2022, Olo had over 600 restaurant brands on its platform— including hundreds of large chains like Hardee's—and approximately 82,000 restaurant locations using its products. *See S*AC ¶¶ 133, 141. "[A]lmost [] all" of Olo's platform revenue comes from its suite of "Ordering" modules. SAC ¶¶ 41, 44. Olo's lower-revenue platform suites include Rails, which allows restaurants to pay a per-order fee to directly integrate their menus and pricing with third-party ordering applications like DoorDash. SAC ¶¶ 42-43. Olo continues to offer new modules and expand its product suite. SAC ¶¶ 185, 187. Olo reports quarterly on several performance indicators, including active locations (defined as a specific restaurant location that has deployed one or more modules) and average revenue per unit ("ARPU"). SAC ¶ 48.

In February 2020, Olo announced a partnership with Subway. SAC ¶ 18. In 2022, Olo learned that Subway might directly integrate with third-party delivery applications rather than continue to use Olo's Rails module, although the timeline was unclear. SAC ¶¶ 94-97, 172. During Olo's earnings call on August 11, 2022, Defendants announced the Subway Transition and that

---

[1] In this opposition, Defendants cite the Second Amended Complaint, ECF No. 72, as the "SAC"; Plaintiff's moving brief, ECF No. 91, as the "Mot."; Plaintiff's Exhibit A, ECF No. 59-1, as the "Officer Rep."; Plaintiff's Exhibit G, ECF No. 92-2, as the "Suppl. Officer Rep."; and each exhibit to the Declaration of Katherine G. McKenney, ECF No. 66, as "Ex. __." For documents with Bates numbers, Defendants will use the last four digits as pincites. Unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis added.

Subway locations using Rails would cease to do so in late 2022 or early 2023. SAC ¶¶ 170-171.

B.    **Summary of Plaintiff's Allegations**

Plaintiff alleges that Defendants (i) knowingly or recklessly made materially misleading statements to investors concerning Olo's growth while concealing the Subway Transition; (ii) knowing or recklessly concealed a "desperate situation" and "slowdown in Olo's business"; and (iii) knowingly or recklessly overstated the number of Olo's active locations by including locations that were inactive or not using Olo's products. SAC ¶¶ 8-26, 59-169. After the Court's recent ruling on Defendants' motion to dismiss, only the Active Locations Claim remains. ECF No. 84. Plaintiff alleges that the "truth emerge[d]" on August 11, 2022, when Olo announced the Subway Transition and lowered its FY2022 guidance, and further alleges that the lowered guidance "represented a materialization of the undisclosed risk of [Defendants'] repeated misreporting of Olo's active locations count." SAC at p. 49, ¶¶ 170-80. Plaintiff further alleges that on the next trading day, August 12, 2022, the price of Olo's Class A common stock dropped 36%, from $12.99 per share to $8.26 per share. SAC ¶ 181. Plaintiff now seeks to certify a class of "[a]ll persons and entities that purchased or otherwise acquired shares of Olo's Class A common stock between March 17, 2021 and August 11, 2022, inclusive." Mot. at 1.

C.    **Plaintiff's Trading History in Olo Stock**

Plaintiff did not make its own investment decisions to engage in transactions in Olo stock during the class period. Rather, Plaintiff engaged outside asset managers that were vested with full discretionary authority to purchase securities on Plaintiff's behalf, including Brown Capital. *See* Ex. A § 1 (Investment Advisory Agreement); Ex. I ("STA-ILA Tr.") at 118:2-119:2. Brown Capital purchased Plaintiff's shares in Olo during and after the class period. Ex. B at -3606 (quarterly statement listing purchases in Q4 2021); Ex. C at -3620 (Q1 2022); Ex. D at -3633 and -3634 (Q2 2022); Ex. E at -3649 (Q3 2022); Ex. F at -3665 (Q4 2022); Ex. G at -0853 (Q1 2023).

The agreement between Plaintiff and Brown Capital ████████████████████ ████████████████████████████████████████████████ *See* Ex. A § 1. The only communications between Plaintiff and Brown Capital about Olo were ██████ ████████████████████ Ex. H ("Brown Tr.") at 159:9-14.

Olo is part of a select Small Company portfolio of approximately 40 companies, which Brown Capital calls "Exceptional Growth Companies" or "EGCs." Brown Tr. at 37:10-38:7, 39:19-21. Brown Capital defines EGCs as ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ Ex. AC at -0077. Because Brown Capital selected EGCs like Olo as long-term investments due to their potential future growth, Brown Capital's philosophy is ████████████████████ *Id.* at -0080.

Brown Capital ████████████████████████████████████████ ██████ In one quarterly report to Plaintiff, Brown Capital touted such ██████ ████████████████████████████████████████████████ ████████ as a distinguishing feature of its investment strategy. Ex. B at -3609. Olo was no exception. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Brown Tr. at 65:13-67:9, 81:14-83:22, 88:7-89:2, 99:11-101:15, 109:17-112:21, 119:21-120:14, 123:22-130:15.

Through its research, Brown Capital knew by October 15, 2021—before it decided to

5

invest in Olo—that "  ." Ex. P at -0761. "

." *Id.*[2] Knowing that, Brown

Capital invested in Olo because of

Ex. P at -0760 to -0767; Brown Tr. at 97:3-11.

