NAR8STEC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STEAMSHIP TRADE ASSOCIATION OF
BALTIMORE – INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION
PENSION FUND, Individually
and on Behalf of All Others
Similarly Situated,

                Plaintiff,

         v.                          22 Cv. 8228 (JSR)

OLO INC., *et al.*,

                Defendants.

------------------------------x

                                   New York, N.Y.
                                   October 27, 2023
                                   3:00 p.m.

Before:

                 HON. JED S. RAKOFF,

                                   District Judge

                       APPEARANCES

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
     Attorneys for Plaintiff
BY:  AMANDA F. LAWRENCE
     MANDEEP S. MINHAS
     ANNA HUNANYAN

GOODWIN PROCTER, LLP
     Attorneys for Defendants
BY:  JUSTIN WARD
     JENNIFER BURNS-LUZ

(In open court; case called)

THE DEPUTY CLERK:  Will everyone please be seated and will the parties please identify themselves for the record.

MS. LAWRENCE:  Good afternoon, your Honor.  Amanda Lawrence, from Scott+Scott, on behalf of lead plaintiff STA-ILA and the putative class.  With me is Mandeep Minhas and Anna Hunanyan.

THE COURT:  Good afternoon.

MR. WARD:  Good afternoon, your Honor.  Justin Ward, from Goodwin Procter, for defendants.  And I am joined by Jennifer Luz, also from Goodwin Procter.

THE COURT:  Good afternoon.

As you may have already noticed, we have here a group of very distinguished law students from NYU Law School, many of them are in the jury box, but the others are behind you, so you're surrounded.  And I trust you will meet their very high standards.

So, we are here on the question of class certification.  Just by way of brief background for our guests, the defendant, Olo, is a provider of software to restaurants, and the complaint, which is a securities class action, alleges that the defendants made false and misleading statements, both in respect to the number of it's so-called active locations, that is, the number of unique restaurant locations using at least one of the Olo's product modules; and second, that Olo

NAR8STEC

failed to timely disclose that one of its partners, Subway restaurants, intended to terminate its partnership.

At the motion to dismiss stage, I dismissed the second of those two claims. So we are now focused on the alleged misrepresentations about the number of active locations and the like.

So, against that background, let me hear first from plaintiff's counsel and then from defense counsel on class certification.

MS. LAWRENCE: Thank you, your Honor.

Again, Amanda Lawrence, from Scott+Scott, on behalf of plaintiff and the putative class.

Defendants here only challenge two elements of Rule 23. I thought I would walk through the elements quickly nonetheless knowing that there was a class here.

THE COURT: If they haven't learned the elements yet from my class action seminar, then I have failed miserably. I think they know the elements.

And you're right. So far as 23(a) is concerned, your adversary is only challenging two of those elements.

MS. LAWRENCE: That's right. They are challenging typicality and adequacy, but they are challenging those two on the same grounds. So I will address those two together.

And as far as 23(b) goes, they are making some challenges on predominance, but I will take the typicality

argument first, again, provided your Honor doesn't want to hear about numerosity and commonality and the like.

THE COURT:  I still have to find that those are satisfied, but they are uncontested in terms of this particular motion.

MS. LAWRENCE:  So the class is sufficiently numerous. There were over 1 million shares of Olo common stock traded during the class period.  In 10(b) cases, commonality is found by, common questions almost always exist.  Those include whether defendants made false and misleading statements, whether those statements were made with scienter and the like.

THE COURT:  I should also mention the fifth requirement, which is not in the rule itself but which has been opposed by the courts, ascertainability, is also typically satisfied in securities class actions because you have a list of who owns the stock.

MS. LAWRENCE:  Correct.  From the investor records we can get the list of shareholders.

So that leaves typicality and adequacy.

Here, Plaintiff STA-ILA, it's a pension fund on behalf of longshoremen in the city of Baltimore.  STA-ILA is both typical and adequate.  Importantly, in the Southern District, neither one of those are particularly demanding standards. They focus on the actions of the company and not that of the plaintiff.  And to be atypical, a class representative has to

NAR8STEC

be subject to unique defenses that threaten to become the focus of the litigation. Quite simply, none of those exist here. The claims of STA-ILA and the class arise from the same course of conduct -- the misstatements and omissions -- and the same legal theories, which are 10(b), and STA-ILA's interests are not antagonistic to those of other class members.

Now, defense counsel has argued in their papers that STA-ILA used an investment adviser, and the investment adviser's access to information beyond SEC filings and the like somehow renders STA-ILA atypical. That's simply not true. Even if -- the adviser's name is Brown Capital -- Brown Capital did have a conversation with management once during the class period, and with the investor relations department at Olo multiple times during the class period, that does not render STA-ILA atypical. There is copious amounts of case law that says that. One of them comes from this Court, and that's the *Petrobras* decision, where your Honor said that conversations with insiders or executives at a company are regular actions that an institutional investor takes in order to invest in a company. I would also refer the Court to Judge Cote's decision in *WorldCom* on that.