During the class period, Brown Capital made 58 purchases of Olo stock, totaling 72,374 shares, on behalf of Plaintiff. *See* ECF No. 16-3, Schedule A (Plaintiff's PSLRA certification). After the "truth emerge[d]" on August 11, 2022, Brown Capital continued to buy Olo stock. The portfolio manager responsible for monitoring Olo testified that .

Brown Tr. at 204:5-9. Between November 17, 2022, and March 31, 2023, Brown Capital made 13 more purchases, totaling 18,192 shares, for Plaintiff. Ex. F at -3665; Ex. G at -0853.[3] Plaintiff

Brown Tr. at 162:14-163:10. To this day, Olo remains in Brown Capital's portfolio, and in Plaintiff's account, because *Id.* at 204:11-17.

### D.    Plaintiff's Expert, Dr. Micah Officer

In support of its motion, Plaintiff relies on the previously-filed expert report of Dr. Micah Officer and a supplemental report addressing the extended class period in the SAC. Officer Rep.; Suppl. Officer Rep. While Dr. Officer's original report contains 13 pages concerning damages (Officer Rep. ¶¶ 128-173), Dr. Officer admitted at deposition that this merely constituted "generic background to what the damages methodology would be. It's not specific to this case." Ex. J

---

[2] A draft of this document from August 23, 2021, contains substantially the same language.
[3] Brown Capital sold Olo stock from Plaintiff's account only once, on August 24, 2022, when it

*See* Brown Tr. at 199:18-200:22.

("Officer Tr.") at 89:1-9. He also admitted that this background was "effectively inspired" by previous reports written by Frank Torchio, the CEO of Forensic Economics. *Id.* at 95:10-12. Here, "inspired" is a euphemism for the fact that Dr. Officer lifted pages of entire paragraphs, often verbatim, from Mr. Torchio's prior work. *See* Ex. K (comparing passages from Dr. Officer's report with prior reports filed by Mr. Torchio).[4]

## LEGAL STANDARD

A class action is an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33. To obtain class certification, plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton II*, 573 U.S. at 275; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard."). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Wal-Mart*, 564 U.S. at 351. The Court must consider "*all* record evidence" relevant to class certification, "regardless whether that evidence overlaps with . . . any . . . merits issue." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021).

---

[4] Dr. Officer's practice of seeking "inspiration" from prior work introduced at least one significant error in his original report, which stated that "my opinions have been accepted (and have never been excluded) by Federal courts in the United States." Officer Rep. ¶ 9. That was false: on March 21, 2023—before Dr. Officer was retained in this case in late April or early May (*see* Officer Tr. at 13:3-7)—Judge Caproni excluded his opinion in *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2023 WL 2918982 (S.D.N.Y. signed Mar. 21, 2023, filed Apr. 12, 2023). Dr. Officer acknowledges this error in his Supplemental Report but tries to explain it away, characterizing Judge Caproni's ruling as having found that his opinions "were simply *not specific enough* to be useful to the finder of fact." Suppl. Officer Rep. at 2 n.9. In reality, Judge Caproni found, among other things, that Dr. Officer's opinions "fail[ed] to satisfy the rigors of a *Daubert* analysis" because he "offer[ed] no admissible expert opinion" on a key issue; that his opinion was "conclusory" and "circular"; that "Dr. Officer's reports lack[ed] any basis whatsoever for his implied conclusion that BANA's previous pass-through model yielded a reasonable interest rate"; and that parts of his opinion were "not helpful" because "Dr. Officer's formula is 'simple' such that expert testimony is not required," analogizing to case law rejecting opinions grounded solely in "simple arithmetic" or "basic calculations." *See Valelly*, 2023 WL 2918982, at *5-9.

"Plaintiffs seeking certification of a Rule 23(b)(3) damages class action must first establish numerosity, commonality, typicality, and adequacy of representation, and then predominance of common questions of law or fact and the superiority of a class action over other procedures." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020).

**ARGUMENT**

**I.      PLAINTIFF CANNOT SATISFY TYPICALITY OR ADEQUACY UNDER RULE 23(A) BECAUSE IT IS SUBJECT TO UNIQUE DEFENSES.**

"In order to be named Class Representative, [a plaintiff] must show, by a preponderance of the evidence, that its claims are typical of the claims of the class, and that it is not subject to any unique defenses which threaten to become the focus of the litigation." *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010). Such unique defenses render the putative class representative both atypical (its claims are not typical of those of the class) and inadequate (the unique defenses distract it from vigorously pursuing the class's claims). *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated in part on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017). "[T]he defendant need not show at the certification stage that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense." *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015) (Rakoff, J.).[5]

Unique defenses that may bar a plaintiff from representing a putative class include, among other things, "an arguable defense of non-reliance on the market." *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007). In one case, a plaintiff was subject to unique defenses

---

[5] At class certification, the Court is not bound by any findings made when appointing the lead plaintiff. *See In re Crayfish Co. Sec. Litig.*, 2002 WL 1268013, at *4 (S.D.N.Y. June 6, 2002) ("Any preliminary class certification findings of adequacy and typicality made at [the lead plaintiff stage] do not preclude any party from contesting the ultimate class certification.").