Defendants might then argue, or have argued, that somehow Brown Capital was made aware of the misstatements and omissions alleged in the complaint through information it produced in discovery. If you look at what these documents

say, and I am sure defendants are going to show them to you, they reveal small little snippets, somewhat tangentially at best related to the fraud.

For example, one of them says that Subway's airport locations won't be using Olo's products.  I would also note that that's in a public magazine; that's not a private document that only Brown Capital had access to.  That comes nowhere close to saying that for a large client the vast majority of them were not having 100 percent adoption of Olo's products and therefore the numbers were inflated.

Another one, a document they point to, says that franchises generally have freedom and flexibility in a certain category.  Again, that comes nowhere close to saying that left and right franchises simply were not adopting, and did not have to adopt, Olo's software.  And so, they shouldn't have been counted as active locations in the active locations count that was given to investors and publicly.

So, I would refer the Court to a case from the Northern District of California.  It's not in our brief so I will provide the citation.  It's *Boston Retirement System v. Uber*, 2022 WL 2954937.

THE COURT:  Did you inform your adversary you were going to cite this?

MS. LAWRENCE:  I did not.  If you don't want me to cite it, I don't need to.

NAR8STEC

THE COURT:  Well, I will let you cite it.  But if your adversary wants, I will give your adversary an opportunity to submit something after this argument about that case, if they want to.

MS. LAWRENCE:  Absolutely.  I apologize for that.  I was doing some last-minute research and found this case that I liked quite a bit.

There, it was alleged that it was conceivable that the plaintiff knew pieces of information related to the alleged omissions.  The court found that this was awareness of snippets of information and that it did not defeat class certification; that information, perhaps, went to a general issue, but not to the magnitude of the problems alleged in the complaint.

And that's exactly what we have here.  While there might be snippets that tangentially discuss locations at restaurants or franchises, just use of these magic words did not somehow reveal the fraud, and certainly not the magnitude of the fraud, to Brown Capital.

I was reviewing the exhibits that defendants put forth, in particular, Exhibit M, Exhibit N, and Exhibit O, and in each of these -- actually, also Exhibit P -- Brown Capital actually cited to the number of active locations that was provided publicly.  So they couldn't have been aware of the magnitude of the fraud if they are relying on the number that was publicly given.

NAR8STEC

The final argument defendants have made on typicality is that plaintiff, through Brown Capital, purchased shares after the end of the class period.  Defendants admit this is not enough to defeat typicality.  I am not sure why the argument has been made.  I would point out again that your Honor has denied those arguments for typicality in the *Monster* decision.  And all that means is that the plaintiff was willing to invest at a lower price, after the fraud was revealed, and not that the fraud was completely irrelevant to the decision to initially buy the stock at the inflated price.

So, for those reasons, STA-ILA meets both the typicality and the adequacy prongs, and every element of Rule 23(a) has been satisfied here.

THE COURT:  Let's turn to 23(b).

Of course, back in the day, before the Supreme Court decided *Basic*, class actions involving securities were often defeated because of the difficulty of showing reliance on the alleged misrepresentations, which would often vary considerably from person to person.  But then the fraud-on-the-market theory was promulgated, and then in *Halliburton* the Supreme Court affirmed the theory but said that it could be defeated by a proper showing at the class action stage.

So, as I understand the defense argument here, they are arguing, first, that this was not an efficient market; and second, that so far as damages are concerned, your expert put

NAR8STEC

together a methodology for determining damages based on the combination of the false statements that are still in the case and the other statements that I have now ruled out of the case, so we don't have a viable methodology of determining damages with respect to what is left in the case.

So what about all of that?

MS. LAWRENCE:  So, I am going to take them in reverse.

As far as the argument that your Honor just raised about damages, that's a disaggregation argument, that our expert, Dr. Officer, needed to disaggregate the amount of the loss that could have been attributable or was attributable to the Subway claims versus the active locations claims.

That simply is not required at the class certification stage.  Again, there is copious, copious case law that says that not removing confounding information in an event study like the one Dr. Officer did is simply loss causation by another name, and plaintiff is not required to jump this hurdle at class certification.  I admit, we have to jump that hurdle; it's just not at this point in time.  In fact, our expert report is due today where that hurdle gets jumped.

I am not disputing that does have to happen, and in this case, an excellent example, the Subway information, we don't deny it was confounding news, needs to be disaggregated. It just does not need to be done at the class certification stage.

NAR8STEC

THE COURT:  How is he going to do it, if you know?

MS. LAWRENCE:  I do.  I am going to say it broadly.

So, there is a way by looking at the amount of revenue that Subway contributed to Olo's total amount of revenue and backing that out from the revenue loss.