8

because she "was a sophisticated broker who had access to more information than other investors" and bought stock "after the value had drastically declined amidst reports of financial difficulty." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).

Plaintiff is subject to precisely these unique defenses, as the evidence shows.

***First***, Brown Capital—the investment manager that made the decision to buy Olo shares on Plaintiff's behalf—did not rely on the integrity of the market price, but on ███████████ ███████████████████████████████████████████████████████████████████ Brown Capital seeks long-term investments in a handful of companies (which it calls "Exceptional Growth Companies" or "EGCs") based on its independent valuation of their business. Ex. B at -3609. In Brown Capital's words: ██████████████████████████████████ ██████████████████████████████████ Brown Tr. at 51:22-52:2. In a letter to Plaintiff dated January 11, 2022, Brown Capital explained: ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. B at -3609.

Before selecting Olo, Brown Capital ████████████████████████████████ ████████████████████████████████ Brown Capital ███████████████████ ███████ *See* Brown Tr. at 123:22-128:13. After the class period, Brown Capital █████████ ████████████████████████ *Id.* at 129:4-22. Brown Capital used an investment-research firm, ████████████████████████████████████████. ██████████████ ████████████████████████████████████████. *Id.* at 99:18-100:1. Before the alleged corrective disclosure on August 11, 2022, ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

9

██████████████████████████████████████████████████████ *Id.* at

101:2-21; Ex. L; Ex. M. Brown Capital also relied on information from Olo ████████

████████████ Brown Capital notes from November 5, 2021, before Brown Capital began

buying Olo stock, reflected ████████████████████████████. Ex. N at -0710

to -0713. Some of this information came from ████████████████████████

████████████ Brown Tr. at 108:7-111:11. Later, Brown Capital reviewed information from

████████████████████████████████████████████████████

████████████████████████████████████████ Ex. O.

*Second*, and critically, Brown Capital's investigation uncovered information that cuts to

the core of Plaintiff's claims. Plaintiff alleges that Olo's disclosure about active locations was false

because, among other things, "not all brand locations within a single chain joined Olo's platform"

and "Olo prematurely included individual restaurant locations in its active locations count." SAC

¶ 147. But Brown Capital understood before investing in Olo that, ████████████████

████████████████████████████████████████████ A

memorandum dated October 15, 2021, ████████████████████████ Ex.

P. The memorandum noted that ████████████████████████████

████████████ *Id.* at -0761. It explained:



*Id.* A Brown Capital document dated November 5, 2021, further observed that ████████████

████████████████████████████████████████████████████

██████████████████████████████ Ex. N at -0733. After making its investment, Brown Capital continued to receive similar information. For example, a Tegus interview from April 2022 with a former Olo customer-service employee informed Brown Capital that ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ *See* Ex. M at -1072 to -1073. After these interviews, from May–August 2022, Brown Capital bought over 27,000 Olo shares for Plaintiff's account at a cost of over $290,000. *See* ECF No. 16-3, Schedule A. This "corrective non-public information" severely undercuts reliance. *GAMCO Inv'rs, Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 257-58 (S.D.N.Y. 2013).

As this record shows, Brown Capital invested in Olo based on its own, independently-developed view of Olo's long-term growth prospects and was essentially indifferent to the integrity of the market price. It is likely that Plaintiff will have to devote time, at summary judgment and trial, to addressing whether Plaintiff and Brown Capital relied on the integrity of the market price of Olo stock. *See In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 466 (S.D.N.Y. 2016) (granting summary judgment for defendant on reliance because plaintiff's investment advisor "pursued an investment strategy that relied on his own, carefully researched evaluation of [the issuer's] assets and liquidity" and was "indifferent to the fraud"); *GAMCO*, 917 F. Supp. 2d at 257-58 (denying plaintiff's motion for summary judgment on reliance where plaintiff's parent company "privately corresponded and/or met with [the issuer's] management during the relevant time period," creating a triable issue whether the plaintiff "did not rely on the misstatements incorporated into the market price"). Thus, class certification should be denied. *See George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *7 (S.D.N.Y. July 3, 2013) (denying class

certification where plaintiffs "subject themselves to unique inquiries regarding their trading patterns and why they made investment decisions" and "whether the fraud was in fact irrelevant to their purchasing and sale decisions"); *Rocco*, 245 F.R.D. at 136 (denying certification where plaintiff "was relying not on the market, but on his own assessment of the value of the stock").

**Third**, Brown Capital's indifference to market price and the alleged fraud is further demonstrated by its trading history, including continued purchases of Olo stock after the alleged corrective disclosure on August 11, 2022. Brown Capital bought Olo stock at a wide range of prices throughout the putative class period, from a high of $29.56 on November 12, 2021 (*see* Ex. B at -3606), to a low of $8.97 per share on May 10, 2022 (*see* Ex. D at -3633). Brown Capital explained that ████████████████████████████████████████████████████ ████████████████████████████████████ Ex. D at -3637. Plaintiff ██████████████████ ██████████████████████████ Brown Tr. at 162:14-163:10; Ex. A § 1.