Now, obviously, there is an issue because we had argued that Subway, when we said Subway should stay in, constituted $6 million in Olo's revenue.  Defendants have argued $3 million.  So he is taking the conservative approach and backing out the $6 million.  And then it becomes a mathematical equation that I do not specialize in.

THE COURT:  They didn't teach you that at law school?

MS. LAWRENCE:  No.  I did not take that class.

So, that's my argument as far as disaggregation goes. And, again, the law is squarely on our side.  Even cases defendants cite for other propositions all say disaggregation is not required at the class certification stage.

THE COURT:  What about the efficiency of the market?

MS. LAWRENCE:  So, for price efficiency, our expert, Dr. Officer, what he did is he set out and satisfied certain factors that courts over the years have said can be indicative of an efficient market.  That's five *Cammer* factors, three *Krogman* factors, the *PolyMedica* factors.  This met every single one of those factors.

Defendants don't fault any of them, except for *Cammer*

NAR8STEC

Factor Five. And it's interesting. They don't dispute the methodology used by Dr. Officer in *Cammer* No. Five, or the steps that he used in his event study. What I understand them to be arguing, and I will let him explain exactly what he is arguing, is that the August 11, 2022, and there is a single corrective disclosure here, did not reveal any truth about the active locations. So, in fact, they are arguing there is a mismatch between the misstatements and the corrective disclosure.

Again, first and foremost, this is a loss causation argument. It's not even in disguise. It's just plain-out a loss causation argument. The Supreme Court in *Halliburton* made clear that loss causation is not addressed at the class certification stage. Scores of other cases have reiterated that.

Second, a corrective disclosure need not be a mere image of the misstatement. And I would cite the Court to the *Vivendi* decision where the corrective disclosure did not expressly recant earlier statements, and it was still applicable at the class certification stage.

Finally, I think this reveals a fundamental misunderstanding of the case by defendants, in that they are trying to lock us in to a corrective disclosure that comes out and absolutely corrects the number and provides the reasons why the math was wrong and what defendants were doing wrong over

the prior year.  That simply does not happen, nor is it required to happen in order for one to demonstrate price impact.

So that would be my argument on the efficiency of the market, your Honor.

THE COURT:  Very good.  We will come back to you for any other arguments you have.  I think it's time to hear now from defense counsel.

MS. LAWRENCE:  Thank you.  In case I don't come back up, I just want to make sure that STA-ILA asks to be appointed class representative as well.

THE COURT:  Yes.

MS. LAWRENCE:  Thank you.

MR. WARD:  Thank you, your Honor.  Justin Ward from Goodwin Procter.

So we would like, just because we haven't had a chance to look at the case that my friend on the other side mentioned --

THE COURT:  So send me a letter not to exceed one page, single-spaced, by 5:00 Monday saying anything you want to say about that case.

MR. WARD:  Very good, your Honor.  Thank you.

So, if it makes sense, your Honor, I would like to start with typicality and adequacy, which is the first reason why certification should be denied, and then move on to the

NAR8STEC

predominance requirement.

THE COURT:  Sure.

MR. WARD:  So, the plaintiff cited *WorldCom* in its remarks just now, and what I would like to point out is there is a lengthy block quote from *WorldCom* on pages 2 to 3 of the reply, but it leaves out the following sentence:  "There is no suggestion that any of the named plaintiffs had access to nonpublic information and learned that there was fraud afoot and decided nonetheless to invest in WorldCom."

And that's the precise circumstance we have here, and it's the ingredient that distinguishes this case from that case, from the Court's decision in *Petrobras*, and from other cases that plaintiff is relying on.

And to see that, I draw your Honor's attention to the first page of the moving brief that plaintiff submitted on this motion, which lays out five categories of misrepresentations.

Well, one of those is the following:  Plaintiff claims that defendants "falsely stated that Olo on-boards all restaurant locations within each of Olo's brand clients."

But Brown Capital knew that wasn't true, and we just heard from plaintiff's counsel why.  An internal Brown Capital memorandum from November 5, 2021, before the first purchase of Olo stock that Brown Capital made on plaintiff's behalf, said that "all of Subway's 20,000-plus locations will not be using Olo, as some are not addressable, such as those in public

NAR8STEC

transit areas, like airports, metro train stations, etc."

So, that's one of the alleged misrepresentations where Brown Capital knew the truth.

Next, plaintiff claims that defendants "falsely stated all restaurant locations go live all at the same time."

Here is another Brown Capital memorandum, this one from October 15, 2021, and this was what Brown Capital described as its full report with its research before making an investment decision.  It says, "For recently signed customers, it takes a while for all restaurants to come online.  The progression might occur with company-owned and then franchise restaurants or by specific geographic regions, but oftentimes not all at once."

Next, plaintiff claims the defendants "falsely stated that certain restaurant brand clients had been fully on-boarded."