After the alleged corrective disclosure, Brown Capital ███████████████████████ ████████████████████████████ Brown Capital's witness testified at deposition that ██████████████████████████████ Brown Tr. at 204:5-9. Contemporaneous evidence shows the same thing. On October 11, 2022, Brown Capital told Plaintiff that ████ ████████████████████████████████████████████████████████████████ Ex. E at -3654. Similarly, on January 12, 2023, Brown Capital ████████████████ ████████████ Ex. F at -3669. Brown Capital explained that ████████████████ ████████████████████████████████████████████████████████████████ ████████ *Id.* at -3670. Accordingly, from November 17, 2022, through March 31, 2023, Brown Capital made 13 purchases totaling 18,192 shares for Plaintiff, at a total cost of $120,522.51. *Id.* at -3665; Ex. G at -0853. The price per share ranged from $6.23 on December 30, 2022, to $8.17

on March 31, 2023. *Id.*

As multiple decisions have held, such post-class-period purchases render a plaintiff "subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision." *China Auto.*, 2013 WL 3357170, at *6.[6] These cases apply in full force here: the reason Brown Capital continued to trade after the alleged corrective disclosure is because it was indifferent to the alleged fraud and relied on its own independent evaluation, not the integrity of the market price. To be clear, Defendants are not arguing that these post-class-period purchases, standing alone, would be sufficient to defeat class certification. *See In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (Rakoff, J.). Rather, these purchases supplement and reinforce other evidence concerning Brown Capital's trading strategy and access to non-public information.

Thus, Plaintiff is not typical or adequate, and class certification should be denied.

## II.   PLAINTIFF HAS NOT SATISFIED RULE 23(B)'S PREDOMINANCE REQUIREMENT.

Class certification should also be denied on the independent ground that Plaintiff has not satisfied Rule 23(b), which requires that "common questions predominate over any questions affecting only individual class members." *In re Amla Litig.*, 282 F. Supp. 3d 751, 759 (S.D.N.Y. 2017) (Rakoff, J.) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469

---

[6] *See also Gary Plastic*, 903 F.2d at 179-80 (affirming denial of class certification where plaintiff continued purchasing the securities despite having investigated the alleged fraud); *Rocco*, 245 F.R.D. at 135-36 (denying certification where "post-class purchases" indicated that plaintiff "was relying not on the market, but on his own assessment of the value of the stock"); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000) ("As this Court has previously noted, a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative."); *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 623-24 (S.D.N.Y. 2015) (Rakoff, J.) (declining to appoint a lead plaintiff that "made a significant investment . . . after the alleged fraud had been fully revealed").

(2013)). Here, Plaintiff seeks class certification based on the Active Locations Claim. *See* Mot. at 1-2. Plaintiff alleges that the "truth" about Olo's active locations was revealed on the corrective disclosure date of August 11, 2022, alongside the news of the Subway Transition. *See* Mot. at 5, 13; SAC ¶¶ 170-180.

Plaintiff's motion fails the predominance requirement for two reasons. First, Plaintiff cannot rely on a presumption of reliance because the evidence shows there was no price impact from the lone surviving misrepresentations about active locations. In this case, price impact can only be observed at the "back end"—*i.e.*, at the time of the alleged corrective disclosure on August 11, 2022—yet a preponderance of the evidence shows there was no back-end "corrective" disclosure about active locations. Thus, individualized issues of reliance will predominate. Second, Plaintiff has not presented a viable classwide damages theory that disaggregates the harm caused by the alleged misrepresentations—harm that, according to Plaintiff's theory, flowed from the materialization of some unspecified "risk" about active locations—from other, confounding factors such as the disclosure of the Subway Transition, which the SAC alleges contributed to investors' losses but which the Court has held is not actionable.

### A.    Defendants Have Rebutted the *Basic* Presumption of Reliance by Showing a Lack of Price Impact.

Plaintiff's ability to establish predominance turns on its invocation of the presumption of reliance from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).[7] Absent that presumption, individual

---

[7] Plaintiff's class certification brief also purports to rely on a presumption of reliance for omissions claims from *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Mot. at 21. But that presumption is unavailable where the "complaint is based primarily on allegations of affirmative misrepresentations, not omissions." *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017). *Affiliated Ute* does not apply to the Active Locations Claim, which rests on affirmative misstatements about the number of active locations. *See* SAC ¶¶ 118-148. In its opposition to the recent motion to dismiss, Plaintiff proclaimed that "[t]his is a primarily misstatement case" and accused Defendants of "mischaracterizing the case as an 'omissions case.'" ECF No. 79 at 1, 23.

questions of reliance predominate. *See Halliburton II*, 573 U.S. at 267-68. One way to rebut the presumption is to establish "that the misrepresentation had no 'price impact.'" *Id.* at 263-64. That can be done through "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff." *Goldman Sachs*, 141 S. Ct. at 1958.