The same memorandum I just referenced said, "Subway, for example, has over 22,000 restaurants, but it is only using one Olo product, and so far only a small percentage of their stores have launched on the Olo platform."

And to contextualize that statement, your Honor, Subway was first announced as an Olo client in February 2020.  So we are now a year and a half later and Brown Capital knew that only a small percentage --

THE COURT:  Assuming for the sake of argument that

Brown Capital knew some of what plaintiffs allege was the fraud, but not all.  Assume that for the moment.  Wouldn't this plaintiff still have the same basic incentives to prove fraud that the class as a whole would have, and so why wouldn't it be an adequate plaintiff?

MR. WARD:  Well, because it's not guaranteed, and in fact far from guaranteed, that every misrepresentation in this case is going to survive summary judgment.  In our view, none of them should, but it's certainly possible that some might and some might not.  If that happened, there would be a trial.

So, for example, say that the only misrepresentations to survive to trial were the three that I just read.  Then this plaintiff would have very little incentive to vigorously prosecute the claims, yet there could very well be other plaintiffs that did have an incentive to do that.  And that's precisely why this plaintiff is not adequate or typical.

Again, the first page of the moving brief lays out five categories.  Three of those five we know Brown Capital had contrary information.  And again, that's based on discovery to date.  The fact that there is the potential that two others could survive notwithstanding that, two out of five is not a passing grade, your Honor.

And I would add on top of that, what is the standard here?  And your Honor in the *Sonar Capital* case laid that out.  It's not that we have to prove that the unique defense is

meritorious.  To the contrary, we need to show that it is meritorious enough to require the plaintiff to devote considerable time to rebut it.  And I feel fairly confident saying with this plaintiff reliance will be an issue at summary judgment, reliance will be an issue at trial, in light of what we know about Brown Capital.

I do want to speak very briefly about the other elements.  It is also true that Brown Capital used nonpublic sources of information.  It's interesting that I heard plaintiff's counsel say for the first time that some of this information was available in public magazines.  I confess that wasn't something that I'd heard before.  I am not sure that's clear from the record that this information came from a public magazine.  But I don't think we know where Brown Capital got each of these pieces.  I think some of them were from conversations with Olo investor relations, some of them were from other places.  But beyond that, Brown Capital conducted a lengthy analysis, over six months, of sources of information, including nonpublic sources.  As a result of that, it came to the view that Olo was an exceptional growth company and that, according to Brown Capital, it reached that decision not looking at stock price, but based on the fundamentals of the company.

We also know that it purchased a broad range of prices, $29 and under $10 during the class period, and it

NAR8STEC

continued purchasing after the class period.  So why would it do all that?  We think the evidence shows that it's because it was not relying on the misrepresentations.  It wasn't relying on the integrity of the marketplace.  And while plaintiff takes a divide-and-conquer strategy and says, well, any one of those things in isolation isn't enough, that's not the law.  The law is to look at all these things together.

And I draw the Court's attention to the *Baffa* case by the Second Circuit, where there was one putative class representative who was a sophisticated broker with access to more information than other investors, and who had bought the issuer stock after a decline in value.  And the Second Circuit held, while perhaps no one facet of that investor's claim rendered it atypical, her status as a professional broker and the defenses to which she was subject convinced us it was within the district court's discretion to reject her as a class representative.

And similarly here, particularly when the access to nonpublic information, contrary to the claim, is combined with the other facts in the record, we think it is a compelling case that there is a unique defense, that it will have to be the subject of extensive time in this litigation going forward.

So, if there are no further questions on that, I will move forward to the next piece, which is predominance.

THE COURT:  Go ahead.

MR. WARD:  I think that our predominance argument is slightly different than your Honor characterized it.  We are not challenging market efficiency.  What we are challenging is price impact, and that is distinct in the case law.  And the Supreme Court has held defendants can challenge price impact without challenging market efficiency.

And the Supreme Court in the *Goldman* decision from 2021 made one thing very clear that I would like to say at the start.  And that is that, when it comes to price impact, the Court must be open to all probative evidence, regardless of whether it overlaps with the merits issue.

So, in that case, the merits issue was materiality --

THE COURT:  I am familiar with that doctrine.  Early in my judicial career I wrote an opinion saying that you could address the merits in a class certification, to the extent that they bore on class certification issues, and I was initially reversed by the Second Circuit, but then the Second Circuit reconsidered and said, come to think of it, I was right.  I was very disappointed they didn't publicly apologize to me, but nevertheless, I am familiar with the doctrine you're referring to.

MR. WARD:  But this goes directly to the point that opposing counsel made earlier, which is that somehow our price impact argument is loss causation in disguise.  There certainly is overlap, but the mere fact that there is overlap does not

NAR8STEC

mean it's out of bounds.  And we need only follow the guidance from the *Goldman Sachs* decision.