There are two ways to measure price impact: at the "front end" (*i.e.*, at the time of the alleged misrepresentation) or at the "back end" (*i.e.*, at the time of the alleged corrective disclosure). Under the latter approach, "the back-end price drop—what happens when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price." *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80 (2d Cir. 2023). Securities plaintiffs generally rely on the "back-end" approach. *See Goldman Sachs*, 141 S. Ct. at 1961 ("Plaintiffs typically try to prove the amount of inflation indirectly" by "claim[ing] that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation."). This case is no exception. The misrepresentations about active locations allegedly started in Olo's IPO offering documents, which became public before the Class Period began. *See* SAC ¶¶ 8, 54-56. Plaintiff therefore has to rely on a "price-maintenance" theory under which the alleged misrepresentations "affect a stock's price . . . by *maintaining* inflation that is already built into the stock price." *Goldman Sachs*, 77 F.4th at 80. Thus, it is only possible to observe (or disprove) price impact at the back end.

One way to rebut back-end price impact is to show that the supposed corrective disclosure was not actually "corrective"—that is, it did not "reveal any 'truth'" that was allegedly misrepresented. *See, e.g.*, *Goldman Sachs*, 141 S. Ct. at 1961 (explaining that the "final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure");

15

*In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at \*19 (S.D.N.Y. July 10, 2019) ("Defendants have persuasively shown that Plaintiff is not entitled to invoke [the *Basic*] presumption with respect to the May 24, 2017 disclosure—because that disclosure did not reveal any 'truth'"); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at \*16 (N.D. Cal. Dec. 22, 2016) (finding *Basic* presumption rebutted because "the court is not convinced the quarterly financial results were a corrective disclosure at all").

Here, the preponderance of the evidence shows that the alleged "corrective disclosure" on August 11, 2022, did not "reveal any 'truth'" related to the Active Locations Claim. In its quarterly earnings releases, Olo routinely disclosed the number of "ending active locations" as of the close of the previous quarter. *See* SAC ¶¶ 125-146. For example, in August 2021, Olo disclosed that the "ending active locations" for the previous quarter (ending June 30, 2021) was 74,000. SAC ¶ 127. Plaintiff claims that the real numbers were lower, because for various reasons not all of these locations were actually "active." SAC ¶ 147. The evidence shows that there was no disclosure on August 11, 2022, that corrected any of Olo's prior statements about active locations.

On August 11, 2022, Olo filed its quarterly report on Form 10-Q, issued an earnings press release (also filed with the SEC on Form 8-K), and held an earnings call with analysts (a transcript of which is available). Full copies of all three documents have been submitted as exhibits. Exs. Q, R, S. There is not one word in any of these documents suggesting that Olo's prior disclosures about active locations were inaccurate. Rather, Olo continued to report on active locations as it did before. The 10-Q reported: "We believe there is a substantial opportunity to continue to grow our customer base across the U.S. restaurant industry, adding to our over 600 existing brands across approximately 82,000 active locations as of June 30, 2022, up from approximately 74,000 active locations as of June 30, 2021." Ex. Q at 27-28.

Similarly, the August 11 earnings press release stated that "[e]nding active locations increased 11% year-over-year to approximately 82,000" (Ex. R at 5) and did not remotely suggest the previous reported numbers were inaccurate. On the earnings call that day, Olo executives made a number of statements about active locations, acknowledging that the Subway Transition would have an impact going forward but never calling into question the prior disclosure. For example:

> [T]his quarter, we deployed roughly 3,000 new locations to the platform with ending active locations increasing 11% year-over-year, flat sequentially to approximately 82,000. This quarter, our active location count was impacted by a change in our relationship with Subway. In February of 2020, we announced a relationship with Subway in which approximately 15,000 locations would utilize the Rails module to integrate and manage third-party marketplace orders. Certain Subway locations began directly integrating with marketplaces, impacting our ending active location count by roughly 2,500 locations in the second quarter. We expect Subway's direct marketplace integration to continue with the balance of their locations being removed from our total active location count in the fourth quarter of this year or the first quarter of 2023.

Ex. S at 6. None of these statements called the historical active locations disclosure into question.

Nor is there any evidence that investors interpreted these statements to mean that Olo's prior disclosure about active locations was inaccurate. *See Goldkrantz v. Griffin*, 1999 WL 191540, at *5 (S.D.N.Y. Apr. 6, 1999) (finding "a complete lack of reaction in the financial press . . . even though [the company] was well covered by analysts" was "nearly sufficient" in and of itself to disprove price impact), *aff'd*, 201 F.3d 431 (2d Cir. 1999). After the August 11 earnings call, several equity analysts issued reports discussing Olo's second-quarter earnings. Full copies are provided as Exhibits T to Z. While analysts commented on Olo's active locations number, they continued to treat Olo's prior disclosure as accurate. For example, Piper Sandler provided the following chart that continued to use the disclosure that Plaintiff claims was wrong (Ex. T at 2 (highlight added)):