To step back here, what do we mean by price impact? Price impact means the impact that the misrepresentation has on the value of the stock.  But in this case, as in almost all security cases, that price impact isn't being observed at the front end when the misrepresentation occurs; it's being observed at the back end.  And so you look at the price decline following the corrective disclosure, and you say the theory that plaintiff's counsel advances is that's a measure of the front end price inflation.

But as the Supreme Court held in *Goldman*, that inference that the back end price drop equals front end inflation starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure.  And there are several cases, and we cite two of them in our briefs, *Signet Jewelers* and *Intuitive Surgical*, where courts found that price impact was rebutted precisely because the alleged corrective disclosure wasn't actually corrective, and on that basis, the *Basic* presumption was rebutted.

In this case, the alleged corrective disclosure on August 11, 2022 simply said nothing that corrected the earlier alleged misstatements about active locations.  In fact, far from correcting the prior disclosure about active locations, it

NAR8STEC

repeated the prior statements about active locations. And I am going to start with a statement from the --

THE COURT: There is such irony. Because what you're saying in effect is, if the earlier statement was a fraud, by gosh, we continued the fraud in this statement. So the fact that the price went down was not because of the disclosure of the fraud. But go ahead.

MR. WARD: Of course, we are very confident there was no misrepresentation about active locations, your Honor, but I take your point about the irony of it.

This is from pages 27 to 28, where Olo disclosed that it had "approximately 82,000 active locations as of June 30, 2022, up from approximately 74,000 active locations as of June 30, 2021." That 74,000 active location number was the exact same number that had been disclosed a year earlier. So not only did the company not say that number was false, it repeated the number and said, by gosh, our active locations have grown.

So what did the equity analysts say? Did they look at the company's disclosure and interpret it to mean, Oh, my goodness, we have been wrong this whole time about the company's active locations, the company has been lying to us? No. There is not one word in any of the analyst reports that suggest, hint, that any of the prior disclosure was wrong. If you look at page 18 of our brief, we included a table from one of those analyst reports that repeats the prior active

locations number as an accurate representation of the company's performance and continues to rely on them.

What I would like to emphasize, your Honor, this is a preponderance of the evidence standard. Your Honor is sitting as fact finder and looking at the evidence on both sides. And as the Supreme Court observed in *Goldman*, while defendants bear the burden on this issue, that issue only matters when the evidence is in equipoise.

So you have seen what is on defendants' side of the scale, which we submit is clear, persuasive evidence that there was no corrective disclosure and therefore these misrepresentations couldn't have had a price impact.

So what is on the other side of the scale? And the answer is nothing. Plaintiff has chosen to put in no evidence of price impact. Plaintiff's expert testified at deposition that he wasn't addressing price impact at all. So instead of providing evidence, plaintiff has provided argument.

First, plaintiff says, well, the number of active locations was flat, stated at 82,000. But the company explained why it was flat. On the earnings call that day, August 11, 2022, Olo said, while we added roughly 3,000 new locations to the platform this quarter, net new locations were impacted by a portion of the Subway locations coming off the platform; that is, but for the Subway transition, which your Honor has already held is in-actionable, active locations would

NAR8STEC

have continued to increase.

Second, plaintiff asserts that Olo disclosed it would have virtually no active locations for 2022.  But that's not true.  The second amended complaint itself, in paragraph 171, says that Olo projected 4,000 additional locations over the remainder of the year.  So to put that in context, 4,000 out of 82,000 is roughly five percent.  That's over six months.  So an annualized growth would be in the order of 10 percent.  I think the Court would be hard-pressed to find an investor to think an annual growth of 10 percent is virtually no growth.

The third thing plaintiffs point to is the revenue guidance.  And they say the revenue guidance was lower and that had some connection to the active locations.  That somehow means something about the historical active locations was wrong.  And that's something they have alleged before.  It seems to have gotten them past the motion to dismiss, but this is an evidentiary hearing.  This is an evidentiary motion and there was not a shred of evidence in the record that the decision to lower guidance had anything to do with an historical error in active locations.  Plaintiff has taken months of discovery, seven depositions, lots of documents.  There is nothing in the record that shows guidance was changed because of some kind of historical inaccuracy about active locations.  And if that evidence existed, it could have been put into the record.

NAR8STEC

So for all of those reasons, defendants submit they have rebutted price impact and class certification should be denied on predominance grounds.

But there is another problem, and that's the lack of a viable class-wide damages methodology. And to start, I want to clarify our argument, because I don't think that it was characterized quite correctly by plaintiff's counsel. We are not saying that their expert needs to disaggregate. Their expert doesn't need to disaggregate, doesn't need to put forth damages calculations, doesn't need to say what percentage is going to go to Subway versus what percentage is going to go to active locations. But the expert needs to tell us how he is going to do it. And that's what the Supreme Court held in *Comcast*. That it's not enough to have the damages model that can be applied class-wide. It has to measure only those damages attributable to plaintiff's theory of liability.