17

**Key Performance Indicators**

| Key Operating Metrics | 2Q20 | 3Q20 | 4Q20 | 1Q21 | 2Q21 | 3Q21 | 4Q21 | 1Q22 | 2Q22 | Trend | 4-Qtr Avg | 8-Qtr Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenue | $24.3 | $27.5 | $30.5 | $36.1 | $35.9 | $37.4 | $40.0 | $42.8 | $45.6 | | | |
| Revenue Growth (y/y) | 100.2% | 94.2% | 117.6% | 124.8% | 47.7% | 35.9% | 30.6% | 18.4% | 27.0% | | 33% | 71% |
| Platform Revenue | $22.5 | $26.2 | $29.2 | $34.9 | $31.5 | $36.1 | $38.9 | $41.5 | $44.5 | | | |
| Platform Revenue Growth (y/y) | 102.3% | 125.1% | 131.5% | 135.8% | 53.3% | 37.7% | 33.1% | 18.7% | 29.0% | | 36% | 80% |
| Ending Active Locations | 56,500 | 59,900 | 64,300 | 69,000 | 74,000 | 76,000 | 79,000 | 82,000 | 82,000 | | | |
| Active Locations Growth (y/y) | 43.0% | 66.4% | 51.7% | 42.9% | 31.0% | 26.9% | 22.9% | 16.6% | 10.6% | | 25% | 38% |
| Net Adds (q/q) | 8,200 | 3,400 | 4,400 | 4,700 | 5,000 | 2,000 | 3,000 | 3,000 | 0 | | 3,250 | 4,213 |

*Source. Company Reports, Piper Sandler*

Other analysts similarly reported on active locations without calling prior disclosure into question.[8]

Plaintiff has no evidence of price impact. At deposition, Dr. Officer stated that he was not offering any opinion on that issue, had not analyzed it, and did not even know what the corrective disclosure was. *See* Officer Tr. at 49:19-52:10. To be sure, Dr. Officer did find a statistically significant price decline on August 11, 2022, but that finding alone has no value in establishing a price impact. "To prove that a stock was responding to a specific piece of information on a specific day under the generally accepted event study approach (1) the return must be abnormal; (2) the abnormal return must be significant; and (3) *there must not be confounding news.*" *In re Credit Suisse First Bos. Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 143 n.14 (S.D.N.Y. 2008). Here, by Plaintiff's own account, there was confounding news on August 11: Olo lowered its annual revenue guidance (SAC ¶ 170), and also announced the Subway Transition—which Plaintiff itself asserts had an impact on Olo's stock price (*id.* ¶¶ 171-174, 180, 194-197). Yet Dr.

---

[8] Ex. U (Stifel Report) at 1 ("The company added 3,000 gross active locations on the quarter."); Ex. V (RBC 8/11/22 Report) at 1 ("Ending active locations were 82K as they added 0K q/q vs. +3K in Q1/22."); Ex. W (JPMorgan Report) at 1 ("OLO saw ending active locations remain flat q/q, despite adding 3,000 new locations."); Ex. X (Truist Report) at 2 ("[A]ctive locations and ARPU get noisy in FY23 as a result of the Subway location attrition."); Ex. Y (RBC 8/12/22 Report) at 3 ("The expectation is that the remaining ~12.5K Subway locations will fully roll-off in Q1/23 and will hit the active locations metric then."); Ex. Z (William Blair Report) at 2 (The "total location count was only up a few hundred locations sequentially given the loss of 2,500 Subway locations during the quarter.").

Officer made no effort to disaggregate the effect of the Subway disclosure from any corrective disclosure related to active locations. *See infra* pp. 24-25.

Nor has Plaintiff introduced evidence to support the risk-materialization theory pleaded in the complaint. The SAC side-stepped the absence of a corrective disclosure by alleging that there was a "materialization of the undisclosed risk of [Defendants'] repeated misreporting of Olo's active locations count." SAC ¶ 176. But the Active Locations Claim concerns misstatements of fact, not failure to disclose a risk. Plaintiff has never explained what this "risk" was, and Dr. Officer admitted at deposition that he did not know it was. Officer Tr. at 60:21-61:6 ("Q. What is your understanding of what the undisclosed risk was that's being referred to there [in paragraph 108 of the AC]? . . . THE WITNESS: I just don't know."). Plaintiff has also never explained how this risk materialized, and Dr. Officer's report is silent on that issue. *See infra* p. 22-24.

While the risk-materialization theory survived a motion to dismiss, it requires evidentiary support at class certification. *See, e.g.*, *Goldman Sachs*, 141 S. Ct. at 1961 (holding that price impact must be evaluated based on "*all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue"). Plaintiff cannot rely on mere speculation. *See Alharbi v. Miller*, 368 F. Supp. 3d 527, 547 (E.D.N.Y. 2019) ("A class cannot be certified on the speculation of plaintiffs' counsel. Rather, it must be certified on their proof, which plaintiffs have not supplied."), *aff'd in part, dismissed in part*, 829 F. App'x 570 (2d Cir. 2020). There is nothing—no documents, no witness testimony—to show that an inaccurate active locations count had a negative impact on Olo's financial performance in the second quarter of 2022. To the contrary, the 10-Q filed on August 11, 2022, explained that revenue was up year-over-year and that one of the reasons was "an increase in new active locations coming onto the platform." Ex. Q at 34; *see also id.* at 37. Nothing in the record suggests otherwise.

In sum, there was no price impact from the remaining claim concerning active locations. The Court should therefore find that Defendants have rebutted the *Basic* presumption. *See Signet Jewelers*, 2019 WL 3001084, at *19; *Intuitive Surgical*, 2016 WL 7425926, at *16. This defeats predominance, because Plaintiff would have to show reliance for each member of the class, which has "likely thousands of members." Mot. at 7; *see Halliburton II*, 573 U.S. at 282.