And the report that plaintiff has submitted simply doesn't do that. It's largely generic, cooker-cutter information that could be said in any 10b-5 case, and it simply does not say anything about this case. In fact, if you look at section 7 of Dr. Officer's report, the only paragraphs that say anything in that section, which is 46 paragraphs long about this case, are paragraphs 165, 166 and 167, and all they provide is a very thumbnail overview of plaintiff's allegations.

NAR8STEC

And when we asked Dr. Officer about some of those allegations in his deposition, he said he didn't know what they meant.  So, for example, we asked him about, in paragraph 167 of his report, does that refer to a corrective disclosure about the number of active locations?  And he said, I'm not sure.  I haven't gotten far enough into this to actually assess the corrective disclosure, in terms of things like economic correspondence, loss causation, and so on.  That wasn't part of my assignment.

And there are two particular issues here that should have been addressed in some way and weren't.  The first is materialization of risk.  And on that issue, I refer your Honor to a case in our brief, a relatively recent decision from the Middle District of Tennessee, the *AAC Holdings* case, that is directly on point.  The plaintiff in that case relied on a materialization-of-risk theory of harm.  If you look at paragraph 176 of the second amended complaint, plaintiff at least purports to rely on such a theory here.  And what the *AAC Holdings* case said was, it's not good enough for the expert to say nothing about that theory of liability.  But that's what plaintiff was doing.  And that is directly on point.  Plaintiff argues that that case was wrongly decided and cites to a case called *Junge v. Geron Corp.* out of the Northern District of California.  I am happy to discuss that in more detail, but we think that *AAC Holdings* addressed that Northern District of

NAR8STEC

California decision.  It's footnote 27 of the *AAC Holdings* case.

THE COURT:  I will take a look at it.

MR. WARD:  And then, there is also the disaggregation issue.  Again, your Honor is well aware of it.  Your Honor identified it as a key issue in this case in your prior decision on the first motion to dismiss.  Again, we aren't saying that it has to be done at this stage, but we have to have some idea how it's going to be done.

THE COURT:  You say there has to be a methodology that could perform that task even if it hasn't yet been performed.

MR. WARD:  And there is some discussion.  I think it's in paragraph 140, thereabouts, to 145.  I will confirm that's the right paragraphs.  But those are among the paragraphs that were taken, for lack of a better word, from another expert's work, which the point is it's not tailored to this case.  It says nothing about this case.  It's extremely general.  It says how in other cases analysts sometimes --

THE COURT:  Forgive me for interrupting.  Something I had not focused on, if I understand what plaintiff's counsel said earlier, there is going to be a new expert report issued tonight.  So maybe I need to give each of you a chance to address the new expert report because that might or might not provide the methodology you say is lacking in the current report.

NAR8STEC

MR. WARD:  Respectfully, your Honor, our position is that the time for that has come and gone.  We started this process months ago.  Plaintiff saw our arguments when we filed our opposition to the initial motion for class certification.

THE COURT:  Timeliness is relevant.  But assuming I disagree with that, and it's not my style to delay things, but assuming arguendo, and I wasn't aware till now that there was going to be a new report tonight, but assuming that there is a new report, if I didn't reject it as untimely, I would give you a chance to have a brief deposition with respect to it, and then maybe put in submissions to me.

Now, of course, if I reject class certification on other grounds, this becomes moot.  But if I don't, it could be an important determination, and I am not sure why timeliness would be so critical there if I gave you the opportunity to examine the report and examine the reporter.

MR. WARD:  Your Honor, I understand the point.  But I think what we would say is there is a tremendous investment of resources that is occurring in this case.  That's a merits expert report.  Our merits expert will begin analyzing it, forming responses.  There is active efforts to complete the remaining discovery in this case.  If this case isn't going to proceed as a class action, we think the time is ripe to decide that issue.  Again, especially because plaintiff had essentially, through no one's fault, a do-over of the class

certification motion and could have corrected this issue if it had wanted to, we think given the investment of resources that is occurring in this case, it would not make sense to give plaintiff essentially a third bite at the apple to correct the flaws in its class certification report.

THE COURT:  I will certainly consider that.  I assume your firm is being paid by the hour.  So it's interesting to hear you complain about having to spend some more hours.

MR. WARD:  I am an associate.  So I am not paid on an hourly basis.

THE COURT:  You're an associate?

MR. WARD:  Yes.

THE COURT:  You should be a partner.  You're very articulate.  I think you should go right back to your firm, regardless of the outcome of this motion, and tell them that you have been judicially declared the equivalent of a partner and what's wrong with them.

MR. WARD:  I will send a copy of the transcript to the partnership committee.

THE COURT:  Anyway, let's get back to the argument.

We are running a little bit late.  I want to hear from plaintiff's counsel.  So let me hear from plaintiff's counsel, and we will come back for one final statement from defense counsel.