**B.      Plaintiff Has Not Established a Viable Classwide Damages Theory.**

In *Comcast*, the Supreme Court held that, to establish predominance, a plaintiff must set forth a proposed damages methodology that "measure[s] only those damages attributable to [Plaintiff's] theory" and does not "identif[y] damages that are not the result of the wrong." 569 U.S. at 35, 37; *see also Waggoner*, 875 F.3d at 106 (holding *Comcast* requires that plaintiff's damages model "actually measure damages that result from the class's asserted theory of injury"). "[C]ourts must conduct a 'rigorous analysis' to determine whether that is so." *Comcast*, 569 U.S. at 35. *Comcast* expressly rejected the proposition that "*any* method of measurement is acceptable so long as it can be applied classwide." *Id.* at 35-36.

Plaintiff has not advanced a damages model consistent with *Comcast*. Its expert admits that his report provides only "generic background information" on damages, much of which he lifted from a prior report by another expert in another lawsuit. This cookie-cutter methodology does not even mention the risk-materialization theory that Plaintiff has alleged. Nor does it address how any residual price decline on August 11, 2022, would be disaggregated among the Active Locations Claim and confounding information, including the Subway Transition.

**1.      Plaintiff's Expert Relies on a "Generic Background" Damages Model Copied from Another Expert's Report.**

The first flaw in Dr. Officer's damages methodology is that it is copied from another expert's report. In his report, Plaintiff's expert Dr. Officer asserted: "To assist me, I used

employees of Forensic Economics, Inc. who worked under my supervision and at my direction for this assignment." Officer Rep. ¶ 11. The reality is very different: Dr. Officer copied huge swaths of his own report verbatim (or nearly verbatim) from prior reports prepared by Forensic Economics' CEO, Frank Torchio. *See* Officer Tr. at 15:5-9 (identifying Mr. Torchio as CEO of Forensic Economics). And Mr. Torchio's opinions have been excluded by courts (including this Court) precisely because they lacked sufficient detail and were unmoored from the case at hand.

On May 28 and July 23, 2021, Mr. Torchio submitted expert reports in support of class certification in a securities action, *In re BofI Holdings, Inc. Sec. Litig.*, No. 3:15-cv-2324 (S.D. Cal.). Exs. AA, AB. Numerous paragraphs of Mr. Torchio's reports are identical or nearly identical to Dr. Officer's report. Exhibit K sets forth these similarities in detail. When presented with some of these passages at deposition, Dr. Officer admitted that he had likely copied passages from a report he signed in another securities action (*Schwab Capital Trust v. Celgene Corp.*, No. 2:20-cv-3754 (D.N.J.)), which were in turn copied from work by Mr. Torchio:

> Frank and I have worked together for a number of years on a number of things, and this particular sentence probably came from the *Celgene* report. And that may have been authored by me being -- having read some of Frank's reports also. This is generic background to what the damages methodology would be. It's not specific to this case.

Officer Tr. at 89:1-9. Dr. Officer's cookie-cutter approach is not good enough. A damages methodology copied from another case is not sufficiently tailored to this case to survive the "rigorous analysis" that *Comcast* demands. 569 U.S. at 35. "[W]ithout assurance beyond [Dr. Officer's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014).

It was particularly inappropriate for Dr. Officer to copy from Mr. Torchio, who has a

history of submitting unacceptably vague and general opinions at class certification. For example, Mr. Torchio submitted a class-certification damages opinion in *Loritz v. Exide Techs.*, 2015 WL 6790247 (C.D. Cal. July 21, 2015). Calculating damages in that case presented several issues (some of which are also present here): "(1) there are multiple alleged misrepresentations, (2) corrective information was allegedly disclosed at multiple times, (3) corrective information regarding different alleged misrepresentations was allegedly disclosed on the same day, and (4) some of the allegedly concealed facts arose or were made known to the company (and thus for the first time could have been disclosed) during the class period." *Id.* at \*22. But like Dr. Officer, Mr. Torchio's report did not address these issues and merely "discusse[d] general techniques for computing damages in securities fraud cases," failing "to tie these theories to the facts of this case or to each other—in other words, he fail[ed] to propose one model explaining how he would use these techniques in concert to calculate damages in this case." *Id.* Similarly, this Court rejected Mr. Torchio's class-certification opinion in *DeMarco v. Lehman Brothers*, 222 F.R.D. 243 (S.D.N.Y. 2004). There, Mr. Torchio sought to opine on price impact so plaintiffs could rely on the fraud-on-the-market doctrine. *See id.* at 248-49. But as the Court observed, Mr. Torchio's method had "virtually nothing to do" with the issue at hand and was "so transparently unreliable as to be inadmissable as a matter of law." *Id.* at 248.

Dr. Officer's opinion thus does not satisfy *Comcast*, warranting denial of class certification.