MR. WARD:  Thank you, your Honor.

NAR8STEC

MS. LAWRENCE:  I just want to clarify the expert report first.  The expert report that is being submitted today is not a class certification report.  The case management order that your Honor entered has merits expert reports due today, and it sets forth a deposition calendar.  And I believe your disclosure of your report is due today too.

THE COURT:  Whatever.  I will go back and look at all of that.  I guess what I am getting at is this.  And I am not sure this will be even necessary.  But assuming for the sake of argument that I thought you had otherwise satisfied me as to class certification, but I wasn't convinced that your expert had identified a methodology sufficient to ascertain what damages are attributable to the remaining claims in this case, I would be tempted at least in that situation to give you another shot at that, if that were the only remaining issue, to see if you could come up with a methodology or not.  So whether it's in his report tonight or in some future report, I am not saying I am going to do that, but that at least was what I was flagging as a possible issue.

MS. LAWRENCE:  I just wanted to make sure the Court understood we weren't trying to submit a third bite at the apple.  This was pursuant to the case management order.  It doesn't say that a methodology or calculation of damages is possible on a class-wide basis.  It does it because that's what you do at the merits stage.

NAR8STEC

THE COURT:  I understand.

MS. LAWRENCE:  Let me go back to typicality.

THE COURT:  It is true, don't you agree, that nevertheless, at this stage, you have to identify a methodology that will show that the damages are ascertainable?

MS. LAWRENCE:  Correct.  And he did that.  He did an out-of-pocket methodology with an inflation ribbon, which is universally accepted in 10(b) cases.  He doesn't go as far as defendants want him to go because it's the class certification stage.

Let me just quickly go through the typicality.

So the *WorldCom* quotation that defense counsel read said that there was no allegation that plaintiff knew fraud was afoot.  There is absolutely no suggestion here that Brown Capital knew fraud was afoot.

THE COURT:  Presumably, it would never have recommended purchase if they knew.

MS. LAWRENCE:  One would hope.  However, in a number of defendants' cases where plaintiffs are found atypical, I was surprised to find out that these were individuals that purchased after frauds were publicized, announced.  The *Baffa* case, the company had filed for bankruptcy because of the fraud and the woman still purchased shares.

THE COURT:  That's a different point.  You could see short sellers, whatever.  But my point is, I see no reason to

NAR8STEC

assume that your adviser, who has a fiduciary duty to you, would not tell you if they had concluded they had determined it was a fraud.

MS. LAWRENCE:  That's correct.  And in the quarterly memos to STA-ILA, Brown doesn't say anything about that.

So what defendants have pointed to is that Brown Capital knew that Subway, one client, which they have argued wasn't a material client, and were successful in that argument, wasn't using Olo products at airport locations, and that Subway was only using one product, which was the rails product, which we allege was fully known.  That's not a part of this case.  We don't dispute that Subway only used rails and that that was publicized left and right.

If you look at the documents that defendants point -- I should be a bigger person and not do this, but it's in Exhibit N, it's in defendants' own exhibit where it says, just after the quotation that defendant cites, "This passage is from an article in QSR magazine."  So I didn't make that up. So this is from public information.

Again, I would point your Honor, that in the exhibits that defendants have put forward somehow revealing the fraud, Brown Capital says, I think Olo has something like 79,000 locations in the United States.  Again, that's exactly from the public representations given by Olo.  And it cites to the company saying that Olo grew customer locations by 20 percent

in 2019 and 52 percent in 2020. So in no way was Brown Capital aware of any of the fraud, let alone the magnitude of it.

And I point out that defense counsel said that reliance of STA-ILA would be an issue at trial. It's not that it would be an issue. It's an issue for anybody. It has to become the focus of the litigation. And we don't have that here.

As far as the access to nonpublic information goes, defendants want it to be this mountain of secret information that Brown Capital was somehow privy to. What we have here is one call with management during the class period, one meeting with one customer, Denny's, that the Brown representative testified lasted maybe an hour, and a subscription to Tegus, which is an online portal where you can get copies of interviews and reports. I have a subscription to Tegus and I am in no way a sophisticated investor. So this is the mountain of secret information that Brown Capital somehow had, and it in no way rises to the level of STA-ILA being atypical.

Now, moving on to 23(b)(3), for price impact, defendants have somewhat obsessed over the *Goldman* case from the Supreme Court. And I just don't see how that is relevant here. What the *Goldman* case said was that at the front end you had these very generic misstatements about controls, and on the back end you had these very, very specific disclosures, and that the two didn't really match and that made it harder at

class certification.  Defendants have never said we had that issue here.  So I don't understand how the *Goldman* case applies.  And I am not going to cite the cases, but there are a number of extremely recent -- one is from August 8 from the Eastern District -- cases saying just that about *Goldman*.  That it's really not that revolutionary to class certification.