### 2. Plaintiff's Expert Has Not Provided Any Methodology Suitable to Measure the Alleged Risk-Materialization Damages.

The SAC pleaded loss causation for the Active Locations Claim by alleging "a materialization of the undisclosed risk of [Defendants'] repeated misreporting of Olo's active locations count." SAC ¶ 176. But Dr. Officer's report did not address damages from materialization of a risk. Officer Tr. at 61:8-11 ("Q. Well, you do make reference to the

22

materialization of an undisclosed risk in your report; don't you? A. I don't believe so."). He did not even know what the supposed risk was. *See id.* at 60:21-61:3. Instead, Dr. Officer assumed that he could use the same methodology as for a corrective disclosure. *See* Officer Rep. ¶ 162. Dr. Officer also did not address any of these issues in his supplemental report. *See* Suppl. Officer Rep. Dr. Officer's failure to even mention a risk-materialization theory of damages is fatal because there are special challenges with calculating damages based on such a theory.

*First*, it will often be inappropriate under a risk-materialization theory to measure front-end inflation using the back-end price decline. As Dr. Officer explains in his report, in a typical corrective-disclosure case, "artificial inflation is computed by starting with the losses measured from the declines in the stock price in reaction to each identified corrective disclosure." Officer Rep. ¶ 162. By contrast, "when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (i.e., on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015).

*Second*, and relatedly, a risk-materialization theory introduces potential differences among class members that need to be accounted for. Dr. Officer admitted at deposition that investors have different risk tolerances. Officer Tr. at 82:6-8. ("Q. You would also agree that not all investors have the same risk tolerance; correct? A. As a generic statement, sure."). As a result of this basic fact, there are some risk-averse class members "who would not have purchased the stock absent the misrepresented risk," and some risk-seeking class members "might have purchased the stock even assuming the true risk." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690 (5th Cir. 2015). While "the decline in the stock's value when the risk actually materialized" might appropriately measure

damages for the former, it would not for the latter, who "cannot be compensated for the materialization of a risk [they] may have been willing to take." *Id.*

Perhaps there is a damages methodology that could address these challenges in this case. But that is impossible to discern from Dr. Officer's opinions, which do not address them at all. Dr. Officer's silence on risk materialization warrants denial of class certification. Two recent decisions have denied class certification for precisely this reason: the plaintiff alleged a materialization-of-the-risk theory, but its expert relied on a boilerplate "out-of-pocket" damages methodology without addressing risk materialization. *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *23-25 (M.D. Tenn. Feb. 24, 2023); *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 590-91 (N.D. Cal. 2021). Denial of class certification should also be the result here.

### 3. Plaintiff's Expert Has Not Provided Any Methodology that Disaggregates the Active Locations Claim from Confounding Factors, Including the Subway Transition.

Yet another flaw in Dr. Officer's methodology is that it fails to explain how he would disaggregate the price decline on August 11, 2022, among the Active Locations Claim and confounding factors, including disclosure of the Subway Transition. The law requires plaintiffs to separate out confounding factors that might have contributed to a price decline. *See, e.g.*, *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2022 WL 151302, at *2 (2d Cir. Jan. 18, 2022) ("[P]roof of loss causation requires that plaintiffs disaggregate losses caused by disclosures of the truth behind the alleged misstatements from losses that result from other factors, such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events."). Dr. Officer agrees that "in general it is necessary to disaggregate out confounding information." Officer Tr. at 72:12-14; *see also* Officer Rep. ¶ 146 (explaining that "the researcher must attempt to exclude the effect of the confounding news").

Dr. Officer fails to disaggregate price inflation and damages between the Active Locations

24

Claim and confounding factors—including the disclosure of the Subway Transition, which the Court has held is not actionable. Plaintiff itself alleges that the disclosure of the Subway Transition was one factor contributing to the price decline on August 11, 2022. *See* SAC ¶¶ 171-174, 180, 194-197. And Dr. Officer admitted that it would be necessary to disaggregate price-inflation and damages between the Active Locations Claim and the Subway Transition:

> Q. But you would agree that any reliable damages methodology must be capable of separately estimating inflation associated with the active location bucket and the Subway allegations buckets; correct? A. Yes, it would need to do that.

Officer Tr. at 79:20-80:8. Critically, Dr. Officer testified that he did not even know ***how*** he would disaggregate these factors because the methodology was "situation specific":

> Q. So could you describe how you would separately do that here? . . . [A.] There's a section in my report that I think I just referred to earlier which broadly defines what would need to be done. I've done this in other cases, and it's very, very much situation specific as to what information you have and what you can use to disaggregate damages between various parts of the complaint and confounding information and so on and so forth. I can't outline for you right now what I would do. It would depend on what it looked like when I got to doing the work to do it.

*Id.* at 80:9-81:3.

Dr. Officer's stark admission that he cannot even "outline . . . what [he] would do" is fatal. As the Supreme Court held in *Comcast*: "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." 569 U.S. at 35. For this reason as well, Plaintiff cannot establish predominance and class certification should be denied.

## CONCLUSION

Defendants respectfully request that the Court deny class certification.

Dated:  October 13, 2023

Respectfully submitted,

OLO INC., NOAH GLASS, and PETER BENEVIDES

By their attorneys,

*/s/ Jennifer B. Luz*

Deborah S. Birnbach
Jennifer B. Luz
Katherine G. McKenney (*pro hac vice*)
Justin D. Ward
Brendan Blake (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
DBirnbach@goodwinlaw.com
JLuz@goodwinlaw.com
KMcKenney@goodwinlaw.com
JWard@goodwinlaw.com
BBlake@goodwinlaw.com

26