Defense counsel for price impact cited both *Signet* and *Intuitive*, both of which are in their brief.  I never understand why they cite these, because in *Signet*, Judge McMahon certified the class, and in *Intuitive*, Judge Davila also certified the class, as should happen here.  And again, their price impact argument is just a loss causation argument in disguise.  The fact that they say that we put forth no evidence of price impact is especially curious given the fact that they did not put up a rebuttal expert.  They had a chance to put up a rebuttal expert, indeed, in most 10(b) cases defense put up rebuttal class cert experts, and they didn't do it, to rebut Dr. Officer's price impact analysis.

As to damages, they spent a lot of time quoting what Dr. Officer said.  And what he actually said when asked is:

"Active locations are, in your point, alleged to have been corrected on August 11, correct?"

And he answered:  "That is my understanding."

That is all that is required at this point in time.  His assignment was not to address loss causation.  That

NAR8STEC

assignment is today, but that was not his assignment for this report.

Now, defense counsel likes to cite the Middle District of Tennessee case and brushed over the *Junge* case, and that's from Judge Alsup and that's 2022 WL 1002446.  It is cited in our brief.  And I would encourage your Honor, especially if you are going to read *AAC*, to take a close read of *Junge*.  Because defendants there likewise said that plaintiffs did not identify a corrective disclosure and that the theory of liability was, therefore, somehow cabined or limited to materialization of the risk.  Judge Alsup noted that materialization of the risk was, again, a loss causation argument and it was totally inappropriate to make that argument at the class certification stage.  Judge Alsup was particularly critical of the *AAC* and *Mulderrig* cases, which defendants rely upon, saying that they were in the vast minority and that his court sided with the majority.  And finally, I would note that in *Mulderrig*, which is the sister to *AAC*, the class was certified on an out-of-pocket damages methodology.

Again, this is just loss causation dressed up as some other animal.  Loss causation will be addressed.  It's being addressed as we speak right now, and it is completely inappropriate at the class certification stage.  Dr. Officer was clear in his report that these things could be done, such as disaggregation, but that he wasn't assigned to do it at that

NAR8STEC

juncture.  And that was what was required at that point in time.

THE COURT:  All right.

MS. LAWRENCE:  Thank you, your Honor.

THE COURT:  Thank you very much.  And I will hear finally from defense counsel.

MR. WARD:  Thank you, your Honor.  I will try to be very brief.

First, on Exhibit N, I think my friend and I are just reading the document differently.  I think that the passage that I quoted comes after the beginning that says this is from Olo IR.  And then there is a second quote further down the page that says this is from a magazine.  That's a different quote and not the one that I read.  So I think we just disagree with that.

THE COURT:  Well, clearly, my decision in this case is going to turn on the determination of this dispute.

MR. WARD:  Your Honor, you never know.  The devil is in the details.

On *Signet* and *Intuitive*, I want to make the point there were multiple corrective disclosures in those cases.  And I actually think the outcome points the other way.  The court went disclosure by disclosure and analyzed for each one whether it was actually corrective.  So what it actually shows is that, this is not a loss causation argument in disguise, and that

there needs to be careful attention to each alleged corrective disclosure to see, is it actually corrective and is there actually a showing of price impact from the earlier misrepresentations as a result?  So we think those cases strongly support our argument.

I also want to note that plaintiff's counsel made a reference to us rebutting Dr. Officer's price impact analysis. Just to be clear, Dr. Officer did not conduct a price impact analysis.  There wasn't one so there was nothing for us to rebut.

Then, on *Junge*, again, I think *AAC Holdings* discusses that case.  I will just point out that we believe the argument that *Junge* made, that there is this line between loss causation and liability, doesn't really make sense to us.  Of course, in evaluating damages, the theory of causation is critical to determine what the appropriate modicum of damages is.  And again, it's not that a class certification report needs to actually conduct a loss causation analysis, but it needs to present a theory of damages that is tied to the theory of liability, and loss causation is a critical part of that.

So, again, we are not saying that loss causation should be addressed or must be addressed.  But to the extent it is necessary to provide a class-wide damages model, and overlaps to that extent, it should be addressed.

Those were the only points I wanted to make.

NAR8STEC

THE COURT:  That's very helpful.  And I want to compliment counsel for both sides.  I thought this was an excellent argument.

I want to mull over the various points that have been made, but I do want to move things along.  So I will get you a bottom-line decision by November 15.  I will try to get you a full opinion by then, but I can't guarantee that.  And then we will see where we proceed accordingly.

Again, my thanks.  And I also want to express my thanks to the students.  We will have our normal class on Monday.  We will obviously not discuss the merits of this matter, but I might discuss with you things about, did you think the lawyers' style was good, bad, so forth?  We won't tell you, but we will just publish it on the net.

Very good.  And we will see you guys on Monday.  And thank you to counsel again.

This matter is concluded.

(Adjourned)